IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GLOBAL POWER EQUIPMENT<br>GROUP INC., *et al.*,<br>　　　　　　Debtors. | Chapter 11<br>Bankruptcy Case No. 06-11045<br>Jointly Administered |
| MITSUBISHI POWER SYSTEMS<br>AMERICAS, INC.,<br>　　　　　　Appellant,<br><br>v.<br><br>DELTAK, LLC,<br>　　　　　　Appellee. | Civil Action No. 06-687<br><br>Appeal from the United States Bankruptcy<br>Court for the District of Delaware<br>(The Hon. Brendan L. Shannon) |

**BRIEF OF APPELLANT**
**MITSUBISHI POWER SYSTEMS AMERICAS, INC.**

Marc J. Phillips (No. 4445)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

Filiberto Agusti
Greg Yates
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)

*Counsel for Appellant*
*Mitsubishi Power Systems Americas, Inc.*

November 13, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

JURISDICTION ................................................................................................................... 1

ISSUE PRESENTED AND STANDARD OF REVIEW ..................................................... 1

STATEMENT OF THE CASE ............................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................... 5

STATEMENT OF FACTS .................................................................................................. 8

ARGUMENT ..................................................................................................................... 16

I.      The Bankruptcy Court's Ruling That Specific Performance Is Not Permitted Under The Bankruptcy Code Was Incorrect As A Matter Of Law ............................................................... 16

II.     MPS Is Entitled To Specific Performance Of The Assignment Covenant Under Oregon Law ..... 25

III.    Section 365 Is Not Intended to Be a Leverage Tool For Debtors .................................. 29

IV.     Because Time Is Of The Essence, This Court Should Order The Requested Relief ............... 33

CONCLUSION .................................................................................................................. 33

i

# TABLE OF AUTHORITIES

## CASES

*Airline Pilots v. Continental Airlines*, 125 F.3d 120 (3d Cir. 1997)................................................22, 23, 24

*In re Armstrong World Industrial*, 432 F.3d 507 (3d Cir. 2005)...................................................................1

*Association of Public-Safety Communications Officials-International v. F.C.C.*,
    76 F.3d 395 (D.C. Cir. 1996)...............................................................................................................30

*Belleville v. Davis*, 498 P.2d 744 (Or. 1972)..............................................................................................26

*Chemical Ltd. v. Slim-Fast Nutritional Foods*, 350 F. Supp. 2d 582 (D. Del. 2004)...................................25

*In re Drexel Burnham Lambert Grp.*, 138 B.R. 687 (Bankr. S.D.N.Y. 1992) ............................................16

*In re Fleishman*, 138 B.R. 641, 648 (Bankr. D. Mass. 1992).....................................................................27

*In re General Datacomm Industrial*, 309 B.R. 848 (D. Del. 2004)................................................................1

*Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889 (8th Cir. 1944).......................................................22, 28

*Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043 (4th Cir. 1985)............................19, 22

*Ohio v. Kovaks*, 469 U.S. 274 (1989).................................................................................................22, 23, 24

*Paullus v. Yarbrough*, 347 P.2d 620 (Or. 1959).........................................................................................26

*Pittenger Equip. Co. v. Timber Structures, Inc.*, 217 P.2d 770 (Or. 1950) ................................................26

*Sir Speedy, Inc. v. Morse*, 256 B.R. 657 (D. Mass. 2000)........................................................16-22, 24, 27

*In re Taylor*, 913 F.2d 102 (3d Cir. 1990)...................................................................................................1

*In re The Ground Round, Inc.*, 335 B.R. 253 (1st Cir. B.A.P. 2005) ............................16-19, 21, 22, 24, 25

*In re Torwico Electronics*, 8 F.3d 146 (3d Cir. 1993) ................................................................................24

*In re Walnut Associates*, 145 B.R. 489 (Bankr. E.D. Pa. 1992) ......................................................16-22, 24

*In re West Chestnut Realty*, 177 B.R. 501 (Bankr. E.D. Pa. 1995) ...........................................17, 21, 22, 25

## STATUTES AND RULES

11 U.S.C. § 365 ................................................................................................................*passim*

28 U.S.C. § 157(b)....................................................................................................................1

28 U.S.C. § 158(a)(1) ..............................................................................................................1

28 U.S.C. § 1334 .....................................................................................................................1

Or. Rev. Stat. Ann. § 72.7160(1) & cmt. 2 (West 2006)....................................................25, 26

Fed. Bankr. R. 4001(b) ..........................................................................................................13

Fed. Bankr. R. 8002(a) ............................................................................................................1

## MISCELLANEOUS

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*,
    59 U. Colo. L. Rev. 845, 931 (1988)................................................................................16

## JURISDICTION

Appellee Deltak, LLC's motion to reject its contract with Appellant Mitsubishi Power

Systems Americas, Inc., was a core bankruptcy proceeding under 28 U.S.C. § 157(b). The Bank-

ruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334. The Bankruptcy Court's order

allowing rejection of the contract, and denying Mitsubishi's objection seeking assignment of Del-

tak's subcontracts, was a final order.[1] This Court has appellate jurisdiction under 28 U.S.C.

§ 158(a)(1). The final order (R.289) was docketed November 9, 2006. Mitsubishi's notice of

appeal (R.270), filed November 7, 2006, was timely under Fed. Bankr. R. 8002(a).

## ISSUE PRESENTED AND STANDARD OF REVIEW

This appeal presents a single issue of law under the Bankruptcy Code:

> **Where a debtor's executory contract contains a remedial covenant spe-
> cifically intended to govern the relationship between the parties after the
> contract ends, may a Bankruptcy Court condition the debtor's rejection
> of the contract on specific performance of that covenant, where the cove-
> nant imposes no burden, cost, or substantive obligation to perform on the
> debtor, but failure to perform the covenant would severely harm both the
> counterparty to the contract and the bankruptcy estate?**

The Bankruptcy Court denied relief because it believed the Code did not permit specific

performance of such a covenant.[2] Whether the Code allows such relief is a question of law, re-

viewed *de novo*.[3]

## STATEMENT OF THE CASE

Appellant Mitsubishi Power Systems America ("MPS" or "Mitsubishi") manufactures

and distributes power generation systems for electric utilities. MPS contracted with Debtor Del-

tak LLC ("Deltak"), for Deltak to manufacture and deliver a major component of a cogeneration

---

[1] *See In re Taylor*, 913 F.2d 102, 104 (3d Cir. 1990).

[2] R.293 (11/6/2006 Tr.) at 13-14.

[3] *See, e.g.*, *In re Armstrong World Indus.*, 432 F.3d 507, 511 (3d Cir. 2005); *In re General Datacomm Indus.*, 309 B.R. 848, 851 (D. Del. 2004).

1

power system called a Heat Recovery Steam Generator (or "HRSG"), for installation at a new

power plant in Oregon.[4] Deltak, in turn, contracted with two subcontractors for the manufacture

and delivery of two major components of the HRSG called "Catalysts," which remove pollutants

from the HRSG's exhaust output.[5] The contract between MPS and Deltak provides that in the

event of Deltak's default, Deltak will assign its subcontracts to MPS.[6]

 HRSGs and Catalysts are massive pieces of custom-designed equipment, that are useful

only for the specific applications for which they were designed—in this instance, installation at

the new Oregon power plant. In this case, the HRSG has largely been completed and delivered.

The only remaining major pieces to be delivered are the Catalysts, which have been completed by

the subcontractors and are awaiting delivery.[7] The subcontractors have no obligation to release

the Catalysts for delivery until they have been paid by Deltak.

 On September 28, 2006, Deltak, along with its parent and affiliates, filed for Chapter 11

reorganization, with the stated intention of winding down and terminating Deltak's HRSG busi-

ness.[8] On September 29, 2006, Deltak moved to reject its HRSG contract with MPS under Bank-

ruptcy Code § 365.[9] MPS consented to immediate rejection, but asked the Bankruptcy Court to

require, as a condition of rejection, that Deltak perform its covenant to assign the Catalyst sub-

---

 [4] As its name suggests, a Heat Recovery Steam Generator recovers heat from the exhaust of the power plant's main turbines, and uses that heat to generate additional electricity. R.264 (11/1/2006 Tr.) at 84 (Thangiah).

 [5] R.264 (11/1/2006 Tr.) at 85, 90 (Thangiah).

 [6] R.159 Ex.4 ¶¶ 29.2.2, 29.2.3 (under seal) (Purchase Agreement For Heat Steam Generator And Auxiliaries For The Port Westward Generating Facility ("HRSG Purchase Agreement")).

 [7] R.264 (11/1/2006 Tr.) at 32 (Ehm); *id.* at 91, 100-01 (Thangiah); *id.* at 117 (Boukal).

 [8] R.1 (Petition).

