**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP | ) Case No. 06-11045 (BLS) |
| INC., et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| MITSUBISHI POWER SYSTEMS | ) |
| AMERICAS, INC., | ) |
| | ) |
| Appellant, | ) Civil Action No. 06-00687 (KAJ) |
| v. | ) |
| | ) |
| DELTAK, LLC, | ) |
| | ) |
| Debtor-Appellee. | ) |

**APPELLEE'S RESPONSE IN OPPOSITION TO MITSUBISHI'S**
**EMERGENCY MOTION FOR EXPEDITED ACTION ON THE**
**APPEAL OF THE BANKRUPTCY COURT'S NOVEMBER 6, 2006 ORDER**

Deltak, L.L.C. ("Deltak"), a debtor and debtor in possession in the above-

captioned chapter 11 cases, along with Global Power Equipment Group Inc., its affiliated debtors

and debtors in possession (collectively, the "Debtors"),[1] files this response (the "Response") to

the Emergency Motion for Expedited Action on the Appeal of the Bankruptcy Court's November

6, 2006 Order (the "Emergency Motion") filed by Mitsubishi Power Systems Americas, Inc.

("MPS") on November 8, 2006 [Dkt. #2], and respectfully represents as follows:

---

[1] In addition to Deltak, the Debtors include Global Power Equipment Group Inc., Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP.

**Factual and Procedural Background**

1.      On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

2.      On September 29, 2006, the Debtors filed the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (i) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors,[2] (ii) Reject Certain Executory Contracts in Connection Therewith, and (iii) Implement Procedures for the Orderly Completion of Work in Progress (the "Rejection Motion"), which sought authority, inter alia, to reject that certain executory contract between Deltak and MPS in connection with the Port Westward Generating Facility (the "Port Westward Contract").

3.      By order dated October 5, 2006 (the "Wind Down Order"), the Bankruptcy Court granted the Rejection Motion with respect to the winding down of the operations of the Deltak Debtors' Heat Recovery Steam Generation ("HRSG") business segment. The Bankruptcy Court continued the hearing on the Rejection Motion with respect to the rejection of contracts.

4.      On October 24, 2006, MPS filed the Corrected Limited Opposition of Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory

---

[2]      The Deltak Debtors consist of Deltak, L.L.C. and Deltak Construction Services, Inc.

Contracts (the "Limited Opposition"), asserting that (i) the Port Westward Contract should be rejected immediately; and (ii) rejection must be conditioned on the enforcement of alleged specific remedy and warranty provisions contained in the contract, including the remedies of specific performance and assignment of certain subcontracts.

5.     On October 27, 2006, Cormetech, Inc. ("Cormetech"), an affiliate of MPS,[3] and one of two subcontractors responsible for the delivery of catalysts to Deltak in connection with the Port Westward Contract, filed the Motion by Cormetech, Inc. to Set a Date for the Assumption or Rejection of Certain Executory Contracts Pursuant to 11 U.S.C. § 365(d)(2) (the "Cormetech Motion").

6.     The Bankruptcy Court heard the Rejection Motion and MPS' Limited Opposition on November 1, 2006, issued a bench ruling on November 6, 2006, and entered an order overruling the MPS objection on November 9, 2006 (the "Ruling"). The Bankruptcy Court granted the Rejection Motion with respect to the Port Westward Contract – i.e., the Court held that the contract would be rejected nunc pro tunc to the date the Rejection Motion was filed – September 29, 2006. The Bankruptcy Court denied the relief requested in the Limited Opposition, refusing to order the Debtors to render specific performance on the Port Westward Contract by assigning its catalyst-related subcontracts to MPS.

7.     On November 6, 2006, the same day it issued its bench ruling concerning MPS' Limited Opposition, the Bankruptcy Court also heard the Cormetech Motion, and entered an order granting the relief requested by Cormetech on November 9, 2006 (the "Cormetech Order"). Pursuant to the Cormetech Order, Deltak was required to file a motion to assume or

---

[3] According to a website for Mitsubishi Heavy Industries America, Inc. ("MHI"), its affiliated organizations include the movant MPS and Cormetech. See http://www.mitsubishitoday.com/affiliates.html (attached hereto as Exhibit "A").

reject its subcontract (the "Subcontract") for the purchase of catalysts from Cormetech on or before November 15, 2006 at 4:00 p.m. On November 15, 2006, the Debtors filed a motion to Reject the Subcontract.

8.      On November 7, 2006, the day after the Bankruptcy Court overruled its Limited Opposition, MPS filed a notice of appeal of the Ruling in the Bankruptcy Court with respect to the instant appeal (the "Appeal"). MPS has since filed its "Statement of Issues," identifying the crux of the Appeal as "[w]hether the Bankruptcy Court erred by ruling that it did not have authority to require, as a condition of rejection of the contract, the Debtor's specific performance of the covenant intended to govern the relationship between the parties after the end of the contract." MPS Statement of Issues [Dkt. #5], at p.2, attached hereto as Exhibit "B."

9.      The Appeal was filed in this Court on November 8, 2006. On the same day, MPS filed its Emergency Motion explicitly invoking Rule 8011(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and it filed the affidavit of Marc J. Phillips in support of the Emergency Motion (the "Affidavit") contemporaneously therewith.

## Opposition

**I.      The Emergency Motion Does Not Comply with Bankruptcy Rule 8011(d) and, Further, Seeks to Avoid Mandatory Mediation**

10.     Under Bankruptcy Rule 8011(d), before filing a motion for expedited relief a party must "make every practicable effort to notify opposing counsel in time for counsel to respond to the motion." Fed. R. Bankr. P. 8011(d). Furthermore, the movant must file an affidavit in support of the emergency motion setting forth, inter alia, "when and how opposing counsel was notified or if opposing counsel was not notified why it was not practicable to do so." Id. Failure to satisfy these requirements provides grounds for denial of the Emergency Motion. See Goldstein v. Matas Corp. (In re Marina City Assocs.), No. 89 C 3453, 1989 WL 206465, at

*8 n.7 (N.D. Ill. June 7, 1989) (counsel's failure to provide an affidavit stating when and how

opposing counsel was notified as required under Bankruptcy Rule 8011(d) constitutes an

adequate basis for denying an emergency motion brought under Bankruptcy Rule

8011(d))(attached hereto as Exhibit "C").

      11.    The Affidavit submitted by MPS in support of its Emergency Motion fails

to satisfy the requirements of Rule 8011(d) because that Affidavit is utterly silent with respect to

MPS' efforts to notify opposing counsel of the Emergency Motion.  Assuming MPS intended

paragraph 28 of the Emergency Motion to satisfy the necessary disclosure requirements, which it

most certainly does not and cannot, such language itself clearly falls short of the notice

requirements of Bankruptcy Rule 8011(d).  Specifically in its Emergency Motion, MPS asserts

that "prior to the filing of [the Emergency Motion], the undersigned counsel for MPS attempted

to contact counsel for Deltak LLC regarding the substance of this motion."  Emergency Motion,

at ¶ 28.  Not only does MPS fail to state when or how it tried to contact Deltak's counsel, but it

also fails to explain why it only "attempted" but did not succeed in doing so.  This deficiency is

especially puzzling given the fact that, upon information and belief, Deltak's counsel was in

meetings with representatives of MPS all day on the day MPS filed its Emergency Motion.

Simply put, the Affidavit does not satisfy the mandatory strictures of Bankruptcy Rule 8011(d),

and for the reasons set forth by the court in In re Marina City Assocs., the Emergency Motion

should be denied.

      12.    In addition to the foregoing, by filing its Emergency Motion for expedited

review, MPS has implicitly sought to avoid the mandatory mediation provisions of this Court for

appeals from the Bankruptcy Court.  Pursuant to the standing order (the "Standing Order") of the

United States District Court for the District of Delaware, entered on July 23, 2004 and attached

hereto as Exhibit "D," all appeals to this Court from the Bankruptcy Court are subject to mandatory mediation procedures, which must be followed prior to the issuance of any decision by this Court. By contending that it will suffer irreparable harm in the absence of expedited action, MPS seeks to circumvent these procedures under the Standing Order and to proceed directly to an accelerated briefing and hearing schedule. For the reasons more fully set forth herein, Deltak does not believe that expedited consideration of this Appeal is warranted or justified, and such appeal should proceed on the briefing schedule set forth in the Bankruptcy Rules and the Federal Rules of Civil Procedure.

13.     Notwithstanding this Court's mandatory mediation procedures, at a recent hearing held on November 13, 2006 concerning an unrelated motion, the Bankruptcy Court requested that counsel for MPS appear, and the Bankruptcy Court informed counsel for MPS that it viewed the current disputes between MPS, MHI and Deltak as ones best resolved as business disputes as opposed to ones requiring a legal resolution. In furtherance of such a resolution, the Bankruptcy Court informed MPS and the Debtors that Judge Gross would be available to mediate the disputes between the parties. As of the filing of this Response, an initial teleconference concerning mediation was held before Judge Gross on Wednesday, November 15, at 11:30 a.m., and pursuant to an agreement between the parties, mediation of all disputes between Deltak and Mitsubishi is currently scheduled before Judge Gross on Friday, November 17, at 1:00p.m.[4]

---

[4]     In addition to the instant appeal, on November 7, 2006, MHI filed its Motion for Relief From the Automatic Stay or for Entry of an Order Compelling Debtor to Assume or Reject Contract related to a contract between MHI and one of Deltak's affiliated debtors, Braden Manufacturing, LLC ("Braden"). Upon information and belief, the parties have substantially resolved all issues related to this motion, subject to approval of the Bank of America. In the event the parties do not resolve their disputes through mediation, the motion is currently scheduled for a hearing before the Bankruptcy Court on November 20, 2006.

6

**II.     The Emergency Motion Should be Denied Because MPS Cannot Show
<u>Irreparable Harm, a Threshold Issue for Receiving Expedited Relief</u>**

14.     Irrespective of the aforementioned fatal deficiencies in the MPS

Emergency Motion that would compel denial of the same, in order for MPS to succeed on its

Emergency Motion, it must show <u>both</u> that (i) there is potential for irreparable harm and (ii)

relief is needed in less time than would normally be taken by the district court or bankruptcy

appellate panel to decide the motion.  Bankruptcy Rule 8011(d).  MPS will not suffer irreparable

harm for two reasons.  First, pursuant to the Bankruptcy Court's Cormetech Order, Deltak filed

its motion to reject the Subcontract with Cormetech on November 15, 2006; and a hearing on

that motion will be heard by the Bankruptcy Court on Friday, November 17, 2006.  As explained

below, the Bankruptcy Court's ruling on Deltak's motion to reject could render any further

action on MPS' Limited Opposition and the Emergency Motion largely meaningless.  Second,

and perhaps most importantly, although MPS has argued that it may suffer "massive damages" in

the absence of immediate relief, it has failed to argue, let alone demonstrate, a potential for

***irreparable harm***.

A.     The issues raised in the Emergency Motion have been
<u>largely resolved through the Cormetech Order.</u>

15.     Although not disclosed by MPS anywhere in the Emergency Motion,

Cormetech, the subcontractor responsible for supplying Deltak with catalysts for the reduction of

post-combustion nitric oxide (the "NOx Catalysts") in connection with the Port Westward

Contract, is an affiliate of MPS, controlled by the same ultimate parent company, MHI.

16.     Pursuant to the Cormetech Motion, which counsel for MPS readily argued

and admitted to the Bankruptcy Court sought relief largely duplicative of its own Limited

Opposition,[5] Cormetech separately requested that the Bankruptcy Court set a date for the assumption or rejection of the NOx Catalyst Subcontract. Pursuant to the Cormetech Order, which was entered just one day after the filing of the Emergency Motion, the Bankruptcy Court required Deltak to file a motion to assume or reject the Subcontract with Cormetech on or before November 15, 2006 at 4:00 p.m., with a hearing on that motion scheduled for November 17, 2006.

