## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., <u>et al.</u>, | Case No. 06-11045 (BLS) |
| Debtors. | Jointly Administered |
| MITSUBISHI POWER SYSTEMS AMERICAS, INC., | |
| Appellant, | Civil Action No. 06-00687 (KAJ) |
| v. | |
| DELTAK, L.L.C., | |
| Debtor-Appellee. | |

## BRIEF OF APPELLEE DELTAK, L.L.C.

Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

*Attorneys to Appellee Deltak, L.L.C.*

December 8, 2006

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

COUNTERSTATEMENT OF ISSUE PRESENTED ...................................................1

STANDARD OF REVIEW ..............................................................................................1

NATURE AND STAGE OF PROCEEDING .................................................................1

SUMMARY OF ARGUMENT ........................................................................................6

COUNTERSTATEMENT OF FACTS .........................................................................7

ARGUMENT ...................................................................................................................10

I.      MITSUBISHI CANNOT COMPEL THE DEBTORS TO ASSUME AND
        ASSIGN DELTAK'S CATALYST SUBCONTRACTS FOR THE PORT
        WESTWARD PROJECT.....................................................................................10

        A.      Mitsubishi is Not Entitled to Specific Performance .......................10

        B.      Mitsubishi Lacks Standing to Compel the Debtors to Assume and
                Assign the BASF Contract or any Other Subcontract .....................16

II.     THE RELIEF REQUESTED BY MITSUBISHI WOULD UNDERMINE
        IMPORTANT BANKRUPTCY CODE POLICIES FAVORING MAXIMIZING
        VALUE FOR THE CREDITORS OF A BANKRUPTCY ESTATE .................20

CONCLUSION...............................................................................................................22

# TABLE OF AUTHORITIES

Page

## CASES

Abboud v. The Ground Round, Inc. (In re The Ground Round, Inc.),
335 B.R. 253 (B.A.P. 1st Cir. 2005) ...................................................................11, 14

Air Line Pilots Ass'n v. Continental Airlines,
125 F.3d 120 (3d Cir. 1997)...........................................................................10, 11

Commodity Futures Trading Comm'n v. Weintraub,
471 U.S. 343 (1985)..............................................................................................19

Hertz v. ANC Rental Corp. (In re ANC Rental Corp.),
280 B.R. 808 (Bankr. D. Del. 2002) ....................................................................17

In re Alongi,
272 B.R. 148 (Bankr. D. Md. 2001) .....................................................................10

In re Bellis,
No. 05-41366, 2006 WL. 2380997 (Bankr. D. N.J. Aug. 16, 2006) ....................11

In re Bergt,
241 B.R. 17 (Bankr. D. Alaska 1999)...................................................................12

In re Riverside Nursing Home,
43 B.R. 682 (Bankr. S.D.N.Y. 1984)....................................................................17

In re Walnut Assocs.,
145 B.R. 489 (Bankr. E.D. Pa. 1992) ..............................................................12, 13

In re West Chestnut Realty of Haverford, Inc.,
177 B.R. 501 (Bankr. E.D. Pa. 1995) ...................................................................13

Jamison Coal & Coke Co. v. Goltra,
143 F.2d 889 (8th Cir. 1944) ...........................................................................10, 11

L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),
209 F.3d 291 (3d Cir. 2000)..................................................................................16

Lamie v. U.S. Trustee,
540 U.S. 526 (2004)..............................................................................................16

Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum),
    339 B.R. 91 (D. Del. 2006) ........................................................................................1

Lubrizol Enters. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers,
    Inc.),
    756 F.2d 1043 (4th Cir. 1985) ...........................................................................10, 11

Midway Motor Lodge of Elk Grove v. Innkeeper's Telemanagement & Equip. Corp.,
    54 F.3d 406 (7th Cir. 1995) .................................................................................10

Oberman v. Weiner (In re Crispo),
    No. 96...............................................................................................................19

Pereira v. Foong (In re Ngan Gung Rest.),
    254 B.R. 566 (Bankr. S.D.N.Y. 2000)..................................................................19

Schlumberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys.,
    Inc.),
    327 F.3d 242 (3rd Cir. 2003) .................................................................................1

Sir Speedy, Inc. v. Moody,
    256 B.R. 657 (D. Mass 2000) ...............................................................................13

South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.),
    129 B.R. 200 (9th Cir. 1991) ...............................................................................16

U.S. Trustee v. Bloom (In re Palm Coast, Matanza Shores Ltd. P'ship),
    101 F.3d 253 (2d Cir. 1996)..................................................................................19

United States v. United States Gypsum Co.,
    333 U.S. 364 (1948)..............................................................................................1

## STATUTES

11 U.S.C. § 101(5) .................................................................................................11

11 U.S.C. §§ 105, 363.........................................................................................2, 3

11 U.S.C. § 1107(a) .............................................................................................19

11 U.S.C. § 365(d)(2) ...........................................................................................3

11 U.S.C. §§ 365(f)(2) ..............................................................................14, 16, 17, 18

## COUNTERSTATEMENT OF ISSUE PRESENTED

Whether the Bankruptcy Court correctly held that the Bankruptcy Code does not permit, upon rejection of an executory contract, the remedy of specific performance of a contract provision that purportedly requires assignment of a debtor's executory subcontracts.

## STANDARD OF REVIEW

In undertaking a review of issues on appeal, district courts apply a clearly erroneous standard to a bankruptcy court's finding of fact and a *de novo* standard to its legal conclusions. Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 94 (D. Del. 2006). The bankruptcy court's factual findings are clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948) (cited with approval in Schlumberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.), 327 F.3d 242, 244 (3rd Cir. 2003)).

## NATURE AND STAGE OF PROCEEDING

Appellant Mitsubishi Power Systems, Inc. ("Mitsubishi") appeals from an order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") that (i) authorized Appellee Deltak, L.L.C. ("Deltak") to reject that certain Purchase Agreement for Heat Recovery Steam Generator and Auxiliaries for the Port Westward Generating Facility (the "Port Westward Contract") between Deltak and Mitsubishi, and (ii) overruled Mitsubishi's limited objection that sought to enforce a provision of the Port Westward Contract requiring Deltak to assign to Mitsubishi certain subcontracts related to the Port Westward Contract. App. Ex. K; App. Ex. L at D-335.[1]

---

[1]    References to the Appendix shall be in the form of "App. Ex. [ ] at [__]."

On September 28, 2006 (the "Petition Date"), Deltak and certain of its affiliates (collectively, the "Debtors") each filed in the Bankruptcy Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

On October 10, 2006, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in these chapter 11 cases. On November 9, 2006, the United States Trustee also appointed an Official Committee of Equity Security Holders. No trustee or examiner has been requested or appointed in any of the Debtors' chapter 11 cases.

On September 29, 2006, immediately after the Petition Date, the Debtors filed the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (i) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (ii) Reject Certain Executory Contracts in Connection Therewith, and (iii) Implement Procedures for the Orderly Completion of Work in Progress (the "Rejection Motion"), which sought authority, inter alia, to reject the Port Westward Contract.

By order dated October 3, 2006 (the "Wind Down Order"), the Bankruptcy Court granted the Rejection Motion with respect to the winding down of the operations of Deltak's heat recovery steam generation ("HRSG") business segment and authorized Deltak to enter into completion agreements with their customers that would provide for, among other things, the

completion of HRSG projects. The Bankruptcy Court continued the hearing on the Rejection

Motion with respect to the rejection of contracts. Id.

Rather than enter into a completion agreement, as discussed below, on October

24, 2006 Mitsubishi filed its Corrected Limited Opposition to Debtors' Motion to Reject Certain

Executory Contracts (the "Limited Opposition"), asserting that (i) the Port Westward Contract

should be rejected immediately; and (ii) rejection must be conditioned on the enforcement of

alleged specific remedy and warranty provisions contained in the contract, including the remedy

of specific performance requiring the assignment of certain subcontracts. App. Ex. D at D-96-

97, 104-105.

On October 27, 2006, Cormetech, Inc. ("Cormetech"), an affiliate of Mitsubishi,[2]

and one of the two subcontractors responsible for the delivery of catalysts to Deltak in

connection with the Port Westward Contract, filed its Motion to Set a Date for the Assumption or

Rejection of Certain Executory Contracts Pursuant to 11 U.S.C. § 365(d)(2) (the "Cormetech

Motion"). App. Ex. F. The contracts at issue included, among others, a subcontract between

Deltak and Cormetech for NOx catalysts that would be installed in the Port Westward HRSG

unit (the "Cormetech Subcontract").

The Bankruptcy Court conducted an evidentiary hearing on the Rejection Motion

and Mitsubishi's Limited Opposition on November 1, 2006, issued a bench ruling on November

6, 2006, and entered its written order on November 9, 2006 (the "Ruling"). App. Ex. G; App.

Ex. L; App. Ex. K. The Bankruptcy Court granted the Rejection Motion with respect to the Port

Westward Contract – i.e., the Court held that the contract would be rejected nunc pro tunc to

September 29, 2006, the date the Rejection Motion was filed. App. Ex. K; App. Ex. L. The

---

[2]     According to a website for Mitsubishi Heavy Industries America, Inc. ("MHI"), its affiliated organizations
include the movant MPS and Cormetech. See http://www.mitsubishitoday.com/affiliates.html. App. Ex. R.

Bankruptcy Court denied the relief requested in the Limited Opposition, refusing to order the Debtors to render specific performance on the Port Westward Contract by assigning its catalyst-related subcontracts to Mitsubishi. App. Ex. K; App. Ex. L.

On November 6, 2006, the same day it issued its bench ruling concerning Mitsubishi's Limited Opposition, the Bankruptcy Court also conducted an evidentiary hearing on the Cormetech Motion, and subsequently entered an order granting the relief requested by Cormetech on November 9, 2006 (the "Cormetech Order"). App. Ex. L; App. Ex. J. Pursuant to the Cormetech Order, Deltak was required to either assume or reject the Cormetech Subcontract on or before November 15, 2006 at 4:00 p.m. App. Ex. J. On November 15, 2006, the Debtors filed a motion to reject the Cormetech Subcontract. App. Ex. M. On November 17, 2006, the Bankruptcy Court entered an order granting the Debtors' motion to reject the Cormetech Subcontract. App. Ex. N.