 [9] R.12 ¶ 26 (Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress ("Rejection Motion")).

contracts to MPS.[10]

Because of their custom design, the Catalysts have no commercial value to anyone other than MPS.[11] None of Deltak, the bankruptcy estate, or the subcontractors has any other ready purchaser for the Catalysts. At the same time, if MPS does not take on-time delivery of the Catalysts, which are completed and awaiting shipment, then MPS' customer, Portland General Electric ("PGE"), will face needless delay in construction of its power plant, and MPS will face massive damages claims from PGE and its prime contractor, including but not limited to escalating liquidated damages of tens of thousands of dollars per day. The bankruptcy estate will also incur massive damages, not only to MPS for failure to deliver the Catalysts on time, but also to the subcontractors for failure to purchase them. All of these harms may be avoided, at no cost whatsoever to Deltak or the bankruptcy estate, by assignment of the subcontracts, which would allow MPS to purchase the Catalysts directly from the subcontractors.

Deltak nonetheless opposed assigning the Catalyst subcontracts to MPS, because of its stated desire to extract additional value from MPS in exchange for turnover of the Catalysts. Deltak proposed a "HRSG Completion Plan" under which MPS could complete its purchase of the Catalysts from Deltak, at a price far in excess of the contract price, conditioned on MPS' waiving all claims under the HRSG contract, including any indemnity or warranty claims against Deltak or the subcontractors.[12] The value of the demanded waivers, while incalculable due to the unknowable future warranty claims, was conceivably in the millions of dollars.[13] After MPS rejected that demand, Deltak instead demanded $1.85 million in cash—more than three times the

---

[10] R.212 at 9-10 (Corrected Limited Opposition by Mitsubishi Power Systems Americas, Inc., to Debtors' Motion to Reject Certain Executory Contracts ("Limited Opposition")).

[11] *See* R.293 (11/6/2006 Tr.) at 14-16 (Bankruptcy Court findings).

[12] R.264 (11/1/2006 Tr.) at 120 (Boukal); R.159 Ex. 5 (under seal).

[13] The prime contractor has already asserted millions of dollars of claims based on Deltak's allegedly inadequate performance.

remaining contract price.[14]  Deltak explained to the Bankruptcy Court that it desired to complete

its sale and delivery to MPS, "but on terms favorable to the Debtors, their estates and creditors."[15]

The Bankruptcy Court acknowledged that Deltak's goal was to "maximize [its] leverage in its

negotiations with Mitsubishi."[16]  In other words, Deltak, which has no commercial use or value

for the Catalysts other than sale to MPS, refuses to assign the subcontracts solely so that it can try

to extract additional value from MPS.  To do this, Deltak is willing to hold up delivery of the

completed Catalysts, delay the completion of PGE's power plant, and court massive liquidated

damages claims against its estate, in the hope that MPS, facing similarly massive liquidated dam-

ages claims from PGE, will pony up additional cash.

 The Bankruptcy Court found these facts were essentially undisputed.[17]  It further recog-

nized the dangerous game of "chicken" Deltak was engaged in.[18]  The court declined to require

assignment of the subcontracts, however, because it believed that such specific performance of

the covenant to assign was not permitted under the Bankruptcy Code:

> [W]hile I understand the business and economic considerations that give rise
> to Mitsubishi's request, neither Bankruptcy Code Section 365 or applicable
> case law . . . mandates or even permits specific performance here.[19]

 Because time was of the essence to the parties, the court read its ruling into the record at

a November 6, 2006 hearing, without any written opinion.[20]  The court followed with a short writ-

ten order on November 9, 2006.[21]

---

[14] R.264 (11/1/2006 Tr.) at 122 (Boukal).

[15] R.212 at ¶ 12. (Debtor's Reply to the Corrected Limited Opposition by Mitsubishi
Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts.

[16] R.293 (11/6/2006 Tr.) at 151.

[17] R.293 (11/6/2006 Tr.) at 14-16.

[18] R.264 (11/1/2006 Tr.) at 145.

[19] R.293 (11/6/2006 Tr.) at 13 (bench ruling).

[20] R.293 (11/6/2006 Tr.) at 10-11.

[21] R.291 (Order Approving Rejection of Mitsubishi HRSG Purchase Agreement).

4

## SUMMARY OF ARGUMENT

Rejection of a contract under Bankruptcy Code § 365 does not void or terminate the contract. Instead, rejection amounts to a breach of the contract pre-petition. § 365(g). Even after rejection, the parties' rights and obligations to one another remain, except that for any required payments, the non-breaching party is relegated to the remedies of a general unsecured creditor. For remedies that may not be reduced to payment, specific performance remains available if authorized by applicable state law.

Like all complex construction contracts, MPS's contract with Deltak contains continuity provisions intended to govern the relation of the parties in the event of the subcontractor's default. One such provision requires Deltak, upon demand, to assign its subcontracts to MPS. Such assignment, contemplated by the parties at the time of the agreement, provides for orderly transition and completion of the work, without delay, and allows the parties to minimize further damages flowing from the breach. Importantly, such assignment would *not* require Deltak to perform any of its substantive obligations under the contract—*i.e.*, Deltak would not be required to take any steps to deliver the already—completed Catalysts, or provide technical advice in connection with their attachment to the HRSGs. Nor would Deltak be required to pay any money. MPS asks for assignment so that MPS, with no further action or payment by Deltak, can take any steps and make any payments necessary to take delivery of the completed Catalysts from the subcontractors. In short, assignment of the subcontract would impose no burden whatsoever on the bankruptcy estate. On the contrary, assignment would benefit the estate and all of its creditors, by preventing the accrual of millions of dollars in liquidated damages claims against Deltak, both from MPS and from the Catalyst subcontractors.

Despite these clear facts, the Bankruptcy Court denied specific performance of the covenant to assign the subcontracts, because it believed such specific performance was not permitted

5

under the Bankruptcy Code.[22] This ruling was legal error. Case law under § 365 distinguishes between specific performance of core substantive obligations under executory contracts, and performance of covenants intended to govern the subsequent relation of the parties after the end of the contractual relationship. The former would burden the estate, whereas performance of the remedial provisions here would impose no burden or cost. Where such a remedial provision does not call for payment by the debtor, bankruptcy law allows specific performance if specific performance would be permitted by applicable state law.

In this case, Oregon law governs the contract. Under Oregon law, MPS may obtain specific performance of the covenant to assign if it governs unique goods that cannot be obtained *at the time needed* on the open market. Here, the Bankruptcy Court found that the Catalysts are custom designed for the Oregon power plant for which they were ordered, and have no other commercial value or use. Because of their custom design and the long lead time required for their order and manufacture, they cannot be currently purchased anywhere else—they are not off-the-shelf items.[23] The Bankruptcy Court ruled that, despite their custom nature, the Catalysts are not "unique" items, because it was possible to re-manufacture them, though at extensive delay and massive cost (due to the millions in liquidated damages that would accrue in the interim). The Bankruptcy Court overlooked, however, that the subcontracts for which MPS seeks assignment are not for the mere *purchase* of the Catalysts. They also require the *timely delivery* of these custom-designed, custom-built pieces of equipment. Because the Catalysts cannot be readily purchased in the open market *in timely fashion*, they are sufficiently "unique" that the Bankruptcy Court may order specific performance of the covenant to assign the Catalyst subcontracts under Oregon law.

---

[22] R.293 (11/6/2006 Tr.) at 13.

[23] R.264 (11/1/2006 Tr.) at 99 (Thangiah).

6

Finally, the Bankruptcy Court ruled that "the availability of easily calculated money damages" was "fatal to Mitsubishi's request for specific performance."[24] But money damages are not a barrier to specific performance of delivery of unique goods under Oregon law. Nor can money damages fully compensate Mitsubishi (or its customer, Portland General Electric) for the *delay* caused by Deltak's refusal to assign the subcontracts. The Bankruptcy Court's analysis was based on the *liquidated* damages MPS stood to suffer if it had to delay completion of the Oregon power plant while it re-ordered new Catalysts. But Mitsubishi's harms are not so limited. Under the contract's default provisions, Mitsubishi may be responsible for currently incalculable *actual* damages caused by its delay in performance, over and above the liquidated damages considered by the lower court (to the extent that the actual damages exceed the liquidated sums).[25]

The Bankruptcy Court's syllogistic reasoning—that damages would be available, ergo specific performance is not—is inconsistent with Oregon law and has unfortunate consequences. In the circumstances presented, it will, in the Bankruptcy Court's words, induce a game of economic "chicken," which law otherwise prevents in international commerce. If the covenant to assign is enforced, it costs Deltak and the estate nothing. Deltak need only sign a piece of paper; Mitsubishi will take care of (and pay for) the rest. This *non-pecuniary* remedy allows Mitsubishi to do what is sensible and orderly: to pay for and take delivery of the completed Catalysts (which have no other use or value), and to complete the PGE job without loss to any party. By allowing Deltak to reject its contract with Mitsubishi while refusing to assign the Catalyst subcontracts, the court allows a situation where Deltak's refusal will require Mitsubishi either to commission new Catalysts, resulting in massive losses to itself and the estates, or to pay "ransom" for the ones that

---

[24] R.293 (11/6/2006 Tr.) at 14.