17.     Thus, prior to the completion of the expedited briefing and hearing schedule proposed by MPS, which would conclude on November 20, 2006, Deltak may have settled its disputes with MPS through mediation, or Deltak will have already rejected – subject to the resolution of any objection and entry of an order of the Bankruptcy Court - the Subcontract with Cormetech, thereby allowing MPS to directly enter into a new agreement with its affiliate for the purchase of the NOx Catalysts. Under either of these scenarios, it is clear that all issues relating to the Port Westward NOx Catalysts will be resolved pursuant to the Bankruptcy Court's unappealed November 9th Cormetech Order by no later than November 17, 2006. And as such, MPS has no basis for contending that there is any emergency relating to the assignment of the Cormetech Subcontract.

B.     MPS' damages, if any, would be strictly monetary, readily quantifiable and, therefore, would not constitute irreparable harm.

18.     Finally, it is well-established in the law that "irreparable harm is injury for which a monetary award cannot be adequate compensation." Europe Movieco Partners Ltd. v. United Pan-Europe Commc'ns N.V. (In re United Pan-Europe Commc'ns N.V.), Case Nos. 02-16020 (BRL) and M-47(RWS), 2003 WL 221819, at *3 (S.D.N.Y. Jan. 30, 2003) (citations omitted)(attached hereto as Exhibit "F"); see also Lentjes Bischoff GmbH v. Joy Envt'l Tech.,

---

[5]     See Transcript of November 1, 2006 Hearing, attached hereto as Exhibit "E," at page 10.

986 F.Supp. 183, 187-88 (S.D.N.Y. 1997) (possible liquidated damages flowing from inability to perform contract obligations insufficient to establish irreparable harm).

19.    In its Emergency Motion, MPS recycles its assertions in the Limited Opposition regarding the damages that may result absent the relief requested therein. But, as the Bankruptcy Court found, those damages are entirely monetary in nature. And monetary damages cannot constitute irreparable harm. In fact, "[t]he availability of adequate monetary damages belies a claim of irreparable injury." Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988); see also In re United Pan-Europe Commc'ns N.V., 2003 WL 221819, at **3,4 (finding that rejection of a contract would not cause "irreparable harm," as that term is defined in Bankruptcy Rule 8011(d), where, among other things, the harm complained of was simply economic).

20.    MPS does not suggest anywhere in its Emergency Motion that it is likely to incur anything beyond the liquidated monetary damages that may flow from Deltak's refusal to assign certain subcontracts relating to the Port Westward Contract. To the contrary, in the Emergency Motion, MPS simply reiterates its assertions from the Limited Opposition that detail the specific, easily-quantifiable liquidated monetary damages that will result at varying time intervals if MPS cannot obtain the catalysts from Deltak and complete its obligations on the Port Westward Project in a timely manner. The Bankruptcy Court explicitly stated that such damages, *if* they are ultimately incurred, could be asserted by MPS as a claim against the Debtors' estate. Such damage claims would constitute MPS' remedy if it ends up being damaged by Deltak's decision to reject the Cormetech Subcontract. However, as noted above, such damages - even if substantial - do not provide grounds for a finding of irreparable harm, which by definition is non-monetary. See Virginia Petroleum Jobbers Ass'n v. Federal Power

Comm'n, 259 F.2d 921, 925 (C.A. D.C. 1958) ("[t]he possibility that adequate compensatory or other relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm"), *quoted with approval in,* Commonwealth of Pennsylvania v. United States, 533 F.2d 107, 110 n.9 (3d Cir. 1976).

      21.    Additionally, while MPS has failed to argue that it will suffer anything but monetary damages in the absence of an expedited appeal, any such claim would be further undermined by the Bankruptcy Court's explicit finding at the hearing on the Limited Opposition, where Judge Shannon specifically found that "***the catalysts in question are neither unique nor irreplaceable, although they are custom made***." See Transcript of November 6, 2006 Hearing, attached hereto as Exhibit "G", at p. 14 (emphasis supplied). Although it has repeatedly stated that the catalysts are specialized, MPS has raised no arguments to refute the Bankruptcy Court's factual finding that the catalysts are replaceable.

[Remainder of page intentionally left blank]

## Conclusion

WHEREFORE, the Debtors respectfully request entry of an order denying the

Emergency Motion and granting Deltak such other and further relief as the Court deems just and

proper.

Dated:  Wilmington, Delaware
        November 15, 2006


                              THE BAYARD FIRM

                          By: _____
                              Jeffrey M. Schlerf (No. 3047)
                              Eric M. Sutty (No. 4007)
                              Mary E. Augustine (No. 4477)
                              222 Delaware Avenue, Suite 900
                              Wilmington, Delaware 19801
                              (302) 655-5000

                                    -and-

                              Thomas E Lauria
                              John K. Cunningham
                              Frank L. Eaton
                              Matthew C. Brown
                              WHITE & CASE LLP
                              Wachovia Financial Center
                              200 South Biscayne Boulevard, 49th Floor
                              Miami, Florida 33131
                              (305) 371-2700

                              Attorneys to Appellee Deltak, L.L.C.

# EXHIBIT A

MHI Japan



| Home | IR Information | Office | MHIA Affiliates |

# ▯Affiliate Organizations

| Name | Address | Phone | Description |
|------|---------|-------|-------------|
| MLP U.S.A. Inc. | 600 Barcley Blvd. Lincolnshire, IL 60069 | (847)634-9100 | Printing Machinery (Sheed-fed, web, newspaper) |
| Mitsubishi Injection Molding Machinery | 520 Thomas Drive Bensenville, Illinois 60106 | (630)350-0516 | Injection Molding Machinery |
| Mitsubishi Engine North America | 1250 Greenbriar Drive Suite E Addison, IL 60101 | (630)268-0750 | Small Engines & Turbochargers |
| Mitsubishi Power Systems | 100 Colonial Center Parkway Lake Mary, FL 32746 | (407)688-6100 | Power Systems (Boiler, Turbine, Gas Turbines) |
| Los Angeles | 100 Bayview Circle, Suite 4000 Newport Beach, CA 92660 | (949)856-8500 | Power Systems Turbine, De-Nox plant & Wind Trubines |
| Miami | 9100 S. Dadeland Blvd. Suite 1707 Miami, FL 33156 | (305)670-0028 | Developing new gas Turbine Units |
| Philadelphia | 259 East Lancaster Avenue Wynnewood, PA 19096 | (610)649-1412 | Power Plants |
| VienTek, L.L.C. | Postal Annex #212, Rudolph Plaza 3233, N. Mesa, Suite 205 #308 El Paso, TX 79902 | (915)225-1314 | Joint Venture between MPS & TRI |
| Advatech, L.L.C. | c/o URS Corporation 9400 Amberglen Boulevard Austin, TX 78729 | (512)419-6104 | Flue Gas Desulfurization System |
| Diamond LNG, L.L.C. | One Houston Center, Suite 3330 1221 Mckinney Houston, TX 77010 | (713)652-9257 | Steel Structure (LNG Tanks, Cable Stayed Bridges, etc) |
| Intercontinental Jet Service Corp. | 3332 M. 74th E. Ave Tulsa, OK 74115 | (618)834-8888 | Aircraft Product |
| Mitsubishi Caterpillar Forklift America | 2121 W. Sam Houston Parkway N. Houston, TX 77043 | (713)365-1000 | Forklift Trucks |
| Mitsubishi Climate Control | 1200 North Mitsubishi Parkway Franklin, IL 46131 | (317)346-5000 | Air Conditioning Systems for Cars |
| Los Angeles | 3030 E. Victoria Street Rancho Dominquez, CA 90221 | (310)635-8111 | Air Conditioning Systems for Cars |
| Detroit | 6555 18 Mile Road Sterling Heights, MI 48314-4213 | (586)685-1440 | Air Conditioning Systems for Cars |

| Cormetech. Inc. | 5000 International Drive<br>Durham, NC 27712 | (919)287-7254 | De-Nox Plant (Catalyst) |

©Copyright Mitsubishi Heavy Industries America, Inc. 2004. Term of Use

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., *et al.*, | Case No. 06-11045 |
| Debtors. | Jointly Administered |
| | **Related to Docket No. 270** |

### MITSUBISHI POWER SYSTEMS AMERICAS, INC.'S STATEMENT OF ISSUES AND DESIGNATION OF CONTENTS OF RECORD ON APPEAL

Mitsubishi Power Systems Americas, Inc. ("MPS"), a creditor of Debtor, Deltak, LLC ("Debtor" or "Deltak"), hereby files this statement of issues and designation of contents of record with respect to its November 8, 2006 appeal [Docket No. 270] under 28 U.S.C. § 158(a).

MPS appeals from the Bankruptcy Court's ruling rendered in open court November 6, 2006, with respect to:

> 1) Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress [Docket No. 12]; and

> 2) MPS' Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc., To Debtors' Motion to Reject Certain Executory Contract [Docket No. 159].

### Statement of Issues

Appellant sets forth the following issue on appeal pursuant to Federal Rule of Bankruptcy Procedure 8006:

Whether the Bankruptcy Court erred by ruling that it did not have authority to require, as

a condition of rejection of the contract, the Debtor's specific performance of the covenant

intended to govern the relationship between the parties after the end of the contract.

## Designation of Record on Appeal

Appellant designates the following documents to be included in the Record on Appeal:

| Date | Docket No. | Document |
|------|-----------|----------|
| 9/29/2006 | 12 | Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress |
| 10/5/2006 | 85 | Corrected Order Granting In Part Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress. **CERTAIN EXHIBITS FILED UNDER SEAL PURSUANT TO ORDER OF OCTOBER 26, 2006 (DOCKET 194).** |
| 10/24/2006 | 159 | Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc., to Debtors' Motion to Reject Certain Executory Contracts |
| 10/24/2006 | 156 | Affidavit of Richard Boukal |
| 10/24/2006 | 167 | Notice of Agenda of Matters Scheduled for Hearing on October 26, 2006 at 10:00 a.m. |
| 10/25/2006 | 181 | Mitsubishi Power Systems Americas, Inc.'s Opposition to Attempted Continuance of Debtor's Motion to Reject Certain Executory Contracts |
| 10/26/2006 | 194 | Order Pursuant to 11 U.S.C. § 107(b) and Federal Rule of Bankruptcy Procedure 9018 Authorizing the Filing of Certain Contracts and |

|  |  | Schedules Under Seal |
|---|---|---|
| 10/30/2006 | 212 | Debtors' Reply to the Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts |
| 10/31/2006 | 223 | Pre-Hearing Brief of Mitsubishi Power Systems Americas, Inc., on Motion Compelling Debtor to Assume or Reject, Immediately an Executory Contract |
| 10/31/2006 | 225 | Joinder of the Creditors Committee to the Debtors' Reply to the Corrected Limited Opposition of Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts |
| 10/31/2006 | 226 | Response of the Creditors' Committee to Debtors' Motion to Approve Wind Down of HRSG Operations and Rejection of Executory Contracts |
| 11/1/2006 | 264 | Transcript of Hearing held on 11/1/2006 |
| 11/6/2006 |  | Transcript of Hearing held on 11/6/2006 |
| 11/7/2006 | 270 | Notice of Appeal |

Dated: November 9, 2006
     Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

-and-

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 261-0658 (facsimile)
Counsel for Power Systems Americas, Inc.

#499062v1

- 3 -

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 9th day of November, 2006, I caused a true and correct copy of the **Mitsubishi Power Systems Americas, Inc.'s Statement of Issues and Designation of Contents of Record on Appeal** to be served in the manner indicated upon the following counsel:

**BY HAND DELIVERY**

Jeffrey M. Schlerf, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Stuart M. Brown, Esq.
William E. Chipman, Jr., Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

Joseph McMahon, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

**BY TELEFAX AND U.S. MAIL**

Matthew C. Brown, Esq.
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, FL 33131

Howard L. Siegel, Esq.
Brown Rudnick Berlack Israels LLP
City Place I
185 Asylum Street
Hartford, CT 06103

Steven D. Pohl, Esq.
John C. Elstad, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111

Thomas S. Kiriakos, Esq.
Matthew Wargin, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker
Chicago, IL 60606-4637

Edward S. Weisfelner, Esq.
Brown Rudnick Berlack Israels LLP
7 Times Square
New York, NY 10036

Jeffrey S. Sabin, Esq.
David M. Hillman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Marc J. Phillips

#499059v1

# EXHIBIT C

Westlaw.

Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

C
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
In re MARINA CITY ASSOCIATES, Debtor.
Ilene F. GOLDSTEIN, Chapter 7 Trustee for Marina
City Associates, Plaintiff,
v.
MATAS CORPORATION and Seay & Thomas, Inc.,
Defendants.
**89 C 3453.**

June 7, 1989.

Appeal from 88 B 17840 89 A 0134.

*AMENDED MEMORANDUM OPINION AND OR-
DER*

ROVNER, District Judge.

*I. INTRODUCTION*
**\*1** This matter comes before the Court on an emer-
gency appeal from the Bankruptcy Court. Pending
before the Court are:

1. The Trustee's Emergency Notice of Appeal;

2. The Trustee's Emergency Motion for Hearing;

3. Defendant's Motion to Dismiss Emergency Ap-
peal; and

4. The Trustee's Emergency Motion for Withdrawal
of Reference of Trustee's Motions.

For the reasons stated below, the Court concludes
that it does not have jurisdiction over this matter, and
therefore dismisses the appeal. As to the Trustee's
motion for withdrawal of reference, the Court finds
that the Trustee has not demonstrated the requisite
good cause, and therefore denies the motion.

*II. PROCEEDINGS IN THE BANKRUPTCY COURT*
Because of the extraordinarily expedited manner in
which this matter has proceeded, and because of the
incomplete record before the Court, the Court's recit-
ation of the proceedings in the Bankruptcy Court

must be somewhat abbreviated. Nonetheless, a brief
summary is necessary.

The Trustee filed a four-count Second Amended
Complaint ("the complaint") on April 24, 1989. The
complaint arises from a contract in which defendant
Matas Corporation ("Matas") agreed to purchase the
Marina City office and retail complex from the Trust-
ee. The complaint alleges that Matas had an obliga-
tion to issue a letter of credit as earnest money to se-
cure the contract, and to deliver the letter of credit to
defendant Seay & Thomas, Inc. ("Seay & Thomas"),
as escrow agent. It goes on to allege that Matas did
obtain and deliver to Seay & Thomas a letter of credit
in the amount of $1,000,000. However, Matas has al-
legedly defaulted on its other obligations under the
contract to purchase the office complex. The letter
of credit allegedly remains in the possession of Seay
& Thomas, although the letter names the Trustee as
its beneficiary and although the contract between
Matas and the Trustee purportedly gives the Trustee
the right to draw proceeds of the letter in the event of
Matas' default under the contract. As set forth more
fully below, the Trustee's complaint asserts claims
with respect to both the contract of sale and the letter
of credit. Most relevant here is Count IV, pursuant
to which the Trustee seeks an order directing Seay &
Thomas to turn over to the Trustee the letter of credit
it is holding. The letter of credit is due to expire on
April 30, 1989. It is this date which purportedly
renders the matters before the Court an emergency.

The Bankruptcy Court held a number of hearings
concerning the letter of credit. The first of these
took place on April 12, 1989, at which time the
Bankruptcy Court dismissed Count I of the Trustee's
original complaint, which sought possession of the
letter of credit. At the same time, the Bankruptcy
Court denied the Trustee's motion for a turnover of
the letter of credit. Subsequently, on April 24, 1989,
the Trustee filed a First and then a Second Amended
Complaint. [FN1] Count I of the Second Amended
Complaint sought an order declaring the letter of
credit to be the earnest money under Matas' agree-
ment to purchase the office complex. Count IV, as
noted earlier, asserted a claim of possession with re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 206465                                                                                Page 2
Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

spect to the letter of credit.   The Trustee also re-
newed her motion for a turnover order on April 24.
On the same day, defendant Matas filed a motion to
dismiss Counts I and IV.

**\*2** Rather than addressing defendant's motion to dis-
miss, Bankruptcy Judge James held an evidentiary
hearing upon the Trustee's renewed motion for a
turnover order on April 26, 1989.   One of the wit-
nesses called by the Trustee at this hearing was Bar-
bara J. Davis ("Davis"), a real estate attorney who
practices with the law firm of Coffield, Ungaretti,
Harris & Slavin ("the Coffield firm"), the law firm
which represents the Trustee.   Davis was called to
testify as to the contract for the Trustee's sale of the
office complex to Matas.   Davis had counselled the
Trustee on real estate aspects of the contract.

At some point in the proceedings, defendant invoked
the advocate witness rule and objected to the testi-
mony of Davis, because she was a member of the
very firm presenting her testimony.   The Bankruptcy
Court did not sustain the objection initially, and al-
lowed the Coffield firm to complete its direct exam-
ination of Davis.   However, early in its cross-
examination of Davis, Matas renewed its objection to
Davis' testimony at the invitation of the Bankruptcy
Court.   The Bankruptcy Court sustained the objec-
tion pursuant to Section 5-102 of the Illinois Code of
Professional Responsibility. [FN2] However, the
Court permitted the Trustee to retain special co-
counsel, Jay Geller ("Geller") of the firm of Jenner &
Block, to proceed with Davis' testimony.

The Bankruptcy Court refused to allow Davis to
simply adopt wholesale the testimony previously eli-
cited by the Coffield firm, and required Geller to re-
examine her question by question from the beginning
of her testimony.   In the course of this examination,
Michael D. McCormick ("McCormick"), a member
of the Coffield firm, conferred with Geller.   Upon
witnessing the consultation, Judge James admonished
McCormick to desist from talking to Geller.   After
this exchange, McCormick and his associate, Steven
J. Roeder, left counsel table and took a seat at the
back of the courtroom.   Later, however, during de-
fendant's cross-examination of Davis, McCormick
left his seat and approached Geller, ostensibly to

provide Geller with a copy of a deposition tran-
script.   At this point, the following exchange took
place:

MR. MC CORMICK:   Excuse me, your Honor.
Page, Counsel?

MR. PATENODE: Fourteen.

THE COURT: Who's managing this--

MR. PATENODE: Yes, that's what I'd like to know.

THE COURT: --Mr. McCormick?

MR. MC CORMICK: Judge, it was in my briefcase.

THE COURT: Yes, but Mr. Geller didn't ask for any-
thing, why are you interfering with the examination
again, sir?

MR. MC CORMICK: I—

THE COURT:   You are interfering.   I think that this
is improper, that the Court at this time deny the mo-
tion without going to further [sic]--I don't think that
the Coffield firm has withdrawn.

What do you want done, Mr. Meister?

MR. MEISTER:   Your Honor, we made that objec-
tion previously.   We don't think that Ms. Davis' testi-
mony should stand, it should be stricken as long as
the--

THE COURT: It seems as though Mr. McCormick
and not Ms. Goldstein, the trustee, is managing this
on behalf of Ms. Goldstein, therefore, we don't have
the independence that is necessary.

**\*3** MR. MC CORMICK: The only point, Judge, is
though, that--

THE COURT: Excuse me, you're not representing
anyone anymore on this particular hearing.

MR. MC CORMICK: May I address the Court?

THE COURT:   Mr. Geller didn't ask anything.   He
could have made a proper--you started managing the
lawsuit again.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 206465                                                                                         Page 3
Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

MR. MC CORMICK: May I address the Court, Judge?

THE COURT: No. Mr. Geller may.

MR. GELLER: Judge, I don't believe that a request for Coffield, Ungaretti to withdraw was made. I think the request was--

THE COURT: They may not represent the trustee in this proceeding, period.

MR. GELLER: Then I will instruct Mr. McCormick--

THE COURT: It's too late. I think I'll deny the motion because of this high-handed attitude of that law firm, not permitting you, for one thing to manage this lawsuit. They want to continue to manage it, fine. Go somewhere else and manage it.

For these reasons, the motion to obtain the letter of credit will be denied.

MS. GOLDSTEIN: You [sic] Honor?

THE COURT: I've ruled, ma'am. I'm offended, and let--the record might as well show that.

MS. GOLDSTEIN: Your Honor, may I make a post-ruling motion?

THE COURT: No, ma'am.

Transcript of Proceeding before Hon. Thomas James at 34-37, *In re Ilene Goldstein, Trustee v. Matas Corp.,* No. 89 B 00134 (Bankr.N.D.Ill. April 26, 1989).

The Bankruptcy Court thereafter closed the proceedings, and entered an order which provided as follows:

On April 26, 1989, the court held a hearing on the plaintiff's motion for turnover order as to Seay & Thomas, Inc., defendant, as to a certain letter of credit. For the reasons stated in open court on that date, the court finds and concludes that the motion is to be denied. Motion denied.

Minute Order, *In re Ilene Goldstein, Trustee v. Matas Corp.* (Bankr.N.D.Ill. April 26, 1989).

According to the parties, the hearing before Judge James ended at approximately 4:30 p.m. on April 26th. At approximately noon on the following day, April 27, 1989, the Trustee filed her "Emergency Notice of Appeal" and Emergency Motion for Hearing before this Court. At 2:40 p.m., defendant Matas filed a Motion to dismiss the Appeal. After receiving defendant's motion, the Court's law clerk conducted a conference call with counsel for both parties and scheduled a hearing for 5:30 p.m. that evening, for purposes of hearing argument and providing the Court with further authority on the following issues:

1) The significance of Bankruptcy Rule 8011(d) (an issue not raised by the parties);

2) The Court's jurisdiction to entertain this appeal; and

3) If jurisdiction exists and the Court decided to reverse, whether the appropriate course would be to remand the matter to the Bankruptcy Court for another hearing on the turnover order or to conduct such a hearing itself.

At approximately 3:45 p.m., the Trustee filed an Emergency Motion for Withdrawal of Reference of Trustee's Motions, in which she sought to withdraw from the Bankruptcy Court her motion for a turnover order, which the Bankruptcy Court had denied, and an emergency motion to draw upon the letter of credit. No written certificate of service accompanied this motion.

**\*4** At 5:30 p.m., Michael W. Coffield ("Coffield"), of the Coffield firm, attempted to file the following documents in chambers:

1. A Motion for Leave to Appeal;

2. A Notice of Trustee's Emergency Motion for Withdrawal of Reference of Trustee's Motions and Motion for Leave to Appeal; and

3. An Affidavit in Support of Emergency Motion for Hearing and Trustee's Emergency Motion for Withdrawal of Reference of Trustee's Motions.

The Court's staff initially accepted these filings, but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

then directed Coffield to submit them in open court. Coffield did so at the conclusion of the hearing. The hearing commenced at 5:35 p.m. and concluded at 7:40 p.m., after counsel for both parties were permitted to present argument and authority to the Court on the issues set forth above. [FN3]

### III. ANALYSIS

A. *Jurisdiction*

In light of Matas' motion to dismiss, this Court must at the outset determine whether it has jurisdiction to entertain this emergency appeal. Cf. *In re Barker,* 768 F.2d (7th Cir.1985) (even if neither party has challenged appellate jurisdiction, court must raise the issue *sua sponte* if it appears jurisdiction may be lacking). Under the circumstances of this case, the Court concludes that it does not have jurisdiction over the appeal. The order from which the Trustee appeals is not a final, appealable order, nor does the appeal present exceptional circumstances which merit the exercise of the Court's discretion to entertain this matter as an interlocutory appeal.

28 U.S.C. § 158(a) authorizes this Court to hear "appeals from final judgments, orders and decrees" of the Bankruptcy Court. *In re Huff,* 61 B.R. 678 (N.D.Ill.1986) (Aspen, J.). In the context of bankruptcy proceedings, a final order is one which "conclusively determines a separable dispute over a creditor's claim or priority." *In re Saco Local Development Corp.,* 711 F.2d 441, 446 (1st Cir.1983); *Huff,* 61 B.R. at 678. *See also In re Childress,* 851 F.2d 926, 929 (7th Cir.1988); *Barker,* 768 F.2d at 193. The standard of finality is therefore a pragmatic one, in which the Court looks not to the whole of the bankruptcy case to determine whether anything at all remains before the Bankruptcy Court, but instead to the individual disputes and proceedings themselves. Even so, an adversarial proceeding which involves multiple claims should be treated as a single judicial unit for purposes of finality. Thus, an order which disposes of one issue in an adversarial proceeding is not considered final so long as it leaves other claims pending in the same proceeding. *Compare Barker,* 768 F.2d at 193 (proceeding to establish claim final when the proceeding is completed).