On November 7, 2006, the day after the Bankruptcy Court overruled its Limited Opposition, Mitsubishi filed a notice of appeal of the Ruling in the Bankruptcy Court with respect to the instant appeal (the "Appeal"). App. Ex. H; App. Ex. O. Mitsubishi then filed its "Statement of Issues," identifying the crux of the Appeal as "[w]hether the Bankruptcy Court erred by ruling that it did not have authority to require, as a condition of rejection of the contract, the Debtor's specific performance of the covenant intended to govern the relationship between the parties after the end of the contract." App. Ex. I.

The Appeal was docketed in this Court on November 8, 2006. App. Ex. O. On the same day, Mitsubishi filed an Emergency Motion for Expedited Action on Appeal of the Bankruptcy Court's November 6, 2006 Order (the "Emergency Motion"), seeking an expedited briefing schedule and hearing pursuant to Rule 8011(d) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"). App. Ex. P. Deltak opposed the Emergency Motion, and the Court held a telephonic hearing on the matter on November 16, 2006.

Following the November 16, 2006 telephonic hearing, the Court ordered that (a) Deltak file its Appellee brief by November 20, 2006 at 5:00 p.m., (b) any reply brief must be filed by November 21, 2006 at 5:00 p.m., and (c) oral argument on the matter would be held on November 22, 2006 at a time to be set by the Court. However, by a November 19, 2006 letter to this Court, three days after the telephonic hearing, Mitsubishi withdrew its request for an expedited appeal for the following reasons: (a) Mitsubishi had made arrangements with BASF for a CO Catalyst; and (b) Deltak's executory contract with Cormetech had been rejected by order dated November 17, 2006 (the "Cormetech Rejection Order").

On November 22, 2006, Mitsubishi filed its Motion of Mitsubishi Power Systems Americas, Inc. for Leave to File Supplemental Brief ("Motion to Supplement").

On November 28, 2006, this Court entered a Scheduling Order setting a revised briefing schedule and oral argument on January 19, 2007. Then, on November 29, 2006, Mitsubishi requested that the appeal be reset to an expedited track as a consequence of a motion by the official committee of unsecured creditors for reconsideration of the Cormetech Rejection Order. On November 30, 2006, following the Debtors' responses to the renewed request for an expedited appeal and Mitsubishi's Motion to Supplement, this Court entered another Scheduling Order providing: (a) Deltak's answering brief must be filed by December 7, 2006 at 5:00 p.m.; (b) Mitsubishi's reply brief must be filed by December 11, 2006 at 5:00 p.m.; and (c) oral argument would be held on December 14, 2006 at 9:30 a.m.[3]

---

[3]      On December 7, 2006, this Court extended Deltak's deadline to December 8, 2006 at noon and Mitsubishi's deadline to December 12, 2006 at noon

## SUMMARY OF ARGUMENT

Through its Appeal, Mitsubishi seeks to compel Deltak to render specific performance on the Port Westward Contract by assigning the BASF Subcontract to Mitsubishi. As the Bankruptcy Court held, however, a grant of specific performance under the facts present here is not proper either under applicable case law or under the Bankruptcy Code. As a threshold matter, the overwhelming weight of legal authority precludes any award of specific performance where, as here, a monetary claim is otherwise available. Not only does the Port Westward Contract provide for monetary damages in the event of breach, but Mitsubishi has failed to rebut the Bankruptcy Court's explicit finding that Mitsubishi has clearly determined those damages with specificity.

The Bankruptcy Court correctly held below that an award of specific performance enforcing the assignment provisions in the Port Westward Contract is simply not permitted under section 365 of the Bankruptcy Code because, under applicable law, Deltak is powerless to assign the BASF Subcontract unless and until it assumes that subcontract and pays all cure costs associated therewith. The Bankruptcy Code expressly provides that Deltak can assume an executory contract such as the BASF Subcontract at any time prior to plan confirmation unless *a party* to such contract successfully moves to compel it to assume or reject the Subcontract sooner. As a non-party to the BASF Subcontract, Mitsubishi lacks standing to force Deltak to assume the BASF Subcontract, and such assumption would be a necessary prerequisite to the specific relief Mitsubishi seeks on appeal.

For the same reasons, Mitsubishi cannot compel Deltak to assign other subcontracts relating to the catalysts, or warranty provisions therein, as a condition to rejecting its executory contract with Deltak.

Having failed to provide the Bankruptcy Court or this Court with any legal basis under the Bankruptcy Code for granting specific performance, Mitsubishi resorts to criticizing Deltak for attempting to obtain fair market value for its property interest in the BASF Subcontract. Mitsubishi conveniently omits from its analysis the fact that, as a debtor in possession subject to all of the statutory obligations of a chapter 11 trustee, Deltak is obligated by statute to maximize the value of estate property for the benefit of *all* creditors, not just Mitsubishi. Notwithstanding Mitsubishi's obvious preference to the contrary, Deltak is simply not authorized to sign over property to Mitsubishi without first maximizing the value of that asset.

## COUNTERSTATEMENT OF FACTS

Deltak engineers and manufactures equipment, including HRSGs, used to enhance the efficiency of gas turbine power plants. App. Ex. B at D-67; App. Ex. G at D-159. In September 2004, Deltak entered into the Port Westward Contract with Mitsubishi. App. Ex. G at D-218. The Port Westward Contract essentially requires Mitsubishi to purchase and Deltak to sell an HRSG for installation as part of a power generation project in Oregon. Id.

Under the Port Westward Contract, Deltak was to deliver two catalysts for use in the HRSG to Mitsubishi by December 15, 2006. App. Ex. D (exh. 4 filed under seal). Accordingly, Deltak entered into the Cormetech Subcontract for the purchase and delivery of a NOx catalyst. In addition, Deltak entered into a subcontract with BASF Catalysts, Inc. (formerly Engelhard Corporation) ("BASF") for the purchase and delivery of a CO catalyst (the "BASF Subcontract"). App. Ex. G at D-166-167. As an initial down payment, Deltak paid a percentage of the total purchase price for each catalyst to Cormetech and BASF: approximately $76,215

under the Cormetech Contract and approximately $39,700 under the BASF Contract. See id. at D-168.

The Port Westward Contract is essentially complete, except for the delivery of the two catalysts. Id. at D-166. Prior to completion and shipping the catalysts, however, Deltak filed for bankruptcy protection.

Prior to the Petition Date, the Debtors evaluated the Deltak HRSG business to determine whether it could continue as a going concern. App. Ex. G at D-206. Because of the competitive nature of the HRSG industry, the Deltak HRSG business segment operates at narrow margins, and given the long duration of HRSG projects, those margins are susceptible to commodity price and other cost volatility. App. Ex. B at D-68; App. Ex. G at D-162-163. The Debtors determined that given their liquidity crisis and the fact that nearly all of their HRSG projects would have generated sizeable cash losses going forward, they could not sustain the Deltak HRSG business segment as a going concern. App. Ex. G at D-206.

As part of their first-day relief, the Debtors sought authority to wind down the HRSG business segment, to reject certain HRSG contracts, and to enter into completion agreements with their HRSG customers to facilitate the completion of those HRSG projects that were already in progress and to minimize the negative impact of the Debtors' bankruptcy filing. App. Ex. A; App. Ex. G at D-165. The Bankruptcy Court granted the Debtors authority to enter into completion agreements with their HRSG customers provided that, at a minimum, those customers agreed to: (i) fund all actual costs of completion; (ii) fund any contract incentives paid to employees retained to perform on the contract; and (iii) waive all rejection damages claims to the extent that the performance on the contract was completed. App. Ex. E at D-122-123. Therefore, Deltak entered into negotiations for project completion agreements with its customers

seeking a balance between minimizing the effect of bankruptcy on its customers and, by completing HRSG projects, maximizing value to the estate by mitigating potential rejection damage claims. Id.

Deltak sought to enter into a completion agreement with Mitsubishi similar to those it entered into with its other customers that would have required Mitsubishi to waive rejection damage claims and fund the completion of the Port Westward Contract so that the cost to the Deltak bankruptcy estate in completing work under the customer contract would be at least cash neutral. Id. at 35. Mitsubishi, however, declined to enter into to such an agreement and instead sought to have Deltak assign the Cormetech and BASF Subcontracts without Mitsubishi waiving any claims or in any way compensating Deltak's estate for the assignment of these assets – assets for which Deltak had already made down payments of over $100,000. Id. at 36. Given Deltak's fiduciary obligations to all of its creditors, Deltak could not agree to assign its rights in the Cormetech Contract and BASF Contract without achieving a quid pro quo benefit to the estate that would reflect at least the market value of the catalysts.

Rather than continuing to work constructively towards a resolution of its dispute with Deltak, Mitsubishi chose to litigate. First, Mitsubishi filed its Limited Opposition. App. Ex. D. Shortly thereafter, Cormetech, Mitsubishi's affiliate, filed the Cormetech Motion seeking to compel Deltak to assume or reject the Cormetech Subontract. App. Ex. F. However, BASF, which is not affiliated with Mitsubishi, has not filed a motion seeking to compel Deltak to assume or reject the BASF Subcontract.

At an evidentiary hearing held on November 1, 2006, the Bankruptcy Court heard nearly four hours of testimony and legal argument. At the conclusion of legal argument, the Bankruptcy Court took the matter under advisement. App. Ex. G at D-309. On November 6,

2006, the Bankruptcy Court issued its Ruling in favor of the Debtors, granting the Debtors

motion to reject the Port Westward Contract and denying Mitsubishi's request for specific

performance of the assignment remedy in the contract. App. Ex. L at D-331-338. Prior to the

Bankruptcy Court entering a written order consistent with its Ruling, Mitsubishi filed a notice of

appeal. App. Ex. H; App. Ex. O. On November 9, 2006, the Bankruptcy Court entered its

written order reflecting its November 6, 2006 Ruling from the bench.[4] App. Ex. K.

## ARGUMENT

I. **MITSUBISHI CANNOT COMPEL THE DEBTORS TO ASSUME AND
ASSIGN DELTAK'S CATALYST SUBCONTRACTS FOR THE PORT
WESTWARD PROJECT**

A. <u>**Mitsubishi is Not Entitled to Specific Performance**</u>

In its Ruling, the Bankruptcy Court correctly held as follows:

> Mitsubishi has the contractual right to require assignment, but
> that's not the issue. The issue is whether to specifically enforce
> that contractual right or limit Mitsubishi to damages if the debtor's
> breach the contract by refusing assignment. And while I
> understand the business and economic considerations that give rise
> to Mitsubishi's request, <u>neither Bankruptcy Code Section 365 or
> applicable case law, including that cited by Mitsubishi, mandates
> or even permits specific performance here</u>.