[25] R.159 Ex.3 (under seal) (Power Island Equipment Purchase Agreement For Port Westward Generating Facility by and between Portland General Electric Company and Mitsubishi Power Systems, Inc. ("PGE Contract ")) ¶¶ 29.1.12, 29.3.

7

are already made, and subject itself to further ransom demands on other contracts.

By refusing assignment, and threatening mutually destructive losses, Deltak openly seeks to extract extra value from Mitsubishi for an asset that has great value to Mitsubishi but no longer has any value at all to the estate or any other purchaser. Section 365, allowing rejection of executory contracts, was enacted to allow debtors to make economically rational decisions to terminate burdensome contracts. It was not enacted to be used as a leverage tool, so that debtors may shake down vulnerable creditors who have great need for unique assets in the hands of the debtor that are otherwise commercially worthless. This sort of behavior—exploiting a unique asset to extract unbargained-for value—is a precise instance for which the specific performance remedy exists. If Section 365 rejection means that customary assignment and takeover provisions in construction contracts are unenforceable, then any subcontractor in bankruptcy who possesses a critical project component will have the ability to hold up any construction project, no matter how complex, until its demands are met.

The contract date on which the Catalysts must be delivered to the Oregon job site is December 15, 2006. It will take 3 weeks to deliver them from their current locations (in Alabama and upstate New York)—meaning that Mitsubishi must know by November 22 (the day before Thanksgiving) whether it may take assignment of the completed Catalysts, or must choose between ransoming its parts or ordering new ones. In light of the urgent need for decision, this Court should reverse and remand with instructions to issue forthwith an order requiring specific performance forthwith of the covenant to assign.

### STATEMENT OF FACTS

1.  Appellant Mitsubishi Power Systems, Inc. (MPS) is the Western Hemisphere power systems sales and service subsidiary of Mitsubishi Heavy Industries, Inc. (Japan). MPS builds power generation systems: gas, steam, hydroelectric, wind, and geothermal turbines, as well as

auxiliary generation systems.[26]  MPS purchases the generation turbines from its Japanese affili-

ates and purchases related major system components from other suppliers.  It delivers these com-

ponents to its customers for construction as integrated power generation systems.[27]  MPS also

offers project management services for the design and construction of power plants.[28]

2.    This case concerns contracts for two major components for a power plant installation

in Oregon: a Heat Recovery Steam Generator, or "HRSG," and two "Catalysts," which are com-

ponents of the HRSG designed to reduce its pollution output.

3.    On September 3, 2004, MPS entered into a Power Island Equipment Purchase

Agreement for Port Westward Generating Facility with Portland General Electric Company

("PGE").[29]

4.    In that contract, MPS agreed to supply a power generation system to PGE consisting

of a "G" Class combustion turbine generator, a steam turbine generator, and a HRSG, along with

all necessary auxiliary equipment and materials.[30]  The Port Westward Generating Facility is cur-

rently under construction.[31]

5.    On September 3, 2004, MPS also entered into a Purchase Agreement for Heat Re-

covery Steam Generator and Auxiliaries for the Port Westward Generating Facility with Deltak,

LLC ("Deltak").[32]

6.    Under that contract, Deltak agreed to supply MPS with a HRSG, including catalysts

---

[26] R.156 ¶ 3 (Boukal Aff.).

[27] R.156 ¶ 4 (Boukal Aff.).

[28] R.156 ¶ 3 (Boukal Aff.); *see also* R.264 (11/1/2006 Tr.) at 85-86 (Thangiah).

[29] R.159 Ex.3 (under seal) (PGE Contract). The PGE Contract was then assigned by Port-
land General Electric to Black & Veatch Construction, Inc. R.156 ¶ 5.

[30] R.159 Ex.3 at 8, 17 (under seal) (PGE Contract).

[31] R.156 ¶ 5 (Boukal Aff.).

[32] R.159 Ex.4 (under seal) (HRSG Purchase Agreement); R.156 ¶ 6 (Boukal Aff.).

9

and all necessary auxiliary equipment and materials.[33] Because the power generation system will not function without an operational HRSG, the HRSG is an integral part of the system that MPS agreed to supply at Port Westward.[34]

    7.  Deltak entered into various subcontracts related to the HRSG, including but not limited to a subcontract with Cormetech, Inc. ("Cormetech") to supply a catalyst for the reduction of post-combustion nitric oxide ("NOx"), and a subcontract with BASF Catalysts, LLP ("BASF") to supply a catalyst for the reduction of carbon monoxide ("CO").[35]

    8.  The HRSG Purchase Agreement between MPS and Deltak contains remedy provisions specifying the parties' rights if a party defaults.  One of those provisions requires Deltak, upon demand, to assign to MPS the outstanding subcontracts on the job:

> 29.2.2  If requested by Purchaser [MPS], Supplier [Deltak] shall withdraw from the Job Site, *assign to Purchaser such of Supplier's subcontracts and vendor contracts as Purchaser may request . . .* , and Purchaser may take possession of any and all designs, materials, Equipment, tools, purchase orders, correspondence, schedules, submittals, and facilities of Supplier which are on the Job Site or have been delivered to Purchaser or have been prepared by Supplier or any Subcontractor in connection with the Agreement; and

> 29.2.3  Purchaser, without incurring any liability to Supplier, shall have the right (either with or without the use of Supplier's materials, Equipment, tools and instruments) to have the obligations of this Agreement finished, whether by enforcing its rights pursuant to the Guaranty *or otherwise.*[36]

The Bankruptcy Court expressly found that MPS had a contractual right to assignment.[37]

    9.  Along with the HRSG, the NOx and CO catalysts and their associated parts (the "Catalysts") are collectively considered a Major Component under the PGE Contract and the

---

    [33] R.159 Ex.4 at 8, 18 (under seal) (HRSG Purchase Agreement); R.156 ¶ 6 (Boukal Aff.).

    [34] R.156 ¶ 7 (Boukal Aff.).

    [35] R.156 ¶¶ 10-12 (Boukal Aff.).

    [36] R.159 Ex.4 ¶¶ 29.2.2, 29.2.3 (emphasis added) (under seal) (HRSG Purchase Agreement).

    [37] R.293 (11/6/2006 Tr.) at 13.

HRSG Purchase Agreement.[38]

10. The "Equipment Delay Liquidated Damages Clause" of the PGE Contract states that should MPS fail to deliver a Major Component of the system on or before December 15, 2006, it faces potential claims for liquidated damages at the rate of $25,000 per day of delay for the first 30 days, $30,000 per day after 30 days, $50,000 per day after 60 days, and $75,000 per day after 120 days.[39]  If the delay is significant enough, MPS may be found in default under the PGE Contract and would be liable to PGE for costs in excess of the contract price that MPS incurred in having the equipment supplied, plus "all the additional reasonable internal expenses incurred" by PGE as a result of MPS' default.[40]

11. Similarly, the HRSG Purchase Agreement specifies that if Deltak fails to deliver a Major Component of the HRSG by December 15, 2006, Deltak faces potential equipment delay liquidated damages of $25,000 per day for the first 30 days, $30,000 per day after 30 days, $50,000 per day after 60 days, and $75,000 per day after 120 days.[41]

12. On September 28, 2006, Global Power Equipment Group, Inc., and its affiliated debtors and debtors in possession (collectively, the "Debtors"), including Deltak, filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

13. As of the filing of its bankruptcy petition, Deltak had delivered nearly all of the HRSG equipment for the Port Westward Project except for the Catalysts.  Thus, the installation of the HRSG in the facility is almost completed.[42]

---

[38] R.159 Ex.4 at Exhibit D-2 p.3 (under seal); R.156 ¶ 9 (Boukal Aff.).

[39] R.159 Ex.3 ¶ 20.2.5(b) (under seal) (PGE Contract).  In noting the risk of such claims, MPS in no way concedes liability for any liquidated damages.

[40] R.159 Ex.3 ¶ 29.1.12, 29.3 (under seal) (PGE Contract).

[41] R.159 Ex.4 ¶ 20.2.5(b) (under seal) (HRSG Purchase Agreement).

[42] R.156 ¶ 8 (Boukal Aff.).