The Bankruptcy Court's order of April 26, 1989, denying the Trustee's motion for a turnover order, does not dispose of all claims in the adversarial proceeding, and is therefore not a final order. The Trustee's Second Amended Complaint contains four counts. In Count I, the Trustee seeks a declaratory judgment that the letter of credit constitutes earnest money under the contract to sell the Marina City office complex. In Count II, the Trustee alleges, in the alternative, that if the letter of credit is not earnest money, then defendant Matas has breached its obligation under the contract of sale to supply a letter of credit to Seay & Thomas. Count III is a claim of fraud, in which the Trustee alleges, again in the alternative, that defendant Matas falsely represented that it had supplied a letter of credit to Seay & Thomas as earnest money. Finally, in Count IV, the Trustee seeks an order requiring Seay & Thomas to turn over the letter of credit to the Trustee. It may be that the imminent expiration of the letter moots Count IV of the complaint, and perhaps Count I as well. Nevertheless, as counsel for the Trustee admitted in the course of the arguments heard by this Court, Counts II and III would remain viable and are still pending before the Bankruptcy Court. Indeed, Counts I and IV themselves are still before the Bankruptcy Court, because Judge James has yet to rule upon defendant's motion to dismiss these two counts. In light of the fact that the very counts of the complaint which underlie the Trustee's motion for a turnover order--let alone the other counts of the complaint--are still pending before the Bankruptcy Court, Judge James' order denying the motion for a turnover does not conclusively resolve the adversarial proceeding. *Compare In re Wieboldt Stores, Inc.,* 68 B.R. 578, 580 (N.D.Ill.1986) (Holderman, J.) (Bankruptcy Court's striking of application for stay not a final order, where merits of underlying adversarial proceeding had not yet been decided); *In re X-Cell, Inc.,* 68 B.R. 131, 133 (N.D.Ill.1986) (Aspen, J.) (order of Bankruptcy Court permitting late filing of claim not final, where merits of claim had not yet been reached). The order is therefore not final for purposes of providing this Court with appellate jurisdiction.

**\*5** The Trustee argues that this case falls within the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 206465                                                                Page 5
Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

"collateral order" exception to the finality doctrine set forth in _Cohen v. Beneficial Industrial Loan, 337 U.S. 541, 69 S.Ct. 1221, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)_ order which:

1) conclusively determines a disputed question;

2) resolves an important issue entirely separate from the merits of the action; and

3) is effectively unreviewable on appeal from a final judgment.

_Coopers & Lybrand v. Livesay,_ 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978); _In re Lytton's,_ 832 F.2d 395, 402 (7th Cir.1987); _In re Cash Currency Exchange, Inc.,_ 762 F.2d 542, 547 (7th Cir.1985), _cert. denied,_ 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985) _Huff,_ 61 B.R. at 681. Even if the Court were to assume that the first and third of these criteria are satisfied in this case, the Court is not satisfied that the issue resolved by the order appealed from is one completely separate from the merits of the adversary proceeding. [FN4] The motion which Judge James denied was the Trustee's motion for an order directing Seay & Thomas to relinquish the letter of credit. This motion appears inextricably bound with Count IV of the complaint, which in essence seeks the identical relief. It is also closely related to the other counts of the complaint, which all bear upon the letter of credit. Therefore, the motion for the turnover order, which the Trustee seeks to bring before this Court, inevitably implicates the merits of the Trustee's complaint. Because all counts of the complaint remain before Judge James, his order denying the motion for turnover does not fall within the "collateral order" exception to the finality doctrine. _See X-Cell,_ 68 B.R. at 133 (ruling as to late filing of claim not separable from merits of claim itself).

2. _Interlocutory Appeal_

The lack of a final order does not preclude the Court from exercising its discretion to hear this matter as an interlocutory appeal pursuant to 28 U.S.C. § 158(a). Counsel did not initially file the motion for leave to appeal called for in this instance by Bankruptcy Rule 8001(b). They did so subsequently, however, and in

any event the Court is free to treat the initial notice of appeal as a motion for leave to appeal, pursuant to Bankruptcy Rule 8003(c).

Nevertheless, the Court must consider whether the circumstances here warrant interlocutory review. Judge Aspen has recently followed the lead of other courts which have looked to the jurisdictional principles of 28 U.S.C. § 1292--the statute which governs interlocutory appeals from the district courts to the courts of appeal--in order to determine whether they should permit interlocutory appeals from bankruptcy courts under § 158(a). [FN5] _See Huff,_ 61 B.R. at 682; _accord Wieboldt Stores,_ 68 B.R. at 580 (applying § 1292 principles) (Holderman, J.). _See also Whaley v. United States,_ 76 B.R. 95, 96 (N.D.Miss.1987) (collecting cases which take this approach). This Court agrees with Judges Aspen and Holderman, and finds that reference to such appellate principles is appropriate under § 158(a).

*6 Analogy to 28 U.S.C. § 1292 calls upon the Court to look at two factors. Under § 1292, interlocutory review is warranted "if there are controlling questions of law as to which there is substantial ground for dispute and if an immediate appeal may materially advance the ultimate termination of the litigation." _See Huff,_ 61 B.R. at 682. In this case, the Court is not persuaded that there is a controlling question of law which satisfies the first part of the two-part inquiry under § 1292. Whether the Court looks to the particular basis upon which Judge James terminated the hearing upon the Trustee's motion for a turnover order, or to the merits of the motion itself, the Trustee has failed to cite to the Court a controlling issue of law as to which there is substantial basis for dispute. _Compare Huff,_ 61 B.R. at 682-83 (finding unsettled question of law as to assets which may be included in debtor's estate). It may be, as a practical matter, that the Trustee's motion for a turnover order will soon become moot, and there is some dictum in Judge Aspen's opinion in _Huff_ which suggests that the prospect of irreparable harm is sufficient to meet the second prong of the two-part test. _See_ 61 B.R. at 683. In the absence of a substantial legal question, however, the press of time is insufficient. [FN6] Accordingly, the Court finds that the circumstances of this cause are insufficient to warrant an interlocutory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appeal.

Based upon the lack of jurisdiction, the Court grants defendant's motion and dismisses the Trustee's emergency appeal.

B. *Motion to Withdraw the Reference*

Also pending before the Court is the Trustee's Emergency Motion for Withdrawal of the Reference of Trustee's Motions. In this motion, the Trustee moves the Court for entry of an order pursuant to 28 U.S.C. § 157(d) withdrawing the reference from the Bankruptcy Court of: (1) the Trustee's Motion for a Turnover Order; and (2) the Trustee's Emergency Motion to Draw Upon a Letter of Credit. For the following reasons, the Trustee's emergency motion for a withdrawal of the reference is denied.

28 U.S.C. § 157(d) authorizes a district court to "withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." Thus, the Court may exercise its discretion to withdraw the reference if 1) the motion is timely, and 2) it finds sufficient "cause."

1. *Timeliness*

Section 157(d) is silent with regard to when a motion is timely for the purpose of a § 157(d) motion. The Court agrees with those courts which have held that timeliness means that "a motion under § 157(d) should be made *as soon as possible* after the moving party has notice of the grounds for withdrawing the reference." *In re IQ Telecommunications, Inc.,* 70 B.R. 742, 746 (N.D.Ill.1987) (emphasis added); *In re Baldwin-United Corp.,* 57 B.R. 751, 753 (S.D.Ohio 1985) (timeliness requires that action be taken "without undue delay" at the "first reasonable opportunity"). Under this test, the Court finds that the Trustee's motion is timely. Given the "emergency" nature of the motion, and the fact that the motion was filed one day after the purported emergency arose, the Court finds that the Trustee filed its motion at the first reasonable opportunity. [FN7]

**\*7** There is some authority which suggests that the Court's dismissal of the Trustee's appeal renders the

motion to withdraw moot or "untimely" because the hearing on the motion for a turnover order has already been terminated. *See Mandalay Shores Cooperative Housing Assoc., Inc.,* 58 B.R. 586, 587 (N.D.Ill.1986) ("common sense dictates that [a motion to withdraw] must precede dismissal of the bankruptcy proceedings"). However, "[b]ecause the bankruptcy court is merely an adjunct of the district court, the district court may withdraw the references of a bankruptcy case or a particular bankruptcy proceeding from the bankruptcy judge *at any time.*" 1 R. Ginsberg, Bankruptcy, ¶ 1121 at 1030 (1988 Supp.) (emphasis added). The present motion to withdraw the reference could not have been made before Bankruptcy Judge James had ruled, because the allegations of bias made by the Coffield firm in support of the motion are inextricably tied to Judge James' ultimate ruling. Even if the Trustee's motion were untimely, given the serious allegations of bias, the Court is compelled on its own motion to explore the merits of the motion to withdraw.

2. *"For Cause Shown"*

In addition to filing its motion in a timely manner, a party seeking to withdraw the reference must demonstrate that "cause" exists for the withdrawal. *Basin Electric Power Cooperative v. Midwest Processing Co.,* 61 B.R. 129, 130 (D.N.D.1986). There is caselaw which suggests that this burden is substantial. One district court has stated that the "for cause shown" requirement in Section 157(d) "creates a presumption that Congress intended to have bankruptcy court proceedings adjudicated in the bankruptcy court unless rebutted by a contravening policy." *In re DeLorean Motor Co.,* 49 B.R. 900, 912 (E.D.Mich.1985). The *DeLorean* court stated that "[t]he presumption may be overcome only by an overriding interest based on a finding by the court that withdrawal of the reference is *essential* to preserve a higher interest than that recognized by Congress and is narrowly tailored to serve that interest." *Id.* (emphasis added). *See also In re One Eighty Investments, Ltd.,* 72 B.R. 35, 37 (N.D.Ill.1987).

The Trustee does not list the specific reasons which support "cause" for withdrawing the reference from the Bankruptcy Court in her motion. Instead, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 206465
Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

Trustee merely states that "[f]or the reasons set forth in the Trustee's Emergency Motion for Hearing, cause has been shown for withdrawing the reference from the Bankruptcy Court."   Trustee's Emergency Mot. to Withdraw Ref. at 2.   After reviewing the Trustee's emergency motion for hearing and the arguments made by counsel for the Trustee before the Court, the Court can ascertain only one reason why the Trustee believes the proceeding must be withdrawn:   that Bankruptcy Judge James is "biased" against the Trustee in the bankruptcy proceedings ("[R]emand to the Bankruptcy Court would appear to be futile because of the Bankruptcy Court's apparent predisposition as to the ultimate ruling on the merits".   Trustee's Emergency Mot. for Hearing, at 8.) [FN8] On the incomplete record before it, the Court finds that there is no basis for finding that the Bankruptcy Judge had an improper bias against the Trustee.

*8 In order to constitute "cause" sufficient to withdraw the reference under § 157(d), a bankruptcy judge's alleged bias must be a personal bias and not one arising from the judge's view of the law as applied to the case. _In re Memorial Estates, Inc._, 90 B.R. 886, 898 (N.D.Ill.1988).   The Court has reviewed the record of the proceedings and finds that the Bankruptcy Judge did not have a personal bias against the Trustee.   The Bankruptcy Judge's comments concerning counsel for the Trustee were made after he had ruled that participation in the examination of Davis by attorneys from the Coffield firm was contrary to the Canons of Ethics, and permitted the trustee to retain Geller as special co-counsel in order to conduct the examination.   It appears that after Geller began the direct examination of Davis, Judge James became upset upon observing McCormick, a member of the Coffield firm, conferring with Geller in a sidebar.   In deference to the Bankruptcy Judge's concerns, McCormick and his associate, who had until that time been seated at counsel table with Geller, left the table and took seats in the rear of the courtroom. The Judge's anger resurfaced later, however, when, during the cross-examination of Davis, McCormick left his seat, approached Geller, and inquired of the attorney cross-examining Davis to what page of Davis' deposition the attorney was then

referring in the cross-examination.   It appears that Judge James interpreted this as an attempt by McCormick to interfere with the proceedings and as a violation of his ruling that the Coffield firm could not participate in the examination of Davis.   Having taken this view of McCormick's actions, the Judge terminated the proceeding and denied the motion which was the subject of the hearing.