App. Ex. L at D-335 (emphasis added).

Mitsubishi argues that "[t]he Bankruptcy Court's belief that the [Bankruptcy]

Code does not permit specific performance of an <u>assignment provision</u> such as that here was

legal error." App. Ex. Q at D-534 (emphasis added). In support of this assertion, Mitsubishi

contends that, as a general matter, "a non-debtor can obtain specific performance of a covenant

---

[4]     The Court also decided the Cormetech Motion on November 6, 2006, and subsequently entered an order
requiring the Debtors to file a motion by November 15, 2006 seeking to assume or reject the Cormetech Contract.
The Debtors complied and filed a motion seeking to reject the Cormetech Contract. The Debtors' motion was
granted by Order dated November 17, 2006, and the Cormetech Contract has now been rejected. App. Ex. N. The
Creditors' Committees motion for reconsideration of that Order is pending.

in a rejected contract, where the covenant concerns not the contract's core obligations but rather the relation of the parties in the event of breach." Id. at D-534-540. For the reasons set forth by the Bankruptcy Court, the fact remains that where, as here, money damages are available upon breach of the obligation to be enforced, specific performance of the obligation is not an available remedy under the Bankruptcy Code. App. Ex. G at D-291.

Applicable case law is clear: courts should only grant specific performance where a monetary claim or other remedy is not otherwise available. See, e.g., Air Line Pilots Ass'n v. Cont'l Airlines, 125 F.3d 120, 133, 136 (3d Cir. 1997) (refusing to grant specific performance where breach of a contractual right could be satisfied by payment of money damages); Lubrizol Enters. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1047 (4th Cir. 1985) ("Allowing specific performance would obviously undercut the core purpose of rejection under § 365(a), and that consequence cannot . . . be read into congressional intent."); see also Midway Motor Lodge of Elk Grove v. Innkeeper's Telemanagement & Equip. Corp., 54 F.3d 406, 407 (7th Cir. 1995) ("Rejection avoids specific performance . . . ."); Jamison Coal & Coke Co. v. Goltra, 143 F.2d 889, 894 (8th Cir. 1944) ("It is well-settled that specific performance will not be granted when there is an adequate remedy at law."); In re Alongi, 272 B.R. 148, 154 (Bankr. D. Md. 2001) ("Where it exists, a monetary remedy is generally favored under the Bankruptcy Code over an equitable one.").

Here, there is no question that, upon rejection of the Port Westward Contract, Mitsubishi could simply file a claim, like every other creditor in Deltak's chapter 11 case, asserting damages arising therefrom. App. Ex. G at D-291 (finding that Mitsubishi had calculated damages associated with breach of the Port Westward Contract "with specificity"). Indeed, in its submission to this Court, Mitsubishi has provided a detailed recitation of the

monetary damages that it would incur without the requested specific performance. See App. Ex. Q at D-526.

Pursuant to section 101(5) of the Bankruptcy Code, the term "claim" is defined to include any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . ." 11 U.S.C. § 101(5)(B). Relying upon this statutory definition, the Third Circuit has refused to authorize an award of specific performance for breach of an executory contract, holding instead that the appropriate basis for relief is a claim for damages. Air Line Pilots, 125 F.3d at 133-36; see also Abboud v. The Ground Round, Inc. (In re The Ground Round, Inc.), 335 B.R. 253, 263 (B.A.P. 1st Cir. 2005) (explaining that an equitable right which gives rise to a right of payment is a "claim" in bankruptcy). The terms of the Port Westward Contract explicitly provide for payment of monetary damages in the event of breach. See App. Ex. Q at D-526. Accordingly, Mitsubishi has a straightforward bankruptcy claim for monetary damages.

Mitsubishi's request for specific performance in lieu of its damages claim does not justify giving preferential treatment to Mitsubishi over other creditors. See In re Bellis, No. 05-41366, 2006 WL 2380997 at *8 (Bankr. D. N.J. Aug. 16, 2006) ("The fact that a creditor's specific performance remedy is preferable to a damages remedy does not mean that a creditor's right to specific performance cannot be reduced to a claim in bankruptcy." (quoting In re Nickels Midway Pier, LLC, 341 B.R. 486, 500 (D. N.J. 2006)));[5] see also Lubrizol, 756 F. 2d at 1048 ("Congress has plainly provided for the rejection of executory contracts, notwithstanding the obvious adverse consequences for contracting parties thereby made inevitable."); Jamison Coal,

---

[5]        A copy of the Bellis decision is attached hereto as Exhibit "A."

143 F. 2d at 894 (recognizing that granting specific performance would enable a plaintiff to "obtain a preference over the other creditors").

Notwithstanding that the Port Westward Contract contains detailed provisions addressing the monetary damages that would arise in the event of breach, Mitsubishi cites Oregon law that purportedly allows specific performance in instances where failure to perform would cause delay. App. Ex. Q at D-540-544. Mitsubishi's reliance on Oregon state law is misplaced since none of the cases they cited arose in the context of a bankruptcy. These cases did not consider the significant distributional consequences that would result if Deltak were ordered to begin to render specific performance on certain of its subcontracts simply to meet deadlines that would reduce its customers' liquidated damages upon its inability to timely perform. Ordering Deltak to specifically perform certain contracts but not others could have a detrimental impact on Deltak's other creditors. As one court explained:

> With a few important exceptions, bankruptcy law accepts the nonbankruptcy substantive law applicable to a contract, but bankruptcy adjusts the form of the remedies available upon breach. Damages may be calculated under state law, but they are paid out according to bankruptcy priorities and principles. . . . The most important example, which is **the choice between damages and specific performance, has powerful distributional consequences and must be governed by a uniform policy in a bankruptcy case; otherwise, state laws providing very broad rights to specific performance would have the inequitable effect of granting preferential treatment to certain contract creditors, to the detriment of all other unsecured creditors in bankruptcy.**

In re Bergt, 241 B.R. 17, 35 (Bankr. D. Alaska 1999) (emphasis added).

The other cases cited by Mitsubishi are likewise completely distinguishable from the facts of this case. Mitsubishi relies heavily on In re Walnut Associates, 145 B.R. 489 (Bankr. E.D. Pa. 1992), to support its argument that specific performance is an available remedy for a rejected executory contract. Although the court in Walnut Associates did take a "new approach"

with respect to the *possibility* of specific performance on a rejected contract, (see id. at 495), the holding of that case is inherently limited by its peculiar facts. In particular, the specific performance sought by the non-debtor party to the rejected executory contract in Walnut Associates was a requirement that the debtor "refrain from continuing to pursue the [non-debtor] in further litigation in the CCP Court litigation or elsewhere, but not to pay money to the [non-debtor]." Id. Indeed, although ultimately remanding the issue, the court determined that such specific performance, if granted, would have a "minimal," if any, effect on the debtor's estates. Id. at 499. In contrast, here there would be significant distributional consequences if Deltak were required to render specific performance for subcontracts of some projects but not others.

Mitsubishi's reliance upon In re West Chestnut Realty of Haverford, Inc., 177 B.R. 501 (Bankr. E.D. Pa. 1995) is similarly misplaced. First, the specific performance sought in that case involved the preservation of the non-debtor's ownership interest in realty, which the court described as "the classic case where the law considers the rights of a contracting party to be unique and thus unsusceptible to the calculation of monetary damages." Id. at 506. Second, because the court was unable to arrive at a legal measure of rejection damages with a sufficient degree of certainty, it therefore considered specific performance a more appropriate remedy. Id. at 506-07. As explained above, that is simply not the case here as Mitsubishi's alleged damages are easily calculable. Indeed, it has already made such a calculation with specificity in papers filed with the Bankruptcy Court.

The remaining cases cited by Mitsubishi are equally unavailing. For instance, in Sir Speedy, Inc. v. Morse, 256 B.R. 657 (D. Mass 2000), the court merely compelled the debtor to comply with the terms of a franchise non-compete agreement, preventing the debtor from operating a competing business within five miles of his franchise location for a year after

termination. In rendering its decision to compel specific performance of the non-compete agreement (which by its nature does not easily yield to a calculation of money damages) the court in <u>Sir Speedy</u> relied "on a string of precedents enforcing non-compete clauses against bankruptcy debtors." App. Ex. Q at D-535.

Conspicuously absent from Mitsubishi's briefing is a citation to any case supporting the proposition that courts can or should authorize specific performance of a subcontract assignment provision in a rejected executory contract.[6] This is not surprising, given that, as explained above, an executory contract cannot be assigned prior to assumption, and assumption can be compelled only by a party to such contract. <u>See</u> 11 U.S.C. §§ 365(f)(2) & (d)(2).

The Bankruptcy Court below specifically rejected the cases cited by Mitsubishi in its Limited Opposition, and recycled in its Appellant's Brief herein, because those cases fail to support Mitsubishi's conclusion, <u>i.e.</u>, that specific performance could be used to compel assignment under the specific facts present here. Having considered the cases cited by Mitsubishi and having heard over four hours of testimony and legal argument on the issue, the Bankruptcy Court correctly stated:

> I did read the <u>Ground Round</u> case . . . . and I have reviewed the other cases that talk about the concept of specific performance in the context of Section 365 and rejection. But . . . even assuming that that body of law is correct, . . . **there's a difference, though, here where you've actually, in your testimony -- or in your witness's testimony, clearly determined what the damages are with specificity.** You can know week-by-week what the damages are, depending on how quickly this -- these items get returned. I don't think there's anyone that disputes that there -- that this --

---

[6]    The <u>Ground Round</u> case involved enforcement of a liquor license provided for in a lease agreement. 335 B.R. at 257. Similarly, <u>In re Torwico Electronics, Inc.</u> involved the enforcement of environmental laws imposing cleanup obligations on the debtor, which the court specifically stressed did not constitute "a right to payment." 8 F.3d 146, 151 (3d Cir. 1993).

> project is difficult to replace. There seems to be a lively debate
> about whether or not there is any other market for it, or another
> buyer on the planet for it other than as scrap value.
>
> But the fact is that what you have is an item that you can get
> another one of. And the consequences are delay and a very
> substantial claim. It's different from a liquor license, for example,
> or a -- and perhaps more aptly, the sale of real estate. You can't
> just spend, you know, six weeks and some more money -- six
> months and some more money and get the same parcel of real
> estate.

App. Ex. G at D-290-291 (emphasis added). The Bankruptcy Court further determined that the

catalysts at issue with regard to the Port Westward Contract were "neither unique nor

irreplaceable, although they [were] custom made." App. Ex. L at D-335.