11

14. The Catalysts, however, are necessary for commissioning and testing the Port West-ward gas turbine.[43]  As such, unless the Catalysts are paid for, delivered to the site, and properly installed by December 15, 2006, commissioning and testing will be delayed.[44]

15. Cormetech and BASF have manufactured the Catalysts and are prepared to ship them to the installation site.[45]  Neither Cormetech nor BASF, however, is obligated to ship its respec-tive catalyst unless and until it is paid in full.[46]

16. The Catalysts are custom-designed for the HRSG currently installed at the Port Westward Facility.[47]  The manufacture of custom catalysts is necessarily time intensive.  As a result, it is not possible for MPS to acquire replacement catalysts in time to perform its obliga-tions under the PGE Contract.[48]  Moreover, the Catalysts' custom design proscribes Deltak's ability to sell them to another buyer.[49]  The Bankruptcy Court found:

> I also note the largely unrebutted and convincing testimony of Mr. [Thangiah] establishes that there is no secondary market for these catalysts, and that it is highly unlikely that they could be sold for use in another plant. Again, the uncontradicted testimony is that these catalysts are custom de-signed, both for the power plant and to comply with local environmental regu-lations.  Mr. [Thangiah] testified convincingly that installation of these cata-lysts in a HRSG at another plant was highly unlikely, both on account of dif-ferent environmental standards, and because the HRSG is engineered to oper-ate at precise pressures that would almost certainly be adversely affected by a non-customized catalyst array.
>
>     . . . .
>
> Consequently, the record before the Court shows that the catalysts have value only to Mitsubishi, and that if the catalyst is not installed in the Port Westward facility, the catalysts will likely have only scrap value for the es-

---

[43] R.156 ¶ 9 (Boukal Aff.).
[44] R.156 ¶ 19 (Boukal Aff.).
[45] R.156 ¶ 14 (Boukal Aff.).
[46] R.156 ¶ 18 (Boukal Aff.).
[47] R.156 ¶ 13 (Boukal Aff.).
[48] R.156 ¶ 14 (Boukal Aff.).
[49] R.156 ¶ 16 (Boukal Aff.).

tate. Correspondingly, Mitsubishi will have a massive damages claim against the debtor.[50]

17. According to the project schedule, 23 weeks are anticipated from the date of order to the date of delivery of either catalyst from either manufacturer.[51] As a result, it is now impossible for MPS to satisfy the December 15, 2006 delivery date if it must order replacements.[52] Accordingly, unless the completed Catalysts are delivered, MPS will face millions of dollars in equipment delay liquidated damages under the PGE Contract.[53]

18. On September 29, 2006, the Debtors, including Deltak, filed emergency motions in the Bankruptcy Court requesting authorization to use Cash Collateral[54] and authority to pay critical vendors and subcontractors of the Debtors.[55] The Debtors, however, did not seek authority to pay critical vendors with respect to its HRSG business. As a result, the Court entered an Interim Cash Collateral Order on October 2, 2006, stating that "no payments be made to critical vendors and/or subcontractors of . . . Deltak."[56]

---

[50] R.293 (11/6/2006 Tr.) at 14-15.

[51] R.159 Ex.2 at 19 (under seal) (Deltak Progress/Fabrication Schedule for Port Westward Project).

[52] Even if MPS had ordered the Catalysts immediately after its November 1, 2006 hearing before the Bankruptcy Court, it would not have been able to meet its scheduled deadline.

[53] R.159 Ex.3 at ¶ 20.2.5(b) (under seal) (PGE Contract).

[54] R.10 (Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 552 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure for (A) Emergency Relief (I) Authorizing the Use of Cash Collateral, (II) Finding that the Senior Lenders' Interests, or that of Any Other Party Which Is Purportedly Secured, Are Adequately Protected, and/or (III) Authorizing the Debtors to Surcharge Collateral, and (IV) Granting Related Relief; and (B) Scheduling Interim and Final Hearings Regarding the Same ("Cash Collateral Motion")).

[55] R.11 (Debtors' Motion for Authority to Pay Subcontractors and Vendors of the Williams Debtors in the Ordinary Course of Business); R.13 (Debtors' Motion for Authority to Pay Certain Critical Subcontractors and Vendors of the Specialty Boilers Business Segment Operated by the Deltak Debtors); R.14 (Debtors' Motion for Authority to Pay Certain Critical Subcontractors and Vendors of the Braden Debtors).

[56] R.40 (Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 552 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Use of Cash Collateral, and (II) Granting Related Relief ("Interim Cash Collateral Order")).

19. To facilitate delivery of the completed Catalysts, MPS offered to assume all of Deltak's obligations to Cormetech, BASF, and any other Catalyst-related subcontractors, in return for an assignment of those subcontracts to MPS, per the specific remedy and warranty provisions contained in the HRSG Purchase Agreement.[57] In order to avoid imposing any burden on the estate, MPS assumed responsibility for attachment of the Catalysts to the HRSG and other steps for completion of the HRSG without any further technical assistance from Deltak.[58]

20. Deltak declined that offer, proposing instead a "HRSG Completion Program,"[59] under which MPS would have to agree:

a.    to waive Deltak's indemnity obligations and liability for any damages under the Port Westward HRSG Contract.[60]

b.    that warranty obligations, equipment performance guarantee obligations, and indemnity obligations are excluded from the definition of "unperformed obligations" under the Contract.[61]

c.    to reimbursement Deltak's actual costs of personnel, materials, and facilities, as well as it out-of-pocket costs and expenses incurred in completing the HRSG project.[62]

d.    to solicit Deltak's consent to the assignment of an existing purchase order with a subcontractor.[63]

e.    to pay the cost and expense of the performance of Deltak's obligations under the Contract.[64]

f.    to waive any rejection damages claims in connection with the Contract upon completion of the work.[65]

g.    that equipment and services would be provided on an "as-is, where-is"

---

[57] R.156 ¶ 20 (Boukal Aff.).

[58] R.156 ¶ 17 (Boukal Aff.).

[59] R.159 Ex.5 at ¶ 1.1 (under seal) (HRSG Completion Program).

[60] R.159 Ex.5 at ¶ 1.2 (under seal) (HRSG Completion Program).

[61] R.159 Ex.5 at ¶ 1.2 (under seal) (HRSG Completion Program).

[62] R.159 Ex.5 at ¶ 1.5 (under seal) (HRSG Completion Program).

[63] R.159 Ex.5 at ¶ 1.5 (under seal) (HRSG Completion Program).

[64] R.159 Ex.5 at ¶ 2.1 (under seal) (HRSG Completion Program).

[65] R.159 Ex.5 at ¶ 2.1 (under seal) (HRSG Completion Program).

basis.[66]

21. MPS refused to accept such terms and continued to seek from Deltak an assignment of the subcontracts for the Catalysts and parts held for shipment by various vendors.

22. After MPS' refusal of the "HRSG Completion Program," Deltak offered to release the Catalysts for a cash payment of $1.85 million. This sum is more than three times the remaining amount owed on the contract.[67]

23. On September 29, 2006, the Debtors filed a motion ("Rejection Motion") seeking authority, *inter alia*, to reject HRSG Purchase Agreement *nunc pro tunc* to the date of the motion.[68] The Debtors also requested that they be permitted to wind down the HRSG business.[69]

24. On October 3, 2006, the Bankruptcy Court issued an order granting the Debtor's Rejection Motion in part. Specifically, the Court "authorized and empowered [the Debtors] to wind down the HRSG Business operations and affairs."[70] The Court also set a hearing on the Debtor's proposed rejection of, *inter alia*, the HSRG Purchase Agreement for October 26, 2006.[71]

25. On October 24, 2006, MPS filed a Limited Opposition to the Debtors' Rejection Motion, asserting that (a) the HRSG Purchase Agreement should be rejected immediately or MPS would oppose rejection on *a nunc pro tunc basis* and (b) the rejection must be conditioned on the specific remedy and warranty provisions contained in the contract, including the assignment of Deltak's subcontracts with Cormetech, BASF, and any other Catalyst-related suppliers to MPS.[72]

---

[66] R.159 Ex.5 at ¶ 3.2 (under seal) (HRSG Completion Program).

[67] R.264 (11/1/2006 Tr.) at 122 (Boukal).

[68] R.12 ¶ 26 (Rejection Motion).

[69] *Id.*

[70] R.85 at 2. (Order Granting in Part Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress ("Rejection Order")).

[71] *See id.*

[72] R.159 at 9-10 (Corrected Limited Opposition by Mitsubishi Power Systems Americas,

(Continued …)

26. The Court held an evidentiary hearing on November 1, 2006, at which additional evidence relating to the above facts was adduced.[73]

27. At a subsequent hearing on November 6, 2006, the Bankruptcy Court announced its ruling, approving rejection of the HRSG Purchase Agreement *nunc pro tunc*, and denying MPS's request for relief.[74] Because time was of the essence to the parties, rather than write a written opinion, the judge read his ruling into the record.[75]

28. The Bankruptcy Court subsequently issued a written order on November 9, 2006, confirming its ruling.[76] This appeal followed.

## ARGUMENT

The parties agreed that their contract was executory, and that it should be rejected immediately.[77] They differ, however, on MPS's demand that Deltak be required to specifically perform its covenant to assign the uncompleted Catalyst subcontracts to MPS.

**I.    The Bankruptcy Court's Ruling That Specific Performance Is Not Permitted Under The Bankruptcy Code Was Incorrect As A Matter Of Law**

Deltak's rejection of its executory contract under Code § 365 does not void or terminate the contract.[78] Instead, under § 365(g), "the rejection of an executory contract ... constitutes a breach of such contract ...."[79]  "Accordingly, the rights and obligations of the parties remain intact after a rejection because 'rejection does not change the substantive rights of the parties to the

---

Inc., to Debtors' Motion to Reject Certain Executory Contracts ("Limited Opposition")).