The Coffield firm now explains that McCormick was simply attempting to provide Geller with a copy of a deposition transcript which Geller did not have, so that Geller could refer to it as Davis was being cross-examined.   This explanation is certainly supported by the record.   Nonetheless, it is not this Court's role to render its own interpretation of the events which transpired before the Bankruptcy Court, but merely to determine if the Bankruptcy Court's judgment was clouded by a personal bias against the Trustee or her counsel. Although the Bankruptcy Judge terminated the hearing below with some strong words directed to the Coffield firm, it does not appear to this Court that the Judge did so out of personal bias.   Rather, the Bankruptcy Court appears to have acted out of fervent concern that the Canons of Ethics be strictly honored. [FN9] Accordingly, the Court finds that the motion to withdraw the reference must be denied for failure to show "cause."

> FN1. The First Amended Complaint is not at issue here.   However, why it took the Trustee until April 24, 1989 to file the First and Second Amended Complaint remains an unanswered question.
>
> FN2. Disciplinary Rule 5-102 provides:
> If a lawyer learns after undertaking employment in contemplated or pending litigation or if it is obvious that he or a lawyer in his firm ought to be called as a witness in behalf of his client, he shall withdraw from the conduct of the trial and neither he nor his firm, if any, shall continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in Rule 5-101(b)(1) through (4).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 206465                                                                    Page 8
Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

FN3. At 8:30 p.m., all personnel were evac-
uated from the Dirksen Federal Building due
to a rupture in the building's main natural
gas line. The Court was not permitted to
reenter the building, and thus had no access
to the pleadings or to its research. Thus, al-
though the Court had every intention of issu-
ing its written ruling on the following day, it
was unable to do so. However, the Court
directed the parties to appear before it at
4:30 p.m. on April 27, 1989, and advised
them orally of its ruling at that time. The
Court contemporaneously issued a minute
order reflecting its decision to dismiss the
Trustee's appeal for want of jurisdiction, and
denying the Trustee's motion for withdrawal
of reference for lack of good cause shown.

FN4. Nor would the Court be convinced that
the issue resolved by the order is an import-
ant or controversial issue calling for guidance
from the district court. *See X-Cell,* 68
B.R. at 133.

FN5. Judge Aspen noted that at least one
district court had additionally looked to the
collateral order doctrine of *Cohen v. Benefi-
cial Industrial Loan Corp., supra,* in weigh-
ing the merits of interlocutory review. *Huff,*
61 B.R. at 682. Assuming that *Cohen* is a
proper source of guidance in the context of
an interlocutory appeal, it does not support
review in this case. As set forth above, the
Court has concluded that the Bankruptcy
Court's April 26 order does not constitute an
appealable collateral order as defined in *Co-
hen* and its progeny.

FN6. Regrettably, the Court cannot undo the
fact that the hearing in the Bankruptcy Court
was held only days before the expiration
date of the letter of credit, nor can it forestall
the expiration. The Court repeatedly en-
couraged the parties to extend the expiration
date of the letter of credit by agreement to
eliminate the emergency. Unfortunately,
the parties were unable to reach such an
agreement.

FN7. Although the motion to withdraw ref-
erence may have been "timely" filed, the
Court notes that counsel for the Trustee
failed to comply with Bankruptcy Rule
8011(d) which describes the procedures for
filing emergency motions, even after the
Court specifically called this rule to coun-
sel's attention. Bkr.R. 8011(d) requires that
emergency motions must be accompanied
by an affidavit setting forth the nature of the
emergency and "when and how opposing
counsel was notified or if opposing counsel
was not notified why it was not practicable
to do so." Although counsel submitted an
affidavit which described the nature of the
emergency, counsel did not state when and
how opposing counsel had been notified.
Rule 8011(d) further requires that the emer-
gency motion itself "state whether all
grounds advanced in support thereof were
submitted to the bankruptcy judge and, if
any grounds relied upon were not submitted,
why the motion should not be remanded to
the bankruptcy judge for reconsideration."
Neither emergency motion filed by the
Trustee complied with this requirement.
Counsel's failure to follow the Bankruptcy
Rules of Procedure constitutes an alternative
ground for denying the Emergency Motion
to Withdraw the Reference and the Emer-
gency Motion for Hearing.

FN8. Counsel for the trustee explicitly la-
belled his argument as one of bias in his oral
arguments to this Court. As Coffield was
reading the transcript of the final moments
of the April 26, 1989 hearing before Judge
James, he paused to preface his recitation of
the last lines of the excerpt with the follow-
ing remark: "... [A]nd then, your Honor, the
words that I believe, in part, have caused us
to claim to this Court that there is clearly bi-
as, there's a lack of due process, and the pro-
ceeding was inappropriately and with an ab-
use of discretion ended...."

FN9. Whether or not Bankruptcy Judge
James erred in applying DR5-102 of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 206465
Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)
**(Cite as: 1989 WL 206465 (N.D.Ill.))**

Code of Professional Responsibility ("Code") is not at issue on appeal. Although counsel for the Trustee argued in his motion that Judge James abused his discretion by applying the Code rather than Rule 3.7 of the ABA Model Rules, counsel repeatedly told the Court during argument that he had been willing to live by Judge James' ruling and was not appealing Judge James' decision to apply the Code.

Not Reported in F.Supp., 1989 WL 206465 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In Re:** | : |
| | : |
| **Procedures To Govern Mediation Of** | : |
| **Appeals From The United States** | : |
| **Bankruptcy Court For This District.** | : |

## O R D E R

WHEREAS, this Court has jurisdiction to hear appeals from the Bankruptcy Court for this

District, 28 U.S.C. § 158;

WHEREAS, the Judges of this Court have determined that, in order to more efficiently

and expeditiously administer justice and assist the parties to amicably resolve the disputes which

are the subject of appeals before the Court, it is appropriate and necessary for there to be

mandatory mediation of all appeals to this Court from the Bankruptcy Court;

NOW THEREFORE, this 23rd day of July, 2004, it is hereby ordered that the following

mandatory mediation procedures shall apply to all appeals to this Court from the Bankruptcy

Court:

    1.    Appellate Mediation Panel

    (a)   The Judges of the Court shall designate a panel of mediators who meet the criteria contained in 1(b) (the "Appellate Mediation Panel" or "Panel").  Panel members will serve at the pleasure of the Judges of this Court.

    (b)   Persons seeking to be members of the Panel must submit a letter requesting same.  Said letter should state the regular hourly rate charged by that person and be accompanied by a Curriculum Vitae which demonstrates the person's experience, competence and acceptability to serve on the Panel.

    (c)   Following selection, the mediator's relationship is solely with the parties to the appeal, except that mediators are subject to certain reporting requirements to the Judges and Clerk of this Court.

2.    <u>Referral to Panel</u>

Appeals in bankruptcy cases shall be referred to the Appellate Mediation Panel to facilitate settlement or otherwise to assist in the expeditious handling of the appeal. The Clerk of this Court shall establish and manage the Appellate Mediation Panel. Mediations will be conducted by members of the Panel. In all cases, the Clerk will assign the matter to a mediator on a rotating basis.

3.    <u>Initial Submissions to Mediator And Deferral of Briefing</u>

The Clerk will provide the mediator with a copy of the judgment or order on appeal, any opinion or memorandum issued by the Bankruptcy Court, any relevant motions, and all statements by the parties of the issues to be presented on appeal.

Briefing shall be deferred during the pendency of mediation unless the Court determines otherwise. A referral to mediation, however, shall not defer or extend the time for ordering any necessary transcripts.

If a case is not resolved through mediation, it will proceed through the appellate process as if mediation had not been considered or initiated.

4.    <u>Referral of Pending Appeals to Mediation</u>

At any time during an appeal pending as of the date of this order, the assigned Judge may refer the appeal to the Panel for mediation. The procedures set forth in paragraph 5 below are applicable to matters referred for mediation pursuant to this paragraph unless otherwise directed by the mediator. Documents, including but not limited to those specified in paragraph 5(a), may be required.

5.    <u>Proceedings After Selection of the Mediator</u>

(a)  <u>Submission of Position Papers and Documents</u>

Within fifteen (15) days after the selection of the mediator, each counsel shall prepare and submit to the mediator a confidential position paper of no more than ten (10) pages, stating counsel's views on the key facts and legal issues in the case, as well as on key factors relating to settlement. The position paper will include a statement of motions filed in this Court and their status. Copies of position papers submitted by the parties directly to the mediator should not be served upon opposing counsel. Documents prepared for mediation sessions are not to be filed with the Clerk's Office and are not to be of record in the case.

(b)  <u>Mediation Sessions</u>

The mediator will notify the parties of the time, date, and place of the mediation session and whether it will be conducted in person or telephonically. Unless the

mediator directs otherwise, mediation sessions must be attended by the senior lawyer for each party responsible for the appeal and by the person or persons with actual authority to negotiate a settlement of the case. If settlement is not reached at the initial mediation session, but the mediator believes further mediation sessions or discussions would be productive, the mediator may conduct additional mediation sessions in person or telephonically.

(c)   Confidentiality of Mediation Proceedings

The mediator shall not disclose to anyone statements made or information developed during the mediation process. The attorneys and other persons attending the mediation are likewise prohibited from disclosing statements made or information developed during the mediation process to anyone other than clients, principals or co-counsel, and then, only upon receiving due assurances that the recipients will honor the confidentiality of the information. Similarly, the parties are prohibited from using any information obtained as a result of the mediation process as a basis for any motion or argument to any court. The mediation proceedings shall be considered compromise negotiations under Rule 408 of the Federal Rules of Evidence. Notwithstanding the foregoing, the bare fact that a settlement has been reached as a result of mediation shall not be considered confidential.

(d)   Settlement

No party shall be bound by statements or actions at a mediation session unless a settlement is reached. If a settlement is reached, the agreement shall be reduced to writing and shall be binding upon all parties to the agreement, and counsel shall file a stipulation of dismissal of the appeal. Such a stipulation must be filed within thirty (30) days after settlement is reached.

(e)   Fees of the Mediator

One-half of the mediator's fees shall be paid by the appellant(s) and one-half of such fees shall be paid by the appellee(s).


FOR THE COURT:


      Sue L. Robinson
SUE L. ROBINSON
CHIEF JUDGE

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        )  Case No. 06-11045(BLS)
                              )  Chapter 11
GLOBAL POWER EQUIPMENT        )
GROUP, INC., <u>et</u> <u>al</u>.,        )  Courtroom No. 1
                              )  824 Market Street
                  Debtors.    )  Wilmington, Delaware 19801
                              )
                              )
                              )  November 1, 2006
                              )  2:04 P.M.

     TRANSCRIPT OF DEBTORS' MOTION FOR AUTHORIZATION FOR WIND DOWN
          PROCEDURES, CONTINUED FROM OCTOBER 26, 2006
                  JUDGE BRENDAN L. SHANNON
              UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:              The Bayard Firm
                          By:  ERIC SUTTY, ESQ.
                          222 Delaware Avenue, Suite 900
                          P.O. Box 25130
                          Wilmington, Delaware 19899-5130

                          White & Case
                          By:  JOHN K. CUNNINGHAM, ESQ.
                               DOUG SWALINA, ESQ.
                          Wachovia Financial Center
                          Suite 4900
                          200 South Biscayne Boulevard
                          Miami, Florida 33131-2352

Audio Operator:           Brandon McCarthy

          Proceedings recorded by electronic sound recording,
            transcript produced by transcription service.