Mitsubishi has not raised any facts to suggest that the Bankruptcy Court erred in

its factual determination id., nor to contest the Bankruptcy Court's finding that Deltak's default

under the Port Westward Contract could be remedied by a claim for monetary damages.

Accordingly, this Court should affirm the Order of the Bankruptcy Court denying

Mitsubishi's request for specific performance of the Port Westward Contract.

**B.    Mitsubishi Lacks Standing to Compel the Debtors to Assume and
Assign the BASF Contract or any Other Subcontract**

In addition to having no basis for compelling specific performance under the Port

Westward Contract, Mitsubishi has failed to provide any argument to explain how the

assignment they seek complies with, or is even proper under section 365 of the Bankruptcy

Code. The Bankruptcy Court stated that "neither [section] 365 or applicable case law . . .

mandates or even permits specific performance here." App. Ex. L at D-335 (emphasis added).

To understand the bankruptcy law prohibition on the relief Mitsubishi has

requested, it is important to first understand the full scope of Mitsubishi's request to compel

assignment of the Port Westward catalyst subcontracts. To begin with, Deltak currently has no

645351v3
3

authority to assign the BASF Contract because, as explained in greater detail below, Deltak has

yet to assume that subcontract.[7] Thus, any order compelling specific performance would

necessarily require Deltak to obtain the right to assign the BASF Subcontract by first assuming

that subcontract and paying all cure costs associated therewith. Mitsubishi has failed to cite a

single case where a bankruptcy or district court has forced a debtor to assume an executory

contract at the request of a non-party to that contract, such as Mitsubishi. Their failure to cite

such a case is not surprising since such relief is strictly prohibited by the Bankruptcy Code.

The Bankruptcy Code expressly prohibits assignment of an executory contract

unless and until such contract is first assumed pursuant to, and subject to the constraints of,

section 365 of the Bankruptcy Code. 11 U.S.C. § 365(f)(2); In re Midwest Portland Cement Co.,

No. 05-2489, 2006 WL 565683, *35 n.1 (3d Cir. Mar. 9, 2006)[8] (noting that a trustee must first

assume an executory contract before it has the authority to assign it); L.R.S.C. Co. v. Rickel

Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 299 (3d Cir. 2000) (same). Thus,

regardless of whatever rights Mitsubishi may have under its own contract with Deltak or under

state law, the Debtors cannot assign their executory contracts to Mitsubishi unless and until they

assume those subcontracts. See, e.g., South Coast Plaza v. Standor Jewelers West, Inc. (In re

Standor Jewelers West, Inc.), 129 B.R. 200 (9th Cir. 1991) (affirming bankruptcy court's

determination that section 365(f) of the Bankruptcy Code preempts a provision in a lease

agreement that might otherwise be valid under state law).

Further, the Bankruptcy Code expressly provides that a debtor can assume an

executory contract at any time prior to plan confirmation unless *a party* to the executory contract

---

[7]       As explained above, the Cormetech Subcontract was rejected by the Debtors after Cormetech, an affiliate
of Mitsubishi, moved to compel Deltak to decide to assume or reject such contract within a short time frame.
[8]       A copy of the Midwest Portland decision is attached hereto as Exhibit "B."

successfully moves to compel the debtor to assume or reject within a specified time period. 11

U.S.C. § 365(d)(2). As the Supreme Court held in <u>Lamie</u>, "[i]t is well established that 'when the

statute's language is plain, the sole function of the courts – at least where the disposition required

by the text is not absurd – is to enforce it according to its terms.'" <u>Lamie v. U.S. Trustee</u>, 540

U.S. 526, 534 (2004) (quoting <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530

U.S. 1, 6 (2000)). Even where a statute "is awkward, and even ungrammatical[,]" a court should

enforce the plain meaning of its text, provided that the meaning of such provision is not

ambiguous. <u>Lamie</u>, 540 U.S. at 534.

There is nothing ambiguous about section 365(f)(2) of the Bankruptcy Code,

which states in no uncertain terms that:

> The trustee may assign an executory contract or unexpired lease of
> the debtor **only if**—
>
>> (A) the trustee assumes such contract or lease in
>> accordance with the provisions of this section; and
>>
>> (B) adequate assurance of future performance by the
>> assignee of such contract or lease is provided, whether or
>> not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2) (emphasis added). Section 365(d)(2) is equally clear:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may
> assume or reject an executory contract or unexpired lease of
> residential real property or of personal property of the debtor **at
> any time before the confirmation of a plan** but the court, **on the
> request of any party to such contract or lease**, may order the
> trustee to determine within a specified period of time whether to
> assume or reject such contract or lease.

11 U.S.C. § 365(d)(2) (emphasis added).

Here, Mitsubishi seeks to compel Deltak to make its decision to assume and

assign its BASF Subcontract immediately by means of the rejection of a different debtor

contract. However, because Mitsubishi is not a party to that subcontract, it lacks standing to

compel Deltak to do so. See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.), 280

B.R. 808, 818 (Bankr. D. Del. 2002) ("The language in section 365 is clearly intended to protect

the rights of those persons or entities who share contractual relationships with the debtors. In

other words, *in order to invoke the protections provided in section 365, an entity must be a*

*party to a contract with the debtor*." (emphasis added)); see also In re Riverside Nursing Home,

43 B.R. 682, 684-85 (Bankr. S.D.N.Y. 1984) ("In adopting 11 U.S.C. § 365(d)(2), Congress

expressly rejected the concept that any party in interest may compel a debtor to assume or reject

an executory contract or a lease. In a sense, a special relationship of contract or estate is

required; *only the other party to the ... contract has standing to request the court to fix the*

*time for its assumption or rejection*." (emphasis added)).

   The same logic applies to Mitsubishi's cited other "remedial continuity

provisions" such as purported covenants to assign other subcontracts or warranty provisions

therein. There are no exceptions in the Bankruptcy Code to maintain the "standards" of certain

industries or to support underlying contractual intentions or policies. Unfortunately for

Mitsubishi, section 365 as well as the Bankruptcy Code's prohibition against preferring some

similarly certain situated creditors supersede these "commercial considerations."

   Simply put, the BASF Subcontract cannot be assigned without first being

assumed by the Debtors, and the Debtors have the right to decide whether or not to assume at

any time before plan confirmation. Only a party to the BASF Subcontract can move to force the

decision to assume or reject the BASF Subcontract sooner, and Mitsubishi is not a party to that

Subcontract. Accordingly, the relief requested by Mitsubishi is not permitted under the plain

language of the Bankruptcy Code, and, for this additional reason, the Court should affirm the

holding of the Bankruptcy Court denying such relief.

## II.   THE RELIEF REQUESTED BY MITSUBISHI WOULD UNDERMINE IMPORTANT BANKRUPTCY CODE POLICIES FAVORING MAXIMIZING VALUE FOR THE CREDITORS OF A BANKRUPTCY ESTATE

Mitsubishi repeatedly criticizes Deltak for attempting to obtain fair market value for its property. Specifically, Mitsubishi states that

> Deltak has been candid about its desire to extract additional value from [Mitsubishi]. It explained to the district court that notwithstanding its rejection of the HRSG contract, it desired to complete its sale and delivery to [Mitsubishi], "but on terms [more] favorable to the Debtors, their estates and creditors."

App. Ex. Q at D-545. Mitsubishi goes on to suggest that "[t]he Bankruptcy Court and this Court, as courts of equity, should not condone" Deltak's attempts to obtain maximum value for the benefit of the Deltak estate. Id. Mitsubishi fails to recognize the simple fact that the Debtors are not only authorized to maximize the value of their property, they are obligated by statute to do so for the benefit of all creditors, not just Mitsubishi.

Under the Bankruptcy Code, creditors are not given the reins to a debtor's business nor are they given responsibilities for administering the estate. Rather, a debtor in possession remains in control of the business and is charged with the same responsibilities and duties as the appointed "trustee" found more frequently in other countries. See 11 U.S.C. § 1107(a); see also Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352 (1985). Specifically, section 1107 of the Bankruptcy Code, in relevant part, provides:

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession . . . shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a) (emphasis added).

One bedrock principle in bankruptcy is that, under section 323(a) of the

Bankruptcy Code, the debtor in possession stands as the representative of the estate and has the

following duties:

- An affirmative duty to protect estate assets. See Pereira v. Foong (In re Ngan Gung Rest.), 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) ("A trustee also owes a fiduciary duty to each creditor of the estate." (citing Weintraub, 471 U.S. at 355);

- A general duty of loyalty to the debtor's estate and its creditors. See Oberman v. Weiner (In re Crispo), No. 96 B 42570 (JLG), Adv. No. 97/8164A, 1997 WL 258482, at *10 (Bankr. S.D.N.Y. May 13, 1997) ("[The Trustee] acts on behalf of the estate and its creditors, to whom he owes fiduciary duties of loyalty and care."); see also U.S. Trustee v. Bloom (In re Palm Coast, Matanza Shores Ltd. P'ship), 101 F.3d 253, 258 (2d Cir. 1996) ("[A] bankruptcy trustee owes a duty of loyalty to the [parties in interest]"); and

- A "statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors." In re Ngan Gung Rest., 254 B.R. at 570.

Consistent with these duties, the Debtors are required by the Bankruptcy Code to

maximize the value of all property of the estate, including the BASF Subcontract, for the benefit

of all of their creditors, not just Mitsubishi. Despite Mitsubishi's understandable preference

otherwise, the Debtors are simply not authorized to just sign over their property to Mitsubishi

without first maximizing the value of the asset.

## CONCLUSION

WHEREFORE, Deltak respectfully requests that this Court affirm the holding of

the Bankruptcy Court denying Mitsubishi's Limited Opposition.

Dated:   Wilmington, Delaware
         December 8, 2006

                              THE BAYARD FIRM

                              By: _____
                                  Jeffrey M. Schlerf (No. 3047)
                                  Eric M. Sutty (No. 4007)
                                  Mary E. Augustine (No. 4477)
                                  222 Delaware Avenue, Suite 900
                                  Wilmington, Delaware 19801
                                  (302) 655-5000

                                  Attorneys to Appellee Deltak, L.L.C.

# EXHIBIT A

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2380997 (Bkrtcy.D.N.J.)
(Cite as: Slip Copy)

In re Bellis Bkrtcy.D.N.J.,2006.Only the Westlaw citation is currently available.NOT FOR PUBLICATION
United States Bankruptcy Court,D. New Jersey.
In Re Russell H. BELLIS, Sr., Debtor.
No. 05-41366 (DHS).