[73] R.264 (11/1/2006 Tr.).

[74] R.293 (11/6/2006 Tr.) at 9-16.

[75] R.293 (11/6/2006 Tr.) at 9-10.

[76] R.289 (Order on Motion as to the Port Westward Project).

[77] R.264 (11/1/2006 Tr.) at 14; R.293 (11/6/2006 Tr.) at 12.

[78] *In re The Ground Round, Inc.*, 335 B.R. 253, 261 (1st Cir. B.A.P. 2005) (citing cases); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. Colo. L. Rev. 845, 931 (1988) ("[R]ejection does not cancel, repudiate, or terminate contracts.").

[79] § 365(g); *accord Ground Round*, 335 B.R. at 261; *Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 659 (D. Mass. 2000); *In re Walnut Assocs.*, 145 B.R. 489, 494 (Bankr. E.D. Pa. 1992) (citing *In re Drexel Burnham Lambert Grp.*, 138 B.R. 687, 700-09 (Bankr. S.D.N.Y. 1992)).

16

contract, but merely means the bankruptcy estate itself will not become a party to it.'"[80]  To the

extent the breach creates a claim for payment, that claim can be processed in the bankruptcy pro-

ceeding, on the same basis as the debtor's general unsecured creditors.[81]  The breach

> also means that, *unless specific performance is available to the non-debtor party under applicable state law,* the debtor cannot be compelled to render its performances under the contract. ***However, if state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it.***[82]

Here, Deltak's rejection of the HRSG Purchase Agreement constitutes a pre-petition

breach.  § 365(g).  The HRSG Purchase Agreement, like most complex construction contracts,

contains remedy provisions that specify what happens in event of breach, *i.e.*, default.  One of

those customary provisions requires a contractor like Deltak, upon request, to assign to the con-

tractor to whom it owes its obligations—here, MPS—all subcontracts and all purchase orders on

the job.[83]  MPS may also order Deltak to cease performance and vacate the Job Site, so that MPS

can take over the Job Site, including any designs, materials, equipment, tools, and purchase or-

ders, among other things, in order to complete the job.[84]  Such assignment and takeover provi-

sions are common in construction contracts in complex projects such as power plants.  They al-

low the non-breaching contractor to take over performance from the breaching subcontractor, in

order to mitigate damages and ensure completion of the job in an orderly and minimally damag-

ing fashion.  Without such transition provisions, the failure of any one of dozens of minor con-

tractors on a power project could throw a billion dollar power plant off schedule.

---

[80] *Ground Round*, 335 B.R. at 261 (quoting Andrew, *supra* note 78, at 848-49); *accord Sir Speedy*, 256 B.R. at 659; *Walnut Assocs.*, 145 B.R. at 494.

[81] *Ground Round*, 335 B.R. at 261; *Walnut Assocs.*, 145 B.R. at 494.

[82] *Walnut Assocs.*, 145 B.R. at 494; *accord Ground Round*, 335 B.R. at 261; *In re West Chestnut Realty*, 177 B.R. 501, 506 (Bankr. E.D. Pa. 1995).

[83] R.159 Ex.4 ¶ 29.2.2 (under seal) (HRSG Purchase Agreement).

[84] *Id.*

In its limited opposition to Deltak's motion to reject, MPS invoked this remedial provision, and asked the Bankruptcy Court to condition Deltak's rejection of the HRSG contract on performance of the remedial covenant to assign the Catalyst subcontracts to MPS. Such assignment, which would require no substantive performance or payment by Deltak, would allow MPS to mitigate its damages from Deltak's breach of the HRSG Purchase Agreement, by proceeding to the orderly completion of the Port Westward Project. MPS offered to pay all sums outstanding to the Catalyst subcontractors (which is well above what MPS owed on the remaining contract price), and to pay all expenses and take all steps to ensure delivery, so that Deltak would not be burdened or have to undertake any substantive performance.[85] The Catalyst subcontractors, in turn, have completed manufacture of the Catalysts, and stand ready to deliver them.[86]

Deltak, however, refuses to assign the subcontracts, as required by the HRSG Purchase Agreement, unless MPS conveys additional unearned value, above and beyond either the contract price or the cost to complete. Deltak first demanded complete waivers of any future claims under the HRSG Purchase Agreement, including indemnification or warranty claims.[87] After MPS refused, Deltak demanded instead $1.85 million in cash—more than three times the amount owing on the contract.[88] Because the respective rights of the parties remain the same after rejection of the contract,[89] Deltak has no basis on which to demand such extra value or such waiver of MPS's claims. Deltak nonetheless seeks leverage for its demands by withholding the Catalysts—which, as custom-designed equipment, have only scrap value to anyone other than MPS.

---

[85] R.156 ¶ 20 (Boukal Aff.).

[86] R.293 (11/1/2006 Tr.) at 100-01 (Thangiah).

[87] Statement of Facts, *supra*, ¶ 20; R.159 Ex.5 (under seal) (HRSG Completion Program).

[88] Statement of Facts, *supra*, ¶ 22; R.264 (11/1/2006 Tr.) at 122 (Boukal).

[89] *Ground Round*, 335 B.R. at 261 (quoting Andrew, *supra* note 78, at 848-49); *accord Sir Speedy*, 256 B.R. at 659; *Walnut Assocs.*, 145 B.R. at 494.

Objecting to such behavior by Deltak, MPS asked the Bankruptcy Court to order specific performance of the covenant to assign the Catalyst subcontracts.  The Bankruptcy Court rejected MPS's request, out of the belief that such specific performance was not permitted under the Bankruptcy Code:

> Mitsubishi has the contractual right to require assignment, but that's not the issue.  The issue is whether to specifically enforce that contractual right or limit Mitsubishi to damages if the debtor[]s breach the contract by refusing assignment.  And while I understand the business and economic considerations that give rise to Mitsubishi's request, neither Bankruptcy Code Section 365 or applicable case law, including that cited by Mitsubishi, mandates *or even permits* specific performance here.[90]

The Bankruptcy Court's belief that the Code does not permit specific performance of an assignment provision such as that here was legal error.

Although a debtor in bankruptcy cannot be compelled to perform its core substantive obligations under an executory contract if such performance would impede reorganization or burden the estate,[91] a number of bankruptcy courts, in this Circuit and elsewhere, have recognized that a non-debtor can obtain specific performance of a covenant in a rejected contract, where the covenant concerns not the contract's core obligations but rather the relation of the parties in the event of breach.[92]

For instance, in *Sir Speedy, Inc. v. Morse*,[93] the rejected contract was a print shop franchise agreement that contained a non-compete clause, under which the debtor agreed not to operate a competing business within five miles of his franchise location for a year after termination.  One week before filing for bankruptcy, the franchisee debtor "removed all the Sir Speedy signs

---

[90] R.293 (11/6/2006 Tr.) at 13.

[91] *See Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985).

[92] Whether specific performance is available is a matter of the state law governing the contract. *See Ground Round*, 335 B.R. at 261; *Walnut Assocs.*, 145 B.R. at 494; Part II, *infra*.

[93] 256 B.R. 657 (D. Mass. 2000).

19

from his store ... and began operating under the name 'Morse Printing.'"[94]  On Sir Speedy's motion to enforce its non-compete clause, the bankruptcy court ruled that the § 365 rejection of the franchise agreement terminated Morse's obligations.[95]  The district court reversed.  Relying on a string of precedents enforcing non-compete clauses against bankruptcy debtors, the court held that Morse remained bound by the non-compete requirement, notwithstanding his rejection of the franchise agreement under § 365.  The court noted that

> [a]lthough Morse, in rejecting the Franchise Agreement, also rejected the covenant not to compete, *the very purpose of the covenant is to govern the relationship between the parties after the demise of the underlying contract.*  The Trustee's rejection of the Franchise Agreement did not, therefore, constitute a 'termination' of that agreement.[96]

In *In re Walnut Associates*,[97] the disputed contract was a settlement agreement ending earlier litigation between the parties.[98]  The settlement agreement did not require payments from the bankruptcy debtor—rather, it required payments from the other party *to the debtor*.[99]  "The Debtor [was] required to do several things [under the settlement], the most important of which [was] to refrain from continuing to pursue the Saidels in further litigation ...."[100]  The debtor sought a declaration that its rejection of the settlement contract made its covenant not to sue unenforceable, but the bankruptcy court ruled the provision remained enforceable notwithstanding the bankruptcy.[101]  The court emphasized that in determining whether a covenant in a rejected con-

---

[94] *Id.* at 658.

[95] In an earlier round of litigation, the bankruptcy court first held that Sir Speedy's "right to enforce the non-compete agreement was a 'claim' like any other to be pursued under § 101(5)(B) of the Bankruptcy Code."  The district court reversed, "holding that the breach of a non-compete agreement does not give rise to a right of payment and thus is not a 'claim' under § 101(5)(B)." *Id.*

[96] *Id.* at 660 (emphasis added).