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

215-862-1115    (FAX) 215-862-6639

2

```
APPEARANCES:
(Continued)

For Mitsubishi Power      Connolly Bove Lodge & Hutz, LLP
Systems:                  By:  MARC PHILLIPS, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          P.O. Box 2207
                          Wilmington, Delaware 19899

                          Steptoe & Johnson LLP
                          By:  FILIBERTO AGUSTI, ESQ.
                               GREG MASCITTI, ESQ.
                          1330 Connecticut Avenue, NW
                          Washington D.C. 20036

                          Steptoe & Johnson LLP
                          By:  GREG R. YATES, ESQ.
                          750 Seventh Avenue, Suite 1900
                          New York New York  10019

For Cormetech, Inc.:      Bifferato, Gentilotti,
                          Biden and Balick
                          By:  CHAT TOMS, ESQ.
                          1308 Delaware Avenue
                          Post Office Box 2165
                          Wilmington, Delaware 19899-2165

                          Nixon Peabody LLP
                          By: GREG MASCITTI, ESQ.
                          1100 Clinton Square
                          Rochester, New York 14604

For Creditors'           Landis Rath & Cobb
Committee:                By:  KERRI MUMFORD, ESQ.
                          The Brandywine Building
                          1000 West Street, Suite 1410
                          Wilmington, Delaware 19801

                          Schulte Roth & Zabel LLP
                          By:  JEFF S. SABIN, ESQ.
                          919 Third Avenue
                          New York, New York 10022

For Bank of America:      Edwards Angell Palmer & Dodge LLP
                          By:  WILLIAM CHIPMAN, ESQ.
                          919 North Market Street, 15th Floor
                          Wilmington, Delaware 19801,
```

3

```
Appearances:
(Continued)

For SNC-Lavalin Power      William D. Sullivan, LLC
Ontario, Inc.:             By:  ELIHU E. ALLINSON, III, ESQ.

                           Sullivan & Worcester
                           By:  PAMELA HOLLERMAN, ESQ.
                           One Post Office Square
                           Boston, Massachusetts 02109

For Ad Hoc Committee       Brown Rudnick Berlac k& Israels
of Equity Holders:         By:  STEVEN POHL, ESQ.
                                HOWARD SIEGEL, ESQ.
                           One Financial Center
                           Boston, Massachusetts 02111
```

4

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **JEFFREY EHM** | | | | |
| By Mr. Swalina | 22 | | 62 | |
| By Mr. Agusti | | 42 | | 67 |
| By Mr. Sabin | | 53 | | |
| By Mr. Cunningham | | 62 | | |
| | | | | |
| **ROBERT CARUSO** | | | | |
| By Mr. Cunningham | 68 | | | |
| By Mr. Agusti | | 74 | | 76 |
| By Mr. Sabin | | 74 | | |
| | | | | |
| **SCHARTZ THANGIAH** | | | | |
| By Mr. Yates | 80 | | | |
| By Mr. Sabin | | 105 | | |
| | | | | |
| **RICHARD BOUKAL** | | | | |
| By Mr. Yates | 112 | | | |
| By Mr. Cunningham | | 127 | | |
| By Mr. Sabin | | 133 | | |

EXHIBITS

| DESCRIPTION | | ID. | EVID. |
|---|---|---|---|
| D-1 | Depiction of the HRSG | 18 | 77 |
| D-2 | Purchase Agreement | 19 | 77 |
| D-3 | Printout from Mitsubishi web site | 19 | 77 |
| M-1 | E-mail | 51 | 79 |
| M-2 | Completion agreement | 52 | 79 |
| C-1 | Purchase order | 57* | |
| C-2 | Purchase order | 60* | |
| C-3 | Diagram of the Port Westward plant | 84 | |
| C-4 | Diagram | 88 | |
| C-5 | Contract agreement with PGE | 102 | |
| C-6 | Calculation | 103 | |
| C-7 | Contract | 116 | |
| C-8 | Payment schedule | 116 | |

*Previously admitted

**Pages 5-9 Intentionally Omitted**

1      MR. AGUSTI:  Your Honor, may it please the Court.

2  Mitsubishi has no problem with the unsealing of its contract,

3  so long as Deltak has consented to the unsealing of that

4  contract between Deltak and Mitsubishi.  We have no problem

5  with having it unsealed.

6      I might note that we don't have a copy of the

7  Cormetech agreement, so we're really -- don't -- not in the

8  position to comment about that.

9      One procedural matter that I wanted to raise, Your

10  Honor, we will be presenting evidence today, Mitsubishi will.

11  The issues -- the testimony to be given overlaps -- I suppose

12  we have -- we agree, I might add, with the debtors' request to

13  reject the contract with Mitsubishi and do not object to it.

14  So, I should think that that would be resolved relatively

15  quickly.

16      But the evidence that we're about to present has

17  relevance -- would have had relevance to that motion, has

18  relevance to our motion to basically condition rejection on

19  assignment, and has relevance to Cormetech's motion, as well.

20      Rather than to have the witnesses appear three times,

21  I would propose that we simply consolidate it and that their

22  evidence be received with respect to all matters before the

23  Court today, if that's acceptable to Your Honor.

24      MR. SABIN:  Jeff Sabin again.  I don't understand the

25  possibility, Your Honor, that Mitsubishi, who is not a moving

11

1  party with respect to Cormetech's motion, is going to be

2  submitting evidence somehow to meet Cormetech's burden.  It was

3  not contemplated in their papers, and it would be a surprise to

4  this Committee.  And I otherwise would suggest that the

5  Cormetech motion be done separately, Your Honor, even if it's

6  possible at this late date with no notice that Cormetech

7  somehow wants to have a Mitsubishi representative meet its

8  burden on its motion.

9           THE COURT:  Mr. Cunningham?

10          MR. CUNNINGHAM:  The debtors agree, Your Honor, with

11  the Committee's position.

12          We have the burden on our motion.  So, we'll produce

13  our evidence and case in chief, and they can put on their

14  defense or rebuttal.  But we'd like to maintain the order of

15  whose burden is it on the Cormetech motion.  It's their burden

16  to put on evidence.  They did not have any evidence attached to

17  the motion.  There was no affidavit, documents, whatsoever.

18  So, I think we would like to be able to see what evidence they

19  are going to produce today and be able to reserve our rights to

20  response to it.

21          THE COURT:  Mr. Agusti?

22          MR. AGUSTI:  Yes, Your Honor.  I mean I suppose that

23  what -- what counsel, I think, is contemplating is that we put

24  on the Mitsubishi witnesses during our case and question them

25  as our witnesses, and then I suppose that later on, Cormetech

1  would put them on as their witnesses to establish their case.

2          Your Honor, the evidence would be very redundant and

3  quite repetitive.  And I would propose that we avoid that and

4  simply have the evidence heard at one time, all counsel having

5  an opportunity to question and cross examine, as the case might

6  be.

7          THE COURT:  All right.  We're going to deal with one

8  motion at a time.  And I think it's appropriate because I think

9  with the -- we're in sort of a procedural morass here, and part

10 of it is my fault by directing that your objection be

11 considered as a motion to compel assumption or rejection.  But

12 I think that was the practical approach.

13         But I don't want to further muddy the record by

14 essentially developing one full set of evidence that may relate

15 to one motion or another.  If we have to deal with repetitive

16 testimony, it will not be the first time.

17         So, we'll proceed with -- first with -- I view this

18 actually as really -- as really two items.  There's the

19 Cormetech motion, which we'll deal with subsequently.  But I

20 see this as the debtors' motion to reject.  If I'm -- they have

21 a motion to reject.  You're compelling them to assume or

22 rejection.  And so I don't really see that as two separate

23 motions.

24         MR. MASCITTI:  Your Honor, with respect to

25 Cormetech's motion, does that mean that I will not have the

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
**(Cite as: 2003 WL 221819 (S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: UNITED PAN-EUROPE COMMUNICA-
TIONS N.V., Debtor.
EUROPE MOVIECO PARTNERS LIMITED, Ap-
pellant,
v.
UNITED PAN-EUROPE COMMUNICATIONS
N.V., Debtor-Appellee.
**Nos. 02-16020 (BRL), M-47(RWS).**

Jan. 30, 2003.

Chapter 11 debtor, which was Dutch holding com-
pany for cable television service provider, moved to
reject distribution agreement with British broad-
caster. The United States Bankruptcy Court for the
Southern District of New York granted motion, and
broadcaster sought expedited appeal. The District
Court, Sweet, J., held that expedited appeal was not
warranted absent showing of irreparable harm.

Relief denied.

West Headnotes

**Bankruptcy ⬛3778**
51k3778 Most Cited Cases
Expedited appeal of bankruptcy court order, allowing
debtor which provided cable television service to re-
ject executory contract with broadcaster, was not
warranted absent showing of irreparable harm; legal
remedy existed for any economic harm, and allega-
tions of reputational harm were conclusory.
Fed.Rules Bankr.Proc. Rule 8019, 11 U.S.C.A.
Dewey Ballantine, New York, NY, By: Stuart Hirsh-
field, Dianne Coffino, for Appellant, of counsel.

White & Case, New York, NY, By: J. Christopher
Shore, Howard S. Beltzer, for Debtor-Appellee, of
counsel.

*OPINION*
SWEET, J.

**\*1** Appellant Europe Movieco Partners Limited
("Movieco") has moved on an emergency basis pur-
suant to Rules 8011 and 8019 of the Federal Rules of
Bankruptcy Procedure for an expedited determination
of Movieco's appeal from an Order of the United
State Bankruptcy Court for the Southern District of
New York entered on January 8, 2003 (the "Rejection
Order"), permitting the debtor, United Pan-Europe
Communications, N.V. ("UPC"), to reject an agree-
ment between Movieco and UPC.

For the following reasons, that motion is denied.

*Parties*

UPC is a holding company organized under the laws
of The Netherlands, with its statutory seat and prin-
cipal place of business in Amsterdam, Holland. UPC
has no business operations or employees in the
United States. UPC's principal assets consist of its
direct and indirect interests in approximately 200 op-
erating subsidiaries, which own and operate broad-
band communication networks that provide tele-
phone, cable and internet services to residential and
commercial businesses in eleven countries in Europe.

Movieco is a limited liability company organized un-
der the laws of England, with its principal place of
business in London, England. Movieco possesses a
broadcast license issued by the Independent Televi-
sion Commission of the United Kingdom pursuant to
Part 1 of the Broadcasting Act of 1990, as amended
by the Broadcasting Act of 1996. Movieco operates
and broadcasts two movie channels, Cinenova and
Cinenova 2, from England via satellite uplink for re-
ception by subscribers in Benelux countries. Movieco
is regulated by British television authorities.

*The Agreement*

UPC and Movieco entered into a Cable Affiliation
Agreement (the "Agreement") on December 21,
1999. Under the Agreement, Movieco licensed to
UPC, for a period of seven years, the right and the
obligation to receive and distribute the Cinenova
movie channel to UPC's subscribers on its cable sys-
tems in The Netherlands and Flemish-speaking Bel-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
**(Cite as: 2003 WL 221819 (S.D.N.Y.))**

gium. In consideration for this license, UPC is required to pay a certain monthly fee to Movieco. UPC has been in breach of its payment obligations under the Agreement since February 2002.

*The Dual Insolvency Proceedings*

On December 3, 2002, UPC filed a petition with the District Court of Amsterdam (Rechtbank) (the "Dutch Bankruptcy Court"), requesting that it grant UPC a suspension of payments or moratorium under Dutch bankruptcy law. With its petition, UPC filed a proposed plan of compulsory composition under the Dutch Faillissementswet ("Dutch Bankruptcy Code").

Also on December 3, 2002, UPC filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code. With its petition, UPC filed a proposed plan of reorganization and an accompanying disclosure statement. On or about December 23, 2002, UPC filed an amended plan of reorganization (the "Amended Plan") and a related amended disclosure statement. The Amended Plan provides that holders of "rejection claims" will be accorded the treatment accorded holders of pre-petition general unsecured claims and, thus, will be satisfied through the distribution of a *pro rata* share of equity in New UPC. Confirmation of the Amended Plan is scheduled to be heard on February 20, 2003.