Aug. 16, 2006

Dean G. Sutton, Esq., Sparta, NJ, for the Debtor.
Marcia Graydon, Powers Kirn, LLC, Marlton, NJ, for Secured Creditor, Countrywide Home Loans, Inc.
Catherine E. Youngman, Esq., Feitlin, Youngman, Karas & Youngman, LLC, Fair Lawn, NJ, for Michael Brodhecker.

### *OPINION*
DONALD H. STECKROTH, Bankruptcy Judge
*1 *THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE*

Before the Court is a motion by Russell H. Bellis, Sr. (the "Debtor") seeking to reject executory contracts and unexpired leases. Countrywide Home Loans, Inc ("Countrywide"), a secured creditor, filed opposition to the Debtor's motion and a cross-motion seeking an order authorizing and requiring the Debtor to sell his real property, or in the alternative, relief from the automatic stay. Michael Brodhecker, a tenant on Debtor's property, filed a certification in opposition to the motion to reject its executory contracts and unexpired leases and in support of Countrywide's cross-motion. The Debtor subsequently filed a reply brief and attached an appraisal of the property.

### *Jurisdiction*

The Court has jurisdiction under 28 U.S.C. § § 1334(b), 151, and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper under 28 U.S.C. § 1409(a). The following shall constitute the Court's findings of fact and conclusions of law, in accordance with Federal Rule of Bankruptcy Procedure 7052.

### *Findings of Fact*

The Debtor and Marie Bellis jointly own property located at 531 Kemah Lake Road, Frankford Township, New Jersey (the "Property"). The Property consists of 2.2 acres on which is located a three bedroom residential dwelling, a metal building, a masonry building and a stone office building. On or about January 21, 2005, the Debtor and Marie Bellis entered into a three-year lease of the Property with Michael Brodhecker ("Brodhecker") which included an option to purchase. Under the lease agreement ("Lease"), Brodhecker was required to remit $2,500.00 per month in rent for use of said property. *Debtor's Motion to Reject Executory Contracts and Unexpired Leases.* Ex. A at Art I; Art. III § 3.01. Although the Lease specifically prohibited the assignment of the Lease, Brodhecker had the right to sublet the three-story residential dwelling and retain the income therefrom. *Id.* Ex. A at Art VIII § 8.02.

The Lease further granted Brodhecker a three-year option to purchase the Property so long as he was not in default with the Lease obligations. *Id.* Ex. A at Art. XXI. Thus, Brodhecker maintained the right to exercise the option to purchase the Property at any time prior to the expiration of the Lease. *Id.* Ex. A at Art. XXI § 21.02. As consideration for the three-year option to purchase, the Lease required Brodhecker to install an approved septic system for the residential dwelling on the property and to remit thirty thousand dollars ($30,000.00) to the Debtor within 120 days of the execution of the Lease. *Id.* Ex. A at Art. XXI § 21.04.

Simultaneously, on January 21, 2005, the Debtor and Marie Bellis entered into a contract for the sale of the Property to Brodhecker. *Debtor's Motion to Reject Executory Contracts and Unexpired Leases,* Ex. B. The parties agreed on a purchase price of $390,000 .00 which was to be offset by the $30,000.00 which Brodhecker was required to remit under the Lease as consideration for the option to purchase. *Id.* Ex B § § 2-3. The parties agreed that the closing of the sales contract would occur on January 20, 2008. *Id.* Ex B § 16.

*2 Although the specific time frame is unclear, Mortgage Electronic Reservation Systems, Inc. initiated foreclosure proceedings on the Property after the Lease and option to purchase were executed. In an apparent effort to avoid foreclosure, the Debtor and Marie Bellis entered into a second contract of

Slip Copy
Slip Copy, 2006 WL 2380997 (Bkrtcy D N J )
(Cite as: Slip Copy)

sale with Brodhecker on or about July 8, 2005  This contract for sale of the property was also for $390,000 00 [FN1] *Debtor's Motion to Reject Executory Contracts and Unexpired Leases*, Ex  C  Under the second sales contract, Brodhecker was entitled to a fifteen thousand three hundred dollar ($15,300 00) credit against the purchase price arising out of Brodhecker's lease of the Property  *Id*  Ex  C §  3 The parties contemplated that closing would occur on July 29, 2005 but the closing did not occur as expected

> FN1. It should be noted that Exhibit C as attached to Debtor's Motion to Reject the Executory Contract is a copy of the second contract for sale of the real property Nevertheless, the contract submitted is signed by Russell Bellis, Sr  as the seller and Marie Bellis as the buyer  The contract as submitted does not contain Brodhecker's signature, does not appear to have been "witnessed" nor is it dated

On or about September 23, 2005, the Debtor filed a Chapter 13 Bankruptcy petition in this Court  On Schedule A of the petition, the Debtor listed a joint interest in the Property and indicated that the Property had both residential and non-residential uses  On or about January 10, 2006, the Debtor filed the instant motion seeking to reject executory contracts and unexpired leases on the grounds that Brodhecker failed to comply with the terms of the Lease  Specifically, the Debtor maintains that Brodhecker failed to remit the required rental payments even though he has collected income from subletting the Property's residential building  The Debtor further includes a blanket assertion that there may be other violations of the Lease. In addition, the Debtor claims that when he entered into the Lease and option to purchase, he was unaware of any significant tax liability which would be incurred on selling the Property  However, if the property is sold to Brodhecker as contemplated, the Debtor now contends that the purchase price will not satisfy the tax liability occasioned by the sale  As a result, the Debtor seeks to reject all executory contracts and unexpired leases with Brodhecker

Countrywide, the servicing agent of Mortgage Electronic Registration Systems, filed an objection to the Debtor's motion and a cross-motion seeking an order to require the Debtor to sell the Property and vacate the automatic stay  Countrywide maintains a secured interest in the Property as it is the mortgage

holder [FN2]  After analyzing the Debtor's schedules, Countrywide highlights that the Debtor's Chapter 13 plan neither requires payments to the trustee until April 2006 nor contemplates the sale or refinance of the Property before October 31, 2008  Countrywide filed an objection to the Debtor's plan on or about December 21, 2005

> FN2. On or about July 2, 2004, the Debtor and Marie Bellis secured a mortgage on the property from Countrywide in the amount of $306,000 00. The record before the Court does not establish the present amount due under the mortgage note.

With respect to the instant motion, Countrywide contends that the Debtor has not demonstrated a better offer for the sale of the Property  Countrywide further asserts that the $390,000 00 purchase price is sufficient to satisfy its secured claim and acknowledges that the Debtor may be entitled to a setoff of Brodhecker's credit in light of the allegations that Brodhecker has failed to pay rent  In addition, Countrywide filed a cross-motion seeking to lift the automatic stay on the grounds that its interest is not being adequately protected  Countrywide asserts that since the petition date the Debtor has not made any mortgage payments  Through January 1, 2006, it is alleged the Debtor is delinquent in the amount of $11,387 13  The record is unclear as to whether the Debtor remitted payments for the months thereafter

*3 Brodhecker, the prospective purchaser of the Property and a tenant under the Lease, filed a certification in opposition to the Debtor's motion and in support of Countrywide's cross-motion  Brodhecker's certification reiterates Countrywide's position  Brodhecker asserts that he is ready, willing and able to close on the existing contract and that he has made improvements to the Property  As a purchaser in possession with a viable sales contract, Brodhecker argues that section 365(i) of the Bankruptcy Code provides a basis on which this Court should deny the Debtor's motion to reject all executory contracts and authorize the sale of the Property under section 363 of the Bankruptcy Code

The Debtor filed a response in support of his motion and in opposition to Countrywide's cross-motion  Attached to the Debtor's response is an appraisal of the Property by the Appraisal Services of North Jersey, Inc, which values the Property at $462,000 00  In light of this appraisal, the Debtor

© 2006 Thomson/West  No Claim to Orig  U S Govt  Works

Slip Copy                                                                                          Page 3
Slip Copy, 2006 WL 2380997 (Bkrtcy.D.N.J.)
(Cite as: Slip Copy)

argues that compelling the sale of the Property for $374,000.00 (the $390,000.00 purchase price less the $15,300.00 credit) will yield the Debtor $87,000.00 less than the fair market value of the Property. In addition, the Debtor recognizes that upon the sale of this Property, capital gains taxes will be triggered. It is the Debtor's contention that the $390,000.00 purchase price is insufficient to satisfy Countrywide's mortgage, the closing costs as well as the capital gains taxes and thus should not be required. The Debtor further argues that Countrywide is adequately protected by the value of the Property and that the Chapter 13 plan proposed to modify the terms of Countrywide's loan. Finally, the Debtor states that he is current with his Chapter 13 payments and requests that the Court grant his motion and deny Countrywide's cross-motion.

At the hearing, the Debtor through counsel explained the basis for his motion seeking to reject the executory contracts and unexpired leases with Brodhecker. First, Brodhecker has failed to remit monthly rental payments under the Lease. The Debtor, however, does not identify the total amount of rent allegedly due. The Debtor further states that Brodhecker failed to remit the ful thirty thousand dollar security deposit which was also the consideration for the option to purchase the Property. Brodhecker only remitted twenty-two thousand dollars ($22,000.00). The Debtor does acknowledge that Brodhecker installed a septic system for the residential building as required. Nevertheless, it is argued that Brodhecker's failure to comply with the Lease obligations is sufficient grounds to reject the Lease and related sales contracts. Arguably, rejection of the Lease and sales contracts is within the Debtor's business judgment since the value of the Property has appreciated and the capital gains tax liability which will be incurred if the sale to Brodhecker is completed will eliminate any proceeds available to the Debtor or the Trustee.

*4 It is undisputed that Brodhecker has been in possession of the property since January 21, 2005. Brodhecker, through counsel, argued at the hearing that he has installed the septic tank, performed various improvements on the property and provided a twenty-two thousand dollar ($22,000.00) security deposit. Brodhecker asserted that the second contract for sale was executed in July of 2005 to provide an expedited closing date. In September 2005, Brodhecker intended to close on the Property; he maintained the necessary funding and was ready, willing and able to purchase the Property. Neither the Debtor nor Marie Bellis attended the scheduled

closing. Brodhecker has filed a proof of claim in this proceeding, remains in possession of the Property and has paid the utility expenses. Brodhecker requests that the Court protect his interests by applying section 365(i) of the United States Bankruptcy Code. 11 U.S.C. § 365(i).