[97] 145 B.R. 489 (Bankr. E.D. Pa. 1992).

[98] *Id.* at 492.

[99] *Id.* at 495.

[100] *Id.*

[101] *Id.*

tract could be subject to specific performance, the dispositive inquiry was not whether the contract was executory, but rather whether specific performance would be allowed under state law.[102]

In *In re West Chestnut Realty*,[103] the executory contract at issue was a stock option agreement which permitted the non-debtor party to purchase an interest in the debtor's landfill.[104] Noting that because the stock option agreement gave the non-debtor an interest in land, which is the quintessential legal right that is "unsusceptible to the calculation of monetary damages," the bankruptcy court ordered specific performance under Pennsylvania law.[105]

Most recently, in *In re Ground Round, Inc.*,[106] the Bankruptcy Appellate Panel for the First Circuit addressed a request for specific performance of a provision directing transfer of a liquor license. The debtor's unexpired lease for business premises was rejected under § 365, and the lease required, in the event of breach, that the lessee (debtor) reconvey the liquor license for the premises back to the lessor.[107] Following the holdings in *Walnut Associates* and *Sir Speedy* that rejection did not terminate the lease's remedial provision, and that specific performance was available if allowed under state law, the appellate panel ruled that "because the liquor license is an inherently 'unique' asset, specific performance [of the retransfer obligation] is a remedy available under Pennsylvania law."[108]

*Ground Round*, *Sir Speedy*, *Walnut Associates*, and *West Chestnut* establish that when a debtor rejects (*i.e.*, breaches) a contract, bankruptcy courts can and do exercise their equitable powers to order specific performance of post-termination remedial portions of rejected contracts,

---

[102] *Id.*

[103] 177 B.R. 501 (Bankr E.D. Pa. 1999).

[104] *Id.* at 503.

[105] *Id.* at 506. (citing and following *Walnut Assocs.*, 145 B.R. at 494).

[106] 335 B.R. 253 (B.A.P. 1st Cir. 2005).

[107] *Id.* at 257.

[108] *Id.* at 262.

if specific performance is available under governing state law.

Other cases denying specific performance under rejected contracts address concerns over imposing undue burdens on the bankruptcy estate. The bulk of them involve refusals to order specific performance of the debtor's core substantive obligations under the rejected contract.[109] Courts refuse to enforce such core performance obligations because they would, as a practical matter, impose the same burdens on the debtor as the contract it has ostensibly rejected, defeating the purpose of § 365 rejection.[110] Such burdens have been deemed inappropriate as interfering with the debtor's reorganization.[111] And courts have particularly refused to impose burdens through specific performance where such performance would effectively impose an obligation to pay money, again circumventing the intent of rejection.[112]

These holdings are unremarkable under existing bankruptcy law. But they do not address enforcement of nonsubstantive, remedial covenants intended to adjust the parties' relations when the contract's substantive provisions have failed. The *Sir Speedy*, *Walnut Associates*, and *Ground*

---

[109] *See, e.g., Lubrizol*, 756 F.2d at 1047 (refusing specific performance where enforcement of exclusive licensing agreement precluding debtor from selling or licensing metal coating technology was of a "core obligation" involving debtor's "principal asset"); *Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889, 894 (8th Cir. 1944) (refusing specific performance where enforcement would violate § 365 by allowing plaintiff "to obtain a preference over . . . other creditors").

[110] *See Airline Pilots v. Continental Airlines*, 125 F.3d 120, 135-36 (3d Cir. 1997) (refusing specific performance where enforcement of seniority integration clause in labor agreement would burden debtor by causing "disruption to the work environment, irreparable damage to work relationships, and hostility and animosity").

[111] *See Airline Pilots*,125 F.3d at 135-36; *Lubrizol*, 756 F.2d at 1047 (specific performance of exclusive licensing agreement would interfere with reorganization because selling and licensing the technology at issue was debtor's "primary potential source of funds by which [it] might emerge from bankruptcy").

[112] *See Ohio v. Kovaks*, 469 U.S. 274, 283 (1989) (refusing specific performance where obligation imposed by injunction had been converted to obligation for money damages, *i.e.*, reimbursement for environmental cleanup); *Airline Pilots*, 125 F.3d at 136 (refusing specific performance where union filed proof of claim requesting money damages, bargaining agreement was silent as to remedies upon breach, and claim was satisfiable by the payment of money damages); *Jamison Coal*, 143 F.2d at 894 (refusing specific performance where enforcement was payment for bonds).

22

*Round,* decisions show that courts will enforce remedial covenants adjusting the relations of the parties after breach, where specific performance is allowed under applicable state law.

The covenant that MPS seeks to enforce is not a claim for money. MPS does not seek enforcement of any payment obligation, or even any payment incidental to execution of its equitable remedy. MPS does not seek to have Deltak discharge its technical advice or delivery obligations under the Contract. Deltak is not being asked to pay a dime. Deltak is being asked to lift a pen and sign a piece of paper allowing MPS to deal with the subcontractors directly, in order to complete the Port Westward job in orderly fashion, using equipment that Deltak cannot use, cannot pay for, and cannot sell.

Deltak's obligation to assign the Catalyst subcontracts does not amount to enforcement of a claim for money. It is not like the employees' right to future pay and benefits contained in the seniority integration clause at issue in *Airline Pilots*:[113] The *Airline Pilots* court noted that the seniority integration provision was specifically intended to protect the pilots' rights to future compensation and benefits.[114] Indeed, the union there had filed a claim in bankruptcy for the obligation,[115] and had specifically sought back pay and front pay, *from the debtor*, for the affected pilots.[116] Here, the MPS/Deltak covenant to assign protects not a right to payment, but rather prevention of future harms through disruption of the PGE Port Westward completion schedule. MPS seeks nothing from Deltak but a signature, to prevent such prospective harms.

Nor is the covenant to assign here similar to the environmental cleanup injunction at issue in *Ohio v. Kovacs*,[117] discussed in *Airline Pilots*.[118] As the Third Circuit pointed out in *Airline*

---

[113] 125 F.3d at 134-36.
[114] *Id.* at 134.
[115] *Id.* at 126.
[116] *Id.* at 134.
[117] 469 U.S. 274 (1985).
[118] 125 F.3d at 132.

23

*Pilots*, the critical fact in *Kovacs* was the state's appointment of a receiver to take over the cleanup, which dispossessed the debtor of the property and the ability to comply with the injunction. After the receiver's takeover, "'[w]hat the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs.'"[119]  Here, MPS seeks not money, nor core performance, but rather performance of a ministerial remedial act to prevent imminent prospective harm.

MPS' request for specific performance is more like the regulatory cleanup obligation in *In re Torwico Electronics*,[120] also discussed in *Airline Pilots*.  In *Torwico*, "the State was not demanding that Torwico pay money to it, but rather was requesting it to take action to ameliorate an ongoing hazard."[121]  "Thus, the state [was] not asserting a 'repackaged claim for damages'; rather there [was] an ongoing and continuing threat and ... an obligation on the part of the debtor to 'ameliorate ongoing pollution ....'"[122]  Likewise here, MPS is not asserting a "repackaged claim for damages"; instead, it is seeking enforcement of a covenant in order to prevent future harm, *i.e.*, future delay and disruption of the Port Westward project.

The fact that future harms could *eventually* be compensated by some amount of money does not mean, *ex ante*, that covenanted-for actions to prevent such harms are tantamount to claims for payment.  If that were so, the cases allowing specific performance of remedial covenants would come out differently.  In *Ground Round*, the liquor license at issue, though specifically tied to the subject property, was not the only liquor license available.  The landlord could, with significant effort and expense, have obtained another one.  Similarly, in *Walnut Associates*, the amount by which the non-debtor civil defendants would have been damaged by violation of the debtor's covenant not to sue would have become known at some point, and could have been

---

[119] *Kovacs*, 469 U.S. at 283 *quoted in Airline Pilots*, 125 F.3d at 132.

[120] 8 F.3d 146 (3d Cir. 1993).

[121] *Airline Pilots*, 125 F.3d at 133.

[122] *Id.* (quoting *Torwico*, 8 F.3d at 150).

24

paid back. In *Sir Speedy*, if the breaching franchisee were permitted to compete in violation of

his contract, the franchisor at some point could have made an estimate of its harms from such

competition, and sued for their recompense. All of the above facts, however, did not mean that

the equitable covenants those non-debtors sought to enforce were "reducible to claims for pay-

ment," such that specific performance was barred. If that were true, every equitable claim could

be reduced to money, and no court could ever award specific performance. What was true in the

above cases, however, is true here: the covenant at issue does not impose the burdens of a core

performance obligation, but is instead intended to govern the relation of the parties after breach.