*Rejection Order*

**\*2** Also on December 3, 2002, UPC filed a motion to reject the Agreement under section 365 of the U.S. Bankruptcy Code (the "Rejection Motion"). Movieco objected to the motion on the grounds that extending section 365 of the Bankruptcy Code to permit rejection of a contract between a Dutch company and an English company that is performed entirely overseas is contrary to the laws of the debtor's homeland and ran afoul of well-founded principles of international comity and the presumption against extraterritoriality. Movieco requested that the Bankruptcy Court abstain from hearing the Rejection Motion in deference to Dutch law and the proceedings pending before the Dutch Bankruptcy Court.

The Bankruptcy Court heard oral arguments on January 7, 2003. Concluding that no conflict existed between Dutch insolvency law and the U.S. Bankruptcy Code and that, in any event, the appropriate foreign tribunal would determine the preemptive effect, if any, of the Amended Plan, the Bankruptcy Court granted the Rejection Motion, authorizing rejection of the Agreement as of March 1, 2003.

The Rejection Order was entered on the Bankruptcy Court's docket on January 8, 2003. On January 16, 2003, Movieco filed a timely Notice of Appeal.

In pleadings served on UPC on January 24, 2003, Movieco has applied for an injunction requiring UPC to perform the agreement on various grounds, including the alleged unavailability of voluntary termination under Dutch law and the purported violation of Dutch competition laws.

On January 24, 2003, Movieco made the instant motion. Movieco included in its motion a proposed schedule for briefing and argument of its appeal that would result in the first brief filed on February 3, 2003 and argument held on February 23, 2002. Oral argument was held on the instant motion on January 29, 2003, at which time the motion was considered fully submitted.

*DISCUSSION*

Bankruptcy Rule 8019 permits a district court to suspend or modify the normal rules and procedures governing appeals from a bankruptcy court decision and expedite the determination of an appeal. Fed. R. Bankr.P. 8019 ("In the interest of expediting decision or for other cause, the district court or the bankruptcy appellate panel may suspend the requirements or provisions of the rules in Part VIII, except Rules 8001, 8002 and 8013 and may order proceedings in accordance with the direction."); *In re Island Helicopters, Inc.,* No. 97 Civ. 4584, 1997 WL 466973, at \*4 (E.D.N.Y. Aug.13. 1997) (permitting expedited appeal); *In re Mego Int'l Inc.,* 30 B.R. 479, 479-80 (S.D.N.Y.1983) (opinion issued on expedited appeal); 10 Collier on Bankruptcy ¶ 8019.01 (15th ed.2002) ("The primary purpose of Federal Rule of Bankruptcy Procedure 8019 is to give the district courts ... the power to expedite the consideration of cases that are 'of primary concern to the public or to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
(Cite as: 2003 WL 221819 (S.D.N.Y.))

the litigants." ') (*citing* Original Advisory Committee Note to Rule 2 of the Federal Rules of Appellate Procedure, from which Rule 8019 is drawn).

**\*3** "Courts will invoke the power given them by Rule 8019 if there are unusual time considerations or if unfairness to the litigants would otherwise result." 10 Collier on Bankruptcy ¶ 8019.01; *see also Groendyke Transp. Inc. v. Davis,* 406 F.2d 1158, 1162 (5th Cir.1969) (permitting expedited disposition because important public policy issues were involved and appellant's position was clearly correct as a matter of law); *In re Finley,* 135 B.R. 456, 458 (S.D.N.Y.1992) (relying on specific detailed allegations that the debtor's plan could not be implemented until all appeals were resolved, the court agreed to prompt resolution of appeal). For the purposes of determining this motion and in the absence of any discussion by the parties of the legislative history of Rule 8019 to the contrary, the "good cause" required by Rule 8019 will be equated to the requirement of "irreparable harm" required of emergency motions by Rule 8011. [FN1]

> FN1. UPC has cited to a number of cases explicitly brought pursuant only to Fed. R. Bankr.P. 8011(d) for the proposition that the law of this Circuit requires that Movieco show "irreparable harm" to expedite its appeal. *E.g., In re Dairy Mart Convenience Stores, Inc.,* 272 B.R. 66, 70 (S.D.N.Y.2002) ("[T]he appellant must show by affidavit that, to avoid irreparable harm, relief is needed in less time than would normally be required."); *In re Delco Dev. Mid-Island Ltd.,* No. 90 Civ. 3914, 1990 WL 263495, at \*1 (E.D.N.Y. Nov.29, 1990) (movant must "demonstrate[ ] that expedited consideration is necessary to avoid irreparable harm").
> Rule 8011 provides that "[w]henever a movant requests expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would normally be required for the district court or bankruptcy appellate panel to receive and consider a response, the word 'Emergency' shall precede the title of the motion." By the plain language of the provi-

sion, Rule 8011 appears to apply only to a court's determination of whether an "Emergency motion"--such as the one before this court--should be heard on an expedited basis. Thus, Movieco would have had to submit, and label as an "Emergency," its appeal, in order for the requirement of "irreparable harm" to apply. Of course, it does not make any sense that a party could file an "Emergency motion" seeking permission for an expedited appeal, instead of directly filing their appeal, and thus avoid the higher showing of irreparable harm. Thus, the Court will read Rule 8019's requirement of showing "good cause" to mean a showing of irreparable harm, as explicitly required in Rule 8011.

Based on the papers and on the arguments presented at a hearing on January 29, 2003, the Court holds that Movieco has failed to present sufficient considerations to justify an expedited schedule.

Movieco points to the fast approaching March 1, 2003 date set by the Bankruptcy Court, at which time UPC can reject the Agreement to show that time is of the essence. Movieco claims that in the absence of an expedited appeal to address whether Section 365 applies to the Agreement (and thus whether any rejection by UPC of the Agreement would be excused under U.S. Bankruptcy law), it would suffer economic and reputational harm if UPC rejected the Agreement and ceased broadcast of Movieco's movie channel. Further, Movieco argues that it stands to lose a substantial source of revenue if the Agreement is rejected, as more than 50 percent of Movieco's revenues are derived from payments UPC is obligated to make under the Agreement.

As an initial matter, according to Movieco's Head of Legal Affairs, UPC has been in breach of its payment obligations to Movieco since February 2002. In light of the ongoing nature of UPC's nonpayment, it is difficult to discern a compelling need to prevent UPC from rejecting the Agreement. In any case, the harm complained of appears to be almost entirely economic in nature, and one for which a legal remedy would exist should Movieco be successful in arguing that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 365 does not apply in this situation and should Movieco further be successful in its arguments in an extra-territorial court that UPC should not be allowed to reject the Agreement. *E.g.*, *In re Dairy Mart*, 272 B.R. at 71 n. 3 ("Monetary loss alone will generally not amount to irreparable harm ....") (*citing Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir.1991)); *Everest Capital Inv. Ltd. v. Editek, Inc.*, 1996 WL 695794, at *3 (S.D.N.Y. Dec.4, 1996) ("Irreparable harm is injury for which a monetary award cannot be adequate compensation") (*citing Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir.1996)(internal citations omitted)).

*\*4* The only potential "irreparable harm" cited is the conclusory allegation that "reputational harm" will ensue if the Agreement is rejected. There are no specific allegations as to what Movieco's current reputation is in the Benelux countries and how that reputation would be affected by the rejection of the Agreement. Nor has Movieco alleged that it could not in any case obtain a contract with another corporation that would provide similar services as UPC had done--and perhaps lead to a better payment history. In light of these conclusory allegations, Movieco has failed to show irreparable harm. *E.g.*, *In re Texaco, Inc.*, 81 B.R. 820, 829 (Bankr.S.D.N.Y.1988) (holding that conclusory statements of irreparable harm, without more, do not suffice to grant relief); *In re Penn-Dixie Indus., Inc.*, 6 B.R. 832, 837 (Bankr.S.D.N.Y.1980) (denying emergency relief because "there ha[d] been no demonstration by [p]laintiffs of any real injury whatsoever that would result from a denial of the relief sought"). In any case, because Movieco fails to establish what sort of reputational harm would occur, it is impossible to judge whether that too would be compensable with an eventual monetary award.

Movieco also points out that its appeal will raise important public policy issues regarding international comity and the extra-territorial reach of section 365 of the U.S. Bankruptcy Code. Movieco has failed to explain, however, why these public policy considerations merit an expedited appeal. Indeed, given the weighty nature of the issues involved, due time and consideration should be given to their briefing and argument by the parties and the measuring thereof by

this Court.

Because Movieco has failed to establish the existence of irreparable harm, the motion for expedited treatment must be denied.

*Conclusion*

For the foregoing reasons, Movieco's motion is denied.

It is so ordered.

Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 06-11045(BLS)
                                    .
                                    . (Jointly Administered)
GLOBAL POWER EQUIPMENT GROUP        .
INC.,                               . 824 Market Street
                                    . Wilmington, Delaware  19801
                                    .
              Debtors.              . November 6, 2006
. . . . . . . . . . . . . . . . . . 1:29 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Debtors:                  The Bayard Firm
                              By:  JEFFREY M. SCHLERF, ESQ.
                                   ERIC M. SUTTY, ESQ.
                              222 Delaware Avenue
                              Suite 900
                              P.O. Box 25130
                              Wilmington, DE  19899

                              White & Case
                              By:  JOHN K. CUNNINGHAM, ESQ.
                                   MATTHEW BROWN, ESQ.
                                   DOUGLAS SWALINA, ESQ.
                                   FRANK KATON, ESQ.
                              Wachovia Financial Center
                              Suite 4900
                              200 South Biscayne Blvd.
                              Miami, FL  33131

Audio Operator:               Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

**DIANA DOMAN TRANSCRIBING**
**P.O. BOX 129**
**Gibbsboro, New Jersey 08026**
**dianadoman@comcast.net**

**(856) 435-7172  Fax No.  (856) 435-7124**

                                                    2

APPEARANCES (Cont'd.):


For Cormetech, Inc.:        Nixon Peabody LLP
                            By:  GREGORY J. MASCITTI, ESQ.
                            1100 Clinton Square
                            Rochester, NY  14603

                            Bifferato, Gentilotti, Biden
                             & Balick P.A.
                            By:  CHAD TOMS, ESQ.
                            Buckner Building
                            1308 Delaware Avenue
                            P.O. Box 2165
                            Wilmington, DE  19899

For Creditors Committee:    Landis Rath & Cobb, LLP
                            By:  ADAM G. LANDIS, ESQ.
                            919 Market Street
                            Wilmington, DE  19801

                            Schulte Roth & Zabel LLP
                            By:  JEFFREY SABIN, ESQ.
                                 DAVID HILLMAN, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Westchester Fire:       Ballard Spahr Andrews &
                             Ingersoll, LLP
                            By:  WILLIAM KELLEHER, ESQ.
                                 ROBERT BOOTE, ESQ.
                            919 North Market Street
                            Wilmington, DE 19801

For Mitsubishi Power Systems: Connolly Bove Lodge & Hutz LLP
                            By:  MARK PHILLIPS, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19801

                            Streptoe & Johnson
                            By:  GREG R. YATES, ESQ.
                            750 Seventh Avenue
                            Suite 1900
                            New York, New York 10019

For SNC-Lavalin Power       WILLIAM D. SULLIVAN, LLC.
Ontario, Inc.:              By: ELIHU E. ALLINSON, III, ESQ.