Counsel for the secured creditor argued that when the Debtor's motion was initially filed the purchase price of $390,000.00 appeared to be adequate to satisfy its claim. It is unclear whether that is still the case. In the alternative, the secured creditor requests that this Court lift the automatic stay since its interest is not being adequately protected because the Debtor has not submitted monthly mortgage payments.

*Legal Analysis*

In determining whether this Court may reject the Debtor's executory contract for the sale of the Property, the Court must explore the provisions of section 365(i) of the United States Bankruptcy Code. Section 365 provides in relevant part-
(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property ... under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative may remain in possession of such real property.
(2) If such purchaser remains in possession-
(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and
(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.
(j) A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.
11 U.S.C. § 365(i)-(j).

*5 The Legislative History and Comment of section 365(i) provides that:Subsection (i) gives a purchaser

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                                    Page 4
Slip Copy, 2006 WL 2380997 (Bkrtcy D N J )
(Cite as: Slip Copy)

of real property under a land installment sales contract similar protection [as § 365(h) provides to lessees] The purchaser, if the contract is rejected, may remain in possession or may treat the contract as terminated If the purchaser remains in possession, he is required to continue to make the payments due, but may offset damages that occur after rejection. The trustee is required to deliver title, but is relieved of all other obligations to perform
H.R. Rep No 595, 95th Cong , 1st Sess 349 (1977); S Rep No 989, 95th Cong , 2d Sess 60 (1978), U.S.Code Cong & Admin News 1978, pp 5963, 6305-06, 5787, 5846

In *McCannon v Marston*, the Third Circuit stated that "[s]ection 365(i) permits a purchaser who is in possession under such executory contract that has been rejected by the trustee the choice of treating the contract as terminated or remaining in possession " 679 F.2d 13, 17 (3d Cir.1982) If such purchaser opts to remain in possession after the rejection, "the purchaser is obliged to continue making all payments due under the contract and the trustee must deliver title to the purchaser in accordance with the terms of the contract " *Id* The Third Circuit further recognized that the protections of section 365(i) were intended to apply to all executory contracts for the sale of property and are not limited to land installment contracts *Id*

In *In re Maier*, the United States Bankruptcy Court for the Western District of New York considered whether to lift the automatic stay to allow a creditor to pursue a state court action for specific performance of an option to purchase real property 127 B.R. 325 (Bankr.W.D.N.Y.1991) In *Maier*, the debtor entered a lease agreement of his farm with the tenant for a one-year term which had both a renewal provision and an option to purchase *Id. at 326.* Years after the lease agreement, the tenant initiated an action in the state court seeking specific performance as to the purchase option. *Id* Tenant, who was in possession of the property, argued that "he exercised the option and is ready and willing to pay the $400,000 00 purchase price but the Debtor refused to accept the purchase price and convey title " *Id* Shortly thereafter, the debtor filed for bankruptcy and the tenant filed a motion to lift the automatic stay to continue the state court action for specific performance *Id* At the hearing to lift the automatic stay, the debtor conceded that "if the option was properly exercised, an executory contract for the purchase of the farm was created " *Id* Nevertheless, the debtor argued that tenant breached the lease and failed to properly exercise the option. *Id* The debtor

further argued that section 365(i) was only applicable to executory contracts where the purchaser gained possession through a prior conveyance of title *Id* at 327

*6 The *Maier* Court concluded that limiting the type of contract to which section 365(i) applied ignores congressional intent to protect third parties who enter transactions with the debtor where the debtor is the owner of real property *Id* The *Maier* Court reasoned that "[t]here is nothing in the language of the section or the policy behind the section which would support an interpretation which excludes a purchaser in possession pursuant to a form of contract other than a 'land installment sales contract ' " *Id* The *Maier* Court noted that "accepting an option to buy contained in a lease, the option becomes a binding contract of sale and the tenant becomes a purchaser in possession " *Id* The Court found that if the tenant properly exercised the option to purchase, then he was a purchaser in possession under New York law as the option became a binding contract for the sale of the property *Id* at 328. In such instance, the debtor may reject the sales contract; but the tenant would be afforded the protections of section 365(i) *Id* Alternatively, however, "if it is determined that [tenant] did not properly exercise the option, or by his prior acts, breached the lease and thereby terminated the option, then he must surrender the property ..." *Id*

In the present case, this Court must examine the agreements between the parties to determine whether Brodhecker may be considered a purchaser in possession under a valid contract and thus entitled to the protections of section 365(i). The parties executed two agreements. The first agreement was the Lease with an option to purchase the property. By the terms of the Lease, the option to purchase was conditioned on Brodhecker's installation of a septic tank in the residential dwelling and the payment of $30,000 00 within 120 days of executing the Lease. It is undisputed that Brodhecker only remitted $22,000 00 rather than the full amount of the required payment. Thus, Brodhecker failed to comply with the specific conditions of the option and lost the right to compel a sale on the terms set forth in the January 21, 2005 option agreement. The Court therefore finds that under the January 21, 2005 agreement, Brodhecker is merely a lessee in possession without a binding option to purchase the Property

Recently, the United States District Court for the District of New Jersey in *In re Nickels Midway Pier, LLC* issued a decision on the application of section

Slip Copy
Slip Copy, 2006 WL 2380997 (Bkrtcy.D.N.J.)
(Cite as: Slip Copy)

365(i) under analogous circumstances 341 B.R. 486 (D.N.J.2006). [FN3] The *Nickels* Court reversed and remanded a decision of the United States Bankruptcy Court for the District of New Jersey, 332 B.R. 262 (Bankr.D.N.J.2005) which allowed a Chapter 11 debtor to reject an executory contract with a lessee and afforded the lessee protections under section 365(i). Nickels Midway Pier, LLC ("Nickels") entered a written lease agreement with Wild Waves, LLC ("Wild Waves"). 341 B.R. at 490. By the terms of the agreement, Wild Waves would lease seventy percent of a pier located at 3500 Boardwalk, Wildwood, New Jersey for the purpose of building and operating a water park. *Id.* Notably, the lease did not mention any agreement that Nickels would sell the entire pier to Wild Wave. *Id.* Nevertheless, Wild Waves argued that it had an oral agreement with Nickels to purchase the pier. *Id.* Wild Waves, however, did not provide a deposit or the purchase price while Nickels did not deliver the deed. *Id.*

> FN3. Neither party to this motion briefed nor argued the implementation of the *Nickels* decision.

\*7 In 2001, Nickels filed a civil action in the New Jersey Superior Court, Chancery Division. *Id.* at 491. Wild Waves subsequently filed a counterclaim on the grounds that an oral contract for the sale of the pier existed between the parties. *Id.* Nickels later filed a chapter 11 petition and shortly thereafter filed a motion to reject its lease with Wild Waves pursuant to section 365. *Id.* In response, Wild Waves filed a motion seeking to lift the automatic stay to pursue its counterclaims in the Chancery Division. *Id.* The Bankruptcy Court granted the motion to lift the automatic stay and reserved its decision on the motion to reject the lease pending the outcome of the Chancery matter. *Id.* The Chancery Division determined that Nickels and Wild Waves entered a binding agreement to lease a portion of the pier and then entered an agreement to purchase the entire pier in a written but unexecuted agreement of sale. *Id.* The Chancery Division further concluded that the purchase price of the pier was $5,550,000.00. In light of the Chancery Division decision, Nickels sought to proceed with its motion to reject the executory contracts. *Id.* at 492.

The Bankruptcy Court first concluded that the sales agreement was executory since substantial performance remained outstanding on both sides of the contract. *Id.* Next, the Bankruptcy Court concluded that the debtor was exercising reasonable business judgment in rejecting the executory contract because real estate values in Wildwood New Jersey had appreciated and debtor had received two substantially higher offers to purchase the pier. *Id.* The Bankruptcy Court next concluded that section 365(i) preempted Wild Waves' claim for specific performance. *Id.* Finally, the Bankruptcy Court held that the debtor could reject the agreement pursuant to section 365(a) but that Wild Waves was entitled to protections under section 365(i), as a purchaser in possession.

The District Court in *Nickels* initially recognized that "if a bankruptcy court approves the rejection of an executory contract or unexpired lease pursuant to § 365(a), the Bankruptcy Code provides certain protections to the other party to the lease or contract. In particular, § 365(h) and § 365(i) provide some protection, respectively to lessees and purchasers in possession of real property under a contract for sale." *Id.* at 494. Specifically, section 365(i) "[c]arves out a limited exception to a debtor's ability to reject a contract for the sale of real property. It creates certain protections for a purchaser already in possession of the real property whose contract for sale has been rejected by the debtor." *Id.*

The District Court in *Nickels* concluded that the Bankruptcy Court improperly applied section 365(i) because it viewed the lease agreement and the oral sales agreement as one seamless agreement. Exploring the provisions of each documents, the District Court found that the "terms and operation of the two parts of the agreement between Nickels and Wild Waves illustrate their independent nature." *Id.* at 495. Obligations under the lease agreement were not conditioned on the performance of the obligations set forth in the oral sales agreement. *Id.* "Viewing the lease and the oral contract for sale as separate aspects of the agreement," the District Court concluded that Wild Waves was 'in possession' of the pier pursuant to the lease agreement rather than the oral contract for sale. *Id.* at 497. Consequently, the District Court held that section 365(i) was not applicable since "there is no contract for sale 'under which [Wild Waves] is in possession' of any part of the pier." *Id.* The District Court recognized that the *Nickels* situation was unusual since the party in possession of the real property under a lease also maintained a separate yet related contract for sale. *Id.* at 498.

\*8 In addition, the District Court affirmed the Bankruptcy Court's ruling that Wild Waves' claim for specific performance can be discharged in a bankruptcy proceeding. *Id.* at 498. The *Nickels* Court

Slip Copy

Slip Copy, 2006 WL 2380997 (Bkrtcy.D.N.J.)

(Cite as: Slip Copy)

Page 6

recognized that if the remedy of specific performance was removed from the definition of a claim dischargeable in bankruptcy, then the provision of section 365 would be rendered meaningless. *Id.* at 500. "The fact that a creditor's specific performance remedy is preferable to a damages remedy does not mean that a creditor's right to specific performance cannot be reduced to a claim in bankruptcy." *Id.* The District Court remanded the proceedings to allow the Bankruptcy Court to analyze the rejection of the lease and oral contract for sale under section 365 independently.