In these circumstances, specific performance of the remedial covenant is available if authorized

by state law.[123]

## II.    MPS Is Entitled To Specific Performance Of The Assignment Covenant Under Oregon Law

In this case, the HRSG Purchase Agreement is governed by Oregon law.[124] Under Ore-

gon law, MPS may obtain specific performance of the covenant to assign if it governs unique

goods that cannot be obtained on the open market. Oregon's U.C.C. statute provides that "[a]

judgment requiring specific performance may be entered *if the goods are unique or in other

proper circumstances*."[125] The commentary to that statutory provision indicates that the defini-

tion of the term "unique goods" and "other proper circumstances" has broadened over time to

take into account the realities of the modern market:

> In view of this Article's emphasis on the commercial feasibility of replace-
> ment, a new concept of what are "unique" goods is introduced under this sec-

---

[123] *See Ground Round*, 335 B.R. at 261; *West Chestnut*, 177 B.R. at 506; *Walnut Assocs.*, 145 B.R. at 494.

[124] *See* R.159 Ex. 4 ¶ 36.15 (under seal) (HRSG Purchase Agreement). Delaware choice-of-law rules generally give effect to contractual choice-of-law provisions. *See, e.g., Chemical Ltd. v. Slim-Fast Nutritional Foods*, 350 F. Supp. 2d 582, 595 (D. Del. 2004). Because the Port Westward facility is located in Oregon, there is reason to disturb this choice-of-law provision.

[125] Or. Rev. Stat. Ann. § 72.7160(1) (West 2006) (emphasis added).

25

tion. Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of *the total situation which characterizes the contract*. Output and requirements contracts *involving a particular or peculiarly available source or market* present today the typical commercial specific performance situation, as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases. However, *uniqueness is not the sole basis of the remedy under this section* for the relief may also be granted "in other proper circumstances" *and inability to cover is strong evidence of "other proper circumstances"*.[126]

Oregon case law contains several examples of courts recognizing specific performance a contract remedy.[127]

Here, the Catalysts fall neatly within the category of goods for which Oregon law mandates specific performance. First, it is undisputed that the Catalysts are designed exclusively for the specific Oregon power plant for which they were ordered.[128] As the Bankruptcy Court found, because of their custom design, the Catalyst are of absolutely no commercial value to anyone other than MPS:

> [t]he record before the Court shows that *the catalysts have value only to Mitsubishi*, and that if the catalyst is not installed in the Port Westward facility, *the catalysts will likely have only scrap value for the estate*.[129]

Moreover, the custom-manufactured Catalysts are not off-the-shelf items that can be readily purchased elsewhere. Because of the long lead time and custom design involved in the Catalysts' manufacture, MPS's ability to cover is severely restricted, as it cannot simply purchase Catalysts

---

[126] *Id.* comment 2 (emphasis added).

[127] *See, e.g., Belleville v. Davis*, 498 P.2d 744, 751 (Or. 1972) (in a case involving contract for sale of one-half interest in taxicab, upholding lower court's determination that specific performance was an appropriate remedy and noting that trial court had considered the one-half ownership interest "unique"); *Paullus v. Yarbrough*, 347 P.2d 620, 641 (Or. 1959) (awarding specific performance, taking into account scarcity of chattel among other factors); *Pittenger Equip. Co. v. Timber Structures, Inc.*, 217 P.2d 770, 777-80 (Or. 1950) (stating that plaintiff is entitled to specific performance if a damages award at law "would not be as perfect and complete a remedy," and also stating that specific performance is an appropriate remedy involving agreements to purchase specific chattel for a specific purpose that can only be fulfilled by the delivery of the chattel itself).

[128] R.293 (11/6/2006 Tr.) at 14-15 (Bankruptcy Court findings).

[129] R.293 (11/6/2006 Tr.) at 15; *see also id.* at 14.

26

"as-is" from any other supplier.[130]

Despite these factual findings, the Bankruptcy Court ruled that, notwithstanding their custom design, the Catalysts are not "unique" because it is *possible* to re-order and re-manufacture them.[131] The Court acknowledged, however, that such a process would be time- and cost-prohibitive, as millions of dollars in liquidated damages would accrue in the interim. Thus, the Bankruptcy Court failed to consider Oregon law's mandate that uniqueness involves a time dimension as well: the ability to cover. The Catalysts are unique not just because of design but because they are only ones available *now*. The agreements involved here—both MPS' HRSG Purchase Agreement with Deltak, and Deltak's subcontracts for the Catalysts—are not merely contracts to *purchase* those goods. Rather, the contracts all require *timely delivery* of custom equipment. Because they are custom built, the Catalysts simply cannot be purchased on the open market in a *timely fashion*. As such, they are sufficiently "unique" to warrant specific performance under Oregon law.

Second, the specific performance sought by MPS is modest, imposes no burden on the debtor, and thus "it does not, in effect do what [Section] 365 [of the Bankruptcy Code] meant to avoid, that is, impose burdensome contracts on the debtor."[132] MPS does not seek to enjoin Deltak to perform any of its core substantive contract obligations. Instead, it requests assignment of the Catalyst subcontracts (equipment MPS needs for which Deltak has no use) in the exercise of the specific remedy provisions in Section 29.2.2 of the HRSG Purchase Agreement.[133] That pro-

---

[130] R.293 (11/6/2006 Tr.) at 15 (Bankruptcy Court findings); *see* R. 264 (11/1/2006 Tr.) at 99 (Thangiah).

[131] R.293 (11/6/2006 Tr.) at 14.

[132] *Sir Speedy*, 256 B.R. at 262 n.3 (quoting *In re Fleishman*, 138 B.R. 641, 648 (Bankr. D. Mass. 1992)).

[133] *See Sir Speedy*, 256 B.R. at 660 (granting specific performance on a rejected contract provision where, as here, "the very purpose of the covenant is to govern the relationship between the parties after the demise of the underlying contract").

vision expressly states that, in the event of default, "[i]f requested by the Purchaser, Supplier shall . . . assign to Purchaser such of Supplier's subcontracts and vendor contracts as Purchaser may request."[134]

Money damages are simply not viable here. "One of the cardinal rules for guidance of a court in equity in the exercise of its discretion in granting or denying an application for enforcement is that it must appear that specific performance will result in no injustice."[135] Here, it is insistence on an exclusive future damages remedy that would result in injustice: such a course would *increase* harm (by allowing *prospective* harms, subject to subsequent reimbursement). By contrast, specific performance would *prevent* those harms from happening in the first place, at no cost to any party. Specific performance is without question the most fair and equitable solution to all parties. As the Bankruptcy Court found, neither Deltak, the estate, nor the Catalyst subcontractors have any other ready purchasers for the Catalysts.[136] However, if MPS does not take timely delivery of the Catalysts, which are completed and ready to ship,[137] PGE will face needless delays in construction of its power plant and MPS will face, at a minimum, massive liquidated damages claims.[138] These harms are utterly avoidable, at zero cost to Deltak or the estate, by enforcement of the covenant to assign the subcontracts.

In ruling that "the availability of easily calculated money damages" was "fatal to MPS's request for specific performance,"[139] the Bankruptcy Court overlooked that the availability of money damages is not a barrier to specific performance under Oregon law, as discussed above. The Court also mistakenly focused only on MPS's showing of the *liquidated* damages it would

---

[134] R.159 Ex.4 ¶ 29.2.2 (under seal) (HRSG Purchase Agreement).

[135] *Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889 (8th Cir. 1944).

[136] *See* R.293 (11/6/2006 Tr.) at 14-15.

[137] R.156 Ex A ¶ 14 (Boukal Aff.).

[138] *See* R.159 Ex. B ¶ 20.2.5(b) (under seal) (PGE Contract).

[139] R.293 (11/6/2006 Tr.) at 14.

28

face, *at a minimum*, in the event of non-delivery. Those liquidated damages are not, however, the limit of MPS's harms. If the delay is long enough, MPS would be liable for *all* damages resulting from a 23-week delay of the entire Port Westward project, including PGE's costs in excess of its contract price, plus "all the additional reasonable internal expenses incurred" by PGE as a result of MPS's default.[140] On a job this large and complex, those damages are unknowable. The Port Windward power plant project is a massive undertaking involving hundreds of pieces of critical equipment and dozens of subcontractors operating on a tightly interwoven schedule. The prospective harms that would result from a minimum 23-week delay in delivery of critical parts of the HRSG are not all knowable, and are by no means limited to a simple tally of 23 weeks' worth of liquidated damages. The liquidated damages represent the likely *minimum* harm to MPS, but MPS' total exposure is not so limited. Given the uncertainties of what would happen on a 23-week-delayed job site, that exposure is ultimately incalculable. Such prospective damages are easily preventable, however, by enforcement of the assignment covenant in the HRSG Purchase Agreement. Accordingly, MPS is entitled to specific performance of that covenant so that it may mitigate its damages and complete the Port Westward Project in orderly fashion.