3

APPEARANCES (Cont'd.):

For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  JOSEPH McMAHON, ESQ.
                             844 King Street
                             Suite 2313
                             Lockbox 35
                             Wilmington, DE 19801

For Bank of America:         Edwards Angell Palmer & Dodge
                              LLP
                             By:  WILLIAM CHIPMAN, ESQ.
                             919 North Market St., 15th Floor
                             Wilmington, Delaware

                             Mayer, Brown, Rowe & Maw
                             By:  THOMAS KIRIAKOS, ESQ.
                             190 South La Salle Street
                             Chicago, IL  60603

For Blackstone:              Simpson, Thacher & Bartlett, LLP
                             By:  MARK THOMPSON, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017

4

## INDEX

**WITNESSES**                                                    **PAGE**

JOHN MATHESON
 Direct Examination by Greg Mascitti                              47
 Cross Examination by John Cunningham                            65
 Cross Examination by Jeffrey Sabin                              67

SCOT PRITCHARD
 Direct Examination by Greg Mascitti                             70
 Cross Examination by John Cunningham                            88
 Cross Examination by Jeffrey Sabin                              92
 Redirect Examination by Greg Mascitti                          101
 Recross Examination by Mr. Cunningham                          108
 Recross Examination by Mr. Sabin                               110
 Further Redirect Examination by Mr. Mascitti                   115

PAT ALBERT
  Direct Examination by Mr. Swalina                             117
  Cross Examination by Mr. Mascitti                             139
  ~~Cross Examination by Mr. Sabin~~                            ~~144~~
  Recross Examination by Mr. Mascitti                           149

**DECISION**
  By the Court                                                  149

**EXHIBITS**                                          **ID.**
Joint Exhibit 1       Contract special and
                      general conditions         83
Joint Exhibit 2       Regarding G.E. Riverside
                      project                    83
Joint Exhibit 3       Regarding Hovensa project  84
Joint Exhibit 4       Regarding Wharton project  85
Joint Exhibit 5       Purchase order between Deltak 85

**Pages 5-9 Intentionally Omitted**

1          So before the Court is the debtors' motion to reject

2    its executory contract with Mitsubishi Power Systems America

3    nunc pro tunc to the petition date.  For reasons that I will

4    describe in more detail, I will approve the rejection of the

5    Mitsubishi nunc pro tunc to the date of the filing of the

6    rejection motion.

7          Mitsubishi has asked that the debtors' rejection of

8    the Mitsubishi agreement be conditioned on the debtors'

9    specific performance of certain provisions of the debtors'

10   contract with Mitsubishi, namely, the assignment to Mitsubishi

11   of the debtors' contracts for catalysts with Cormetech and

12   BASF.  The Court will deny that request and overrule the

13   objection of Mitsubishi for reasons that I will state.

14         As I said, the Court did conduct an evidentiary

15   hearing on the 1st of November and heard testimony from

16   witnesses for both the debtor and for Mitsubishi.  The

17   Committee also participated actively in that hearing and has

18   submitted pleadings in connection therewith.  At the conclusion

19   of the hearing I took the matter under advisement.

20         From the pleadings, evidence, and argument, I am

21   acutely aware that the business issues arising from this

22   dispute are urgent, and I have elected to provide you with my

23   decision from the bench in order to insure that all parties are

24   aware of my ruling as promptly as possible.  And as I said,

25   while a formal written opinion might have been preferable to

11

1  deal with some of the rather novel issues that are raised, the

2  attendant delay would not have served either the interests of

3  justice or the parties.

4        The record reflects that both the debtor and

5  Mitsubishi and the Official Committee support rejection of the

6  Mitsubishi contract.  The standard for rejection of an

7  executory contract under Section 365(a) is the business

8  judgment rule, and it's axiomatic, but this is a fairly low

9  threshold.

10        Through the testimony of Mr. Ame and Mr. Caruso, I

11  find that the debtors have carried their burden, and I will

12  approve the rejection of the agreement with Mitsubishi.

13        The second issue concerns the timing of the

14  rejection.  The debtors have asked for rejection nunc pro tunc

15  to the petition date, September 8, 2006.  The motion to reject

16  was filed on September 29, 2006.  The debtors' rejection will

17  be effective as of the rejection motion -- as of the filing of

18  the rejection motion.  Given that there's only a day's

19  difference between the two, there may be no meaningful economic

20  difference between those two dates, nevertheless, both

21  applicable case law and established practice in this

22  jurisdiction lead to the conclusion that the effective date of

23  the rejection should not be prior to the date of the filing of

24  the motion to reject.  In this context the crux of the analysis

25  is whether the debtor has given clear notice of its unequivocal

12

1  intent to breach and reject the contract, and both the debtor

2  and Mitsubishi have acted consistently with those

3  representations.

4      The unrebutted testimony from the November 1 hearing

5  reflects that the debtor has take no steps to perform under the

6  contract, and Mitsubishi has consistently acted as if the

7  contract was breached as of the motion date notwithstanding its

8  attempt to compel specific performance and certain provisions

9  of the contract.  It appears to the Court that it is the filing

10  of the motion that gives notice of the debtors' unequivocal

11  intent and affords a non-debtor counter party to a contract the

12  ability to negotiate and enter into agreements predicated upon

13  the debtors' timely rejection to mitigate or cover its loss or

14  damages.  The mere act of filing of a petition does not satisfy

15  or accomplish this notification purpose, but the filing of a

16  debtor's motion with it's representations of unequivocal intent

17  in paragraphs 34, 35, and 36 of the rejection motion to breach

18  these agreements does lay the necessary predicates for nunc pro

19  tunc rejection effective as of the date of the filing of the

20  motion.

21      Now we turn to the question of whether it is

22  appropriate for this Court to order as a condition to rejection

23  of a contract the specific performance of certain terms of that

24  rejected contract to benefit a non-debtor contract party.

25  Specifically, Mitsubishi asks that I require the debtor as a

13

1  condition to rejection to assign over subcontractor agreements
2  between the debtors and third parties that would allow
3  Mitsubishi to finish the Port Westward project.  Mitsubishi has
4  the contractual right to require assignment, but that's not the
5  issue.  The issue is whether to specifically enforce that
6  contractual right or limit Mitsubishi to damages if the
7  debtor's breach the contract by refusing assignment.  And while
8  I understand the business and economic considerations that give
9  rise to Mitsubishi's request, neither Bankruptcy Code Section
10  365 or applicable case law, including that cited by Mitsubishi
11  mandates or even permits specific performance here.

12       More specifically, I will overrule and deny
13  Mitsubishi's demand and let the debtor assign over contracts
14  with Cormetech and BASF as a condition to rejection of the
15  Mitsubishi contract.  Mitsubishi has cited numerous decisions
16  that it offers as persuasive precedent that a debtor can be
17  required to specifically perform portions of a rejected
18  contract.  Specifically, the West Chestnut Realty case involved
19  a contract for ownership of real property.  The classic context
20  for equitable remedy -- it's for the equitable remedy of
21  specific performance as real property is deemed unique.  Here,
22  while the catalysts are custom made, they are neither unique
23  nor irreplaceable.

24       In the opinion by Judge Scholl in Walnut Associates
25  is likewise unavailing to Mitsubishi.  Without going into

1  greater detail, I find that <u>Walnut Associates</u> is both

2  procedurally and substantively distinguishable from the case at

3  bar.  And Judge Scholl's comments about the availability of

4  specific performance are dicta in a case that largely turns on

5  principles of estoppel.

6         At bottom, the testimony adduced from Mr. Ame and Mr.

7  Gangaiah, I believe, is in agreement that the catalysts in

8  question are neither unique nor irreplaceable, although they

9  are custom made.  In fact, the testimony from the three

10  industry witnesses was consistent and identified with

11  specificity how to replace the catalysts, how long it would

12  take, and exactly what the costs and damages would be.  The

13  availability of easily calculated money damages and the

14  opportunity to replace the product on the open market is fatal

15  to Mitsubishi's request for specific performance of Section 20

16  of the contract.

17         I also note the largely unrebutted and convincing

18  testimony of Mr. Gangaiah establishes that there is no

19  secondary market for these catalysts, and that it is highly

20  unlikely that they could be sold for use in another plant.

21  Again, the uncontradicted testimony is that these catalysts are

22  custom designed, both for the power plant and to comply with

23  local environmental regulations.  Mr. Gangaiah testified

24  convincingly that installation of these catalysts in a HRSG at

25  another plant was highly unlikely, both on account of different

1 environmental standards, and because the HRSG is engineered to

2 operate at precise pressures that would almost certainly be

3 adversely affected by a non-customized catalyst array.

4       In a nutshell, the testimony of both Mr. Ame and Mr.

5 Gangaiah supports the conclusion that while the catalysts may

6 be a series of blocks, these blocks are not uniform, they're

7 not standard, and they're not interchangeable with catalysts at

8 other sites.  The Lego block analogy that was used is

9 appealing, but it is inept.

10       Consequently, the record before the Court shows that

11 the catalysts have value only to Mitsubishi, and that if the

12 catalyst is not installed in the Port Westward facility, the

13 catalysts will likely have only scrap value for the estate.

14 Correspondingly, Mitsubishi will have a massive damages claim

15 against the debtor.

16       The record from the November 1 hearing, and more

17 specifically the arguments and representations of counsel at

18 that hearing, reveal that negotiations have occurred to try to

19 reach a business resolution, and this is a situation that cries

20 out for a negotiated resolution.  But the parties, and

21 particularly the debtor and the Committee, should be on notice

22 that they and the creditor body will bear the heavy financial

23 consequences if the debtor is left with a worthless stack of

24 catalysts and a massive damages claim from Mitsubishi.  I will

25 look to the debtor to settle a form of order with Mitsubishi

1  consistent with my ruling and submit it under certification.

2  Are there any questions?

3                        (No verbal response)

4          THE COURT:  We'll turn to the agenda.

5          MR. CUNNINGHAM:  Thank you, Your Honor.  Your Honor,

6  agenda item number three is the debtors' application to retain

7  Alvarez and Marsal as financial advisor nunc pro tunc.  The --

8  Your Honor, the issue primarily that we received from the

9  Creditors Committee initially was the scope of Alvarez and

10 Marsal's retention given that we were also retaining Blackstone

11 Group.  Initially, Your Honor, when we filed the motion,

12 Alvarez and Marsal was playing several functions including an

13 investment banking function.  We subsequently filed a

14 supplement with the Court which modified Alvarez and Marsal's

15 retention to make clear that Alvarez and Marsal was only being

16 retained on an hourly basis as turnaround consultants to the

17 debtors, and that the investment banking function would be

18 fulfilled by the Blackstone Group.

19         And specifically, Your Honor, we went through the

20 provisions with the Creditors Committee at our meeting last

21 Monday that we held in New York in which we've described the

22 role of both Alvarez and Marsal and the Blackstone Group.  And

23 to clarify, Your Honor, for the record, I'd like to just read

24 for the record what that structure was that we had identified.

25         Alvarez and Marsal primarily would be operations and

## CERTIFICATE OF SERVICE

I, Mary E. Augustine, hereby certify that on the 15th day of November, 2006, I caused a

copy of the **Appellee's Response in Opposition to Mitsubishi's Emergency Motion for**

**Expedited Action on the Appeal of the Bankruptcy Court's November 6, 2006 Order** to be

served upon the parties listed below in the manner indicated.

### *VIA* ELECTRONIC MAIL & HAND DELIVERY

Joseph McMahon, Esquire
Office of the United States Trustee
844 King North King Street, Suite 2207
Wilmington, DE 19801
joseph.mcmahon@usdoj.gov

Stuart M. Brown, Esquire
William E. Chipman, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801
sbrown@eapdlaw.com
wchipman@eapdlaw.com

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801
landis@lrclaw.com
mumford@lrclaw.com

Marc J. Phillips, Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801
mphillips@cblh.com

Steven K. Kortanek, Esquire
Christopher A. Ward, Esquire
Klehr, Harrison, Harvey, Branzburg &
    Ellers LLP
919 North Market Street
Suite 1000
Wilmington, DE 19801
skortanek@klehr.com
cward@klehr.com

### *VIA* ELECTRONIC MAIL & FIRST CLASS MAIL

Thomas S. Kiriakos, Esquire
Matthew Wargin, Esquire
Mayer, Brown, Rowe & Maw LLP
71 South Wacker
Chicago, IL 60606-4637
tkiriakos@mayerbrownrowe.com
mwargin@mayerbrownrowe.com

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Curt Weidler, Esquire
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
jeffrey.sabin@srz.com
david.hillman@srz.com
curt.weidler@srz.com

Filiberto Agusti, Esquire
Joshua R. Taylor, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
fagusti@steptoe.com
jrtaylor@steptoe.com

Howard L. Siegel, Esquire
Brown Rudnick Berlack Israels LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402
hsiegel@brownrudnick.com

Steven D. Pohl, Esquire
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
spohl@brownrudnick.com

Mary E. Augustine (No. 4477)

643211v1