In light of *Nickels,* this Court must first determine whether the Lease with option to purchase the Property and the second sales contract are independent components of the parties' overall agreement as to the disposition of the Property. The express language of section 365(i) provides that the section applies when "the trustee rejects an executory contract of the debtor for the sale of real property under which the purchaser is in possession." 11 U.S.C. § 365(i). Thus, it is critical to determine the nature of the executory contract. The first agreement in question was the Lease with an option to purchase. By the terms of the Lease, the option to purchase was conditioned on the satisfaction of two prerequisites: Brodhecker was required to install a septic system in the residential dwelling and remit a $30,000.00 payment within 120 days of execution of the Lease. Brodhecker failed to satisfy both conditions since he only paid $22,000.00. This default voids the option to purchase. Consequently, the option to purchase the Property expired and the agreement remained only a lease.

The second agreement describes itself as an amendment of a prior contract of sale. For Brodhecker to prevail, this Court must conclude that the execution of the second document amended the first, and is not itself a separate and distinct contract. If both documents are part of a single agreement, then Brodhecker would be in possession under an executory contract for sale and entitled to the protections of section 365(i). If, however, the two contracts are distinct, then Brodhecker is in possession under the Lease without an option to purchase, and the purchaser, who is not in possession, under a sale contract. Brodhecker is in the unique position, like Wild Waves in *Nickels,* of being 'in possession' under a Lease while simultaneously maintaining an executory contract to buy. Neither the Lease nor sale contract satisfies all of the criteria of section 365(i). Therefore, Brodhecker is not entitled to the protections of section 365(i) since he is in

possession of the Property under the terms of the Lease and not pursuant to a contract of sale.

Pursuant to section 365(a), the "trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). An executory contract, as defined by Vern Countryman is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp. v. National Fuel Gas Dist. Corp. (In re Sharon Steel),* 872 F.2d 36, 39 (3d Cir.1989); *see* Countryman, Executory Contract in Bankruptcy, Part 1, 57 Minn. L.Rev. 439, 460 (1973). The Third Circuit has adopted the business judgment standard for determining whether to approve the assumption or rejection of an executory contract. *Sharon Steel,* 872 F.2d at 39-40. To satisfy the business judgment test, "the trustee or debtor in possession needs to establish that rejection will benefit the estate. Once the debtor meets it burden, the non debtor party bears the burden of proving that the debtor's decision derives from bad faith, whim or caprice." *In re Central Jersey Airport Services,* 282 B.R. 176, 183 (Bankr.D.N.J.2002)(citing In re *Sharon Steel,* 872 F.2d 36 (3d Cir.1989) and *In re Audra-John Corp.,* 140 B.R. 752, 759 (Bankr.D.Minn.1992)) Here, the Debtor has argued that rejection of the sales contract satisfies the business judgment test. As demonstrated by the submitted appraisal, the value of the Property has significantly increased from the $390,000.00 purchase price set forth in the contract for sale. Clearly, rejection of the sales contract for a sum less than fair market value is in the best interest of the estate.

*9 The Debtor also argues for rejection of the Lease. Here, Brodhecker has failed to pay rent under the Lease, while collecting rent from his tenant on the residential area of the Property. The Lease may also be rejected under the Debtor's business judgment so the Property can be effectively marketed for sale without the burden of the Lease being an issue, or at the very least, be rented by the Debtor with the estate obtaining rental income. Thus, the Debtor's motion to reject the executory contracts and unexpired leases is GRANTED.

This Court will not grant the relief sought by Countrywide and Brodhecker in the cross-motion seeking an order requiring the Debtor to sell his Property. Although Brodhecker is not a purchaser in possession for the purposes of section 365(i), this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy
Slip Copy, 2006 WL 2380997 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy)**

Court should consider the relief afforded by section 365(j) of the Bankruptcy Code, 11 U.S.C. § 365(j). Section 365(j) provides that "a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid." 11 U.S.C. § 365(j). To the extent Brodhecker has made any payment towards the purchase price, he is not entitled to a lien afforded by section 365(j). However, this lien is adequately protected by the substantial equity in the Property.

Finally, the Debtor has not submitted mortgage payments to the secured creditor and for this reason, it is argued that Countrywide's interest is not adequately protected and the stay should be lifted. However, the equity in this Property adequately protects the secured creditor's interest at this time and the Debtor's plan addresses modification of the mortgage under section 1325 of the Bankruptcy Code. *see* 11 U.S.C. § 1325. Any objections to the plan will be heard in conjunction with confirmation of the plan. For the time being, the secured party's interest is adequately protected and the cross-motion to vacate the stay is DENIED.

A copy of an order in conformance with this opinion is attached.

Bkrtcy.D.N.J.,2006
In re Bellis
Slip Copy, 2006 WL 2380997 (Bkrtcy.D.N.J.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

174 Fed.Appx. 34                                                                                    Page 1
174 Fed.Appx. 34, 2006 WL 565683 (C.A.3 (Pa.)), 46 Bankr.Ct.Dec. 45
(Cite as: 174 Fed.Appx. 34)

H
In re Midwest Portland Cement Co.C.A.3
(Pa.),2006 This case was not selected for publication
in the Federal Reporter.NOT PRECEDENTIAL
Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
In re: MIDWEST PORTLAND CEMENT
COMPANY, Debtor
Mark L. Glosser, Trustee, Kents Run Partnership,
Ltd
v.
Maysville Regional Water District, Kents Run
Partnership, Ltd., Appellant
No. 05-2489.

Submitted Under Third CircuitLAR 34.1(a) Feb. 28,
2006
Filed March 9, 2006.

**Background:** Trustee moved for leave to assume
and assign alleged executory contract entered into by
debtor. The Bankruptcy Court denied motion, and the
United States District Court for the Western District
of Pennsylvania, David S. Cercone, J., 323 B.R. 408,
affirmed. Trustee appealed.

**Holding:** The Court of Appeals, Sloviter, Circuit
Judge, held that unperformed obligations under
contract were not duties, and, thus, contract was not
executory.

Affirmed.
West Headnotes
[1] Bankruptcy 51 ⟶3106

51 Bankruptcy
    51IX Administration
        51IX(C) Debtor's Contracts and Leases
            51k3105        Contracts        Assumable;
Assignability
                51k3106 k. Executory Nature in General
Most Cited Cases
Unperformed obligations to "more particularly
describe" easements under prepetition deed

conveying debtor's interest in certain property to
regional water district subject to easements in favor
of debtor to construct and maintain conveyor belt
over property to transport quarried limestone, and
subject to another easement for waterlines, did not
make parties' agreement "executory," within
meaning of bankruptcy statute which governs
debtor's executory contracts and unexpired leases. 11
U.S.C.A. § 365; Restatement (Second) of Contracts
§ 225(3)

[2] Bankruptcy 51 ⟶3106

51 Bankruptcy
    51IX Administration
        51IX(C) Debtor's Contracts and Leases
            51k3105        Contracts        Assumable;
Assignability
                51k3106 k. Executory Nature in General
Most Cited Cases
Unperformed obligations to record documents needed
to provide notice of easements to third parties, under
prepetition deed conveying debtor's interest in certain
property to regional water district subject to
easements in favor of debtor to construct and
maintain conveyor belt over property to transport
quarried limestone, and subject to another easement
for waterlines, did not amount to material breach, and
thus did not make parties' agreement "executory,"
within meaning of bankruptcy statute which governs
debtor's executory contracts and unexpired leases,
where act of creating and filing those documents was
ministerial, and there was no indication that either
party failed to comply with the standards of good
faith and fair dealing. 11 U.S.C.A. § 365;
Restatement (Second) of Contracts § 225(3)

*34 On Appeal from the United States District Court
for the Western District of Pennsylvania (D.C. No.
03-cv-01760) District Judge: Honorable David S.
Cercone

Thomas A. Young, Porter, Wright, Morris & Arthur,
Columbus, OH, for Kent Run Partnership.
Linda A. Michler, Bethel Park, PA, for Maysville
Regional Water District

Before: SLOVITER, FUENTES, Circuit Judges, and
BRODY,[FN*] District Judge.

FN* Hon. Anita B. Brody, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

#### *35 OPINION

SLOVITER, Circuit Judge.
**1 At issue is whether a contract entered into by the debtor is executory and therefore one that the bankruptcy trustee may assume and assign under 11 U.S.C. § 365. Both the Bankruptcy Court and the District Court held that the contract is not executory.

#### I.

The relevant facts are undisputed, well-known to the parties, and were set forth in full in the opinions below. We thus summarize for purposes of this appeal. On March 15, 1993, Midwest Portland Cement Company (Midwest), and appellee Maysville Regional Water Department (Maysville), entered into a contract for the sale of real property located in Muskingum County, Ohio. Midwest sold to Maysville: (i) the land surrounding a water source that Maysville owns called Frazier Quarry; and (ii) a separate property called Lake Isabella. Each party also secured an easement in the transaction. Midwest retained an easement through Maysville's property so that it could construct a conveyor belt and storage facility for limestone that it mined from an adjacent property where Midwest had mining rights. That adjacent property is owned by the appellant in this proceeding, Kents Run Partnership Ltd. (Kents Run). Maysville, in turn, obtained an easement to run waterlines from the Lake Isabella property across certain adjacent property that Midwest still owned. The parties recorded a deed on December 22, 1993, reflecting the sale. Maysville made full payment under the contract.

On May 5, 1997, an involuntary petition placed Midwest in Chapter 7 bankruptcy proceedings. In 2002, the Bankruptcy Court approved a settlement agreement among Midwest's Bankruptcy Trustee (the Trustee), Kents Run, and two other companies that, like Kents Run, were claimants in the bankruptcy proceedings. As relevant here, the settlement agreement called for the Trustee to seek approval from the Bankruptcy Court to assume the 1993 contract with Maysville on the ground that the contract is "executory." See 11 U.S.C. § 365(a) ( "[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."). If approved, the Trustee

would then assign the executory contract to Kents Run.FN1 Kents Run, it appears, is primarily interested in Midwest's easement to construct a conveyor belt and storage facility for stones mined from Kents Run's property. At the time of the bankruptcy petition, Midwest had yet to develop its easement.

FN1. A trustee has authority to assign an executory contract, § 365(f)(1), but must first assume the contract, § 365(f)(2).

The Bankruptcy Court denied the Trustee permission to assume the 1993 contract. It agreed with Maysville that the contract is not "executory" within the meaning of § 365 because the parties' sale of property became final and complete upon recording their deed, and neither Midwest nor Maysville has remaining obligations that would constitute a material breach if unperformed. The Court also concluded that the easement granted to Midwest is personal and non-assignable. The District Court affirmed. Kent's Run P'ship, Ltd. v. Glosser, 323 B.R. 408 (W.D.Pa.2005). It too held that the contract is not executory and concluded, alternatively, that Midwest's easement is non-assignable.