## III.    Section 365 Is Not Intended to Be a Leverage Tool For Debtors

As discussed above, performance of the covenant to assign will simply enact, at no burden to Deltak, the parties' contemplated remedial action in the event of breach. It will accomplish the remedial covenant's goal—allowing MPS to proceed with the orderly completion of the Port Windward project—at MPS's own expense and with no cost to Deltak.

Deltak nonetheless opposes specific performance, and refuses to turn over an asset for which it has no use or commercial value. The Bankruptcy Court expressly found, as a factual matter, that there is no secondary market for this custom equipment, that Deltak has no ready

---

[140] R.159 Ex.3 ¶¶ 29.1.12, 29.3 (under seal) (PGE Contract ).

buyer, that there likely will never be any buyers, and that that the Catalysts thus have no value to the estate or to anyone but MPS.[141] Moreover, Deltak is not even in a position to take delivery of the Catalysts—not only does it lack a buyer for them, it lacks cash to pay for them.[142] The *only* thing Deltak is able to do with the Catalysts is withhold them from MPS. It is doing so for one reason: to extract additional, non-bargained-for value from MPS. Deltak tried to characterize this as "fair market value" in the Bankruptcy Court, but it is not fair market value, because, as the court found, there *is no market* for this custom equipment.[143] The Catalysts have inherent value only to MPS. Their only value to Deltak is as a leverage tool to extract concessions (*i.e.*, money) from MPS. That is not fair market value, but instead ransom.[144] The Bankruptcy Court and this Court, as courts of equity, should not condone it.

Deltak has been candid about its desire to extract additional value from MPS. It explained to the district court that notwithstanding its rejection of the HRSG contract, it desired to complete its sale and delivery to MPS, "but on terms [more] favorable to the Debtors, their estates and creditors."[145] Deltak first proposed a so-called "HRSG Completion Plan," under which it would withhold the Catalysts unless MPS agreed to concessions (waivers of future indemnifica-

---

[141] R.293 (11/6/2006 Tr.) at 14-15 (Bankruptcy Court findings); *see also* R.264 (11/1/2006 Tr.) at 49 (Ehm) (no secondary market for catalyst); *id* at 97 (Thangiah) (same); *id.* at 67 (Ehm) (unaware of any sale of a used catalyst); *id.* at 123 (Boukal) (same)..

[142] *Id.*; R.40 (Interim Cash Collateral Order).

[143] R.293 (11/6/2006 Tr.) at 14 (finding the testimony *"that there is no secondary market for these catalysts*, and that it is *highly unlikely that they could be sold for use in another plant"* was "unrebutted and convincing" (emphasis added)); *id.* at 150 ("[T]he testimony does not indicate that there is or will be a meaningful opportunity to sell these catalysts on the market, and that the catalysts are custom made items.").

[144] Or, in the language of law and economics scholars, "rent-seeking" behavior. *See e.g., Ass'n of Public-Safety Communications Officials-Int'l v. F.C.C.*, 76 F.3d 395, 399 n.5 (D.C. Cir. 1996).

[145] R.212 ¶ 8 (Debtors' Reply to the Corrected Limited Opposition by Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts).

tion or warranty claims under the contract) potentially worth tens of millions of dollars.[146]  When

MPS refused, Deltak then proposed releasing the Catalysts, for a payment of $1.85 million—

more than 3 times the amount still owing on the contract price.[147]  The Bankruptcy Court ac-

knowledged that Deltak's goal was to "maximize [its] leverage in its negotiations with Mitsubi-

shi,"[148] and warned Deltak that it was playing a dangerous game of "chicken," in which it was

potentially exposing the estate and its creditors to millions of dollars in liquidated damage claims

from MPS and the Catalyst subcontractors.[149]

In other words, Deltak wants to withhold custom-made equipment in the midst of a bil-

lion-dollar construction project, thereby threatening to hold up completion of an entire power

plant, in the process exposing MPS, itself, and its estate and creditors to massive damages (in-

cluding *but not limited to* liquidated damages), in the hope that MPS, facing massive losses of its

own, will cave in and pay more.  Deltak thus seeks to use the Bankruptcy Code itself as a lever-

age tool, knowing that any future losses to it will be discharged, while MPS's threatened losses

exist in real dollars.  Section 365 was enacted to protect debtors from the burdens of unfavorable

contracts, not to allow rejecting debtors to extort non-debtors by withholding custom assets that

are worthless to the debtor.

Common sense and basic equity counsel against condoning this strategic gamesmanship.

If debtors may hold construction projects hostage by withholding critically needed custom

equipment, it will remove productive rationality from the business judgments that debtors and

non-debtors must make in the real-world conduct of their businesses.  If defaulting subcontractors

---

[146] Statement of Facts, *supra,* ¶ 20; R.159 Ex. 5 (under seal) (HRSG Completion Program).

[147] Statement of Facts, *supra,* ¶ 22; R.264 (11/1/2006 Tr.) at 121-22 (Boukal).

[148] R.293 (11/6/2006 Tr.) at 151.

[149] R.264 (11/1/2006 Tr.) at 145; R.293 (11/6/2006 Tr.) at 15-16.

31

may hold up construction projects to enforce ransom demands, non-debtors faced with such demands will have to contrast their short-term interests (where reason dictates paying the ransom rather than incurring much greater losses) with their long-term interests (considering whether paying ransom will only encourage similar demands from the debtor on other projects). The process may induce rational actors to make otherwise irrational choices—letting perfectly good custom equipment go to waste, for example, rather than encouraging future demands by capitulating to present ones.

Complex construction projects like the Port Windward installation often involve hundreds of subcontracts, on interlocking schedules, to be performed by vendors or subcontractors who often operate on tight margins near the edge of solvency. It is for this reason that construction contracts routinely include assignment and takeover provisions among their remedies. If Deltak is right that Section 365 rejection prevents enforcement of assignment and takeover provisions, the industry will lose a critical contract tool that has long served to ensure the orderly continuation of projects. Instead, any complex construction project will be subject to holdup any time a subcontractor holding a critical custom asset seeks bankruptcy protection. Section 365 was not intended to hand debtors such a tool for gamesmanship.

Cases addressing this factual scenario are scarce, for the simple reason that, despite thousands of subcontractor bankruptcies in the construction industry, no businessmen in that industry have previously thought it legitimate to engage in this type of tactic. This Court should not allow reluctance or skepticism about the availability of specific performance lead it to be the first court to condone such behavior. Instead, it should apply common sense and basic equity to order performance of the contract's remedial continuity provision.

**IV.    Because Time Is Of The Essence, This Court Should Order The Requested Relief**

The liquidated damages clause of the Port Westward Project Contract demands *delivery* of the Catalysts on or before December 15, 2006. It will take three weeks to ship the Catalysts from their present locations in New York and Alabama.[150] Thus, MPS needs to know by November 22 (the day before Thanksgiving) whether it may require assignment of the Catalyst subcontracts, or whether it must decide whether to order new Catalysts. Accordingly, this Court Because time is of the essence, MPS respectfully requests that this Court issue an order by November 22 directing the Bankruptcy Court to order forthwith that Deltak assign the Catalysts subcontracts immediately.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Bankruptcy Court's November 9, 2006 Order (R.291) to the extent that it denied MPS' request for specific performance of the covenant to assign the Catalyst subcontracts. Because of the urgent need for decision in light of the looming December 15 deadline for Mitsubishi to supply a HRSG on the Port Windward project, this Court should direct the Bankruptcy Court, on remand, to enter an order forthwith directing specific performance of the covenant to assign.

---

[150] *See* R.264 (11/1/2006 Tr.) at 125-27.

Respectfully submitted,

Marc J. Phillips (No. 4445)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141
mphillips@cblh.com

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)
fagusti@steptoe.com
jrtaylor@steptoe.com

*Counsel for Appellant*
*Mitsubishi Power Systems Americas, Inc.*

#499547v1

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 13th day of November, 2006, I caused a true and correct copy of the **Brief of Appellant Mitsubishi Power Systems Americas, Inc.** to be served in the manner indicated upon the following counsel:

### BY HAND DELIVERY

Jeffrey M. Schlerf, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Stuart M. Brown, Esq.
William E. Chipman, Jr., Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

Joseph McMahon, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

Christopher A. Ward, Esquire
Klehr, Harrison, Harvey, Branzburg
 & Ellers LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

### BY TELEFAX AND U.S. MAIL

Matthew C. Brown, Esq.
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, FL 33131

Howard L. Siegel, Esq.
Brown Rudnick Berlack Israels LLP
City Place I
185 Asylum Street
Hartford, CT 06103

Steven D. Pohl, Esq.
John C. Elstad, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111

Thomas S. Kiriakos, Esq.
Matthew Wargin, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker
Chicago, IL 60606-4637

Edward S. Weisfelner, Esq.
Brown Rudnick Berlack Israels LLP
7 Times Square
New York, NY 10036

Jeffrey S. Sabin, Esq.
David M. Hillman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Marc J. Phillips (No. 4445)

#499551v1