*36 **2 Kents Run filed this appeal.FN2 We have jurisdiction under 28 U.S.C. § 158(d). See Matter of Taylor, 913 F.2d 102, 104 (3d Cir.1990). The question whether the parties' contract is executory under § 365 is a legal one subject to de novo review. In re Sunterra Corp., 361 F.3d 257, 263 (4th Cir.2004).

FN2. The Trustee has not appealed the District Court's judgment, nor was the Trustee required to pursue an appeal under the terms of the approved settlement agreement between the Trustee and Kents Run. App. at 48. Notably, the Trustee and Kents Run did not make the validity and enforceability of their settlement contingent or conditional upon the result of the present proceeding. Id.

#### II.

Kents Run contends that as of the date of the bankruptcy petition, there were five unperformed obligations by Midwest and Maysville concerning the two easements conveyed in the 1993 sale. It contends that (1) Midwest must "more particularly

174 Fed.Appx. 34                                                          Page 3
174 Fed.Appx. 34, 2006 WL 565683 (C.A.3 (Pa.)), 46 Bankr.Ct.Dec. 45
(Cite as: 174 Fed.Appx. 34)

describe" its easement after it constructs the conveyor belt and storage facility; (2) Maysville must "more particularly describe" its easement after constructing the waterlines; (3) Midwest must make any conveyance of the property over which the waterlines run subject to Maysville's easement; (4) Maysville must record an appropriate written document regarding the portion of Midwest's easement that crosses over Frazier Quarry; and (5) Midwest must file a document in the chain of title to provide subsequent purchasers with notice of Maysville's easement.[FN3] According to Kents Run, the District Court erred in failing to deem the 1993 contract executory based on these unperformed obligations. We disagree.

> [FN3.] In the District Court, Kents Run also cited Midwest and Maysville's obligation to limit use of the easements to the particular purposes for which they were granted. The District Court rejected that ground because "any use of the property interest contrary to the right which was granted was a property dispute, not a breach of the original contract." *Kent's Run,* 323 B.R. at 417. Because Kents Run does not pursue this argument on appeal, we do not address it.

This court has defined an executory contract for purposes of § 365 as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir.1989) (citations omitted); *see also In re Columbia Gas Sys. Inc.,* 50 F.3d 233, 239 (3d Cir.1995) ("[U]nless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365.") "The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." *In re Columbia Gas,* 50 F.3d at 240.

The parties agree that the materiality of any unperformed obligation under the 1993 contract must be evaluated under Ohio law. *See also id.* at 239 n. 10. Ohio courts generally look to the Restatement (Second) of Contracts, which presents five factors as significant in determining whether a failure to render or to offer performance is material:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably

expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the **\*37** party failing to perform or to offer to perform will cure his failure, taking into account all of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.

**\*\*3** *Russell v. Ohio Outdoor Adver. Corp.,* 122 Ohio App.3d 154, 701 N.E.2d 417, 419 (1997) (quoting Restatement (Second) of Contracts § 241).

[1] Kents Run first contends that Midwest and Maysville have yet to "more particularly describe" their respective easements. As the District Court recognized, however, these unperformed obligations are conditioned under the terms of the parties' agreement upon the occurrence of events that have yet to occur. "There is a distinction in the law between failure of a condition and breach of a duty: 'Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.'" *In re Columbia Gas,* 50 F.3d at 241 (quoting Restatement (Second) of Contracts § 225(3) (1981)).

The terms of the parties' deed requires a further description of Midwest's easement *after* Midwest constructs the conveyor belt and storage facility. Maysville likewise must first construct its waterlines before added description becomes an obligation. It is undisputed that neither Midwest nor Maysville had developed the easements at the time of the bankruptcy petition. Moreover, Maysville and Midwest were under no contractual duty or promise to create the contemplated improvements on the easements. Absent such a duty, failure to perform the contingent obligations of further description did not breach the contract. The same holds true for the claim that the contract is executory due to Midwest's obligation to burden any future conveyance with the Maysville easement-any breach of this obligation could not occur until Midwest conveys the property without notice of the easement, but Midwest had not conveyed the property, nor was it under an obligation to convey it, prior to the bankruptcy proceeding.

Kents Run concedes that the parties were under no duty to make the conditions precedent occur, *see* Appellant's Br. at 29, but it argues that a contract that is dependent upon the occurrence of an event, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

happening of which is not the contractual obligation of any party, can still be an executory contract even though the triggering event had not occurred as of the date of the bankruptcy petition. *Id.* at 27. Kents Run cites, without elaboration, two bankruptcy court decisions holding that a contract for an option to purchase real estate or an unused right of first refusal on a real estate purchase can be executory. *Id.* (citing *In re Kellstrom Indus.*, 286 B.R. 833 (Bankr.D.Del.2002); *In re Carlisle Homes, Inc.*, 103 B.R. 524 (Bankr.D.N.J.1988)). We find, however, that the law as it applies in the present context is sufficiently clear: if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365 because no material breach could occur." *In re Columbia*, 50 F.3d at 241. For the reasons stated, the first three unperformed obligations cited by Kents Run were properly held to be mere conditions.[FN4]

> FN4. In Judge Brody's view, the District Court was required to apply Ohio's five-factor Restatement test to the first three unperformed obligations cited by Kents Run, even though those obligations were contingent obligations. Nonetheless, Judge Brody agrees that a breach of the three unperformed obligations would not constitute a material breach under Ohio law and, therefore, the three obligations do not give rise to an executory contract under section 365.

**\*4** **[2]** Kents Run's final two claims of material breach are that Maysville failed to **\*38** record a document regarding the portion of the Midwest easement that crosses over Frazier Quarry, and that Midwest failed to record a document in the chain of title to provide subsequent purchasers with notice of the Maysville easement. The District Court held that the parties' failure to create and record these documents did not render the contract executory because "these outstanding duties were not material." *Kent's Run*, 323 B.R. at 419. The District Court determined that the 1993 deed was effective under Ohio law to create legally enforceable easements between the parties. To the extent that Midwest and Maysville have both lost a benefit under the contract insofar as the easements have yet to be made enforceable against subsequent purchasers, Maysville has expressed its readiness to execute the appropriate documents, the act of creating and filing those documents is ministerial, and there is no indication that either party failed to comply with the standards

of good faith and fair dealing. The District Court thus concluded that the unperformed obligations do not amount to a material breach.

Having reviewed the record, we find no error in the District Court's analysis. Kents Run does not dispute that the parties' deed was sufficient under Ohio law to create and record the easements as between Midwest and Maysville. Rather, Kents Run takes issue with the District Court's application of the Restatement (Second) factors, set forth *supra*, in holding immaterial the failure to record documents needed to enforce the easements against subsequent purchasers. Kents Run argues in particular that the District Court erred in giving weight to Maysville's representation that it was prepared to record an appropriate document concerning the portion of the Midwest easement that crosses Frazier Quarry, noting that Maysville failed to make that representation prior to the bankruptcy proceeding. As noted, the petition date marks the time to determine materiality of unperformed obligations for purposes of § 365, *In re Columbia Gas*, 50 F.3d at 240, but here Maysville had no notice until the bankruptcy proceeding that Midwest believed the contract was breached by failure to record the easement document. Under the circumstances, Maysville's clear statement of its intention to file the necessary documents, which by all accounts is a ministerial task, was properly weighed against finding a material breach. Moreover, the District Court rightly observed that there was no conduct by either party to the 1993 contract reflecting a lack of good faith or fair dealing.

At bottom, "not every contract that appears executory because it has not been completely performed is executory for purposes of § 365." *In re Columbia Gas*, 50 F.3d at 244 n. 20. We agree with the Bankruptcy Court and the District Court that the contract here is not executory merely because the parties failed to perform various, non-material obligations with respect to the easements conveyed. As such, assumption of the contract was properly denied under § 365.[FN5]

> FN5. Given our conclusion that the contract is not executory and cannot be assumed by the Trustee under § 365(a), we need not reach the question whether assignment of the contract would impermissibly expand the nature of the easement granted to Midwest.

**III.**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

174 Fed.Appx. 34
Page 5

174 Fed.Appx. 34, 2006 WL 565683 (C.A.3 (Pa.)), 46 Bankr.Ct.Dec. 45
(Cite as: 174 Fed.Appx. 34)


**\*5** For the reasons stated, we will affirm the District
Court's judgment.

C.A.3 (Pa.),2006
In re Midwest Portland Cement Co.
174 Fed.Appx. 34, 2006 WL 565683 (C.A.3 (Pa.)),
46 Bankr.Ct.Dec. 45

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Kathryn D. Sallie, hereby certify that on the 8th day of December, 2006, I caused a copy of the **Brief of Appellee Deltak, L.L.C.** to be served upon the parties listed below in the manner indicated.

### *VIA* ELECTRONIC MAIL & HAND DELIVERY

Joseph McMahon, Esquire
Office of the United States Trustee
844 King North King Street, Suite 2207
Wilmington, DE 19801
joseph.mcmahon@usdoj.gov

Stuart M. Brown, Esquire
William E. Chipman, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801
sbrown@eapdlaw.com
wchipman@eapdlaw.com

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801
landis@lrclaw.com
mumford@lrclaw.com

David B. Stratton, Esquire
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19801
strattond@pepperlaw.com

Marc J. Phillips, Esquire
Jeffrey C. Wisler, Esquire
Connolly, Bove, Lodge & Hutz
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 888-6258
Fax: (302) 658-0380
mphillips@cblh.com
jwisler@cblh.com

Mark Minuti, Esquire
Saul Ewing LLP
222 Delaware Avenue
Suite 1200
Wilmington, DE 19808
mminuti@saul.com

### *VIA* ELECTRONIC MAIL & FEDERAL EXPRESS

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Curt Weidler, Esquire
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
jeffrey.sabin@srz.com
david.hillman@srz.com
curt.weidler@srz.com

Howard L. Siegel, Esquire
Brown Rudnick Berlack Israels LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402
hsiegel@brownrudnick.com

Steven D. Pohl, Esquire
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
spohl@brownrudnick.com


Erik D. Lindauer, Esquire
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
lindauere@sullcrom.com

Filiberto Agusti, Esquire
Joshua R. Taylor, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
fagusti@steptoe.com
jrtaylor@steptoe.com

_____
Kathryn D. Sallie (No. 4600)