## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) | Case No. 06-11045 (BLS) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |
| MITSUBISHI POWER SYSTEMS AMERICAS, INC., | ) | |
|  | ) |  |
| Appellant, | ) | Civil Action No. 06-00687 (KAJ) |
| v. | ) |  |
| DELTAK, L.L.C., | ) |  |
|  | ) |  |
| Debtor-Appellee. | ) |  |

## APPENDIX TO THE BRIEF OF APPELLEE DELTAK, L.L.C.

Dated: December 8, 2006
Wilmington Delaware

Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

*Attorneys to Appellee Deltak, L.L.C.*

TABLE OF CONTENTS

Exhibit                                                                                           Page

A        Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365
         for an Order Authorizing Debtors to (i) Wind Down Operations
         of the Heat Recovery Steam Generation Business Segment
         Operated by the Deltak Debtors, (ii) Reject Certain Executory
         Contracts in Connection Therewith, and (iii) Implement
         Procedures for the Orderly Completion of Work in Progress
         [D.I. 12].................................................................................................. D-1

B        Affidavit in Support of First Day Motions and Applications by
         John M. Matheson [D.I. 18]...................................................... D-36

C        Corrected Order Granting in Part Debtors' Motion Pursuant to
         11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing
         Debtors to (i) Wind Down Operations of the Heat Recovery
         Steam Generation Business Segment Operated by the Deltak
         Debtors, (ii) Reject Certain Executory Contracts in Connection
         Therewith, and (iii) Implement Procedures for the Orderly
         Completion of Work in Progress [D.I. 85] ............................... D-89

D        Corrected Limited Opposition by Mitsubishi Power Systems
         Americas, Inc. to Debtors' Motion to Reject Certain Executory
         Contracts, filed on October 24, 2006 [D.I. 159] ....................... D-96

E        Amended Order Granting In Part Debtors' Motion For An
         Order Authorizing Debtors To (i) Wind Down Operations of
         the Heat Recovery Steam Generation Business Segment
         Operated by the Deltak Debtors, (ii) Reject Certain Executory
         Contracts in Connection Therewith, and (iii) Implement
         Procedures for the Orderly Completion of Work in Progress
         [D.I. 195]................................................................................ D-121

F  Motion by Cormetech, Inc. to Set a Date for the Assumption or Rejection of Certain Executory Contracts Pursuant to 11 U.S.C. § 365(d)(2) [D.I. 204].................................................................. D-124

G  Transcript of Hearing held on November 1, 2006 before the Honorable Brendan L. Shannon, filed on November 7, 2006 [D.I. 264]................................................................................... D-135

H  Notice of Appeal [D.I. 270] ...................................................... D-311

I   Appellant Designation of Items For Inclusion in Record On Appeal and Statement of Issues [D.I. 288] ............................... D-314

J   Order, entered on November 9, 2006 [D.I. 291]...................................... D-317

K  Order Approving Rejection of Mitsubishi HRSG Contract [D.I. 289] ........................................................................................... D-319

L   Transcript of Hearing held on November 6, 2006 before the Honorable Brendan L. Shannon [D.I. 293]................................ D-322

M  Debtors Motion to Reject Cormetech Port Westward Contract Pursuant to 11 U.S.C. Sections 105 and 365 [D.I. 320] ......................... D-474

N  Order Granting Debtors' Motion for Authority to Reject Cormetech Port Westward Contract [D.I. 353] ...................................... D-487

O  Notice of Appeal from Bankrutpcy Court appealing the Order entered on 11/6/06 by Judge Brendan L. Shannon in Bankruptcy Case [06-687 D.I. 1].............................................................. D-489

P      Emergency Motion for Expedited Action on the Appeal of the
       Bankruptcy Court's November 6, 2006 Order [06-687 D.I. 2] ................ D-500


Q      Brief of Appellant Mitsubishi Power Systems Americas Inc.
       [06-687 D.I. 7] ....................................................................................... D-512


R      Website Page http://www.mitsubishitoday.com/affiliates.html............... D-551

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) ) ) | Case No. 06-11045 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 FOR AN ORDER AUTHORIZING DEBTORS TO (I) WIND DOWN OPERATIONS OF THE HEAT RECOVERY STEAM GENERATION BUSINESS SEGMENT OPERATED BY THE DELTAK DEBTORS, (II) REJECT CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (III) IMPLEMENT PROCEDURES FOR THE ORDERLY COMPLETION OF WORK IN PROGRESS

Global Power Equipment Group Inc. ("Global Power") and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] file this motion (the "Motion") pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") for an order authorizing the Debtors to (i) wind down operations of the Heat Recovery Steam Generation business segment (the "HRSG Business") operated by the Deltak Debtors,[2] (ii) reject, on twenty (20) days notice, nunc pro tunc to the date hereof, certain executory contracts and unexpired leases in connection therewith (as identified on Exhibit "A" hereto, collectively, the "HRSG Contracts"), and (iii) implement procedures for the orderly completion of work in progress, and respectfully represent as follows:

### Preliminary Statement

1.    The HRSG Business, headquartered in Plymouth, Minnesota,

---

[1]       In addition to Global Power, the Debtors include Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP.

[2]       The Deltak Debtors consist of Deltak, L.L.C. and Deltak Construction Services, Inc.

manufacturers and markets heat recovery steam generators, commonly known as "HRSG" units. HRSG units are highly technical and customized industrial units that increase the efficiency of combined cycle power plants by using the hot exhaust emitted by gas turbines to create steam. HRSG units, which typically themselves range from $10 million to $60 million depending upon the particular application, are component parts to much larger power plant projects that may range in the hundreds of millions of dollars.

2.      The HRSG industry is extremely competitive, both foreign and domestic, and operates under fixed price contracts. As a result of this competitiveness, the HRSG Business has been forced to operate in recent years on narrow margins. In addition, HRSG projects may span several years in duration. Given the need to fund HRSG projects over a long period of time at a fixed price, the HRSG Business is both capital intensive and subject to the risk of substantial commodity price and other cost volatility. For instance, in 2004 and 2005, the price of steel, which is the single largest commodity expense for the HRSG Business, doubled.

3.      As a result of this challenging environment, the Deltak Group, of which the HRSG Business is a part, posted net losses of approximately $1.7 million on revenue of approximately $133.8 million as of July 31, 2006, mostly attributable to the HRSG Business. The HRSG Business has a negative project-to-date gross margin, in the aggregate, for its HRSG projects and the projected losses for the HRSG projects as of July 31, 2006 totaled approximately $26.6 million. Importantly, absent the relief requested herein, the HRSG Business expects continued losses and, absent a cash infusion, predicts future negative cash usage of approximately $22 million for the completion of its HRSG projects.

4.      The Debtors, after due inquiry, have concluded that given the current liquidity crisis, the projected losses and the absence of a profitable prospective book of business,

the HRSG Business has little to no going concern value, at least in the absence of a substantial infusion of capital beyond its current ability to raise. The Debtors have further determined in their sound business judgment that the only value that can be derived from the business is through the cessation of the HRSG Business operations and affairs and the liquidation of its assets. Accordingly, concurrently with the chapter 11 filings, the Debtors have instructed approximately 100 employees dedicated to the HRSG Business not to return to work absent further notice and, by this Motion, seek authority to cease operations and reject all of their contracts for the delivery of HRSG units and related services.

        5.      Nevertheless, as stated, HRSG units are highly customized component parts of much larger and more substantial power plants. As such, the Debtors' inability to deliver the HRSG units currently under contract may have a substantial impact on the business objectives of many of the HRSG Business' customers. Indeed, notwithstanding the Debtors' rejection of the underlying contracts as burdensome, the Debtors believe that many if not all of their HRSG customers may still require delivery of the units and be prepared to make the necessary financial accommodations to ensure receipt. The Debtors believe that, provided that they may do so at no cost to the estate, the orderly completion of work in progress can provide substantial benefits to the Debtors and their employees, customers, vendors and other stakeholders. If successful, orderly completion of work in progress would help reduce the hardship endured by employees, customers and vendors resulting from the sudden cessation of HRSG operations and substantially reduce the number of claims against the estate. Accordingly, by this Motion, the Debtors also seek to implement procedures for the orderly completion of HRSG work in progress.

## Background

### A.    The Bankruptcy Cases

6.    On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    No creditors' committee has yet been appointed in these cases by the United States Trustee. Further, no trustee or examiner has been requested or appointed in any of the Debtors' chapter 11 cases.

### B.    Business Operations

8.    Global Power, together with its debtor and non-debtor affiliates (collectively, the "Company"), is a comprehensive provider of power generation equipment for customers in the domestic and international energy and power infrastructure industries, and a provider of routine and specialty maintenance services to customers in the utility and industrial sectors. The Company operates primarily through three business groups: the Williams Group, the Braden Group, and the Deltak Group. The Company's corporate headquarters are located in Tulsa, Oklahoma, with facilities in Plymouth, Minnesota; Tulsa, Oklahoma; Auburn, Massachusetts; Atlanta, Georgia; Monterrey, Mexico; Shanghai, China; Nanjing, China; and Heerlen, The Netherlands.

9.    Immediately prior to the Petition Date, the Company employed approximately 3,580 employees worldwide. Of those employees, approximately 2,330 were based domestically and approximately 1,250 were based with the Company's foreign, non-Debtor subsidiaries.

10.    <u>The Williams Group</u>.  The Williams Group, which is the Debtors' industrial services business segment, is comprised entirely of Williams Industrial Services Group, L.L.C. and its three wholly owned subsidiaries, Williams Industrial Services, LLC, Williams Specialty Services, LLC, and Williams Plant Services, LLC, all headquartered in Atlanta, Georgia.[3]  Through the Williams Group, the Company provides routine and specialty maintenance services to a diversified base of utilities and industrial customers, including nuclear, fossil and hydroelectric power plants and pulp and paper mills, and to government agencies, primarily as a subcontractor to the United States Department of Energy.

11.    The Williams Group is the Company's leading business segment and has forged longstanding relationships with its utility and industrial customers, including the Southern Company, Tennessee Valley Authority, Florida Power & Light, Energy North West, the Jacksonville Electric Authority, Exelon, Consolidated Edison, Mead Westvaco and Smurfit Stone.

12.    <u>The Braden Group</u>.  The Braden Group,[4] the Company's auxiliary power equipment segment, is headquartered in Tulsa, Oklahoma and designs, engineers and manufactures a wide range of equipment primarily used to facilitate the operation of gas turbine power plants.  The equipment is manufactured and marketed under the Braden and Consolidated

---

[3]    The Williams Group also includes WSServices, LP, a California limited partnership that is 99%-owned by Williams Specialty Services, LLC, its general partner, and 1%-owned by Williams Plant Services, LLC, its limited partner.  WSServices, LP is a Debtor entity but is not currently operating, and it has no assets or creditors.

[4]    The Braden Group consists of (i) Braden Manufacturing, L.L.C., one of the Debtors, (ii) Braden Construction Services, Inc., one of the Debtors, and (iii) Global Power Equipment (Shanghai) Co. Ltd., a non-Debtor, and each a wholly owned subsidiary of Global Power; (iv) Braden-Europe BV, a wholly owned subsidiary of Braden Manufacturing, L.L.C.; and (v) Braden Manufacturing SA de CV, a 98%-owned subsidiary of Braden Manufacturing, L.L.C.

Fabricators[5] brand names, and includes products such as filters, enclosures, air intake housings and exhaust systems for gas turbines. The equipment is produced through a combination of in-house manufacturing at the Company's factories in the United States, Mexico and China and through extensive outsourcing relationships around the world.

13.    The Deltak Group.  The Deltak Group,[6] the Company's heat recovery equipment segment, is headquartered in Plymouth, Minnesota and manufactures and markets products under the Deltak brand name.  The Deltak Group designs, engineers and manufactures equipment used to enhance the efficiency of gas turbine power plants, and its products include heat recovery steam generators ("HRSGs"), specialty boilers, and industrial boilers.[7]  Its products are produced through a combination of in-house manufacturing at the Company's own factories in the United States and China and through extensive outsourcing relationships around the world.

14.    Through the Braden and Deltak Groups, the Company has equipment installed in power plants and other industrial operations in more than 40 countries on six continents, and estimates that it has one of the largest installed bases of equipment for power generation in the world.  The Braden and Deltak Groups have maintained long-term relationships

---

[5]        Consolidated Fabricators, Inc. was merged into Braden Manufacturing, L.L.C., one of the Debtors, on June 28, 2004.

[6]        The Deltak Group consists of (i) Deltak, L.L.C., one of the Debtors, (ii) Deltak Construction Services, Inc., one of the Debtors, and (iii) Global Power Asia Limited, a non-Debtor, and each a wholly owned subsidiary of Global Power; (iv) Deltak BV, a wholly owned non-Debtor subsidiary of Deltak, L.L.C.; (v) Deltak Power Equipment (China) Co. Ltd., a 90%-owned non-Debtor subsidiary of Global Power Asia Limited; (vi) Global Power Equipment Group Brazil LTDA, a 99%-owned non-Debtor subsidiary of Deltak, L.L.C.; and (vii) Deltak Israel Ltd., a 99%-owned non-Debtor subsidiary of Deltak, L.L.C.

[7]        HRSGs are boilers that create steam in a combined-cycle power plant using the hot exhaust emitted by a gas turbine; specialty boilers capture waste heat and convert it into steam, and are used in process heat recovery and incineration systems, small power generation systems and marine co-generation systems; and industrial boilers produce steam and heat for various industrial and commercial applications.  The industrial boilers are produced by Deltak Power Equipment (China) Co. Ltd., a non-Debtor.

with some of the world's largest participants in the gas turbine manufacturing industry, including GE Energy, Mitsubishi Power Systems, Siemens Power Generation and ALSTOM.

C.     **Capital and Debt Structure**

15.     As of July 31, 2006, the Company's consolidated balance sheet assets totaled approximately $314,137,000. Of this amount, approximately $26,947,000 was comprised of cash and cash equivalents, $9,779,000 was comprised of restricted cash, $21,600,000 was comprised of property, plant and equipment, net of depreciation, and approximately $255,811,000 was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $256,096,000. As of the Petition Date, the Company estimates that it has unrestricted cash of approximately $15.0 million and approximately $8.5 million in a cash collateral account with Bank of America, N.A.

16.     On or about October 1, 2004, Global Power and certain of its subsidiaries (collectively, the "Borrowers")[8] entered into a $100,000,000 Credit Agreement (as amended from time to time, the "Senior Credit Facility"), with Bank of America, N.A., as administrative agent, swing line lender and letter of credit issuer, certain lenders from time to time party thereto, U.S. Bank National Association, as syndication agent, and Bank of Oklahoma, N.A., as managing agent (collectively, the "Senior Lenders"). All of Global Power's domestic subsidiaries, including the Debtors which comprise the Williams Group, the Braden Group and the Deltak Group, are guarantors under the Senior Credit Facility. Notably, on or about April 1, 2005, the Debtors which comprise the Williams Group entered into Joinder Agreements to the Senior Credit Facility with the Senior Lenders. All documents in connection with the Senior Credit Facility are referred to as the "Senior Credit Documents."

---

[8]     As of the Petition Date, the Borrowers are Global Power and the following foreign subsidiaries: Global Power Equipment (Shanghai) Company, Ltd., Deltak Power Equipment (China) Co., Ltd., and Braden-Europe B.V.

17.    The Senior Credit Facility consists of a term loan of $25 million and a revolving credit facility of $75 million, a portion of which may be used for letters of credit. As of the Petition Date, Global Power had $15.1 million outstanding under the term loan and $1.3 million outstanding under the revolving credit facility for borrowings in China. Letters of credit totaling approximately $23.6 million were issued and outstanding under the facility at the Petition Date. There have been no drawings under these letters of credit. The Debtors estimate the prepetition amount owed to the Senior Lenders pursuant to the Senior Credit Facility, if the outstanding letters of credit were drawn down in full, would be approximately $40 million in the aggregate (the "Prepetition Obligations"). As provided in the Senior Credit Documents, the Prepetition Obligations constitute claims against the Debtors secured by liens on and security interests in substantially all of the Debtors' assets (the "Prepetition Collateral").[9]

18.    In addition, Global Power issued $69 million of 4.25% Convertible Senior Subordinated Notes (the "Convertible Notes") due November 23, 2011. The Convertible Notes were issued to several noteholders (the "Noteholders") pursuant to a Securities Purchase Agreement.

**D.    Events Leading to the Commencement of the Chapter 11 Cases**

19.    Notwithstanding the continued profitability and anticipated growth of the Williams Group, prior to the Petition Date, the Company has sustained losses primarily at the Deltak Group. The Deltak Group expects continued losses and predicts future negative cash usage of approximately $22 million for the completion of its heat recovery projects.

20.    The losses at the Deltak Group result from, among other things, (i) higher than anticipated subcontracting and labor costs, (ii) sharp rises in fabrication costs, particularly in

---

[9]    Nothing contained herein shall constitute an admission by the Debtors of the validity, priority, extent or enforceability of the Prepetition Obligations or any lien or security interest asserted by the Senior Lenders in connection with the Prepetition Collateral.

Asia, where a significant portion of the Company's manufacturing is performed, (iii) increased freight costs and associated fuel surcharges, and (iv) unexpected warranty costs. In addition, in 2004 and 2005, the price of steel, which is the single largest commodity expense for the Company, doubled.

21.    On March 28, 2006, the Senior Lenders notified Global Power that due to its failure to deliver audited financial statements as required under the Senior Credit Facility, requests for further credit extensions would not be honored. As a consequence, the Debtors have been unable to utilize the Senior Credit Facility, except in limited circumstances.

22.    In April 2006, the Senior Lenders consented to the making or renewal of certain loans in China and the extension of letters of credit on the condition that Global Power's obligations with respect thereto be cash collateralized. In June 2006, the Senior Lenders consented to the extension and issuance of additional letters of credit and loans on the condition that such letters of credit and loans be cash collateralized. Currently, Global Power has pledged approximately $8.5 million in cash and cash equivalents to secure its obligations under the Senior Credit Facility.

23.    In addition to the covenant defaults under the Senior Credit Facility, Global Power is also purportedly in default of certain covenants under the Convertible Notes and Securities Purchase Agreement due to its failure to file its 2005 Form 10-K and quarterly statements. On March 31 and April 10, 2006, certain Noteholders sent letters of default to Global Power, and on or about May 4, 2006, one of the Noteholders filed a lawsuit against Global Power in the United States District Court for the Southern District of New York, claiming breaches under the Convertible Notes and Registration Rights Agreement.

24.    As a result of the foregoing defaults and purported defaults, prior to the

commencement of these chapter 11 cases, Global Power sought to refinance the Senior Credit

Facility and Convertible Notes. These efforts were unsuccessful due in large part to the

unprofitability of the Deltak Group. Accordingly, because of the losses the Debtors have

sustained through the Deltak Group and the inability to draw under the Senior Credit Facility, the

Debtors are experiencing a severe liquidity crisis necessitating the commencement of these cases

under chapter 11 of the Bankruptcy Code.

### Jurisdiction

25.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

26.    By this Motion, pursuant to sections 105, 363 and 365 of the Bankruptcy

Code, the Debtors respectfully request authority to (i) wind down the operations and affairs of

the HRSG Business, (ii) reject the HRSG Contracts on twenty (20) days notice, nunc pro tunc to

the date hereof, and (iii) implement procedures for the orderly completion of work in progress.

The relief sought by the this Motion relates only to the HRSG Business segment of the Deltak

Debtors. By this Motion, the Debtors do not intend to restrict or impede the Deltak Debtors'

ability to continue to operate their specialty boiler business in the ordinary course.

### A.    Wind Down of the HRSG Business is Appropriate

27.    Arguably, the decision to wind down a business is a transaction out of the

ordinary course of business for which court approval in accordance with section 363(b) of the

Bankruptcy Code is required; and, although the Debtors made the determination to wind down

the affairs of the HRSG Business prior to the Petition Date, in the interest of caution and to put

the Court and all parties in interest on appropriate notice, the Debtors have filed this Motion.

28.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or cessation of a debtor's business operations, applicable case law provides that a bankruptcy court should approve a transaction that is out of the ordinary course of a debtor's business if the debtor can demonstrate that it exercised sound business judgment in determining to enter into the transaction.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991); Dai-Ichi Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999).

29.     Once the debtor articulates a valid business justification, there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res. (In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Once a valid business judgment is made, the business judgment rule shields a debtor's management from judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (quoting In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986), providing that the Bankruptcy Code "'favors the continued operation

of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.'").

30.    Moreover, section 105(a) of the Bankruptcy Code gives this Court broad authority under its equitable powers to fashion any order or decree that would preserve or protect the value of the Debtors' assets. See, e.g., Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.), 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003) ("Section 105 of Title 11 provides the bankruptcy courts with a broad range of equitable powers over cases within its jurisdiction.").

31.    The decision to wind down the affairs of the HRSG Business falls well within the Debtors' sound business judgment. Given the operational losses at the Deltak Group and the related cash drain on the Debtors' overall business operations, the Debtors believe that the cessation and orderly wind down of the HRSG Business is in the best interests of the Debtors, their estates, creditors and all parties in interest. Simply, the Debtors lack sufficient funds to operate the HRSG Business, which will likely sustain substantial cash losses in the future. Further, in light of the substantial negative cash generation of the current book of business, the going concern will otherwise attract little if any interest from a third party investor sufficient to justify any continued capital investment necessary to market the business.

**B.    Rejection of HRSG Contracts**

32.    As stated, the Debtors sell the HRSG units pursuant to fixed price contracts. In connection with the cessation of the HRSG Business operations and affairs, the Debtors have determined, in an exercise of sound business judgment, to reject immediately, effective nunc pro tunc to the Petition Date, all executory contracts for the delivery by the Debtors of HRSG units to customers. In addition, the Debtors intend to vacate and no longer require the use of certain premises relating to an unexpired lease of nonresidential real property.

Thus, the Debtors also seek authority to reject this lease. Attached as Exhibit "A" hereto is a table identifying the HRSG Contracts, which includes that certain lease.[10]

33.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject an executory contract or an unexpired lease." 11 U.S.C. § 365(a). The assumption or rejection of an unexpired lease or executory contract by a debtor is subject to review under the business judgment standard. See Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul, & Pacific R.R. Co., 318 U.S. 523, 550 (1943); In re Trans World Airlines, Inc., 261 B.R. 103, 120-21 (Bankr. D. Del. 2001); Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 845-846 (Bankr. W.D. Pa. 1987). This standard is satisfied when a debtor determines that rejection will benefit the estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Group, 872 F.2d 36, 39-40 (3d Cir. 1989); Wheeling-Pittsburgh, 72 B.R. at 846. If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See, e.g., Sharon Steel, 872 F.2d at 39-40; Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"); cf. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984).

34.     The Debtors estimate that they are not able to complete any of the HRSG Contracts in a cash flow neutral or positive manner. Furthermore, given the specialty nature of the business and the inability to meet current customer demands pursuant to the terms of the

---

[10]     Nothing contained herein or in Exhibit "A" constitutes an admission that any HRSG Contract is an executory contract, but in the event any such contract or lease is deemed executory, the Debtors intend to seek rejection.

contracts, the HRSG Contracts represent little to no value to a third party purchaser.[11]

Accordingly, rejection of these agreements is an exercise of the Debtors' sound business

judgment and is in the best interests of the Debtors, their estates and their creditors.

35.    Normally, the effective date of a rejection is the date that the order

approving rejection is entered.  See In re Chi Chi's Inc., 305 B.R. 396, 399 (Bankr. D. Del. 2004)

(citing In re Thinking Machines Corp., 67 F.3d 1021, 1025 (1st Cir. 1995) (the date of court

approval controls)).  However, rejection has been allowed nunc pro tunc to the date the motion

seeking rejection is filed under certain circumstances.  See Chi Chi's, 305 B.R. at 399 (citing In

re Thinking Machines Corp., 67 F.3d at 1025, which held the bankruptcy court has discretion to

approve a rejection retroactively to the motion filing date, when principles of equity so dictate);

In re CCI Wireless, LLC, 297 B.R. 133, 140 (D. Colo. 2003) (same).  To grant nunc pro tunc

rejection, the Debtors must have stated an unequivocal intent to reject the contract or leases.

See, e.g., In re Amber's Stores, Inc., 193 B.R. 819, 825-26 (Bankr. N.D. Tex. 1996) (explaining

the view that "rejection is effective when the landlord receives unequivocal notice of the debtor's

intent to reject the lease").

36.    Maximization of the value of the Deltak Debtors depends in large measure

on their ability to relieve themselves from burdensome contracts and to keep their postpetition

costs of administration to a minimum.  For these reasons, the Debtors by this Motion provide

notice of their intent to reject those contracts identified on Exhibit "A" hereto.  In accordance

with applicable law, this provision of notice is sufficient to enable rejection to the HRSG

Contracts to become effective as of the date of this Motion, notwithstanding the actual date of

entry of the order approving rejection.

---

[11]    The Debtors are continuing to evaluate the HRSG Contracts.  Prior to the expiration of the 20-day notice period, the Debtors reserve the right to exclude or add additional HRSG Contracts, or to otherwise modify, the schedule of contracts and leases contained on Exhibit "A."

37.    The Debtors request authority pursuant to Bankruptcy Rules 2002 and 6006 to provide notice of rejection of the HRSG Contracts, substantially in the form annexed hereto as Exhibit "B" (the "Rejection Notice"), to the counterparties of such contracts and leases (the "HRSG Counterparties"). The Debtors further request that the Court establish a deadline for the HRSG Counterparties to object to the Rejection Notice on a date occurring no later than twenty (20) days from the date of entry of the order approving the Rejection Notice, and that, in the event objections are filed, the Court conduct a hearing to consider such objections at the next available hearing date.

C.    **Authority to Implement Procedures to Orderly Complete Work in Progress**

38.    The HRSG units are highly customized, specialty equipment, for which the HRSG Business is often the sole source provider; similarly, the Debtors' vendors are also sole source providers for the type of labor and supplies necessary to complete the HRSG projects. Because these products are highly customized, the Debtors believe it would be beneficial to give customers the option to complete the construction of the specialty equipment on mutually beneficial terms.

39.    Accordingly, the Debtors intend to provide HRSG customers with the opportunity to have the HRSG Business complete current HRSG projects in progress. While the Debtors intend to seek the best possible terms for the completion of each of the HRSG projects, at a minimum, to exercise such option, the Debtors will require each customer to agree to (a) fund not less than all actual costs of completion on time and materials terms, including, without limit, all outstanding and future costs owed to vendors and the customer's proportionate share of any excess overhead costs that would not otherwise be incurred in the ordinary course of the wind down plan, and (b) upon delivery of the relevant HRSG unit, waive any and all claims

against the Debtors relating to such HRSG unit, including all rejection damage claims (the "HRSG Completion Program").

40.     Concurrently with the chapter 11 filings, the Deltak Debtors instructed approximately 100 employees who are dedicated to the HRSG Business not to report to work absent further notice. The Deltak Debtors have retained a number of employees to expeditiously contact customers to gauge interest in participating in the HRSG Completion Program. Given the nature of these contracts, the Debtors believe that they will know whether the HRSG Completion Program can be successful in whole or in part within thirty (30) days of the Petition Date.

41.     In the event a sufficient number of customers agree to the terms of the HRSG Completion Project, they intend to offer contract employment to a sufficient number of recently terminated employees necessary to complete the projects.

42.     Because the Debtors seek implementation of the HRSG Completion Project, the Debtors do not intend at this time to reject their outstanding supply contracts with their vendors. If the HRSG Completion Project is ultimately unsuccessful, the Debtors anticipate rejecting vendor contracts in the near term. Furthermore, from both a legal and practical standpoint, the Debtors believe that it will be necessary to require that all outstanding amounts owing to vendors relating to completion of a HRSG unit be paid by the customer without regard to when the cost was incurred by the Debtors. From a legal standpoint, the vendors may possess rights as materialmen or have other claims against the customers that will ultimately be satisfied by such customers in any event. Furthermore, payment by the customers to the vendors is beneficial to the estate as it will ultimately reduce claims against the estate. Because such payments are being made by the customer, which remains the customer's option with or without

the relief requested herein, the Debtors believe that such payment will not constitute payment on account of a prepetition claim by the Debtors.[12]

43.    Finally, although the Debtors are hopeful that a sufficient number of employees will return as Contract Employees to complete those projects that their customers agree to fund to completion, there can be no assurances that such employees will in fact return. Accordingly, the implementation of the HRSG Completion Project will be conditioned upon a sufficient number of employees returning to work. To induce a sufficient number of "employees" to return on a contract and temporary basis, the Debtors will likely be required to offer terms with a retention component and modest enhancements as compared with those offered to full time employees. Pursuant to the terms of the HRSG Completion Project, all such costs will be borne by the participating customers.[13]

### Notice

44.    Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the Senior Lenders, counsel to the Noteholders,

---

[12]    Under the proposed procedures, payments of outstanding amounts due to vendors would be funded by the Debtors' customers for their benefit without diminishing the estate; accordingly, such payments do not amount to impermissible satisfaction of prepetition claims by the Debtors. However, even if such payments were deemed to be the satisfaction of a prepetition claim by the Debtors, such payments are appropriate, as they meet the criteria for authorizing critical vendor payments under controlling law. In re Just for Feet, Inc., 242 B.R. 821, 824 (Bankr. D. Del. 1999) (bankruptcy courts may exercise equity powers to authorize payment of prepetition debt where such payment is necessary to preserve the going concern value of a debtor's business); In re CoServ, L.L.C., 273 B R 487, 497 (Bankr. N.D. Tex. 2002) (noting that the preplan satisfaction of prepetition claims may be necessary to satisfy a debtor's fiduciary duties under section 1107 and 1108 of the Bankruptcy Code). Here, because the HRSG Business' vendors are often sole source provides, it is critical that the Deltak Debtors deal with them to complete the HRSG projects. Second, unless the Deltak Debtors deal with these vendors, the Debtors risk the loss of economic advantage to the Debtors' estates. Third, there is no practical or legal alternative by which the Debtors can deal with the claimant other than by payment of the claim. See CoServ, 273 B.R. at 497. For those reasons, coupled with the fact that the HRSG customers' payments will not result in diminishment of the estate, the proposed payment procedures are appropriate.

[13]    Although the newly enacted section 503(c) of the Bankruptcy Code places limitations on the allowance and payment of administrative expenses for retention bonuses and severance payments to insiders, and other transfers outside the ordinary course of business made to officers, managers, or consultants hired postpetition, these limitations should not apply with respect to rehired contract employees. Any amounts owing to such contract employees will be paid either by the Debtors' customers directly or through funds provided to the Debtors by their customers and held in trust for the employees' benefit.

the Debtors' 30 largest unsecured creditors on a consolidated basis, each of the HRSG

Counterparties, and all parties requesting notices pursuant to Bankruptcy Rule 2002. The

Debtors submit that no other or further notice need be provided.

   45. Pursuant to Rule 7.1.2(a) of the Local Rules of Civil Practice and

Procedure of the United States District Court for the District of Delaware, incorporated by

reference into Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the

United States Bankruptcy Court for the District of Delaware, and because there are no novel

issues of law presented in the Motion, the Debtors waive their right to file a brief in support of

this Motion.

   46. No previous motion for the relief sought herein has been made to this or

any other court.

**Conclusion**

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        September 29, 2006

                                        THE BAYARD FIRM

                                        By: _____
                                        Jeffrey M. Schlerf (No. 3047)
                                        Eric M. Sutty (No. 4007)
                                        Mary E. Augustine (No. 4477)
                                        222 Delaware Avenue, Suite 900
                                        Wilmington, Delaware 19801
                                        (302) 655-5000

                                            -and-

                                        Thomas E Lauria
                                        Gerard Uzzi
                                        Matthew C. Brown
                                        WHITE & CASE LLP
                                        Wachovia Financial Center
                                        200 South Biscayne Boulevard, 49th Floor
                                        Miami, Florida 33131
                                        (305) 371-2700

                                        Proposed Attorneys to the Debtors and
                                        Debtors in Possession

# EXHIBIT A

D 20

**EXHIBIT A**

## Deltak Debtors – Heat Recovery Steam Generation Segment
## Executory Contracts and Unexpired Leases
Revised Sept. 28, 2006

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Black & Veatch Limited | Deltak, LLC | G06005 | Immingham Phase 2 | Project No. 145646 | 31-Aug-06 | 11401 Lamar Overland Park, KS 66211 | Gary Townsend | |
| CTCI Corporation | Deltak, LLC | G04301 | PT UT EPCC Works of Central Utility | PO no: 04CHX0111A-F0002 | 10-Jan-05 | 19Fl, CTCI Tower, 77, Sec. 2, Tun Hwa S. Rd., Taipei 106, Taiwan, R.O.C. | H. C. Chu | |
| CTCI Corporation | Deltak, LLC | G05302 | PT UT CUP1 Phase II [Power | PO No: 04CHX0111B-F0002 | 5-Jan-06 | 22Fl, 77, Sec. 2, Tun Hwa S.Road, Taipei 106, Taiwan | | |
| CTEP FZCO | Deltak, LLC | G05003 | Qatargas II Development | PO No. QGXF5A0022 | 27-May-05 | PO Box 261645 Jebel Ali Free Zone, Duba, United Arab Emirates | | |
| CTEP FZCO | Deltak, LLC | G05005 | Qatargas 3 & 4 Onshore | PO No. QC5F5A0003 | 27-May-05 | PO Box 261645 Jebel Ali Free Zone, Dubai, United Arab Emirates | | |
| Deltak Power Equipment (China) Co. Ltd | Deltak, LLC | G05301 | Lin Yuan Steel | PO No. DPEC H05-014-001 | 20-Dec-05 | No. 139 Taishan Road, Jianye Disctrict, Nsjing China, 210012 | | |
| Flour Transworld Services, Inc./ JAMALCO | Deltak, LLC | G06004 | JAMALCO 1U3 | PO No. A2MU-4-0302-01 | | 100 Flour Daniel Drive Greenville, SC 29607 | Carmen Henson | A2MU |
| GE International Operations Co., Inc. | Deltak, LLC | G04010 | Puentes | PO no: 180851577 | 14-Jul-05 | Prolongacion Reforma 490, 4o Piso Colonia Santa Fe, 01217 Mexico D.F Mexico | John Kosiakowski | |
| General Electric Company | Deltak, LLC | G04008 | Tamazunchale | PO no: 180752566 | 8-Sep-04 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosiakowski | |
| General Electric Company | Deltak, LLC | G04010 | Puentes | PO no: 180772517 | 22-Nov-04 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosiakowski | |

MIAMI 670/680 v4
(2K)

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| General Electric Company | Deltak, LLC | G04010/Portugal | Puentes Portugal | PO no: 180881419 | 6-Oct-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010 | Puentes | PO no: 180886930 | 26-Oct-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010/Czech Republic | Puentes | PO no: 180893186 | 15-Nov-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010/Netherlands | Puentes | PO no: 180894649 | 18-Nov-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak Construction Services, Inc. | G05002 | 7H Launch-Inland Empire | PO no: 180910241 | 12-Jan-06 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G05002 | 7H Launch-Inland Empire | PO no: 180800231 | 4-Feb-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric International, Inc. | Deltak, LLC | G04010 | Puentes | PO no: 180849474 | 6-Jul-05 | Spain Branch, Juan Bravo 3C, Apartado 700, 28006 Madrid, Spain | Rocio Sanchez-Portal | |
| Greenfield Energy Centre, LP | Deltak, LLC | G05004 | Greenfield | Contract for Construction Services | 5-Aug-05 | 200 Bay Street, Ste. 3800,Toronto, Ontario, M5J 2Z4 | Calpine Greenfield Limited Partnership, c/o Calpine Construction Management Co. Inc, 104 Woodmere Rd. Folsom, CA 95630, Attn: Kurt Seel | CESCL-0000000003 |
| Maasvlakte Energie BV | Deltak, LLC | G04011 | Pergen | Project Pergen HRSG Contract | 10-Dec-04 | Corkstraat 46, 3407 AC, Rotterdam, The Netherlands | Jaap Hoogcarspel | |
| Mitsubishi Power Systems, Inc. | Deltak, LLC | G04006 | MPS/PGE/Port Westward | Purchase Agreement for the Port Westward Generating Facility Ref: 5910-09A | 3-Sep-04 | 100 Colonial Center Parkway Lake Mary, FL 32746 | Rich Boukal | 4006403 |
| Navasota Odessa Energy Partners LP | Deltak, LLC | G06001 | Wharton Project | Purchase and Sale Contract | 26-Jan-06 | 6711 Appley Valley, Ste. 200 Houston, TX 77069 | David Hudson | |

2

MIAMI 676980 v4
(2K)

D 22

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Navasota Wharton Energy Partners LP | Deltak, LLC | G06002 | Odessa Project | Purchase and Sale Contract | 26-Jan-06 | 6711 Appley Valley, Ste. 200 Houston, TX 77069 | David Hudson | |
| SNC-Lavalin Power Ontario Inc. | Deltak, LLC | G06003 | Goreway Station | PO No: 59000010 | 26-Jan-06 | 2655 N. Sheridan Way Ste.180 Mississauga, Ontario, Canada L3K 2P8 | Jack Tarranova (location is different) | |
| TIC - International (TICI) | Deltak, LLC | G05006 | Hovensa GT-13 | PO No: 20008-90000 | 15-Nov-05 | TIC International P.O. Box 580 El Segundo, CA 90245 | Devern Dickerson The Industrial Company 40185 RCR 129 P.O. Box 77494 Steamboat Springs, CO 80477 | |
| Southern Company Services, Inc | Deltak, LLC | G01010 | McIntosh | 2003 Generation SGC00-001 | 15-Jun-01 | PO Box 2625/ BIN B237, 42 Inverness Ctr. Parkway, 35242 | Milton Balch | |
| Southern Company Services, Inc | Deltak, LLC | G01011 | McIntosh | 2003 Generation SGC00-001 | 15-Jun-01 | PO Box 2625/ BIN B237, 42 Inverness Ctr. Parkway, 35242 | Milton Balch | |
| South Houston Green Power LP | Deltak, LLC | G01015 | South Houston Green Power | PO No 157543 | 28-Sept-01 | C/O Cinergy Power Generation Services 1000 East Main Street Plainfield, IN 46168 | W. Michael Womack | |
| MidAmerica Energy | Deltak, LLC | G02001 | Greater DesMoines Energy Center | Contract MEC Project 13488 | 21-Dec-01 | 106 East Second Street Post Office Box 4350 Davenport, Iowa 52802 | John Roche | |
| Madison Gas & Electric | Deltak, LLC | G02004 | | PO No: P2190 | 17-Jun-02 | 222 W Washington Ave PO Box 1231 Madison, WI 53707-1231 | Donald Peterson | |
| ExxonMobil Chemical Company | Deltak, LLC | G02005 | Baytown Chemical | PO No: A470192639 | 18-Oct-02 | 3525 Decker Drive Baytown, TX 77521 | L.J Guillory | |
| ExxonMobil Chemical Company | Deltak | G03001 | Beaumont Refinery | PO No C-62604 | 24-Feb-03 | 4500 Bayway Drive Baytown, TX 77520 | Dave Shertz | |
| Bechtel Corp | Deltak LLC | G03002 | Darwin | PO No: 24879-000-MRA-MBPR-0001 | 11-April-03 | P.O. Box 2166 Houston, Texas 77252-2166 | Ronny Gilliland | |

3

MIAMI 676980 v4
12(A)

D 23

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Power Systems Sourcing Operation, General Electric International, Inc | Deltak LLC | G03003 | Caojing | PO No: 180597867 | 24-April-03 | Building 37-2E One River Road Schenectady, NY 12345 | Craig Smith | |
| JGC | Deltak LLC | G03004 | Aramco Berri Plant | 0-3105-P-215b-001-A | 24-July-03 | 2-3-1, Minato Mirai, Nishi-ku Yokohama, 220-6001, Japan | Yoshiyuki Shimizu | |
| Toshiba Plant Systems & Services Corporation, International Procurement Department | Deltak LLC | G03005 | Coco | PO No: PDP0000600 | 28-Aug-03 | 36-5, Tsurumicho 4-chome, Tsurumi-ku, Yokohama 230-8691, Japan | Masahito Harada | |
| Power Systems Sourcing Operation, General Electric International, Inc | Deltak LLC | G04001 | Quebec | PO No: 180679810 | 03-Feb-04 | Building 37-2E One River Road Schenectady, NY 12345 | Craig Smith | |
| Zhejiang Guohua Yuyao Gas Turbine Power Plant Co, Ltd | Deltak LLC | G04002 | Gouhau | Contract No: 20031228 | 22-Mar-04 | Gong Hang Building, 15th Floor No 58 Xinjian Road, Yuyao City, Zhejiang Province, China 315400 | Mr. Zhu Yu Huai | |
| Kinder Morgan Production Company LP | Deltak LLC | G04003 | SCR Retrofit to G01008 | PO No: DZM1002 | | 500 N. Loraine Suite 900 Midland, Texas 79701 | Davorin Metovich | |
| Toshiba Plant Systems & Services Corporation, International Procurement Department | | G04005 | Cocoa 4.2 | Contract amendment to PDP0000600 on G03005 | 15-July-04 | 36-5, Tsurumicho 4-chome, Tsurumi-ku, Yokohama 230-8691, Japan | Masahito Harada | |

**Leases**

| Lessor | Lessee | Property | Expiration Date | Contact Address | Contact Person | Principal Uses |
|---|---|---|---|---|---|---|
| Liberty Property Limited Partnership | Deltak, LLC | 2905 Northwest Boulevard, Northwest Business Campus I, Plymouth, Minnesota | 9/30/2009 | 10400 Viking Drive, Ste. 130, Eden Prairie, MN 53344 | Thomas Shaver | Engineering and admin office |

4

MIAMI 676/680 v4 (3X)

D 24

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (CSS) |
| Debtors. | Jointly Administered |

NOTICE OF PROPOSED REJECTION OF CERTAIN EXECUTORY CONTRACTS RELATED TO THE HEAT RECOVERY STEAM GENERATION BUSINESS SEGMENT OPERATED BY THE DELTAK DEBTORS

TO:     [Name and Address of Affected Party]

Re:     [Deltak Reference Number, Project Name, PO Number, Contact Name, Contract Number] (the "HRSG Contract")

　　　　**PLEASE TAKE NOTICE THAT** on _____, 2006, the United

States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court")  entered

an Order (the "Wind Down Order") granting the Debtors' Motion Pursuant To 11 U.S.C.

§§ 105, 363 And 365 For An Order Authorizing Debtors To (I) Wind Down Operations

Of The Heat Recovery Steam Generation Business Segment Operated By The Deltak

Debtors, (II) Reject Certain Executory Contracts In Connection Therewith, And

(III) Implement Procedures For The Orderly Completion Of Work In Progress (the

"Motion").

　　　　**PLEASE TAKE FURTHER NOTICE THAT** the Wind Down Order,

among other things, authorized Global Power Equipment Group Inc. ("Global Power")

and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] to serve

---

[1]　　　　In addition to Global Power, the Debtors include Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP.

MIAMI 675521 v14
(2K)

this notice of proposed rejection (the "Rejection Notice") pursuant to section 365(a) of

title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") to

all counterparties to certain executory contracts and unexpired leases identified on

Exhibit "A" attached hereto (the "HRSG Contracts") which relate to the Heat Recovery

Steam Generation business segment operated by the Deltak Debtors.[2]

       **PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Motion

the Debtors seek to reject each of the HRSG Contracts, effective as of September 28,

2006.

       **PLEASE TAKE FURTHER NOTICE THAT,** pursuant to the Wind

Down Order, an objection to the Debtors' rejection of any HRSG Contract must filed

with the Bankruptcy Court and served so that it is actually received **no later than twenty**

**(20) days from the date of service of this Rejection Notice** by the following parties: (i)

proposed counsel to the Debtors: White & Case LLP, Wachovia Financial Center, 200

South Biscayne Boulevard, 49th Floor, Miami, Florida 33131, Attn.: Matthew C. Brown,

Esq., and The Bayard Firm, 222 Delaware Avenue, Suite 900, Wilmington, Delaware

19801, Attn.: Jeffrey M. Schlerf, Esq.; (ii) counsel to the Senior Lenders; (iii) counsel to

the Noteholders; (iv) counsel to the Official Committee of Unsecured Creditors, if any;

and (v) the Office of the United States Trustee.

       **PLEASE TAKE FURTHER NOTICE THAT** if a timely objection is

filed as to any of the HRSG Contracts, the Court will schedule a hearing to consider that

objection. Any HRSG Contracts to which no timely objection is filed in accordance

herewith shall be deemed to be rejected effective as of September 29, 2006, without

further notice, hearing or order of this Court. If the Bankruptcy Court overrules an

---

[2]    The Deltak Debtors consist of (i) Deltak, LLC and (ii) Deltak Construction Services, Inc.

objection filed in accordance herewith to the rejection of any of the HRSG Contracts,

such HRSG Contract shall be deemed to be rejected effective as of September 28, 2006,

without further notice, hearing or order of this Court.

Dated:   Wilmington, Delaware
         _____, 2006.

THE BAYARD FIRM

By: _____
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

-and-

Thomas E Lauria
Gerard Uzzi
Matthew C. Brown
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

Proposed Attorneys to the Debtors and
Debtors in Possession

D 28

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | ) Case No. 06-11045 (CSS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re: Docket No. ___ |

**ORDER GRANTING DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 FOR AN ORDER AUTHORIZING DEBTORS TO (I) WIND DOWN OPERATIONS OF THE HEAT RECOVERY STEAM GENERATION BUSINESS SEGMENT OPERATED BY THE DELTAK DEBTORS, (II) REJECT CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (III) IMPLEMENT PROCEDURES FOR THE ORDERLY COMPLETION OF WORK IN PROGRESS**

Upon the motion, dated September 29, 2006 (the "Motion"),[1] of Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), for entry of an order pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing the Debtors to (i) wind down the HRSG Business operations of the Deltak Debtors[2] and (ii) reject, on twenty (20) days notice, nunc pro tunc to the date hereof, certain executory contracts and unexpired leases in connection therewith (as identified on Exhibit "A" hereto, collectively, the "HRSG Contracts"), and (iii) implement procedures for the orderly completion of work in progress, as more fully set out in the Motion; and upon consideration of the Affidavit of John M. Matheson in Support of First Day Motions and Applications sworn to on the 29th day of September, 2006; and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion as set forth therein is sufficient under the circumstances, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors; and

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2]    The Deltak Debtors consist of (i) Deltak, LLC and (ii) Deltak Construction Services, Inc.

upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, the Debtors are hereby authorized and empowered to wind down the HRSG Business operations and affairs; and it is further

ORDERED that the Debtors shall provide notice of rejection of the HRSG Contracts, pursuant to section 365(a) of the Bankruptcy Code, effective retroactively as of the date of the filing of the Motion, to the HRSG Counterparties; and it is further

ORDERED that the form of Rejection Notice is hereby approved; and it is further

ORDERED that the HRSG Counterparties shall file objections, if any, to the Rejection Notice, no later than twenty (20) days after the date of the entry of this Order, and that, in the event objections are filed, a hearing on such objections shall be held at the next available omnibus hearing, or some other date set by the Court or agreed to by the parties; and it is further

ORDERED that if the Debtors have deposited monies with any HRSG Counterparty as a security deposit or other arrangement, such counterparty shall not setoff or otherwise use such deposit without prior authority of this Court; and it is further

ORDERED that the Debtors are authorized, but not directed, to negotiate with customers to reach accommodations for the completion of certain HRSG Contracts in exchange for such customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms, including, without limit, all outstanding costs owed to vendors and Contract Employees relating to the completion of such contracts, plus the customer's share of any excess costs that would be incurred in the ordinary course outside of the wind down plan, (ii) fund any

contractor incentives offered to Contract Employees who are retained to perform on such customer's HRSG project, and (iii) waive all rejection damages claims to the extent the Deltak Debtors complete such customer's HRSG project; and it is further

ORDERED that to the extent completion of any HRSG Contract results in the receipt of proceeds in excess of costs, the Debtors are authorized and directed to recover any such proceeds; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or in relation to the implementation of this Order.

Dated:    Wilmington, Delaware
          October __, 2006


_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

## Deltak Debtors – Heat Recovery Steam Generation Segment
### Executory Contracts and Unexpired Leases
Revised Sept. 28, 2006

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Black & Veatch Limited | Deltak, LLC | G06005 | Immingham Phase 2 | Project No. 145646 | 31-Aug-06 | 11401 Lamar Overland Park, KS 66211 | Gary Townsend | |
| CTCI Corporation | Deltak, LLC | G04301 | PTTUT EPCC Works of Central Utility | PO no: 04CHX0111A-F0002 | 10-Jan-05 | 19Fl., CTCI Tower, 77, Sec. 2, Tun Hwa S. Rd., Taipei 106, Taiwan, R.O.C. | H. C. Chu | |
| CTCI Corporation | Deltak, LLC | G05302 | PT UT CUP1 Phase II (Power | PO No: 04CHX0111B-F0002 | 5-Jan-06 | 22Fl., 77, Sec. 2, Tun Hwa S.Road, Taipei 106, Taiwan | | |
| CTEP FZCO | Deltak, LLC | G05003 | Qatargas II Development | PO No. QGXF5A0022 | 27-May-05 | PO Box 261645 Jebel Ali Free Zone, Dubai, United Arab Emirates | | |
| CTEP FZCO | Deltak, LLC | G05005 | Qatargas 3 & 4 Onshore | PO No. QCSF5A0003 | 27-May-05 | PO Box 261645 Jebel Ali Free Zone, Dubai, United Arab Emirates | | |
| Deltak Power Equipment (China) Co. Ltd | Deltak, LLC | G05301 | Lin Yuan Steel | PO No. DPEC H05-014-001 | 20-Dec-05 | No. 139 Taishan Road, Jianye District, Najing China, 210012 | | |
| Flour Transworld Services, Inc./ JAMALCO | Deltak, LLC | G06004 | JAMALCO IU3 | PO No.. A2MU4-0302-01 | | 100 Flour Daniel Drive Greenville, SC 29607 | Carmen Henson | A2MU |
| GE International Operations Co., Inc. | Deltak, LLC | G04010 | Puentes | PO no: 180851577 | 14-Jul-05 | Prolongacion Reforma 490, 4o Piso Colonda Santa Fe, 01217 Mexico DF Mexico | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04008 | Tamazunchale | PO no: 180752366 | 8-Sep-04 | 1 River Road, Bldg 37-2E. Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010 | Puentes | PO no: 180775517 | 22-Nov-04 | 1 River Road, Bldg 37-2E. Schenectary NY 12345 | John Kosakowski | |

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| General Electric Company | Deltak, LLC | G04010/Portugal | Puentes Portugal | PO no: 180881419 | 6-Oct-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010 | Puentes | PO no: 180886930 | 26-Oct-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010/Czech Republic | Puentes | PO no: 180893186 | 15-Nov-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G04010/Netheria nds | Puentes | PO no: 180894649 | 18-Nov-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak Construction Services, Inc. | G05002 | 7H Launch-Inland Emprie | PO no: 180910241 | 12-Jan-06 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric Company | Deltak, LLC | G05002 | 7H Launch-Inland Emprie | PO no: 180800231 | 4-Feb-05 | 1 River Road, Bldg 37-2E, Schenectary NY 12345 | John Kosakowski | |
| General Electric International, Inc. | Deltak, LLC | G04010 | Puentes | PO no: 180849474 | 6-Jul-05 | Spain Branch Juan Bravo 3C, Apartado 700 28006 Madrid, Spain | Rocio Sanchez-Portal | |
| Greenfield Energy Centre, LP | Deltak, LLC | G05004 | Greenfield | Contract for Construction Services | 5-Aug-05 | 200 Bay Street, Ste. 3800,Toronto, Ontario, M5J 2Z4 | Calpine Greenfield Limited Partnership, c/o Calpine Construction Management Co. Inc, 104 Woodmere Rd., Folsom, CA 95630, Attn: Kurt Steel | CESCL-0000000003 |
| Maasvlakte Energie BV | Deltak, LLC | G04011 | Pergen | Project Pergen HRSG Contract | 10-Dec-04 | Corkstraat 46, 3407 AC, Rotterdam, The Netherlands | Jaap Hoogcarspiel | |
| Mitsubishi Power Systems. Inc. | Deltak, LLC | G04006 | MPS/P/GE/Port Westward | Purchase Agreement for the Port Westward Generating Facility Ref: 5910-09A | 3-Sep-04 | 100 Colonial Center Parkway Lake Mary, FL 32746 | Rich Boukal | 4006403 |
| Navasota Odessa Energy Partners LP | Deltak, LLC | G06001 | Wharton Project | Purchase and Sale Contract | 26-Jan-06 | 6711 Appley Valley, Ste. 200 Houston, TX 77069 | David Hudson | |

2

NHAMI 676980 v4
(3X)

D 33

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Navasota Wharton Energy Partners LP | Deltak, LLC | G06002 | Odessa Project | Purchase and Sale Contract | 26-Jan-06 | 6711 Appley Valley, Ste. 200 Houston, TX 77069 | David Hudson | |
| SNC-Lavalin Power Ontario Inc. | Deltak, LLC | G06003 | Goreway Station | PO No: 59000010 | 26-Jan-06 | 2655 N. Sheridan Way Ste.180 Mississauga, Ontario, Canada L5K 2P8 | Jack Tarranova (location is different) | |
| TIC - International (TICI) | Deltak, LLC | G05006 | Hovensa GT-13 | PO No: 20008-90000 | 15-Nov-05 | TIC International P.O. Box 580 El Segundo, CA 90245 | Devern Dickerson The Industrial Company 40185 RCR 129 P.O. Box 77494 Steamboat Springs, CO 80477 | |
| Southern Company Services, Inc | Deltak LLC | G01010 | McIntosh | 2003 Generation SGC00-001 | 15-Jun-01 | PO Box 2625/ BIN B237, 42 Inverness Ctr. Parkway, 35242 | Milton Balch | |
| Southern Company Services, Inc | Deltak LLC | G01011 | McIntosh | 2003 Generation SGC00-001 | 15-Jun-01 | PO Box 2625/ BIN B237, 42 Inverness Ctr. Parkway, 35242 | Milton Balch | |
| South Houston Green Power LP | Deltak LLC | G01015 | South Houston Green Power | PO No 157543 | 28-Sept-01 | C/O Cinergy Power Generation Services 1000 East Main Street Planfield, IN 46168 | W. Michael Womack | |
| MidAmerica Energy | Deltak LLC | G02001 | Greater DesMoines Energy Center | Contract MEC Project 13488 | 21-Dec-01 | 106 East Second Street Post Office Box 4350 Davenport, Iowa 52802 | John Roche | |
| Madison Gas & Electric | Deltak LLC | G02004 | | PO No: P2190 | 17-Jun-02 | 222 W Washington Ave PO Box 1231 Madison, WI 53707-1231 | Donald Peterson | |
| ExxonMobil Chemical Company | Deltak LLC | G02005 | Baytown Chemical | PO No: A470192639 | 18-Oct-02 | 3525 Decker Drive Baytown, TX 77521 | L.J. Guillory | |
| ExxonMobil Chemical Company | Deltak | G03001 | Beaumont Refinery | PO No C-62604 | 24-Feb-03 | 4500 Bayway Drive Baytown, TX 77520 | Dave Shertz | |
| Bechtel Corp | Deltak LLC | G03002 | Darwin | PO No: 24879-000-MRA-MBPR-0001 | 11-April-03 | P.O. Box 2166 Houston, Texas 77252-2166 | Ronny Gilliland | |

3

MIAMI 670/080 v4
(2K)

D 34

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Power Systems Sourcing Operation, General Electric International, Inc | Deltak LLC | G03003 | Caojing | PO No: 180597867 | 24-April-03 | Building 37-2E One River Road Schenectady, NY 12345 | Craig Smith | |
| JGC | Deltak LLC | G03004 | Aramco Berri Plant | 0-3105-P-215b-001-A | 24-July-03 | 2-3-1, Minato Mirai, Nishi-ku Yokohama, 220-6001, Japan | Yoshiyuki Shimizu | |
| Toshiba Plant Systems & Services Corporation, International Procurement Department | Deltak LLC | G03005 | Coco | PO No: PDP0000600 | 28-Aug-03 | 36-5, Tsurumicho 4-chome, Tsurumi-ku, Yokohama 230-8691, Japan | Masahito Harada | |
| Power Systems Sourcing Operation, General Electric International, Inc | Deltak LLC | G04001 | Quebec | PO No: 180679810 | 03-Feb-04 | Building 37-2E One River Road Schenectady, NY 12345 | Craig Smith | |
| Zhejiang Guohua Yuyao Gas Turbine Power Plant Co, Ltd | Deltak LLC | G04002 | Gouhau | Contract No: 20031228 | 22-Mar-04 | Gong Hang Building, 15th Floor No 58 Xinjian Road, Yuyao City, Zhejiang Province, China 315400 | Mr. Zhu Yu Huai | |
| Kinder Morgan Production Company LP | Deltak LLC | G04003 | SCR Retrofit to G01008 | PO No: DZM1002 | | 500 N. Loraine Suite 900 Midland, Texas 79701 | Davorin Metovich | |
| Toshiba Plant Systems & Services Corporation, International Procurement Department | | G04005 | Cocoa 4.2 | Contract amendment to PDP0000600 on G03005 | 15-July-04 | 36-5, Tsurumicho 4-chome, Tsurumi-ku, Yokohama 230-8691, Japan | Masahito Harada | |

Leases

| Lessor | Lessee | Property | Expiration Date | Contact Address | Contact Person | Principal Uses |
|---|---|---|---|---|---|---|
| Liberty Property Limited Partnership | Deltak, LLC | 2905 Northwest Boulevard, Northwest Business Campus I, Plymouth, Minnesota | 9/30/2009 | 10400 Viking Drive, Ste. 130, Eden Prairie, MN 55344 | Thomas Shaver | Engineering and admin office |

4

MIAMI 670/990 v.4
(3N)

D 35

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., | ) Case No. 06-11045 (CSS) |
| Debtor. | ) |
| In re | ) Chapter 11 |
| GLOBAL POWER PROFESSIONAL SERVICES, L.L.C., | ) Case No. 06-11046 (CSS) |
| Debtor. | ) |
| In re | ) Chapter 11 |
| BRADEN MANUFACTURING, L.L.C., | ) Case No. 06-11047 (CSS) |
| Debtor. | ) |
| In re | ) Chapter 11 |
| BRADEN CONSTRUCTION SERVICES, INC., | ) Case No. 06-11048 (CSS) |
| Debtor. | ) |
| In re | ) Chapter 11 |
| DELTAK CONSTRUCTION SERVICES, INC., | ) Case No. 06-11049 (CSS) |
| Debtor. | ) |
| In re | ) Chapter 11 |
| DELTAK, L.L.C., | ) Case No. 06-11050 (CSS) |
| Debtor. | ) |

| | |
|---|---|
| In re<br><br>WILLIAMS INDUSTRIAL SERVICES<br>GROUP, L.L.C.,<br><br>              Debtor. | Chapter 11<br><br>Case No. 06-11051 (CSS) |
| In re<br><br>WILLIAMS INDUSTRIAL SERVICES, LLC,<br><br>              Debtor. | Chapter 11<br><br>Case No. 06-11052 (CSS) |
| In re<br><br>WILLIAMS SPECIALTY SERVICES, LLC,<br><br>              Debtor. | Chapter 11<br><br>Case No. 06-11053 (CSS) |
| In re<br><br>WILLIAMS PLANT SERVICES, LLC,<br><br>              Debtor. | Chapter 11<br><br>Case No. 06-11054 (CSS) |
| In re<br><br>WSSERVICES, LP,<br><br>              Debtor. | Chapter 11<br><br>Case No. 06-11055 (CSS) |

## AFFIDAVIT OF JOHN M. MATHESON IN
## SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

| | |
|---|---|
| STATE OF OKLAHOMA<br><br>COUNTY OF TULSA | )<br>) ss.:<br>) |

John M. Matheson, being duly sworn, deposes and says:

D 37

1.      On September 28, 2006 (the "Petition Date"), Global Power Equipment Group Inc. ("Global Power") and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), as debtors and debtors in possession, each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court. I am the Executive Vice President and Chief Operating Officer of Global Power, and I am an officer of each of the remaining Debtors. As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      I submit this affidavit to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first day motions and applications (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this affidavit. I am authorized to submit this affidavit.

**I.**
**BACKGROUND AND EVENTS LEADING TO**
**THE COMMENCEMENT OF THE CHAPTER 11 CASES**

**A.      Business Operations**

4.      Global Power, together with its debtor and non-debtor affiliates (collectively, the "Company"), is a comprehensive provider of power generation equipment for customers in the domestic and international energy and power infrastructure industries, and a

provider of routine and specialty maintenance services to customers in the utility and industrial sectors. The Company operates primarily through three business groups: the Williams Group, the Braden Group, and the Deltak Group.[1] The Company's corporate headquarters are located in Tulsa, Oklahoma, with facilities in Plymouth, Minnesota; Tulsa, Oklahoma; Auburn, Massachusetts; Atlanta, Georgia; Monterrey, Mexico; Shanghai, China; Nanjing, China; and Heerlen, The Netherlands.

5.    The Company originated in May 1998. On May 18, 2001, the Company completed an initial public offering and began trading on the New York Stock Exchange under the symbol "GEG."

6.    Immediately prior to the Petition Date, the Company employed approximately 3,040 employees worldwide. Of those employees, approximately 1,790 were based domestically and approximately 1,250 were based with the Company's foreign. non-Debtor subsidiaries.

7.    The Williams Group. In April 2005, the Company added the Williams Group, its industrial services business segment, which is comprised entirely of Williams Industrial Services Group, L.L.C. and its three wholly owned subsidiaries, Williams Industrial Services, LLC, Williams Specialty Services, LLC, and Williams Plant Services, LLC, all headquartered in Atlanta, Georgia.[2] Through the Williams Group, the Company provides routine and specialty maintenance services to a diversified base of utilities and industrial customers.

---

[1]    An organizational chart of the Company is attached hereto as Exhibit "A".

[2]    The Williams Group, sometimes also referred to herein as the "Williams Debtors," also includes WSServices, LP, a California limited partnership that is 99%-owned by Williams Specialty Services, LLC. its general partner, and 1%-owned by Williams Plant Services, LLC, its limited partner   WSServices, LP is a Debtor entity but is not currently operating, and it has no assets or creditors.

including nuclear, fossil and hydroelectric power plants and pulp and paper mills, and to government agencies, primarily as a subcontractor to the United States Department of Energy.

8.    The services offered by the Williams Group include industrial painting and coating, removal of hazardous materials, industrial insulation, repair and replacement of roofing systems and nuclear, fossil fuel and hydroelectric power plant maintenance. These services are generally provided pursuant to long-term contracts spanning several years, and they are provided both on a constant presence basis and on a discrete project basis.

9.    The Williams Group is the Company's leading business segment and has forged longstanding relationships with its utility and industrial customers, including the Southern Company, Tennessee Valley Authority, Florida Power & Light, Energy North West, the Jacksonville Electric Authority, Exelon, Consolidated Edison, Mead Westvaco and Smurfit Stone.

10.    Prior to and after its acquisition, the Williams Group has been consistently profitable. For the seven-month period ending July 31, 2006, the Williams Group had net profits of approximately $7.2 million on revenue of approximately $96.0 million. Given the increasing markets served by the Williams Group and the growing trend in the industrial maintenance industry towards outsourcing to independent service providers, the Company expects that the demand for the types of services provided by the Williams Group will continue to increase over the next several years. The Williams Group is solvent and intends to continue its operations in the ordinary course of business.

11.    The Braden Group. The Braden Group,[3] the Company's auxiliary power

---

[3]    The Braden Group consists of (i) Braden Manufacturing, L.L.C., one of the Debtors, (ii) Braden Construction Services, Inc., one of the Debtors, and (iii) Global Power Equipment (Shanghai) Co. Ltd., a non-Debtor, and each a wholly owned subsidiary of Global Power; (iv) Braden-Europe BV, a wholly owned subsidiary of Braden Manufacturing, L.L.C.; and (v) Braden Manufacturing SA de CV, a 98%-owned subsidiary of Braden Manufacturing, L.L.C.

equipment segment, is headquartered in Tulsa, Oklahoma and designs, engineers and manufactures a wide range of equipment primarily used to facilitate the operation of gas turbine power plants. The equipment is manufactured and marketed under the Braden and Consolidated Fabricators[4] brand names, and includes products such as filters, enclosures, air intake housings and exhaust systems for gas turbines. The equipment is produced through a combination of in-house manufacturing at the Company's factories in the United States, Mexico and China and through extensive outsourcing relationships around the world.

12.    In general, the Braden Group's power generation equipment contracts involve projects that generally range in duration from three to six months, and are generally priced within the range of $200,000 to $2 million. Nearly all of these contracts are entered into on a fixed-price basis, and the contract prices are established based on projected costs over the life of the project. These costs, however, often vary from the original projections due to unanticipated changes such as customer budget decisions, design changes, and delays in permitting or delivery of the Company's products.

13.    For the seven-month period ending July 31, 2006, the Braden Group had net losses of approximately $446,000 on revenue of approximately $60.3 million. As discussed below, the Braden Group's operations, which the Company believes are fundamentally sound, have been adversely affected by the Company's inability to draw on its senior credit facility and the financial and operational difficulties of the Deltak Group (as defined below).

14.    The Braden Group believes that significant revenue may be realized from its current projects in progress, and that the business may be continued or sold as a going concern. As such, the Braden Group intends to continue operating and seek accommodations

---

[4]    Consolidated Fabricators, Inc was merged into Braden Manufacturing, L L C., one of the Debtors, on June 28, 2004.

from its customers to ensure it maintains sufficient liquidity to complete the projects in progress and realize the revenue generated from such projects.

15.    <u>The Deltak Group</u>.  The Deltak Group,[5] the Company's heat recovery equipment segment, is headquartered in Plymouth, Minnesota and manufactures and markets products under the Deltak brand name.  The Deltak Group designs, engineers and manufactures equipment used to enhance the efficiency of gas turbine power plants, and its products include heat recovery steam generators, specialty boilers ("Specialty"), and industrial boilers.[6]  Its products are produced through a combination of in-house manufacturing at the Company's own factories in the United States and China and through extensive outsourcing relationships around the world.

16.    Through the Braden and Deltak Groups, the Company has equipment installed in power plants and other industrial operations in more than 40 countries on six continents, and estimates that it has one of the largest installed bases of equipment for power generation in the world.  The Braden and Deltak Groups have maintained long-term relationships with some of the world's largest participants in the gas turbine manufacturing industry. including GE Energy, Mitsubishi Power Systems, Siemens Power Generation and ALSTOM.

17.    The Deltak Group submits competitive contract bids for its projects, which generally range from $10 million to $60 million, depending on the nature of the project.  Given

---

[5]    The Deltak Group consists of (i) Deltak, L.L.C., one of the Debtors, (ii) Deltak Construction Services. Inc . one of the Debtors, and (iii) Global Power Asia Limited, a non-Debtor, and each a wholly owned subsidiary of Global Power; (iv) Deltak BV, a wholly owned non-Debtor subsidiary of Deltak, L.L.C.; (v) Deltak Power Equipment (China) Co. Ltd., a 90%-owned non-Debtor subsidiary of Global Power Asia Limited; (vi) Global Power Equipment Group Brazil LTDA, a 99%-owned non-Debtor subsidiary of Deltak, L L.C.; and (vii) Deltak Israel Ltd , a 99%-owned non-Debtor subsidiary of Deltak, L.L.C.

[6]    Heat recovery steam generators are boilers that create steam in a combined-cycle power plant using the hot exhaust emitted by a gas turbine; specialty boilers capture waste heat and convert it into steam, and are used in process heat recovery and incineration systems, small power generation systems and marine co-generation systems: and industrial boilers produce steam and heat for various industrial and commercial applications. The industrial boilers are produced by Deltak Power Equipment (China) Co. Ltd , a non-Debtor

D  42

the competitive nature of the industry, both foreign and domestic, the Deltak Group operates on narrow margins with regard to its HRSG projects, and, as discussed below, has sustained significant losses on those projects. With regard to its Specialty projects, however, the Deltak Group operates on much broader margins and has generally realized profit on such projects.

18.    The Deltak Group's HRSG contracts are entered into on a fixed-price basis, and the contract prices are established based on projected costs over the life of the project, which often vary, sometimes substantially, from the original projections due to several factors, including commodity prices. Due to significant front-end engineering required to customize products for a particular customer's needs, the Deltak Group's projects are complex, and range in duration from 12 to 24 months. Because of the longer duration of its projects and the vagaries of commodity prices, it has been difficult for the Deltak Group to accurately project its costs over the life of the project.

19.    The Deltak Group's HRSG projects involve significant monetary risk due to the large dollar amounts associated with the projects, which are often priced in tens of millions of dollars. Although the Deltak Group posted net losses of approximately $1.7 million on revenue of approximately $133.8 million as of July 31, 2006, the group had a negative project-to-date gross margin for nearly all of its HRSG projects. The aggregate projected losses for the Deltak Group's HRSG projects as of July 31, 2006 were approximately $26.6 million. As a consequence of these projected losses and the absence of a profitable prospective book of business, the Deltak Group has little to no going concern value in the absence of a substantial infusion of capital beyond its current ability to raise. Accordingly, the Deltak Group intends to wind down the operations of the domestic affiliated Debtors of the Deltak Group relating to the HRSG business. During the wind down, customers on HRSG projects will be approached regarding the opportunity for the Deltak Group to complete current HRSG projects in process

20.    With regard to the Deltak Group's Specialty business, the Deltak Group believes that significant revenue may be realized from completing current projects in progress, and that the Specialty business may be continued or sold as a going concern. As such, the Deltak Group intends to continue operating the Specialty business and seek accommodations from Specialty customers to ensure that the Deltak Group has sufficient liquidity to complete the Specialty projects and realize the revenue generated from such projects.

### B.    Capital and Debt Structure

21.    As of July 31, 2006, the Company's consolidated balance sheet assets totaled approximately $314,137,000. Of this amount, approximately $26,947,000 was comprised of cash and cash equivalents, $9,779,000 was comprised of restricted cash, $21,600,000 was comprised of property, plant and equipment, net of depreciation, and approximately $255,811,000 was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $256,096,000. As of the Petition Date, the Company estimates that it has unrestricted cash of approximately $15.0 million and approximately $8.5 million in a cash collateral account with Bank of America, N.A.

22.    On or about October 1, 2004, Global Power and certain of its subsidiaries (collectively, the "Borrowers")[7] entered into a $100,000,000 Credit Agreement (as amended from time to time, the "Senior Credit Facility"), with Bank of America, N.A. ("BofA"), as administrative agent, swing line lender and Letter of Credit issuer, certain lenders from time to time party thereto, U.S. Bank National Association, as syndication agent, and Bank of Oklahoma, N.A., as managing agent (collectively, the "Senior Lenders"). All of Global Power's domestic subsidiaries, including the Debtors which comprise the Williams Group, the Braden

---

[7]    As of the Petition Date (as defined herein), the Borrowers are Global Power and the following foreign subsidiaries: Global Power Equipment (Shanghai) Company, Ltd , Deltak Power Equipment (China) Co . Ltd . and Braden-Europe B.V.

Group and the Deltak Group, are guarantors under the Senior Credit Facility. Notably, on or about April 1, 2005, the Debtors which comprise the Williams Group entered into Joinder Agreements to the Senior Credit Facility with the Senior Lenders. All documents in connection with the Senior Credit Facility are referred to as the "Senior Credit Documents."

  23. The Senior Credit Facility consists of a term loan of $25 million and a revolving credit facility of $75 million, a portion of which may be used for letters of credit. As of the Petition Date, Global Power had $15.1 million outstanding under the term loan and $1.3 million outstanding under the revolving credit facility for borrowings in China. Letters of credit totaling approximately $23.6 million were issued and outstanding under the facility at the Petition Date. There have been no drawings under these letters of credit. In sum, the Debtors estimate the prepetition amount owed to the Senior Lenders pursuant to the Senior Credit Facility is up to approximately $40 million in the aggregate (the "Prepetition Obligations").[8] As provided in the Senior Credit Documents, the Prepetition Obligations constitute claims against the Debtors secured by liens on and security interests in substantially all of the Debtors' assets (the "Prepetition Collateral").[9]

  24. In addition, Global Power issued $69 million of 4.25% Convertible Senior Subordinated Notes (the "Convertible Notes") due November 23, 2011. The Convertible Notes were issued pursuant to a Securities Purchase Agreement, dated as of November 23, 2004 (the "Securities Purchase Agreement"), by and between Global Power, Kings Road Investments Ltd. ("Kings Road"), Steelhead Investments Ltd. ("HBK"), D.B. Zwirn Special Opportunities Fund,

---

[8] In the event the outstanding letters of credit are drawn down in full, the Prepetition Obligations would be approximately $40 million in the aggregate.

[9] Nothing contained herein shall constitute an admission by the Debtors of the validity. priority, extent or enforceability of the Prepetition Obligations or any lien or security interest asserted by the Senior Lenders in connection with the Prepetition Collateral.

L.P. ("Zwirn LP"), D.B. Zwirn Special Opportunities Fund, Ltd. ("Zwirn LTD") and HCM/Z

Special Opportunities LLC ("Zwirn LLC" and, together with Kings Road, HBK, Zwirn LP and

Zwirn LTD, the "Noteholders"). In connection with the Securities Purchase Agreement, Global

Power and the Noteholders also entered into a Registration Rights Agreement, dated as of

November 23, 2004. The Convertible Notes are guaranteed by Global Power's domestic

subsidiaries, other than the Williams Group, and are unsecured. If an event of default occurs

under the Convertible Notes, a cross-default would occur under the Senior Credit Facility

entitling the Senior Lenders to accelerate the indebtedness thereunder.

C.    **Events Leading to the Commencement of the Chapter 11 Cases**

25.    Notwithstanding the continued profitability and anticipated growth of the

Williams Group, prior to the Petition Date, the Company has sustained losses primarily at the

Deltak Group. The Deltak Group expects continued losses and predicts future negative cash

usage of approximately $50 million.

26.    The losses at the Deltak Group are a result of, among other things,

(i) higher than anticipated subcontracting and labor costs, (ii) sharp rises in fabrication costs,

particularly in Asia, where a significant portion of the Company's manufacturing is performed.

(iii) increased freight costs and associated fuel surcharges, and (iv) unexpected warranty costs.

In addition, in 2004 and 2005, the price of steel, which is the single largest commodity expense

for the Company, doubled.

27.    In addition to the operational problems at the Deltak Group, the Company

has experienced a liquidity crisis since it can no longer borrow under its Senior Credit Facility as

a result of the following events.

28.    Beginning in early 2006, the Company's management became aware of

previously unrecognized expenses related to two of its projects in China that were substantially

completed in December 2004. Upon further review, the Company determined that gross profit had been inadvertently overstated, resulting in the need to restate earnings for the year ended December 31, 2004, and the first, second and third quarters of 2005.

29.    The restatement purportedly triggered technical defaults under the Senior Credit Facility and the Convertible Notes.[10] In early March 2006, however, Global Power negotiated with the Senior Lenders a waiver agreement, which, inter alia, (i) provided for the waiver of certain defaults that may have arisen from the restatement, (ii) waived compliance with the financial covenants set forth in the Senior Credit Facility for a limited period, (iii) included new minimum EBITDA and liquidity covenants, and (iv) reduced the availability of the revolving credit facility to $60 million.

30.    Shortly after Global Power entered into the waiver agreement, the Company discovered potential cost reporting issues in connection with several Deltak Group projects, resulting in Global Power announcing in March 2006 that it could not file by the required deadline its 2005 Form 10-K with the Securities and Exchange Commission. This delay triggered other covenant defaults under the Senior Credit Facility and the Convertible Notes.

31.    On March 28, 2006, the Senior Lenders notified Global Power that due to its failure to deliver audited financial statements as required under the Senior Credit Facility, requests for further credit extensions would not be honored. As a consequence, the Debtors have been unable to utilize the Senior Credit Facility, except in the limited circumstances provided below.

---

[10]    The Senior Lenders and the Noteholders have alleged various covenant defaults against Global Power under the Senior Credit Facility and Convertible Notes. The Debtors dispute many of those purported defaults, and nothing contained in this affidavit should be construed as an admission as to liability or regarding the occurrence of any of the purported events of default.

32.    In April 2006, the Senior Lenders consented to the making or renewal of certain loans in China and the extension of letters of credit on the condition that Global Power's obligations with respect thereto be cash collateralized. In June 2006, the Senior Lenders consented to the extension and issuance of additional letters of credit and loans on the condition that such letters of credit and loans be cash collateralized. Currently, Global Power has pledged approximately $8.5 million in cash and cash equivalents to secure its obligations under the Senior Credit Facility.

33.    In addition to the covenant defaults under the Senior Credit Facility, Global Power is also purportedly in default of certain covenants under the Convertible Notes and Securities Purchase Agreement due to its failure to file its 2005 Form 10-K and quarterly statements. On March 31 and April 10, 2006, the Noteholders sent letters of default to Global Power, and on or about May 4, 2006, one of the Noteholders filed a lawsuit against Global Power in the United States District Court for the Southern District of New York, alleging, among other things, that Global Power failed to maintain an effective Registration Statement for ten consecutive trading days resulting in a purported event of default under the Convertible Notes, and a breach of the Registration Rights Agreement.

34.    As a result of the foregoing defaults and purported defaults, prior to the commencement of these chapter 11 cases, Global Power sought to refinance the Senior Credit Facility and Convertible Notes. These efforts were unsuccessful due in large part to the overall unprofitability of the Deltak Group. Accordingly, because of the losses the Debtors have sustained through the Deltak Group and the inability to draw under the Senior Credit Facility, the Debtors are experiencing a severe liquidity crisis necessitating the commencement of these cases under chapter 11 of the Bankruptcy Code.

## II.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

35.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions. The Debtors request that the relief requested in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties in interest.

**Debtors' Motion Pursuant to Bankruptcy Rule 1015(b)**
**and Local Rule 1015-1 for Joint Administration of Cases**

36.    The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). Joint administration will obviate the need for duplicative notices, motions, applications and orders, and thereby save time and expense for the Debtors and their estates.

37.    The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases because each creditor may still file its claim against a particular estate. The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files.

38.    The Debtors believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

MIAMI 674762
(2K)

D 49

**Debtors' Motion Pursuant to Bankruptcy Rule 1007(c) and
Local Rule 1007-1(b) for an Extension of Time to File Schedules
of Assets and Liabilities, Schedules of Executory Contracts
and Unexpired Leases, and Statements of Financial Affairs**

39.    The Debtors seek an extension of the period in which to complete and file

their schedules of assets and liabilities, schedules of executory contracts and unexpired leases.

and statements of financial affairs (collectively, the "Schedules and Statements").

40.    On the Petition Date, the Debtors filed with this Court a list of all creditors

on a consolidated basis. In addition, attached to the Debtors' Voluntary Petitions is a list of

creditors holding the thirty (30) largest unsecured claims, on a consolidated basis, excluding

insiders, against the Debtors' estates and the estimated amounts that each such creditor is owed.

41.    Due to the complexity and diversity of their operations, the Debtors

anticipate being unable to complete their Schedules and Statements in the time required under

Bankruptcy Rule 1007(c) and Local Rule 1007-1(b). The Debtors hope that they will be able to

file their Schedules and Statements, all in the appropriate formats prescribed by the Bankruptcy

Code, the Bankruptcy Rules, and the Local Rules, within ninety (90) days after the Petition Date.

42.    In view of the size and complexity of the Debtors' chapter 11 cases and

the amount of information that must be assembled and compiled, ample cause exists for the

requested extension.

**Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 345
and 363 and Local Rule 2015-2 (i) Authorizing
Continued Use of Existing (a) Cash Management System
and Bank Accounts and (b) Business Forms; and
(ii) Waiving Investment and Deposit Requirements**

The Debtors seek (i) authority to continue to use the Debtors' existing (a) cash

management system, as modified in the motion (the "Modified Cash Management System"), and

bank accounts and (b) business forms; (ii) authority to continue postpetition intercompany

transfers, with limited exception; and (iii) a waiver of investment and deposit requirements.

D 50

43.    The Debtors also seek authority to continue funding Braden Mexico's operating expenses (via weekly check requests on an as-needed basis) in the ordinary course of business, subject to the condition that such funding be limited to amounts budgeted in connection with the Court's authorization of the approval of use of cash collateral, which is being sought by separate motion filed concurrently herewith.

44.    As is typical with most corporate enterprises, the Debtors have established a system for the collection of receipts and the disbursement of funds. In the ordinary course of operating their businesses, the Debtors manage their cash, which is ultimately swept up to Global Power, in two primary ways. First, the Debtors maintain bank accounts in a consolidated cash management system for the Williams Group and the Debtors in the Braden Group, i.e., Braden Manufacturing, L.L.C. and Braden Construction Services, Inc. (together, the "Braden Debtors"). Second, the Debtors maintain separate bank accounts to manage the businesses of the Debtors in the Deltak Group, i.e., Deltak, L.L.C. and Deltak Construction Services, Inc. (together, the "Deltak Debtors").

45.    The Williams Group and Braden Debtors' Cash Management System. The Debtors maintain the bank accounts that form their consolidated cash management system for the Williams Group and Braden Debtors at Bank of America, N.A. and Banc of America Securities LLC (together, "BofA"). Through this system, Global Power, as corporate parent, maintains one concentration account (the "Global Power Concentration Account") and each operating subsidiary maintains a separate depository account. Global Power also maintains a money market account at BofA (the "BofA Investment Account") for short-term investments.

46.    The Williams Group and Braden Debtors receive checks and wire transfers in their own names into their respective local depository accounts. The separate business receipts are then automatically swept nightly into the Global Power Concentration

16

Account where the respective funds of the Williams Group and Braden Debtors are consolidated
The respective operating entities in each of the Williams Group and Braden Debtors pay their
disbursements from their respective local disbursement accounts which are funded by the Global
Power Concentration Account.

47.    Global Power maintains the Global Power Concentration Account, and
after funding the operating subsidiaries' disbursements, may do one of two things with any
excess amount. First, as a matter of course, Global Power retains funds in the Global Power
Concentration Account to maintain the BofA bank accounts. Second, although infrequently
done, Global Power may also manually transfer excess funds into the BofA Investment Account.

48.    Global Power maintains an additional cash collateral account at the
request of BofA (the "Collateral Account") to secure amounts outstanding under the Senior
Credit Facility. Per the request of the Senior Lenders, the Debtors are required to maintain a
significant portion of their cash in the Collateral Account, to which only BofA retains access.

49.    The Deltak Debtors' Cash Management System. The Deltak Debtors
maintain several bank accounts at U.S. Bank National Association ("U.S. Bank") in their own
name, both for receipts and disbursements (the "Deltak Accounts"). Global Power also
maintains a corporate account at U.S. Bank (the "Corporate U.S. Bank Account"). Generally, on
a daily basis, funds are transferred manually between the Deltak Accounts and the Corporate
U.S. Bank Account or the Global Power Consolidation Account at BofA. In addition, Global
Power maintains a money market account at U.S. Bank (the "U.S. Bank Investment Account"),
which receives manually swept funds nightly from the Corporate U.S. Bank Account to the
extent there are excess funds. The U.S. Bank Investment Account receives funds solely from the
Corporate U.S. Bank Account, but may transfer funds out to either the Corporate U.S. Bank
Account or the Deltak Accounts upon request.

50.    For each operating subsidiary, the Debtors maintain separate accounts for the purpose of employee payroll that function in a similar manner to the non-payroll disbursement accounts (as described above). The Braden Debtors and Global Power use a payroll agent, whereas the Williams Group and Deltak Debtors issue payroll payments directly. In both systems, the payroll checks clear the Debtors' accounts directly.[11]

51.    The Debtors maintain additional accounts at both BofA and U.S. Bank that are kept separate from the rest of the Cash Management System and are used only to receive or send payments in foreign currency (i.e., Euros, Canadian Dollars, and Pesos). The Braden Debtors also maintain for limited activity secondary accounts at JPMorgan Chase Bank, N.A. ("JPM"), f/k/a Bank One, for payroll, employee benefits, and customer receipts.

52.    Because the receipt and disbursement functions are maintained separately at each operating entity, the financial interaction of the businesses is effected through intercompany transfers, all of which are recorded as receivables or payables in intercompany accounts. Prior to the Petition Date, domestic intercompany accounts were maintained on a rolling basis, and not settled in cash.

53.    From time to time, the Debtors make payments to their foreign subsidiaries through the issuance of purchase orders or other funding, and receive payments from their foreign subsidiaries through the issuance of purchase orders, the declaration of dividends, or intercompany loans. With limited exception,[12] to the extent intercompany trade transactions are entered into among the Debtors' foreign non-debtor affiliates or between the Debtors and their foreign non-debtor affiliates, the intercompany accounts are settled in cash.

---

[11]    As described below, the Debtors have filed a motion concurrently herewith seeking, among other things, authority to pay certain prepetition obligations owing to the Debtors' employees.

[12]    Notably, prior to the Petition Date, the intercompany accounting with respect to Braden Manufacturing SA de CV was not financially settled.

54.    Braden Manufacturing SA de CV ("Braden Mexico"), a non-debtor indirect subsidiary of Global Power, operates a facility primarily dedicated to manufacturing products for the Braden Group. Braden Mexico is dependent on the Braden Debtors for the funding of its operating expenses. On a weekly basis, Braden Mexico sends a check request to Braden Manufacturing, L.L.C. ("Braden Manufacturing") that itemizes the amounts needed to meet Braden Mexico's outstanding operating expenses, which amounts are then transferred to Braden Mexico through the Braden Debtors' disbursement accounts. Amounts paid pursuant to the weekly check requests are offset against any amounts owing on account of purchase orders issued by Braden Manufacturing to Braden Mexico for the purchase of goods and services. To the extent any amounts remain owing after such offset, the remainder is recorded as an intercompany loan.

55.    By preserving business continuity and avoiding the operational and administrative paralysis that changing the cash management system, bank accounts, and business forms would necessarily entail, all parties in interest will be best served and the Debtors will benefit considerably from the relief requested in the motion.

### Debtors' Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits

56.    The Debtors seek authority to pay certain prepetition obligations owing to the Debtors' employees, including, but not limited to, (i) amounts owed to employees for wages and salaries; (ii) reimbursement of employee business expenses incurred in the ordinary course, such as travel, meals and lodging; (iii) maintenance of employee health and welfare plans, workers' compensation, 401(k), and other similar benefits; and (iv) other miscellaneous employee expenses and benefits (collectively, the "Prepetition Employee Obligations"). The Debtors seek authority to honor Prepetition Employee Obligations as payment of such obligations is critical and essential to employee morale and future business needs.

57.    The Debtors, together with their non-debtor foreign affiliates, employ approximately 3,580 employees worldwide, approximately 2,330 of which are employed domestically, inclusive of approximately 130 employees laid off concurrently with the chapter 11 filings.[13]

58.    The Debtors' employees can generally be divided into four groups: (a) employees of Global Power, (b) employees of Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP (collectively, the "Williams Debtors"), (c) employees of the Braden Debtors, and (d) employees of the Deltak Debtors. Global Power employs approximately 23 full-time, non-union employees. The Williams Debtors employ approximately 340 full-time, non-union employees. In the ordinary course, the Williams Debtors also employ union workers on a temporary basis to fulfill their contractual obligations to their customers. The Williams Debtors currently employ approximately 1,480 union employees. The Braden Debtors employ approximately 150 full-time, non-union employees and three full-time and part-time union employees. The Deltak Debtors employ approximately 315 full-time, non-union employees and six part-time, non-union employees.

59.    <u>Wages, Salaries, and Other Compensation: Debtors' Payroll Obligations</u>. The Debtors seek to be authorized, but not directed, to honor all outstanding payroll obligations. Approximately 4.1% of the Debtors' payroll costs represent compensation paid to "Senior Executives,"[14] with the remaining 95.9% representing compensation to middle management or

---

[13]    This figure does not include individuals employed by the Debtors as contract employees. Furthermore, as the Debtors are seeking relief with respect to recently laid off employees, all figures presented herein include such laid off workers unless otherwise stated.

[14]    As of the Petition Date, the Debtors employed 12 "Senior Executives," which, solely for the purposes of this Motion, is defined to include the corporate officers, presidents and chief operating officers for each of the Debtors. The annual base salary of the Senior Executives ranges from $135,000 to $425,000.

rank and file employees.[15]

60.    Global Power employees are paid semi-monthly on a current basis.[16]
Global Power's gross semi-monthly payroll averages approximately $120,000 in the aggregate.
Global Power's last regular payroll date was September 15 (the "Last Global Power Payroll").
Due to the lag in payroll, the Debtors estimate that approximately $108,000 in the aggregate has
accrued but is not yet due to Global Power employees until the next pay date, with only one
employee owed in excess of $10,000.[17]

61.    The Williams Debtors' employees are paid either weekly or bi-weekly in
arrears, with a Sunday payroll close date and Wednesday or Thursday pay date. On a monthly
basis, the Williams Debtors' gross payroll averages approximately $1,500,000 in the aggregate
for its permanent employees, and approximately $5,100,000 in the aggregate for its union and
non-union temporary employees. The Williams Debtors' last regular payroll dates were
September 28 and September 27 (the "Last Williams Payrolls") with respect to the bi-weekly and
weekly payrolls, respectively. Due to the lag in payroll, the Debtors estimate that approximately
$1,920,000 in the aggregate has accrued but is not yet due to the Williams Debtors' employees
until the next pay date, with no employees owed in excess of $10,000.

62.    The Braden Debtors' employees are paid either (i) bi-weekly in arrears,
with a Sunday payroll close date and Friday pay date or (ii) weekly in arrears, with a Sunday
payroll close date and Wednesday pay date. The Braden Debtors' gross bi-weekly payroll

---

[15]    The Debtors have various bonus plans for their Senior Executives and other employees. Aside from the
Braden Debtors' sales incentive plan discussed herein, the Debtors are not seeking authority to approve such bonus
plans at this time, but reserve the right to seek to pay the prepetition component, if any, of such bonus plans at the
appropriate time.

[16]    Although regular pay is paid on a current basis, overtime pay for Global Power employees is typically
subject to a two week lag.

[17]    Larry Edwards, Global Power's President and Chief Executive Officer, is owed approximately $16,000 on
account of accrued but unpaid compensation.

D 56

averages approximately $272,000 in the aggregate, while the weekly payroll averages approximately $72,000 in the aggregate. The Braden Debtors' last regular payroll dates were September 15 and September 27 (the "Last Braden Payrolls") with respect to the bi-weekly and weekly payrolls, respectively. Due to the lag in payroll, the Debtors estimate that approximately $400,000 in the aggregate has accrued but is not yet due to the Braden Debtors' employees until the next pay date, with only two employees[18] owed in excess of $10,000.[19]

63.     Approximately 10 of the Braden Debtors' employees also receive a modest sales incentive award as part of their yearly compensation. Although accrued during the year, awards under this plan are distributed annually in March based upon performance metrics achieved throughout the previous year, including sales bookings goals, gross margin on completed projects and general financial goals of the company. For 2006, the Debtors estimate that approximately $125,000 in aggregate awards under the Braden Debtors' sales incentive plan have accrued but not yet been paid, with no one employee owed more than approximately $19,000.

64.     The Deltak Debtors' employees are paid either weekly or bi-weekly in arrears, with a Saturday payroll close date and Thursday pay date. The Deltak Debtors' gross bi-weekly payroll averages approximately $610,000 in the aggregate, while the weekly payroll averages approximately $95,000 in the aggregate. The Deltak Debtors' last regular payroll dates were September 21 and September 28 (the "Last Deltak Payrolls" and, together with the Last Global Power Payroll, the Last Williams Payrolls, and the Last Braden Payrolls, the "Last Payrolls") with respect to the bi-weekly and weekly payrolls, respectively. Due to the lag in

---

[18]     Dean Glover, Chief Operating Officer of Braden Manufacturing, L.L.C., is owed approximately $11,600 on account of accrued but unpaid compensation; Gene Schockemoehl, President of Braden Manufacturing, L.L.C., is owed approximately $15,600 on account of accrued but unpaid compensation.

[19]     This estimate does not include any amounts accrued pursuant to the Braden Debtors' sales incentive plan.

payroll, the Debtors estimate that approximately $560,000 in the aggregate has accrued but is not yet due to the Deltak Debtors' employees until the next pay date, with no employees owed in excess of $10,000.

65.    In sum, the Debtors estimate that approximately $3,113,000 in unpaid wages and salary is owing to all of their employees in the aggregate for services rendered prior to the Petition Date, including approximately $280,000 owing to employees subject to the recent reduction in workforce.

66.    Due to the timing of the Last Payrolls, payroll checks for some employees who do not receive compensation by direct deposit likely remain in float. In addition, although the Debtors believe that most payroll checks relating to payroll periods prior to the Last Payrolls have been presented to and honored by the applicable drawee banks, the Debtors recognize that certain employees may fail to cash or deposit their paychecks in a timely manner. Accordingly, it is possible that some checks will remain in float postpetition that banks will not honor absent explicit authority and direction to do so. Furthermore, while the Debtors do not believe material amounts, if any, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors submit that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise. Accordingly, the Debtors request the authority to honor payroll checks in float but not presented or otherwise honored timely for payment. The Debtors believe that no employee is owed in excess of $10,000 on account of payroll checks in float.

67.    Wages, Salaries, and Other Compensation: Vacation and Sick Leave. In addition to wages and salary, certain of the Debtors' employees accrue paid vacation time, paid time off, and/or paid sick time based on length of service. The Debtors intend to permit remaining employees to continue to use any such accrued but unused time off in the ordinary

course. Employees who are terminated, however, including those subject to the reduction in workforce, would normally be entitled to receive cash in lieu of accrued but unused vacation or paid time off upon separation. The Debtors seek to pay all accrued and unused vacation and paid time off to terminated employees upon separation, which they estimate will cost approximately $440,000.[20]

68.    <u>Wages, Salaries, and Other Compensation: Contract Employees</u>. The Debtors employ approximately 60 individuals as contract employees (the "Contract Employees"), which provide services including, but not limited to, engineering, sales, accounting, administration, and consulting. Approximately 45 Contract Employees are employed by the Williams Debtors, the Braden Debtors, and the specialty boiler business of the Deltak Debtors through third-party agencies. The Debtors believe that these third-party agencies will likely terminate services if they are not paid amounts owing and that such termination would be significantly detrimental to the Debtors' businesses. In addition, approximately 15 Contract Employees are paid directly by and work solely for the Debtors. Although such Contract Employees are considered independent contractors as opposed to actual employees for the purposes of applying certain federal, state or local employment, labor, tax and other laws and regulations, their livelihood is no less dependent on the Debtors, nor is their employment any less an integral component of the Debtors' businesses, than any of the Debtors' other non-contract employees. With respect to Contract Employees employed both directly and through third-party agencies by Global Power, the Williams Debtors, the Braden Debtors, and the Deltak Debtors' specialty boiler business, the Debtors estimate that no more than $270,000 in the

---

[20]    Additionally, the Debtors believe that payment of accrued and unused vacation and paid time off may be necessary to comply with applicable state law requirements. <u>See, e.g.</u>, <u>Lee v. Fresenius Med. Care, Inc.</u>, 719 N.W. 2d 222 (Minn. Ct. App. 2006) (concluding that once earned, accrued vacation constitutes "wages" and must therefore be paid out upon termination of employment).

aggregate has accrued but not yet been paid. With respect to the Contract Employees employed by the Deltak Debtors' heat recovery steam generation business, the Debtors estimate that no more than $140,000 in the aggregate has accrued but not yet been paid.

69.    Reimbursable Business Expenses. Prior to the Petition Date and in the ordinary course of their businesses, the Debtors reimbursed employees for certain business expenses incurred in the scope of their employment. Based upon historical averages, approximately 165 employees incur expenses monthly aggregating on average $600,000, relating to, among other things, business related travel expenses, business meals, car rentals and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred on the Debtors' behalf in connection with employment by the Debtors and in reliance upon the understanding that such expenses would be reimbursed. The Debtors estimate that, as of the Petition Date, the total amount owed for Reimbursable Expenses is no more than $600,000, with no one employee estimated to receive in excess of $15,000.

70.    Employee Benefits. In the ordinary course of their businesses, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide employees with medical, dental, prescription, disability and life insurance, employee savings, and other similar benefits (collectively, the "Employee Benefits"). The Employee Benefits are generally described below:

71.    Employee Benefits: Health and Dental Insurance. An important element of the Employee Benefits is medical, dental and similar health insurance (the "Health and Dental Benefits"). The Debtors maintain both premium based and self insurance programs.

72. The Williams Debtors maintain a premium-based medical plan, with an average monthly cost of approximately $84,000, of which approximately $50,000 is borne by the Debtors with the remainder paid by the employees.

73. The Braden Debtors maintain premium-based medical and dental plans.[21] The average monthly cost of the medical plan is approximately $35,000, of which approximately $28,000 is borne by the Debtors with the remainder paid by the employees. The average monthly cost of the dental plan is approximately $34,000, of which approximately $27,000 is borne by the Debtors with the remainder paid by the employees.

74. The Deltak Debtors maintain a premium-based medical plan, with an average monthly cost of approximately $200,000, of which approximately $140,000 is borne by the Debtors with the remainder paid by the employees.

75. The Debtors believe that they are current on all Health and Dental Benefit payments under their premium based insurance plans; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such amounts.

76. The Braden Debtors and Global Power jointly maintain self-insured medical and dental plans. The average monthly cost of the medical plan is approximately $100,000, of which $12,500 is paid by the employees with the remainder borne by the Debtors. The average monthly cost of the dental plan is approximately $9,700, of which approximately $1,200 is paid by the employees with the remainder borne by the Debtors. The Debtors maintain

---

[21] The Braden Debtors' premium based medical and dental plans only cover employees of the former Consolidated Fabricators, Inc. The remainder of the Braden Debtors' employees eligible for medical and dental insurance coverage are covered under the self-insured medical and dental plans jointly covering employees of Global Power and the Braden Debtors.

a stop-loss policy which limits liability under these plans to $85,000 per claim. Based on historical lag time and average monthly costs, the Debtors estimate that approximately $54,000 in claims for reimbursement under the Braden Debtors and Global Power self insured medical/dental plans have been submitted but not yet paid. The Debtors are unable to estimate the total cost remaining of services rendered prior to the Petition Date for which reimbursement has not yet been sought. Nevertheless, based upon the monthly averages for all claims and their historical experience of processing claims in a timely manner, the Debtors believe that such amounts are not likely to be relatively substantial. Accordingly, the Debtors seek to continue paying such amounts in the ordinary course without regard to when services were rendered.

77.    Employee Benefits: Life, AD&D, Short and Long Term Disability Insurance. The Debtors provide most of their full-time employees with either fully insured or self-funded life, accidental death and dismemberment, and short and long term disability insurance. The average monthly cost to the Debtors is as follows: $16,000 for life and accidental death and dismemberment insurance, $39,000 for short term disability, and $16,000 for long term disability insurance. The Debtors believe that they are current on all such payments; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such amounts.

78.    Employee Benefits: Union Employee Benefits. With respect to the approximately 1,480 union employees of the Williams Group, the employees' respective unions provide them with employee benefits, including health and welfare, retirement, and paid vacation benefits, the costs of which are reimbursed by the Williams Group through the payment of union fringes (the "Union Fringes"). On a monthly basis, the Union Fringes average approximately $1,400,000 in the aggregate, of which approximately $200,000 is borne by the Debtors with the

remainder paid by the employees through paycheck deductions. The Debtors estimate that, as of the Petition Date, the total amount owed for Union Fringes is approximately $2,600,000, payment towards which $260,000 has already been deducted from the union employees' paychecks.

79.    401(k) Contributions. The Debtors offer all eligible employees an opportunity to participate in a 401(k) plan (the "401(k) Plan"). Under the 401(k) Plan, the Debtors' eligible employees[22] may contribute up to 50% of their compensation not to exceed the maximum dollar amount set by federal regulations.

80.    The Debtors have established a modest and limited matching program to induce all employees to participate in this valuable resource (the "Matching Obligation"). A participating employee's entitlement to receive the Matching Obligation vests over time. The Matching Obligation is $0.50 for each $1 the employee contributes to the 401(k) Plan, up to 6% of that employee's total yearly compensation subject to the relevant statutory caps. The Debtors' Matching Obligations are contributed to the 401(k) Plan on a quarterly basis and are current for the first and second quarters of 2006. The Debtors estimate that no more than $300,000 in Matching Obligations have accrued but not yet been contributed to the 401(k) Plan during the third quarter.

81.    Additionally, the Debtors contribute qualified nonelective contributions ("QNECs") to the 401(k) Plan periodically throughout the year in an aggregate amount equal to 1% of each qualified 401(k) Plan participant's annual gross pay. The QNECs are generally

---

[22]    An employee is eligible to participate in the 401(k) Plan if the employee has completed six months of consecutive service and worked a minimum of 500 hours. The following employees are not eligible to participate in the 401(k) Plan: (i) employees whose employment is governed by a collective bargaining agreement under which retirement benefits were the subject of good faith bargaining, unless such agreement expressly provides for participation in the 401(k) Plan; (ii) leased employees; (iii) certain nonresident aliens; and (iv) temporary employees and cooperative education student employees.

contributed on a weekly or monthly basis. The Debtors estimate that no more than $20,000 in QNECs have accrued but not yet been contributed to the 401(k) Plan.

82.    The Debtors submit that it is essential for the morale and maintenance of trust of the employees that necessary steps are taken to protect the employees' 401(k) Plan, including Matching Obligations and the QNECs. Accordingly, to the extent that any portion of the Matching Obligations or QNECs may be considered the payment of prepetition claims, the Debtors seek authority to pay such amounts.

83.    Workers' Compensation. The Debtors are liable to employees under various workers' compensation policies. Each workers' compensation policy is designed to provide coverage to the Debtors' employees for injuries which are sustained by such employees during the policy year.

84.    Global Power, the Williams Debtors, and the Braden Debtors collectively maintain a premium-based workers' compensation insurance plan, with an annual premium of $1,500,000, and a deductible of $250,000 per claim. Coverage under the plan is financed through a premium insurance and finance company. The coverage is paid for in advance and is current to date. Additionally, liability under this plan is backstopped by a letter of credit issued pursuant to the Senior Credit Facility in the amount of $3,685,000,[23] and, with respect only to the Williams Debtors, a letter of credit issued pursuant to the Senior Credit Facility in the amount of $1,350,000.[24] There are currently eleven outstanding claims under the policy, which the Debtors estimate will cost approximately $48,000.

---

[23]    Pursuant to their insurance agreement, Global Power, the Williams Debtors, and the Braden Debtors are required to maintain a letter of credit as security for the repayment of claims paid on their behalf by the insurance provider up to the deductible amount.

[24]    In early 2006, the Williams Debtors switched from their original workers' compensation insurance policy to that of Global Power and the Braden Debtors. Under the original policy, the Williams Debtors were required to maintain a letter of credit as security for the repayment of claims paid on their behalf by the insurance provider up to

(continued )

85.    The Deltak Debtors maintain a self-insured policy for their employees, with an average monthly cost of approximately $10,500. The policy is administered by a third-party administrator which is pre-funded with a $25,000 account. The stop-loss limit on the policy is $390,000 per claim. Additionally, the Deltak Debtors maintain a separate aggregate stop-loss plan, at the cost of approximately $5,000 per month, which limits the aggregate liability under their self-insured policy to $1,200,000. Finally, liability under the Deltak Debtors' insurance policy is backstopped by a letter of credit issued pursuant to the Senior Credit Facility in the approximate amount of $450,000.[25] There are currently five outstanding claims under the policy, which the Debtors estimate will cost approximately $3,000.

86.    To the extent that the Debtors have amounts owing due to prepetition workers' compensation obligations or to the extent that a portion of the current payments may be characterized as prepetition obligations, the Debtors seek authority to pay such amounts.

87.    <u>Administrative Service Providers</u>. As is customary in the case of most large companies in the ordinary course of their business, the Debtors utilize certain third-party providers to administer employee benefit plans and payroll services (the "Administrative Service Providers"). The Debtors estimate that the average monthly cost of these services is approximately $25,000 in the aggregate. The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' Employee Benefit and payroll obligations. The Debtors believe that they are current with respect to

---

( continued)

a certain deductible amount. Because the original policy continues to cover claims that arose or may arise with respect to the period of time such policy was in effect, the Williams Debtors are still required to maintain the letter of credit for such claims at this time.

[25]    The Deltak Debtors are required by the State of Minnesota to maintain this letter of credit as security for the payment of claims up to the applicable stop-loss limits.

amounts owing to Administrative Service Providers; however, to the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized, but not directed, to pay such amounts.

88.    <u>Withholdings From Employee Paychecks</u>. The Debtors deduct certain amounts from their employees' paychecks for the payment of the employee portion of health, dental and welfare insurance premiums, flexible medical spending amounts, 401(k) deductions, union dues, and other miscellaneous amounts (collectively, the "Employee Deductions."). The Employee Deductions comprise property of the Debtors' employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

89.    The Debtors may also be in possession of various withholdings, such as payroll taxes, social security, garnishments, child support payments, etc. (together with the Employee Deductions, the "Deductions"). It is likely that funds have been deducted from employee wages but have not yet been forwarded to the appropriate third-party recipients. The Debtors seek authority to forward the Deductions to the appropriate parties.[26] Without such authority, the Debtors expose their officers and directors to personal liability.

90.    <u>Miscellaneous</u>. The Debtors may determine that there are additional <u>de minimis</u> prepetition obligations, which have not been identified in the Motion. Accordingly, the Debtors seek authority to pay any such additional obligations up to an aggregate amount of $100,000 on notice, and reserve their right to seek authority from the Court to pay any obligations in excess of the aforementioned limit.

91.    The Debtors' employees are an essential component of a successful reorganization. Any deterioration in employee morale and welfare at this critical time

---

[26]    As described below, the Debtors have filed a motion concurrently herewith seeking, among other things, authority to pay prepetition obligations owing on account of trust fund taxes, including all taxes owed to federal, state, and local taxing authorities.

undoubtedly would have a devastating impact on the Debtors, the value of their assets and businesses, and ultimately, the Debtors' ability to reorganize. Accordingly, the relief sought in the motion is in the best interests of the Debtors' estates and creditors, and will allow the Debtors to continue to operate their businesses with minimal disruption and proceed with the important task of stabilizing their operations.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion Of Work In Progress**

92.    The Debtors seek authority to (i) wind down operations of the Heat Recovery Steam Generation business segment (the "HRSG Business") operated by the Deltak Debtors, (ii) reject, on twenty (20) days notice, nunc pro tunc to the date hereof, certain executory contracts and unexpired leases in connection therewith (collectively, the "HRSG Contracts"), and (iii) implement procedures for the orderly completion of work in progress. The relief sought by the motion relates only to the HRSG Business segment of the Deltak Debtors; the Debtors do not intend by the motion to restrict or impede the Deltak Debtors' ability to continue to operate their specialty boiler business in the ordinary course.

93.    The Deltak HRSG Business. The HRSG Business, headquartered in Plymouth, Minnesota, manufacturers and markets heat recovery steam generators, commonly known as "HRSG" units. HRSG units are highly technical and customized industrial units that increase the efficiency of combined cycle power plants by using the hot exhaust emitted by gas turbines to create steam. HRSG units, which typically themselves range from $10 million to $60 million depending upon the particular application, are component parts to much larger power plant projects that may range in the hundreds of millions of dollars.

32

94.     The HRSG industry is extremely competitive, both foreign and domestic, and operates under fixed price contracts. As a result of this competitiveness, the HRSG Business has been forced to operate in recent years on narrow margins. In addition, HRSG projects may span several years in duration. Given the need to fund HRSG projects over a long period of time at a fixed price, the HRSG Business is both capital intensive and subject to the risk of substantial commodity price and other cost volatility. For instance, in 2004 and 2005, the price of steel, which is the single largest commodity expense for the HRSG Business, doubled.

95.     As a result of this challenging environment, the Deltak Group, of which the HRSG Business is a part, posted net losses of approximately $1.7 million on revenue of approximately $133.8 million as of July 31, 2006, mostly attributable to the HRSG Business. The HRSG Business has a negative project-to-date gross margin, in the aggregate, for its HRSG projects and the projected losses for the HRSG projects as of July 31, 2006 totaled approximately $26.6 million. Importantly, absent the relief requested herein, the HRSG Business expects continued losses and, absent a cash infusion, predicts future negative cash usage of approximately $22 million for the completion of its HRSG projects.

96.     The Debtors, after due inquiry, have concluded that given the current liquidity crisis, the projected losses and the absence of a profitable prospective book of business, the HRSG Business has little to no going concern value, at least in the absence of a substantial infusion of capital beyond its current ability to raise. The Debtors have further determined in their sound business judgment that the only value that can be derived from the business is through the cessation of the HRSG Business operations and affairs and the liquidation of its assets. Accordingly, concurrently with the chapter 11 filings, the Debtors have instructed approximately 100 employees dedicated to the HRSG Business not to return to work absent

further notice and, by this Motion, seek authority to cease operations and reject all of their contracts for the delivery of HRSG units and related services.

97.    Nevertheless, as stated, HRSG units are highly customized component parts of much larger and more substantial power plants. As such, the Debtors' inability to deliver the HRSG units currently under contract may have a substantial impact on the business objectives of many of the HRSG Business' customers. Indeed, notwithstanding the Debtors' rejection of the underlying contracts as burdensome, the Debtors believe that many if not all of their HRSG customers may still require delivery of the units and be prepared to make the necessary financial accommodations to ensure receipt. The Debtors believe that, provided that they may do so at no cost to the estate, the orderly completion of work in progress can provide substantial benefits to the Debtors and their employees, customers, vendors and other stakeholders. If successful, orderly completion of work in progress would help reduce the hardship endured by employees, customers and vendors resulting from the sudden cessation of HRSG operations and substantially reduce the number of claims against the estate. Accordingly, by this Motion, the Debtors also seek to implement procedures for the orderly completion of HRSG work in progress.

98.    The HRSG Contracts. As stated, the Debtors sell the HRSG units pursuant to fixed price contracts. In connection with the cessation of the HRSG Business operations and affairs, the Debtors have determined, in an exercise of sound business judgment, to reject immediately, effective nunc pro tunc to the Petition Date, all executory contracts for the delivery by the Debtors of HRSG units to customers. In addition, the Debtors intend to vacate and no longer require the use of certain premises relating to an unexpired lease of nonresidential real property. Thus, the Debtors also seek authority to reject this lease. Attached as Exhibit "A" hereto is a table identifying the HRSG Contracts, which includes that certain lease.

34

99.    The Debtors estimate that they are not able to complete any of the HRSG Contracts in a cash flow neutral or positive manner. Furthermore, given the specialty nature of the business and the inability to meet current customer demands pursuant to the terms of the contracts, the HRSG Contracts represent little to no value to a third party purchaser.[27] Accordingly, rejection of these agreements is an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors, their estates and their creditors.

100.    Procedures to Orderly Complete Work in Progress. The HRSG units are highly customized, specialty equipment, for which the HRSG Business is often the sole source provider; similarly, the Debtors' vendors are also sole source providers for the type of labor and supplies necessary to complete the HRSG projects. Because these products are highly customized, the Debtors believe it would be beneficial to give customers the option to complete the construction of the specialty equipment on mutually beneficial terms.

101.    Accordingly, the Debtors intend to provide HRSG customers with the opportunity to have the HRSG Business complete current HRSG projects in progress. While the Debtors intend to seek the best possible terms for the completion of each of the HRSG projects, at a minimum, to exercise such option, the Debtors will require each customer to agree to (a) fund not less than all actual costs of completion on time and materials terms, including, without limit, all outstanding and future costs owed to vendors and the customer's proportionate share of any excess overhead costs that would not otherwise be incurred in the ordinary course of the wind down plan, and (b) upon delivery of the relevant HRSG unit, waive any and all claims against the Debtors relating to such HRSG unit, including all rejection damage claims (the "HRSG Completion Program").

---

[27]    The Debtors are continuing to evaluate the HRSG Contracts. Prior to the expiration of the 20-day notice period, the Debtors reserve the right to exclude or add additional HRSG Contracts, or to otherwise modify, the schedule of contracts and leases contained on Exhibit "A."

102.    Concurrently with the chapter 11 filings, the Deltak Debtors instructed approximately 100 employees who are dedicated to the HRSG Business not to report to work absent further notice. The Deltak Debtors have retained a number of employees to expeditiously contact customers to gauge interest in participating in the HRSG Completion Program. Given the nature of these contracts, the Debtors believe that they will know whether the HRSG Completion Program can be successful in whole or in part within thirty (30) days of the Petition Date.

103.    In the event a sufficient number of customers agree to the terms of the HRSG Completion Project, they intend to offer contract employment to a sufficient number of recently terminated employees necessary to complete the projects.

104.    Because the Debtors seek implementation of the HRSG Completion Project, the Debtors do not intend at this time to reject their outstanding supply contracts with their vendors. If the HRSG Completion Project is ultimately unsuccessful, the Debtors anticipate rejecting vendor contracts in the near term. Furthermore, from both a legal and practical standpoint, the Debtors believe that it will be necessary to require that all outstanding amounts owing to vendors relating to completion of a HRSG unit be paid by the customer without regard to when the cost was incurred by the Debtors. From a legal standpoint, the vendors may possess rights as materialmen or have other claims against the customers that will ultimately be satisfied by such customers in any event. Furthermore, payment by the customers to the vendors is beneficial to the estate as it will ultimately reduce claims against the estate. Because such payments are being made by the customer, which remains the customer's option with or without the relief requested herein, the Debtors believe that such payment will not constitute payment on account of a prepetition claim by the Debtors.

105.    Finally, although the Debtors are hopeful that a sufficient number of employees will return as Contract Employees to complete those projects that their customers agree to fund to completion, there can be no assurances that such employees will in fact return. Accordingly, the implementation of the HRSG Completion Project will be conditioned upon a sufficient number of employees returning to work. To induce a sufficient number of "employees" to return on a contract and temporary basis, the Debtors will likely be required to offer terms with a retention component and modest enhancements as compared with those offered to full time employees. Pursuant to the terms of the HRSG Completion Project, all such costs will be borne by the participating customers.

**Debtors' Motion for Authority to Pay Certain Critical Subcontractors
and Vendors of the Williams Debtors in the Ordinary Course of Business**

106.    The Debtors seek authority to pay, subject to certain conditions, certain subcontractors and vendors of the Williams Debtors (the "Williams Subcontractors") who provide critical goods and services to the Williams Debtors and/or customers of the Williams Debtors (the "Williams Customers") for certain of the Williams Debtors' ongoing projects.

107.    The Williams Debtors are the Debtors' most profitable business segment. In the ordinary course, the Williams Debtors pay Williams Subcontractors for goods and services provided to either the Williams Debtors or, in most cases, the Williams Customers directly. On many projects the Williams Debtors are paid by the Williams Customers pursuant to a payment schedule or when certain project milestones are reached, including completion of the project. As such, the Williams Debtors must often pay their Williams Subcontractors before they can receive payment from the Williams Customers.

108.    If the Williams Debtors' Subcontractors remain unpaid, such Williams Subcontractors, in most if not all cases, may assert liens against the projects for which they are providing goods and services. See, e.g., Ga. Code Ann. § 44-14-361 (providing for special liens

on the real estate, factories, railroads, or other property for which subcontractors furnish labor, services, or materials). In this regard, many of the Williams Debtors' contracts require, as a condition precedent to the Williams Customers' duty to pay, that the Williams Debtors provide proof that Williams Subcontractors have been paid.

109.    Even in the absence of such a provision, the Williams Customers would likely assert damage claims against the Williams Debtors or withhold payments in amounts equal to or greater than the value of the liens that are or could be asserted by the Williams Subcontractors against the Williams Customers. Thus, payment of the Williams Subcontractors will be cash neutral.

110.    The Williams Debtors are solvent, and the Debtors believe that they will remain solvent so long as they are authorized to pay their subcontractors and vendors in the ordinary course of business. As the Williams Debtors are solvent, all creditors, including subcontractors and vendors with prepetition claims, will likely be paid in full through confirmation of a plan of reorganization. Thus, the relief requested herein should primarily affect only the timing of payment of Williams Subcontractors' claims rather than their treatment for distribution purposes, and should neither prejudice general unsecured creditors nor materially affect the Debtors' estates.

111.    Similarly, under section 503(b)(9) of the Bankruptcy Code, claims for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business" are entitled to administrative priority status. Certain of the claims related to the Williams Subcontractors are on account of goods the Debtors received in the ordinary course of their businesses within the 20-day period before the Petition Date. In the

event the Williams Debtors do not pay these claims now, the Debtors could eventually be required to satisfy such claims under section 503(b)(9) of the Bankruptcy Code.

112.    The payment of the Williams Subcontractors is critical to the Debtors' restructuring efforts as it will (i) help preserve relationships with their Subcontractors and the Williams Customers, and (ii) preserve the going concern value of Global Power's most valuable asset, the Williams Debtors.

113.    The Williams Debtors' businesses are service businesses, and the Williams Debtors rely heavily on the repeat business of a finite group of customers. Thus, the viability of the Williams Debtors' businesses is largely dependent on the Williams Debtors' ability to demonstrate to its customers seamless performance. Any interruption of service to the Williams Customers, even for a short period, while the Williams Debtors try to convince unpaid Williams Subcontractors to continue to perform, or to find substitute performance, will be devastating, if not fatal, to the going concern value of the Williams Debtors.

114.    Furthermore, although the Debtors could demand payment from the Williams Customers for goods received and services provided, such requests, in light of Williams Subcontractor liens or potential liens against the Williams Customers' projects, will likely lead to litigation between the parties. Any such litigation will cost the Debtors' estates considerable time and money and, more importantly, would certainly jeopardize the Williams Debtors' ongoing relationships with the Williams Customers, which are vital to its value.

## Debtors' Motion for Authority to Pay Certain Critical Subcontractors and Vendors of the Braden Debtors

115.    The Debtors seek authority to pay, subject to certain conditions, subcontractors and vendors of the Braden Debtors (the "Braden Subcontractors") who provide critical goods and services to the Braden Debtors and/or customers of the Braden Debtors (the "Braden Customers") for certain of the Braden Debtors' ongoing projects.

MIAMI 674762
(2K)

D 74

116.    In the ordinary course, the Braden Debtors pay Braden Subcontractors for goods and services provided to either the Braden Debtors or, in many cases, the Braden Customers directly. On most projects, the Braden Debtors are paid by customers after completion of the project. As such, the Braden Debtors must often pay their Braden Subcontractors before they can receive payment from the Braden Customers.

117.    If the Braden Subcontractors remain unpaid, such Subcontractors, in most if not all cases, may assert liens against the projects for which they are providing goods and services. See, e.g., Okl. Stat. Ann. § 143 (providing for liens on land and/or improvements thereto for which subcontractors furnish labor, services, or materials). In this regard, many of the Braden Debtors' contracts require, as a condition precedent to the Braden Customers' duty to pay, that the Braden Debtors provide proof that Braden Subcontractors have been paid.

118.    Even in the absence of such a provision, the Braden Customers would likely assert damage claims against the Braden Debtors or withhold payments in amounts equal to or greater than the value of the liens that are or could be asserted by the Braden Subcontractors against the Braden Customers. Thus, payment of the Braden Subcontractors will be cash neutral.

119.    Under section 503(b)(9) of the Bankruptcy Code, claims for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business" are entitled to administrative priority status. Certain of the claims related to the Braden Subcontractors are on account of goods the Debtors received in the ordinary course of their businesses within the 20-day period before the Petition Date. In the event the Braden Debtors do not pay these claims now, the Debtors could eventually be required to satisfy such claims under section 503(b)(9) of the Bankruptcy Code. Thus, with respect to these claims, the relief requested herein should primarily affect only the timing of payment of Subcontractors'

40

claims rather than their treatment for distribution purposes, and should neither prejudice general unsecured creditors nor materially affect the Debtors' estates.

120.    The payment of the Braden Subcontractors is critical to maintaining the value of the Braden Debtors business operations, as well as supporting the Debtors' overall restructuring efforts as it will (i) help preserve relationships with their subcontractors, vendors, and customers and maximize the prospects for the completion of the Braden Debtors' ongoing projects, (ii) enable the Braden Debtors to realize revenue on their ongoing projects that they would not otherwise be able to complete absent the relief requested herein, and (iii) preserve the Braden Debtors' value for the benefit of the Debtors' creditors and their respective bankruptcy estates.

121.    As part of the Braden Debtors' efforts to restructure their business operations and provide their creditors with the greatest return possible, the Braden Debtors will be seeking accommodations from the Braden Customers to allow the Braden Debtors to complete ongoing projects.  Such accommodations would require the Braden Customers to advance money owed on projects in progress and/or to pay Braden Subcontractors directly on an ongoing basis.   If the Braden Customers agree to grant such accommodations, the Braden Debtors will be able to realize substantial revenue on current projects in progress.  Importantly, the Debtors believe that any such revenue realized will far exceed the amounts they seek to pay to Braden Subcontractors pursuant to this Motion.

122.    Furthermore, although the Debtors may demand payment from the Braden Customers for goods received and services provided, such requests, in light of liens or potential liens against the Braden Customers' projects, will likely lead to litigation between the parties. Any such litigation will cost the Debtors' estates considerable time and money and will

MIAMI 674762
(2K)

D 76

jeopardize the Braden Debtors' attempts to reach accommodations with the Braden Customers to complete projects and realize the revenue generated from such projects.

123.    If the Braden Debtors' relationships with the Braden Customers are damaged, then such customers will be less likely to grant any accommodations, and the Braden Debtors will not be able to complete projects in progress. Such inability to complete those projects will result in the loss of revenue that would otherwise be realized on those projects for the benefit of the all stakeholders, and the likely demise of the Braden Debtors.

**Debtors' Motion for Authority to Pay Certain Critical
Subcontractors and Vendors of the Specialty Boilers
Business Segment Operated by the Deltak Debtors**

124.    The Debtors seek authority to pay, subject to certain conditions, subcontractors and vendors of the Specialty Boilers Business operated by the Deltak Debtors (the "Specialty Boilers Critical Subcontractors and Vendors") who provide critical goods and services to the Deltak Debtors and/or customers of the Deltak Debtors (the "Specialty Boilers Customers") for certain of the Deltak Debtors' ongoing projects.

125.    In the ordinary course, the Specialty Boilers Business pays Specialty Boilers Subcontractors for goods and services provided to either the Specialty Boilers Business or, in many cases, the Specialty Boilers Customers directly. On most projects, the Specialty Boilers Business is paid progress payments by the Specialty Boilers Customers pursuant to a payment schedule or when certain project milestones are reached. As such, the Specialty Boilers Business must often pay its Subcontractors before it can receive payment from the Specialty Boilers Customers.

126.    If the Specialty Boilers Subcontractors remain unpaid, such Subcontractors, in most if not all cases, may assert liens against the projects for which they are providing goods and services. See, e.g., Minn. Stat. Ann. § 143 (providing for liens on land

42

and/or improvements thereto for which subcontractors furnish labor, services, or materials). In this regard, many of the Specialty Boilers Business' contracts require, as a condition precedent to the Specialty Boilers Customers' duty to pay, that the Specialty Boilers Business provide proof that Specialty Boilers Subcontractors have been paid.

127.    Even in the absence of such a provision, the Specialty Boilers Customers would likely assert damage claims against the Specialty Boilers Business or withhold payments in amounts equal to or greater than the value of the liens that are or could be asserted by the Specialty Boilers Subcontractors against the Specialty Boilers Customers. Thus, payment of the Specialty Boilers Subcontractors will be cash neutral.

128.    Under section 503(b)(9) of the Bankruptcy Code, claims for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business" are entitled to administrative priority status. Certain of the claims related to the Specialty Boilers Subcontractors are on account of goods the Debtors received in the ordinary course of their businesses within the 20-day period before the Petition Date. In the event the Specialty Boilers Business does not pay these claims now, the Debtors could eventually be required to satisfy such claims under section 503(b)(9) of the Bankruptcy Code. Thus, with respect to these claims, the relief requested herein should primarily affect only the timing of payment of Subcontractors' claims rather than their treatment for distribution purposes, and should neither prejudice general unsecured creditors nor materially affect the Debtors' estates.

129.    The payment of the Subcontractors is critical to maintaining the value of the Specialty Boilers Business operations, as well as supporting the Debtors' overall restructuring efforts as it will (i) help preserve relationships with their subcontractors, vendors,

and customers and maximize the prospects for the completion of the Specialty Boilers Business'
ongoing projects, (ii) enable the Specialty Boilers Business to realize revenue on its ongoing
projects that it would not otherwise be able to complete absent the relief requested herein, and
(iii) preserve the Specialty Boilers Business' value for the benefit of the Debtors' creditors and
their respective bankruptcy estates.

130.    As part of the Specialty Boilers Business' efforts to restructure their
business operations and provide their creditors with the greatest return possible, the Specialty
Boilers Business will be seeking accommodations from the Specialty Boilers Customers to allow
the Specialty Boilers Business to complete ongoing projects. Such accommodations would
require the Specialty Boilers Customers to advance money owed on projects in progress and/or
to pay Subcontractors directly on an ongoing basis. If the Specialty Boilers Customers agree to
grant such accommodations, the Specialty Boilers Business will be able to realize substantial
revenue on current projects in progress. Importantly, the Debtors believe that any such revenue
realized will far exceed the amounts they seek to pay to Subcontractors pursuant to this Motion.

131.    Furthermore, although the Debtors may demand payment from the
Specialty Boilers Customers for goods received and services provided, such requests, in light of
liens or potential liens against the Specialty Boilers Customers' projects, will likely lead to
litigation between the parties. Any such litigation will cost the Debtors' estates considerable
time and money and will jeopardize the Specialty Boilers Business' attempts to reach
accommodations with the Specialty Boilers Customers to complete projects and realize the
revenue generated from such projects.

132.    If the Specialty Boilers Business' relationships with the Specialty Boilers
Customers are damaged, then such customers will be less likely to grant any accommodations.
and the Specialty Boilers Business will not be able to complete projects in progress. Such

inability to complete those projects will result in the loss of revenue that would otherwise be realized on those projects for the benefit of the all stakeholders, and the likely demise of the Specialty Boilers Debtors.

### Debtors' Motion for Authority to Pay Prepetition Trust Fund Taxes in the Ordinary Course of Business

133.    The Debtors seek authority to pay prepetition sales, use, employee-related withholding and other trust fund type taxes (however denominated) (the "Trust Fund Taxes") owed to the appropriate federal, state and local taxing authorities (each a "Taxing Authority" and collectively, the "Taxing Authorities") in the ordinary course of business, on an unaccelerated basis, as such payments become due and payable and to the extent adequate funds are available to make such payments. The Debtors seek authority to pay Trust Fund Taxes to avoid the serious disruption to their reorganization efforts that would result from the nonpayment of such taxes.

134.    In the ordinary course of their businesses, the Debtors collect Trust Fund Taxes from their employees, customers, subcontractors and other third parties, and subsequently remit such taxes to the appropriate Taxing Authorities. In addition, the Debtors withhold certain taxes (including FICA and Medicare taxes) from their employees' paychecks, which amounts are remitted periodically to the appropriate federal, local and state Taxing Authorities. The process by which the Debtors remit the Trust Fund Taxes varies, depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is to be paid. The Debtors estimate that, in the aggregate, no more than $730,000.00 accrued but unpaid Trust Fund Taxes may be owing as of the Petition Date.

135.    The Debtors believe that granting the relief requested in the motion is appropriate and in the best interest of the Debtors, their estates and their creditors.

MIAMI 674762
(2K)

D 80

**Debtors' Motion Pursuant to 11 U.S.C. § 366(b) for
an Order (i) Prohibiting Utility Companies from
Altering, Refusing or Discontinuing Service to the
Debtors, and (ii) Establishing Procedures for
<u>Determining Requests for Additional Adequate Assurance</u>**

136.    The Debtors seek entry of an order (i) prohibiting the Utility Companies

(defined below) from altering, refusing or discontinuing service to debtors, and (ii) establishing

procedures for determining requests for additional adequate assurance.

137.    In connection with the operation of their businesses and management of

their properties, the Debtors obtain electricity, telephone and similar services (together, the

"Utility Services") from many different utility companies (the "Utility Companies").

Historically, the Debtors timely paid amounts owing to the Utility Companies. Furthermore, to

the best of the Debtors' knowledge, the Debtors are substantially current with respect to their

undisputed Utility Services invoices, other than payment interruptions that may be caused by the

commencement of these chapter 11 cases. Prior to the Petition Date, the average monthly cost of

Utility Services was approximately $150,000 in the aggregate.

138.    The Debtors maintain operations in multiple locations throughout the

United States. Because of the scope of the Debtors' operations, it is essential that the Utility

Services continue uninterrupted. If the Utility Companies are permitted to terminate Utility

Services, the Debtors' operations will be irreparably harmed and their ability to reorganize

jeopardized.

139.    Through the anticipated use of cash collateral, the Debtors project

generating sufficient cash postpetition to satisfy it obligations related to Utility Services.

140.    The Debtors submit that granting the relief requested in the motion is both

necessary and appropriate. It will afford the Debtors an opportunity to successfully reorganize

and will not prejudice the rights of the Utility Companies.

**Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105, 362 and 525
(i) Enforcing the Automatic Stay with Respect to Assets of the Debtors
Outside the United States, (ii) Enjoining Creditors of the Debtors from
Attempting to Enforce Such Claims Against the Assets of Foreign
Non-Debtor Subsidiaries, and (iii) Enforcing the Anti-Discrimination
Provisions of the Bankruptcy Code With Respect to Governmental Entities**

141.    The Debtors seek entry of an order (i) enforcing the automatic stay with respect to assets of the Debtors outside the United States, (ii) enjoining creditors of the Debtors from attempting to enforce such claims against the assets of foreign non-Debtor subsidiaries, and (iii) enforcing the anti-discrimination provisions of the Bankruptcy Code with respect to governmental entities.

142.    The Debtors operate worldwide with activity primarily in China, Mexico, and The Netherlands, as well as the United States. Due to the international nature of the Debtors' businesses, the Debtors believe that many parties will be unaware of or simply choose to ignore the automatic stay imposed by section 362 of the Bankruptcy Code or the protections of section 525 of the Bankruptcy Code. Indeed, the Debtors believe that it is likely that, given the opportunity, many parties may choose to exploit the international nature of these chapter 11 cases and attempt to seize the Debtors' assets located outside of the United States to the detriment of the estates and other creditors.

143.    The Debtors believe that under the circumstances of these chapter 11 cases, entry of an order granting the motion, which in large measure is a restatement of the applicable provisions of sections 362 and 525 of the Bankruptcy Code, would help protect the Debtors from violations of these crucial provisions and spare them the burden of commencing proceedings to enforce the Bankruptcy Code.

MIAMI 674762
(2K)

D  82

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363
for Authority to (i) Continue and Maintain Insurance Policies,
(ii) Continue Insurance Premium Financing Program in the
Ordinary Course, and (iii) Pay All Obligations Associated Therewith**

144.     The Debtors seek authority to (i) continue and maintain existing insurance

policies on an uninterrupted basis, consistent with the practices in effect prior to the Petition

Date, (ii) continue their insurance premium financing program in the ordinary course, including

entering into new premium finance arrangements postpetition, and (iii) pay all premiums and

other amounts due and owing or accrued as of the Petition Date with respect to the Insurance

Policies and Premium Finance Agreement (each defined below), including payments to premium

finance companies and insurance brokers in connection with postpetition services rendered.

145.     In connection with the daily operation of their businesses, the Debtors

maintain certain insurance policies (each an "Insurance Policy" and, collectively, the "Insurance

Policies") in respect of, inter alia, real property, personal property, commercial general liability,

commercial umbrella liability, equipment breakdown, business automobile liability, crime and

theft liability, employment practices liability, contractor's pollution liability, kidnap and ransom

protection, terrorism protection, travel accident protection, and officers and directors liability.

146.     The premiums for each of the Insurance Policies are determined annually,

and the majority of the premiums are financed pursuant to a premium finance agreement and

promissory note (the "Premium Finance Agreement") between Global Power and AFCO Credit

Corporation ("AFCO"). Of the Insurance Policies addressed in this Motion, the Debtors'

premiums due under the pollution liability insurance and officers and directors liability insurance

policies are not covered by the Premium Finance Agreement.

147.     The Debtors estimate that prepetition amounts due for policy premiums

financed under the Premium Finance Agreement total approximately $202,750, and for

Insurance Policies not covered thereunder the prepetition amounts due total no more than $10,000.

148.    The total premiums under the Insurance Policies covered by the Premium Finance Agreement equal $3,088,931.00. Under the Premium Finance Agreement, the Debtors made a down payment of $264,380.44 and, after assessment of a $84,470.61 finance charge, financed a total of $2,824,550.56. The financed amount is payable in eleven monthly installments of $264,456.47, due on the fifth day of each month. The Debtors' obligations under the Premium Finance Agreement are secured by all unearned premiums or dividends payable to the Debtors under the Insurance Policies covered by the Premium Finance Agreement, and loss payments that reduced unearned premiums. Under the Premium Finance Agreement, AFCO is appointed as the Debtors' attorney in fact with authority to, among other things, cancel the Insurance Policies in the event of non-payment of premiums.

149.    It is important for the Debtors to continue their Insurance Policies, which provide a comprehensive range of coverage in full force and effect for the Debtors, their businesses and their properties. If these policies were allowed to lapse, or if AFCO were able to cancel the policies, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others. Maintenance of the officer and director liability policies also is necessary to the retention and protection of the Debtors' senior management who are critical to the success of the Debtors' businesses. Furthermore, the amounts proposed to be paid with respect to prepetition periods in connection with the Insurance Policies are minimal compared with the size of the Debtors' estates and the potential liability exposure of the Debtors absent insurance coverage. Therefore, the relief requested in the motion is amply justified.

**Application of Debtors for Order Authorizing and Approving
the Appointment of AlixPartners, LLC as Noticing, Claims,
and Balloting Agent for the Bankruptcy Court**

150.    The Debtors seek the appointment of AlixPartners LLC ("AlixPartners) as

claims, noticing and balloting agent to, among other tasks, (i) serve as the Court's noticing agent

to mail notices to the estates' creditors and parties in interest, (ii) provide computerized claims,

objection and balloting database services, and (iii) provide expertise, consultation and assistance

in claim and ballot processing and other administrative information with respect to the Debtors'

bankruptcy cases.

151.    I estimate that the Debtors have more than 200 potential creditors plus

additional parties in interest to whom certain notices, including notice of these chapter 11 cases.

will be sent. The size of this universe makes it impracticable for the Debtors or the Clerk's

Office to, without assistance, undertake the task of sending notices to creditors and other parties

in interest. The Debtors seek the appointment of AlixPartners to serve certain designated notices

and maintain the claims register and other tasks related to claims administration in these cases.

In addition, assistance in the plan solicitation and voting process may be necessary. I believe

that AlixPartners' assistance will expedite and streamline these processes.

152.    I believe that AlixPartners is well-qualified to provide the above services.

Accordingly, I believe that approval of AlixPartners appointment is in the Debtors' best interests

and the best interests of their estates, creditors, and other parties in interest.

## Conclusion

The Debtors hope to confirm a plan of reorganization and emerge from chapter 11 in as short a time as is necessary. The Debtors believe that the protections afforded by chapter 11 will enable them to develop, implement and consummate a financial restructuring that will provide for the equitable treatment of all claims and interests, and preserve the value of their assets for the benefit of creditors and equity security holders alike.

GLOBAL POWER EQUIPMENT GROUP INC.,
(for itself and on behalf of each of its affiliated debtors as debtors and debtors in possession)

By: _____

Name: John M. Matheson
Title: Executive Vice President and Chief Operating Officer

Sworn to before me on this
29 day of September, 2006

_Elayna M. Conner_
Notary Public

Notary Public Oklahoma
OFFICIAL SEAL
ELAYNA M. CONNER
TULSA COUNTY
COMMISSION #: 06002027
My Commission Expires: 02/22/2010

# EXHIBIT A

# GLOBAL POWER EQUIPMENT GROUP INC.

Subsidiary Chart

# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
|  | Jointly Administered |
| Debtors. |  |
|  | Re: Docket No. 12 |

CORRECTED ORDER GRANTING IN PART DEBTORS' MOTION PURSUANT
TO 11 U.S.C. §§ 105, 363 AND 365 FOR AN ORDER AUTHORIZING DEBTORS
TO (I) WIND DOWN OPERATIONS OF THE HEAT RECOVERY STEAM
GENERATION BUSINESS SEGMENT OPERATED BY THE DELTAK
DEBTORS, (II) REJECT CERTAIN EXECUTORY CONTRACTS IN
CONNECTION THEREWITH, AND (III) IMPLEMENT PROCEDURES FOR
THE ORDERLY COMPLETION OF WORK IN PROGRESS

Upon the motion, dated September 29, 2006 (the "Motion"),[1] of Global Power

Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the

"Debtors"), for entry of an order pursuant to sections 105, 363 and 365 of the Bankruptcy Code

authorizing the Debtors to (i) wind down the HRSG Business operations of the Deltak Debtors[2]

and (ii) reject certain executory contracts and unexpired leases in connection therewith (as

identified on Exhibit "A" hereto, collectively, the "HRSG Contracts"), and (iii) implement

procedures for the orderly completion of work in progress, as more fully set out in the Motion;

and upon consideration of the Affidavit of John M. Matheson in Support of First Day Motions

and Applications sworn to on the 29th day of September, 2006; and it appearing that the Court

has jurisdiction over this matter; and it appearing that due notice of the Motion as set forth

therein is sufficient under the circumstances, and that no other or further notice need be

provided; and it further appearing that the relief requested in the Motion is in the best interests of

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2] The Deltak Debtors consist of (i) Deltak, LLC and (ii) Deltak Construction Services, Inc.

the Debtors and their estates and creditors; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted to the extent set forth herein; and it is further

ORDERED that pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, the Debtors are hereby authorized and empowered to wind down the HRSG Business operations and affairs; and it is further

ORDERED that within three (3) days of entry of this Order, the Debtors shall serve a copy of the Motion and this Order on the HRSG Counterparties, providing notice of the Debtors' intent to reject the HRSG Contracts nunc pro tunc to the date of the Motion; and it is further

ORDERED that any objection to the Debtors' proposed rejection of the HRSG Contracts shall be filed with this Court no later than October 23, 2006 at 4:00 p.m. Prevailing Eastern Time; and that a hearing on the Debtors' proposed rejection of the HRSG Contracts, and any objections thereto, shall be held on October 26, 2006 at 10:00 a.m. Prevailing Eastern Time, before the undersigned United States Bankruptcy Judge; and it is further

ORDERED that if the Debtors have deposited monies with any HRSG Counterparty as a security deposit or other arrangement, such counterparty shall not setoff or otherwise use such deposit without prior authority of this Court; and it is further

ORDERED that the Debtors are authorized, but not directed, to negotiate with customers to reach accommodations for the completion of certain HRSG Contracts in exchange for such customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms, including, without limit, all outstanding costs owed to vendors and Contract

2

Employees relating to the completion of such contracts, plus the customer's share of any excess costs that would be incurred in the ordinary course outside of the wind down plan, (ii) fund any contractor incentives offered to Contract Employees who are retained to perform on such customer's HRSG project, and (iii) waive all rejection damages claims to the extent the Deltak Debtors complete such customer's HRSG project; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or in relation to the implementation of this Order.

Dated:    Wilmington, Delaware
          October 5, 2006

                              _____
                              UNITED STATES BANKRUPTCY JUDGE

EXHIBIT A

Deltak Debtors – Heat Recovery Steam Generation Segment
Executory Contracts and Unexpired Leases
Revised Sept. 28, 2006

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contract Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Black & Veatch Limited | Deltak, LLC | G06205 | Immingham Phase 2 | Project No. 145546 | 31-Aug-06 | 11401 Lamar Overland Park, KS 66211 | Gary Townsend | |
| CTCI Corporation | Deltak, LLC | G04301 | PTTUT EPCC Works of Cansal Utility | PO no: 04GHX(11)A-F0042 | 10-Jan-05 | 19FL, CTCI Tower, 77, Sec. 2, Tun Hwa. S. Rd., Taipei 106, Taiwan, R.O.C. | H. C. Chu | |
| CTCI Corporation | Deltak, LLC | G05302 | PT UT CUPI Phase II (Power | PO No: 04CH30011(1)B-F0052 | 5-Jan-06 | 22FL, 77, Sec. 2, Tun Hwa S Road, Taipei 106, Taiwan | | |
| CTEP FZCO | Deltak, LLC | G05503 | Qatargas II Development | PO No. Q03F5A0072 | 27-May-05 | PO Box 261645 Jebel All Free Zone, Dubai, United Arab Emirates | | |
| CTEP FZCO | Deltak, LLC | G05505 | Qatargas 3 & 4 Onshore | PO No: QC5F5A0003 | 27-May-05 | PO Box 261645 Jebel All Free Zone, Dubai, United Arab Emirates | | |
| Deltak Power Equipment (China) Co. Ltd | Deltak, LLC | G05301 | Lin Yuen Steel | PO No. DPEC H05-016-001 | 20-Dec-05 | No. 139 Tianshan Road, Hsayn District, Najing Ciara, 210012 | | |
| Flour Transworld Services, etc./ JAMALCO | Deltak, LLC | G06004 | JAMALCO JUJ | PO No: A3MG-44092-01 | | 100 Float Object Drive Greenville, SC 29607 | Carmen Henson | A3MG |
| GE International Operations Co, Inc. | Deltak, LLC | G04010 | Petroleo | PO no: 188181577 | 14-Jul-05 | Prolongacion Reforma 490, 4o Piso Colpeal, Santa Fe, 01217 Mexico D.F. Mexico | John Kozakowski | |
| General Electric Company | Deltak, LLC | G04008 | Tamazunchale | PO no: 188752566 | 8-Sep-04 | 1 River Road Bldg 37-7E, Schenectady NY 12345 | John Kozakowski | |
| General Electric Company | Deltak, LLC | G04010 | Puentes | PO no: 188775517 | 22-Nov-04 | 1 River Road Bldg 37-7E, Schenectady NY 12345 | John Kozakowski | |

241242.419-030 v4
1281

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| General Electric Company | Deltak, LLC | G04010/Portugal | Puentes Portugal | PO no: 180081419 | 6-Oct-05 | 1 River Road, Bldg 37-2E, Schenectady NY 12345 | John Korsikowski | |
| General Electric Company | Deltak, LLC | G04010 | Puentes | PO no: 180086910 | 26-Oct-05 | 1 River Road, Bldg 37-2E, Schenectady NY 12345 | John Korsikowski | |
| General Electric Company | Deltak, LLC | G04010/Czech Republic | Puentes | PO no: 180089186 | 15-Nov-05 | 1 River Road, Bldg 37-2E, Schenectady NY 12345 | John Korsikowski | |
| General Electric Company | Deltak, LLC | G04010/Vehicula nela | Puentes | PO no: 180089469 | 18-Nov-05 | 1 River Road, Bldg 37-2E, Schenectady NY 12345 | John Korsikowski | |
| General Electric Company | Deltak Construction Services, Inc. | G05002 | 7H Launch-Inland Empire | PO no: 180091624! | 12-Jan-06 | 1 River Road, Bldg 37-2E, Schenectady NY 12345 | John Korsikowski | |
| General Electric Company | Deltak, LLC | G05002 | 7H Launch-Inland Empire | PO no: 180092025! | 4-Feb-05 | 1 River Road, Bldg 37-2E, Schenectady NY 12345 | John Korsikowski | |
| General Electric International, Inc. | Deltak, LLC | G04010 | Puentes | PO no: 180045474 | 6-Jul-05 | Spain Branch Juan Bravo 3C, Apartado 700 28006 Madrid, Spain | Rocio Sanchez-Portal | |
| Greenfield Energy Centre, LP | Deltak, LLC | G05004 | Greenfield | Contract for Construction Services | 5-Aug-05 | 300 Bay Street, Ste. 3800,Toronto, Ontario, M5J1Z4 | Calpine Greenfield Limited Partnership, c/o Calpine Construction Management Co., Inc., 164 Woodmere Rd., Folsom, CA 95630, Attn: Kent Reed | CESCL-0000000001 |
| Maasvlakte Energie BV | Deltak, LLC | GR0011 | Pargro | Project Pergan HRSG Contract | 10-Dec-04 | Cochranai 4B, 3407 AC, Rotterdam, The Netherlands | Jaap Hoogenspeel | |
| Mitsubishi Power Systems, Inc. | Deltak, LLC | G04006 | MHSPC/GE/Port Westward | Purchase Agreement for the Port Westward Generating Facility Ref: 5910-06A | 3-Sep-04 | 100 Colonial Center Parkway Lake Mary, FL 32746 | Rich Benkel | 400640! |
| Newmont Ostrea Energy Partners LP | Deltak, LLC | G06001 | Wharton Project | Purchase and Sale Contract | 16-Jan-06 | 0711 Appley Valley, Ste. 200p Houston TX 72069 | David Hudson | |

2

D  93

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Navasota Wharton Energy Partners LP | Deltak, LLC | G96002 | Odessa Project | Purchase and Sale Contract | 26-Jan-06 | 6711 Appley Valley, Ste. 200 Houston, TX 77069 | David Hudson | |
| SNC-Lavalin Power Ontario Inc | Deltak, LLC | G96003 | Greenway Station | PO No: 59600010 | 26-Jan-06 | 2655 N. Sheridan Way Ste. 180 Mississauga, Ontario, Canada L5K 2P8 | Jack Tennova (location is different) | |
| TIC - International (TICI) | Deltak, LLC | G95906 | Howana GT-13 | PO No: 20026-50000 | 13-Nov-05 | TIC International P.O. Box 310 El Segundo, CA 90245 | Deven Dickerson The Industrial Company 40185 RCR 129 P.O. Box 77494 Steamboat Springs, CO 82977 | |
| Southern Company Services, Inc | Deltak LLC | G01010 | McIntosh | 2003 Generation SGC00-001 | 15-Jan-01 | PO Box 2625/ BIN B237, 42 Inverness Ctr. Parkway, 35242 | Milton Balch | |
| Southern Company Services, Inc | Deltak LLC | G01012 | McIntosh | 2003 Generation SGC00-001 | 15-Jan-01 | PO Box 2625/ BIN B237, 42 Inverness Ctr. Parkway, 35242 | Milton Balch | |
| South Houston Green Power LP | Deltak LLC | G01015 | South Houston Green Power | PO No 1575KS | 26-Sep-01 | C/O Cinergy Power Generation Services 1000 East Main Street Plainfield, IN 46168 | W. Michael Wernecke | |
| MidAmerica Energy | Deltak LLC | G02001 | Greater DesMoines Energy Center | Contract MEC Project: 12-685 | 21-Dec-01 | 106 East Second Street Post Office Box 4350 Davenport, Iowa 52808 | Josh Roose | |
| Madison Gas & Electric | Deltak LLC | G02004 | | PO No. P9190 | 17-Jun-02 | 222 W. Washington Ave PO Box 1231 Madison, WI 53701-1231 | Donald Paterson | |
| ExxonMobil Chemical Company | Deltak LLC | G02005 | Baytown Chemical | PO No: A47G192659 | 18-Oct-02 | 1825 Decker Drive Baytown, TX 77521 | L.J. Guilloy | |
| ExxonMobil Chemical Company | Deltak | G03001 | Beaumont Refinery | PO No: C-62664 | 24-Feb-03 | 4500 Bayway Drive Baytown, TX 77520 | Dave Sheitz | |
| Bechtel Corp | Deltak LLC | G03002 | Dowra | PO No. 24879-000-MRA-M4PR-0601 | 11-April-03 | P.O. Box 2166 Houston, Texas 77252-2166 | Roney Gilliland | |

3

| Party | Supplier | Deltak Ref No. | Project | PO Number | Other | Address | Contact Name | Contract No. |
|---|---|---|---|---|---|---|---|---|
| Power Systems Sourcing Operation, General Electric International, Inc | Deltak LLC | G03003 | Catalog | PO No: 180597367 | 24-April-03 | Building 37-2E One River Road Schenectady, NY 12345 | Craig Smith | |
| IGC | Deltak LLC | G03004 | Aramco Berri Plant | 0-3105-P-211D-001-A | 24-July-03 | 23-1, Minato Mirai, Nishi-ku Yokohama, 220-6001, Japan | Yoshiyuki Shimizu | |
| Toshiba Plant Systems & Services Corporation, International Procurement Department | Deltak LLC | G03005 | Coco | PO No: PO70000609 | 28-Aug-03 | 16-5, Tsurumicho 4-chome, Tsurumi-ku, Yokohama 230-8691, Japan | Masahiro Honda | |
| Power Systems Sourcing Operation, General Electric International, Inc | Deltak LLC | G04001 | Quebec | PO No: 180679810 | 03-Feb-04 | Building 37-2E One River Road Schenectady, NY 12345 | Craig Smith | |
| Zhejiang Gaohua Yuyao Gas Turbine Power Plant Co., Ltd | Deltak LLC | G04002 | Gaohua | Contract No: 20031228 | 22-Mar-04 | Gong Hang Building, 1st Floor No 55 Xiqian Road, Yuyao City, Zhejiang Province, China 315400 | Mr. Zhu Yu Hua | |
| Kinder Morgan Production Company LP | Deltak LLC | G04003 | SCR (Retrofit to G04003) | PO No: DZA21002 | | 300 N. Loraine Suite 900 Midland, Texas 79701 | Dawson McIntosh | |
| Toshiba Plant Systems & Services Corporation, International Procurement Department | Deltak LLC | G04005 | Ocean C-2 | Contract amendment to PDP0000600 on G03005 | 15-July-04 | 16-5, Tsurumicho 4-chome, Tsurumi-ku, Yokohama 230-8691, Japan | Masahiro Honda | |

| Lessee | Lessor | Property | Expiration Date | Contact Address | Contact Person | Principal Use |
|---|---|---|---|---|---|---|
| Liberty Property Limited Partnership | Deltak, LLC | 2905 Northwest Boulevard, Northwest Business Campus I, Plymouth, Minnesota | 9/30/2009 | 10440 Viking Drive, Ste. 130, Eden Prairie, MN 55344 | Thomas Shaver | Engineering and admin office |

4

D  95

# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>GLOBAL POWER EQUIPMENT GROUP INC., *et. al.*,<br><br>Debtors. | Chapter 11<br>Case No. 06-11045<br>Jointly Administered<br><br>**Hearing Date: 10/26/06 at 10:00 a.m.**<br>**Obj. Deadline: 10/23/06 at 4:00 p.m.**<br>**Related to Docket Nos. 12 and 155** |

## CORRECTED LIMITED OPPOSITION BY MITSUBISHI POWER SYSTEMS AMERICAS, INC., TO DEBTORS' MOTION TO REJECT CERTAIN EXECUTORY CONTRACTS

Mitsubishi Power Systems Americas, Inc. ("MPS") (formerly known as Mitsubishi Power Systems, Inc.), a creditor in this proceeding, hereby files this limited opposition to the Rejection Motion[1] of Global Power Equipment Group, Inc., and its affiliated debtors and debtors in possession (collectively, the "Debtors"). Debtor Deltak, LLC ("Deltak") requested, *inter alia,* authority to reject a Purchase Agreement for Heat Recovery Steam Generator and Auxillaries for the Port Westward Generating Facility by and between MPS and Deltak (the "Port Westward HRSG Contract") and represented that it would immediately reject the Contract. MPS does not object to rejection of the Port Westward HRSG Contract. Indeed, MPS requests that the Court enter an order immediately rejecting the Port Westward HRSG Contract and opposes *nunc pro tunc* rejection if rejection is not immediate. MPS believes, however, that the order must be conditioned on the enforcement of specific remedy and warranty provisions contained in the Port

---

[1] Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress [Docket No. 12] (the "Rejection Motion").

Westward HRSG Contract. Enforcement of these provisions will provide Deltak with a release of its obligations under the Contract and will not impose a burden on the bankruptcy estate.

## BACKGROUND AND JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.    MPS sells and services electrical power generating equipment and systems in the United States.[2] MPS purchases turbines from its Japanese affiliates, purchases related equipment – including heat recovery steam generators ("HRSGs") – from other suppliers, and delivers integrated power generation systems to its customers for construction.[3]

3.    On September 3, 2004, MPS entered into a Power Island Equipment Purchase Agreement for Port Westward Generating Facility by and Between Portland General Electric Company and Mitsubishi Power Systems, Inc. (the "Port Westward Project Contract").[4]

4.    For the Port Westward power plant, still under construction, MPS agreed to supply a power generation system that includes a "G" Class combustion turbine generator, a steam turbine generator, and an HRSG, including all necessary auxiliary equipment and materials.[5]

5.    If MPS fails to deliver a major component of the system on time, MPS faces at least equipment delay liquidated damages of $25,000 a day, escalating to $30,000 a day after 30

---

[2] Affidavit of Richard Boukal, ¶ 3.

[3] *Id.* ¶ 4.

[4] Port Westward Project Contract, at p. 5, attached as Exhibit 3 hereto (filed under seal). The Port Westward Project Contract was then assigned by Portland General Electric to Black & Veatch Construction, Inc. Affidavit of Richard Boukal, ¶ 5.

[5] *Id.* at pp. 8, 17; Affidavit of Richard Boukal, ¶ 5.

-2-

days, $50,000 a day after 60 days, and $75,000 a day after 120 days.[6] Along with the HRSG, the catalyst for the reduction of post-combustion nitrous oxide ("NOx") and the catalyst for the reduction of carbon monoxide ("CO") and associated parts (collectively, the "Catalysts") are collectively considered a Major Component under the Port Westward Project Contract.[7]

6.       Ultimately, MPS faces default and a risk of actual damages.  If the Catalysts are not delivered within one year after the scheduled delivery date of December 15, 2006, then MPS would be in default under its contract with the project owner.[8]  If an event of default occurs, MPS would be liable to the project owner for any costs in excess of the contract price that the owner incurred in having the equipment supplied.[9]  In addition, MPS would be liable for "all additional reasonable internal expenses incurred" by the project owner as a result of MPS's default.[10]

7.       Pursuant to the Port Westward HRSG Contract, Deltak agreed to supply MPS with an HRSG, including catalysts and all necessary auxiliary equipment and materials.[11]  The HRSG is an integral part of the power generation system that MPS agreed to supply at Port Westward.[12]  The power generation system will not function without a functioning HRSG.[13]

---

[6] Port Westward Project Contract, ¶ 20.2.5(b).

[7] *Id.*, Exhibit D-2 at p. 3.

[8] *Id.* ¶ 29.1.12, Exhibit D-2 at p. 3.

[9] *Id.* ¶ 29.3.

[10] *Id.*

[11] Port Westward HRSG Contract at pp. 8, 18, attached as Exhibit 4 hereto (filed under seal); Affidavit of Richard Boukal, ¶ 6.

[12] Affidavit of Richard Boukal, ¶ 7.

[13] *Id.*

8.    The Port Westward HRSG Contract specifies that if Deltak fails to deliver a Major Component of the HRSG on time, Deltak faces at least equipment delay liquidated damages of $25,000 a day, escalating to $30,000 a day after 30 days, escalating to $50,000 a day after 60 days, and $75,000 a day after 120 days.[14]  The Catalysts are a Major Component under the Port Westward HRSG Contract.[15]

9.    Like MPS, Deltak faces default and a risk of actual damages.  If the Catalysts are not delivered within one year after the scheduled delivery date of December 15, 2006, then Deltak would be in default under its contract with MPS.[16]  If an event of default occurs, Deltak would be liable to MPS for any costs in excess of the contract price that MPS incurred in having the equipment supplied.[17]  In addition, Deltak would be liable for "all additional reasonable internal expenses incurred" by MPS as a result of Deltak's default.[18]

10.    As of the petition date, Deltak had delivered virtually all of HRSG equipment for the Port Westward Project except for the Catalysts.  The HRSG is largely installed in the facility.[19]

11.    Both Catalysts are custom-designed for the HRSG currently installed at the Port Westward facility.[20]  Because of the time required to manufacture this custom designed product,

---

[14] Port Westward HRSG Contract, ¶ 20.2.5(a).

[15] *Id.*, Exhibit D-2 at p. 2.

[16] *Id.* ¶ 29.1.12.

[17] *Id.* ¶ 29.3.

[18] *Id.*

[19] Affidavit of Richard Boukal, ¶ 8.

[20] *Id.* ¶ 13.

- 4 -

MPS cannot acquire replacement catalysts in time to perform its obligations under the Port Westward Project Contract.[21] This custom design also prevents Deltak from selling the Catalysts to another buyer without substantial modifications.[22]

12.    Deltak entered into a subcontract with Cormetech, Inc. ("Cormetech"), to supply the NOx catalyst.[23] Deltak entered into a subcontract with Engelhard Corp., now BASF Catalysts, LLC ("BASF") to supply the CO Catalyst.[24] Deltak also entered into other subcontracts related to the HRSG.[25]

13.    The project schedule shows 23 weeks scheduled for the ordering, manufacturing, and delivery of the NOx catalyst from Cormetech.[26] The project schedule also shows 23 weeks for ordering, manufacturing, and delivery of the CO catalyst from BASF.[27] Therefore, even if MPS re-ordered the NOx catalyst and the CO catalyst on the day after the October 26 hearing, it could not meet the December 15, 2006, scheduled delivery date. MPS would face a minimum equipment delay liquidated damages of $4,650,000 under the Port Westward Project Contract for the Catalysts.[28]

---

[21] *Id.* ¶ 14.

[22] *Id.* ¶ 16.

[23] *Id.* ¶ 10.

[24] *Id.* ¶ 11.

[25] *Id.* ¶ 12. A list of the relevant subcontractors is attached as Exhibit 1 hereto (filed under seal).

[26] Deltak Progress/Fabrication Schedule for Port Westward Project, dated January 4, 2006, at p. 19, attached as Exhibit 2 hereto (filed under seal).

[27] *Id.*

[28] Both Catalysts comprise a single Major Component as defined under the Port Westward Project Contract. Delay in delivery of this Major Component is subject to equipment

14.    MPS can provide for completion of the HRSG without any further technical assistance from Deltak, subject to the relief sought by MPS in this current proceeding.[29] Cormetech and BASF have completed the Catalysts and they are ready to ship to the site.[30] But MPS needs the Catalysts, and neither Cormetech nor BASF are obligated to ship their respective Catalysts unless someone pays them in full.[31]

15.    The Catalysts are necessary for commissioning and testing of the Port Westward gas turbine.[32] Unless the Catalysts are paid for, delivered to Oregon and properly installed, commissioning and testing will be delayed.[33]

16.    On September 28, 2006, the Debtor filed a voluntary petition for relief with this Court pursuant to Chapter 11.

17.    Although the Debtor requested that the court enter orders authorizing the use of Cash Collateral[34] and authority to pay critical vendors and subcontractors of the Debtors,[35] the

---

delay liquidated damages. There are approximately 7 weeks between the October 26, 2006, hearing on the Rejection Motion and the December 15, 2006, scheduled delivery date. Thus, there would be an additional 16 weeks of exposure for equipment delay liquidated damages beyond the scheduled delivery date. For the first 30 days, equipment delay liquidated damages would total $750,000 ($25,000 x 30). For the following 30 days, equipment delay liquidated damages would total $900,000 ($30,000 x 30). For the following 60 days, equipment delay liquidated damages would total $3,000,000 ($50,000 x 60), giving a total of $4,650,000.

[29] Affidavit of Richard Boukal, ¶ 17.

[30] *Id.* at ¶ 13.

[31] *Id.* ¶ 18.

[32] Id. ¶ 9.

[33] *Id.* ¶ 19.

[34] Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 552 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure for (A) Emergency Relief (I) Authorizing the Use of Cash Collateral, (II) Finding that the Senior Lenders' Interests, or that of Any Other Party Which Is Purportedly Secured, Are Adequately Protected, and/or (III) Authorizing the

D101

Debtors did not seek authority to pay critical vendors with respect to the HRSG business.

Further, the Interim Cash Collateral Order does not permit the Debtors to pay subcontractors or

vendors of Deltak.[36]

18.    To facilitate delivery of the completed Catalysts, MPS has offered to assume all

of Deltak's obligations to Cormetech, BASF, and any other Catalyst-related subcontractors under

Deltak's subcontracts for the procurement of the Catalysts and related materials for the Port

Westward Project Contract in return for an assignment of those subcontracts to MPS.[37] Deltak

has declined, however, instead offering a "Completion Program," calculated to force MPS to

waive its legal rights in this proceeding in exchange for a release of needed parts:

       1.    Deltak would have no indemnity obligations, and Deltak would have no
          liability for any damages under the Port Westward HRSG Contract;[38]

---

Debtors to Surcharge Collateral, and (IV) Granting Related Relief; and (B) Scheduling Interim
and Final Hearings Regarding the Same [Docket No. 10] (the "Cash Collateral Motion").

[35] Debtors' Motion for Authority to Pay Subcontractors and Vendors of the Williams
Debtors in the Ordinary Course of Business [Docket No. 11]; Debtors' Motion for Authority to
Pay Certain Critical Subcontractors and Vendors of the Specialty Boilers Business Segment
Operated by the Deltak Debtors [Docket No. 13]; Debtors' Motion for Authority to Pay Certain
Critical Subcontractors and Vendors of the Braden Debtors [Docket No. 14].

[36] Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 552 and Rule 4001(b)
of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Use of Cash Collateral, and
(II) Granting Related Relief [Docket No. 40] (the "Interim Cash Collateral Order"); Order
Granting Debtors' Motion for Authority to Pay Subcontractors and Vendors of the Williams
Debtors in the Ordinary Course of Business [Docket No. 63]; Order Granting Debtors' Motion
for Authority to Pay Certain Critical Subcontractors and Vendors of the Specialty Boilers
Business Segment Operated by the Deltak Debtors [Docket No. 65]; Order Granting Debtors'
Motion for Authority to Pay Certain Critical Subcontractors and Vendors of the Braden Debtors
[Docket No. 66].

[37] Affidavit of Richard Boukal, ¶ 20.

[38] Draft Completion Agreement for Deltak ("Completion Agreement"), ¶ 1.1, attached as
Exhibit 5 hereto (filed under seal).

2.   Deltak excludes warranty obligations, equipment performance guarantee obligations, and indemnity obligations from its definition of "unperformed obligations" under the Contract;[39]

3.   Deltak's fulfillment of its remaining performance obligations would be subject to reimbursement by MPS to Deltak of Deltak's actual costs of personnel, materials, and facilities, as well as Deltak's out-of-pocket costs and expenses actually incurred in completing the HRSG project;[40]

4.   As to an assignment of an existing purchaser order with a Deltak subcontractor, MPS would have the right only to solicit Deltak's consent to such assignment;[41]

5.   Performance of Deltak's obligations under the Contract, either by MPS itself or by a third party hired by MPS, would be at MPS's cost and expense;[42]

6.   MPS would waive rejection damages claims in connection with the Contract upon completion of the work;[43]

7.   Equipment and services would be provided on an "as-is, where-is" basis.[44]

MPS is unwilling to agree to these unfair and burdensome requirements. All it needs from Deltak are assignment of Catalysts and parts held for shipment by others.

19.   The Debtors have filed their Rejection Motion requesting that they be authorized to reject certain executory contracts, including the Port Westward HRSG Contract, and that they be permitted to wind down the HRSG business. In their Rejection Motion, the Debtors seek "to *reject immediately* ... all executory contracts for the delivery by the Debtors of HRSG units to

---

[39] *Id.* ¶ 1.2.

[40] *Id.* ¶ 1.2.

[41] *Id.* ¶ 1.5.

[42] *Id.* ¶ 1.5.

[43] *Id.* ¶ 2.1.

[44] *Id.* ¶ 3.2.

- 8 -

customers."[45] The Debtors also seek *nunc pro tunc* rejection of those executory contracts to the

date of the Rejection Motion.[46] After a first-day hearing, the Debtors were "authorized and

empowered to wind down the HRSG Business operations and affairs."[47] The Court also set a

hearing on rejection of executory contracts for October 26, 2006.[48] Pursuant to the Rejection

Order, on October 4, 2006, the Debtors filed and served a notice of proposed rejection of the

executory contracts that were the subject of the Rejection Motion.[49]

### RELIEF REQUESTED

MPS does not object to the Debtors' proposal to immediately reject the Port Westward

HRSG Contract, with the condition that MPS will be allowed to enforce a contractual remedy

provision compelling Deltak to assign its subcontracts with Cormetech, BASF, and any other

Catalyst-related suppliers to MPS upon MPS's request. The order MPS requests would require

that such an assignment release the Debtor's obligations under the subcontracts, provided that

Cormetech and BASF agree to such a release. MPS does not seek to burden the estate with

performance obligations. Rather, MPS would take over Deltak's obligations under the

Cormetech and BASF subcontracts. In addition, MPS seeks to enforce a provision in the

---

[45] Rejection Motion, ¶ 32 (emphasis added).

[46] *Id.* ¶ 36.

[47] Order Granting in Part Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress [Docket No. 64] (the "Rejection Order").

[48] Rejection Order, at p. 2.

[49] Notice of Proposed Rejection of Certain Executory Contracts Related to the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors [Docket No. 79] ("Notice of Rejection").

D104

Contract requiring Deltak to assign certain warranties to MPS, and MPS also requests an assignment to MPS of a provision giving Deltak the right to enforce certain warranties. Again, MPS would not be saddling the estate with additional obligations. Instead, MPS simply seeks certain rights as to warranties involving certain subcontractors of Deltak who are component manufacturers.

### LEGAL AUTHORITY

**I.    THE COURT SHOULD ENTER AN ORDER IMMEDIATELY REJECTING THE PORT WESTWARD HRSG CONTRACT.**

MPS supports the Debtors' desire to immediately reject the Port Westward HRSG Contract. Indeed, because MPS faces substantial risk of nonpayment and damages from delay in shipping the Catalysts if the Debtor does not immediately reject the Port Westward HRSG Contract, MPS believes rejection *must* be immediate. Any attempt to delay rejection or to merely obtain authority to reject in the indefinite future should be denied due to the Debtors' request for *nunc pro tunc* rejection.

### A.    The Port Westward HRSG Contract Should be Immediately Rejected.

The Debtor's request to immediately reject the Port Westward HRSG Contract should be granted. First, MPS has substantial exposure if the Debtor continues to sit in post-petition default, failing to deliver the Catalysts. If the Catalysts are not delivered by the scheduled date, MPS will be liable for equipment delay liquidated damages.[50] If Deltak cannot pay for the Catalysts, it should release MPS to do so and mitigate damages for delay in receipt of the

---

[50] Port Westward Project Contract, ¶ 20.2.5(a). In addition, if the delay is significant enough, MPS may be found in default under the Port Westward Project Contract and would be liable to the project owner for costs in excess of the contract price that the owner incurred in having the equipment supplied, plus "all additional reasonable internal expenses incurred" by the project owner as a result of MPS's default. *Id.* ¶¶ 29.1.12, 29.3.

- 10 -

Catalysts. Tying MPS's hands would, in turn, damage the Debtor. The Debtor will face significant equipment delay liquidated damages for its failure to timely deliver the Catalysts.[51] In addition, if the delay is significant enough, Deltak may be found in default under the Port Westward HRSG Contract and would be liable to MPS for costs in excess of the contract price that MPS incurred in having the equipment supplied, plus "all additional reasonable internal expenses incurred" by MPS as a result of Deltak's default.[52] Thus, delay in delivery of the Catalysts will significantly harm both MPS and Deltak. MPS must be released immediately to negotiate with the Deltak subcontractors and mitigate damages.

Second, the Debtor is not permitted under the Interim Cash Collateral Order to make payments to the subcontractors who are supposed to provide the Catalysts. Its Completion Program proposes only assistance to others on a cost-plus basis. Thus, the Debtor cannot perform under the Port Westward HRSG Contract because it will be unable to pay the subcontractors and, therefore, the subcontractors will not ship the Catalysts.

**B.    If Rejection Is Not Immediate, *Nunc Pro Tunc* Treatment for Future Rejections Would be Contrary to Law.**

Rejection of the Port Westward HRSG Contract should be immediate; any attempt to delay its rejection or to merely obtain authority to reject in the indefinite future should be denied, in light of the Debtors' request for *nunc pro tunc* rejection. Retroactive, or *nunc pro tunc*, rejection generally changes the effective date of an executory contract's rejection from the date of court approval of rejection to the date of the motion seeking rejection.[53] *Nunc pro tunc*

---

[51] Port Westward HRSG Contract, ¶ 20.2.5(a).

[52] *Id.* ¶¶ 29.1.12, 29.3.

[53] *See Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1025 (1st Cir. 1995).

- 11 -

rejection is permitted only when principles of equity so allow.[54]  MPS does not oppose *nunc pro tunc* rejection if Deltak rejects immediately.

If Deltak does not seek immediate rejection of the Port Westward HRSG Contract, however, MPS objects to *nunc pro tunc* treatment.  The Debtor should not be given discretion to reject anytime it chooses.  If the Port Westward HRSG Contract is not rejected immediately but *nunc pro tunc* rejection is permitted, Deltak could allow further harm to accrue to MPS before rejecting the Contract, then have rejection relate back to an earlier period.  The Debtor could hold onto the Catalysts until after the scheduled delivery date and then subsequently decide to reject, leaving MPS in a state of certainty in the meantime as to obtaining replacement Catalysts, which take substantial time to build.  The effect of *nunc pro tunc* treatment and discretion to reject at some indefinite future point is contrary to the Code's requirement that post-petition damages under unassumed contracts receive administrative priority.[55]  Thus, the date on which the Debtor files its motion to reject is significant, and as stated above courts must look at each request for *nunc pro tunc* treatment to determine whether it is equitable.  Further, the Court would not be in a position to determine whether such a later *nunc pro tunc* rejection would be equitable under the circumstances then extant.  The effective date of rejection would be as early as September 29, 2006, the date of the Rejection Motion, so Deltak could end up avoiding incurring post-petition damages from the unassumed Contract.  For these reasons, any proposal

---

[54] *See In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004); *TW, Inc. v. Angelastro (In re TW, Inc.)*, No. 03-10785 (MFW), Civ. 03-533-SLR, 2004 WL 115521, at *2 (D. Del. Jan. 14, 2004).

[55] See *U.S. Postal Service v. Dewey Freight System, Inc.*, 31 F.3d 620, 624 (8th Cir. 1994) (stating that counterparty to an unassumed executory contract is entitled to an administrative claim to the extent it has benefited the estate post-petition); *Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)*, 264 B.R. 578, 584 (9th Cir. BAP 2001) (same).

- 12 -

to delay rejection of the Port Westward HRSG Contract while giving such a future rejection *nunc pro tunc* treatment is contrary to law and, if rejection is not immediate, MPS opposes it.

### C.    Rejection of the Port Westward HRSG Contract Should be Conditioned on the Enforcement of Certain Remedy Provisions in the Contract as to Assignment of Subcontracts.

#### 1.    Effect of Rejection and Specific Performance as Remedy.

Rejection of an executory contract "does not invalidate, repudiate, repeal, or avoid an executory contract."[56] It is a breach of that contract.[57]

Rejection of an executory contract also affects the debtor's performance under the contract, as the court in *Walnut Associates* explained:

> [U]nless specific performance is available to the non-debtor party under applicable state law, the debtor cannot be compelled to render its performances required under the contract. However, if state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it.[58]

Another court within this Circuit addressed the issue of specific performance in light of a rejected executory contract. In *In re West Chestnut Realty of Haverford, Inc.*,[59] the executory contract at issue was an option agreement to purchase a 20% interest in the debtor's landfill and the debtor's business for $500.[60] Under the debtor's proposed reorganization plan, all executory contracts not specifically assumed by the debtor before the plan confirmation date would be

---

[56] *In re Walnut Assocs.*, 145 B.R. 489, 494 (Bankr. E.D. Pa. 1992).

[57] *In re Grand Union Co.*, 266 B.R. 621, 627 (Bankr. D. N.J. 2001); *see* 11 U.S.C. § 365(g) ("[T]he rejection of an executory contract ... of the debtor constitutes a breach of such contract or lease . . . .").

[58] *Walnut Assocs.*, 145 B.R. at 494.

[59] 177 B.R. 501 (Bankr. E.D. Pa. 1995).

[60] *Id.* at 503.

D108

automatically rejected.[61]  The counterparty to the executory contract filed a proof of claim for

rejection damages.[62]  The debtor then objected to the counterparty's claim.[63]  After determining

that the agreement at issue was an executory contract, the court then analyzed the movant's

rejection damages.[64]  Although the court noted that the agreement set forth a basis for liquidating

the movant's monetary claim based upon the occurrence of certain events, the court determined

that because none of those events had occurred by the bankruptcy petition date, the court could

not arrive at a legal measure of damages with sufficient certainty.[65]  Citing *Walnut Associates*,

however, the court stated that upon rejection of an executory contract, the counterparty is limited

in its claims for breach to a prepetition claim, unless specific performance is available to the

counterparty under applicable state law.[66]  The court determined that specific performance would

certainly be available to the counterparty under state law, given the uniqueness of the

counterparty's rights in land.[67]  Although the court denied the counterparty's claim for monetary

damages, the court concluded by stating that a proposed reorganization plan without appropriate

termination damages would likely be unsuccessful.[68]  If that were to occur, the counterparty's

rights would pass through the bankruptcy case unaffected.[69]

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* at 504.

[65] *Id.* at 504, 507.

[66] *Id.* at 506.

[67] *Id.*

[68] *Id.* at 507.

[69] *Id.*

- 14 -

In *Abboud v. Ground Round, Inc. (In re Ground Round, Inc.)*,[70] the court analyzed whether specific performance was an available remedy regarding a liquor license clause in a lease agreement. The lease agreement between the debtor restaurant and the landlord required the landlord to transfer a liquor license to the debtor for use during the lease term.[71] The agreement also required the debtor to transfer the liquor license back to the landlord for $1 upon termination of the lease.[72] After filing for chapter 11 relief, the debtor filed a motion to reject the lease, which the bankruptcy court granted.[73] The landlord later filed an adversary proceeding to determine the debtor's interest in the liquor license, arguing that the lease provision requiring transfer of the license was still enforceable against the debtor despite rejection of the lease.[74] Affirming the bankruptcy court below, the court cited *Walnut Associates* for the proposition that "a party is entitled to specific performance of a rejected contract if specific performance is clearly available under applicable state law."[75] The court then analyzed Pennsylvania law on specific performance, concluding that such a remedy was appropriate in the case because a liquor license is a unique asset that is not readily available.[76]

---

[70] 335 B.R. 253 (1st Cir. BAP 2005).

[71] *Id.* at 257.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* at 261.

[76] *Id.* at 262.

- 15 -

In a similar vein, courts have upheld an executory contract counterparty's right to enforce a non-compete clause contained in such an agreement, despite the contract's rejection.[77]

Here, Deltak's rejection of the Port Westward HRSG Contract will constitute a breach of the Port Westward HRSG Contract. Based on the court's decisions in *Walnut Associates*, *West Chestnut*, and *Ground Round, Inc.*, MPS can enforce the subcontracts assignment provision of the Port Westward HRSG Contract against Deltak if applicable state law authorizes specific performance as a remedy. It does.

### 2.    Enforcement of Contract Provision as to Subcontract Assignment.

This Court should apply Oregon law in determining whether specific performance is an authorized remedy. Under Delaware choice-of-law rules, express choice-of-law provisions in contracts are generally given effect.[78] Here, the Port Westward HRSG Contract contains a choice-of-law provision stating that Oregon law applies.[79] Because the Port Westward facility is in Oregon, there is no reason to disturb this choice-of-law provision.

Oregon's UCC statute expressly states that "[a] judgment requiring specific performance may be entered *if the goods are unique* or in other proper circumstances."[80] The following comments to this statutory provision indicate how the definition of "unique" goods has broadened over time:

> Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section

---

[77] *See, e.g., Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 660 (D. Mass. 2000); *Kwik-Copy Corp. v. Klein (In re Klein)*, 218 B.R. 787, 790-91 (Bankr. W.D. Pa. 1998).

[78] *Chemipal Ltd. v. Slim-Fast Nutritional Foods, Int'l, Inc.*, 350 F.Supp.2d 582, 595 (D. Del. 2004).

[79] Port Westward HRSG Contract, ¶ 36.15.

[80] Or. Rev. Stat. Ann. § 72.7160 (West 2006) (emphasis added).

D111

must be made in terms of the total situation which characterizes the contract. Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation, as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases. However, uniqueness is not the sole basis of the remedy under this section for the relief may also be granted in "other proper circumstances" and *inability to cover is strong evidence of "other proper circumstances."*[81]

Oregon case law contains several examples of courts recognizing specific performance as a contract remedy.[82]

Here, specific performance is a particularly appropriate remedy. First, the Catalysts are unique because they are specially designed for MPS's use.[83] Indeed, the Catalysts would be of little or no use to another company with different design requirements.[84] Thus, MPS's ability to cover is severely restricted, as it cannot simply purchase Catalysts "as-is" from another supplier.[85] Second, monetary damages would be a deficient remedy here. Time is of the essence, and simply providing MPS with monetary relief will not make MPS whole. The Catalysts that MPS needs immediately have been manufactured by BASF and Cormetech

---

[81] *Id.* (Comment 2) (emphasis added).

[82] *See, e.g., Belleville v. Davis*, 498 P.2d 744, 748, 751 (Or. 1972) (in a case involving contract for sale of one-half interest in a taxicab, upholding lower court's determination that specific performance was an appropriate remedy and noting that trial court had considered the one-half ownership "unique"); *Paullus v. Yarbrough*, 347 P.2d 620, 641 (Or. 1959) (awarding specific performance, taking into account scarcity of chattel among other factors); *Pittenger Equipment Co. v. Timber Structures, Inc.*, 217 P.2d 770, 777-80 (Or. 1950) (stating that plaintiff is entitled to specific performance if a damages award at law "would not be as perfect and complete a remedy," and also stating that specific performance is an appropriate remedy involving agreements to purchase specific chattel for a specific purpose that can only be fulfilled by the delivery of the chattel itself).

[83] Affidavit of Richard Boukal, ¶ 13.

[84] *Id.* ¶ 16.

[85] *Id.* ¶ 14.

D112

specifically for MPS and are ready for MPS to use.[86] It serves no purpose to postpone the release of the shipment of Catalysts. If MPS is not assigned Deltak's subcontracts with BASF and Cormetech, MPS would have to re-order the Catalysts with another supplier, which will take a significant amount of time to produce and will cause MPS to incur significant damages due to the delay. Therefore, MPS should be entitled to the remedy of specific performance.

The specific performance that MPS seeks is quite modest and imposes no burden on the estate. MPS simply requests that it be allowed to enforce a provision in the Port Westward HRSG Contract allowing for the assignment of Deltak's subcontracts with BASF and Cormetech to MPS. The specific provision that MPS seeks to enforce is Section 29.2.2 of the Contract, which states as a remedy for default that "[i]f requested by Purchaser, Supplier shall ... assign to Purchaser such of Supplier's subcontracts and vendor contracts as Purchaser may request."[87]

MPS emphasizes that it does not seek a standard assignment of an executory contract under 11 U.S.C. § 365(f), which requires assumption of the contract and adequate assurance of future performance by the assignee of the contract.[88] Instead, MPS requests assignment of the BASF and Cormetech subcontracts in the exercise of its remedies, with a release of Deltak's obligations, provided that BASF and Cormetech agree to release Deltak from its obligations under those subcontracts. MPS believes this is a fair and equitable solution to Deltak, MPS, BASF, and Cormetech. MPS will be able to immediately acquire the Catalysts it needs to complete its turbines for the Port Westward Project, and BASF and Cormetech will receive payment of the balance due under those subcontracts from MPS for the Catalysts. Therefore,

---

[86] *Id.* ¶ 13.

[87] Port Westward HRSG Contract, ¶ 29.2.2.

[88] 11 U.S.C. § 365(f).

- 18 -

should this Court grant Deltak's motion to reject the Port Westward HRSG Contract, the

corresponding order should include MPS's proposed condition as to enforcement of Section

29.2.2 of the Contract.

**C.    Rejection of the Port Westward HRSG Contract Should Also be Conditioned on the Enforcement of Certain Provisions in the Contract as to Warranties.**

MPS requests a similar condition regarding the Port Westward HRSG Contract's

provisions as to warranties from certain subcontractors of Deltak, some of whom are component

manufacturers. The specific provisions that MPS seeks to enforce are contained within Section

19.4.1, which states in relevant part as follows:

> For the Equipment, Supplier shall . . . upon Purchaser's request, use reasonable
> efforts to obtain for Purchaser and Company, from any respective component
> manufacturers, warranties substantially identical with Section 19.1, which such
> warranties shall obligate the respective manufacturers to refurnish, remove and
> replace nonconforming or defective material or components of the Equipment in
> substantially the same manner and on terms and conditions substantially similar to
> those contained herein. Any manufacturer's warranty in excess of the Warranty
> Periods set forth above shall, to the extent of such excess, be assigned to
> Purchaser and Company by Supplier without need for request therefor by
> Purchaser. All manufacturers' or other warranties shall run directly to Purchaser
> and Company . . . .[89]

In particular, MPS seeks to enforce the provisions in Section 19.4.1 concerning

assignment of component manufacturers' warranties in excess of the Warranty Periods. MPS

also seeks an assignment from Deltak to MPS of Deltak's ability to enforce component

manufacturers' warranties during the Warranty Periods. Neither request creates any additional

obligation for Deltak.

Again, despite the rejection of the Port Westward HRSG Contract, MPS would be

entitled to specific performance under Oregon law. And as with the assignment of Deltak's

subcontracts discussed above, MPS's requests as to component manufacturers' warranties

---

[89] Port Westward HRSG Contract, ¶ 19.4.1 (emphasis added).

coverage poses no additional burden on the estate. A detailed listing of the subcontractor-suppliers to which MPS makes this request is attached as Exhibit 1. Should this Court grant Deltak's motion to reject the Port Westward HRSG Contract, the corresponding order should include MPS's proposed condition as to enforcement of the above-mentioned provisions of Section 19.4.1 of the Contract.

WHEREFORE, MPS respectfully requests that this Court (1) order immediate rejection of the Port Westward HRSG Contract; (2) condition the order rejecting the Port Westward HRSG Contract on MPS's enforcement of Section 29.2.2 of the Contract regarding assignment of Catalyst and other listed subcontracts on terms releasing Deltak from further obligations under such subcontracts; (3) condition the order rejecting the Port Westward HRSG Contract on MPS's enforcement of provisions of Section 19.4.1 of the Contract regarding component manufacturers' warranties; and (4) grant such further relief as the court deems appropriate.

Dated: October 24, 2006
Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

-and-

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)
Counsel for Mitsubishi Power Systems Americas, Inc.

#495408v1

- 20 -

D115

<u>Exhibit 1</u>

(to be filed under seal)

D116

Exhibit 2

(to be filed under seal)

- 22 -

Exhibit 3

(to be filed under seal)

- 23 -

D118

Exhibit 4

(to be filed under seal)

D119

Exhibit 5

(to be filed under seal)

D120

# EXHIBIT E

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
|  | Jointly Administered |
| Debtors. | Re: Docket No. 12 |

### AMENDED ORDER GRANTING IN PART DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 FOR AN ORDER AUTHORIZING DEBTORS TO (I) WIND DOWN OPERATIONS OF THE HEAT RECOVERY STEAM GENERATION BUSINESS SEGMENT OPERATED BY THE DELTAK DEBTORS, (II) REJECT CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (III) IMPLEMENT PROCEDURES FOR THE ORDERLY COMPLETION OF WORK IN PROGRESS

Upon the motion, dated September 29, 2006 (the "Motion"),[1] of Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), for entry of an order pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing the Debtors to (i) wind down the HRSG Business operations of the Deltak Debtors[2] and (ii) reject certain executory contracts and unexpired leases in connection therewith (as identified on Exhibit "A" hereto, collectively, the "HRSG Contracts"), and (iii) implement procedures for the orderly completion of work in progress, as more fully set out in the Motion; and upon consideration of the Affidavit of John M. Matheson in Support of First Day Motions and Applications sworn to on the 29th day of September, 2006; and a hearing on the Motion having been held on October 2, 2006 (the "October 2 Hearing"); and the Court having entered an order dated October 5, 2006 (the "Original Order"); and a further hearing on the Motion having been held on October 26, 2006 (the "October 26 Hearing" and collectively with the October 2

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2]    The Deltak Debtors consist of (i) Deltak, LLC and (ii) Deltak Construction Services, Inc.

Hearing, the "Hearings") and based upon the record of the Hearings; and the Court having been advised that the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Senior Lenders have agreed to entry of this Order on the terms set forth herein; and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion as set forth therein is sufficient under the circumstances, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted to the extent set forth herein; and it is further

ORDERED that pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, the Debtors are hereby authorized and empowered to wind down the HRSG Business operations and affairs; and it is further

ORDERED that the hearing on the Debtors' proposed rejection of the HRSG Contracts, and any objections thereto, shall be held on November 6, 2006 at 1:00 p.m. Prevailing Eastern Time, before the undersigned United States Bankruptcy Judge; and it is further

ORDERED that if the Debtors have deposited monies with any HRSG Counterparty as a security deposit or other arrangement, such counterparty shall not setoff or otherwise use such deposit without prior authority of this Court; and it is further

ORDERED that the Debtors are authorized, but not directed, to negotiate with customers to reach accommodations for the completion of certain HRSG Contracts (the "Accommodations") in exchange for such customer's agreement, at a minimum, to (i) fund all

actual costs of completion on time and materials terms, including, without limit, all outstanding costs owed to vendors and Contract Employees relating to the completion of such contracts, plus the customer's share of any excess costs that would be incurred in the ordinary course outside of the wind down plan, (ii) fund any contractor incentives offered to Contract Employees who are retained to perform on such customer's HRSG project, and (iii) waive all rejection damages claims to the extent the Deltak Debtors complete such customer's HRSG project; provided however, that the Debtors shall provide written notice to the Creditors' Committee and the Senior Lenders of any proposed Accommodations and, unless otherwise agreed to by the Creditors' Committee and the Senior Lenders, the Debtors shall not implement such proposed Accommodations until at least forty-eight (48) hours after delivery of such written notice to the Creditors' Committee and the Senior Lenders (the "48-Hour Period"), provided further however, that, in the event the Creditors' Committee or the Senior Lenders deliver to the Debtors a written objection to such proposed Accommodations within such 48-Hour Period, the Debtors shall obtain approval of such Accommodations from this Court prior to implementation thereof, and provided further, the Creditors' Committee and the Senior Lenders agree not to oppose a request by the Debtors for an expedited hearing to consider approval of such proposed Accommodations by the Court to the extent required herein.

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or in relation to the implementation of this Order.

Dated:    Wilmington, Delaware
          October 26 2006

 

UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT F

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____

|  |  |
|---|---|
| **In re:** | **Chapter 11**<br>**Case No. 06-11045**<br>**Jointly Administered** |
| **GLOBAL POWER EQUIPMENT**<br>**GROUP, INC., et al.,** |  |
| **Debtors.** | Hearing Date: To be determined<br>Obj. Deadline: To be determined |

_____

## MOTION BY CORMETECH, INC. TO SET A DATE
## FOR THE ASSUMPTION OR REJECTION OF CERTAIN
## EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365(d)(2)

Cormetech, Inc. ("Cormetech") hereby moves for the entry of an Order pursuant to 11

U.S.C. § 365(d)(2) establishing a date by which Deltak, L.L.C. and Deltak Construction

Services, Inc. (referred to collectively as "Deltak"), debtors and debtors-in-possession in the

above-captioned jointly administered cases, must assume or reject certain executory contracts

between Cormetech and Deltak.  In support of the relief requested herein, Cormetech states as

follows:

### BACKGROUND

1.      On September 28, 2006 (the "Petition Date"), Deltak L.L.C. filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code (Case No. 06-11050).  Upon information and

belief, Deltak L.L.C. continues to operate its business and manage its assets pursuant to 11 U.S.C.

§§ 1107(a) and 1108.

2.      On September 28, 2006, Deltak Construction Services, Inc. filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code (Case No. 06-11049).  Upon information and

- 2 -

belief, Deltak Construction Services, Inc. continues to operate its business and manage its assets pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.    Pursuant to an Order dated October 3, 2006, the Debtors[1] cases are being jointly administered under Case No. 06-11045 [Docket No. 70].

4.    Upon information and belief, no trustee or examiner has been appointed in any of the Debtors' cases.

5.    On October 10, 2006, the United States Trustee appointed an official committee of unsecured creditors for the jointly administered Debtors (the "Committee") [Docket No. 104].

6.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE DEBTORS' MOTION TO REJECT CERTAIN EXECUTORY CONTRACTS

7.    On September 29, 2006, the Debtors filed a Motion Pursuant To 11 U.S.C. §§ 105, 363, And 365 For An Order Authorizing Debtors To (I) Wind Down Operations Of The Heat Recovery Steam Generation Business Segment Operated By The Deltak Debtors, (II) Reject Certain Executory Contracts In Connection Therewith, And (III) Implement Procedures For The Orderly Completion Of Work In Progress [Docket No. 12] (the "Rejection Motion").

8.    In the Rejection Motion, the Debtors "seek authority to cease operations and reject all of their contracts for delivery of HRSG [heat recovery steam generator] units and related services." Rejection Motion, ¶ 4.

---

[1]    In addition to Deltak L.L.C. and Deltak Construction Services, Inc., the following entities are debtors and debtors-in-possession in the above-captioned jointly administered cases: Global Power Equipment Group, Inc., Global Power Professional Services, L.L.C., Braden Manufacturing, L.L.C., Braden Construction Services, Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, and WSServices, LP (referred to collectively as the "Debtors").

- 3 -

9.    A list of the contracts that the Debtors seek to reject (the "HRSG Contracts") is attached to the Rejection Motion as Exhibit A. The HRSG Contracts include:

- a contract between Deltak L.L.C. and Mitsubishi Power Systems, Inc. (Deltak Ref. No. G04006) related to the "MPS/PGE/Port Westward" project (the "Port Westward Project");

- a contract between Deltak L.L.C. and General Electric Company (Deltak Ref. No. G05002) and a contract between Deltak Construction Services, Inc. and General Electric Company (Deltak Ref. No. G05002) related to the "7H Launch-Inland Empire" project (the "Riverside Project");

- a contract between Deltak L.L.C. and TIC – International (TICI) (Deltak Ref. No. G05006) related to the "Hovensa GT-13" project (the "Hovensa Project");

- a contract between Deltak L.L.C. and Navasota Odessa Energy Partners LP (Deltak Ref. No. G06001) related to the "Wharton" project (the "Wharton Project"); and

- a contract between Deltak L.L.C. and Navasota Wharton Energy Partners LP (Deltak Ref. No. G06002) related to the "Odessa" projection (the "Odessa Project;" the Port Westward Project, the Riverside Project, the Hovensa Project, the Wharton Project, and the Odessa Project referred to collectively as the "HRSG/Catalyst Projects").

10.    The Debtors "estimate that they are not able to complete any of the HRSG Contracts in a cash flow neutral or positive manner." Rejection Motion, ¶ 34.

11.    As set forth in the Rejection Motion, on or about September 28, 2006, the Debtors "instructed approximately 100 employees who are dedicated to the HRSG Business [heat recovery

10172147 1

D126

- 4 -

steam generation business segment] not to return to work absent further notice." Rejection Motion, ¶ 40.

12.    While the Debtors seek to reject certain executory contracts with Deltak's customers, the Debtors have not requested authority to reject the outstanding supply contracts with Deltak's vendors given the possible implementation of the Debtors' proposed HRSG Completion Program (as defined in the Rejection Motion). Rejection Motion, ¶¶ 38-43.

13.    The Debtors indicate that "they will know whether the HRSG Completion Program can be successful in whole or in part" by October 28, 2006. Rejection Motion, ¶ 40.

14.    The Debtors further indicate that they "anticipate rejecting vendor contracts in the near term" if the HRSG Completion Program is not successful. Rejection Motion, ¶ 42.

15.    Pursuant to an Order dated October 5, 2006 [Docket No. 85], this Court granted the Rejection Motion, set a deadline for the filing of any objections to the Debtors' proposed rejection of the HRSG Contracts (October 23, 2006), and set a hearing date on the proposed rejection of the HRSG contracts (October 26, 2006).

16.    The following entities objected to the rejection of their contracts by asserting that such contracts were not executory: South Houston Green Power, L.P. [Docket No. 154] and Madison Gas and Electric Company [Docket No. 141].

17.    Mitsubishi Power Systems Americas, Inc. ("Mitsubishi") filed a limited opposition to the Rejection Motion [Docket No. 159]. Mitsubishi did not oppose the rejection of its contract with Deltak. Rather, Mitsubishi requested certain additional relief as a condition to the rejection of its contract with Deltak.

10172147 1

- 5 -

18.    Upon information and belief, the Debtors requested an adjournment of the October 26, 2006 hearing on the Rejection Motion. Mitsubishi opposed the adjournment of the hearing [Docket No. 181].

19.    On October 26, 2006, this Court entered an Amended Order adjourning the hearing on the Rejection Motion to November 6, 2006 [Docket No. 195].

20.    Upon information and belief, a hearing on Mitsubishi's objection to the Rejection Motion is returnable on November 1, 2006.

## CORMETECH'S EXECUTORY CONTRACTS WITH DELTAK

21.    Cormetech supplies Deltak with catalysts used by Deltak in the HRSG Business. The catalysts manufactured by Cormetech for sale to Deltak are custom designed for specific Deltak projects. At the time Deltak filed bankruptcy, Cormetech and Deltak were parties to the following executory contracts:

- a contract (Deltak P.O. No.6-D6754) for the manufacture and sale of a custom designed catalyst to be used in the Port Westward Project (the "Port Westward Contract");

- a contract (Deltak P.O. No. 6-D8818) for the manufacture and sale of a custom designed catalyst to be used in the Riverside Project (the "Riverside Contract");

- a contract (Deltak P.O. No. 6-E0388) for the manufacture and sale of a custom designed catalyst to be used in the Hovensa Project (the "Hovensa Contract");

- a contract (Deltak P.O. No. 6-E2084) for the manufacture and sale of a custom designed catalyst to be used in the Wharton Project (the "Wharton Contract"); and

101172147 1

- 6 -

- a contract (Deltak P.O. No. 6-E2083) for the manufacture and sale of a custom designed catalyst to be used in the Odessa Project (the "Odessa Contract;" the Port Westward Contract, the Riverside Contract, the Hovensa Contract, the Wharton Contract , and the Odessa Contract referred to collectively as the "Cormetech Supply Contracts").

22.    The Cormetech Supply Contracts have not been fully performed by either Cormetech or Deltak; both Cormetech and Deltak have material obligations remaining under the Cormetech Supply Contracts.

23.    Upon information and belief, the catalysts to be supplied to Deltak by Cormetech under the Cormetech Supply Contracts may only be used in connection with the specific projects for which they have been designed and manufactured.  The catalysts are not "off the shelf" items. Upon information and belief, Deltak does not have any customers that could use the catalysts other than in connection with the HRSG/Catalyst Projects.  Similarly, since the catalysts are separately designed and manufactured for each HRSG/Catalyst Project, Cormetech cannot sell such catalysts in connection with any other projects.

## RELIEF REQUESTED

24.    Pursuant to this Motion, Cormetech seeks entry of an Order pursuant to 11 U.S.C. § 365(d)(2) establishing a date by which the Debtors must assume or reject the Cormetech Supply Contracts.  Cormetech respectfully requests that the Debtors be required to assume or reject the Cormetech Supply Contracts at the same time the Debtors decide to either complete the HRSG/Catalyst Projects pursuant to the HRSG Completion Program or decide to reject the contracts with Deltak's customers for the HRSG/Catalyst Projects.

10172147.1

- 7 -

## BASIS FOR RELIEF REQUESTED

25.    Section 365(d)(2) of the Bankruptcy Code provides that a chapter 11 debtor-in-possession may assume or reject an executory contract at any time prior to confirmation.  Section 365(d) allows a debtor-in-possession a reasonable time, measured by the facts of each case, within which to determine whether the assumption or rejection of the executory contract would be beneficial to an effective reorganization.  Matter of Whitcomb & Keller Mortgage Co., Inc., 715 F.2d 375, 379 (7th Cir, 1983); *accord* Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.), 681 F.2d 102, 106 (2d Cir. 1982).  Section 365(d)(2) further provides that the Court may, on request of a party in interest, order a debtor-in-possession to assume or reject an executory contract within a specified period of time:

> In a case under chapter 9, 10, 11, or 13 of this title, the trustee may assume or reject an executory contract… at any time before the confirmation of a plan but the court, on the request of any party to such contract…may order the trustee to determine within a specified period of time whether to assume or reject such contract…. 11 U.S.C. § 365(d)(2)

Section 365(d)(2) does not identify the standards by which the determination to compel assumption or rejection is to be made.  In exercising its discretion, a bankruptcy court must take into account the interest of the non-debtor party and consider the nature of each side's respective interests, the balance of harm to the parties, the good to be achieved, the safeguards afforded the litigants, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary.  In re Beker Industries Corp., 64 B.R. 890 (Bank, S.D.N.Y. 1986) *citing* Matter of Midtown Skating Corp., 3 B.R. 194, 198 (Bankr. S.D.N.Y. 1980); In re Adelphia Communications Corp., 291 B.R. 283, 296-300 (Bankr. S.D.N.Y. 2003) (considering similar factors).  A court must protect the interests of the non-debtor party pending the debtor's

- 8 -

decision to assume or reject. <u>In Re Continental Energy Associates Ltd. Partnership</u>, 178 B.R.

405 (Bankr. M.D. Pa. 1995); <u>In Re Whitcomb</u>, <u>supra</u>.

26.    Deltak's decision with respect to the HRSG/Catalyst Projects goes hand in hand with

Deltak's decision to assume or reject the Cormetech Supply Contracts. If Deltak and a customer

agree that a HRSG/Catalyst Project will be completed by Deltak under the HRSG Completion

Program, the "Deltak will need the catalyst being manufactured by Cormetech and should assume

the related Cormetech Supply Contract. Presumably, the cure of any prepetition or postpetition

default will be covered by the customer under the HRSG Completion Program. If Deltak rejects a

contract with a customer for an HRSG/Catalyst Project, then Deltak will have no need for the

catalyst being manufactured by Cormetech and should reject the related Cormetech Supply

Contract.

27.    The Debtors have created a worst case scenario for Deltak's customers and

Cormetech. Although the Debtors seek to reject Deltak's contracts with customers for the

HRSG/Catalyst Projects, the Debtors have not sought to reject the Cormetech Supply Contracts.

As a result, the Debtors have created a situation where the customers' contracts for the

HRSG/Catalyst Projects may be rejected, yet the Cormetech Supply Contracts have not been

rejected. As a result, Cormetech will not be able to enter into new agreements to supply the

catalysts to Deltak's customers. As long as the possibility exists that the Debtors could seek to

assume the Cormetech Supply Contracts, Cormetech's hands are tied. If Deltak rejects the

Cormetech Supply Contracts, then Deltak's customers and Cormetech will be free to enter into

new agreements and may be able to mitigate the damages arising from Deltak's decision to cease

the HRSG Business.

101721471

D131

- 9 -

28.    The Debtors will have sufficient time to determine whether to assume or reject the Cormetech Supply Contracts given the relationship between the Cormetech Supply Contracts and the HRSG/Catalyst Projects.  Cormetech simply seeks to have the Debtors' decision to assume or reject the Cormetech Supply Contracts made at the same time the Debtors decide to either complete the HRSG/Catalyst Projects or to reject the related contracts with Deltak's customers. The Debtors' decision making process should be straightforward: if the HRSG/Catalyst Projects are going to be completed by Deltak, then the Cormetech Supply Contracts should be assumed; if Deltak is not going to complete the HRSG/Catalyst Projects, then the Cormetech Supply Contracts should be rejected.  If the Debtors do not decide to assume or reject the Cormetech Supply Contracts at the same time as their decision to complete the HRSG/Catalyst Projects, then Deltak's customers may be forced to find another supplier in order to meet construction schedules and Cormetech could be left with a useless catalyst.

29.    No prior application for the relief sought herein has been made to this or any other Court.

- 10 -

WHEREFORE, Cormetech respectfully requests the entry of an Order pursuant to 11

U.S.C. § 365(d)(2) requiring the Debtors to decide whether to assume or reject the Cormetech

Supply Contracts at the same time the Debtors decide whether to complete the HRSG/Catalyst

Projects under the HRSG Completion Program or to reject the contracts with Deltak's customers

related to the HRSG/Catalyst Projects, together with such other an further relief as this Court

deems just and proper.

Counsel for Cormetech, Inc.

By _____

Ian Connor Bifferato (#3273)
Chad J. Toms (#4155)
1308 Delaware Avenue
Wilmington, DE 19899-2165
(302) 429-1900
(302) 429-8600 fax

and

Gregory J. Mascitti
Nixon Peabody LLP
1300 Clinton Square
Rochester, NY 14604
Tel: (585) 263-1123
Fax: (585) 263-1600

Dated: October 27, 2006
    Wilmington, DE

10172147.1

D133

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:                  ) | |
|                      ) | **Chapter 11** |
| **GLOBAL POWER EQUIPMENT GROUP**   ) | **Case No. 06-11045** |
| **INC., et al.,**              ) | **Jointly Administered** |
|                      ) | |
|        **Debtors.**          ) | |

## ORDER

UPON the foregoing Motion By Cormetech, Inc. To Set A Date For The Assumption Or Rejection Of Certain Executory Contracts Pursuant To 11 U.S.C. § 365(d)(2) (the "Motion") dated October 27, 2006; and a hearing having been held on the Motion; and the Court having considered matter; it is

**ORDERED,** that the Motion is granted; and it is further

**ORDERED,** that the Debtors shall file a motion to assume or reject the Cormetech Supply Contracts (as defined in the Motion) so as to cause the assumption or rejection of Cormetech Supply Conracts to occur at the same time as the Debtors' assumption, rejection, or agreement to complete the contracts listed on Exhibit A of the Debtor's Motion Pursuant To 11 U.SC. §§ 105, 363, And 365 For An Order Authorizing Debtors To (I) Wind Down Operations Of The Heat Recovery Steam Generation Business Segment Operated By The Deltak Debtors, (II) Reject Certain Executory Contracts In Connection Therewith, And (III) Implement Procedures For The Orderly Completion Of Work In Progress dated September 29, 2006 related to the HRSG/Catalyst Projects.

 

_____
United States Bankruptcy Judge

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )  Case No. 06-11045(BLS)
                                )  Chapter 11
GLOBAL POWER EQUIPMENT          )
GROUP, INC., et al.,            )  Courtroom No. 1
                                )  824 Market Street
                   Debtors.     )  Wilmington, Delaware 19801
                                )
                                )
                                )  November 1, 2006
                                )  2:04 P.M.

TRANSCRIPT OF DEBTORS' MOTION FOR AUTHORIZATION FOR WIND DOWN
      PROCEDURES, CONTINUED FROM OCTOBER 26, 2006
            JUDGE BRENDAN L. SHANNON
         UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:              The Bayard Firm
                          By:  ERIC SUTTY, ESQ.
                          222 Delaware Avenue, Suite 900
                          P.O. Box 25130
                          Wilmington, Delaware 19899-5130

                          White & Case
                          By:  JOHN K. CUNNINGHAM, ESQ.
                               DOUG SWALINA, ESQ.
                          Wachovia Financial Center
                          Suite 4900
                          200 South Biscayne Boulevard
                          Miami, Florida 33131-2352

Audio Operator:           Brandon McCarthy

        Proceedings recorded by electronic sound recording,
           transcript produced by transcription service.

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

215-862-1115    (FAX) 215-862-6639

2

APPEARANCES:
(Continued)

For Mitsubishi Power          Connolly Bove Lodge & Hutz, LLP
Systems:                      By:  MARC PHILLIPS, ESQ.
                              The Nemours Building
                              1007 North Orange Street
                              P.O. Box 2207
                              Wilmington, Delaware 19899

                              Steptoe & Johnson LLP
                              By:  FILIBERTO AGUSTI, ESQ.
                                   GREG MASCITTI, ESQ.
                              1330 Connecticut Avenue, NW
                              Washington D.C. 20036

                              Steptoe & Johnson LLP
                              By:  GREG R. YATES, ESQ.
                              750 Seventh Avenue, Suite 1900
                              New York New York  10019

For Cormetech, Inc.:          Bifferato, Gentilotti,
                              Biden and Balick
                              By:  CHAT TOMS, ESQ.
                              1308 Delaware Avenue
                              Post Office Box 2165
                              Wilmington, Delaware 19899-2165

                              Nixon Peabody LLP
                              By: GREG MASCITTI, ESQ.
                              1100 Clinton Square
                              Rochester, New York 14604

For Creditors'                Landis Rath & Cobb
Committee:                    By:  KERRI MUMFORD, ESQ.
                              The Brandywine Building
                              1000 West Street, Suite 1410
                              Wilmington, Delaware 19801

                              Schulte Roth & Zabel LLP
                              By:  JEFF S. SABIN, ESQ.
                              919 Third Avenue
                              New York, New York 10022

For Bank of America:          Edwards Angell Palmer & Dodge LLP
                              By:  WILLIAM CHIPMAN, ESQ.
                              919 North Market Street, 15th Floor
                              Wilmington, Delaware 19801,

3

Appearances:
(Continued)

For SNC-Lavalin Power          William D. Sullivan, LLC
Ontario, Inc.:                 By:  ELIHU E. ALLINSON, III, ESQ.

                               Sullivan & Worcester
                               By:  PAMELA HOLLERMAN, ESQ.
                               One Post Office Square
                               Boston, Massachusetts 02109

For Ad Hoc Committee           Brown Rudnick Berlac k& Israels
of Equity Holders:             By:   STEVEN POHL, ESQ.
                                     HOWARD SIEGEL, ESQ.
                               One Financial Center
                               Boston, Massachusetts 02111

4

## INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY EHM | | | | |
| By Mr. Swalina | 22 | | 62 | |
| By Mr. Agusti | | 42 | | 67 |
| By Mr. Sabin | | 53 | | |
| By Mr. Cunningham | | 62 | | |
| | | | | |
| ROBERT CARUSO | | | | |
| By Mr. Cunningham | 68 | | | |
| By Mr. Agusti | | 74 | | 76 |
| By Mr. Sabin | | 74 | | |
| | | | | |
| SCHARTZ THANGIAH | | | | |
| By Mr. Yates | 80 | | | |
| By Mr. Sabin | | 105 | | |
| | | | | |
| RICHARD BOUKAL | | | | |
| By Mr. Yates | 112 | | | |
| By Mr. Cunningham | | 127 | | |
| By Mr. Sabin | | 133 | | |

## EXHIBITS

| DESCRIPTION | | ID. | EVID. |
|---|---|---|---|
| D-1 | Depiction of the HRSG | 18 | 77 |
| D-2 | Purchase Agreement | 19 | 77 |
| D-3 | Printout from Mitsubishi web site | 19 | 77 |
| M-1 | E-mail | 51 | 79 |
| M-2 | Completion agreement | 52 | 79 |
| C-1 | Purchase order | 57* | |
| C-2 | Purchase order | 60* | |
| C-3 | Diagram of the Port Westward plant | 84 | |
| C-4 | Diagram | 88 | |
| C-5 | Contract agreement with PGE | 102 | |
| C-6 | Calculation | 103 | |
| C-7 | Contract | 116 | |
| C-8 | Payment schedule | 116 | |

*Previously admitted

1           THE COURT:  Please be seated.  Mr. Sutty?

2           MR. SUTTY:  Good afternoon, Your Honor.  Eric Sutty

3  from The Bayard Firm on behalf of Global Power Equipment Group,

4  Inc., and its affiliated debtors.

5           We submitted an amended agenda earlier this morning,

6  hopefully you've got a copy.

7           THE COURT:  I received it.  Thank you.

8           MR. SUTTY:  One other housekeeping matter before we

9  get started.  We also filed a motion for the pro hac admission

10  of Douglas Swalina.  He is here today and will be presenting

11  some items.

12           THE COURT:  Very well.  I'll grant it when I see it.

13           MR. SUTTY:  I'm going to turn the podium over to Mr.

14  Cunningham.

15           THE COURT:  Okay.

16           MR. CUNNINGHAM:  Good afternoon, Your Honor.

17           THE COURT:  Good afternoon, Mr. Cunningham.

18           MR. CUNNINGHAM:  Your Honor, we have two items that

19  are up for hearing, or I should say three because we have the

20  debtors' motion with respect to rejection of the Mitsubishi

21  HRSG contract.  Solely that is the relief we're seeking under

22  our original HRSG motion that we filed at the beginning of the

23  case.

24           And then there is the corrected limited opposition by

25  Mitsubishi Power Systems of which they filed, as Your Honor

6

1  recalls, last week.  And Your Honor indicated you would

2  construe that as a motion to compel us to assume or reject.

3          THE COURT:  Sure.

4          MR. CUNNINGHAM:  So, those two items kind of go hand-

5  in-hand.

6          And then the second motion that is up for later, but

7  I think it's secondary because the threshold is the Mitsubishi

8  contract, is the motion by Cormetech, which they filed earlier,

9  I believe, on Friday.  And Your Honor has set that for a

10 hearing today.  And that's with respect to a subcontract that

11 we have.

12         But that's their motion and -- so, I would suggest,

13 Your Honor, for purposes of proceeding today, we do have

14 evidence and testimony to present in connection with our motion

15 to reject the Mitsubishi contract.

16         I would also note, as Your Honor may have seen, that

17 the Committee did file a response yesterday.  And I think --

18         THE COURT:  I saw the Committee's response.

19         MR. CUNNINGHAM:  I think Mr. Sabin just wanted to

20 just quickly update the Court where we are on that.

21         THE COURT:  Very well.

22         MR. CUNNINGHAM:  Thank you.

23         MR. SABIN:  Good afternoon, Your Honor.

24         THE COURT:  Good afternoon.

25         MR. SABIN:  Jeffrey Sabin of Schulte Roth and Zabel,

7

1  still proposed counsel for the Creditors' Committee in this
2  case.

3          I am happy to report that subsequent to the filing
4  just before 4 P.M. yesterday of our objection to the debtors'
5  proposed rejection to the Mitsubishi contract, we at least have
6  received most of the information that we have required to try
7  to understand the business judgment that has led the debtors
8  today to seek this Court's approval for the rejection of the
9  Mitsubishi customer contract.

10          Based on the information we have received, although
11  we certainly reserve our rights to challenge any rejection
12  claim that may be filed, and we certainly reserve our rights
13  given some reason to believe that there may have been some
14  improprieties that could lead to tortious interference claims,
15  we'll reserve all of those claims and all of those rights. But
16  we, otherwise, support the relief.

17          In addition, Your Honor, you may recall that you
18  signed an order sealing some of the relevant documents in this
19  case.  We have now received directly from the debtor the
20  Cormetech documents that allegedly constitute the Cormetech
21  vendor agreements, and we have received the documents that
22  allegedly represent the customer agreement.

23          We have also, pursuant to the confidentiality
24  agreement, gotten the consent of the debtors to make those
25  documents public and to use them in connection with today's

8

1 hearing.

2        And, therefore, would ask that at least those
3 documents, anything to do with the Cormetech vendor agreement,
4 which is for the catalyst -- one catalyst, and anything to do
5 with the actual customer agreement that the debtor seeks
6 rejection of would be in open court.  That the questions that
7 were asked, that the arguments that would be made would all be
8 in open court and would not be subject to sealing.

9        THE COURT:  Does Cormetech have a position as to the
10 admission of its documents into evidence?

11        MR. TOMS:  Good afternoon, Your Honor.  Chad Toms
12 from Bifferato, Gentilotti, Biden and Balick.

13        And, Your Honor, I rise this morning to introduce my
14 co-counsel, Mr. Gregory Mascitti.  We've moved for his
15 admission pro hac, and that was filed yesterday.

16        THE COURT:  Very well.

17        MR. MASCITTI:  Good afternoon, Your Honor.

18        THE COURT:  Can you come to the microphone, please?
19 Otherwise he can't pick you up.

20        MR. MASCITTI:  Good afternoon, Your Honor.  My
21 understanding is that these vendor agreements are subject to a
22 confidentiality agreement between Cormetech and the debtor.  I
23 don't have any objection to their use at the hearing today,
24 provided that the debtor has agreed that we won't be violating
25 the confidentiality agreement.

9

1      THE COURT:  Well, I'm not sure that that answers the
2  question.  Again, we're talking about this very hypothetically.
3      I'm happy to allow the parties to admit and produce
4  any documents that they wish to do so.  But if there are
5  parties that would seek to enforce confidentiality provisions
6  as to agreements, I think that they should speak now or the
7  documents will be admitted and part of the public record.
8      MR. MASCITTI:  And until I -- until, Your Honor, I
9  can consult with my client, this is the first news that I've
10 heard that they've proposed to introduce these Cormetech vendor
11 agreements.
12     THE COURT:  All right.  Well, we'll -- I think our
13 best bet would be that we'll cross that bridge when we come to
14 it.  But I think we'll come to it fairly soon.
15     Mr. Phillips?
16     MR. PHILLIPS:  Good afternoon, Your Honor.  Marc
17 Phillips, Connolly Bove Lodge and Hutz, for Mitsubishi Power
18 System.
19     With me today is Fil Agusti.  He's been admitted pro
20 hac vice.  And also with me from Steptoe and Johnson is Mr.
21 Greg Yates.  He has not been admitted yet, we will be filing
22 his papers this week.  I move for his admission to be able to
23 speak to present evidence.
24     THE COURT:  Very well.  I'll hear him.
25     MR. PHILLIPS:  Thank you.

1          MR. AGUSTI:  Your Honor, may it please the Court.
2   Mitsubishi has no problem with the unsealing of its contract,
3   so long as Deltak has consented to the unsealing of that
4   contract between Deltak and Mitsubishi.  We have no problem
5   with having it unsealed.

6          I might note that we don't have a copy of the
7   Cormetech agreement, so we're really -- don't -- not in the
8   position to comment about that.

9          One procedural matter that I wanted to raise, Your
10  Honor, we will be presenting evidence today, Mitsubishi will.
11  The issues -- the testimony to be given overlaps -- I suppose
12  we have -- we agree, I might add, with the debtors' request to
13  reject the contract with Mitsubishi and do not object to it.
14  So, I should think that that would be resolved relatively
15  quickly.

16         But the evidence that we're about to present has
17  relevance -- would have had relevance to that motion, has
18  relevance to our motion to basically condition rejection on
19  assignment, and has relevance to Cormetech's motion, as well.

20         Rather than to have the witnesses appear three times,
21  I would propose that we simply consolidate it and that their
22  evidence be received with respect to all matters before the
23  Court today, if that's acceptable to Your Honor.

24         MR. SABIN:  Jeff Sabin again.  I don't understand the
25  possibility, Your Honor, that Mitsubishi, who is not a moving

11

 1  party with respect to Cormetech's motion, is going to be
 2  submitting evidence somehow to meet Cormetech's burden.  It was
 3  not contemplated in their papers, and it would be a surprise to
 4  this Committee.  And I otherwise would suggest that the
 5  Cormetech motion be done separately, Your Honor, even if it's
 6  possible at this late date with no notice that Cormetech
 7  somehow wants to have a Mitsubishi representative meet its
 8  burden on its motion.

 9          THE COURT:  Mr. Cunningham?

10          MR. CUNNINGHAM:  The debtors agree, Your Honor, with
11  the Committee's position.

12          We have the burden on our motion.  So, we'll produce
13  our evidence and case in chief, and they can put on their
14  defense or rebuttal.  But we'd like to maintain the order of
15  whose burden is it on the Cormetech motion.  It's their burden
16  to put on evidence.  They did not have any evidence attached to
17  the motion.  There was no affidavit, documents, whatsoever.
18  So, I think we would like to be able to see what evidence they
19  are going to produce today and be able to reserve our rights to
20  response to it.

21          THE COURT:  Mr. Agusti?

22          MR. AGUSTI:  Yes, Your Honor.  I mean I suppose that
23  what -- what counsel, I think, is contemplating is that we put
24  on the Mitsubishi witnesses during our case and question them
25  as our witnesses, and then I suppose that later on, Cormetech

12

1   would put them on as their witnesses to establish their case.

2         Your Honor, the evidence would be very redundant and

3   quite repetitive.  And I would propose that we avoid that and

4   simply have the evidence heard at one time, all counsel having

5   an opportunity to question and cross examine, as the case might

6   be.

7         THE COURT:  All right.  We're going to deal with one

8   motion at a time.  And I think it's appropriate because I think

9   with the -- we're in sort of a procedural morass here, and part

10  of it is my fault by directing that your objection be

11  considered as a motion to compel assumption or rejection.  But

12  I think that was the practical approach.

13        But I don't want to further muddy the record by

14  essentially developing one full set of evidence that may relate

15  to one motion or another.  If we have to deal with repetitive

16  testimony, it will not be the first time.

17        So, we'll proceed with -- first with -- I view this

18  actually as really -- as really two items.  There's the

19  Cormetech motion, which we'll deal with subsequently.  But I

20  see this as the debtors' motion to reject.  If I'm -- they have

21  a motion to reject.  You're compelling them to assume or

22  rejection.  And so I don't really see that as two separate

23  motions.

24        MR. MASCITTI:  Your Honor, with respect to

25  Cormetech's motion, does that mean that I will not have the

13

1  ability then to ask cross examination questions of the

2  witnesses or I'll have to recall them for direct examination

3  when our motion is --

4          THE COURT:  You would have to recall them for direct

5  examination.  You're not a party and you don't have pleadings

6  filed in the context of this contested matter.

7          MR. MASCITTI:  Thank you, Your Honor.

8          THE COURT:  Very well.

9          MR. SABIN:  Thank you, Your Honor.

10         THE COURT:  But that raises a question, and I would

11 pose it to Mr. Cunningham and to Mr. Agusti.  I want to

12 understand exactly what we're fighting over here.  And I think

13 as a business matter, I understand what the -- what it is that

14 we're fighting over.

15         But as a legal matter, is it correct that both

16 parties agree that rejection today is appropriate?

17         MR. CUNNINGHAM:  I believe that is the case,

18 including now that the Committee has now signed on and agreed

19 to it.  Again, we are seeking nunc pro tunc relief.  But

20 otherwise --

21         THE COURT:  But that's -- but -- but -- you agree

22 that rejection is appropriate.

23         MR. CUNNINGHAM:  Yes.

24         THE COURT:  We can talk about nunc pro tunc.  Mr.

25 Agusti?

1          MR. AGUSTI:  Your Honor, we agree and would like to
2  see the contract rejected today.

3          THE COURT:  Okay.

4          MR. AGUSTI:  So, there's no dispute there.

5          THE COURT:  Mr. Sabin?

6          MR. SABIN:  Thank you, Your Honor.  We do agree.  But
7  the new evidence or new submissions that we got subsequent to
8  the filing of the Committee's papers raises, I think, an
9  additional issue for the Court to consider in that context.
10 And that is if we had time, we would otherwise argue, and we
11 will be arguing as part of the record today, that what
12 otherwise was handed to us as a writing, that it indicates on
13 its face it's a purchase order.  And which I assume in the
14 papers is otherwise going to be argued to you is the executory
15 contract for the catalyst.  In our view, as a matter of law,
16 if, indeed, this is a contract, it is a contract for a
17 financial accommodation.  And it has the financial
18 accommodation provisions, as I will argue to you, and otherwise
19 as I will adduce the record, in two component parts.  If I read
20 it right, there was already supposed to be delivery by
21 Cormetech as of November 1st of its catalysts, which, as I
22 understand it, has not been done.

23          Number two, the contract was net 30.  Which means
24 that Cormetech gave trade credit under this arrangement.

25          And, number three, the contract also calls for a

15

1  letter of credit to be issued by Cormetech in favor of these

2  debtors.

3        So, when we really cut through it, and we get to the

4  nub of the business issue and/or understanding, what is not

5  clear to the Committee, at least, when it reads this is whether

6  we're dealing with the debtors' property.  It's not clear as I

7  read the purchase order, by way of example, if, indeed, this

8  catalyst is substantially built or completed, whether the

9  debtor has title to it or whether Cormetech does.

10        If the debtor has title to it, whether the senior

11  lenders' liens attach to it.

12        And even if the debtor doesn't have title, and title

13  would pass when delivery's supposed to have been made, then if

14  I read it right, this debtor could go to its lenders, under the

15  cash collateral order, it could ask for the roughly $507,000

16  that it would owe 30 days later, and it could have title and

17  keep it and still reject the contract.  And if, indeed, the

18  debtor decided that someone else wants to come along and pay

19  more for it than what otherwise is the offer in the

20  negotiations, that's the nub of the issue here.

21        And so from our perspective --

22        THE COURT:  Well, that's the nub of the Cormetech

23  issue.

24        MR. SABIN:  It's also the --

25        THE COURT:  That's not really the nub of this issue,

16

1 is it?

2       MR. SABIN:  It is.  It is, Your Honor.  Because if I
3 read the cases and the argument both made by Mitsubishi and
4 responsively which we have joined in by the debtor, and if the
5 Committee is right, if I am right in my legal analysis, even if
6 Mitsubishi is right, that they somehow can force specific
7 performance, I don't believe that's going to override your
8 ability and the Bankruptcy Code to say no, you can't.
9 365(c)(2) categorically says if you determine that this is a
10 contract and if you determine it's a contract for a financial
11 accommodation, then even if you were to determine that specific
12 performance is okay under the case law, which the Committee
13 does not believe is the case, but even if you were to do so, I
14 don't think you have the power to override 365(c)(2).  So, I
15 just want to bring that issue to the Court's attention.

16       MR. AGUSTI:  Your Honor, are we going to begin
17 subsequent argument now on the legal issue?

18       THE COURT:  We seem to be headed down that path, but
19 I --

20       MR. AGUSTI:  I'm happy to join the --

21       THE COURT:  -- don't think that that's the best
22 approach.

23       MR. AGUSTI:  I'm happy to join the argument, if
24 that's the --

25       THE COURT:  The purpose -- the purpose for my

1  question was really to make sure that the presentations by the
2  parties aren't really effectively two ships passing in the
3  night.  And what I have before me regarding Agenda Item Number
4  1 is an agreed rejection and a dispute about the conditions, if
5  any, to that rejection.  That's what we have.

6        MR. CUNNINGHAM:  I think that's exactly right, Your
7  Honor.

8        MR. AGUSTI:  That's the dispute between us and the
9  debtor, Your Honor.

10        THE COURT:  Okay.  And treating it as the debtors'
11  motion to reject, which I think is probably procedurally the
12  easiest way to do it, that's how I'll ask the parties to
13  proceed as they deal with their evidence and -- so, I think
14  it's appropriate that the debtor go first and put on its
15  evidence.

16        The question I'm -- what I'd like, without asking for
17  an offer of proof, what is the evidence?  What type of evidence
18  are you and the debtor going to be presenting?

19        MR. CUNNINGHAM:  The evidence we were going to
20  present, quite simply, Your Honor, is simply a background on
21  our decision to reject the HRSG contracts, the description of
22  HRSG and specifically as it relates to this contract, the
23  economic decision that went into the debtors' decision to
24  reject.  And then to describe, which I think is the heart of
25  what the parties are going to be arguing, probably closing

18

1   argument, is what is the nature of these subcontracts.  And is
2   there -- are they custom made, are they only applicable to this
3   Mitsubishi project, can the debtors have other customers they
4   may maximize value with respect to.

5          I think you're going to hear testimony that's going
6   to relate to that issue which will go to their issue of the
7   ability to enforce specific performance notwithstanding
8   rejection and I think that's kind of the issues.  I know we'll
9   overlap some of what Cormetech will argue in the second motion,
10  but the heart here is they are asking for the specific
11  performance.  And as I read their papers, they're saying this
12  is unique and that they need the catalyst to be assigned to
13  them, not withstanding rejection.

14          THE COURT:  Mr. Agusti?

15          MR. AGUSTI:  Your Honor, our evidence will also go to
16  the issue of the technical uniqueness of this product.  Our
17  evidence will address the value of this product to other
18  parties, in general terms.  And we will, in that process, hope
19  to give evidence to the Court as to the technical background
20  surrounding this equipment.

21          THE COURT:  Okay.

22          MR. CUNNINGHAM:  I think ultimately the decision on
23  specific performance and the conditions, as Your Honor called,
24  is ultimately a legal determination by you that we can address
25  in closing argument.  But we'll be referring back to the

19

1    testimony that has been elicited both by us and by Mitsubishi.

2        THE COURT:  Okay.  That's helpful.  I appreciate it

3    and I hope that you understand the difficulty that I had just

4    trying to understand exactly what the parties did and did not

5    agree on.

6        The fact is that I saw that we had a motion to

7    reject.  That as far as I could tell, everyone seemed to be on

8    board with.  And it does boil down to the issues that you've

9    just described about the conditions under which the rejection

10   will occur and what the consequences of that rejection are.

11       So, with that, you can proceed.  I don't believe that

12   we need opening argument.

13       MR. CUNNINGHAM:  Thank you, Your Honor.  Your Honor,

14   we do have three documents that we were going to introduce into

15   evidence.  We've given them to Mitsubishi.  And I'd like to

16   just go through them easily.  I don't think there will be a

17   dispute on their admission, but if I can approach?

18       THE COURT:  Very well.

19       MR. CUNNINGHAM:  Your Honor, Debtors' Exhibit 1 is

20   simply a demonstrative exhibit.  This is not being offered by

21   the debtors into evidence, and it will be addressed in the

22   testimony.  But simply it is a depiction of the HRSG.

23       THE COURT:  I assume that this is responsive to my

24   observation that last week that I thought that it was probably

25   bigger than a breadbox?

20

1        MR. CUNNINGHAM:  That's exactly right, Your Honor.
2   And I think this picture safely assumes that.

3        Exhibit 2, Your Honor, is a copy of the Mitsubishi
4   Power Systems agreement at the Port Westward Generating
5   Facility with Deltak.  So, this is the agreement that we are
6   seeking to reject, and the underlying exhibits thereto.  And
7   that constitutes Debtors' Exhibit 2.

8        And then lastly, Your Honor, Debtors' Exhibit 3 is a
9   printout from a web site at Mitsubishi listing affiliate
10  organizations.  We can address that in testimony.  The purpose
11  of it is to show the -- that Mitsubishi Power Systems and
12  Cormetech are affiliates.  They're all affiliates of the
13  ultimate parent, Mitsubishi Heavy Industries America, Inc.  And
14  those are the three exhibits that we will be working with in
15  our testimony today, Your Honor.

16        THE COURT:  Mr. Agusti, is there any -- any objection
17  to these documents?

18        MR. AGUSTI:  Your Honor, we don't plan to object to
19  any of those documents.

20        THE COURT:  Very good.

21        MR. CUNNINGHAM:  Your Honor, with that we can now
22  turn to the testimony.  We have two witnesses in support of our
23  motion today.  Mr. Ehm, and his testimony will be taken by my
24  colleague, Mr. Swalina.  And then I have Mr. Caruso of Alvarez
25  and Marsal, and I will be taking his testimony.  And I will

21

1  also be doing the closing argument.

2        THE COURT:  Okay.  One last point of clarification

3  before we turn.  At our last hearing, I recall that there was

4  general uncertainty about how long it would take to deliver the

5  catalysts in compliance with Mitsubishi's needs.  Mr. Agusti, I

6  think -- no one was certain, everyone assumed that it would

7  take a while to get done.  But obviously the one day everybody

8  was certain on was December 15th.  Have we clarified that

9  issue?  Or will that be the subject of further evidence and

10 testimony?

11       MR. AGUSTI:  Your Honor, we plan to submit evidence

12 on that.

13       THE COURT:  Okay.  Okay.  Mr. Sabin?

14       MR. SABIN:  Your Honor, as we deal with evidence, and

15 I don't know if now is the right time, unfortunately since I

16 got this literally about an hour and a half before the hearing,

17 so I have not had a chance to make copies, it would be the two

18 other relevant documents, including one that I think answers

19 the question that you just asked about whether December 15th is

20 relevant or not.

21       One is the purchase order for one of the catalysts

22 with Cormetech, and the other is the purchase order with

23 Engelhard Corp., which I understand has been assigned to BASF,

24 so that the record is clear.

25       THE COURT:  Okay.

22

1    MR. AGUSTI:  Your Honor, may we have a copy of those

2  exhibits?

3    THE COURT:  My guess would be that as we go through

4  the direct testimony, Mr. Sabin, you'll probably have a fair

5  amount of time.  So, if there's any way to arrange to have

6  somebody make copies, I think you'll have an opportunity to do

7  that.

8    MR. SABIN:  I hope so, and we will, Your Honor.

9    THE COURT:  Very well.

10    MR. SABIN:  Thank you.

11    THE COURT:  Mr. Cunningham, you may proceed.

12    MR. CUNNINGHAM:  Thank you, Your Honor.  I'd like to

13  turn over the podium to my colleague, Mr. Swalina.

14    MR. SWALINA:  Good afternoon, Your Honor.

15    THE COURT:  Good afternoon.

16    MR. SWALINA:  Our first witness is going to be Jeff

17  Ehm.

18    CLERK:  Sir, please remain standing.  Please raise

19  your right hand, state your full name, spelling your last for

20  the Court.

21    MR. EHM:  Jeff Douglas Ehm, last name, E-H-M.

22    JEFFREY EHM, DEBTORS' WITNESS, SWORN

23    CLERK:  You may be seated.

24    DIRECT EXAMINATION

25  BY MR. SWALINA:

1  Q    Good afternoon, Mr. Ehm.  If we could start out, would you

2  just tell us where you reside presently?

3  A    Plymouth, Minnesota.

4  Q    And where are you presently employed?

5  A    At Deltak.

6  Q    Okay.  Now, what is your position in at Deltak?

7  A    Currently I'm Manager of Project Operations.

8  Q    And about how long have you been in your current position?

9  A    In that position, since roughly September of 2005.  And

10 prior to that, from early 2003, I was Manager of the Gas

11 Turbine HRSG project managers.

12 Q    Okay.  And before that, what positions did you hold at

13 Deltak?

14 A    I held various positions as account manager, development

15 manager, engineering manager and project manager.

16 Q    All tolled, how long have you been with Deltak?

17 A    Approximately 17 years.

18 Q    If you wouldn't mind -- just sort of for the Court's

19 perspective, if you wouldn't mind explaining your

20 responsibilities as the manager of project operations.

21 A    As the manager of project operations, I'm responsible for

22 the project managers associated with the two business units of

23 the company, the Gas Turbine HRSG business unit and the

24 specialty boiler basis unit.

25          THE COURT:  Excuse me.  For the Court Reporter, we'll

Ehm - Direct 24

1  need you to get a little bit closer to the microphone.

2        THE WITNESS: Oh, okay. Do I need to repeat?

3        THE COURT: If you would repeat it, that would be

4  helpful.

5  A     In my current position, I'm responsible for the project

6  managers of the Gas Turbine business unit and the specialty

7  boiler basis unit. These project managers manage the projects

8  on both sides of the business units, approximately five project

9  managers on the gas turbine side and four project managers on

10 the specialty boiler side.

11 Q     And if you could explain a little bit in detail sort of

12 typically what is your interaction with these project managers?

13 What types of things are you discussing?

14 A     On a daily, weekly, monthly basis, we reviewed the

15 projects. I advise and consult on situations that develop with

16 vendors and with customers. We review financial results. We

17 review cash flow. We review issues associated with vendors.

18 And as the project goes forward, trying to resolve issues that

19 come up.

20 Q     Are you at all involved in the management of customer and

21 vendor relations?

22 A     I get involved in both of those relations, especially if a

23 problem develops and we need to have a third party sort of

24 intermediate and let cooler heads prevail and kind of work with

25 the -- work out the differences that we have.

1  Q     Are you generally familiar with Deltak's business model?

2  A     Yes.

3  Q     Okay.  Could you please describe Deltak's business for the

4  Court?

5  A     Deltak's business is heavy industrial heat recovery

6  fabrication equipment.  We design, fabricate, ship and

7  sometimes erect that equipment as we satisfy the purchase

8  orders with our customers.

9  Q     Would you -- where are Deltak's products manufactured?

10  A     They're manufactured worldwide.  We manufacture a lot of

11  specialty boiler and HRSG projects in our facilities in

12  Plymouth, Minnesota.  We also utilize an array of vendors

13  around the world, in China and Malaysia and Korea, places like

14  that.

15  Q     This work by the various vendors is done through

16  subcontracting?

17  A     That's correct.

18  Q     Could you take a moment, please, and describe for us

19  what's been referred to as the HRSG business, in particular?

20  A     Well, that's our business unit.  As we said earlier, we

21  design, procure, fabricate and deliver large industrial units

22  for the recovery of heat that is generated by the gas turbine

23  HRSG -- the gas turbine -- from the combustion turbines.  That

24  excess heat is recovered by our HRSG, it is used to develop or

25  create more steam, which can augment and increase the power

1 production in a combined cycle power plant.

2 Q    Roughly these HRSG units that are produced, how much --

3 how much do those cost?

4 A    Typically a single unit, HRSG project, can be in the

5 neighborhood of ten to $15 million.  And if we -- we've had

6 other projects where we've had up to four units, and in that

7 case, it would be roughly a $60 million type of projects.

8 Q    I'm going to hand you what Mr. Cunningham referred to as

9 the Debtor's Exhibit Number 1, and ask you to take a look at

10 that for a moment.

11 A    Okay.

12 Q    Specifically, if it helps to utilize that picture, would

13 you mind sort of explaining for the Court exactly what a HRSG

14 unit looks like, and describe its size and physically what is

15 its presence?

16 A    Well, this is -- this is one of our HRSGs located in

17 Texas.  And it is roughly 150 feet long.  At the very top, it's

18 roughly 100 feet high, probably 30 to 40 feet wide at its

19 widest point.  It contains roughly 50 to 60 miles worth of

20 tubes.   If you were to -- and basically those are steel tubes

21 finned with serrated edges to enhance the heat transfer.  So,

22 on a project like the Port Westward project that we've been

23 discussing, there's approximately 70 mile -- linear miles of

24 tube in that, compacted into those boxes.

25 Q    So, you mentioned some dimensions, and to just sort of

1  help out from a perspective for my own perspective.  Is this --

2  is it fair to say this is probably what, about ten stories

3  tall?

4  A    Approximately, yes.

5  Q    And 150 feet.  So, length-wise, this spans almost half of

6  a football field?

7  A    That's correct.

8  Q    Now, what are these units principally constructed of?

9  What's the single largest component of these?

10 A    The main component is steel.

11 Q    Now, you mentioned that the tubing inside that was

12 stretched for 60 to 90 miles, or 70 --

13 A    Um-hum.

14 Q    -- with respect to the Port Westward, that it was steel

15 finned tubing.  Could you explain what that -- what that means?

16 A    Yes, it's the primary heat transfer surface in our

17 boilers.  We construct panels that are made up of rows and rows

18 of tubes.  Those tubes are wrapped with a serrated finning in

19 order to enhance or facilitate better heat transfer between the

20 gas -- the hot gas and heat, and cause it to more efficiently

21 heat the water inside the tube and generate steam.

22 Q    Now, with respect to the use of steel in producing one of

23 these HRSG units, about how much steel is required in weight in

24 order to produce one of these?

25 A    The weight of the project that we're dealing with right

1  now is -- the total weight was estimated at approximately seven
2  and a half million pounds.

3  Q    Worth of steel?

4  A    Worth of steel, yes.

5  Q    Now, with respect to the HRSG business, in general, could
6  you sort of describe the general nature of the industry in
7  terms of maybe how the business is awarded and the level of
8  competition in the industry?

9  A    The competition in the industry is rather stiff.  Lately
10 we've been seeing a lot -- a lot of low margin projects.  The
11 projects are bid on a fixed price.  It can last over -- over --
12 from release of order to delivery of the equipment and final
13 installation, it can last over two years.

14 Q    What effect has this sort of increased competition that
15 you've seen had on the profitability of HRSG -- of the HRSG
16 projects?

17 A    Well, because it's fixed price, and we've seen a lot of
18 escalation in the material prices, we've seen substantial
19 negative impact to our margins.

20 Q    Are there any sort of variable costs that are associated
21 with performing under a HRSG contract, sort of once it's set in
22 motion?

23 A    When you get into developing a -- implementing an HRSG
24 project, you can get changes to the vendor's subcontracts that
25 we issue.  We saw a lot of increasing in the pricing of bids

1  that we were -- in our estimate.  We went out for bid at a
2  later date after receiving the project.  Those estimated costs
3  were not achieved.  We saw significantly higher prices on
4  those.  We saw higher pricing in the steel industry -- in the
5  steel that makes up our project.  And, as well, as the shipping
6  and the freight associated with transporting these heavy
7  modules overseas, whether they're coming from China, Korea,
8  Malaysia.  The cost associated with that was tied to fuel
9  indexes, which were also rising at the time, and that impacted
10  our margins.
11  Q    Now, these variable costs, what impact does the big
12  fluctuation and a variable cost such as that have on the
13  profitability of a HRSG project?
14  A    It can have a huge impact.  In the case of a lot of the
15  projects we were dealing with that got us to this point, we saw
16  impacts that took our margins into the negative territory.
17  Q    Can you give us some specific instances of times where
18  profitability was affected by a variable cost?
19  A    For instance, the steel.  Steel almost -- in 2004, 2005,
20  from the time we bid these projects, nearly doubled.  And as
21  you can -- as we said earlier, we have 700 -- 7.5 million
22  pounds of steel.  That impacted us greatly.
23  Q    Are you aware of any business decisions that have taken
24  place at Deltak that were made by management concerning the
25  HRSG business as a result of the negative effects of such, you

Ehm - Direct                                30

1   know, variable costs and the profitability of the projects?

2   A    Well, the main decision --

3            MR. SABIN:   Objection.   Lack of foundation.

4            THE COURT:   You can lay a foundation.

5   Q    As these -- let me see if I can ask this a different way.

6   In your capacity as manager of the project managers, you

7   supervise the project managers, have you had any discussions

8   with the various project managers regarding the impacts that

9   the variable costs have had on their projects?

10  A    Yes.   In our monthly financial review meetings where the

11  project managers and the project teams would report the results

12  of the projects, we would -- we would review and see those

13  negative impacts on a monthly basis for each project.

14  Q    And have you discussed with these managers the impacts

15  that such variable costs have had on the profitability of their

16  projects?

17  A    Well, they would know the -- they would know the

18  profitability of that as we do the calculation each month, and

19  they can see whether we're maintaining a positive margin or if

20  we have gone negative.

21  Q    Are you aware of the fact that Deltak is currently seeking

22  to reject certain HRSG customer contracts?

23  A    Yes, I am.

24  Q    Is Deltak seeking to complete any of those HRSG agreements

25  or contracts?

1  A    We're seeking to set up completion agreements with many

2  customers right now in order to facilitate and assist them in

3  the completion of their projects to minimize the negative

4  impact of the bankruptcy.

5  Q    Have you been at all personally involved in the

6  negotiations for these completion agreements?

7  A    Yes, I have.  As part of the -- my position, I've moved

8  between -- from negotiation -- in the negotiation, kind of

9  overseeing and gathering information and understanding, making

10 sure that we're all on the same page, if you will.

11 Q    And who else at Deltak have you been dealing with in

12 negotiating these completion agreements?

13 A    Well, we've been dealing with the other project managers,

14 project managers and project engineers may have been assigned

15 one or maybe two projects to deal with and assist with the

16 developing the completion agreements.  Because of the reduction

17 in force, we had to spread those resources around.

18 Q    Now, how familiar -- well, is one of the contracts that

19 you're -- that has been selected for rejection a purchase

20 agreement that Deltak entered into with Mitsubishi Power

21 Systems for the Port Westward facility?

22 A    Yes, that's one of the contracts.

23 Q    And how familiar are you with the Port Westward project

24 and/or the contract related thereto?

25 A    I've seen the contract, I'm familiar with it, I've worked

1   with the project manager from time to time on issues that have

2   arisen with regard to the project.  And so I know -- I know the

3   basic terms and conditions of the contract, where we stand on

4   accounts payable, accounts receivable, things like that with

5   the contract.

6   Q    Have you reviewed the monthly financials for that project?

7   A    Yes, I have.

8   Q    Now, has -- since the petition date in this case, has

9   Mitsubishi Power Services provided any services to Deltak under

10  that contract?

11  A    Not to my knowledge.

12  Q    Likewise, have any Deltak employees sort of remained on

13  site or performed any additional services related to that

14  project since the petition date?

15  A    Since that time, we've had no people on site.

16  Q    Now, as of today, -- well, could you just sort of say as

17  of today what the current status is of that Port Westward

18  project?

19  A    The project is essentially complete.  The only thing that

20  really needs to be done is some of the punch list items on the

21  site, as well as delivery of the SCR and the CO catalyst.

22  Q    Now, you mentioned delivery of the catalyst.  Now, did --

23  did Deltak order these catalysts from a third party?

24  A    Yes, we did.

25  Q    And who are those third parties?

1  A    I understand them to be Cormetech and Engelhard.

2  Q    Okay.  Was -- what was -- what was the nature of the

3  subcontract with Cormetech?

4  A    Cormetech was the provider of the SCR with a NOx reduction

5  catalyst.  And Engelhard was the provider of the SCR catalyst,

6  or the NOx reduction catalyst.  Did I say that backwards?

7  Q    You mentioned the NOx, that's the N-O-X catalyst?

8  A    NOx is for Engelhard, and Cormetech is the CO catalyst.

9  I'm sorry.  I got it backwards again.  Cormetech provided the

10 NOx SCR catalyst.  And Engelhard provided the CO catalyst.

11 Q    Now, is Engelhard sometimes referred to as BASF?

12 A    That's correct.

13 Q    Okay.  Now, if Deltak were to assume the contract that it

14 has with Mitsubishi for the Port Westward project, what could

15 it expect to realize in terms of revenue under the contract?

16 A    Right now, as we look at the remaining revenue, we're

17 calculating approximately $1.2 million in receivables from MPS.

18 Q    Okay.  Is that -- is that number comprised of different

19 components or different parts?

20 A    It's made up of two components.  One is a milestone

21 associated with the delivery of the catalyst for the project,

22 roughly five percent.  And another five percent for a

23 substantial completion, which was -- I believe it was scheduled

24 to be met in middle of October.

25 Q    So, in total, if the Port Westward contract were to be

Ehm - Direct                                    34

1  fully performed, Deltak could expect to receive about $1.2

2  million?

3  A    About 1.2, correct.

4  Q    Now, on the other side, based on your knowledge and

5  understanding of the agreement and the project, what would it

6  cost Deltak to complete its performance under the Westward --

7  Port Westward contract if it were to assume that contract?

8  A    According to my --

9          MR. SABIN:  Objection, Your Honor.  Again, assume is,

10  one, a legal conclusion that the debtor would have a right to

11  assume it.  And, two, lack of foundation.

12          THE COURT:  I'll overrule the objection.  You can

13  answer.

14  A    According to my calculations right now, we're looking at

15  approximately $3.3 million to complete the contract.  Those are

16  made up of roughly five components.  The first component is

17  $1.6 million associated with open -- open account payables to

18  vendor purchase orders.

19          The next component -- the next two largest components

20  would be the amounts owed on the catalysts.  The Engelhard

21  catalyst and the Cormetech catalyst.  Those amounts of three

22  point -- $360,000 for the Cormetech catalyst, and roughly

23  $445,000 for the Engelhard catalyst.

24          Additionally, we have outstanding extra work orders

25  from the site totaling about $100,000.  And there's a pass-

1  through claim that's in contention right now for roughly

2  $600,000 with regard to a well count (sic) dispute on site.

3  Q    Okay.  And that brings us up to -- by my math, that's

4  about $3.1 million.  Is there -- there's an additional

5  $200,000?

6  A    Yeah, there's the -- roughly $200,000 associated or

7  forecasted with the remaining warranty on the project.

8  Q    Okay.  And how did you arrive at that number?

9  A    It's -- it's a calculation based on our historical

10 experience with this type of project.

11 Q    Now, based on your analysis, your independent analysis of

12 the expected revenues and the cost for performance, have you

13 reached an opinion about the profitability of Deltak assuming

14 the Port Westward contract?

15 A    Well, right now, if we were to assume that contract and

16 perform on it, we would be basically upside down by about $2.1

17 million.

18 Q    Now, even though you'd be upside down if you fully perform

19 on this contract, is Deltak, nonetheless, still attempting to

20 negotiate with Mitsubishi to complete its obligations under the

21 original agreement?

22 A    Yes.  As we've done with all of the customers in this

23 situation, we've initiated phone calls with those customers and

24 attempted to lay a foundation for working forward on a

25 completion agreement.

Ehm - Direct                        36

1  Q    Now, based on your -- have you participated in the
2  negotiations with Mitsubishi directly?

3  A    Yes, I've been on the conference calls with them.

4  Q    And based on -- based on your participation, what's your
5  understanding of Mitsubishi's position regarding the completion
6  agreement?

7  A    Well, right now, it appears that they do not have an
8  interest in the completion agreement.  They have stated that
9  they want to receive assignment of the catalyst.  And during
10 our conference calls, they've asked if our position has
11 changed.  And we have not changed our position.

12 Q    Now, you mentioned earlier -- you mentioned the Cormetech
13 and subcontracts for the catalysts.  I was wondering if you
14 wouldn't mind describing sort of what these catalysts are so we
15 can have an understanding of, you know, physically what do they
16 look like?  How are they constructed and how do they fit into
17 the bigger, you know, HRSG unit?  Could you just walk us
18 through that, please?

19 A    Well, that catalysts are made up of blocks.  And these
20 blocks are porous and they allow the gas flow to pass through
21 them from the -- of the combustion turbine in that -- in  that
22 -- when that happens, there's a reaction that reduces the
23 emissions in the gas flow.  The construction of the catalyst
24 blocks -- they're basically building blocks that start out at a
25 certain size and are then containerized or put into modules

1  that are bundled tighter and then shipped to the site and then

2  put in a larger frame to create basically a cross sectional

3  area inside the HRSG that we're talking about here to allow the

4  gas -- the combustion turbine exhaust gases to pass through

5  that with minimal pressure drop and trying to -- and it tries

6  to optimize the reduction of the emissions.

7  Q    So, if I understand this correctly, we start with

8  individual smaller building blocks, which would be an

9  individual catalyst?

10 A    Yes.    There's a catalyst -- a catalyst block that's

11 fabricated, gets placed in a frame that holds these blocks, and

12 they're laid in there and then they're bound tightly into that

13 frame, and that frame would be transported to the site and

14 placed into the HRSG.    That would typically make up -- in this

15 project, I think they're three wide and roughly 11 high that

16 would be stacked in there for the SCR catalyst.

17 Q    At the Port Westward project?

18 A    At the Port Westward project.

19 Q    The one you were referring to?

20 A    Right.

21 Q    And each one of these sort of modules that you're

22 describing is comprised of a bunch of very -- are they all

23 identical little components that are stacked within that module

24 or --

25 A    Yes, I -- in this case, I believe they are identical, yes.

1  Q    Now, what is the significance or the value of these
2  specifically designed catalyst modules that you described?
3  A    Well, they have a value unto themselves in that they
4  perform the function to reduce the emissions on the sites.  But
5  they also are composed of, in some cases, exotic or heavy
6  metals that would lend themselves to -- oh, I guess I would say
7  a recycling or a recovery of those metals for a certain amount
8  of market value.
9  Q    In -- with respect to the Port Westward project, the
10 catalyst modules that have been, you know, ordered specifically
11 for that project, in their current form, what particular value
12 do they have to Deltak's ongoing operations?
13 A    Well, right now, as I understand it, they are of value to
14 us.  They may be of value on the secondary market where we
15 could find a buyer or a customer that is interested in
16 purchasing those, and it would increase the value of the Deltak
17 estate in this process.
18 Q    Now, if not used for this specific Port Westward project,
19 can you sort of run through some examples as to how these
20 catalysts could be used?
21 A    Well, because they're basically building blocks, and we
22 can use them to create an array or a cross sectional area of
23 varying dimensions, they could be used on other projects, and
24 specifically we've identified a couple of customers that have
25 used SCR catalyst blocks with the exact specific dimensions of

Ehm - Direct                          39

1  these blocks.  So, we think that they're -- they have a useful
2  value on the market to other customers that have combustion
3  turbine HRSG installation.

4  Q    Am I correct, you've identified a customer that has used
5  the exact same module configuration that has been produced for
6  the Port Westward project?

7  A    That's correct.

8  Q    Now, you had mentioned that these catalysts had some
9  residual value, perhaps for recycling, but can you sort of walk
10 us through, you know, what are the -- what are these catalysts
11 made up of --

12 A    Well --

13 Q    -- that makes them value?

14 A    The main components that I've -- that I understand these
15 are composed of is titanium, vanadium, and platinum.  Platinum
16 being one of the -- one of the more valuable or recognizable
17 components of these, which is recoverable on the -- from the
18 catalyst.

19 Q    Now, how long, based on your experience in managing
20 projects, do you think it would take Deltak to assess what
21 market value it could obtain for these catalysts if it were to
22 assume -- if it were to assume its subcontracts with Cormetech
23 and not use them for the Mitsubishi project?

24 A    Well, based on the research that we have right now, I
25 would assume it would take maybe two to four months.

1  Q    Now, what impact would requiring Deltak to reject its

2  current supply contracts for the catalysts have if it was

3  ordered to do so at the same time it rejected the contract for

4  the Port Westward project?

5  A    Well, it would have a negative effect on the estate.

6  Q    In what way?

7  A    Well, we would -- we would be giving up an asset that we

8  could otherwise sell on the open market.

9  Q    Now, going back to what we were talking about earlier, I

10  think you had mentioned there was a specific project that had

11  used this form module before, what is the -- if you could

12  describe in terms of the useful life of these catalysts, what

13  is the useful life, shelf life, operational life?

14  A    Right now, I'm confident that the shelf life is in excess

15  of a year, maybe longer if kept in clean, dry conditions.  And

16  then the operational life could be in the three- to five-year

17  range.

18  Q    Now, this -- this contract that you've identified or this

19  customer that you've identified that used the exact same

20  module, how long ago did that plant become operational?

21  A    I believe they became operational in 2003, early 2004.

22  Q    Now, how much money does Deltak already have invested in

23  the catalyst that we've been discussing for the Port Westward

24  project?

25  A    Roughly ten percent of the value of each of the purchase

Ehm - Cross/Agusti                           41

1  orders.

2  Q    And that has already been paid?

3  A    Yes, it's been paid, correct.  That's what we would be --

4  that's one of the things we would be giving up if we had to

5  reject the purchase order.

6  Q    Now, are you aware that both Mitsubishi Power Systems and

7  Cormetech have both sought to enforce the immediate rejection

8  of the Port Westward contract and are seeking to have Deltak

9  assign its rights under the Cormetech subcontracts directly to

10 Mitsubishi?

11 A    Yes, that's what I've understood.

12 Q    Now, if you would turn in the binder that's in front of

13 you to Tab Number 3, it's Exhibit Number 3, it's a web site

14 printout.  Do you recognize this document?

15 A    Yes, it's the printout from the Mitsubishi Heavy Industry

16 America web site.

17 Q    Based on this -- based on this exhibit, what is sort of

18 your understanding of the relationship between Cormetech and

19 Mitsubishi Power Systems?

20 A    My understanding --

21         MR. AGUSTI:  Objection, Your Honor.  The document

22 speaks for itself.  The witness is not -- additional

23 foundation, if the witness has any knowledge independent from

24 the document he saw on the Internet.

25         MR. SWALINA:  I think he's right, Your Honor.  The

Ehm - Cross/Agusti                    42

1  document does speak for itself.  It's an admission by the

2  parties.

3           THE COURT:  Sustained.

4           MR. SWALINA:  We have no other questions for this

5  witness.

6           THE COURT:  Cross examination.

7                    CROSS EXAMINATION

8  BY MR. AGUSTI:

9  Q    Good afternoon, Mr. Ehm.

10 A    Good afternoon.

11 Q    You mentioned that there was another customer who might be

12 able to use -- was it the NOx catalyst?

13 A    No, it was the SCR catalyst.

14 Q     SCR catalyst.

15 A    No, the -- I'm sorry.  Yes, the NOx -- it's a bit of a

16 misnomer.  But selective catalytic reduction started out as

17 being called the NOx catalyst.  So, when we talk about SCR, we

18 interchange NOx reduction catalyst with the name SCR.

19 Q    So, you're referring to what we call here the NOx

20 catalyst?

21 A    That's correct.

22 Q    Who was that customer?

23 A    That customer was on a project we called the G0003 project

24 for Deltak, and our customer on that project was Mitsubishi

25 Power Systems, and it's the Wolf Hollow Project.

D176

Ehm - Cross/Agusti                    43

1   Q    And Wolf Hollow is in Texas?

2   A    Yes, it is.

3   Q    And what type of fuel is used in the Wolf Hollow project?

4   A    Primarily natural gas.

5   Q    What type of Mitsubishi turbines are used at the Wolf

6   Hollow project?

7   A    I believe they are the 501 -- let's see -- the 501Fs.

8   Q    501Fs?

9   A    I think so.  It's been a while.

10  Q    Now, isn't it true that -- Mr. Ehm, that a catalyst has to

11  be different depending upon the turbine that it's attached to?

12  A    (No verbal response)

13  Q    Ultimately, it's not attached to a turbine -- let me

14  backup and rephrase the question.  A catalyst is attached to a

15  HRSG, correct?

16  A    Correct.  Yes, that's correct.

17  Q    And that is processing heat that is -- gases that are

18  coming out of a turbine, correct?

19  A    That's correct.

20  Q    And the type of a catalyst that you use for an F machine

21  is different than the kind used for a G machine, isn't that

22  right?

23  A    The types of -- the type of catalyst would be the same.

24  The quantity of the catalyst would vary, or the volume of the

25  catalyst would vary.

D177

Ehm - Cross/Agusti                    44

1  Q    So, the size of the catalyst would vary if you have a G
2  machine, wouldn't it?
3  A    A larger -- a larger machine would take more catalysts.
4  Q    And wouldn't the performance characteristics of different
5  machines be different from machine to machine, depending upon
6  whether it's an F machine or a G machine?
7  A    Yes, they can vary.
8  Q    And that variance would affect how you configure the
9  catalyst, wouldn't it?
10 A    Yes, depending on the cross sectional area requirements,
11 yeah.
12 Q    And the machines at the -- at the Port Westward plant are
13 G machines, aren't they?
14 A    I believe so.  I haven't --
15 Q    And a G machine --
16 A    I don't recall.  If you would clarify for me, that would
17 be helpful because I am not familiar with the type of machine.
18 I'm mostly focused on the HRSG site.
19 Q    So, you don't know whether -- you don't know whether it's
20 a G machine or a F machine at Port Westward?
21 A    I know it's either right now.
22 Q    But you don't know -- you don't know whether it's one or
23 the other.
24 A    It's one or the other.
25 Q    But it's your testimony today that you believe that

Ehm - Cross/Agusti                                        45

1 catalyst -- the catalyst that is being -- that has been
2 designed and --
3 A      My --
4 Q      -- is ready to ship --
5 A      My --
6 Q      Let me finish my question, sir.  -- to Port Westward is
7 the same configuration as the F machines at Wolf Hollow, Texas?
8 A      My testimony is that the dimension of the catalyst
9 modules, as I've been told by my engineering team, for the Port
10 Westward -- and as we said, in the Port Westward, there would
11 be three of those across and 11 high.  The dimension of that
12 base foundation catalyst is the same dimension as the blocks
13 that are used in the Wolf Hollow project.
14 Q      And -- but there would be -- have to be a substantial
15 modification in the existing catalyst in order to be able to
16 make it -- actually it would have to be significantly smaller,
17 wouldn't it, in order to work for an F machine, wouldn't it?
18 A      To work for an F machine, if the -- if the gas path is
19 wide, then it would require that another block of catalyst be
20 placed in the width of that gas path.
21 Q      Now, Mr. Ehm, do you know -- do you even know whether an F
22 machine generates more nitric oxide than a G machine or whether
23 it's vice versa?
24 A      I believe it's vice versa, but I don't know for a fact.   .
25 Q      You don't know.

Ehm - Cross/Agusti                                    46

1  A    Right.

2  Q    And it's your testimony that one would work as well as the
3  other?

4  A    My testimony is that the catalyst block and the volume of
5  catalyst used in a SCR NOx reduction is directly proportional
6  to the reactivity of the volume of the catalyst.  And if there
7  are -- if there are -- if you have a higher or lower NOx coming
8  out of the turbine, that you may or may not require more -- you
9  may require more or less volume of NOx to achieve the desired
10 results.

11 Q    So, your concept would be that you would cannibalize the
12 existing catalyst and make it smaller for an F machine?

13 A    That --

14 Q    Is that right, sir?

15 A    That is one of the possibilities with the smaller modules
16 is that you could remove them from a frame and put them in
17 another frame.

18 Q    Now, you said that the -- now, let me ask you this.  Do
19 you know whether or not the type of fuel affects the type of
20 catalyst that you have?

21 A    The type of fuel does have an effect.

22 Q    Okay.  And so you have different -- a different catalyst
23 for, say, a fuel oil turbine -- a turbine that's being run with
24 fuel oil than one that's being run with natural gas, correct?

25 A    There would be a -- I believe there would be an affect.

1  And it may just be a matter of the rate of degradation of the

2  catalyst.

3  Q    But you don't know?

4  A    No, I don't know for a fact.

5  Q    You don't know.  Okay.  Now, do you know whether or not a

6  different -- if natural gas comes from a different geographic

7  source, it also would have an affect on the type of catalyst

8  that you use?

9  A    It's possible it would, yes.

10 Q    Is it possible or do you know?

11 A    I know that when we do the analysis of -- for the design

12 of a catalyst, that the fuel components of the -- that are

13 going to be used at that site play a key role in determining

14 what that is.

15 Q    And just to be clear, in order to be able to construct the

16 catalyst, you actually have to know what the nitrogen content

17 is in the particular type of natural gas that you're using,

18 don't you?

19 A    Yes.

20 Q    And different natural gas, depending upon what geographic

21 region it comes from, has different nitrogen content, doesn't

22 it?

23 A    That's true.

24 Q    And so you would need -- another thing that you would have

25 to determine is whether nitrogen -- whether the -- the natural

Ehm - Cross/Agusti                    48

1 gas being used in Oregon is the same as what's being used in

2 Wolf Hollow, Texas, isn't that right, sir?

3 A    It's an evaluation that would have to be done, yes.

4 Q    And have you made that evaluation?

5 A    No, I have not.

6 Q    Now, Texas -- there's also --

7             MR. AGUSTI:  Strike that.

8 Q    Catalysts have to perform to certain standards, don't

9 they, sir?

10 A    Yes.

11 Q    And those standards vary from place-to-place, don't they,

12 sir?

13 A    Yes, they do.

14 Q    They vary because of local emission standards, right?

15 A    Um-hum.

16 Q    And as you're sitting here today, do you know whether or

17 not the emission standards are the same in Texas as they are in

18 Oregon?

19 A    No, I'm not aware.

20 Q    Okay.  So, you don't know that when you're -- you're

21 testifying earlier that you could use the same machine, you

22 don't know what the affect was of local emission standards and

23 the modifications that one would have to make in order to meet

24 local emission standards in Texas?

25 A    There may be the requirement if you were to use one

1  catalyst in a different location, that you may require more of

2  that catalyst to achieve the same results, depending on the

3  efficiency of the catalyst.

4  Q    Now, we're talking about G machines in the secondary

5  markets.  Are you aware of a secondary market in catalysts?

6  A    Are we talking about the catalysts for G machines?  Or G

7  machines?

8  Q    Catalysts.  I'm talking about a secondary market for

9  catalysts.

10 A    No, I'm not aware.

11 Q    You're not aware of one.  And General Electric is one of

12 your clients, aren't they?

13 A    That's correct.

14 Q    And they don't even have a G machine, do they?

15 A    They have the -- they have an H machine.

16 Q    They have an H machine.  And that's not the same as a G

17 machine, is it?

18 A    It's not -- very different than the Mitsubishi machine

19 versus the G -- the GE machine is different --

20 Q    You --

21 A    Different numbering, different nomenclature in the designs

22 and in the labeling of the machines.

23 Q    Now, isn't it true that the H machine is a larger machine

24 than the G machine?

25 A    Yes, it is.

Ehm - Cross/Agusti                          50

1   Q    And it's a next generation machine?

2   A    That's correct.

3   Q    So, it would require different catalysts, wouldn't it,

4   sir?

5   A    It would require catalysts that would be very similar in

6   nature to the other catalysts, but it may require a lot more

7   catalysts or less catalysts, depending on the performance of

8   that machine if the NOx emissions are significantly less.

9   Q    So, you would have to re-engineer and reconfigure it in

10  order to adapt to the local conditions, the difference of the

11  machine, the type of fuel that's being used, the level of

12  nitrogen --

13  A    You would have to --

14  Q    -- in that machine --

15  A    You would have to evaluate all those points, yes.

16  Q    And you would have to re-engineer and re-fabricate the

17  machine to -- in order to satisfy all those points, isn't that

18  right, sir?

19  A    Well, I'm not aware of the details that go into the

20  calculations that Engelhard or Cormetech use in their

21  proprietary designs to determine what has to be done and what

22  needs to be done, but that seems that that would be required.

23  Q    So, you don't know what would need to be done to modify

24  this machine?

25  A    No, I don't.

Ehm - Cross/Agusti                              51

1  Q    And yet you testified that you think you could sell it on
2  the secondary market, that you don't know exists?
3  A    I think you could.
4            MR. AGUSTI:  Your Honor, I'd like just to have the
5  witness identify a couple of documents.
6            THE COURT:  Sure.
7            MR. AGUSTI:  If I may just have the Court Reporter
8  mark them?
9            THE COURT:  Please.
10                          (Pause)
11           MR. AGUSTI:  Your Honor, may I approach?
12           THE COURT:  Please.
13             (Attorneys conferring off-the-record)
14 BY MR. AGUSTI:
15 Q    Mr. Ehm, I've handed you what's been marked as Exhibit
16 Number 1 for identification, and I ask if you will identify
17 that it's an e-mail that you sent to Mitsubishi Power Systems?
18 A    That's correct.
19 Q    Thank you.
20           MR. AGUSTI:  And if I may approach again.
21                          (Pause)
22           MR. AGUSTI:  Your Honor, this is -- Your Honor, there
23 is a book of exhibits that would be in our direct case, I don't
24 know if counsel have them.
25           THE COURT:  Okay.

Ehm - Cross/Agusti/Sabin                                    52

1  BY MR. AGUSTI:

2  Q    And, Mr. Ehm, I believe you testified about a completion

3  agreement that you proposed to Mitsubishi Power Systems.

4  A    Correct.

5  Q    And is that a fair and accurate copy of the completion

6  agreement that you sent over to them?

7  A    Appears to be, yes.

8  Q    Finally, you testified about an Internet site and the

9  appearance of Cormetech on that site.  Do you recall that, Mr.

10 Ehm?

11 A    Yes.

12 Q    Mr. Ehm, do you have any idea whether Mitsubishi has an

13 ownership interest in Cormetech?

14 A    What I know is that -- that in a conference -- after a

15 conference call with Mitsubishi, we were talking amongst

16 ourselves and Monte Ness, to the fact that the -- that there

17 was an ownership relationship between Mitsubishi, the parent,

18 and Cormetech and Mitsubishi Power Systems.

19 Q    Monte Ness is a colleague of yours?

20 A    I'm sorry.  Monte Ness is the President of Deltak.

21 Q    And you don't have any way of knowing whether he has any

22 accurate information on the subject, do you?

23 A    At that time, I did not.

24 Q    Okay.  Other than that, you don't have any way of knowing

25 if Mitsubishi has an ownership interest in it, or what that

Ehm - Cross/Agusti/Sabin                    53

1  interest might be?

2  A    That's correct, I don't know.

3  Q    And you don't have any idea what -- what relationship --

4  corporation relationships there might be between the two

5  entities?

6  A    No, I do not.

7            MR. AGUSTI:  I have no further questions, Your Honor.

8            THE COURT:  Cross examination, Mr. Sabin?

9            MR. SABIN:  Yes, Your Honor.  Thank you.

10                    CROSS EXAMINATION

11  BY MR. SABIN:

12  Q    Good afternoon, Mr. Ehm.

13  A    Good afternoon.

14  Q    I just want to make sure I understood your direct

15  testimony in terms of your familiarity with some of the

16  exhibits already.  Are you familiar with the Debtors' Exhibit

17  Number 2?

18            MR. SABIN:  And for the transcript and for the

19  record, that purports to be the executed copy of the purchase

20  agreement.

21  A    Yes, I'm familiar with this.  I've seen the document.

22  Q    Did you have any role in negotiating it?

23  A    No, I did not.

24  Q    And what role do you have with it, if you could describe,

25  from the beginning of time that you had that role?

1  A    My role with that contract would have been to advise and

2  consult Mr. Otterson (phonetic) on issues that may have arisen

3  during the execution of the contract as they -- as those issues

4  related to the contract.

5  Q    And you are familiar generally with how the HRSG business

6  works, is that correct?

7  A    That's correct.

8  Q    And pursuant to the normal course of business for the

9  development of negotiations for these kinds of contracts, such

10  as Exhibit Number 2, is it your testimony that Deltak employees

11  also designed the HRSG?

12  A    Deltak employees do design the HRSG, yes.

13  Q    All right.  And is it also a Deltak employee who would

14  design the subcontract that would be made by, in this case, the

15  subcontract?  The catalyst, I mean.

16  A    He -- you mean designs the catalyst or design --

17  Q    The catalyst.

18  A    No, the employee -- the employee of Deltak would take the

19  requirements of the contract, put them into a specification and

20  then issue those to -- for -- out for quote to a catalyst

21  supplier.

22  Q    Would the catalyst itself be part of the equipment, which

23  is a defined term, in Debtors' Exhibit 2?

24  A    Yes.

25  Q    Do you know whether either of the catalysts, that are the

Ehm - Cross/Sabin                          55

1    subject of this motion and a motion later today, are the
2    subject of any patent or copyright owned by Deltak, or any of
3    its affiliates?
4    A    I'm not aware.
5    Q    So, is it your testimony that under Section 27.1, there is
6    no proprietary information with respect to the catalyst?
7    A    I'd have to read on that section.  I don't know the answer
8    to that.
9    Q    Why don't we take a moment and take a look at Section
10   27.1?
11   A    27.1?
12   Q    Yes.
13   A    Okay.
14   Q    I believe it's Page 63.
15                         (Pause)
16             THE COURT:  I have it on Page 83.
17             MR. SABIN:  Yeah, excuse me.  Page 83.
18                         (Pause)
19   A    Okay.
20   Q    Now that you've had a chance to read it, would you confirm
21   your prior testimony that, indeed, if I understood it right,
22   there is no, to your knowledge, patent or copyright with
23   respect to either of the two catalysts at issue here?
24   A    I'm -- I -- I'm really not following you on this.  Is the
25   -- I need a little bit more clarification.

1  Q    Okay, sure.  If I understand it right, it is Deltak that

2  designs, and then puts out for bid a need for the catalyst

3  parts that otherwise are part of the HRSG, is that correct?

4  A    Deltak -- Deltak specifies -- creates a specification to

5  cause the catalyst vendors to create a catalyst that functions.

6  Q    And to your knowledge, are any of those specifications or

7  any other work that Deltak does generate proprietary

8  information which otherwise has become with respect to either

9  or both of the two catalysts in this case, a patent, a

10  copyright or other legal right that would evidence proprietary

11  information?

12  A    I don't think so.

13  Q    So, let me put it this way, do you believe there was any

14  right granted under Section 27.1 to Mitsubishi with respect to

15  your specifications to a catalyst?

16         MR. AGUSTI:  Objection, Your Honor.  The witness has

17  testified he did not negotiate the agreement.  And I think the

18  document speaks for itself.

19         THE COURT:  Sustained.

20  Q    To your knowledge, is Deltak free to make modifications to

21  the catalysts?

22  A    I don't believe so.

23  Q    I Deltak were to acquire the catalysts from Cormetech, is

24  Deltak then free to make changes to the catalyst and sell it to

25  anyone who it desires to sell it to?

1  A    If Deltak were to acquire the catalyst, I don't see how

2  that we could modify the catalyst. Catalysts. The catalyst

3  itself, the components that make the reaction, is not

4  changeable. That cell or that block is not changeable. The

5  array or the area, the cross sectional area of that catalyst

6  could be modified and you could actually create a long, low

7  flat cross sectional area or anything in between the tall and

8  the narrow that we have right now.

9  Q    And to your knowledge, nothing in Section 27.1 would

10 prevent that, is that correct?

11 A    That's correct.

12 Q    Are you familiar with the Cormetech subcontract?

13 A    To the extent that I know we have a purchase order with

14 them and a lot of our standard terms and conditions area

15 associated with it.

16           MR. SABIN:  Your Honor, if I may approach and --

17           THE COURT:  Please.

18           MR. SABIN:  -- mark as Exhibit Number 1 for

19 Creditors' Committee, a document that's entitled purchase

20 order.

21                         (Pause)

22 BY MR. SABIN:

23 Q    Do you recognize this document?

24 A    Yes, I recognize it as a -- it's a standard Deltak

25 purchase order document listing the requirements that we issued

Ehm - Cross/Sabin                        58

1  to the vendor.

2  Q    And to your knowledge, is this the purchase order with

3  Cormetech?

4  A    Yes.

5  Q    And if I can call your attention on Page 1 to Item Number

6  1, would you explain the significance under the column due date

7  at designation of the November 1 date?

8  A    The due date is the date that we enter into our

9  requisitions in order to communicate a due date to our buyer,

10 who then issues -- puts it into the purchase order so that that

11 becomes the due date in the order with our vendor.

12 Q    So, in this case, is the vendor supposed to deliver the

13 catalyst on or about November 1, 2006?

14 A    Yes.

15 Q    Has it done so, to your knowledge?

16 A    No.

17 Q    Also on Page 1, I call your attention to the upper left-

18 hand corner underneath the grayish area that's headed terms.

19 And underneath the word terms is net 30.  Do you see that?

20 A    Yes.

21 Q    What do you understand that to mean?

22 A    I understand that to be the terms of payment that Deltak

23 would follow upon the completion of the line items that have

24 value on this purchase order.

25 Q    And so to the extent that there are still deliverables

1  from Cormetech, you would have at least 30 days after delivery
2  to make payment?

3  A     After delivery -- after delivery, Cormetech would send us
4  an invoice, and upon receipt of that invoice, the terms would
5  be net 30 payable.

6  Q     I call your attention to the third page in this handout
7  that I think is labeled in the upper right-hand corner, Page 3
8  of 5.

9  A     Um-hum.

10 Q     In particular, under the column headed item, Item 13, and
11 in the description of that item, if you could read it, please?
12 I ask you to describe what otherwise is referred to as a letter
13 of credit?

14 A     That's correct.  We -- we initiate a description by
15 calling something a service within our partnering system.   In
16 this case, the service is to provide a letter of credit, the
17 supplier to provide ten, ten percent.  Letter of credit to be
18 valid for 53, 53 months from the delivery of the catalyst and
19 equipment to contract delivery site.  It appears the value is
20 listed as $10,000.

21              So, in this case --

22 Q     Do you understand that provision to mean that Cormetech is
23 supposed to supply a letter of credit to Deltak?

24 A     That's correct.

25 Q     To your knowledge, has Cormetech done so?

1  A     I do not know.

2          MR. SABIN:  If I may approach again, Your Honor, with

3  Creditors' Committee's document for identification --

4          THE COURT:  Yes.

5          MR. SABIN:  -- Number 2?

6                        (Pause)

7  Q     Would you take a moment and tell me if you recognize this

8  document.

9  A     It appears to be a purchase order in the same format as

10 the other one.

11 Q     And who is this purchase order with?

12 A     Engelhard Corporation.

13 Q     And this is otherwise what you were referring to as a

14 contract now in favor of BASF or with --

15 A     Yeah, BASF/Engelhard, correct.

16 Q     And is it also your testimony that this would be the

17 governing document with respect to the catalysts that would be

18 deliverable by BASF?

19 A     Correct.

20 Q     I call your attention to Page 1, once again, Item 1.  Is

21 it your testimony that this purchase order and contract, like

22 the Cormetech contract, calls for a due date for delivery?

23 A     Yes.

24 Q     And what's that date?

25 A     December 18th, 2006.

Ehm - Cross/Sabin                            61

1  Q    And is it also in this contract that on Page 1 under net

2  terms that the box headed terms net 30 means the same thing in

3  this contract as it does in the Cormetech contract?

4  A    That's correct.

5  Q    And I call your attention to Page 2 of this exhibit, Item

6  11.  So, if you could describe the terms and conditions of this

7  item.

8  A    That also is a letter of credit, to be valid for 42 months

9  after all equipment and catalyst delivered to the job site.

10 Q    To your knowledge, has that letter of credit been

11 delivered?

12 A    Not to my knowledge.

13             MR. SABIN:  I would move the admission of Creditor's

14 Exhibits 1 and 2.

15             THE COURT:  Any objections?

16             MR. AGUSTI:  We have no objection, Your Honor.

17             THE COURT:  They're admitted.

18             MR. SABIN:  Thank you, Your Honor.  I have no further

19 questions.

20             THE COURT:  Recross -- redirect?

21             MR. CUNNINGHAM:  Briefly, Your Honor.

22                       REDIRECT EXAMINATION

23 BY MR. SWALINA:

24 Q    Mr. Ehm, can you turn to Mitsubishi's Exhibit 1, which I

25 believe is the letter that says, "Rich," I guess it's an e-mail

Ehm - Redirect                                    62

1  that was printed out.

2  A    Oh.

3  Q    Do you have that in front of you?

4  A    Yes.

5  Q    It's from you.

6  A    Right.

7  Q    Can you read the second paragraph of that e-mail?

8  A    The second paragraph says, "The involved parties in the

9  bankruptcy have been determined -- have determined that in

10 order to proceed forward on a time and material basis, that a

11 completion agreement is required, including the waiver of

12 objection of claims.  Therefore, any items sold outside of a

13 completion agreement must be sold at fair market value."

14 Q    Now, when it talks about the completion agreement, that's

15 the completion program, is it not, that you were describing in

16 your earlier testimony?

17 A    Yes, that's the agreements that we're working on with the

18 various customers that we have.

19 Q    And those agreements don't require positive cash payments

20 to the debtors, is that correct?  It is essentially supposed to

21 be neutral?

22 A    We are supposed to be --

23        MR. AGUSTI:  Objection, Your Honor.  The document is

24 in evidence and it speaks for itself as to what the conditions

25 are of the completion agreement.

Ehm - Redirect                                    63

1          MR. SWALINA:  I'm -- since he's been negotiating,

2   this is one form of a completion agreement.  I'm just asking

3   what his knowledge is of the completion program.

4          THE COURT:  I believe he's talking about other

5   completion agreements.  So, to the extent the objection's

6   application, I'll overrule it.

7          THE WITNESS:  Restate the question, please.

8   BY MR. SWALINA:

9   Q    What is your understanding of what you're asking the

10  customers to do as part of the completion program?

11  A    My -- my understanding of the completion program is that

12  we are asking the customers to keep Deltak cash neutral going

13  forward so that we can keep resources at Deltak in order to

14  help and assist them in completion of their project.

15  Q    So, if they have -- the -- they have not yet had the

16  project completed, you're offering to complete it, but they

17  would have to pay the costs associated with completing it.

18  A    They would have to pay the costs associated with that

19  completion.

20  Q    And in addition, you are asking that they waive any damage

21  -- rejection damage claims, any damage claims --

22  A    Yes, we're asking them --

23  Q    -- against the debtors --

24  A    -- to waive those claims.

25  Q    -- in order to do that?

1  A    Yes.

2  Q    So, in this document, Mitsubishi Exhibit 1, when it says,

3  we need to determine fair market value outside of completion

4  agreement, you're talking about if you don't want to subscribe

5  to a completion agreement, you just want to pay us for the

6  catalysts, here's a proposal?

7  A    Correct.

8  Q    And you have a proposal of a million eight seventy-five

9  for both the NOx catalysts and CO catalysts, correct?

10 A    That's correct.

11 Q    And in arriving at that, does that number include what you

12 would have to then pay to Cormetech and BASF if you assume

13 their contract --

14 A    Yeah, that --

15 Q    -- and were to sell it?

16 A    That includes that, yes.

17 Q    So, the net amount above that is what you believed to be

18 what the estate would get in return if Mitsubishi had accepted

19 this offer?

20 A    That's correct.

21 Q    And you -- but also, as part of your analysis is that

22 these are ready-made catalysts.  They don't require any future

23 build out, they're ready-made, ready to be shipped, as

24 Mitsubishi says, and that were calculated in your determination

25 what you think the fair market value may be?

1  A    That was part of our development of that number, yes.

2  Q    I think you also described that when -- that -- in terms

3  of the uniqueness of these catalysts, that, in essence, they

4  are part of the project.  They're building blocks, aren't --

5  aren't -- isn't that correct?

6  A    Yes.

7  Q    I think you had described it as almost like Legos.

8  A    Well, a catalyst module is made up of smaller catalyst

9  blocks that are assembled into a module.

10 Q    And right now, you have only had discussions with

11 Mitsubishi in trying to negotiate a completion agreement,

12 correct?

13 A    That's correct.

14 Q    You have not talked to and gone out and canvassed the

15 market of other potential customers who may be interested in

16 these catalysts, is that correct?

17 A    Have not.

18 Q    And that is because you've been trying to negotiate with

19 Mitsubishi.

20 A    Right, that was the first and foremost thing on our mind

21 is to work with the customers to develop a completion agreement

22 so we could go forward.

23 Q    And to your knowledge, is Mitsubishi offering to pay you

24 anything for the catalysts?  Pay the debtors --

25 A    No.

1  Q    -- to have it assigned to them?

2  A    No.

3  Q    So, what -- your testimony was, you want to go out and

4  talk to other customers to see if they'll pay you something.

5  A    Something.  Find some determinative value, yes.

6  Q    And you think that period would take two to four months?

7  A    Two to four months, depending on how many contacts we want

8  to make, what the resources we have available to put on that

9  and make those calls.

10 Q    And I think you described that there was a -- a life, an

11 active life once these are installed in a HRSG of approximately

12 three to five years?

13 A    That's my understanding.

14 Q    So, there may also be replacement value to another

15 customer who has an existing HRSG they may need to replace

16 their catalyst, is that correct?

17 A    That's possible, yes, that that catalyst could be used in

18 another application.

19 Q    And that -- that may represent another spectrum of

20 customers other than Mitsubishi that you would like to talk to

21 to see --

22 A    Sure.

23 Q    -- if they would pay you for that -- those catalysts.

24 A    We would like to find that out, yes.

25       MR. SWALINA:  Nothing further, Your Honor.

Ehm - Recross/Agusti                        67

1              THE COURT:  Recross?

2              MR. AGUSTI:  Yes, Your Honor.

3                      RECROSS EXAMINATION

4  BY MR. AGUSTI:

5  Q    Mr. Ehm, have you ever sold a used reconfigured catalyst

6  to anybody?

7  A    No, I have not.

8  Q    There were some references to the purchase orders for

9  Engelhard and, now BASF, catalyst and also to the purchase

10 order of Cormetech.

11 A    Sure.

12 Q    And there was some references to letters of credit in

13 those.

14 A    Um-hum.

15 Q    Is it your understanding -- it's your understanding, isn't

16 it, that the letters of creditor are put forward to protect

17 against possible defects in the catalysts, claims arising out

18 of defects of the catalysts?

19 A    Correct.

20              MR. AGUSTI:  I have no further questions, Your Honor.

21              THE COURT:  You may step down.

22                      (Pause)

23              MR. CUNNINGHAM:  Your Honor, we have one other

24 witness to call, and that is Bob Caruso of Alvarez and Marsal.

25              THE COURT:  Proceed.

1          CLERK:   Please raise your right hand, state your full

2    name, spelling your last for the Court.

3          MR. CARUSO:   Robert M. Caruso, C-A-R-U-S-O.

4            ROBERT CARUSO, DEBTORS' WITNESS, SWORN

5          CLERK:   You may be seated.

6                      DIRECT EXAMINATION

7    BY MR. CUNNINGHAM:

8    Q    Good afternoon, Mr. Caruso.   Can you tell the Court, what

9    is your educational background?

10   A    I have a bachelor's degree in accountancy from the

11   University of Illinois at Urbana.   I'm a certified public

12   accountant in the State of Illinois, and a certified insolvency

13   and reorganization advisor.

14   Q    And who are you employed by?

15   A    Alvarez and Marsal.

16   Q    What is your position at Alvarez and Marsal?

17   A    Managing Director.

18   Q    Prior to joining Alvarez and Marsal, where did you work?

19   A    I was a Senior Managing Director at FTI prior to that.

20   And before that, a partner at PricewaterhouseCoopers in their

21   corporate financing and restructuring practice.   And prior to

22   that, a managing director at KPMG, before getting involved in

23   restructuring, was on the audit side of KPMG.

24   Q    So, how many years experience have you had in the

25   restructuring practice at those various positions?

Caruso - Direct                                69

1  A     Twenty-two years of total business experience, 16 years of
2  which has been in the restructuring space.

3  Q     And what areas have you specialized in?

4  A     Well, I advise companies, management, Boards of Directors
5  senior lenders and other creditor constituencies related to
6  companies that are involved in some form of restructuring.  In
7  that capacity, I advise on the development of business plans
8  and review those business plans and financial projections.  And
9  go the soup to nuts process of planning and operating a company
10 in Chapter 11, including negotiations of DIP financing and any
11 use of cash collateral, as well as the ultimate exit
12 strategies, plans of reorganizations, advice on asset sales,
13 wind downs and ultimately plans of reorganizations.

14 Q     Now, what is the proposed scope of the retention of
15 Alvarez and Marsal?  I know that your retention is up for
16 hearing this coming Monday, but what is the proposed scope
17 under your engagement agreement with the debtors?

18 A     We are acting as a financial advisor to the debtors,
19 Global Power and its debtor affiliates.  And in that capacity,
20 we are really advising on all aspects of the financial affairs
21 of the debtor, including the initial preparation of the filing,
22 as well as commencing the filing, operating and advising
23 management and operating the company during the pendency of the
24 case.

25          In that capacity, we're involved with a lot of

1  negotiations that take place with the bank group, a use of cash

2  collateral, as well as preparation of the underlying budgets

3  that are being used to operate the business.

4  Q    And are you the lead principal at Alvarez and Marsal that

5  is leading this engagement --

6  A    I am.

7  Q    -- for the debtors?

8  A    Yes, I am.

9  Q    And you referred to the banks -- I think we've referred to

10 them in our papers are the senior lenders.  Who are the senior

11 lenders?

12 A    It's a consortium of banks, but Bank of America is the

13 administrative agent.

14 Q    And approximately how much are the senior lenders owed

15 pre-petition?

16 A    Including issued LC's, but on drawn LC's, roughly $40

17 million of exposure.

18 Q    Are you familiar with the cash collateral orders, two of

19 them that have been entered by the Court --

20 A    I am.

21 Q    -- thus far in these cases?

22 A    Yes, I am.

23 Q    Are you involved in negotiating those orders with the

24 senior lenders --

25 A    Yes, I am.

1  Q    -- and their advisors?  Are you aware that each contains a
2  budget?

3  A    I am.

4  Q    And that budget was also negotiated heavily with our
5  senior lenders?

6  A    That's correct.

7  Q    Do you know -- are there any amounts authorized under the
8  cash collateral order or budget for --  to pay for completion
9  of any HRSG projects?

10 A    No.

11 Q    You are familiar with the debtors' books and records and
12 their financial affairs, is that correct?

13 A    That's correct.

14 Q    Were you involved in management's decision in commencing
15 these Chapter 11 cases?

16 A    I was.

17 Q    Were you involved in management's decision in filing the
18 motion to reject the HRSG contracts that are attached as an
19 exhibit to the HRSG wind down motion?

20 A    Yes, I was.

21 Q    And what was the driving force behind that decision?

22 A    Well, essentially we had a book of business at HRSG that
23 had a number of projects that were at various stages of
24 completion.  And management had undertaken an analysis to
25 understand where we were on those projects and what it would

1  cost to complete those projects, compared to what we could

2  expect to generate in the way of revenues on those projects.

3  We -- that estimate at that point in time suggested we'd need

4  roughly $24 million of additional net cash flow.  In other

5  words, cash in excess of the receipts we could bill on in those

6  contracts to complete them.

7         We didn't have the liquidity, either in the way of

8  cash on hand, even if it were simply to support that an effort,

9  nor did we have access to any credit facilities that would

10 provide the necessary liquidity to complete those projects.

11        In addition to that, there really weren't any new

12 orders booked for some period of time, and there were a couple

13 of prospects the company had looked at, but they were prospects

14 that didn't meet their standards of acceptable margins that

15 would really enable that business to move forward.  So, it

16 became clear without any access to liquidity.  And not only

17 that, but that these projects would have generated sizeable

18 cash losses on a go-forward basis.  That ultimately led to the

19 decision to reject these contracts and enter into the wind down

20 and negotiate completion agreements with our customers.

21 Q    Now, you were in the courtroom when you heard Mr. Ehm's

22 testimony about -- specifically the Mitsubishi contract and

23 that it was -- his testimony and words were upside down, is

24 that correct?

25 A    That's correct.

Caruso - Direct                                    73

1  Q    And based on your knowledge of the debtors' books and
2  records and your involvement with the wind down program and the
3  rejection of these agreements, do you -- is there anything in
4  his testimony that you would dispute?
5  A    No.
6  Q    Do you believe the Mitsubishi -- rejecting the Mitsubishi
7  contract is in the best interest of the debtors and their
8  estates and their stakeholders?
9  A    Yes, I do.
10 Q    You also heard the testimony, did you not, that as of now,
11 Mitsubishi is not offering to pay any amounts to the debtors in
12 exchange for the two catalysts that are connected with this
13 Mitsubishi project, that's correct?
14 A    I did hear that, yes.
15 Q    And did you not -- and you also heard testimony that the
16 debtors would like to talk to other customers about whether
17 they'd be interested in these catalysts, is that correct?
18 A    I did hear that, yes.
19 Q    Would that be, in your role as financial advisor, your
20 advise to the debtors in terms of pursuing?
21 A    Yes.  I believe that all of our contracts are assets of
22 the estate.  And we need to make sure that we do what we can to
23 exhaust all abilities to determine and maximize value of those
24 contracts.  So, I do believe it's appropriate to canvas the
25 market if we believe there's value to those catalysts.

1          MR. CUNNINGHAM:  Thank you.  No further questions,

2   Your Honor.

3          THE COURT:  Cross examination?

4                    CROSS EXAMINATION

5   BY MR. AGUSTI:

6   Q    Good afternoon, Mr. Caruso.

7   A    Good afternoon.

8   Q    Have you been involved in any direct telephone

9   communications or other kind of communications with Mitsubishi

10  Power Systems officials with respect to the Deltak contract?

11  A    No, I have not.

12         MR. AGUSTI:  I have no further questions, Your Honor.

13         THE COURT:  Mr. Sabin?

14         MR. SABIN:  Thank you, Your Honor.

15                   CROSS EXAMINATION

16  BY MR. SABIN:

17  Q    Good afternoon, Mr. Caruso.

18  A    Good afternoon.

19  Q    I don't know if the witness stand still has a copy of

20  Creditors' Exhibits 1 and 2.

21  A    I believe it does.  One that starts with a picture of the

22  HRSG?

23  Q    No, Creditors' Committee's 102, which would be the two

24  purchase orders.

25  A    Um --

1          (Pause)

2          MR. SABIN:  If I may approach, Your Honor?

3          THE COURT:  Please.

4  BY MR. SABIN:

5  Q    Are you familiar with Creditors' Exhibit 1 and/or 2?

6  A    This is the first that I'm actually seeing it.

7  Q    But you are familiar with the debtors' documentation

8  regarding its secured lenders?

9  A    Yes.

10  Q    And is it your understanding with respect to the secured

11  lenders' collateral that it would include anything that the

12  debtors have title to?

13  A    That's correct.

14  Q    Do you know whether the debtors have title today to the

15  catalysts?

16  A    I don't.

17  Q    If the debtors did get title to the catalysts, it is your

18  understanding that that would be then subject to the lien of

19  the lenders?

20  A    That's my understanding.

21  Q    And you've heard the testimony of what amount would be due

22  and owing, have you not, with respect to these two catalysts?

23  A    I did hear that, yes.

24  Q    Have you ever asked the lenders whether they would forward

25  the cost of the amounts due under either of these two purchase

1  orders so that the debtors could get title, if they didn't

2  already have title?

3  A    No, we did not have those discussions specifically.

4  Q    So, is it not true that if the debtors got title, based on

5  the testimony of the potential value and/or the offer that was

6  already made by the debtors, that there might be excess value

7  over the amounts that are due under these purchase orders?

8  A    Yes.

9  Q    Do you know whether either of the two letters of credit,

10 which are supposed to be issued to Deltak, have been issued?

11 A    I don't know.

12           MR. SABIN:  I have no further questions, Your Honor.

13           THE COURT:  Mr. Agusti?

14           MR. AGUSTI:  Thank you, Your Honor.

15                    RECROSS EXAMINATION

16 BY MR. AGUSTI:

17 Q    Mr. Caruso, you testified that, I believe, that if -- that

18 there may be excess value in the catalysts over and above the

19 amounts necessary to purchase the catalysts, is that your

20 testimony?

21 A    My testimony is -- is my understanding based upon

22 representations.

23 Q    And what was that based on?

24 A    Based upon representations made by management and the

25 testimony of the prior witness.

1  Q    So, you were just basing your testimony based on Mr. Ehm's

2  testimony, correct?

3  A    That's correct.

4  Q    So, you have nothing really to add other than that you

5  were here and you heard what he said, and you are confirming

6  that you heard what he said?

7  A    That's correct.

8            MR. AGUSTI:  No further questions.

9            THE COURT:  Any redirect?

10           MR. CUNNINGHAM:  No, Your Honor.

11           THE COURT:  Very well.  You may step down.  Mr.

12  Cunningham, any other witnesses?

13           MR. CUNNINGHAM:  No, Your Honor.  Just as a

14  housekeeping detail on our exhibits, I don't think I moved for

15  their admission, Debtors' Exhibits 1, 2 and 3.  1 was, again,

16  the demonstrative; 2 is the contract, I don't think there's any

17  dispute in that;  and, 3, is a party admission we got from

18  Mitsubishi's web site.

19           MR. AGUSTI:  Your Honor, I don't believe it's a party

20  admission, but we don't objection to its admission.

21           THE COURT:  They're admitted.

22           MR. CUNNINGHAM:  Thank you, Your Honor.  And I would

23  ask if the Court could take judicial notice of one document,

24  and that is Your Honor's order, the corrected order that

25  originally set these hearings, and also it's the order dated --

78

1   corrected order dated October 5th, 2005 (sic) in these cases.
2   It says, granting in part motion pursuant to 105363, 365 for an
3   order authorizing debtors to wind down operations the heat
4   recovery steam generation business segment, et cetera.  This is
5   the -- Your Honor's order that approved the initial wind down
6   procedures and then set up the procedure for the -- notifying
7   parties of the rejection.

8       THE COURT:  I don't know if it's necessary or
9   appropriate for me to take judicial notice of it.  The fact is
10  that it's certainly a matter of record, it's on the docket, and
11  it's clearly of record and pertinent to this matter.

12      So, I think it's -- I think it's already part of the
13  record.

14      MR. CUNNINGHAM:  Thank you, Your Honor.  Nothing
15  further, Your Honor.

16      THE COURT:  Again, as a matter of housekeeping, I
17  think that we do have -- I don't know if we've actually
18  admitted or moved the admission of a collection of other
19  exhibits.  Mr. Agusti, I know that you have a binder that
20  you've given me, and I'm sure we'll address that when you get
21  to it, but I do have the two Creditors' Committee submissions.
22  And I simply don't recall whether they were admitted.

23      MR. SABIN:  They have been.

24      THE COURT:  Very well.

25      MR. SABIN:  Thank you.

79

1          MR. AGUSTI:  Your Honor, and if I may, I'd like to

2  move the admission of the two documents that I had Mr. Ehm

3  identify.

4          THE COURT:  Any objection?

5          UNIDENTIFIED ATTORNEY:  No objection.

6          THE COURT:  They're admitted.  You may proceed.

7          MR. AGUSTI:  Your Honor, we're ready to proceed with

8  our direct case, but if it would be all right, could we beg the

9  Court's indulgence for a five-minute recess?

10         THE COURT:  Yes, we can.  Before we do that, how many

11 witnesses do you have and how long do you expect to be?

12         MR. AGUSTI:  We have two witnesses, Mr. Yates will be

13 conducting the direct examination.

14         MR. YATES:  Your Honor, Greg Yates, Steptoe and

15 Johnson on behalf of Mitsubishi Power Systems.  I believe the

16 two witnesses in total on direct should take less than an hour.

17         THE COURT:  Mr. Cunningham, anything further?

18         MR. CUNNINGHAM:  Your Honor, one thing.  Mr. Caruso,

19 I believe, we're done with his testimony, we don't anticipate

20 calling him on any rebuttal or in connection with the next

21 motion.  So, I would ask if he can be excused?

22         THE COURT:  That would be fine.

23         MR. CUNNINGHAM:  Thank you, Your Honor.

24         THE COURT:  All right.  We'll take a five-minute

25 break.  We stand in recess.

Thangiah - Direct                                                80

1                    (Recess 3:45 P.M./Reconvene 3:57 P.M.)

2                    THE COURT:  Please be seated.

3                    MR. YATES:  Good afternoon, Your Honor.  I would like

4    to call Mr. Schartz Thangiah to the stand, please.

5                    THE COURT:  Very well.

6                    CLERK:  Please raise your right hand, state your full

7    name, spelling your last for the Court.

8                    MR. THANGIAH:  Schwartz Thangiah, last name is

9    spelled T-H-A-N-G-I-A-H.

10                   SCHARTZ THANGIAH, MITSUBISHI'S WITNESS, SWORN

11                   CLERK:  You may be seated.

12                            DIRECT EXAMINATION

13   BY MR. YATES:

14   Q    Good afternoon, Mr. Thangiah.  Who are you employed by?

15   A    I am employed by Mitsubishi Power Systems America.

16   Q    And in what office do you work out of?

17   A    I work at their Lake Mary office in Florida.

18   Q    How long have you been employed by Mitsubishi Power

19   Systems?

20   A    I've been employed with them since August of 2000.

21   Q    What is your current position at Mitsubishi Power Systems?

22   A    I'm the project manager for the Port Westward project.

23   Q    And how long have you been project manager for Port

24   Westward?

25   A    I became the project manager from May of this year.

Thangiah - Direct                                          81

1  Q     And prior to that time, what was your position at
2  Mitsubishi?
3  A     Prior to that, from 2004, I was the project engineering
4  manager for Port Westward from the beginning of this project.
5  Q     And prior to that, what was your position at Mitsubishi
6  Power Systems?
7  A     Prior to that, I was a senior project engineer.
8  Q     Okay.  Any particular projects you worked on as senior
9  project engineer?
10 A     I have worked in all the G gas turbine plants applied by
11 Mitsubishi in U.S.A. except the one in Michigan, so I have
12 worked in two plants in Boston, one in Texas, and currently I'm
13 working on Port Westward.
14 Q     Thank you.  Could you briefly describe your educational
15 background, please?
16 A     I have a bachelors degree in mechanical engineering with
17 distinction from University of Madras in 1985.  I have a
18 masters in business administration from University of Central
19 Florida in 2005.
20 Q     And before you went to work for Mitsubishi Power Systems,
21 where were you employed?
22 A     From '97 to 2000, I was a project manager in Apco Boilers
23 (phonetic) in Texas.  And prior to that, from '94 to '97, I was
24 with Mitsubishi Heavy Industries in Japan as a mechanical
25 engineer.

1  Q    Have all of these positions been in the power generation

2  industry?

3  A    Yes, in total I have 21 years of experience in power

4  generation industry.

5  Q    And that experience is as a engineer, as well as project

6  management?

7  A    Yes.

8  Q    What does Mitsubishi Power Systems do?  What is Mitsubishi

9  Power Systems' business?

10  A    We supply power generation equipment for the U.S. market.

11  And also we supply technical assistance for the installation of

12  our equipment, a start-up and commissioning of the same.

13  Q    And can you be a little more specific in what you

14  individually do as project manager for Port Westward?

15  A    As the project manager of Port Westward, I am fully

16  responsible for all the aspects of this project.  I am involved

17  in day-to-day activities of various activities.  I'm also

18  involved in the customer coordination, coordination with the

19  EPC contract.  And I also monitor and coordinate the technical

20  assistance services to the field.  And I'm also involved in the

21  engineering coordination of all the vendor items in U.S.

22  Q    And can you tell me generally what the Port Westward

23  project is?

24  A    Port Westward project is a combined cycle power plant and

25  the -- the owner of the project is Portland General Electric,

D216

Thangiah - Direct                    83

1  it's a 400 megawatt nominal power plant, uses natural gas as a
2  fuel to fire in the gas turbine.
3  Q    How many turbines are there at the Port Westward project?
4  A    There is one gas turbine and one steam turbine.
5  Q    And the term HRSG, or H-R-S-G, has been used.  Can you
6  tell me what that stands for?
7  A    It stands for heat recovery steam generator.
8  Q    And is that a component of the Port Westward project?
9  A    Yes, it is.
10 Q    Okay.
11       MR. YATES:  I'd like to, for the Court's convenience,
12 as well as the parties, to show a diagram that might help us
13 visualize Port Westward.
14                    (Pause)
15       MR. YATES:  If I may approach?
16       THE COURT:  Please.
17 Q    If you could look at the diagram that has been blown up in
18 the chart off to your side and tell me what that diagram
19 represents?
20 A    This represents a schematic of a combined cycle plower
21 plant.
22 Q    Would that be a good general approximately of the Port
23 Westward power plant?
24 A    Yeah, it is.
25 Q    Could you briefly --

1           MR. YATES:  And if Your Honor would allow the witness
2   to stand and brief describe how this power plant operates?
3           THE COURT:  Please.
4           (Witness testifying away from microphone)
5   A    The main component of the power plant is the
6   (indiscernible).  It uses (indiscernible).  And there is --
7           THE COURT:  Can you pull the mic towards you so we
8   can pick this up?  Very good.
9   A    So, as I said, there is a generator connected to this
10  turbine, and we generate electricity here.  And this
11  (indiscernible) two fifty megawatt of electricity.  And then
12  product of the combustion is hot exhaust that is coming out of
13  the turbine, they'll be in the range of thousand two hundred
14  degree Fahrenheit.  And what we do is we take that into the
15  heat recovery steam generator and this extracts the heat from
16  the exhaust gasses and this, in turn, generates steam here.
17  And we take this steam and put it in the steam turbine.  And
18  this steam turbine is connected to another generator here.  So,
19  we generate more electricity.  So, we get a two fifty megawatt
20  here, we get another 150 megawatt here, which makes up the
21  total 400 megawatt in this plant.
22          There are other equipment, but our scope is mainly
23  the gas turbine, HRSG, and the steam turbine.
24  Q    Thank you.  I think you can be seated now.
25          MR. YATES:  I'd like to mark the small copy of the

1  exhibit as Creditors' Exhibit 3, I believe.  Your Honor, I

2  believe the record should be correct.  I think it was

3  Creditors' Committee's 1 and 2, perhaps this might be

4  Mitsubishi Number 1.

5            THE COURT:  I think we have marked yours as

6  Creditors' Committee --

7            MR. YATES:  I think there were two creditors'

8  exhibits, the e-mail and completion agreement.

9            THE COURT:  And I think we've marked yours as

10  Creditors' Committee, hopefully there won't be confusion.

11            MR. YATES:  Thank you, Your Honor.

12  BY MR. YATES:

13  Q    And, in general, you've pointed out how this system works.

14  Can you tell me where the catalyst would be in this system?

15  A    Catalysts are located in the HRSG.

16  Q    Generally, what role does the -- the HRSG play within the

17  total power plant system?

18  A    As I explained, we have hot exhaust gasses coming out of

19  the gas turbine.  And the HRSG regulate some of the heat from

20  the hot gasses and generate steam.  It also, by prorating those

21  catalysts, cleans up the exhaust gasses before we allow them to

22  go into the atmosphere.

23  Q    And what is Mitsubishi Power Systems' role in the Port

24  Westward project?

25  A    Our scope is to supply the equipment, mainly the gas

1  turbine, HRSG, steam turbine and the other related equipment

2  for that.  In addition, we also provide the technical

3  assistance for installing these equipment.

4  Q    Okay.  And does Mitsubishi do the actual installation of

5  the equipment into the plant?

6  A    We don't do that.  The EPC contractor does it, the

7  engineering procurement construction contractor.

8  Q    Does Mitsubishi provide advice to that contractor that's

9  doing the installation?

10  A    Yes, we provide technical assistance.

11  Q    Where does Mitsubishi Power Systems obtain the turbines

12  that are used in the plant?

13  A    We get them from our affiliates in Japan.

14  Q    And what type of gas generator is being used in the Port

15  Westward project?

16  A    Uh, can you rephrase it?

17  Q    What type of gas turbine is being used in this project?

18  A    We use a Class G, which can generate 250 megawatt of

19  electric power.

20  Q    You've testified that Mitsubishi Power Systems obtains the

21  turbines from its affiliates in Japan.  Where does Mitsubishi

22  Power Systems obtain the HRSGs?

23  A    For our U.S. projects, we buy them in U.S.

24  Q    Generally, are there different types of power plants that

25  are available to an end user?

1  A    Yes, there are many types available.

2  Q    Are there differences between different types of power
3  plants?

4  A    There are many differences, and also there are various
5  considerations why you should go with a particular type of
6  power plant.

7  Q    What would be some of the considerations an end user and
8  owner of a power plant would use in deciding what type of plant
9  to specify being built?

10  A    Some of the considerations will be the type of fuel they
11  have, how much power they need, what are the local emission
12  regulations, which they have to meet.  And also what are the
13  lead time or how much time they have before they, you know,
14  start to generate the power.

15  Q    And for each of these considerations, would there be
16  different types of equipment and attachments that would be
17  associated with those particular factors?

18  A    Yes.

19  Q    Why are the custom designed attachments to power plants
20  necessary?

21  A    Except for some of the core components, all the other
22  auxiliaries and other equipment have to be designed to meet the
23  various conditions and also, you know,  we need to make all the
24  equipment work together.  So, that results in consideration of
25  various components.

Thangiah - Direct                          88

1  Q    So, are there any parts of the system that tend to be

2  generic, say the turbines, do they tend to be generic?

3  A    Yes, for example, if you just take the gas turbine for a

4  natural gas fired unit, that's a standard unit.  But all the

5  auxiliaries that go around that will be based on the

6  conditions, for example, in Portland, you know, what is a State

7  condition there, what are the designs, what are the local

8  codes?  We need to meet all those things, so we design around

9  those requirements.

10 Q    In your experience, typically does the party that supplies

11 the turbines in these type of projects also contract for the

12 supply of the HRSGs?

13 A    Normally, yes.

14        MR. YATES:  I'd like to approach with Creditors'

15 Exhibit 4.

16 Q    I ask you to take a look at that and tell me what that

17 diagram is.

18 A    This shows the side view of a HRSG, similar to what we

19 have in Port Westward.  As we go from left, it's slightly

20 different, as an expansion joint, that connects the HRSG to the

21 gas turbine exhaust.  So, the hot gasses flow from left to

22 right in this sketch.

23 Q    So, this diagram pretty much if you look at Debtors'

24 Exhibit 1, I think --

25 A    Yes.

Thangiah - Direct                                89

1  Q    -- the picture, you can see the slope, and it pretty much
2  is a cross section of a unit like that?
3  A    Yes.
4  Q    Okay.  If you could explain, as you were starting to do,
5  going, I suppose the easiest way, from left to right, what the
6  various units are and particularly attention to where the
7  catalyst are in this HRSG.
8  A    So, as we go from left to right, you know, there are a lot
9  of vertical lines shown, those are the tubes that were referred
10 by Mr. Ehm.  We have a -- many heat transfer sections which are
11 arranged in bundled, we call them super heat (indiscernible) at
12 a different pressure levels.  But once you cross the first drum
13 here, this one, --
14 Q    And that would be the one with the circular --
15 A    HPE steam drum, yeah.  To the right of that, if you see,
16 it's very small, but the first one is CO catalyst.  It's
17 written C-O, and I -- you know, there is a dotted line going
18 right across.  So, the CO catalyst is located in that position,
19 you know, it spans or it complete covers the cross section of
20 the HRSG.  So, that all the gasses that flow through the HRSG
21 should go through that catalyst.
22         So, first we have the CO catalyst, and then after
23 that we have AIG, which is the ammonia injection grid, it's
24 part of the NOx catalyst system.  And then to the right of
25 that, if you see, we have the SCR catalyst.

 1       And then after that, again, you have the heat
 2  transfer surfaces, there, you know, on the outside you have hot
 3  gasses, and on the inside we circulate water and generate
 4  steam.  And finally the cool exhaust gas will be sent to
 5  atmosphere through the stack, which is a -- like 200 feet tall.
 6  Q    So, would it be fair to say that generally, the HRSG takes
 7  hot gasses, converts some of it to steam to drive steam
 8  generators, and cleans the rest for emission into the
 9  atmosphere?
10  A    Yeah.  The heat is extracted from the hot gasses and
11  converted to steam and save to tubes -- and save to tube
12  bundles.
13  Q    Is it customary for the supplier of the HRSG to also be
14  responsible for the supply of the catalysts that are included
15  within the HRSG?
16  A    In all our projects, yes, that was the norm we have
17  followed.
18  Q    In your experience, do the manufacturers of the HRSGs
19  typically also manufacturer the catalysts that go in the HRSG?
20  A    No, they don't.
21  Q    And how do they obtain the catalysts?
22  A    They go to the -- you know, specialty, like Cormetech or
23  Engelhard, or current BASF, to obtain these catalysts, and also
24  they are, you know, the CO catalyst by itself is a system, it's
25  a standalone system, you don't need any other auxiliaries

1  (indiscernible).  But if you go to the SCR, you have the

2  catalyst blocks.  In addition to that, you have auxiliary

3  equipment for injecting ammonia into the system.  So, you have

4  fans, pumps, vaporizer tanks.  So, all those things the HRSG

5  vendor designs by themself.  So, they buy only the catalyst

6  from Cormetech.

7  Q    Or other manufactures?

8  A    Or other manufactures, yeah.

9  Q    Okay.  Are the catalysts typically custom designed and

10 manufactured?

11 A    Yes.

12 Q    Can you tell me about the status of the HRSG at the Port

13 Westward plant at this point today?

14 A    The erection of the HRSG is completed.  All the tubes have

15 been hydro tested for leakage and that has been successfully

16 done.  And the major item we are waiting is for the catalysts.

17 Q    So, is it your testimony that basically the HRSG is

18 complete, with the exception of the installation of the

19 catalysts?

20 A    And like Mr. Ehm said, there are some punch -- you know,

21 punch list items.

22 Q    Would you consider those punch list items minor items or

23 major items?

24 A    So far they have been minor, you know.

25 Q    If you were to -- if Mitsubishi Power Systems was to

1  obtain the catalysts outside its contract with Deltak, the
2  contract that's being rejected today, would Mitsubishi need
3  Deltak to provide any technical assistance?

4  A    No, we don't need any technical assistance from Deltak.
5  Q    Is there a difference -- there's been two types of
6  catalysts that's been discussed, the NOx or the SCR catalyst
7  and the CO Catalyst.  Are there differences between those two
8  types of catalysts?

9  A    Yes, they are totally different in that the CO catalyst
10 converts the carbon monoxide and the exhaust gasses to carbon
11 dioxide.  And the NOx catalyst converts the oxides of nitrogen
12 to nitrogen and water.  So, that when they -- you know, when
13 they exit from the stack, they are harmless.

14 Q    And we've talked about these two types of catalysts, and
15 in my mind sometimes I hear it's just like one unit.  But are
16 there multiple catalysts within the HRSG?  For example, is
17 there more than one CO catalyst?

18 A    There are multiple blocks of modules.  For the CO, we have
19 384 modules.  And then for -- like Mr. Ehm said, it is 33
20 blocks at 33 modules.

21 Q    And for each, could you give us just a general idea of the
22 size, the dimensions and weight of those?

23 A    Yeah, the CO catalyst blocks are the modules that are much
24 smaller.  They're like two feet long by two feet wide, and then
25 maybe around there inches deep.  It's like a small type.

Thangiah - Direct                    93

1 Whereas as the catalyst or the NOx catalyst are nine feet by

2 six feet, and then they are like two feet deep, approximately.

3          THE COURT:  I'm going to ask that anybody that's

4 participating by phone put their phone on mute.  If the

5 keyboarding continues, we'll terminate the call.

6          Proceed.

7          MR. YATES:  Thank you.

8 BY MR. YATES:

9 Q    And do the HRSGs and the catalysts contain therein --

10 contain different configurations based on the location of the

11 installation?

12 A    Yes.

13 Q    Mr. Ehm, I believe, testified that in his mind, that

14 catalysts were basically like Lego building blocks.  Would you

15 characterize the catalysts in that way?

16 A    If you take the module itself, they are like building

17 blocks.  But individually, if you deeper, I think they have a

18 different final construction.

19 Q    So, the base unit itself might be fairly standard.  But

20 the use to which it is put is very specific, is that your

21 testimony?

22 A    The dimensions, yes.

23 Q    What would be some of the factors that would influence the

24 design of the catalysts?

25 A    The sizing of the catalyst is dictated by the inlet

1  condition, or how much NOx or how much CO gets into these
2  catalysts.  And the outlet conditions, which are dictated by
3  the local emissions regulations, you know, how much NOx is
4  allowed into the atmosphere, or how much CO is allowed into the
5  atmosphere.  And also the block size itself will vary based on
6  the cross section, whatever Deltak has designed, for the HRSG.
7            And, again, the inlet conditions vary by the type of
8  gas turbines, what we will use, type of fuel, what we use, you
9  know, there are many variables on those.
10 Q    So, starting, say, at the input side of the HRSG, the
11 HRSG, I think you've testified that the input itself, the type
12 of gas would be important in the particular design and
13 configuration of the catalyst, is that correct?
14 A    Yes.
15 Q    Now, would all gas turbines on the input side be
16 configured similarly?
17 A    No, each one is different.
18 Q    All right.  And why would that be?
19 A    Again, as I said, it depends on the capacity or the model
20 of the gas turbine.  Like MHI makes F class, G class.  GE makes
21 F class and H class.  Siemens have their own naming system, and
22 each one have different capacity.  And each one -- the -- the
23 amount of NOx and CO basically is dictated by the compression
24 temperature inside the gas turbine and how they do it.  So,
25 they can vary depending on how they design it.

1  Q    So, it's not only the type of fuel or even the type of
2  natural gas, but it's the pressure that is produced by the
3  turbine of the gasses flowing into the HRSG?
4  A    It's the temperature at which these fuel gas are burned,
5  that dictates how much NOx is found.
6  Q    And that would be a variable depending on the type of --
7  A    Design, yes.
8  Q    -- generation?
9  A    Yes.
10 Q    On the output side, particularly the environmental
11 standards in various locations, would that affect the design of
12 a particular catalyst?
13 A    Yes.  For example, we have done a project in Boston, the
14 unit was located in a city, so their emission requirements were
15 very stringent.  We had to meet -- we were allowed to exhaust
16 only two PPM of NOx through the stack.  Two PPM of CO.
17        But a similar project, what we did in Texas, we were
18 allowed to exhaust eight PPM of NOx, had quantities of CO.
19 And, in fact, there is no CO catalyst in the Wolf Hollow Plant.
20        And in Port Westward, you know, it's designed for a
21 2.3 PPM NOx and 4.9 PPM of CO.  So, you know, the outlet
22 conditions vary totally based on which -- dimensions of the
23 catalyst, you know.
24 Q    So, it's your testimony that there are numerous factors
25 that would dictate the design and manufacturer of a particular

1  catalyst for a use in the HRSG of a power plant?

2  A    Yes.   In fact, I missed one item.  In Port Westward, you

3  know, the end user wanted a minimum life requirement.   They

4  said the catalyst should be -- the NOx catalyst should have

5  minimum four years of life.  So, at that time we went back,

6  Deltak, they redesign and, you know, we were led to believe

7  that they had to add more catalysts because they, you know, the

8  normal life was, let's say, X years, and now we are asking for

9  more.  So, that could be only achieved by adding more

10 catalysts.  So, it's a bigger catalyst, what we have in Port

11 Westward.

12 Q    Would that be a factor that is just a matter of adding

13 more of these blocks or would there be other design changes,

14 configuration changes that would be involved?

15 A    See, the cross section is -- it's the only way you can

16 increase or decrease is changing the depth and once Deltak

17 gives that design input to the catalyst people, they will

18 design how much, you know, depth they have to provide to meet

19 those requirements.  So, what I'm saying is let's say if the

20 emission requirements in Portland are similar to Deltak, the

21 thickness catalyst may be eight inches.  Then, let's say, now

22 we are designing for two point, fire may go up to one -- one

23 foot by one foot six inches.  I'm just throwing approximate

24 numbers.  And then customer wants -- they impose more

25 requirement on, hey, the life should be increased, they want

1 four years.  So, finally we end up with a two feet long or two

2 feet deep catalyst, that's how it progresses.

3 Q    In your long experience in the power industry, have you

4 ever encountered a situation where a catalyst that had been

5 manufactured for one particular facility was used in a

6 different facility?

7 A    No.

8 Q    Do you have any idea if there's a secondary market for

9 catalysts once they've been manufactured?

10 A    I don't think so.

11 Q    As a representative for Mitsubishi and project management,

12 would you ever allow your procurement department to purchase

13 catalysts that had been designed for another plant and modified

14 to be put in the plant you were --

15 A    I would not allow that in my project.

16 Q    I think debtor -- Mr. Ehm, debtors' witness, testified

17 that there was one possible buyer that they thought they might

18 have located, the Wolf Hollow plant in Texas, are you familiar

19 with that project?

20 A    Yes.

21 Q    have you had any involvement in the past with that

22 project?

23 A    I was involved in the design of the project.

24 Q    Do you believe that the catalyst designed for Port

25 Westward would fit into the Wolf Hollow project?

1 A    The gas turbine are, you know, the most similar ones, they

2 have the G class gas turbines, both in Wolf Hollow and also in

3 Port Westward, but the design conditions are totally different,

4 especially on the exhaust side.  So -- and also, there are no

5 requirements on life or anything on Wolf Hollow.  So, I don't

6 think we can use these catalysts in Wolf Hollow.

7         Again, the reason is the more -- you know, it's going

8 to be a size thing if we use the same catalyst in Wolf Hollow

9 plant.  And once you put more, it's going to result in higher

10 pressure drops and the exhaust gas site.  Once you start

11 increasing the exhaust gas pressure site, my gas output is

12 going to come down.  The more resistance I add, that's going to

13 dramatically impact my output.  So, I cannot compromise on

14 that.

15 Q    So, trying to fit a catalyst that's not specifically

16 designed in the system might sort of kind of work, but it's

17 going to have major implications for the rest of the system, is

18 that correct?

19 A    Yes.  You know, especially -- in my opinion, these are two

20 G class turbines, and I'm saying that it cannot be used.  But

21 if you go to F class machine or another class machine, the

22 flows are totally different.  That will result in different

23 pressure drops and I don't know how they can balance or match

24 these existing catalysts.

25 Q    But even for fairly -- or very similar power plants that

Thangiah - Direct                                    99

1  use the exact same turbine, it's your testimony that the

2  catalysts would not work, would not be interchangeable between

3  the --

4  A    Yeah, there are so many other variables which have to be

5  considered before using them.

6  Q    Can you tell me about how long it would take to

7  manufacture a catalyst from scratch if Mitsubishi had to order

8  new catalysts for the HRSG?

9  A    If there is no designers involved or if they have design,

10 existing design, what we learned is BASF needs three months to

11 manufacture the CO catalyst.  And Cormetech will need like four

12 to six months to get these blocks out.

13 Q    And can you tell me, again, why it takes so long to obtain

14 those catalysts?

15 A    Uh, as Mr. Ehm mentioned, you know, these catalysts use

16 some exotic material.  You know, they're not available off the

17 shelf.  You are to order them, wait for them to come back, and

18 then you, again, make these into all these blocks, so it takes

19 some time to get these out of your factory.

20 Q    So, that they are custom designed and manufactured?

21 A    Yeah, they have to be made, you know, they cannot just go

22 and pull something off their inventory or whatever.

23 Q    And to your knowledge, did Deltak subcontract out the

24 manufacturer of the catalyst in the Port Westward project?

25 A    Yes.

Thangiah - Direct                    100

1  Q    And can you tell me who the subcontractors were?

2  A    For the NOx, they went to Cormetech.  For the CO, they

3  went to Engelhard, who are presently known as BASF.

4  Q    And do you know the status of those catalysts that he

5  spoke -- excuse me.

6         MR. SABIN:  I'm just going to object, lack of

7  foundation.

8         THE COURT:  He can answer.  Overruled.

9  Q    Have you spoken with representatives of Cormetech

10 concerning the status of the catalysts?

11 A    I spoke to them to find out what are the lead times

12 involved, you know, if we have to order something new.

13 Q    And did you discuss at all the catalysts that have already

14 been manufactured?

15 A    I had the shipping pro forma packing orders from Deltak

16 saying they are ready, you know, they are ready to be shipped.

17 Q    So, Deltak has informed you that they are ready --

18 A    Yes.

19 Q    -- to ship?

20 A    Yes.

21 Q    How about from BASF, the catalysts?

22 A    Yes, all the information flows to us through Deltak.  So,

23 I have the pro forma packing list for both CO and also for NOx.

24 Q    So, it's your testimony that Deltak representatives have

25 told you that both sets of catalysts are manufactured and ready

1  to ship to Port Westward?

2  A    Yes.

3  Q    When we talk about commissioning in regard to a power

4  plant, what does that mean?

5  A    Prior to handing over the plant to the customer, we need

6  to get the unit running, and then we do all the tests and

7  checks to see whether everything is meeting or functioning as

8  per the design, and all those activities are commissioning.

9  Q    Why is that critical to the completion of a power plant?

10 A    Only when we go through all the commissioning process, we

11 ensure everything is functioning properly.  Otherwise, you

12 know, if we don't do that and give it to customer, they don't

13 know, they cannot operate the plant.

14       And also as a part of commissioning, we have to do

15 many functional tests which are agreed in the contract.  We

16 have to do a performance test to prove that whatever guarantees

17 we have made in the contract, we are meeting them.

18 Q    And those tests have to be completed before the customer

19 will accept delivery of the plant?

20 A    Yes.

21 Q    Can the commissioning be completed without the catalyst

22 installed in the HRSG?

23 A    No.

24 Q    So, would you consider the catalyst the HRSG's major

25 components of the combined cycle plant?

Thangiah - Direct                                        102

1  A     Yeah, we need the catalyst -- we need to commission the
2  NOx because, as I said, the -- CO is just a passive system, it
3  doesn't have anything.  Whereas the NOx has system like ammonia
4  injection, and we need to tune those to meet our emission
5  guarantees.  And also, you know, we need to prove our emission
6  guarantees to the customer.  So, for that, all these things
7  should be installed and functioning.
8  Q     I'm going to hand up to you a document that's contained in
9  our booklet of documents that have been filed under seal.  It's
10 Exhibit 3, and I think Exhibit 3 in that binder is marked
11 Creditors' Exhibit 5.  And ask if you can tell me what that
12 document is?
13 A     That's our contract agreement with PGE which was later
14 assigned to the EPC contractor.
15 Q     And what has been your involvement with that document?
16 Were you involved in the negotiation of that document?
17 A     I was involved on the technical aspects during
18 negotiation.
19 Q     Okay.  And have you become familiar with that document --
20 A     Yes.
21 Q     -- in your capacity as project manager?
22 A     Yes.
23 Q     Is it your understanding that under this agreement with
24 Portland Gas and Electric, that Mitsubishi Power Systems will
25 be subject to liquidated damages beginning December 15th if the

1  catalysts are not delivered to the Port Westward project?

2  A    Yes.

3          MR. YATES:  I think can be marked Creditors' Exhibit

4  6.

5  BY MR. YATES:

6  Q    And I ask if you can tell me what that exhibit is?

7  A    This shows a calculation that was done to show how much

8  L.D., liquidated damages exposure we have.  You know, even if

9  we order a SCR catalyst, which isn't the critical part, by

10 Monday of this month, assuming that we have a six-month lead

11 time, and the L.D. kicks on 12/15 --

12 Q    Okay.  First I'd like you just to say do you recognize the

13 document?  And I think you did that.

14 A    Yes.

15 Q    I'll ask you to go through it for the Court in just a

16 second.  Do you believe that this document, this spreadsheet or

17 chart, adequate -- reflects your understanding of how

18 liquidated damages would be calculated against Mitsubishi under

19 its contract with Portland Gas and Electric?

20 A    Yes, that's my understanding.

21 Q    Okay.  Now, if you could give me the assumptions behind

22 this document, and walk through it, how these damages were

23 calculated.  As I said, this -- you know, we -- this is an

24 estimate of what is our exposure to the liquidated damages.

25 You know, even if we -- if there is no division made, and then

1 we have to order a catalyst by next Monday, which is 11/5, you
2 know, and assuming that is a six-month lead time, the delivery
3 date for the catalyst will be by May 5th of 2007, and the L.D.,
4 or the liquidated damages, clock starts on 12/15.  And
5 according to the contract, the L.D. alone for any delay up to
6 the first 30 days if $25,000 per day.  And from the 31 to 60,
7 it's $30,000 per day.  From 61 to 90, it's $50,000 per day.
8 And anything above 91, it's $75,000 per day.  So, if we make
9 those calculations and add everything up, it comes to six point
10 nine, you know, nine seven five million dollars.
11 Q    So, it was your testimony, I think, previously that the
12 NOx or the SCR catalyst could take anywhere from four to six
13 months.
14       In looking at that chart the way I interpret it is
15 that even at the lowest end, that would result in about a $3.15
16 million liquidated damage claim against Mitsubishi.  If it was
17 at the sort of outside end, six months, that would be
18 $6,975,000.
19 A    Yes.
20 Q    Is that your understanding of the liquidated damages?
21 A    That's my understanding, yes.
22       MR. YATES:  I'm finished with the witness, Your
23 Honor.
24       THE COURT:  Cross examination.
25       MR. CUNNINGHAM:  The debtors have no cross.

1          THE COURT:  Mr. Sabin?

2          MR. SABIN:  Thank you, Your Honor.

3                    CROSS EXAMINATION

4  BY MR. SABIN:

5  Q    Good afternoon, sir.

6  A    Good afternoon.

7  Q    If I understand it right, you are familiar with the actual

8  contract between Deltak and Mitsubishi with respect to the

9  HRSG?

10  A    Yes.

11  Q    Did you actually participate in the negotiations of that

12  contract?

13  A    I -- I took part on the engineering side, not on the

14  technical side.  The commercial aspects I don't get involved

15  in.

16  Q    And have you had an involvement in any of the discussions

17  leading to the negotiations and/or dispute on the completion --

18  proposed completion agreement?

19  A    I was there during the conference call.

20  Q    And is it your understanding that there exists a dispute

21  with respect to that proposed arrangement?

22  A    Yes.

23  Q    If you could, look at Debtors' Exhibit 2, please, which is

24  the contract itself.

25  A    Between Deltak and MPS?

1 Q    Yes.  And in particular, I call your attention to Page 90,
2 Section 31.1.

3 A    31.1?

4 Q    31.1.1.  31.1 is the general, and I have some questions
5 regarding three subsections.

6       MR. YATES:  Your Honor, I'm going to object to the
7 extent that the contract between Deltak and Mitsubishi Power
8 Systems, that the witness did not testify to that during
9 direct, he has not indicated he's participated in the
10 negotiation of that contract, and he's not a lawyer.  The
11 document will speak for itself.

12       MR. SABIN:  I believe, Your Honor, he did testify
13 he's familiar with it.  And I believe he testified how it works
14 with respect to the HRSG, I believe he testified how it works
15 with respect catalyst.

16       THE WITNESS:  I know all the engineering aspects of
17 this design.

18       MR. YATES:  Your Honor, I think there may be a
19 mistake, and maybe I mismarked the exhibit.  The contract that
20 we were referring to is the contract between Pacific Power and
21 Electric --

22       THE COURT:  Portland General Electric.

23       MR. YATES:  Portland General.

24       THE WITNESS:  No, Portland General Electric.

25       MR. YATES:  Excuse me.  And Mitsubishi.  As we will

1  see with the next witness, the liquidated damages provisions
2  are mirror images.  But other than that, the contracts may
3  contain quite substantial differences.
4        THE COURT:  I'll allow it.  If he can testify, he can
5  testify.
6  BY MR. SABIN:
7  Q    Could you familiarize yourself with Section 31.1, sir?
8                          (Pause)
9  A    Yes.
10 Q    To your knowledge, do you know if the parties sought to
11 mediate their dispute under the provisions of Section 31.1.1,
12 as this contract seems to require?
13 A    It starts with the senior management and then various
14 steps.
15 Q    Do you know whether the parties ever sought mediation in
16 Florida?
17 A    I don't think -- in my opinion, I don't think we have gone
18 up to that stage. You know, still -- uh -- we are discussing --
19 Q    Fair enough.
20 A    Yeah.
21 Q    That's fair enough.  And to your knowledge, if you look at
22 Section 31.1.3, and understanding that I'm not asking you for
23 your legal view, do you believe that you would have to walk
24 through these processes of informal discussion and mediation
25 before you could otherwise take relief as set forth in Section

D241

1   31.1.3?

2   A    You know, I understand these process in a nominal course

3   of any project but with the bankruptcy situation, I don't know

4   how these play.

5   Q    That's fair enough.  I now ask you to look at Creditors'

6   Committee Exhibits 1 and 2.

7         MR. SABIN:  And if you don't have them, I'd ask the

8   Court's indulgence to approach.

9         THE COURT:  You may.

10  Q    Let's take Creditors' Committee's Number 1, which is the

11  Cormetech contract.  Do you recognize that document?

12  A    Can you repeat your question, please?

13  Q    Surely.  Let's take the Creditors' Exhibit -- Creditors'

14  Committee Exhibit Number 1 --

15  A    Um-hum.

16  Q    -- which, at the top of it, says purchase order.

17  A    Um-hum.

18  Q    And then the top left says Cormetech.

19  A    Yes.

20  Q    Do you recognize that document?

21  A    No.

22  Q    So, you have never seen it before today?

23  A    Never seen it.

24  Q    Have you ever spoke to any Cormetech representative

25  regarding the catalyst that Cormetech is to -- to have

1  manufactured and delivered?

2  A    I have talked to -- talked to them to find out what the

3  delivery --

4  Q    No, I just asked have you ever spoken to the Cormetech

5  representative, yes or no?

6  A    As I said, I talked to them about --

7  Q    Yes or no, sir?

8  A    Uh, it's a no.

9  Q    You've never talked to a Cormetech representative?

10 A    I -- I talked to them, but it was with respect to --

11            THE COURT:   Allow him to answer, please.

12            MR. SABIN:   That's fine.

13            THE COURT:   You may answer.

14 A    I talked to them to find out, you know, what are the

15 typical lead times if we have to buy something new, that part I

16 had discussed with them --

17 Q    And what --

18 A    -- and what is required to ship the current one.

19 Q    When -- when was that conversation?

20 A    That's within the past two weeks maybe.

21 Q    And did you ever have a conversation with any other

22 Cormetech representative before that conversation with respect

23 to this contract?

24 A    I had been present in some conference calls.

25 Q    And what was the nature of those discussions, if you

1  remember?

2  A    Again, to find out what is -- you know, where they are.

3  Q    Independently, do you know whether Cormetech is, indeed,

4  obligated to deliver the catalyst on or before November 1st,

5  2006, today?

6  A    I don't know the contract agreement between Deltak and

7  Cormetech.  But the delivery date, we tell Deltak when we need

8  those components.

9  Q    And have you told Deltak?

10 A    No, we -- we -- initially when we start the contract, we

11 give them a target date, and also we tell them when the L.D.

12 starts kicking in.  As the project progresses, you know, we

13 talk to the EPC, you know, we ask them when they need it, and

14 we kind of fine tune as we get closer.

15 Q    I appreciate that.  But have you conveyed to Deltak when

16 is it that you need and want this particular catalyst that

17 Cormetech --

18 A    Yes.  We have told them that we need them by December 15.

19 Q    In addition to these discussions with Cormetech that you

20 either listened to or participated in recently --

21 A    No.

22 Q    -- or in the past --

23 A    No.

24 Q    -- have you had any other discussions --

25 A    No.

1  Q    -- with Cormetech individuals?  If I were to ask you the

2  same questions with respect to BASF or their predecessor

3  Engelhard, would your answers be the same?

4  A    I had the same discussion with them.

5  Q    And have you given a date by which you need the BASF?

6  A    Through Deltak?  Yes.

7  Q    Yes.  And that date is?

8  A    December 15th.

9  Q    I believe you said your affiliate in Japan supplies the

10 turbine, is that correct, sir?

11 A    Yes.

12 Q    Do you understand the meaning of affiliate?

13 A    Uh, I was familiar with the parent company, but I learned

14 that parent company and affiliate are same.

15 Q    Okay.  Who is the parent company of Mitsubishi Power

16 Systems America?

17 A    Mitsubishi Heavy Industries.

18 Q    And is that the same parent company of Cormetech?

19 A    I don't know about that.

20 Q    Do you know whether Cormetech's an affiliate, as you use

21 the term?

22 A    I don't know the relationship between Mitsubishi and

23 Cormetech.

24          MR. SABIN:  I have no further questions, Your Honor.

25          THE COURT:  Any redirect?

Boukal - Direct                    112

1           MR. YATES:  No, Your Honor.

2           THE COURT:  Very well.  You may step down.  Thank

3  you.

4           You have one more witness?

5           MR. YATES:  One more witness, Your Honor.

6           THE COURT:  Okay.

7           MR. YATES:  I'd like to call Mr. Richard Boukal to

8  the stand, please.

9           CLERK:  Please hand, state your full name, spelling

10 your last for the Court.

11          MR. BOUKAL:  Richard Levan (phonetic) Boukal, B-O-U-

12 K-A-L

13          RICHARD BOUKAL, MITSUBISHI'S WITNESS, SWORN

14          CLERK:  You may be seated.

15                       DIRECT EXAMINATION

16 BY MR. YATES:

17 Q    Good afternoon.

18 A    Good afternoon.

19 Q    Could you tell me who you're employed by?

20 A    I'm employed by Mitsubishi Power Systems America.

21 Q    And how long have you worked for Mitsubishi Power Systems

22 America?

23 A    Over six years.

24 Q    And what is your current position with Mitsubishi?

25 A    I'm the Global Sourcing Manager.

1  Q    Okay.  And what is your responsibilities as Global

2  Sourcing Manager?

3  A    I'm responsible for purchasing all of the related

4  auxiliary equipment that surrounds our gas turbine and steam

5  turbine that's purchased in the United States.

6  Q    So, you're not responsible for the purpose of the turbines

7  from Japan, but you are responsible for the purchase of

8  everything else by Mitsubishi Power Systems, is that correct?

9  A    No, just the items that are purchased in the United

10  States.

11  Q    In the United States.  Have you held other positions with

12  Mitsubishi Power Systems?

13  A    No.

14  Q    So, since 2000, you've been the Global Sourcing Manager?

15  A    That's correct.

16  Q    Could you briefly describe your educational background?

17  A    I have a bachelor of science and business administration

18  degree from Creighton University in 1979, and I have a master

19  of -- my MBA from the University of Central Florida in 1997.

20  Q    Prior to your employment at Mitsubishi Power Systems, can

21  you tell me where you were employed?

22  A    I was employed by Alston Power in Middleton, Virginia in

23  the gas turbine division for two years, and I was employed by

24  Westinghouse Electric Corporate, now Siemens Electric

25  Corporation, which is in Orlando, Florida for approximately

Boukal - Direct                      114

1  eight years.  And prior to that, I was with Combustion

2  Engineering, a boiler manufacturing company in Windsor,

3  Connecticut for two years.

4  Q    Okay.  And have all those positions been in procurement?

5  A    That's correct.

6  Q    And have all those positions been in the power generation

7  industry?

8  A    That's correct.

9  Q    So, for a total, how long have you been in the procurement

10 and power generation industry?

11 A    Procurement, my whole career.  And power generation, for

12 over 21 years.

13 Q    Are you familiar with the Port Westward project?

14 A    Yes, I am.

15 Q    Could you describe Mitsubishi Power Systems' role in the

16 project?

17 A    We were an equipment supplier and technical assistance for

18 the EPC contract, engineering procurement construction

19 contract.

20 Q    Okay.  And how long have you been involved with the Port

21 Westward project?

22 A    Since its inception on December -- I mean September 3rd,

23 2004.

24 Q    And what are your responsibilities in regards to the Port

25 Westward project?

D248

1  A     I'm responsible for buying the auxiliary equipment that is
2  not supplied by Japan or purchased by Japan for our --
3  surrounding our gas turbine.
4  Q     Can you tell me what you mean by auxiliary equipment?
5  A     Auxiliary equipment is like the HRSG, it's fuel oil skids,
6  it's fire protection equipment, it's pumps.  Anything that we
7  would not supply with our equipment, it still needs to be
8  procured in order to make a power generation station.
9  Q     Would that include the catalysts?
10 A     Yes.
11 Q     Did Mitsubishi subcontract with Deltak for the Port
12 Westward HRSG?
13 A     Yes, we did.
14 Q     Were you involved in those negotiations with Deltak?
15 A     Yes, I was.
16 Q     And can you remember when those negotiations took place?
17 A     It took place in the summer of 2004.  Finalized on October
18 with signature of the contract, the effective date of the
19 contract was back-to-back with ours, which is September 3rd,
20 2004.
21 Q     I'd like to show you an exhibit in the binder of documents
22 filed under seal, I think it's Exhibit 4.  Can you review that
23 and tell us what that document is?  I think this is Creditors'
24 Exhibit 7.
25 A     Yes, this is the contract that was negotiated with Deltak

Boukal - Direct                               116

1  for the Port Westward generating station.

2  Q    And you're familiar with the contents based on the

3  involvement in your negotiations of the contract?

4  A    Yes, the commercial side of the negotiations was handled

5  by myself.

6  Q    I show you another exhibit, it's really in the binder, but

7  I've broken it out separately for ease of use.  I think this is

8  Creditors' Exhibit 8.  Can you review that tell me what that

9  document is?

10 A    This is an exhibit of the payment schedule for the

11 contract between MPS and Deltak for the Port Westward

12 generating station.

13 A    Okay.  Would that be Exhibit J to the contract?

14 A    That's correct.

15 Q    What was contract price that Mitsubishi was contracted to

16 pay Deltak for supplying the HRSGs and catalysts?

17 A    We agreed upon a fixed firm contract price of $12,400,000

18 for supply.

19 Q    Is that amount then paid to Deltak?

20 A    The entire amount, with the exception of the last

21 milestone completion, the SCR payment has not been paid.   The

22 entire balance has been.

23 Q    When is that last five percent due?

24 A    It's due upon the completion of the SCR delivery.

25 Q    And the SCR is what we also refer to as the NOx catalyst?

1  A    And the CO catalyst.

2  Q    And the -- okay.  Do you know the status of the HRSG at

3  the Port Westward project?

4  A    My understanding is it's complete, with the exception of

5  the delivery of the catalysts.

6  Q    Will the HRSG function without the catalysts?

7  A    No, that's not my understanding, it won't.

8  Q    Can you tell me under the contract when the catalysts were

9  scheduled to be delivered?

10 A    Yes, I believe we had a scheduled delivery date of

11 December 15th, 2006.

12 Q    And do you know who actually built the various catalysts?

13 A    As I understand, Engelhard has built the CO catalyst and

14 Cormetech has built the NOx.

15 Q    To the best of your knowledge, have those catalysts been

16 manufactured?

17 A    Yes.

18 Q    To the best of your knowledge, are those catalysts

19 awaiting shipment?

20 A    Yes.

21 Q    Do you know if Cormetech has been paid for the catalysts?

22 A    I had a conversation with Deltak, and Monte Ness indicated

23 to me that he still has a substantial amount of money to be

24 paid.

25 Q    Do you recall generally how much?

1  A    Monte Ness, President of Deltak, indicated it

2  approximately $450,000.

3  Q    And in regard to the BASF Engelhard catalyst, do you know

4  if they have been paid for the catalyst?

5  A    In my conversation with Monte Ness, he indicated to me

6  that it was $367,000 approximately that still needed to be paid

7  to Engelhard.

8         MR. SABIN:  Your Honor, I only rise to strike the

9  answer to the last three questions to the extent they actually

10  are going to be used in any way, shape or form for the truth of

11  those statements, they otherwise are hearsay.

12         THE COURT:  Understood.

13  BY MR. YATES:

14  Q    Besides the obligation that Deltak has under the contract

15  to deliver a completed HRSG, along with the catalyst, are there

16  other obligations under the contract of Deltak?

17  A    There are other obligations for warranty, as well as TA

18  assistance.

19  Q    Have you requested Deltak to give Mitsubishi Power Systems

20  confirmation if they would deliver the catalyst by December

21  15th?

22  A    Yes, I have.

23  Q    What was the response?

24  A    The response was the submission of a completion agreement

25  indicating we had to sign that prior to any shipment being

1  made.

2  Q    And in response to that statement by Deltak, what did
3  Mitsubishi Power Systems do?

4  A    We indicated to Deltak that we would not be signing the
5  completion certificate -- completion agreement.

6  Q    Did Mitsubishi Power Systems make an offer to resolve this
7  delivery matter with Deltak?

8  A    Yes, we offered to take assignment of the equipment and
9  take Deltak completely out of the loop and make direct payment
10 to the subcontractors of the remaining balances.

11 Q    Would that offer have included all payments to BASF and
12 Cormetech that were due and owing?

13 A    Yes, it would.

14 Q    Would that offer have been also to take on any other
15 obligations under those contracts?

16 A    That's correct, it would also take on the warranty
17 obligation, and any other obligations.

18 Q    Did Mitsubishi Power Systems also offer Deltak to obtain
19 releases from Cormetech and BASF in favor of Deltak?

20 A    Yes, we did.

21 Q    What was the response from Mitsubishi to that -- excuse me
22 -- from Deltak to that offer?

23 A    They indicated they could not agree, we had to sign the
24 completion agreement in order to proceed further with the
25 delivery of our equipment by the deadline of December 15th.

1 Q    The completion agreement has previously been introduced

2 into record.  I won't burden the record with introducing it

3 again.  I will -- I think it's Exhibit 5 in the binder, the

4 documents filed under seal, and ask you to review that and tell

5 me if you're familiar with it.

6 A    Yes, that looks like the copy that was sent to my

7 attention.

8 Q    Can you describe generally what you believed the document

9 required of Mitsubishi Power Systems in order to attain

10 delivery of the catalysts?

11 A    Basically my understanding is that we would have to waive

12 all of our rights to any claims, and that we would have to

13 proceed with Deltak on a time and material basis.  That Deltak

14 would not have -- no longer have any obligation for warranty

15 claims, indemnities relating to the Port Westward agreement.

16 Q    If the contracts -- the subcontracts were assigned to

17 Mitsubishi under Mitsubishi's offer, would Mitsubishi have had

18 to ask Deltak for any further assistance?

19 A    No.

20 Q    Did the -- in your mind, did the completion agreement

21 affect the warranties on the catalysts to any extent?

22 A    If it was assigned?  Or not assigned?

23 Q    No, if Mitsubishi was to enter into the completion

24 agreement?

25 A    Oh, yes, all warranties would be voided.

Boukal - Direct                    121

1  Q    And those were warranties from Deltak?

2  A    From Deltak for any equipment that they've purchased for

3  the Port Westward project.

4  Q    Is it your understanding it would also include warranties

5  from the manufacturers from the subcontractor?

6  A    Any manufacturer that had an extended warranty beyond our

7  required warranty that was for the contract expected to be

8  passed down would also be null and void, that was my

9  impression.

10 Q    And did Mitsubishi depend on that and guarantee that to

11 the prime -- under the prime contract, to the best of your

12 knowledge?

13 A    Yes.  Our contract with the customer is a back-to-back

14 with the Deltak agreement.  So, we're responsible for giving

15 those to the end user.

16 Q    What did you tell Deltak about the possibility of

17 Mitsubishi entering into the completion agreement?

18 A    We said there was no way.

19 Q    Can you tell me approximately how long ago that occurred?

20 A    Well, Deltak contacted me in a conversation on -- I think

21 it was October 27th, on Friday.  So, we had another

22 conversation, that was a very short conversation, with our

23 counsel, both inside and outside, and Deltak's inside and

24 outside counsel.  We reiterated strongly our position that we

25 cannot waive any of our claims and they, again, said that they

1  needed this in order to deliver the equipment.  And so the call
2  was abruptly ended.

3  Q    And have you had any further oral or written
4  communications with Deltak representatives since that time?
5  A    Yes, I received an e-mail that was sent to me late Friday
6  that I received on Sunday when I went to the office and
7  indicated that they would release our equipment, not to
8  agreeing upon the completion agreement, if we paid them a lump
9  sum of -- I think it said $1.875 million, which I considered as
10  a hostage.

11  Q    I believe that e-mail has previously been marked as
12  Creditors' Exhibit 1.  I've got a copy right here.
13  A    Yes, this looks like the e-mail.

14  Q    Can you tell me what your understanding of the terms of
15  that agreement -- that proposed offer or agreement were?
16  A    My understanding is that they would, in fact, for our
17  payment of one million eight seventy-five, have the two
18  catalysts shipped to our job site.  And they, in fact, would
19  take that and pay off the two suppliers.  And then we would not
20  have to enter into any type of completion agreement.

21  Q    And that would require a payment to Deltak of a certain
22  sum?

23  A    Yeah, 1,875,000.  Again, which I considered some type of
24  extortion.

25  Q    Was that represented as fair market value by Deltak?

Boukal - Direct                    123

1  A    That's what they represented as fair market value.

2  Q    Do you believe that is fair market value?

3  A    I don't believe that to be the case.

4  Q    Do you believe fair market value is substantially lower

5  than that amount?

6  A    I believe this has no value from what I understand, other

7  than for Mitsubishi Power Systems for the Port Westward

8  project.

9  Q    And what do you base that opinion on?

10 A    I base it on just what my engineers have told me.

11        MR. SABIN:  I rise again for purposes of hearsay.

12 Objection to preserve.

13        THE COURT:  You can cross on it.

14 Q    In your position as Global Procure Manager and other

15 procurement positions before that time, have you ever run

16 across a pre-manufactured catalyst being sold in the power

17 plant context?

18 A    Never in my career.  In fact, most of our contracts have a

19 stipulation that the equipment must be new and usable,

20 specifically for that project.

21 Q    So, Mitsubishi specifically contracts against that

22 possibility of somebody doing that without telling Mitsubishi?

23 A    Mitsubishi does and our end user does, our customer.

24 Q    So, that the customers that you had occasion to deal with

25 in the past that buy power plants, there is a similar type

Boukal - Direct                          124

 1  provision in most of those contracts --

 2  A    That's correct.

 3  Q    -- requiring the equipment to be specifically manufactured

 4  for the facility?

 5  A    Be in new, unused condition and manufactured specifically

 6  for its intended purpose and performance.

 7  Q    So, based on your own personal knowledge as a procurement

 8  officer, do you believe that these catalysts have a fair market

 9  value other than basically scrap value?

10  A    I do not.

11  Q    How much did you say that Mitsubishi owes under the HRSG

12  contract to Deltak?

13  A    We owe approximately a payment of $589,000 for the

14  successful delivery of the SCR.

15  Q    And it's your previous testimony that the HRSG is not

16  useful without those catalysts?

17  A    That's what I've been told.

18  Q    I want to pass up another exhibit to be introduced, and

19  that's the liquidated damages calculation.  If you could review

20  that and tell me what that is.

21  A    This is a similar back-to-back provision we have in our

22  prime contract with Deltak, meaning the importance of the

23  delivery of the SCR is attached to a liquidated damage portion.

24  The first 30 days being at $25,000 per day.  The next 30 days,

25  an additional -- it's up to 30,000, fifty and then seventy-

1  five.

2  Q    So, it's your understanding that under the Deltak

3  contract, that Deltak would be responsible for liquidated

4  damages in those amounts based on the time to Mitsubishi Power?

5  A    That's correct.

6  Q    Is that the same numbers, same liquidated damages that

7  Mitsubishi would be liable to -- to prime Portland General?

8  A    That's correct.

9  Q    Under the contract, what is your understanding of

10  Mitsubishi's rights upon default to have any subcontracts

11  assigned to it?

12  A    My understanding is there's a clause in the contract that

13  identifies that we could have assignment of any subcontract of

14  Deltak at our request.

15  Q    The debtor has already indicated earlier in this

16  proceeding its intent -- in fact, its request that the contract

17  with Mitsubishi Power Systems be rejected.  In fact, rejected

18  nunc pro tunc, which is fancy legal language for back to the

19  date of the filing of the motion.

20       But if this Court does not grant the relief that

21  Mitsubishi asked the assignment of the subcontracts for the

22  catalysts, what will be your reaction tomorrow morning?  Will

23  you have to take any actions tomorrow morning?

24  A    Yes, as you see from the liquidated damages scale, we

25  would be losing 75,000 for each day we delay.  So, we would

Boukal - Direct                    126

1  have to make adjustments in order to new catalysts.

2  Q    So, in order to mitigate your damages, unless you can

3  obtain an assignment of the subcontracts for the catalysts, you

4  will have to, very shortly, order new catalysts?

5  A    Yes.

6  Q    I want to show you another exhibit -- I think this goes to

7  the Court's earlier question for a list of critical time line

8  to get these catalysts to Oregon by December 15th.  And I've

9  got a smaller version.

10         Can you tell me what that represents?

11 A    It represents the time frame required by Cormetech to do

12 packaging and shipping in order to get it there by the December

13 15th, 2006 date.  We would have to release -- Cormetech would

14 have to be released on November 22nd, 2006 in order to meet the

15 delivery date of 12/15.

16 Q    And what assumption is that based on?

17 A    That's based on my discussions with Cormetech.

18 Q    And what did they tell you about the time from -- when

19 they were directed to ship, how long it would take to actually

20 get the catalyst to Oregon?

21 A    They indicated that it would take approximately three

22 weeks because of the packaging and scheduling the trucks and

23 logistics of just getting everything out there.

24 Q    And I see that there's a period -- it looks like of about

25 four days for the Thanksgiving holiday.  Was that done for any

Boukal - Direct                    127

1  particular reason?

2  A    It was taken into account because most people shut down in

3  that time period.

4  Q    And if the contract is not assigned to Mitsubishi, but

5  alternatively if the contract -- if the debtor rejects the

6  contract with Cormetech, and Mitsubishi's free to negotiate

7  with Cormetech, would that extend the time line to any extent?

8  A    Yes, I added a week there for scheduling -- I mean for

9  negotiating the contract and finalizing the agreement with

10  Cormetech directly.

11  Q    And that would put Mitsubishi at a critical deadline of

12  when?

13  A    That's November 15th.

14            MR. YATES:   That's all my questions.   Thank you.

15            THE COURT:   Cross examination.

16            MR. CUNNINGHAM:   Yes, Your Honor.

17                        CROSS EXAMINATION

18  BY MR. CUNNINGHAM:

19  Q    Mr. Boukal, you just testified that you're very familiar

20  with this contract with Deltak, that's correct?

21  A    I'm familiar with the commercial aspects of it, yes.

22  Q    But you also said you were familiar with the provision in

23  which you can require Deltak to assign its subcontracts that it

24  has for Cormetech and BASF over to you if there's a default, is

25  that correct?

1  A    No.  I said I understand there is a provision that allows

2  that to happen.

3  Q    Okay.  So, it is your understanding there's a provision.

4  A    That's my understanding.

5  Q    Let me ask you.  Is it your understanding -- is that a

6  provision -- an alternative to money damages under the

7  contract?

8  A    I'm not sure by your question?

9  Q    Why don't we go to the contract, since you're familiar

10  with it.

11          MR. YATES:  Object to the --

12  Q    I would go to the --

13          MR. YATES:  -- extent that he's not a lawyer and

14  can't answer legal questions.

15          MR. CUNNINGHAM:  That's why I'd like to point him the

16  provision in the contract.

17          THE COURT:  I'll allow it.  He testified that he

18  believed that this provision was in the contract.

19          Which contract are we talking about?

20          MR. CUNNINGHAM:  We're talking about -- if you have

21  our binder, Judge, it is Debtors' Exhibit 2.  And it's

22  specifically on Page 88, and it's 29.2, identified as Remedies.

23  And I'd ask the witness if he can turn to that page.

24          THE WITNESS:  What page is that, again?

25          MR. CUNNINGHAM:  It's Page 88, and it's Section

 1 | 29.2.2.
 2 |             THE WITNESS:  My Page 88 is 25.1.
 3 |             THE COURT:  I think you're in a different binder.
 4 |                          (Pause)
 5 |             THE WITNESS:  Okay.  Go ahead.  What's your question?
 6 | BY MR. CUNNINGHAM:
 7 | Q    I had asked if you can see that provision and tell me if
 8 | you're familiar with it and if you believe that's the provision
 9 | that you said obligates the debtor to assign over to you its
10 | subcontracts.
11 | A    Which provision is this?
12 | Q    29.2.2.
13 | A    Again, I'm not a lawyer so I couldn't tell you.  I just
14 | was told that there's a provision in here that allows us to
15 | request assignment.
16 | Q    Well, let's read it.  29.2.2 says, "If requested by
17 | purchaser, supplier shall withdraw from the job site, assigned
18 | to purchaser such of suppliers' subcontractors and vendor
19 | contracts as purchaser may request."
20 |             And then it goes on, do you see that?
21 | A    Yes, I do.
22 | Q    So, it specifically says if requested by purchaser.  This
23 | is not a provision that automatically kicks in upon a default.
24 | It says if you request us, we'll assign it over to you, is that
25 | correct --

Boukal - Cross/Cunningham                    130

1  A     Again --

2  Q     -- from reading it?

3  A     -- I'm not a lawyer, but the contract speaks for itself.

4  Q     I'm -- again, I'm just asking your familiarity, since

5  you've testified you were familiar with this provision.

6  A     No, I didn't.  I testified, again, that the contract

7  states -- I've been told the contract states that there's a

8  provision there that allows us to have assignment.

9  Q     Oh, you -- do you -- are you aware of any other provision

10  but -- other than this one that allows or requires assignment

11  of the contracts upon a default?

12  A     As I said, to my understanding, there's a provision in the

13  contract that allows it.

14  Q     Okay.  Well, go to the next provision, 29.3, do you see it

15  says, Damages?

16  A     Yes, I see it.

17  Q     Okay.  Is it your understanding, based on your knowledge

18  of the contract, that Mitsubishi's entitled to claim damages

19  against Deltak as a result of a breach of this agreement by

20  Deltak?

21  A     Again, I'm not a lawyer so I couldn't tell you.

22  Q     Well, are you familiar with the objection filed by

23  Mitsubishi in this case to our motion?

24  A     No, I'm not.

25  Q     Are you familiar that there are liquidated damage

D264

1  provisions?

2  A    I'm familiar with the commercial aspects --

3  Q    Okay.

4  A    -- of this contract.

5  Q    So, would there be, under the commercial aspects, would

6  there be damages?  Perhaps liquidated damages that Mitsubishi

7  could assert against Deltak in the event of a default?

8  A    The contract has a liquidated damage clause in there which

9  stipulates specific liquidated damages in the event the

10 equipment is not delivered on a timely matter or performance is

11 not met.

12 Q    But you don't know whether that's an alternative provision

13 to the provision I just read about whether or not the contracts

14 had to be assigned to you?

15 A    Yeah, I just say the contract speaks for itself.

16 Q    Well, let's -- let's have you speak for yourself for a

17 second.  You did submit an affidavit in connection with the

18 objection you're not familiar with.

19 A    I did sign an affidavit.

20 Q    Okay.  Well, it was attached to what was submitted by your

21 counsel, and there was -- so, I assume you're familiar with

22 your affidavit.

23 A    I'm familiar with my affidavit.

24 Q    Okay.  Let me read Paragraph 15 of your affidavit and tell

25 me if it's accurate.  It says, "If MPS reorders the catalysts

Boukal - Cross/Sabin                    132

1  from Cormetech and BASF, it will take approximately 23 weeks

2  for the ordering, manufacturing and delivery of the catalysts

3  based on the project schedule."

4          Is that correct?

5  A    That's correct.

6  Q    So, you can go out and reorder these things.  If they're

7  not available to you, if you don't get these catalysts from

8  Deltak because negotiations fail, your legal arguments fail,

9  you'll go out and you'll reorder them.  It will take longer.

10  A    That's correct.

11  Q    But you'll go out and you'll reorder them.

12  A    That's correct.

13  Q    Now, it may result in delays, it may result in damages,

14  liquidated damages, as you have indicated, but it's not

15  impossible for you to complete this project.

16  A    It's impossible for us to complete it in a timely manner

17  which --

18  Q    Okay.

19  A    -- we were contracted for but not --

20  Q    But you can complete it?

21  A    We can go and order another catalyst, yes.

22  Q    Let me ask also.  Are you familiar with Cormetech?

23  A    No, I'm not.

24  Q    Okay.  Fair enough.

25          MR. CUNNINGHAM:  Your Honor, the debtors have no

Boukal - Cross/Sabin                     133

1  further questions.

2          THE COURT:  Any further cross?

3          MR. SABIN:  The Committee does, Your Honor.

4                  CROSS EXAMINATION

5  BY MR. SABIN:

6  Q    Good evening, Mr. Boukal.

7  A    Good evening.

8          MR. SABIN:  Your Honor, if you could, in your binder,

9  turn to related document 1C.  And if I may approach, and let

10 the record reflect I'm handing a copy of what appears to be the

11 affidavit.

12                  (Pause)

13 Q    Can you identify that document?

14 A    Yes.  This looks like the affidavit I signed.

15 Q    And if you could take a look at it briefly and just answer

16 the following:  Is every statement in there still true today as

17 you're testifying now?

18                  (Pause)

19 A    Yes, as I understand it.

20 Q    And this affidavit was based on your personal knowledge,

21 is that correct, sir?

22 A    Excuse me?

23 Q    This affidavit and the statements made therein are based

24 on your personal knowledge?

25 A    Knowledge I've been told.

Boukal - Cross/Sabin                    134

1  Q    Oh, so why don't we walk through this affidavit sentence-

2  by-sentence, and why don't you tell us which of these

3  statements, if any, are based on something someone else told

4  you, if we could?

5  A    Well, again, I'm not an engineer, so I don't know a lot of

6  these specifics about the operation.

7  Q    Okay.  So, for example, do you know whether Paragraph 9 is

8  true of your personal knowledge?

9  A    I know that the catalysts are necessary for commission,

10  yes.

11  Q    Do you know whether Paragraph 10 is true, of your personal

12  knowledge?

13  A    I -- again, I was told by Deltak, so that's my personal

14  knowledge.  We received schedules from them showing --

15  Q    But you have never seen -- well, let me ask you this.

16  Have you ever seen Creditors' Committee Exhibit 1?

17  A    Which is?

18  Q    I believe it's the purchase order with Cormetech.

19  A    No, I haven't.  We've received Deltak's schedules

20  identifying who they purchased the material from, but I've

21  never seen the purchase order.

22  Q    So, you don't know whether -- you don't know what the

23  terms and conditions are, do you, of that contract?

24  A    No, I don't.

25  Q    And would your answers be the same to those questions if I

1 asked them with respect to Paragraph 11 of your affidavit?

2 A    Yes, I don't know about Deltak's agreement with Engelhard,

3 I just know that they purchased it from Engelhard.

4 Q    And I ask you with respect to Paragraph 18, do you have

5 personal knowledge of the statement made in Paragraph 18?

6 A    Yes, I do.

7 Q    Excuse me?

8 A    Yes.

9 Q    And -- and -- all right.  How did you acquire that

10 personal knowledge?

11 A    Through various means.  Deltak indicated they will not

12 ship it until we signed the completion agreement.

13 Q    I'm referring to Paragraph 18.

14 A    That --

15 Q    That otherwise says, "Cormetech and BASF are not obligated

16 to ship until someone pays them, if I understand your

17 statement."  How do you know the truth of that statement?

18 A    I had discussions with BASF and Cormetech about the

19 delivery of the equipment.  They indicated that, you know, with

20 the bankruptcy, they would need to be paid.  But that's the

21 gist of the conversation.

22 Q    When were those conversations, sir?

23 A    Those were after the bankruptcy announcement by Deltak.

24 Q    What else was discussed in those conversations?

25 A    The completion of the equipment in the time frame --

Boukal - Cross/Sabin                    136

1  Q    Did you make any offers to them?

2  A    No, I did not.

3  Q    Did you discuss in any way the terms and conditions of

4  their contract or what it is you were prepared to do with

5  respect to your need to get those two catalysts?

6  A    No, I did not.

7  Q    I ask you, sir, to look at Creditors' Committee Exhibit 1.

8  A    Again, which document is that/

9  Q    It is the purchase order with Cormetech.

10  A    Okay.

11  Q    That otherwise would appear on its face to call for a

12  delivery today of the catalysts.  Do you know if the catalysts

13  has been delivered as yet?

14  A    I know it has not been delivered.

15  Q    Did you have any discussions with Cormetech about when

16  they were obligated to make the delivery?

17  A    No, I did not.

18  Q    Who, at Cormetech, told you they wouldn't deliver until

19  they were paid?

20  A    I don't recall.

21  Q    Do you know when you had the conversation?

22  A    Again, it was after the bankruptcy, but I don't recall the

23  date.

24  Q    Do you have personal knowledge about your statement made

25  in Paragraph 16?  And why don't we take it sentence-by-

1  sentence?

2  A    Again, that's something I've been told by my engineers.

3  Q    Do you know who has legal title to the catalysts right

4  now?

5  A    No, I don't.

6  Q    Do you know whether Mitsubishi has taken any action to

7  mitigate its alleged damages?

8  A    I don't.

9  Q    Do you know whether the contract between Deltak and

10 Mitsubishi has a cap on the alleged liquidated damages that

11 you've testified to?

12 A    Yes, I do.

13 Q    And what's that cap?

14 A    Twenty-five percent of the contract price.

15 Q    And does that have a -- does your contract with Portland

16 General have a similar cap?

17 A    It has a cap, I don't know what the extent of that is.

18 Q    So, your testimony is now correct such that there is not a

19 back-for-back match-up between the liquidated damages in the

20 general contract and the cap under this contract, is that

21 correct, sir?

22 A    No, what I said was the amounts were the same as the back-

23 to-back.

24 Q    Do you have any independent basis, sir, for your personal

25 view that the catalysts today has no fair market value?

138

1  A    Other than a scrap value?  Again, what I -- my -- my

2  understanding is that it has -- going to be used by Mitsubishi

3  Power Systems for the Port Westward project.

4  Q    And that's an understanding how?

5  A    That I've been told by my engineering group.

6  Q    Have you had any discussions with any other affiliate of

7  Mitsubishi besides the entity that hires you?

8  A    Excuse me?

9  Q    Let's put it this -- let me rephrase the question.  Have

10 you discussed any of the matters that are the subject of these

11 motions with any representative or employee, agent, of

12 Mitsubishi Heavy Industries U.S.A.?

13 A    No, I haven't.

14          MR. SABIN:  I have no further questions, Your Honor.

15          THE COURT:  Any redirect?

16          MR. YATES:  No, Your Honor.

17          THE COURT:  Very well.  You may step down.  Mr.

18 Yates, any additional witnesses?

19          MR. YATES:  No, Your Honor.  No additional witnesses.

20          THE COURT:  I'm prepared to take argument briefly.

21          MR. CUNNINGHAM:  Thank you, Your Honor.  On behalf of

22 the debtors, I'd like to say I think there are three issues, we

23 start at the top:

24          One was just the rejection of the agreement itself.  .

25 I think as Your Honor indicated at the beginning of this

139

1  hearing, that all the parties are in agreement that rejection
2  is appropriate.  I think the testimony of Mr. Ehm and Mr.
3  Caruso on behalf of the debtors established the debtors'
4  business judgment.  I don't believe that has been challenged.

5      And so -- and no one disputes the legal standards for
6  rejection.  So, I think, as Your Honor had indicated, the
7  actual issues are then narrowly focused to nunc pro tunc, and
8  then probably the biggest issue, which is the alleged specific
9  performance.

10     Nunc pro tunc, again, I don't think the legal
11 standards are in dispute.  It's based on the equities of the
12 case.  We've cited the case, as Your Honor -- and it basic --
13 basically provides that Your Honor can order nunc pro tunc
14 relief based on the equities.  We believe that we put parties
15 on notice we were rejecting this at the time we filed the
16 motion.  That -- and that there has been no further acting upon
17 that contract.

18     I believe Mr. Ehm testified that the debtors have not
19 been on-site.  That Mitsubishi has not provided any services to
20 us with respect to that contract.  So, we believe, nunc pro
21 tunc is appropriate.

22     And, in fact, Mitsubishi, at least in their papers
23 last week, supported nunc pro tunc.  But, again, they
24 conditioned that upon what I believe is the biggest issue,
25 which is the specific performance.

1    And getting into that argument, Your Honor, they --
2    they have argued to the Court that the contract conditions --
3    the contract requires an assignment of our subcontracts for the
4    catalysts with Cormetech and BASF to them as a consequence of
5    our breach.  And they believe that that is a provision that is
6    enforceable under State law and it should be a condition to the
7    rejection of the agreement.

8    I believe, Your Honor, that that argument fails for
9    many reasons under the Bankruptcy Code.  Because when you deal
10   with the Bankruptcy Code, which they surprisingly don't have a
11   lot to look at when you look at their objections.  They don't
12   even cite 365(g), for example.  365(g), which is the first one
13   I would look to, and the Court, I think, would look to, which
14   is what is the effect of rejection.  And 365(g) says,
15   "Rejection of an executory contract constitutes a breach of
16   such contract immediately before the filing of the petition
17   date."

18   And there's a mirror image in 502(g) of the
19   Bankruptcy Code that deals with the allowance of a rejection
20   damage claim.  And it says that an allowance of rejection
21   damage claim is determined, the same as if such claim had
22   arisen before the petition date.

23   So, that then leads to me, Your Honor, as a
24   bankruptcy lawyer, what you need to look at is we need to look
25   at what is the definition of claim under the Bankruptcy Code

141

1   and 101-5 and what to -- what is Mitsubishi really asserting

2   here as a consequence of our rejection.

3       Well, we already know that in 101-5(a), it says a

4   right to payment is a claim.  Well, certainly Mitsubishi is

5   claiming a right to payment because they've alleged liquidated

6   damages that could or would otherwise arise as a consequence of

7   rejection.  I specifically point Your Honor to Paragraphs 8 and

8   9 of their objection, response, in which they identify the

9   daily per diem day damages on a -- that they specifically said

10  Deltak faces.  It's in Paragraph 8 and Paragraph 9.  They says

11  -- I'm just even reading Paragraph 9, it says, "Like MPS,

12  Deltak faces default and risk of actual damages."

13      We -- and they're -- we pointed to the actual

14  provisions in the contract, Your Honor, that show and outline

15  the damages.

16      So, I think clearly that element of their claim would

17  constitute a claim under 101-5.

18      The real issue then on specific performance, I

19  believe, is governed under 101-1(5)(b).  101-1(5)(b) of the

20  Bankruptcy Code specifically defines a claim to include a right

21  to equitable -- an equitable remedy for breach of performance

22  if such breach gives rise to a right of payment, whether or not

23  such right to an equitable remedy is reduced to judgment,

24  fixed, contingent, matured, unmatured, disputed, undisputed,    .

25  secured or unsecured.

142

1    That then brings us squarely into the case law, Your
2  Honor, about what is an equitable remedy that would constitute
3  a bankruptcy claim.  And the 3rd Circuit has spoken on that
4  issue.  And specifically as we cite in our brief, it's
5  Continental Airlines.  And in Continental, the United -- the
6  3rd Circuit specifically looked at the Supreme Court seminal
7  decision in Ohio v. Kovacs, 469 U.S. 274, as well as the prior
8  decision by the 3rd Circuit in the Torwico Electronics case, 8
9  F. 3d. 146.  And what the 3rd Circuit said at Page 133 of the
10  Continental Airlines case, it says, "Kovacs indicates, and
11  Torwico Electronics implies, that a right of payment under the
12  Bankruptcy Code is essentially an obligation to pay money.
13  Thus, the issue we must decide is whether monetary payment is
14  an alternative for the equitable remedy of," in this case it
15  was seniority integration under a collective bargaining
16  agreement.  And the Court specifically said, the District Court
17  answered this question affirmative and we agree.

18    In this case, we have an alternative remedy of
19  specific performance, but it's an alternative to money damages.
20  And if you -- if the other party has an alternative, they can
21  seek specific performance or they can seek money damages
22  pursuant to their agreement, then by definition, there is an
23  alternative remedy for money damages.  They can't just say I'm
24  going to not treat this as a bankruptcy claim by not -- by just
25  ignoring the fact that they have an alternative remedy for

D276

143

1  damages.

2       Here, it specifically says that the -- their specific
3  performance right is conditioned upon them electing to, you
4  know, notified us to do that.

5       THE COURT:  Well, let's go back actually if we can
6  for a second.

7       MR. CUNNINGHAM:  Sure.

8       THE COURT:  To a more basic question.  Do I need to
9  know what you're going to do with Cormetech and BASF to assess
10 the exercise of your reasonable business judgment?  For
11 example, if you reject this contract and then, for some reason,
12 go to sleep on it, don't do anything.  They're accruing
13 damages, presumably BASF has damages where they -- or Cormetech
14 would argue that the contract's assumed or the contract's
15 rejected.  But don't I need to know what happens there before I
16 can figure out whether or not this is or isn't an exercise of
17 your reasonable business judgment?

18      MR. CUNNINGHAM:  Well, the only problem you have
19 there, Judge, is the flip side.  Because if the -- if we were
20 to give you -- and accept their level of damages, and it's five
21 million or 10 million or 20 million, then the Court is in the
22 situation of ordering us to either assume or reject, as I
23 understand the Code.  You would order us to either assume or
24 reject that agreement.

25      And our view is that assumption of that agreement is

1  a net negative -- on an administrative basis in terms of cash,

2  of $2.1 million.  And we don't have the ability under a cash

3  collateral order to do that.  So, we -- it would be impossible

4  for us to assume the Mitsubishi agreement if Your Honor were to

5  require that.

6       We do believe, however, on the flip side going to

7  Cormetech and BASF, that that's a valuable contract of the

8  estate.  We believe that we have the right under 365(a) to go

9  and try to negotiate to assume and assign that contract to

10  Mitsubishi, which we've tried to do in the last 30 days, in

11  which they've admitted they haven't gone out to try to cover to

12  get a replacement part.  But now the negotiations are now in

13  front of the Court in terms of litigation.  That's fine,

14  parties have that right.

15       But we have the right now if they don't want to work

16  with us, that's fine.  They don't have to work with us.  We'll

17  go out and seek to maximize value of those agreements.

18  Something is better than nothing.  And Mr. Ehm had testified

19  that we, the debtors, want the ability to go out and talk to

20  customers.  We believe that we can find replacement customers

21  out there.  It's not a fait accompli that these are destine

22  only to go to Mitsubishi.  I think the testimony by the two

23  witnesses are all -- all our engineers tell us.  Or -- I think

24  the first witness said, I don't -- he goes, I don't think so.

25  He doesn't know for sure.

145

1        The bottom line is it is the debtors' agreements and
2   we want to unlock the value.  If it's not going to be with
3   Mitsubishi, we're going to go and try to negotiate with other
4   customers.

5        THE COURT:  What -- just speaking hypothetically.
6   What if actually Mitsubishi's testimony is correct and there is
7   no secondary market and this has zero value over scrap.  And
8   that's a decision you've made, I guess you've took the risk or
9   you're playing a little bit of chicken and you're wrong, what
10  are the consequences from that?  Who bears the consequences?

11       MR. CUNNINGHAM:  Well, I think clearly if we could
12  not find an alternative customer and we had no agreement with
13  Mitsubishi, we'd have to reject the agreements.

14       So, we would incur, again, pre-petition damage claims
15  as a result of that.  We would have -- and whatever -- of
16  course, to the extent the parties suddenly get together and
17  mitigate in some other fashion, that would reduce the rejection
18  damage claims.  They're kind of speculative right now given
19  that there are -- you know, it's all subject to mitigation and
20  certain events that are going on here.

21       I mean Mitsubishi, I understand, is sitting there
22  saying, we're going to wind up paying millions of dollars if we
23  don't have this by December 15th.

24       On the other hand, they're telling us, we don't want
25  it, we want to cut you out of the accommodation agreement, we

146

1  don't want to deal with you anymore, and we believe our
2  contract requires you to give us your contract rights that you
3  have, which are executory contracts, which under 365 Congress
4  gave us the right to assume or reject and find potential other
5  parties.  None of the -- not a single case that they cite for
6  rejection that says that rejection needs to be conditioned upon
7  specific performance involves an executory contract.  Of
8  course, how could it?  How could a state law principle of
9  specific performance and the U.C.C. and their contract rights
10 basically require us to assume and assign a contract that
11 Congress, under 365(a), said we have the option to go out and
12 decide what we're going to do?

13         Otherwise -- I just can't imagine that that is going
14 to be the case.  As a consequence of rejecting this master
15 contract with Mitsubishi, that the Court would require us to
16 then exercise our 365(a) rights and assume and assign this
17 contract over them for nothing.

18         So, I would suggest to Your Honor what will pay out,
19 if Your Honor grants the rejection, and I think that's --
20 you're going to grant the rejection, the only question is will
21 there be conditions upon it?  If there are no conditions, it's
22 a rejection, they'll file a rejection damage claim.

23         That means we can go out and talk and start talking
24 to other customers to see if there is other interest in
25 acquiring these catalysts so we can get some value for them and

1  we can assume and assign them.  Or the phone still works.  If
2  Mitsubishi wants to talk to us, they can continue to talk to
3  us.

4          They keep saying they call us, you know,
5  extortionists, we've asked for ransom demands.  The HRSG
6  completion program, as outlined in Your Honor's own order, is
7  pretty basic.  We want it to be neutral to us.  But, yes, we
8  want any damage claims -- to minimize any hit to the estate, we
9  want them to waive any rejection claims as a result of that.

10         THE COURT:  Well, it's not cash neutral to you,
11 though.  I mean the testimony is there's about $800,000 left to
12 pay over to BASF and Cormetech.

13         MR. CUNNINGHAM:  Correct.

14         THE COURT:  And in order to facilitate the
15 assignment, you've asked for 1.875 million.  Is the other 1.05
16 million going to go to subcontractors under the agreement?  Or
17 to pay off other people?

18         MR. CUNNINGHAM:  No, that would --

19         THE COURT:  Or is that a -- is that a benefit that
20 the estate will achieve?

21         MR. CUNNINGHAM:  That -- if they did that, that would
22 be a benefit to the estate.  But they would reclaim all of
23 their alleged damage claims that they have as a result of our
24 rejection.

25         We offered that --

148

1          THE COURT:  They would reclaim -- what do you mean
2   reclaim?
3          MR. CUNNINGHAM:  We -- I can -- I'll put it to you
4   this way, Your Honor.  We were negotiating a completion
5   agreement as set forth in your order.
6          THE COURT:  I recognize, and they've rejected that.
7   And then --
8          MR. CUNNINGHAM:  Right.  So, then they say, we want
9   to keep whatever damage claims we have.  Warranty claims,
10  whatever they are, we want to keep them.
11         THE COURT:  Okay.
12         MR. CUNNINGHAM:  And we said, okay, if you want to
13  keep them, then pay us a market value for what the contract --
14  we believe the contract holds.
15         THE COURT:  Okay.
16         MR. CUNNINGHAM:  So, yes, that million dollars would
17  come to us --
18         THE COURT:  And now I understand the distinction.
19  Okay.
20         MR. CUNNINGHAM:  Again, I think my last point kind of
21  summarizes it.  Their three cases that they have relied upon,
22  which is the -- let's see.  The Walnut Associates case, the
23  West Chestnut case, and the Ground Round case, I -- again, I
24  don't think has any application to this contract.
25         They do not involve the assignment of an otherwise

149

1   executory contract of the debtors.  The <u>Walnut Associates</u> case

2   involves a settlement agreement in which the Court in dicta

3   noted that maybe, under State law, specific performance may be

4   available.  But it did not order the specific performance.  It

5   left it, it said, to another court to decide.

6        And the only determination <u>Walnut</u> -- the <u>Walnut</u> court

7   did determine was the settlement agreement was at least

8   executory, the plan provided for rejection of such agreements,

9   and it provided, was rejected.

10       The <u>West Chestnut</u> case, which is the other decision

11  they cite, deals with a landfill.  Again, deals with an option

12  to acquire a 20 percent interest in the landfill in which the

13  Court in <u>Walnut</u> noted that specific performance was available

14  because, quote, "The ownership of realty is the classic case

15  where the law considers the rights of a contracting party to be

16  unique and, thus, unsusceptible to the calculation of money

17  damages."

18       Again, it deals with land, it doesn't deal with an

19  executory contract.

20       <u>Ground Round</u> deals with a liquor license.  And,

21  again, in this case, it was not -- it was a liquor license that

22  was first owned by the landlord, was conveyed to the tenant, in

23  this case, the debtor, in order to run its restaurant.  When

24  the debtor rejected its lease agreement with the landlord, it

25  did not otherwise give back the license that it had also

150

1  attained part and parcel with the lease.

2  And in that -- in that decision at Page 262 to Page

3  263, the Court said, "It is well settled that damages cannot be

4  accurately ascertained. And, thus, specific performance is an

5  appropriate remedy where the subject matter of the agreement is

6  an asset that is unique or one such that its equivalent cannot

7  be purchased on the open market. A liquor license has been

8  recognized as such an asset."

9  Your Honor, these catalysts can be purchased on the

10 open market. It may take time to complete, to start it up

11 again, but they've admitted that they can go out and cover and

12 go and reorder them.

13 So, it's not a liquor license. It's not unique. So,

14 their cases are clearly distinguishable. Again, in each

15 instance, do not involve an executory contract of the debtors

16 in trying to displace the debtors' rights that Congress has

17 given it under 365 in the Bankruptcy Code. And, you know,

18 that's the substance of the debtors' argument, Your Honor.

19 THE COURT: I'll hear from the Committee.

20 MR. SABIN: Thank you, Your Honor. I will not repeat

21 any of the arguments Mr. Cunningham has already put forth. But

22 I offer three arguments for this Court to consider:

23 One, that to condition projection as Mitsubishi asked

24 would be counter to public policy. It would be tantamount to,

25 in essence, a company that subsequently becomes a debtor

151

1  contracting before bankruptcy to give up rights that it has

2  under the Bankruptcy Code.  And there are numerous cases, start

3  with <u>Placid Oil</u> with the right to file itself being taken away

4  in such a contract.  That otherwise courts have said, we can't

5  do that, it's against public policy.

6       I believe that this arrangement, if it is to be

7  construed, as Mitsubishi wants, otherwise it be violative of

8  that rule.

9       Number two, I think the evidence, both documentary

10 with respect to Creditors' Committee Exhibit 1, and the

11 testimony, makes clear that the Cormetech contract should be

12 construed by this Court as a contract that otherwise falls

13 within the ambit of Section 365(c)(2) which, in relevant part,

14 says that, "A debtor may not assume or assign such a contract

15 to make a loan or to extend debt financing or financial

16 accommodations in either of those cases to or for the benefit

17 of the debtor."

18      I would submit to you, Your Honor, that the purchase

19 order itself and the testimony has at least two material

20 component parts that would constitute financial accommodations:

21      One, net 30.  The debtors are not obligated to pay

22 for --

23          THE COURT:  Don't all sales of goods sales contracts

24 have payment terms?

25          MR. SABIN:  And, in fact, Your Honor, that's always

152

1  why the vendors turn around and say, you're not going to get it
2  COD because you can't assume it.

3         Secondly, Your Honor, a letter of credit that has yet
4  to be delivered to backup the warranty obligation that runs in
5  favor of Deltak which, indeed, the testimony says is very
6  material because, indeed, that is what Deltak relies, in part,
7  upon when it has to turn around and give a warranty obligation
8  under its contract.

9         THE COURT:  Well, let me stop on this point.  Because
10 you raised it, and I've looked at 365(c)(2).  I note that it
11 wasn't raised in anyone's papers.

12        MR. SABIN:  And --

13        THE COURT:  And I understand from your observation
14 we've been moving quickly, I'm not pointing fingers at anybody,
15 but I don't think at this point that it is fair either to
16 Mitsubishi or to Cormetech, for that matter, for me to ascribe
17 any significance to that argument.  I understand the point.  I
18 think it's interesting.  But clearly I am competent that
19 Mitsubishi and Cormetech would have something to say.  Maybe --
20 maybe favorably, maybe not.  But what I -- what I don't want to
21 do is be in a position where there is -- this concept ties to
22 this dispute, as well as the Cormetech dispute.  So, I
23 understand your point.  But I just don't think that the record
24 is sufficiently developed in that regard and whether it
25 actually drives the discussion as it relates to Mitsubishi

153

1    versus a Cormetech motion to compel assumption or rejection.

2           MR. SABIN:  I don't disagree, Your Honor.  And as the

3    record made clear earlier, I believe --

4           THE COURT:  Okay.

5           MR. SABIN:  -- I got this exhibit less than an hour

6    before I entered your courtroom today.

7           THE COURT:  Okay.

8           MR. SABIN:  The third and final argument, Your Honor,

9    is not susceptible, I think, to that kind of, if you will,

10   additional thought by all parties.  And that is Section 31.1 of

11   the contract itself.  And as I read it right, and if I

12   understand the testimony, Mitsubishi doesn't deny that there's

13   a dispute and has not followed the process in its own contract.

14          THE COURT:  Well, are you -- you know, I was trying

15   to follow that when you raised it.  Are you suggesting that in

16   response to your motion to reject their contract to breach the

17   agreement, that instead of filing a response, they should have

18   appointed or asked for a mediator?  Didn't the debtor start

19   this ball rolling?  Because you are -- I mean are -- is it your

20   suggestion that if that principal applies, then they could

21   actually defend against the rejection motion by saying, no, no,

22   no, they can't come to this Court, they're bound by the

23   mediation provisions.

24          MR. SABIN:  I've seen it happen in connection with

25   arbitration provisions, Your Honor, and that's why I raise it.

154

1        THE COURT:  Agreed.

2        MR. SABIN:  That's why I raise it.

3        THE COURT:  Agreed.  But it is a slightly different

4   circumstance, at least in the context of rejection.  It may be

5   that it would be appropriate to enforce that when it comes to

6   damages if there's a damages hearing, maybe, indeed.  But the

7   question of rejection seems to be here.

8        MR. SABIN:  And I would suggest to you that it is

9   different but that the condition they ask for may, itself, be

10  subject to mediation, separate and apart from your jurisdiction

11  that otherwise would be simple rejection or not.

12       THE COURT:  Okay.

13       MR. SABIN:  And that's the reason I make the

14  argument.

15       THE COURT:  I understand.

16       MR. SABIN:  For those reasons, Your Honor, the

17  Committee would support rejection today nunc pro tunc without

18  any conditions.

19       THE COURT:  Very good.

20       MR. SABIN:  Thank you.

21       THE COURT:  Mr. Chipman?

22       MR. CHIPMAN:  Good evening, Your Honor.  For the

23  record, William Chipman on behalf of Bank of America, the

24  senior lenders.

25       I only rise to say that we support the debtors in

155

1  this motion.

2      And also, I just saw tonight for the first time the
3  purchase orders.  I believe that the Court can take judicial
4  notice of our two cash collateral orders and the pre-petition
5  financing documents that have been previously submitted to the
6  Court.

7      I only want to raise the point that if there are
8  value in these contracts, these contracts are our collateral,
9  the purchase orders themselves.  Not the contract being
10 rejected.

11     I haven't heard any evidence to suggest that these
12 contracts are somehow cum onere with the contract being
13 rejected or they're somehow integrated, any value that would
14 flow from these contracts being retained by the debtor and
15 whether they negotiate a deal with Mitsubishi or someone else,
16 the proceeds of that transaction would be our collateral also.
17 And I know it was raised a little bit in the evidence and in
18 the testimony, but no one brought that point forward, and I
19 just raise to bring that to Your Honor's attention.

20     Thank you.

21     THE COURT:  Thank you.  Mr. Agusti?

22     MR. AGUSTI:  Your Honor, I've already had a lot of
23 fun reading the cases, as I hope Your Honor has.

24     THE COURT:  I have.

25     MR. AGUSTI:  On the specific performance issue.  And

156

1  I think actually in trying -- cases say different things
2  broadly. And I think that essentially to find the point of
3  reconciliation, I think it's best found in the <u>Ground Round</u>
4  case of the 1st Circuit Bankruptcy Appellate Panel. And
5  actually it's right around 262, not far from where counsel
6  indicated.

7            Essentially what the Court there says that, of
8  course, specific performance is not general -- is not generally
9  available in situations where it would undo what 365 was
10 intended to do. To essentially put a burdensome contract back
11 on the debtor. Where essentially specific performance would be
12 used to circumvent the effect of 365.

13            But then the Court went on to say that when what you
14 have before you is a covenant, the very purpose of which is to
15 define the relationship between the parties after the demise of
16 the underlying contract. That kind of a provision can be and
17 should be specifically enforced. It was specifically -- I
18 think the <u>Ground Round</u> case actually is a relatively -- a
19 relatively good example of the situation. Essentially there
20 you had --

21            THE COURT: But let's go back to it.

22            MR. AGUSTI: Yes, sir.

23            THE COURT: Because I think that -- and I did read
24 the <u>Ground Round</u> case.

25            MR. AGUSTI: Yes, sir.

1       THE COURT:  And the -- and I have reviewed the other
2  cases that talk about the concept of specific performance in
3  the context of Section 365 and rejection.

4       But there are -- even assuming that that body of law
5  is correct, the -- there's a difference, though, here where
6  you've actually, in your testimony -- or in your witness's
7  testimony, clearly determined what the damages are with
8  specificity.  You can know week-by-week what the damages are,
9  depending on how quickly this -- these items get returned.  I
10 don't think there's anyone that disputes that there -- that
11 this -- project is difficult to replace.  There seems to be a
12 lively debate about whether or not there is any other market
13 for it, or another buyer on the planet for it other than as
14 scrap value.

15      But the fact is that what you have is an item that
16 you can get another one of.  And the consequences are delay and
17 a very substantial claim.

18      It's different from a liquor license, for example, or
19 a -- and perhaps more aptly, the sale of real estate.  You
20 can't just spend, you know, six weeks and some more money --
21 six months and some more money and get the same parcel of real
22 estate.

23      MR. AGUSTI:  Yes, Your Honor, but I would just bring
24 the Court's attention to the Sir Speedy case.  Is it that
25 different from a covenant not to compete?  Where one could --

158

1  one could try, and I'm certain that in some situations you have

2  seen attempts to estimate the value of the breach of covenant

3  not to compete.  Is it really different than, for example, the

4  covenant not to sue in the <u>Walnut Associates</u> case.  In both of

5  these situations, essentially what the Court is saying is that

6  -- and I might add, Your Honor, if one looks at Section 29.2,

7  it's relatively clear that the 29.2 provisions -- it actually -

8  - the words of the contract are that they are in addition to

9  and without prejudice to other remedies that the parties have.

10        Essentially, Your Honor, what the contract is

11  recognizing is that we've got damages that we're going to be --

12  that we're going to be accruing as a result of a breach of the

13  contract.  And there's a breach of the contract, of course, by

14  the fact of rejection.

15        But in addition to that, the 29.2 provisions, Your

16  Honor, really provide a transition, a way to permit us to

17  litigate damages.

18        The way we are -- the way things are right now, when

19  you are doing a large power project of this nature, it would be

20  disastrous if every time -- and, indeed, it's surprising that

21  this is never really -- that there's no real case law in this

22  area.  Because typically what subcontractors try to do is their

23  level best to pass off contracts and pass off the

24  responsibility of the contractor above them in order to

25  mitigate damages for the project.

159

1    Essentially the unusual thing in this situation is
2 that those transitional provisions are being challenged.  And
3 although we actually -- there are -- let me -- let me suggest
4 what would not be appropriate under the Code if we were to ask
5 for it, and why we think what we're asking for is appropriate.

6    The contract between Deltak and Mitsubishi provides
7 also that they actually deliver the catalysts to Oregon.  We
8 are not asking the Court to compel them to do that.  We feel
9 like that would be asking them to compel -- to substantively
10 move the equipment, to make them -- to actually make them do
11 something.

12    THE COURT:  Well, you raise a -- you raise an
13 interesting question.  And I -- I tried to sort of formulate
14 the hypothetical.  If we changed the facts slightly and took
15 Cormetech and Deltak out of that --

16    MR. AGUSTI:  Yes.

17    THE COURT:  -- out of the exercise, and so instead
18 this is just that the -- that Deltak makes the catalysts and
19 there they are, they're on the shelf, in the warehouse.  And
20 they reject the agreement, could you compel them to deliver
21 them?

22    MR. AGUSTI:  Your Honor --

23    THE COURT:  Where the debtor believes that there's
24 value to them in a secondary market, et cetera.

25    MR. AGUSTI:  Your Honor, I -- I, frankly, in that

160

1  situation, I -- we have refrained from trying to compel them to
2  deliver these catalysts.  We have not asked that.

3       We are now willing to go and arrange for the delivery
4  separately, although the contract, if we were to actually ask
5  for full specific performance, the contract would actually
6  require them to do it.  But I don't believe that under the Code
7  and under the case law that -- of the Code, specific
8  performance allows one -- or one is allowed to seek specific
9  performance if it would actually involve the debtor having to
10  perform core substantive obligations.

11       But as the Ground Round case days, in a situation --
12  with respect to covenants, the very purpose of which it is to
13  provide this transition, essentially to establish the parties'
14  relationship after the contract has already been rejected,
15  after the underlying contraction relationship's been
16  eliminated.  When all that we're asking for is essentially for
17  them to sign a piece of paper.  And as Your Honor knows from
18  our papers, we are -- we would not ask for them to assume
19  obligations under the contract if, in fact, we are unable to
20  negotiate appropriate terms with the subcontractors that
21  release the debtors, the order would be essentially no good.

22       What we're -- all we're trying to do, Your Honor, is
23  essentially have access to this remedy, this limited remedy in
24  the contract which basically permits us to be in a situation
25  where it avoids being in this very unusual situation, being in

161

1  a -- the hostage situation.

2          THE COURT:  There's a tact you're taking right now

3  that's not really -- that's not really laid out in the papers

4  that this is the transition mechanism.  And I understand your

5  concept.  But would you be able to enforce this if you could go

6  out and, on easier terms, get the catalysts?  If you can go to

7  Wal-Mart.

8          MR. AGUSTI:  If I could go to Wal-Mart?  I think not,

9  Your Honor, because we would not be entitled to specific

10 performance.  There's where State Law comes in.

11         THE COURT:  But --

12         MR. AGUSTI:  State --

13         THE COURT:  But your -- but you're mixing pieces and

14 parts.

15         MR. AGUSTI:  Yes, sir.

16         THE COURT:  There's one where it's enforceable

17 because it's in order to facilitate the transition on a post

18 termination or post rejection basis, and that would seem to be

19 independent from how hard the -- perhaps that I would weigh the

20 burden on the debtor.  But otherwise, it's really independent

21 of whether or not the services of the project are

22 irreplaceable.

23         And then we have a whole separate argument about

24 irreplaceability, and I'm not sure that those two actually -- .

25         MR. AGUSTI:  Yeah, let -- if I might explain, Your

162

1  Honor.  Essentially it's -- I would view it as a two-step
2  process.  I do view it as a two-step process.  The first step
3  is the specific performance available under State law.  And
4  here, we argue, and there really is no dispute about it --
5  well, there's some dispute as to the uniqueness of the goods,
6  and I'm happy to go through the evidence, Your Honor, I think
7  it's relatively --
8         THE COURT:  No, I -- I think I've digested the
9  evidence.
10        MR. AGUSTI:  I think it's -- assuming that these are
11  unique goods, they clearly -- we clearly would be outside of
12  bankruptcy entitled to specific performance under Oregon law.
13        Now, there's -- what I'm saying -- what I'm
14  suggesting, Your Honor, is that there is another layer that you
15  go to.  For example, Your Honor, one of the cases that's cited
16  by counsel is the Nichols case.  And that's not a case that,
17  you know, on its face, is friendly to us, but it falls -- but
18  it really falls very well within the Ground Round ordering
19  principle.
20        In the Nichols case, essentially what the -- what the
21  parties were trying to do, and what he non-debtor was trying to
22  do was to enforce a -- specifically enforce a real estate sale
23  contract.  And the Court said, you know -- and it would be --
24  it would have been specifically enforceable under State law.
25        But the Bankruptcy Court said, no, there's another

163

1  level at which -- that you have to satisfy in bankruptcy.  You

2  can't have specific enforcement of an executory contract where

3  essentially what would be going on is that you would be

4  receiving the -- or that the debtor would be burdened with the

5  contract that it was trying to avoid.

6          So, even -- so, in that -- so, it's actually really a

7  two-step test.  The first step is is specific performance

8  available under State law.  I trust that we have shown that

9  there is -- that these are unique goods.  Specific performance

10 would be available under State law.

11         Your Honor, there is no evidence on the record today

12 that there is a secondary market for these products.  We have

13 two witnesses on the Mitsubishi side that specifically say that

14 they are not aware of one.  And even the witness on the side of

15 the debtor admitted that he didn't know of one.  Indeed, he had

16 never sold a refurbished machine.

17         THE COURT:  The lack of a secondary market doesn't

18 make it unique.  It just means that --

19         MR. AGUSTI:  There's no use for it other than to us.

20         THE COURT:  -- there's -- that the debtor doesn't --

21 that from your point of view, the debtor would have no use for

22 it, you're the only people on the planet that can use this.

23         MR. AGUSTI:  That's exactly right, Your Honor.

24 That's exactly right.

25         And so in terms of the burden to the estate, are we

164

1  burdening -- in terms of looking at that second leg of the

2  analysis, are we burdening -- are we enforcing obligations that

3  burden the estate.  Well, no.  Essentially what we're doing is

4  we're having them assign to us a contract for a part that they

5  can't really sell to anybody other but -- other than us.

6          And so in that sense, we're not burdening the estate.

7  And so -- and so in looking at -- in looking at it, again, Your

8  Honor, it's really -- it's really two parts.

9          Part number one is is specific performance available

10  under State law.  We believe there is, and I don't think

11  there's -- aside from any issue there might be as to whether

12  these are unique goods, there's no real question that under

13  Oregon State law, a sale of unique goods is specifically

14  enforceable.

15          And secondly, is it -- does it pass muster under the

16  Bankruptcy Code.  And I would say that the <u>Ground Round</u>

17  dichotomy, if you will, essentially divides cases like the

18  <u>Alpha v. Continental Airlines</u> case.  My goodness, Your Honor,

19  in that case, the Airline Pilots Association was seeking to

20  enforce a seniority integration provision from a rejected

21  collective bargaining agreement.  That is about as core

22  substantive as you can get.  And the Court found that the

23  enforcement -- that specific enforcement would essentially

24  wreak havoc with the employment relations of the debtor.

25          And so, Your Honor, I would go, again, to the -- to

165

1  the Lubrizol case.  In the Lubrizol case, Your Honor, you had a

2  situation where the non-debtor was seeking to enforce covenants

3  in a -- in a non-exclusive license, a rejected non-exclusive

4  license that it claimed it had specific performance for under

5  State law.  But the Court there said, no, as a practical

6  matter, what that does is that it tied up the metal coating

7  technology that the debtor had and prevented the debtor from

8  being able to sell that metal coating technology to some other

9  third party on an exclusive basis.  That, again, tremendous

10 burden to the debtor.

11          No evidence here, Your Honor, that we're burdening

12 the debtor.

13          The truth of the matter is, Your Honor, that the

14 debtor would like more time.  And I don't -- there is no

15 evidence that they want more time in order to market the

16 product.

17          The fact of the matter is that all of the evidence

18 that was presented today suggests that this product really

19 doesn't have any value other than to us.

20          Certainly, Your Honor, in terms of the game of

21 chicken, we could, I suppose, continue to play this game.  And

22 that's really what -- what -- the extended time, I suppose,

23 would be for.

24          But, Your Honor, I don't think we have to get into

25 that.  Because I think basically what we're asking for in this

166

1  particular case is so limited. All we're asking for them to do
2  is to sign a document to us. We are going to perform all other
3  obligations. We are not going to seek -- under the
4  Deltak/Mitsubishi contract, as you -- as you heard the
5  testimony, there's also -- we would theoretically have a right
6  to ask them for advice on issues relating to the installation
7  of the catalyst into the HRSG. We're not going to do that.
8  We're not asking Your Honor to compel them to do that.

9      Just one thing we're asking for, the one -- the 29.2
10  transitional provisions that -- 29.22 which specifically talk
11  about their turning over, basically getting out of the way, if
12  you will, and turning over to us the subcontracts so that we
13  can mitigate damages effectively. That's what those provisions
14  are all about.

15     Now, damage provisions, that's -- there may not be
16  any damage provisions if, in fact, -- or damages might be
17  limited. Certainly Your Honor has heard testimony that there
18  are warranty claims outstanding against the Deltak equipment.
19  But certainly if we are allowed to enter into contracts with
20  the people who actually have the catalysts in the most
21  unobtrusive, non-intrusive way possible with the debtor, which
22  is that they sign a document that basically releases them from
23  future obligations under the contract, that assigns it to us
24  and releases them so that we assume those obligations going
25  forward, is essentially, Your Honor, the relief we're seeking.

167

1  And I think that it's a relief that is consistent with the

2  thinking of Ground Round and with really the reconciliation of

3  these different cases.

4        I don't think that any of the cases that debtor cited

5  -- and I could go through each of them.  I've gone through the

6  ones that, on their face, somebody might say are the worse.

7  But generally speaking, courts are -- what the debtors have

8  done, with all deference in their briefs, they've picked out

9  statements from the Courts in cases with inapposite facts,

10  actually some of the cases don't involve the determination of

11  whether one can enforce covenants after a rejection.  And

12  judges say generally, well, you can't have specific performance

13  of a rejected performance.  Well, that's quite true where that

14  specific performance would impose obligations on the debtor,

15  would impose --

16        THE COURT:  But the debtor says that that specific

17  performance actually costs them value.  And do I -- I guess the

18  question I'm wrestling with is do I have to actually make that

19  determination, that they're right or that you're right?  And

20  could you only get -- I guess I keep coming back to this.  But

21  could you only get specific performance if there's no value to

22  the estate with the product?

23        MR. AGUSTI:  Your Honor, obviously --

24        THE COURT:  If there is a secondary market, then

25  there is a burden.

D301

168

1          MR. AGUSTI: Your Honor, I would, first of all, say
2   that I don't think there's been any proof presented today at
3   today's evidentiary hearing.

4          Every one -- there's no evidence that there's a
5   secondary market. And the evidence that there is is that, in
6   fact, quite frequently, there's special efforts to make sure
7   that there's absolutely no used equipment of any form in the
8   machines.

9          THE COURT: Well, no, I'm familiar with the evidence.
10  And I --

11         MR. AGUSTI: Yes, sir.

12         THE COURT: And I -- and I know that. But I guess --
13  I'm trying to understand -- because this is a larger principle.
14  And I think I'm trying to understand different circumstances in
15  which it would be applicable. Because I have to confess that
16  my reaction was the same as your. Now, maybe this happens a
17  lot when research issues come up, but I would have expected
18  that there would have been -- that this situation would have
19  come up.

20         And the absence of specific applicable controlling
21  authority doesn't help you.

22         MR. AGUSTI: Your Honor, it's caused me a couple of
23  sleepless nights trying to --

24         THE COURT: But you're -- but -- but I guess -- I
25  want to come back to this question. Because there are -- it is

169

1  to me an interesting question about is it dependant upon all of

2  these facts?  Do we have to have something unique that has no

3  value to the estate, that cannot be resold, and that in a

4  circumstance that imposes absolutely no burden on the debtor.

5  Let's say I take all of that, is that the only circumstance

6  where I can, absent, you know, a land sale or something like

7  that.  Is that the only circumstance that you would say?

8          MR. AGUSTI:  No, Your Honor.  My analysis would be

9  slightly different than that.

10          I would look -- what the Court in <u>Ground Round</u> said

11  is that the -- that the covenant not impose -- you know, a

12  burdensome contract.

13          THE COURT:  It's a sliding scale.

14          MR. AGUSTI:  So -- it's a sliding scale, I suppose.

15  But I would note that in <u>Ground Round</u>, the liquor license was

16  -- did have a value.  That's why the debtor was -- was seeking

17  to keep it.  And so there was something that they wanted to

18  market there.

19          If -- certainly the -- in the <u>Walnut Associates</u> case,

20  the debtor there viewed its potential rights of action against

21  its former lawsuit, the non-debtor, to have potential value.

22  And yet the covenant not to sue was enforced.

23          So, essentially there is -- there are certainly

24  instances that you don't have to be at a place where you've got

25  absolutely zero value.  But an injunction, by its nature, or

D303

170

1  equitable relief by its nature, involves equitable judgment.

2  And so I -- I would say that there is no bright line case

3  necessarily.  But I think that we're well to -- based on the

4  evidence presented today, I think we're well to the south of

5  any burden on the debtor that's caused by this particular

6  special assignment.

7          THE COURT:  I will, for the moment, take this under

8  advisement.  And what I'm trying to figure out now for the rest

9  of the evening is where we are with Cormetech and what the

10  parties wish to do.  I'm at your disposal.  I am also available

11  tomorrow to some extent

12          MR. MASCITTI:  Your Honor, I've got an eight o'clock

13  flight.  My misunderstanding with the procedural morass is that

14  I thought we were coming for oral argument on our motion today.

15  Obviously this is an evidentiary hearing.

16          What I would propose is that since we have all of our

17  other contracts on for the 6th, that we just move the Cormetech

18  motion to the 6th, have it heard that day.

19          MR. CUNNINGHAM:  That is perfectly acceptable to the

20  debtor, Your Honor.

21          THE COURT:  Mr. Cunningham, you have excellent

22  instincts.

23          MR. CUNNINGHAM:  And my wife, who is en route to San

24  Francisco will thank counsel for making that comment.

25          THE COURT:  You're fortunate this isn't Halloween.

171

1          MR. CUNNINGHAM:  But this is -- I'm sorry.  Counsel

2  for the Committee just raised an issue, not as to Cormetech.  I

3  think as to Cormetech, we can hear their motion on the 6th.

4          What counsel for the Committee is raising to me, Your

5  Honor, is, as Your Honor will recall, we had put the additional

6  contract -- HRSG contracts up for hearing on that date.  The

7  ones -- the non-Mitsubishi/Cormetech contracts.

8          The Committee, as a result of our meeting in New

9  York, on Monday, has asked for a further continuance as to

10  that.  Not as to Mitsubishi or Cormetech, but as to the balance

11  of our contracts.  They've asked for an extension.  We had two

12  other objecting parties.  We've reached out to them.  They've

13  consented to that extension.  And we noted that the Court had

14  cash collateral for the 17th of November, and we did not now if

15  Your Honor could also entertain on that day then the balance of

16  the HRSG rejection motion, which will give the Committee

17  additional time.

18          But I don't think it affects hearing Cormetech on the

19  6th.  The only other issues I'm aware of up on the 6th are some

20  retentions and the like.  So, I think we hopefully would have

21  time on the 6th.

22          THE COURT:  Well, I think that Cormetech had a number

23  of other contracts that they identified in their motion to

24  compel assumption or rejection.

25          MR. CUNNINGHAM:  But I think they also said that that

172

1  decision would go hand-in-hand to when we rejected the --

2       MR. MASCITTI:  Absolutely.  If you haven't rejected

3  those contracts and you're pushing that out, we're fine with

4  pushing off our motion with respect to those contracts.

5       MR. CUNNINGHAM:  Thank you.

6       MR. MASCITTI:  However, the evidence that we

7  presented we would like to present in connection with all of

8  the contracts.  I don't want to bring someone back a second

9  time.  We're going to be here, so ideally we'd get their

10  testimony related to all of the contracts.  I don't care if

11  it's -- we put the motion -- we could argue that later, but the

12  testimony should be in.

13       MR. CUNNINGHAM:  Again, it's -- I guess the Court can

14  take that up on the 6th when we deal with that.  I don't even

15  know what testimony they're going to be putting on.

16       MR. MASCITTI:  In other words, the testimony that's

17  going to be presented is related to all of the contracts.  And

18  I don't want to be in a position where we say, well, now I've

19  got to have you come back and give the same testimony.

20       MR. CUNNINGHAM:  No, I understand that.  I recognize

21  that.  That would be acceptable.

22       MR. SABIN:  Your Honor, Jeff Sabin again for the

23  Creditors' Committee.

24       The 6th is fine for the motion to compel with respect

25  to all of the Cormetech contracts.

1    I would do it -- I would ask on an informal basis,
2  unlike the scenario where there's an affidavit that was filed,
3  effectively by Mitsubishi, there's been no evidence, affidavit
4  or otherwise.

5    And so if we could work out an understanding of who
6  it is that you're going to offer as a witness or witnesses,
7  what documents you're relying on, and if the time is going to
8  be permitted between now and when the hearing starts, the
9  Committee would reserve its right to at least sit down, whether
10 it's informally or take a deposition, so that we can also focus
11 the questions and move forward on the 6th.

12    I don't know if Cormetech is amenable to that, Your
13 Honor.

14    MR. MASCITTI:  We can talk afterwards.

15    MR. SABIN:  Thank you.

16    MR. MASCITTI:  I'm happy to provide you with whatever
17 you're looking for.

18    MR. SABIN:  Thank you.

19    MR. CUNNINGHAM:  One -- two technical -- one
20 technical issue with respect to our motion, Your Honor, that
21 you've taken under advisement, and one issue that is separate.
22 The technical issue is our motion sought nunc pro tunc to the
23 date of filing in the motion, but it also says as of the
24 petition date, we had a --

25    THE COURT:  The third --

174

1   MR. CUNNINGHAM:  We filed on the evening of the 28th
2  and the motion got then filed on the 29th.

3   THE COURT:  It --

4   MR. CUNNINGHAM:  So, the motion, if you read in
5  there, it does request as of the petition date, but it does say
6  as of the date hereof.  So, again, I think that's -- if Your
7  Honor were to approve nunc pro tunc, we would ask for the
8  petition date.  But we recognize it was filed on the 29th.
9  That's -- that's as to that technical issue.

10   The other issue, which I've been advised by my
11  colleagues, Your Honor, separate and apart from anything we've
12  done today, is -- and with knowledge to the Committee and to
13  our lenders, is we have certain bonding requirements that are
14  coming up.  And we are most likely going to be filing an
15  emergency motion with the Court after talking to our lenders
16  and to the Committee, and be seeking to set that on an
17  emergency basis.

18   I won't ask the Court to set aside time.  We need to
19  file that.  And Your Honor will determine when you want that
20  heard.  I just wanted to kind of raise that flag to the Court.

21   THE COURT:  Well, I understand that.  And I will look
22  for papers when they're filed.  Obviously I understand the
23  company's bonding requirements.  I assume that these relate to
24  businesses other than Deltak.

25   MR. CUNNINGHAM:  Yes, most particularly Williams.

175

1          THE COURT:  So, I would expect any requests to
2   shorten time to reflect that there's been dialogue and
3   hopefully assent from the Official Committee, and from your
4   lenders, as well.
5          MR. CUNNINGHAM:  Thank you, Your Honor.
6          THE COURT:  So, I'll consider it when I see it.
7          MR. SABIN:  Your Honor, as a housekeeping matter,
8   and/or as a substantive matter, understanding that you are
9   taking this argument and the evidence under advisement, do you
10  wish or would you accept voluntarily any kind of additional
11  briefing?
12         THE COURT:  No, the record is closed.
13         MR. SABIN:  Thank you, Your Honor.
14         THE COURT:  All right.  I have taken it under
15  advisement.  And I -- I appreciate the time and effort that's
16  been put in by counsel, and certainly by the witnesses, as
17  well.  It is -- and I think you may have gotten a sense of this
18  from the first dates.  I find one of the nice things about this
19  job is the opportunity to learn a little bit about some
20  different industries.
21         So, today, I learned a little bit, which I think can
22  be a dangerous thing.
23                    (Laughter)
24         THE COURT:  But I will take it under advisement.  I
25  understand the timing and the issues.  And I will consider it

176

1   and move it promptly forward.  Stand in recess.

2                    (Proceedings Adjourn at 6:25 P.M.)

3

4

5                    C E R T I F I C A T I O N

6

7          I, Karen Hartmann, certify that the foregoing is a

8   correct.transcript to the best of my ability, from the

9   electronic sound recording of the proceedings in the above-

10  entitled matter.

11

12   /s/  *Karen Hartmann*                    Date:   November 6, 2006

13  TRANSCRIPTS PLUS

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT H

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GLOBAL POWER EQUIPMENT GROUP | ) | Case No. 06-11045 |
| INC., *et al.*, | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

### NOTICE OF APPEAL

Mitsubishi Power Systems Americas, Inc. ("MPS"), a creditor of Debtor, Deltak, LLC ("Debtor" or "Deltak"), appeals under 28 U.S.C. § 158(a) from the ruling of the bankruptcy judge with respect to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress [Docket No. 12] and MPS' Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc., To Debtors' Motion to Reject Certain Executory Contract [Docket No. 159] rendered in open court on November 6, 2006.

The names of all parties to the judgment, order, or decree appealed from and the names, address, and telephone numbers of their respective attorneys are as follows:

D311

**Debtor:**

Jeffrey M. Schlerf
Eric M. Sutty
Mary E. Augustine
The Bayard Firm
222 Delaware 19801

Thomas E. Lauria
Gerard Uzzi
Matthew C. Brown
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131

**Official Committee of Unsecured Creditors:**

Adam G. Landis
Kerri K. Mumford
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware 19899

Jeffrey S. Sabin
Adam C. Harris
David M. Hillman
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

**U.S. Trustee:**

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

**Cormetech, Inc.:**

Ian Connor Bifferato
Chad J. toms
1308 Delaware Avenue
Wilmington, Delaware 19899

- 2 -

D312

Gregory J. Mascitti
Nixon Peabody LLP
1300 Clinton Square
Rochester, NY 14604

Dated: November 7, 2006
      Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

-and-

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 261-0658 (facsimile)
Counsel for Mitsubishi Power Systems
Americas, Inc.

#498426v1

# EXHIBIT I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP | ) | Case No. 06-11045 |
| INC., *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Related to Docket No. 270** |

## MITSUBISHI POWER SYSTEMS AMERICAS, INC.'S STATEMENT OF ISSUES AND DESIGNATION OF CONTENTS OF RECORD ON APPEAL

Mitsubishi Power Systems Americas, Inc. ("MPS"), a creditor of Debtor, Deltak, LLC

("Debtor" or "Deltak"), hereby files this statement of issues and designation of contents of

record with respect to its November 8, 2006 appeal [Docket No. 270] under 28 U.S.C. § 158(a).

MPS appeals from the Bankruptcy Court's ruling rendered in open court November 6, 2006, with

respect to:

1) Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress [Docket No. 12]; and

2) MPS' Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc., To Debtors' Motion to Reject Certain Executory Contract [Docket No. 159].

### Statement of Issues

Appellant sets forth the following issue on appeal pursuant to Federal Rule of Bankruptcy

Procedure 8006:

D314

Whether the Bankruptcy Court erred by ruling that it did not have authority to require, as a condition of rejection of the contract, the Debtor's specific performance of the covenant intended to govern the relationship between the parties after the end of the contract.

### Designation of Record on Appeal

Appellant designates the following documents to be included in the Record on Appeal:

| Date | Docket No. | Document |
|------|-----------|----------|
| 9/29/2006 | 12 | Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress |
| 10/5/2006 | 85 | Corrected Order Granting In Part Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress. **CERTAIN EXHIBITS FILED UNDER SEAL PURSUANT TO ORDER OF OCTOBER 26, 2006 (DOCKET 194).** |
| 10/24/2006 | 159 | Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc., to Debtors' Motion to Reject Certain Executory Contracts |
| 10/24/2006 | 156 | Affidavit of Richard Boukal |
| 10/24/2006 | 167 | Notice of Agenda of Matters Scheduled for Hearing on October 26, 2006 at 10:00 a.m. |
| 10/25/2006 | 181 | Mitsubishi Power Systems Americas, Inc.'s Opposition to Attempted Continuance of Debtor's Motion to Reject Certain Executory Contracts |
| 10/26/2006 | 194 | Order Pursuant to 11 U.S.C. § 107(b) and Federal Rule of Bankruptcy Procedure 9018 Authorizing the Filing of Certain Contracts and |

D315

| | | Schedules Under Seal |
|---|---|---|
| 10/30/2006 | 212 | Debtors' Reply to the Corrected Limited Opposition By Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts |
| 10/31/2006 | 223 | Pre-Hearing Brief of Mitsubishi Power Systems Americas, Inc., on Motion Compelling Debtor to Assume or Reject, Immediately an Executory Contract |
| 10/31/2006 | 225 | Joinder of the Creditors Committee to the Debtors' Reply to the Corrected Limited Opposition of Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts |
| 10/31/2006 | 226 | Response of the Creditors' Committee to Debtors' Motion to Approve Wind Down of HRSG Operations and Rejection of Executory Contracts |
| 11/1/2006 | 264 | Transcript of Hearing held on 11/1/2006 |
| 11/6/2006 | | Transcript of Hearing held on 11/6/2006 |
| 11/7/2006 | 270 | Notice of Appeal |

Dated: November 9, 2006
    Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

-and-

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 261-0658 (facsimile)
Counsel for Power Systems Americas, Inc.

#499062v1

- 3 -

D316

# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                )
                                      )    Chapter 11
GLOBAL POWER EQUIPMENT GROUP          )    Case No. 06-11045
INC., et al.,                         )    Jointly Administered
                                      )
          Debtors.                    )
                                      )

### ORDER

UPON the foregoing Motion By Cormetech, Inc. To Set A Date For The Assumption Or Rejection Of Certain Executory Contracts Pursuant To 11 U.S.C. § 365(d)(2) (the "Motion") dated October 27, 2006 [Docket No. 204]; upon the Motion To Shorten Notice In Connection With Motion By Cormetech, Inc. To Set A Date For The Assumption Or Rejection Of Certain Executory Contracts Pursuant To 11 U.S.C. § 365(d)(2) dated October 27, 2006 [Docket No. 205]; upon the Order dated October 30, 2006 [Docket No. 207]; upon the Debtors' Objection To The Motion By Cormetech, Inc. To Set A Date For The Assumption Or Rejection Of Certain Executory Contracts Pursuant To 11 U.S.C. § 365(d)(2) dated October 31, 2006 [Docket No. 224]; upon the Creditors' Committee's Objection To the Motion By Cormetech, Inc. To Set A Date For The Assumption Or Rejection Of Certain Executory Contracts Pursuant To 11 U.S.C. § 365(d)(2) dated October 31, 2006 [Docket No. 227]; and an evidentiary hearing on the Motion having been held on November 6, 2006 (the "Hearing"); and the Court having considered the evidence presented at the Hearing; it is

**ORDERED**, that the Motion as to the Port Westward Project (as defined in the Motion) is GRANTED for the reasons stated upon the record at the Hearing; and it is further

101773211.2

- 2 -

ORDERED, that the Debtors shall file and serve a motion to assume or reject the Cormetech Supply Contract for the Port Westward Project (as defined in the Motion) on or before November 15, 2006 at 4:00 p.m. (the "Port Westward Motion"); and it is further

ORDERED, that the Port Westward Motion shall be heard on November 17, 2006 at 10:30 a.m. with objections, if any, to be filed and served so as to be received by November 16, 2006 at 4:00 p.m.; and it is further

ORDERED, that the Motion as related to the HRSG/Catalyst Projects other than the Port Westward Project (as defined in the Motion) shall be continued to November 17, 2006 at 10:30 a.m.

United States Bankruptcy Judge

101732112

D318

# EXHIBIT K

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| Debtors. | Jointly Administered |
| | Re: Docket Nos. 12, 159, 212, 223 |

## ORDER APPROVING REJECTION OF MITSUBISHI HRSG CONTRACT

Upon the motion, dated September 29, 2006 (the "Motion"),[1] of Global Power

Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the

"Debtors"), for entry of an order pursuant to sections 105, 363 and 365 of the Bankruptcy Code

authorizing the Debtors to (i) wind down the HRSG Business operations of the Deltak Debtors,[2]

(ii) reject certain executory contracts and unexpired leases in connection therewith, and (iii)

implement procedures for the orderly completion of work in progress, as more fully set out in the

Motion; and upon consideration of the Affidavit of John M. Matheson in Support of First Day

Motions and Applications sworn to on the 29th day of September, 2006; and upon consideration

of the Corrected Limited Opposition by Mitsubishi Power Systems Americas, Inc. to Debtors

Motion to Reject Certain Executory Contracts (the "Mitsubishi Objection"); and upon

consideration of the Debtors' Reply to the Corrected Limited Opposition by Mitsubishi Power

Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts (the "Debtors'

Reply"); and upon consideration of the Pre-Hearing Brief of Mitsubishi Power Systems

Americas, Inc. on Motion Compelling Debtor to Assume or Reject, Immediately, an Executory

Contract (the "Mitsubishi Brief"); and a hearing on the Motion, the Mitsubishi Objection, the

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2]    The Deltak Debtors consist of (i) Deltak, LLC and (ii) Deltak Construction Services, Inc.

Debtors' Reply and the Mitsubishi Brief regarding the rejection of that certain Purchase

Agreement for Heat Recovery Steam Generator and Auxillaries for the Port Westward

Generating Facility by and between Deltak, L.L.C. and Mitsubishi Power Systems Americas,

Inc. (the "Mitsubishi Contract") having been held on November 1, 2006 (the "Hearing"); and the

Court having issued its ruling on the record at a hearing held on November 6, 2006 (the

"Ruling"); and based upon the record of the Hearing; it appearing that the Court has jurisdiction

over this matter; and it appearing that due notice of the Motion is sufficient under the

circumstances, and that no other or further notice need be provided; and it further appearing that

the relief requested in the Motion is in the best interests of the Debtors and their estates and

creditors; and upon all of the proceedings had before the Court; and after due deliberation and

sufficient cause appearing therefor; and for all of the reasons stated by the Court in its Ruling, it

is hereby

ORDERED that the Motion be, and it hereby is, granted to the extent set forth

herein; and it is further

ORDERED that the Mitsubishi Objection be, and it hereby is, overruled; and it is

further

ORDERED that the Mitsubishi Contract be, and it hereby is, rejected pursuant to

11 U.S.C. 365(a), *nunc pro tunc* to the date of the filing of the Motion on September 29, 2006;

and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect

to all matters arising from or in relation to the implementation of this Order.

Dated:    Wilmington, Delaware
          November 9 , 2006


UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT L

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    . Case No. 06-11045(BLS)
                                          .
                                          . (Jointly Administered)
GLOBAL POWER EQUIPMENT GROUP              .
INC.,                                     . 824 Market Street
                                          . Wilmington, Delaware  19801
                                          .
            Debtors.                      . November 6, 2006
. . . . . . . . . . . . . . . . . 1:29 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Debtors:                    The Bayard Firm
                                By:  JEFFREY M. SCHLERF, ESQ.
                                     ERIC M. SUTTY, ESQ.
                                222 Delaware Avenue
                                Suite 900
                                P.O. Box 25130
                                Wilmington, DE  19899

                                White & Case
                                By:  JOHN K. CUNNINGHAM, ESQ.
                                     MATTHEW BROWN, ESQ.
                                     DOUGLAS SWALINA, ESQ.
                                     FRANK KATON, ESQ.
                                Wachovia Financial Center
                                Suite 4900
                                200 South Biscayne Blvd.
                                Miami, FL  33131

Audio Operator:                 Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

DIANA DOMAN TRANSCRIBING
P.O. BOX 129
Gibbsboro, New Jersey 08026
dianadoman@comcast.net

(856) 435-7172  Fax No.  (856) 435-7124

D322

2

APPEARANCES (Cont'd.):

For Cormetech, Inc.:              Nixon Peabody LLP
                                  By:  GREGORY J. MASCITTI, ESQ.
                                  1100 Clinton Square
                                  Rochester, NY  14603

                                  Bifferato, Gentilotti, Biden
                                   & Balick P.A.
                                  By:  CHAD TOMS, ESQ.
                                  Buckner Building
                                  1308 Delaware Avenue
                                  P.O. Box 2165
                                  Wilmington, DE  19899

For Creditors Committee:          Landis Rath & Cobb, LLP
                                  By:  ADAM G. LANDIS, ESQ.
                                  919 Market Street
                                  Wilmington, DE  19801

                                  Schulte Roth & Zabel LLP
                                  By:  JEFFREY SABIN, ESQ.
                                       DAVID HILLMAN, ESQ.
                                  919 Third Avenue
                                  New York, NY  10022

For Westchester Fire:             Ballard Spahr Andrews &
                                   Ingersoll, LLP
                                  By:  WILLIAM KELLEHER, ESQ.
                                       ROBERT BOOTE, ESQ.
                                  919 North Market Street
                                  Wilmington, DE 19801

For Mitsubishi Power Systems:     Connolly Bove Lodge & Hutz LLP
                                  By:  MARK PHILLIPS, ESQ.
                                  The Nemours Building
                                  1007 North Orange Street
                                  Wilmington, DE  19801

                                  Streptoe & Johnson
                                  By:  GREG R. YATES, ESQ.
                                  750 Seventh Avenue
                                  Suite 1900
                                  New York, New York 10019

For SNC-Lavalin Power             WILLIAM D. SULLIVAN, LLC.
Ontario, Inc.:                    By: ELIHU E. ALLINSON, III, ESQ.

3

APPEARANCES (Cont'd.):

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  JOSEPH McMAHON, ESQ.
                               844 King Street
                               Suite 2313
                               Lockbox 35
                               Wilmington, DE 19801

For Bank of America:           Edwards Angell Palmer & Dodge
                                LLP
                               By:  WILLIAM CHIPMAN, ESQ.
                               919 North Market St., 15th Floor
                               Wilmington, Delaware

                               Mayer, Brown, Rowe & Maw
                               By:  THOMAS KIRIAKOS, ESQ.
                               190 South La Salle Street
                               Chicago, IL  60603

For Blackstone:                Simpson, Thacher & Bartlett, LLP
                               By:  MARK THOMPSON, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017

4

<u>INDEX</u>

**<u>WITNESSES</u>**                                               <u>PAGE</u>
JOHN MATHESON
 Direct Examination by Greg Mascitti                     47
 Cross Examination by John Cunningham                    65
 Cross Examination by Jeffrey Sabin                      67

SCOT PRITCHARD
 Direct Examination by Greg Mascitti                     70
 Cross Examination by John Cunningham                    88
 Cross Examination by Jeffrey Sabin                      92
 Redirect Examination by Greg Mascitti                  101
 Recross Examination by Mr. Cunningham                  108
 Recross Examination by Mr. Sabin                       110
 Further Redirect Examination by Mr. Mascitti           115

PAT ALBERT
  Direct Examination by Mr. Swalina                     117
  Cross Examination by Mr. Mascitti                     139
  Cross Examination by Mr. Sabin                        144
  Recross Examination by Mr. Mascitti                   149

**<u>DECISION</u>**
  By the Court                                          149

**<u>EXHIBITS</u>**                                    <u>ID.</u>
Joint Exhibit 1        Contract special and
                        general conditions       83
Joint Exhibit 2        Regarding G.E. Riverside
                        project                   83
Joint Exhibit 3        Regarding Hovensa project  84
Joint Exhibit 4        Regarding Wharton project  85
Joint Exhibit 5    .   Purchase order between Deltak 85

5

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Mr. Schlerf, good
3  afternoon.

4          MR. SCHLERF:  Good afternoon, Your Honor.  Jeffrey
5  Schlerf of The Bayard Firm, Delaware counsel to the debtors.
6  Your Honor, we really appreciate your indulgence in giving us
7  some more time.  I think it was very well spent.  The
8  discussion, as you heard from your clerk, was regarding the
9  Blackstone retention.  As I understand it, that is
10  substantially resolved.  There is one legal issue between the
11  U.S. Trustee and Blackstone and the debtors.  And also I'm
12  pleased to say that the Alvarez and Marsal resolution is along
13  similar lines, but we'll get to that in the agenda a little bit
14  later, Your Honor.

15          Items number one and two, Your Honor, are continued.
16  Item number one is the wind down motion.  The rejection portion
17  of that motion is still alive, Your Honor.  And, as you'll
18  recall, you know that Mitsubishi was a piece of that, Your
19  Honor, and I was advised by your clerk at the end of last week
20  that Your Honor was going to announce a ruling on the matters
21  from last Wednesday.

22          THE COURT:  I will.  Why don't we run through what
23  the agenda is and how we'll proceed, and then I will rule?

24          MR. SCHLERF:  Very well, Your Honor.  The other
25  matters, Your Honor, on rejections we would like to continue as

6

1  we've said on the record last Wednesday and is reflected in the
2  agenda letter that went out to all the parties including the
3  rejecting parties.

4         Number two, Your Honor, is the cash management 345
5  waiver.  There are two responses, and both parties have agreed
6  to adjourn that to the November 17th hearing.

7         Three is Alvarez and Marsal.  Your Honor, it probably
8  would be -- make sense for Mr. Cunningham to address that along
9  with Blackstone together.

10        THE COURT:  Sure.

11        MR. SCHLERF:  Number four is ordinary course
12 professionals.  As I understand it, that's resolved.

13        THE COURT:  Oh, okay.  That's not reflected in the
14 agenda.

15        MR. SCHLERF:  Your Honor, I believe it was resolved
16 as we -- literally a few minutes --

17        THE COURT:  Oh.

18        MR. SCHLERF:  -- before we came over to court.

19        THE COURT:  That's fine.

20        MR. SCHLERF:  And again Mr. Cunningham can cover
21 that.  I think where the parties are going to have to make a
22 record, Your Honor, although it would be argument on all the
23 items except number five is just final consideration of the
24 Committee confidentiality motion, and I understand Mr. Landis
25 has a form of order.

1           And number nine, Your Honor, as I understand it --

2           THE COURT:  Of the -- I'm sorry --

3           MR. SCHLERF:  Sure.

4           THE COURT:  -- but on number five, have the U.S.

5  Trustee's concerns been resolved through the form of order?

6           MR. LANDIS:  Good afternoon, Your Honor.  Adam Landis

7  from Landis, Rath, and Cobb here on behalf of the Official

8  Committee --

9           THE COURT:  Good afternoon.

10          MR. LANDIS:  -- of Unsecured Creditors.  We teed this

11 up, so an interim order would go out, and today would be the

12 day for final hearing.  No objections were filed, including no

13 objections of the U.S. Trustee, who let us know that they might

14 want to tweak some of the provisions in the order.  Having

15 received no tweaks, I'm assuming that we're okay.

16          THE COURT:  We'll deal with that when we come to it

17 then.

18          MR. LANDIS:  All right.  Thank you.

19          THE COURT:  Very good.  Mr. Sabin, good afternoon.

20          MR. SABIN:  Good afternoon, Your Honor.  Jeff Sabin

21 of Schulte Roth, proposed counsel -- co-counsel for the

22 Creditors Committee.  As to item number one, I do believe that

23 the record should now indicate what we understand from the

24 debtors to be a slight modification of the debtors' desire to

25 go forward on the 17th with the balance of the rejection, and

 1  I'm going to ask Mr. Cunningham to address the exclusions.
 2  There are several exclusions, that if I understand it right,
 3  from the initial exhibit A of contracts to be rejected, that
 4  will not be moving forward.

 5       MR. CUNNINGHAM:  Your Honor, there are several items
 6  on that list that we are still reviewing that we will be
 7  withdrawing and not going forward on the 17th.  I don't have
 8  the list in front of me.  I will go through with the Committee
 9  and advise them, and certain advise the Court, but we did agree
10  as to the balance, that we would go forward on the 17th as I
11  advised the Court last week.

12       THE COURT:  Very good.  That brings us to item number
13  six.

14       MR. SCHLERF:  That is the --

15       THE COURT:  That's Blackstone.  I assume that
16  Blackstone and Alvarez will -- are of a piece.

17       MR. SCHLERF:  Correct, Your Honor.  Number seven is
18  the motion to extend by two weeks the time for filing
19  schedules.  The U.S. Trustee has an objection to that
20  extension.

21       THE COURT:  Okay.

22       MR. SCHLERF:  Which leaves us with eight, Your Honor,
23  the Cormetech motion, which is going forward.  I imagine that
24  will take some time.

25       THE COURT:  Okay.

9

1          MR. SCHLERF:  And then nine, Your Honor, I understand
2  -- I don't believe there were any pending objections.  There is
3  a revised form of order that we can present to you when we get
4  to that part of the agenda.

5          THE COURT:  Okay.  Very good.  Mr. Cunningham.

6          MR. CUNNINGHAM:  Your Honor, if I can proceed with
7  agenda item number three, which is the debtors' application to
8  retain Alvarez and Marsal.

9          THE COURT:  Actually, what I would propose that we do
10  is, since I've raised it to the parties that I would rule on
11  the Mitsubishi matter from last week, I would propose to go
12  ahead and do that --

13          MR. CUNNINGHAM:  Certainly, Your Honor.

14          THE COURT:  -- simply to dispose of it, and then we
15  can move forward with the agenda.  I would note that, as I
16  think most of the parties in the courtroom are aware, we did
17  hold a hearing on the first of November.  It was a fairly
18  extended hearing, and I did not rule from the bench at the
19  conclusion of that hearing, but as you'll hear, I was
20  sufficiently concerned about the business realties that I
21  thought the parties needed a prompt disposition from the Court.
22  And while it would have been fun initially here, while it would
23  have been perhaps interesting to write more extensively on
24  this, I didn't think that the delay would be to anyone's
25  benefit.

1     So before the Court is the debtors' motion to reject
2  its executory contract with Mitsubishi Power Systems America
3  nunc pro tunc to the petition date.  For reasons that I will
4  describe in more detail, I will approve the rejection of the
5  Mitsubishi nunc pro tunc to the date of the filing of the
6  rejection motion.

7     Mitsubishi has asked that the debtors' rejection of
8  the Mitsubishi agreement be conditioned on the debtors'
9  specific performance of certain provisions of the debtors'
10  contract with Mitsubishi, namely, the assignment to Mitsubishi
11  of the debtors' contracts for catalysts with Cormetech and
12  BASF.  The Court will deny that request and overrule the
13  objection of Mitsubishi for reasons that I will state.

14     As I said, the Court did conduct an evidentiary
15  hearing on the 1st of November and heard testimony from
16  witnesses for both the debtor and for Mitsubishi.  The
17  Committee also participated actively in that hearing and has
18  submitted pleadings in connection therewith.  At the conclusion
19  of the hearing I took the matter under advisement.

20     From the pleadings, evidence, and argument, I am
21  acutely aware that the business issues arising from this
22  dispute are urgent, and I have elected to provide you with my
23  decision from the bench in order to insure that all parties are
24  aware of my ruling as promptly as possible.  And as I said,
25  while a formal written opinion might have been preferable to

11

1 deal with some of the rather novel issues that are raised, the
2 attendant delay would not have served either the interests of
3 justice or the parties.

4        The record reflects that both the debtor and
5 Mitsubishi and the Official Committee support rejection of the
6 Mitsubishi contract.  The standard for rejection of an
7 executory contract under Section 365(a) is the business
8 judgment rule, and it's axiomatic, but this is a fairly low
9 threshold.

10        Through the testimony of Mr. Ame and Mr. Caruso, I
11 find that the debtors have carried their burden, and I will
12 approve the rejection of the agreement with Mitsubishi.

13        The second issue concerns the timing of the
14 rejection.  The debtors have asked for rejection nunc pro tunc
15 to the petition date, September 8, 2006.  The motion to reject
16 was filed on September 29, 2006.  The debtors' rejection will
17 be effective as of the rejection motion -- as of the filing of
18 the rejection motion.  Given that there's only a day's
19 difference between the two, there may be no meaningful economic
20 difference between those two dates, nevertheless, both
21 applicable case law and established practice in this
22 jurisdiction lead to the conclusion that the effective date of
23 the rejection should not be prior to the date of the filing of
24 the motion to reject.  In this context the crux of the analysis
25 is whether the debtor has given clear notice of its unequivocal

D332

12

1  intent to breach and reject the contract, and both the debtor
2  and Mitsubishi have acted consistently with those
3  representations.

4          The unrebutted testimony from the November 1 hearing
5  reflects that the debtor has take no steps to perform under the
6  contract, and Mitsubishi has consistently acted as if the
7  contract was breached as of the motion date notwithstanding its
8  attempt to compel specific performance and certain provisions
9  of the contract. It appears to the Court that it is the filing
10  of the motion that gives notice of the debtors' unequivocal
11  intent and affords a non-debtor counter party to a contract the
12  ability to negotiate and enter into agreements predicated upon
13  the debtors' timely rejection to mitigate or cover its loss or
14  damages. The mere act of filing of a petition does not satisfy
15  or accomplish this notification purpose, but the filing of a
16  debtor's motion with it's representations of unequivocal intent
17  in paragraphs 34, 35, and 36 of the rejection motion to breach
18  these agreements does lay the necessary predicates for nunc pro
19  tunc rejection effective as of the date of the filing of the
20  motion.

21          Now we turn to the question of whether it is
22  appropriate for this Court to order as a condition to rejection
23  of a contract the specific performance of certain terms of that
24  rejected contract to benefit a non-debtor contract party.
25  Specifically, Mitsubishi asks that I require the debtor as a

13

1  condition to rejection to assign over subcontractor agreements
2  between the debtors and third parties that would allow
3  Mitsubishi to finish the Port Westward project.  Mitsubishi has
4  the contractual right to require assignment, but that's not the
5  issue.  The issue is whether to specifically enforce that
6  contractual right or limit Mitsubishi to damages if the
7  debtor's breach the contract by refusing assignment.  And while
8  I understand the business and economic considerations that give
9  rise to Mitsubishi's request, neither Bankruptcy Code Section
10 365 or applicable case law, including that cited by Mitsubishi
11 mandates or even permits specific performance here.

12       More specifically, I will overrule and deny
13 Mitsubishi's demand and let the debtor assign over contracts
14 with Cormetech and BASF as a condition to rejection of the
15 Mitsubishi contract.  Mitsubishi has cited numerous decisions
16 that it offers as persuasive precedent that a debtor can be
17 required to specifically perform portions of a rejected
18 contract.  Specifically, the West Chestnut Realty case involved
19 a contract for ownership of real property.  The classic context
20 for equitable remedy -- it's for the equitable remedy of
21 specific performance as real property is deemed unique.  Here,
22 while the catalysts are custom made, they are neither unique
23 nor irreplaceable.

24       In the opinion by Judge Scholl in Walnut Associates
25 is likewise unavailing to Mitsubishi.  Without going into

1  greater detail, I find that Walnut Associates is both
2  procedurally and substantively distinguishable from the case at
3  bar.  And Judge Scholl's comments about the availability of
4  specific performance are dicta in a case that largely turns on
5  principles of estoppel.

6        At bottom, the testimony adduced from Mr. Ame and Mr.
7  Gangaiah, I believe, is in agreement that the catalysts in
8  question are neither unique nor irreplaceable, although they
9  are custom made.  In fact, the testimony from the three
10 industry witnesses was consistent and identified with
11 specificity how to replace the catalysts, how long it would
12 take, and exactly what the costs and damages would be.  The
13 availability of easily calculated money damages and the
14 opportunity to replace the product on the open market is fatal
15 to Mitsubishi's request for specific performance of Section 20
16 of the contract.

17        I also note the largely unrebutted and convincing
18 testimony of Mr. Gangaiah establishes that there is no
19 secondary market for these catalysts, and that it is highly
20 unlikely that they could be sold for use in another plant.
21 Again, the uncontradicted testimony is that these catalysts are
22 custom designed, both for the power plant and to comply with
23 local environmental regulations.  Mr. Gangaiah testified
24 convincingly that installation of these catalysts in a HRSG at
25 another plant was highly unlikely, both on account of different

15

1  environmental standards, and because the HRSG is engineered to
2  operate at precise pressures that would almost certainly be
3  adversely affected by a non-customized catalyst array.

4          In a nutshell, the testimony of both Mr. Ame and Mr.
5  Gangaiah supports the conclusion that while the catalysts may
6  be a series of blocks, these blocks are not uniform, they're
7  not standard, and they're not interchangeable with catalysts at
8  other sites.  The Lego block analogy that was used is
9  appealing, but it is inept.

10          Consequently, the record before the Court shows that
11  the catalysts have value only to Mitsubishi, and that if the
12  catalyst is not installed in the Port Westward facility, the
13  catalysts will likely have only scrap value for the estate.
14  Correspondingly, Mitsubishi will have a massive damages claim
15  against the debtor.

16          The record from the November 1 hearing, and more
17  specifically the arguments and representations of counsel at
18  that hearing, reveal that negotiations have occurred to try to
19  reach a business resolution, and this is a situation that cries
20  out for a negotiated resolution.  But the parties, and
21  particularly the debtor and the Committee, should be on notice
22  that they and the creditor body will bear the heavy financial
23  consequences if the debtor is left with a worthless stack of
24  catalysts and a massive damages claim from Mitsubishi.  I will
25  look to the debtor to settle a form of order with Mitsubishi

16

1  consistent with my ruling and submit it under certification.

2  Are there any questions?

3                    (No verbal response)

4           THE COURT:  We'll turn to the agenda.

5           MR. CUNNINGHAM:  Thank you, Your Honor.  Your Honor,

6  agenda item number three is the debtors' application to retain

7  Alvarez and Marsal as financial advisor nunc pro tunc.  The --

8  Your Honor, the issue primarily that we received from the

9  Creditors Committee initially was the scope of Alvarez and

10 Marsal's retention given that we were also retaining Blackstone

11 Group.  Initially, Your Honor, when we filed the motion,

12 Alvarez and Marsal was playing several functions including an

13 investment banking function.  We subsequently filed a

14 supplement with the Court which modified Alvarez and Marsal's

15 retention to make clear that Alvarez and Marsal was only being

16 retained on an hourly basis as turnaround consultants to the

17 debtors, and that the investment banking function would be

18 fulfilled by the Blackstone Group.

19         And specifically, Your Honor, we went through the

20 provisions with the Creditors Committee at our meeting last

21 Monday that we held in New York in which we've described the

22 role of both Alvarez and Marsal and the Blackstone Group.  And

23 to clarify, Your Honor, for the record, I'd like to just read

24 for the record what that structure was that we had identified.

25         Alvarez and Marsal primarily would be operations and

1  restructuring advisors.  They would be assisting in the
2  preparation of operation plans and capital forecasts, assisting
3  in the day-to-day operations of the business in crisis
4  management, assisting in cash management and collateral issues,
5  assisting in negotiations with key customers and subcontractor
6  agreements, primarily interfacing with the financial advisors
7  of the senior lenders and the Creditors Committee,
8  participating in negotiations with creditors and other
9  interested parties as well as assisting the debtors in the
10 development of a plan of reorganization.

11        Blackstone Group, on the other hand, Your Honor,
12 would primarily be focusing on the capital structure issues of
13 the debtors.  They will be assisting the debtors in attempting
14 to arrange DIP financing, assisting the debtors in the
15 potential sale of all or a portion of the company, if
16 applicable.  Blackstone would also evaluate the debtors' debt
17 capacity in alternative capital structures.  They would
18 similarly participate in negotiations with the creditors and
19 other interested parties on such issues.  To the extent
20 necessary, assist in the development of a reorganization plan
21 that involve those issues as well as to the extent necessary
22 assist in the raising of exit financing, primarily again an
23 investment banking function.  That was the structure that we
24 laid out for the Creditors Committee, both Bob Caruso, who was
25 the lead principal advisor for Alvarez and Marsal who testified

1  last week, was present, as well as Tim Coleman of the
2  Blackstone Group, who's the lead advisor at Blackstone.

3        The one other aspect of Alvarez and Marsal's
4  compensation -- proposed compensation is a restructuring fee,
5  Your Honor, of $500,000 that's in addition to the hourly fee,
6  and that is payable only upon consummation of a plan of
7  reorganization.  And based on that we successfully resolved any
8  issues that we had with the Creditors Committee.  As the Court
9  might note, the Creditors Committee did not file an objection
10  to Alvarez and Marsal's retention.

11        We did receive an objection by the counsel for the
12  senior lenders as well as the Office of the United States
13  Trustee.  I'm pleased to report we do have a resolution of the
14  senior lenders' objection, Your Honor, and that resolution is
15  as follows.  The restructuring fee amount of $500,000, Your
16  Honor, would be payable only if the senior lenders are first
17  paid in full under the senior creditor facility including post-
18  petition amounts thereunder, whether it's prior to that plan of
19  reorganization being consummated, or pursuant to that plan of
20  reorganization, the senior lenders have to be paid in full
21  before any restructuring fee would be payable to Alvarez and
22  Marsal.

23        And similarly, Your Honor, if the senior lenders have
24  not been paid in full in these cases by April 1st of 2007, the
25  senior lenders would have until April 15th, 2007 to file an

19

1   objection with this court to the payment of the restructuring

2   fee and -- on any grounds, and we would then have a hearing on

3   that objection.  So if the senior lenders do not believe that a

4   restructuring fee should be payable in any manner to Alvarez

5   and Marsal, they can raise that objection.  They won't be bound

6   by a 328 or 330 standard.  They could file the objection, and

7   we'll have a hearing for Your Honor on that objection.  And I

8   believe that is the resolution that we have with the senior

9   lenders, Your Honor.

10          THE COURT:  Mr. Kiriakos.

11          MR. KIRIAKOS:  Good afternoon, Your Honor.  Tom

12  Kiriakos, Mayer, Brown, Rowe, and Maw, appearing on behalf of

13  Bank of America as administrative agent.  Mr. Cunningham has

14  accurately summarized where we are with those.  With

15  satisfactory language in the order, that will resolve our

16  objection.

17          THE COURT:  As it relates to Alvarez and Marsal.

18          MR. KIRIAKOS:  As it relates to --

19          THE COURT:  You have one relating to Blackstone as

20  well.

21          MR. KIRIAKOS:  Exactly right.  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. CUNNINGHAM:  Your Honor, a suggestion.  Mr.

24  McMahon has asked if I'd take a few moments to talk with him.

25  We don't -- we can allow the rest of the hearing to go forward,

20

1 allow this to come back at the end, so that we may have a
2 resolution with the U.S. Trustee on its objection to Alvarez
3 and Marsal.

4 THE COURT: Okay. We also have -- I saw pleadings by
5 the Ad Hoc or Unofficial Equity Security Holders Committee
6 or --

7 MR. SIEGEL: Yes, Your Honor. This is telephonically
8 Howard Siegel, Brown Rudnick, on behalf of certain equity
9 security holders. Your Honor, we filed a statement, as Your
10 Honor has indicated for the record, making -- with the intent
11 of making the Court aware that the U.S. Trustee has initiated a
12 formation process for an official equity committee with an
13 organization meeting to be held on November 9th. Our statement
14 simply requests consideration for a deferral of the Court's
15 acting on these motions until the next calendar, November 17th,
16 so that the Official Equity Committee would have the
17 opportunity to review these matters and indicate a position.

18 We understand these are fast-moving cases. It's not
19 our intent to impede or slow down important business that is
20 taking place, but these are matters we believe are of
21 significance to equity. While there are cost issues that
22 certain parties have addressed on behalf of equity, we would
23 note the assistance to management that these professionals can
24 bring to bear is something that may also have great importance,
25 and the equity holders may have a view on that.

21

1       THE COURT:  I'm not sure exactly what you mean by the
2   assistance to management that these professionals can bring to
3   bear.  I'm not following you.

4       MR. SIEGEL:  That given the need for a restructuring
5   activity in a relatively compressed time frame, the assistance
6   that Alvarez and Marsal can bring on an operations front we
7   think could be important to allow management to assist the
8   existing management to perform on a timely basis with the
9   resources necessary, and likewise, the additional activities
10  that I understand Blackstone is being paid to perform would
11  likewise be of assistance in this matter.

12      THE COURT:  Okay.

13      MR. CUNNINGHAM:  Your Honor, as I understand counsel,
14  the request is to continue this matter until the November 17th
15  hearing.  I think in light of the fact that Alvarez and Marsal
16  has been working daily and tremendously with us since September
17  the 28th when we filed these cases, they've already agreed to
18  an extension to deal with the Committee issues through today.
19  I think to impose a further continuation in which their
20  retention is hanging out there is unduly burdensome.  I think
21  that they waited until now.  I think that they should be able
22  to go forward and be retained.  It's in the debtor's best
23  interest that they be retained, and that they know that they
24  are retained in these cases.

25      THE COURT:  Well, that's certainly true, and I don't

1  think there's anyone that doubts that I have the ability, and
2  there's certainly  more than enough case law supporting a
3  proposition that their retention can be effective nunc pro
4  tunc, and this is clearly an appropriate circumstance for that.
5  But wouldn't it be appropriate if the U.S. Trustee is going to
6  appoint a new official committee in this case, that they have
7  the opportunity to weigh in on a significant or actually two
8  significant pieces?  If -- because, basically, we're talking
9  about Blackstone and Alvarez and Marsal, because they sort of
10 go off of each other.  Wouldn't that be appropriate, and what
11 we're talking about is just 11 days?

12        MR. CUNNINGHAM:  I recognize it's 11 days, but again
13 it's -- again, Your Honor, it just goes to the comfort level of
14 these professionals who are providing valuable services to the
15 debtors.  I don't think we could -- to the extent that they
16 feel insecure and the like, I recognize it's 11 days, but, you
17 know, from the debtors' standpoint, they have -- at least I can
18 tell you obviously in connection with Alvarez and Marsal,
19 they've been there from day one, and they are providing a
20 critical function to the debtors.  They're meeting constantly
21 with the Creditors Committee and with the bank's advisors.  So
22 they are fulfilling a very necessary function, and I think a
23 delay only creates uncertainty and -- as far as the debtors are
24 concerned.

25        I mean, obviously, it's up to Your Honor, but the

1  debtors would recommend that Your Honor go forward today.  We
2  are amenable to working with the U.S. Trustee in trying to see
3  if we can resolve any issues there.  And as I said, we resolved
4  the Creditors Committee, and we resolved the bank's.  I can't
5  imagine that an equity committee is going to come in and be
6  able to change their role any further.

7          THE COURT:  Well, that may be true, but that doesn't
8  necessarily mean I have to deprive them of the opportunity.

9          MR. CUNNINGHAM:  That's correct.

10          THE COURT:  The fact of the matter is that I did
11 review the response -- the statement of the equity security
12 holders, and the concern that I have is that I was unaware,
13 and, obviously so -- but I was unaware that the U.S. Trustee
14 had agreed to appoint an equity committee.  They will be an
15 official committee assuming that they're formulated by the
16 Office of the U.S. Trustee on the 9th of November.  And it
17 seems to me appropriate in this context with important
18 retentions and engagements that they have at least some
19 opportunity to participate.  And I'm sensitive to the issues of
20 the various professionals, but I make the following
21 observations.

22          Any retentions that I approve will be effective nunc
23 pro tunc.  Having reviewed the papers, I don't think that
24 there's any uncertainty about the appropriateness of nunc pro
25 tunc relief.  And I also note that while these cases are moving

1 at a pretty good clip, it is -- we're not looking at a sale
2 next week or a restructuring or transaction. I understand that
3 these processes are moving, but in the grand scheme of things a
4 relatively brief delay seems appropriate under the
5 circumstances. And you may be right that having resolved
6 issues with the lenders, the Official Committee of Creditors,
7 and the U.S. Trustee, there may be little left to complain
8 about, but I think they at least have the opportunity to
9 participate in that dialogue, and I think it's appropriate.

10 I also -- just so that the parties are aware, I will
11 rule on this on the 17th. So I would imagine that once the
12 Official Committee is appointed, the equity committee, this
13 should be a front burner thing, because we're going forward on
14 the 17th.

15 MR. CUNNINGHAM: Can I ask the Court as a possible
16 interim step is to possibly get an interim order approving
17 their retention today, subject to a final hearing on it on the
18 17th? That way they're protected with respect to their fees
19 that they've earned.

20 THE COURT: I think they are protected though. I
21 mean what's an interim order, for example, for Blackstone going
22 to do?

23 MR. CUNNINGHAM: It again would provide for whatever
24 portion of the monthly fee that they get will have been earned
25 and payable to them for the services that they're doing. I can

D345

1  say Blackstone's providing a measurable amount of services

2  right now with respect to trying to arrange DIP financing.

3          THE COURT:  Oh, I'm not debating that they're doing

4  -- that they're providing valuable services, both Alvarez and

5  Marsal and Blackstone.  My only observation is that I've stated

6  I think pretty clearly that any relief -- any retention that I

7  approve will be effective nunc pro tunc.  And I'm not sure what

8  the consequences of an interim order approving the retention

9  are.  For example, if the -- if you reach different financial

10  accommodations based upon your discussions with the U.S.

11  Trustee, perhaps even subsequent to today, I'm just concerned

12  that I'm -- I don't know what the consequences to that -- to

13  the entry of that interim order would be.

14          I'm very comfortable that their retentions will be

15  approved nunc pro tunc, and that that gives them the necessary

16  protection about compensation for the services that they're

17  currently providing.  I think that's a pretty standard approach

18  with Chapter 11 professionals, all of whom are providing

19  services, and the Official Committee is here.  Mr. Sabin has no

20  guarantee that I'm going to approve its retention.  So I think

21  that there's no need under the circumstances, or it would not

22  be appropriate for me to enter an interim order.

23          MR. CUNNINGHAM:  May I just consult with --

24          THE COURT:  Certainly.

25                      (Pause)

26

1       MR. SIEGEL: Your Honor, for the record again this is
2   Howard Siegel. We certainly have no intent of putting these
3   two in jeopardy, and if there is any type of order the Court
4   would consider that protects them between now and the -- from
5   conception to November 17th. We certainly have no objection to
6   that. Our intent was simply given the imminency of this, an
7   official committee being appointed, to have the opportunity to
8   weigh in for the full scope of the case. But we have no reason
9   to question services rendered to date and don't want any of
10  those professionals to feel they're in jeopardy for a short
11  continuance period.

12      MR. CUNNINGHAM: Your Honor, based on the Court's
13  comments, we will continue both the Alvarez and Marsal
14  retention and the Blackstone retention until the hearing on
15  November the 17th. It will also give us the time necessary to
16  address any additional -- or the concerns that have been raised
17  by the United States Trustee, and when the equity committee
18  does presumably get formed this week and retain counsel, we
19  will be in communication immediately on these retentions.

20      THE COURT: The record is closed as to everyone but
21  the equity committee.

22      MR. CUNNINGHAM: Yes. Thank you, Your Honor.

23      THE COURT: Yes, we'll adjourn this to the 17th. As
24  I said, we will go forward. I would expect any retention that
25  is approved would be approved nunc pro tunc to the date

D347

1  requested in the application.  The fact that the group of
2  shareholders or the Ad Hoc committee has no opposition to the
3  interim order proposal by counsel doesn't change my concern
4  that I'm not sure what the consequences of an interim order
5  are, and I think that that's a question or a request that I
6  would face in every case.  For that sort of relief, I think the
7  system works effectively, and I think that they are adequately
8  protected, particularly given the relatively modest delay.  If
9  this were an open-ended issue, it would be perhaps a different
10  circumstance.  So we'll go forward on the 17th.

11      MR. CUNNINGHAM:  Thank you, Your Honor.  And that
12  would affect items number three, which is Alvarez and Marsal,
13  application to be retained, and item number six.  And because,
14  as Your Honor said, the record will be closed, I do want to
15  just get the -- read on the record the resolution of the
16  Blackstone application for retention that we have with the
17  senior lenders, the modifications that we're going to make
18  there.

19      With respect to that, Your Honor, to the extent that
20  the senior lenders are not paid in full by April the 1st, that
21  two things, Your Honor.  One is that Blackstone has agreed to
22  credit the monthly fee of 150,000 that they earned in January,
23  February, and March against their restructuring fee of
24  1,650,000.  And also similar to the Alvarez and Marsal
25  agreement, the senior lenders would have until April the 15th

28

1  to file an objection with respect to any additional or further
2  compensation, whether it's monthly or whether it's a
3  restructuring fee, with respect to the Blackstone Group.  And
4  if they file such an objection, then the Court would have a
5  hearing on the bank's objection.

6      MR. KIRIAKOS:  Tom Kiriakos again, Your Honor, on
7  behalf of Bank of America.  That's an accurate statement with
8  two caveats.  One, we need to be -- we haven't seen the form of
9  the order yet.  We've been working on language, but we haven't
10 finalized it.  And two, at least from where we sit, the idea is
11 that if we're not paid in full by April 2nd, our opportunity to
12 object is as if your order had never been entered.

13     In other words, we're back -- it's as if this hearing
14 today went forward on the objection, except with respect to the
15 compensation being paid for the period prior to April 2nd and
16 the application.  So that's where we're coming from.  We need
17 to look at the order.  We'll try to resolve it with Blackstone.
18 But with those two caveats, we're okay.

19     THE COURT:  Mr. Thompson.

20     MR. THOMPSON:  Good afternoon, Judge.  Mark Thompson
21 from Simpson Thacher.  And if I may just very briefly appear
22 for this limited purpose --

23     THE COURT:  Certainly.

24     MR. THOMPSON:  -- on the application of Blackstone?

25     THE COURT:  I'm happy to hear you.

1           MR. THOMPSON:  With respect to Mr. Kiriakos'
2   statement, I think I just need one clarification, which is that
3   there is an indemnification agreement attached to the
4   engagement letter that Your Honor's being asked to approve I
5   think now the 17th.  And I don't think that Mr. Kiriakos meant
6   to say that the indemnification for a period before April 2nd
7   would be removed either.  You're speaking strictly about the
8   terms of compensation.  I just appreciate that clarification,
9   so we know we don't have to debate that further.

10          MR. KIRIAKOS:  We don't have to debate that.  They're
11  entitled to their deal up through April 2nd.  It's the post-
12  April 2nd period that we're going to revisit as if with respect
13  to that period this order had never been entered.  Thank you.
14  And I apologize for the confusion.

15          MR. THOMPSON:  Thank you, Mr. Kiriakos.  Thank you,
16  Judge.

17          MR. SCHLERF:  Mr. Thompson, Mr. Kiriakos, if you
18  could stay here?  One last clarification.  Paid in full.  I
19  just want to make sure given the pre-petition facility and the
20  orders entered in this court for the cash collateral, we're
21  dealing with both amounts owed to you and contingent claims
22  related to LC's that your clients have.  So if you could just
23  address how --

24          MR. KIRIAKOS:  And we're also -- thank you.  And
25  we're also dealing with in the event a subset of -- the lenders

D350

1  are a subset that provide DIP financing in any way, shape, or
2  form.  The idea is regardless of what we do, we're out entirely
3  by April 2nd.  So thank you for that clarification.

4          MR. SCHLERF:  Thank you.

5          MR. CUNNINGHAM:  Your Honor, with those comments
6  again items three and six then will be continued to the hearing
7  on November the 17th.

8          With respect to item four, Your Honor, this is the
9  debtors' motion to employ ordinary course professionals.  We've
10  received an objection by the senior lenders, U.S. Trustee, and
11  the Creditors Committee.  We have talked to all three, Your
12  Honor, and have come up with a resolution.  The resolution,
13  Your Honor, is to set up -- first of all, just to advise the
14  Court, we had originally filed a list of 23 ordinary course
15  processionals.  We have now whittled that list down to 20.  And
16  on that list we are going to attach as an exhibit to the order
17  a -- the name of the professional, the type of services that
18  they are performing, and then the estimated monthly fees in
19  columns, and that would be attached to the order.  And we're
20  going to have three tiered caps that would be imposed on those
21  professionals on a monthly basis.

22          To the extent any professional is listed at an
23  estimated monthly fee of $10,000 or higher, their monthly fees
24  would be capped at no more than $20,000 for a month.  To the
25  extent that the fees listed on the schedule reflect an

1  estimated monthly fee of between 5,000 and 9,999 dollars, there
2  would be a $10,000 cap then placed on that professional. And
3  any professionals that we estimate to be below $5,000 would
4  have a $5,000 monthly cap. In all instances, Your Honor, there
5  would be an aggregate monthly cap, $200,000 in the aggregate,
6  as well as a provision in the order that would reflect that
7  notwithstanding this order, it is subject to -- payment of any
8  of these professional fees are subject to the cash collateral
9  order and any budget thereto. I don't know if any of the
10 parties want to make any additional comments on that.

11         MR. KIRIAKOS: Tom Kiriakos again, Your Honor.
12 That's an accurate statement. Our concern, as you know, as
13 we've stated in other papers that we filed, is we just don't
14 think these debtors can survive in Chapter 11 long if they're
15 paying, you know, these types of amounts to professionals.

16         Specifically, with respect to the 200,000 monthly cap
17 for the ordinary course professionals, as Mr. Cunningham said,
18 it's, of course, subject to our cash collateral rights. But
19 also we asked for an were told that the 200,000 actually
20 represents less than what these same professionals were
21 averaging during the pre-petition period. The number we were
22 told was about a $260,000 per month average for these
23 professionals. So that fact was -- that's a question we had in
24 terms of how the $200,000 cap compared to what their actual
25 pre-petition experience was, and we were told that it's

32

1 actually less. The pre-petition experience was 260,000. If
2 Mr. Cunningham could confirm that that's what we were told on
3 the record, it would be useful. Thank you.

4 MR. CUNNINGHAM: I can confirm that, Your Honor.

5 THE COURT: Very well. Mr. Landis.

6 MR. LANDIS: Thank you, Your Honor. Back again.
7 Adam Landis, for the record, on behalf of the Official
8 Committee of Unsecured Creditors. We've had a number of
9 discussions with counsel for the debtors, and they've been very
10 productive. Things have been moving quickly, and this is not
11 the largest thing that has been worked on, but we do appreciate
12 the flexibility the debtors have shown.

13 That said, we did have a couple of other comments
14 that I believe are subject to some final language negotiations,
15 and I'd like to get confirmation of that on the record. We
16 were working on two other pieces of language. One that would
17 reflect in the order that none of these ordinary course
18 professionals, although they might separately work for non-
19 debtor entities, none of them will be paid for the work they do
20 for non-debtor entities by the estate. And I think we worked
21 out the language on that, and I didn't hear it reflected in Mr.
22 Cunningham's comments.

23 The second point is we were working on some sort of
24 mechanism to enable -- notice parties, to take a look and see
25 actually what was, in fact, billed in the month to make sure

33

1 that the caps are being adhered to, and that there's no non-
2 debtor professional fees going out the door as well. So we
3 were working on some language on that.

4 One other little thing we've been talking about with
5 the debtors is with respect to the exhibit that will be going
6 in detailing the professionals services and the caps. With
7 respect to at least one of the professionals, we discussed and
8 narrowed the scope of the services that will be performed. On
9 the exhibit B that was filed with the motion, Grant Thornton we
10 proposed to be retained and to provide accounting support at
11 the Deltak location. We understand from the debtors that that
12 no longer is going to be part of the scope of their services,
13 although the estimated monthly fees will not change. I believe
14 that is everything that we had talked about. And we get
15 confirmation subject to language, I think we'll be fine.

16 THE COURT: Mr. McMahon, good afternoon.

17 MR. McMAHON: Your Honor, good afternoon. Joseph
18 McMahon. Your Honor, we have participated in discussions with
19 the debtors regarding the form of order, and subject to seeing
20 it in final form, I believe that Mr. Cunningham has accurately
21 reflected an acceptable resolution.

22 THE COURT: Very good. Thank you.

23 MR. CUNNINGHAM: Your Honor, just picking up on Mr.
24 Landis' comments, we will make the modification to the exhibit
25 A, a list of professionals with respect to the type of service

34

1 Grant Thornton is performing. It is tax related, and we will
2 reflect that.

3 With respect to his comments with respect to services
4 that these professionals may provide to certain non-debtor
5 affiliates, I think the resolution we can propose, Your Honor,
6 is that to the extent we do receive a bill that we feel we need
7 to pay because it's work to be performed for a non-debtor
8 affiliate, then we will submit that to our committee counsel as
9 well as to our lender's counsel. If we get their consent, then
10 we can go ahead and pay it up to this cap amount here. And if
11 not, we'll file an application with the Court to pay it.

12 I would also note I didn't reflect in my comments
13 that I do have that similar agreement to the extent -- and I've
14 already discussed this with them. To the extent we need to, in
15 our view, exceed any of these monthly cap amounts, as long as
16 we're still within the aggregate, if we go to our -- to the
17 Committee -- Creditors Committee and we go to the senior
18 lenders, and they give us our consent as opposed to somebody
19 having to file an application that goes above the monthly cap,
20 if they consent, we're still within the aggregate 200,000, then
21 we can go ahead and do that. And the order would also provide
22 for that.

23 THE COURT: Is that acceptable?

24 MR. LANDIS: Your Honor, that mechanism is acceptable
25 to the Creditors Committee, and we'll just have to get the

35

1   language nailed down.

2       THE COURT:  Very good.  I assume if you resolve this
3   matter, that I'll see the order under certification.  If for
4   any reason you run into a roadblock, this matter would be
5   carried to the 17th.

6       MR. CUNNINGHAM:  Yes, Your Honor.  That takes us to
7   agenda item five, which I think was dealt with at the
8   beginning.

9       MR. LANDIS:  Your Honor, I'm back again.  This was
10  the motion that the debtors filed originally with respect to
11  1102(b)(3) protocol, supplemented by the Creditors Committee's
12  motion, approved on an interim basis at the last hearing.  We
13  did send out the proposed order on notice by priority mail to
14  all parties on the 2002 list.  We've received no objections.  I
15  have a final form of order for Your Honor.  If I might hand it
16  up?

17      THE COURT:  Please.

18      MR. LANDIS:  Thank you, Your Honor.  The final form
19  of order merely reflects the inclusion of some handwritten
20  comments in the interim order in paragraphs eight and ten in
21  response to the United States Trustee's comments that they
22  didn't want to see any -- the language is that nothing in this
23  order otherwise prejudices rights of certain creditors, and
24  instead of handwriting that, we've made it by word processing.
25      The only other change is consistent throughout the

D356

36

1  change, the interim nature of the order to a final order.  So
2  we'd ask that Your Honor, if acceptable, sign it, and we will
3  be done with this matter, at least for now.

4          THE COURT:  Very good.  As a practical matter, is the
5  Committee and are committees in cases providing substantially
6  more information than they did prior to the enactment of
7  amended 1102?

8          MR. LANDIS:  Your Honor, I can tell you that at least
9  anecdotally in my experience having represented three
10 committees since the enactment of the statute, we have gotten
11 any number of requests under new 1102(b)(3) and having the
12 protocol in place has been very helpful.  We've also, in
13 connection with the website that we've been running, we get
14 responses, and we respond to them as quickly as we can and
15 certainly within the parameters that we establish on the
16 protocol.  But we have not had to yet test the provisions that
17 would bring us into court.

18         THE COURT:  Okay.

19         MR. LANDIS:  At least on my experience.

20         THE COURT:  All right.  I've entered the order.
21 That's a final order.  It will be on the docket this afternoon
22 or tomorrow.

23         MR. LANDIS:  Thank you, Your Honor.

24         MR. CUNNINGHAM:  Thank you, Your Honor.  Again,
25 agenda item six, the Blackstone Group retention is being

1 continued to November the 17th.

2 Item number seven is the debtors motion for
3 additional time to file schedules. Your Honor, we do have one
4 objection by the United States Trustee. At the first day
5 hearing Your Honor gave us 45 days to file the schedules. We
6 are asking for an additional two weeks to November the 27th,
7 which is a Monday, to file the schedules. That's just the time
8 frame that we've been given by our claims agents putting that
9 together. The U.S. Trustee would like for that extension to be
10 with prejudice. I just can't -- since I don't know what's
11 going to happen between now and then, if I need to come before
12 Your Honor on the 27th and ask for additional time and make a
13 case for it, I want to be able to do that. So that's why we do
14 not accept the with prejudice extension.

15 THE COURT: Mr. McMahon.

16 MR. McMAHON: Your Honor, good afternoon. The
17 initial date set for the 341 meeting is tomorrow, Your Honor.
18 Obviously, we're going to be leaving the meeting open, because
19 we don't have the schedules and statements, and I would like to
20 keep the time frames as tight as possible given the fact that
21 we are going to be two months into the case very soon.

22 THE COURT: Okay.

23 MR. McMAHON: I appreciate the debtors' concern
24 regarding not being able to gauge the precise day on which
25 they're able to get done. There's a -- I guess a couple of

38

1  options here.  To the extent that we can grant the request
2  subject to revisiting it on the 17th, to the extent that the
3  debtors have more clarity about whether or not they're going to
4  be done by the 27th, then we can, you know, address that issue
5  on that date.  But, you know, 60 days is a lot of time to put
6  together schedules and statements, especially when there were
7  at least some bankruptcy experienced professionals in place
8  prior to the petition date, and we'd like to make that a front
9  burner issue for the debtors.

10        THE COURT:  Okay.  I'm going to overrule the
11  objection.  I will grant the motion and simply encourage the
12  debtor to get their papers filed by the 27th.  Mr. Cunningham,
13  you will meet with a considerably more hostile response.

14        MR. CUNNINGHAM:  I understand.

15        THE COURT:  -- if you see a further extension.

16        MR. CUNNINGHAM:  I understand, Your Honor.

17        THE COURT:  But 60 days is a fair amount of time.
18  The other observation is that the -- I thought about this
19  objection by the Office of the United States Trustee, and again
20  what I'm concerned about actually in this context would be what
21  the consequences are.  For example, having represented debtors,
22  if the documents aren't done, who's in contempt?  And it
23  doesn't seem to serve a purpose.

24        As a practical matter, I think Mr. McMahon could move
25  to dismiss the case, and I think that actually is the remedy

39

1 | rather than a request for an extension with prejudice.  So
2 | under those circumstances, I'm going to overrule the objection,
3 | and I'll look for the debtors' schedules to be timely filed.

4 |          MR. CUNNINGHAM:  Thank you, Your Honor.  I do have a
5 | proposed form of order.

6 |          THE COURT:  Very good.

7 |          MR. CUNNINGHAM:  Can I hand it up?

8 |          THE COURT:  Please.  Thank you.  And the 27th is
9 | being Monday after Thanksgiving.

10 |          MR. CUNNINGHAM:  Yes.

11 |          THE COURT:  Okay.  Good luck with that.  Very well.
12 | I've entered the order.

13 |          MR. CUNNINGHAM:  Thank you, Your Honor.  That then
14 | leaves us with the last two agenda items.  Item number eight is
15 | the Cormetech motion which is contested and will involve the
16 | introduction of evidence, Your Honor.  The last item, if we can
17 | skip over to item nine, is the debtors' emergency motion to
18 | enter into a new indemnity agreement which we have resolved
19 | with the senior lenders and with the committee, and if I can
20 | take that one up, Your Honor?

21 |          THE COURT:  That makes sense.

22 |          MR. CUNNINGHAM:  And, in fact, on that one I'd like
23 | to turn it over to my colleague Mr. Matt Brown.  Thanks.

24 |          MR. BROWN:  Good afternoon, Your Honor.  Matthew
25 | Brown on behalf of the debtors.  With regard to number nine,

1  the debtors' emergency motion for authority to enter into the

2  new indemnity agreement, the debtors' filed this motion, Your

3  Honor, seeking authority to enter into the new indemnity

4  agreement with Westchester Fire Insurance, which was a

5  condition of Westchester to the renewal or issuance of new

6  bonds which the debtors require in the ordinary course of their

7  business.

8          In particular, Your Honor, as you'll see in our

9  papers, the debtors need immediately to enter into three bonds

10 -- one in the amount of 1.5 million with Energy -- for a

11 project with Energy Northwest.  The existing bond expires at

12 the end of this week, Your Honor, on November the 11th.  The

13 second bond, Your Honor, is with -- on a project with JEA, 2

14 million.  That one also expires in the near term, on the 23rd.

15 And the final is for a potential project with the Tennessee

16 Valley Authority, and that bond would be at this point

17 $500,000, Your Honor.

18         There were no objections filed to the motion, but the

19 Committee did raise concerns which we have resolved by consent.

20 And if I may approach, Your Honor, and provide you with a form

21 of order?

22         THE COURT:  Please.  Are all these for Williams Group

23 projects?

24         MR. BROWN:  Yes, sir.

25         THE COURT:  Okay.  Thank you.

1    MR. BROWN:  As you will see from the form of order,
2  Your Honor, we've agreed with the Creditors Committee that the
3  debtors will not post any additional collateral to secure any
4  obligations of the new indemnity agreement or modify the
5  agreement without their consent or court order.  The debtors
6  have also agreed that when we're submitting any requests to
7  Westchester for the issuance of any new bonds, that we will
8  contemporaneously provide the Creditors Committee with
9  supporting detail, and the supporting detail, Your Honor, to
10  the extent available and subject to confidentiality consists of
11  pricing and timing of receipts for the associated project,
12  location of the project, the counter party to the project, the
13  debtors' estimated profit, the expected length of the project,
14  the amount of the proposed bond, the issuer of the bond, the
15  premiums to the bond, and the materials terms of the bond.

16    THE COURT:  Okay.

17    MR. BROWN:  The Creditors Committee will have three
18  business days after receiving our notice to file an objection
19  with the Court.  If they do not object, then the debtors can go
20  ahead and have that bond issued.  If there is an objection,
21  then we would request -- well, neither party will object to a
22  request to have that heard on expedited notice.

23    THE COURT:  So for every -- do you need Court
24  approval for every upcoming bonding?  I assume you bond for
25  every project.

42

1         MR. BROWN:  That's not the debtors' position, Your
2  Honor.  We believe it's ordinary course for each bond that
3  would be issued.

4         THE COURT:  Okay.  Okay.  Mr. Sabin, anything to add?
5  Mr. Hillman.

6         MR. HILLMAN:  Good afternoon, Your Honor.  David
7  Hillman on behalf of the Creditors Committee.  I think Mr.
8  Brown has accurately summarized our discussions.  The only
9  thing I'd like to add is the bond notice that Mr. Brown
10 described to the Court.  That was an essential part of the
11 negotiations of this order.  And while I wasn't present in the
12 court, I understand Your Honor had some concerns about putting
13 detailed reporting requirements in an order.

14        THE COURT:  That was a little bit different.  That
15 was the DIP financing order.

16        MR. HILLMAN:  Okay, because it was under that concept
17 that we agreed to take out the reporting requirements.

18        THE COURT:  Well --

19        MR. HILLMAN:  We're certainly willing to work with
20 White and Case, and we're going to -- we're comfortable with
21 the way this order appears, and we're comfortable with the
22 working relationship that they'll provide us with the necessary
23 information.  I just wanted the Court to understand how
24 important this was to the Committee, and it's been made clear
25 to White and Case as well.

43

1    THE COURT: Sure. I understand, and I do recall from
2  the discussion about -- I think it was the DIP financing order
3  that had all of the reporting requirements were built in.
4  Rather than being agreements between the parties, they were
5  ordered by me. The fact of the matter is that in this kind of
6  relationship you have a deal with the debtor, and you have the
7  ability to enforce it whether it's in the order or not.

8    MR. HILLMAN: Thank you, Your Honor.

9    THE COURT: Does anybody else wish to be heard on the
10 indemnity motion?

11    (No verbal response)

12    THE COURT: Very well. I'll enter the order.

13    MR. BROWN: Thank you, Your Honor.

14    MR. CUNNINGHAM: Your Honor, that then leaves us with
15 the last matter. It's item number eight, the motion by
16 Cormetech to set a date for assumption rejection of certain
17 executory contracts. The debtors have filed an objection. The
18 Creditors Committee filed an objection. I'll turn it over to
19 counsel to Cormetech. I would also -- only note that I just
20 spoke with counsel to Cormetech. They said they will not be
21 needing any Alvarez and Marsal or Blackstone representative to
22 testify, and I would ask if it were all right with the Court if
23 they can be --

24    THE COURT: Certainly.

25    MR. CUNNINGHAM: -- excused from the rest of the

44

1 hearing.

2          THE COURT:  Certainly.

3          MR. CUNNINGHAM:  Thank you.

4          MR. TOMS:  Good afternoon, Your Honor.  May it please
5 the Court, Chad Toms from Bifferato, Gentilotti, Biden, and
6 Balick.  And, Your Honor, I rise to introduce my co-counsel
7 Gregory Mascitti.  And, Your Honor, I want to point out to the
8 Court that the pro hac motion for Mr. Mascitti was filed on the
9 31st of October, and he was allowed to address the Court on the
10 1st.  I haven't seen any order pop up, but I'm happy to either
11 hand up a copy of the order or submit an extra one to chambers,
12 if necessary.

13          THE COURT:  Why don't you hand up the order?  Thank
14 you.  Very good.  I've signed the order.  Mr. Mascitti.

15          MR. MASCITTI:  Thank you, Your Honor.  Greg Mascitti,
16 Nixon, Peabody, on behalf of Cormetech, Inc.  Your Honor --

17          THE COURT:  How do you want to proceed today?  Do you
18 have witnesses?  Do we have evidence?  Do we have documents?

19          MR. MASCITTI:  I would intend to call two witnesses.

20          THE COURT:  Okay.

21          MR. MASCITTI:  I do have documents --

22          THE COURT:  Okay.

23          MR. MASCITTI:  -- that we would submit into evidence.
24 Some of your findings from the prior hearing would be relevant
25 to this hearing.

45

1        THE COURT:  I expect they would.

2        MR. MASCITTI:  Part of the testimony will most likely
3  be repetitive, but I don't know any other way around that given
4  procedurally where we've ended up.

5        THE COURT:  Well, I think we were warned about it at
6  the beginning of the last hearing.  Have the parties had an
7  opportunity to exchange documents, and have we pre-marked
8  documents?

9        MR. MASCITTI:  We have not pre=marked documents, but
10  I did produce copies of the contracts to Mr. Sabin.

11        THE COURT:  Very good.  Why don't we do this?  Let's
12  take a ten-minute break.  I'd like the parties, if they would,
13  to pre-mark their documents and give a set to the court
14  reporter, and then we'll reconvene, and we'll start the
15  hearing.  Mr. Sabin.

16        MR. SABIN:  Before we take that, one thing, because I
17  see people in the courtroom who are not necessarily subject to
18  the confidentiality agreements, that otherwise were consented
19  to so as to the Committee to receive documents directly.  And
20  so I just wondered from Mr. Cunningham's position on behalf of
21  the debtor and Cormetech's position whether this wold be an
22  open hearing or whether it's just the Committee, the debtor,
23  and Cormetech who are otherwise going to be able to review
24  these documents and the Court and our witnesses, to ask
25  questions on it?

46

1        MR. MASCITTI:  Your Honor, the documents reflect and
2   refer to a separate confidentiality agreement.  Our
3   investigation leads us to conclude that none was ever signed,
4   so I don't believe Cormetech is bound by any particular
5   confidentiality agreement, unless the debtor found one.
6        MR. CUNNINGHAM:  We don't have any objection, Your
7   Honor.
8        THE COURT:  Okay.  As a general proposition, I would
9   prefer open hearings.  I think that's a pretty obvious maxim.
10  Mr. McMahon, do you wish to be heard?
11       MR. McMAHON:  Your Honor, to the extent that we are
12  not going to be taking a position with respect this issue, I
13  just ask to be excused.
14       THE COURT:  Very well.
15       MR. McMAHON:  Thank you.
16       THE COURT:  Thank you.
17       MR. MASCITTI:  Ten minutes, Your Honor?
18       THE COURT:  Ten minutes.
19       MR. MASCITTI:  Thank you.
20       THE COURT:  Stand in recess.
21                    (Recess)
22       THE CLERK:  All rise.
23       THE COURT:  Please be seated.  Mr. Mascitti.
24       MR. MASCITTI:  Thank you, Your Honor.  We have marked
25  our exhibits, and I believe we are ready to proceed.

1          THE COURT:  Very good.

2          MR. MASCITTI:  Your Honor, Cormetech would call John

3  Matheson as our first witness.

4          THE COURT:  Okay.

5          THE CLERK:  Please place your hand on the bible.

6          MR. MATHESON:  John Matheson.

7          THE CLERK:  Please place your hand on the bible.

8  Please state your first name and spell your last name for the

9  record.

10          MR. MATHESON:  John Matheson, M-a-t-h-e-s-o-n.

11          JOHN MATHESON, CORMETECH'S WITNESS, SWORN

12          MR. MASCITTI:  Good afternoon, Mr. Matheson.

13                    DIRECT EXAMINATION

14  BY MR. MASCITTI:

15  Q    You are the Executive Vice President and Chief Operating

16  Officer of Global Power Equipment Group.  Correct?

17  A    That's correct.

18  Q    And as such, you're familiar with the business operations

19  of Deltak, LLC and Deltak Construction Services, Inc.  Correct?

20  A    That's correct.

21  Q    I'm going to refer to those two entities as Deltak as we

22  proceed.  Deltak designs, engineers, and manufactures heat

23  recovery steam generators.  Is that correct?

24  A    That's correct.

25  Q    Deltak also designs, engineers, and manufactures specialty

Matheson - Direct/Mascitti                    48

1  boilers and industrial boilers.  Correct?

2  A    Yes.

3  Q    Prior the bankruptcy Deltak evaluated its heat recovery

4  steam generator business, which I'll call HRSG business,

5  segment to determine whether or not to cease that business

6  operation.  Is that correct?

7  A    Yes.

8  Q    Were you involved in that process?

9  A    Yes.

10  Q    And that evaluation was done with professionals retained

11  by Deltak.  Correct?

12  A    Retained by Global Power, yes.

13  Q    And these were professionals that had experience in

14  turning around companies.  Correct?

15  A    Yes.

16  Q    And they had all of the financial information available to

17  them related to Deltak's business operations.  Correct?

18  A    Yes.

19  Q    And they had a sufficient amount of time to evaluate the

20  business operations of Deltak.  Correct?

21  A    I believe so.

22  Q    And after that thorough evaluation of the HRSG business

23  segment, those professionals concluded that it would be in the

24  best interest of Deltak to cease the HRSG business operations.

25  Correct?

Matheson - Direct/Mascitti                49

1   A    When they concluded that, they provided information where

2   a decision was reached.

3   Q    Did they suggest to you that the HRSG business operations

4   should continue?

5   A    Yes.  Did you say should or should not?

6   Q    Should continue?

7   A    Should continue.  No.

8   Q    Okay.  Did you support -- you concluded then, based on the

9   advice provided to you by these professionals, that the HRSG

10  business operations should cease?

11  A    I would say the Board of Directors concluded that would be

12  a better answer.

13  Q    And you supported that conclusion?

14  A    Yes.

15  Q    That decision was based in part on negative gross margins

16  on nearly all of the HRSG projects.  Correct?

17  A    Yes.

18  Q    And it was based in part -- that decision based in part on

19  aggregate projected losses of over $26 million.  Correct?

20  A    Yes.

21  Q    That decision was also based in part on projected future

22  negative cash usage of $22 million.  Correct?

23  A    Yes.

24  Q    That conclusion was also based in part on a lack of

25  profitable prospective book of business.  Correct?

1  A    Yes

2  Q    And that decision was based in part on the conclusion that

3  Deltak could not complete any of the HRSG projects in a cash

4  flow, neutral, or positive manner.  Correct?

5  A    Yes.

6  Q    Based on this evaluation of the HRSG business, the Board

7  of Directors of Deltak concluded that there would be no going

8  concern value for this business segment.  Is that correct?

9  A    I don't know if we addressed going concern value.  It was

10  the Board of Directors of Global Power that made the decision

11  to wind down the HRSG business.

12  Q    Did the Board of Directors of Global Power conclude that

13  the HR -- the HRSG business segment had little to no going

14  concern value in the absence of substantial capital infusion?

15  A    Yes.

16  Q    And Deltak was not able or Global Power, for that matter,

17  was not able to raise such capital infusion.  Is that correct?

18  A    That's correct.

19  Q    As a result of that analysis and evaluation of the HRSG

20  business, the debtors filed a motion to seek authority to wind

21  down the business.  Is that correct?

22  A    Yes.

23  Q    And as part of the cessation of the HRSG business segment,

24  Deltak terminated 100 employees.  Correct?

25  A    Approximately.

1 Q    With respect to those employees, what percentage did that

2 make up of the HRSG business employees?

3 A    Certainly a majority -- a significant majority.

4 Q    Ninety percent?  Ninety-five percent?

5 A    I would say, you know, at least 80 percent or so.

6 Q    How many employees are currently employed by the debtor

7 that are devoted specifically to and exclusively to the HRSG

8 business segment?

9 A    I don't have the number with me, but I would say

10 approximately 20 to 30.

11 Q    Those hundred employees were terminated on or about

12 September 28th, 2006.  Correct?

13 A    That's correct.

14 Q    Since that time the debtor, Deltak, has not performed any

15 work on the various projects that are part of the HRSG business

16 segment.  Is that correct?

17 A    Any work?  I don't have knowledge to that.  There may be

18 some work going on.  I'm not sure.

19 Q    No work has been performed by the employees that were

20 terminated.  Correct?

21 A    Oh, that's correct, except unless they were hired away by

22 an outside party.  So I wouldn't know.

23 Q    Has Deltak been performing work on any of the HRSG

24 projects, to the best of your knowledge?

25 A    I don't know if there's any work.  I would assume that

1 there's not.

2 Q    As part of the wind down of the HRSG business segment and

3 the motion with the court, Deltak proposed what is called in

4 the motion the HRSG completion program.  Correct?

5 A    Yes.

6 Q    Are you familiar with that completion program?

7 A    Some of it, yes.

8 Q    Now, this completion program was proposed, because many of

9 the vendors of Deltak are sole source providers for necessary

10 parts related to these projects.  Correct?

11 A    I don't know if that's true or not.  I don't know if

12 they're sole source.  I'm not familiar with that.

13 Q    Sir, did you complete an affidavit in connection with the

14 motion to wind down the HRSG business and reject certain

15 contracts?

16 A    In the first day affidavit I did.

17        MR. MASCITTI:  Your Honor, may I approach the

18 witness?

19 Q    Mr. Matheson, I'm showing you what has been marked as

20 joint exhibit 11.  Can you identify that?

21 A    Yes.

22 Q    What is it?

23 A    This would be the first day affidavit that I signed.

24 Q    I would like to direct your attention to paragraph 100 on

25 page 35.

1    MR. MASCITTI:  Your Honor, would you like a copy of
2  that exhibit as well?
3         THE COURT:  Please.  Is it in the binder?
4         MR. MASCITTI:  No, it's not.
5         THE COURT:  Okay.
6         MR. MASCITTI:  It's the only one that's not.
7  BY MR. MASCITTI:
8  Q    Again directing your attention to paragraph 100, page 35,
9  of your affidavit, in that affidavit you stated, "The debtors'
10 vendors are also sole source providers for the type of labor
11 and supplies necessary to complete the HRSG projects."
12 Correct?
13 A    Not in all cases.  It says often.
14 Q    I'm sorry?
15 A    It says often, correct?  Is that correct?
16 Q    Sir, the affidavit in Paragraph 100 states --
17 A    Yes.
18 Q    "Similarly, the debtor's vendors are also sole source
19 providers for the type of labor and supplies necessary to
20 complete the HRSG projects", correct?
21 A    That's correct.  I'm sorry.  I was referring to the line
22 above that where it says, "HRSG Businesses often the sole
23 source provider, similarly" --
24 Q    Well, that's referring to something else, though, isn't
25 it?

1  A    Yes, correct.

2  Q    Okay.  So, we're in agreement --

3  A    Yes.

4  Q    -- that the debtor's vendors are sole source providers for

5  the type of labor and supplies necessary to complete HRSG

6  projects, correct?

7  A    Yes.

8  Q    And in part the HRSG completion program was proposed

9  because these are highly customized products, correct?

10 A    Why the completion program was proposed?

11 Q    Yes.

12 A    They were proposed so we could meet the obligations of the

13 customer on a cash neutral basis.

14 Q    Sir, in your affidavit that you submitted --

15        THE COURT:  Excuse me, Mr. Matheson, can you get a

16 little bit closer to the microphone?  The court reporter is

17 having difficulty picking you up.

18 Q    Sir, part of the debtor's business justification for the

19 HRSG completion program is supported by your affidavit in which

20 you point out that these are highly customized products,

21 correct?

22 A    That's correct.

23 Q    And that was part of the basis of proposing the HRSG

24 completion program, correct?

25 A    Yes, to serve the customers, yes.

Matheson - Direct/Mascitti                    55

1  Q    And one of the benefits to the customers of this program

2  would be to reduce the hardship on the customers, correct?

3  A    That's correct.

4  Q    And one of the benefits to the estate would be -- if the

5  completion program was successful -- a reduction of claims

6  against the estate, correct?

7  A    That's correct.

8  Q    The HRSG Completion Program was conditioned on a

9  sufficient number of customers participating in the program,

10 correct?

11 A    I believe that's correct.

12 Q    Did you have a sense of how many customers you needed to

13 participate in the program in order for it to be successful?

14 A    I don't believe we had a sense.  We had a sense that most

15 customers would participate.

16 Q    So, at the time you started to implement the program

17 -- the completion program, you did that without knowing how

18 many customers you would need to make it successful?

19 A    We didn't have an exact number.  We thought -- we thought

20 all of them would participate, frankly.

21 Q    Have all of them participated?

22 A    To my knowledge.

23 Q    Has Mitsubishi participated in the HRSG completion

24 program?

25 A    We're in negotiations with Mitsubishi.

D376

1  Q    HRSG is -- Mitsubishi -- I'm sorry -- has not participated

2  in the HRSG Completion Program, have they?

3  A    I don't think anyone has signed up -- agreement yet.

4  We're just in talks with them.

5  Q    Okay.  There's negotiants, but they're not participating

6  in the program, correct?

7  A    That's correct.

8  Q    However, Deltak has rejected the Mitsubishi contract,

9  correct?

10 A    Correct.

11 Q    The HRSG completion program is also conditioned on the

12 sufficient number of employees returning, correct?

13 A    Either returning or being engaged by the customer.

14 Q    But at some point, Deltak would need to bring back some of

15 the employees it previously terminated whether as employees or

16 under a contractual relationship, correct?

17 A    That's correct.  Either -- if that was paid for by the

18 customer or the customer would hire them directly, that's

19 correct.

20 Q    Do you know how many employees you needed to bring back in

21 order to make the program successful?

22 A    Personally, I do not know that.

23 Q    Do you know how many of the employees are still available

24 to come back to work?

25 A    I don't know that.

Matheson - Direct/Mascitti                                    57

1  Q     Sir, you don't know whether or not the HRSG Completion

2  Program can be successful at this point, do you?

3  A     There may be someone in the company.  I personally don't

4  know that -- where it stands.

5  Q     As part of the HRSG Completion Program, Deltak retains

6  certain employees to expeditiously determine the interest of

7  the customers in the HRSG Completion Program, correct?

8  A     That's correct.

9  Q     How many employees were retained to do that?

10 A     Those 20 to 30 or so I mentioned earlier.

11 Q     And they are all currently still employed with Deltak?

12 A     Yes.

13 Q     In the affidavit and motion that was filed by Deltak in

14 connection with HRSG business segment, you indicated that

15 debtors should know within 30 days or October 28, 2006 as to

16 whether or not the program would be successful, is that

17 correct?

18 A     Yes.

19 Q     And we are past that date, correct?

20 A     Yes.

21 Q     Has the debtor made a determination as to whether or not

22 the HRSG Completion Program can be successful?

23 A     No.

24 Q     With respect to the Port Westward contract that has been

25 rejected by the debtors, there is no completion agreement

Matheson - Direct/Mascitti                          58

1  currently in place with Mitsubishi, correct?

2  A    Not to my knowledge, no.

3  Q    As of this point, the debtors have not rejected any other

4  HRSG business contracts though, correct?

5  A    That's correct.

6  Q    Given the rejection of the Port Westward contract, Deltak

7  does not have any use for the catalyst that was designed,

8  engineered, and manufactured for the Port Westward project,

9  does it?

10 A    I don't know the answer to that.

11 Q    Sir, you have filed a motion seeking to cease the business

12 operation and to reject certain contracts associated with that.

13 And as part of your affidavit, you indicated that certain

14 vendor contracts associated with the HRSG business segment

15 would be rejected in the near term, is that correct?

16 A    In the near term if the completion agreements were not

17 successful, is that what you mean?

18 Q    Right.

19 A    Yes.

20 Q    And when exactly would -- based on your affidavit in your

21 Term B with respect to the vendor's contracts related to the

22 Port Westward project?

23 A    I don't know what the time line would be, it would be

24 depending on how the negotiations were going with the customer.

25 Q    And at this point, your testimony is that you don't know

D379

1  whether or not Deltak has any other use for the catalyst that

2  was specifically designed for the Port Westward project, is

3  that correct?

4  A    I personally don't know.  There may be other testimony

5  within the company that would.  I do not know.

6  Q    Are you the person who would decide whether or not the

7  contract at issue with the vendors -- whether those contracts

8  should be assumed or rejected now?

9  A    I or Larry Edwards.  Actually that particular group

10 continues to report to Larry Edwards, the CEO of the company.

11 Q    Has anyone -- if you don't have that personal knowledge,

12 has anyone advised in connection with that?

13 A    In connection with the SCR?

14 Q    In connection with the HRSG business segment and the

15 outstanding contracts related to projects that have been

16 terminated and rejected.

17 A    I'm not sure I understand your question.  I've been

18 advised on how the completion agreement talks were going.  If

19 that's your question, that's yes.

20 Q    Sir, my question is how can you make a determination as to

21 whether or not to assume or reject a contract when you don't

22 know whether or not the debtor needs the contract?

23 A    If the completion agreement goes well, and we sign it,

24 then we would need that.

25 Q    Are you still negotiating --

1  A    To complete it.

2  Q    Sorry?

3  A    I'm sorry, go ahead.

4  Q    However, the contract has been rejected at this point with

5  respect to the Port Westward project?

6  A    Yes.

7  Q    So, unless there is a completion agreement in place, the

8  debtor would not have any need for the catalyst, correct?

9  A    I said, I don't have personal knowledge on whether or not

10 we could use that catalyst.

11 Q    Debtor currently has no obligation to perform the Port

12 Westward contract, correct?

13 A    You mean after we've rejected the contract?

14 Q    Yes, sir.

15 A    I'm not sure.  I need advice -- contract's been rejected,

16 I'm not sure what our obligations are at this point.

17 Q    Once the contract is rejected, do you believe the debtor

18 still has an obligation to perform the contract?

19 A    No.

20       MR. CUNNINGHAM:  Your Honor, I object to the extent

21 he's asking for a legal conclusion.  Witness is not a lawyer.

22       THE WITNESS:  Yeah, I know.

23       THE COURT:  He's answered the question.

24       MR. MASCITTI:  Okay.

25 Q    And the debtor is currently under no obligation to perform

1  any work for Mitsubishi in connection with the HRSG Completion

2  Program, correct?

3  A    If it's under that rejected contract, not to my knowledge,

4  no.

5  Q    In fact, the debtor lacks any ability right now to pay

6  Cormetech in connection with any of these contracts, correct?

7         MR. SABIN:   Objection.  Lack of foundation, Your

8  Honor.

9         THE COURT:   Sustained.

10 Q    Mr. Matheson, are you familiar with the cash collateral

11 order that's in place in this case?

12 A    Yes.

13 Q    And that cash collateral order provides that no payments

14 shall be made and cash collaterals shall not be used to pay any

15 of the Deltak subcontractors, correct?

16        MR. SABIN:   Objection, Your Honor.  The order that

17 was -- excuse me -- speaks for itself and only runs to the

18 17th.  So, I'll object to the extent that question asked for a

19 time frame past the budget date that's in the order right now.

20        MR. MASCITTI:   That's fine.  At this point in time is

21 what I'm referring to.  The debtor has no ability to use cash

22 collateral to pay any Deltak subcontractor including Cormetech,

23 correct?

24 A    That's right, unless a completion agreement is executed.

25 Q    Is that provided for in the cash collateral order?

1  A     On, no.

2  Q     So, there is no ability currently in the cash collateral

3  order to use any cash collateral to pay any subcontractors of

4  Deltak, correct?

5         MR. SABIN:  Objection.  Again to the extent of that

6  we're dealing with up until November 17.

7         THE COURT:  I think he stipulated to that.  So, you

8  may answer.

9         MR. SABIN:  Just for the record.

10         THE COURT:  Very well.

11  Q     I'm sorry, sir, I did not hear your answer.

12  A     I'm sorry, could you repeat the question.

13  Q     I think we've established that, thank you.  To your

14  knowledge, is the debtor currently looking for another buyer of

15  the catalyst other than Mitsubishi?

16  A     I don't have any knowledge of that.

17  Q     So, you don't know whether or not the debtor has conducted

18  any marketing efforts in connection with the catalyst -- any of

19  these catalysts?

20  A     I don't know whether they are or they are not, no.

21  Q     You don't know how long it would take to find another

22  buyer for the catalyst?

23  A     No, I do not.

24  Q     You don't know what it would take to modify the catalyst

25  in order to sell it to another buyer, correct?

Matheson - Direct/Mascitti                    63

1  A     That is correct.

2  Q     You don't know how much the cost would be to modify the
3  catalyst to sell it to another buyer, is that correct?

4  A     That's not my area of expertise, that's correct.

5  Q     In the event that the debtor is unable to reach a
6  completion agreement with Mitsubishi and is unable to find
7  another buyer, what would the debtor do with respect to the
8  HRSG contracts as related to Cormetech?

9  A     What would we do with that contract?

10 Q     Yes.

11 A     I assume they would be rejected.

12 Q     And in the event the contract is rejected -- strike that.
13 I'm sorry, sir, that was a legal question.  In the event that
14 contract is rejected, the debtor would not have any obligation
15 to perform that contract as to Cormetech, correct?

16 A     Correct.

17 Q     And in the event that Mitsubishi doesn't enter into a
18 completion agreement, debtor doesn't find another buyer for the
19 catalyst, the debtor rejects the contract with Cormetech,
20 Cormetech is stuck with a custom designed catalyst, correct?

21             MR. CUNNINGHAM:  Your Honor, I would object.  I think
22 this question's been asked and answered now several times.

23             MR. MASCITTI:  No, this is a different question.

24             THE COURT:  I think it is a different question.

25 Overruled.  You may answer.

D384

Matheson - Direct/Mascitti                    64

1  A    The question is what would Cormetech do with the SCR?

2  Q    In the event that Mitsubishi does not enter into a

3  completion agreement, the debtor is unable to find another

4  buyer for the catalyst, and the debtor rejects the Cormetech

5  contract, Cormetech is left with a custom designed catalyst for

6  projects with no one to sell to, correct?

7  A    Unless they can find another buyer, that's correct.

8  Q    Deltak does not design, engineer, or manufacture SCR

9  catalysts, correct?

10 A    I wouldn't answer that.  I'm not -- there may be some

11 designing and engineering.

12 Q    Deltak typically subcontracts the design, engineering, and

13 manufacturing of catalysts to other subcontractors, correct?

14 A    That's correct.

15 Q    And Cormetech was one of such subcontractors, correct?

16 A    That's correct.

17 Q    Deltak is not in the business of selling catalysts that

18 are not a part of HRSG components, correct?

19 A    There are some with the Braden side of business where

20 there would be some outside of a HRSG application.

21 Q    I'm referring to Deltak.

22 A    Okay.

23 Q    With respect to Deltak, is that correct?

24 A    That's correct.

25 Q    The business -- the debtor's efforts to rehabilitate and

1 reorganize don't include entering into a new line of business

2 where you're selling catalysts on a secondary market, correct?

3 A     For HRSG?

4 Q     Correct.

5 A     Correct.

6 Q     Sir, we discussed the decision to wind down the business

7 operations with respect to the HRSG business.  And the

8 consultations that were made with professionals in making that

9 determination, there were no such discussions or evaluations in

10 connection with the HRSG Completion Program, were there?

11 A     What -- the assumption with the HRSG Completion Program

12 was it would either be cash neutral or positive to the estate.

13 Q     And on the advice of the professionals, if there -- if the

14 customers were not willing to agree to the HRSG Completion

15 Program, those contracts should be rejected correct?

16 A     That's correct.

17             MR. MASCITTI:  No further questions, Your Honor.

18             THE COURT:  Cross examination?

19             MR. CUNNINGHAM:  Briefly, Your Honor.

20                    CROSS EXAMINATION

21 BY MR. CUNNINGHAM:

22 Q     Mr. Matheson, you're the chief operating officer of the

23 ultimate parent debtor here, Global Power Equipment Group, is

24 that correct?

25 A     That's correct.

Matheson - Cross/Cunningham                    66

1 | Q    So, with respect to Deltak related decisions on completion
2 | agreements and the like, that's something you've delegated to
3 | Deltak operational people, is that correct?

4 | A    That's correct.

5 | Q    And in fact, those Deltak people are the ones who have
6 | been having the negotiations directly with the customers, is
7 | that correct?

8 | A    That's correct.

9 | Q    And at this point in time, you've received updates -- I
10 | think as you testified -- from your Deltak operational people.
11 | Is it your understanding that those negotiations continue?

12 | A    Yes, that's correct.

13 | Q    So, it is not -- you've not determined today that the
14 | completion program is a failure, is that correct?

15 | A    That's correct.

16 | Q    And that you also believe that as a consequence of
17 | negotiating with your customers, you also believe you need to
18 | delay, at least for now whether to assume or reject the supply
19 | contract with your vendors, is that correct?

20 | A    That's correct.

21 | Q    Because if you were to reject the supply agreements while
22 | you were still having on-going negotiations on the customer
23 | side, it would completely destroy whatever progress has been
24 | made to date, is that correct?

25 | A    That's correct.

Matheson - Cross/Sabin                    67

1        MR. CUNNINGHAM:  Thank you, Your Honor.  I have no

2   further questions.

3        THE COURT:  Mr. Sabin?

4        MR. SABIN:  Thank you, Your Honor.

5                    CROSS EXAMINATION

6   BY MR. SABIN:

7   Q    Good afternoon, Mr. Matheson.

8   A    Afternoon.

9   Q    Are you an officer of Deltak, LLC?

10  A    An officer?  I am not.

11  Q    Are you a director of Deltak, LLC?

12  A    I am now a director, yes.

13  Q    You are not a director?

14  A    I am a director, I'm sorry.

15  Q    Of Deltak, LLC?

16  A    I believe that was recently changed.

17  Q    And when was that changed?

18  A    I believe it was just before the filing.

19  Q    And as such, as a director, did you participate in a

20  meeting of the board of directors of Deltak, LLC in connection

21  with it's decision to wind down the HRSG business?

22  A    Well, that decision was made by the Global Power board of

23  directors.

24  Q    So, there was never any meeting of the Deltak directors in

25  connection with the proposed motion by Deltak to wind down its

 1 HRSG business?

 2 A    There may have been a meeting by consent pursuant to the
 3 Global Power board's meeting, by written consent.

 4 Q    But to your knowledge, did you participate in it?

 5 A    If there was a written consent when I was a director, I
 6 would have, yes.

 7 Q    But you don't know today as your testifying whether you
 8 did or you didn't?

 9 A    That's correct.

10 Q    And you don't know today whether such meeting ever took
11 place by consent or otherwise?

12 A    At the Deltak level, that's correct.

13 Q    And you don't know today what business judgment if any was
14 exercised by Deltak directors in connection with the motion to
15 wind down?  I'm just talking about your personal knowledge.

16 A    Yeah, it was -- if there was action taken, it would have
17 been pursuant to the Global Powers board at their direction.

18 Q    But you have no personal knowledge today is your
19 testimony?

20 A    I don't recall.

21 Q    And so is it fair to characterize the various statements
22 in your first day affidavit as an aggregate picture in your
23 role as an officer of the parent entity?

24 A    Yes, it is.

25 Q    And is it fair also to say that therefore, you have no

69

1  personal knowledge of any contract by contract analysis of
2  customer contracts, whether it is beneficial or detrimental to
3  assume or reject?
4  A    Throughout the completion agreement process?
5  Q    No.   Just -- in terms of -- let me rephrase the question.
6  To your knowledge, prior to the filing of the motion to reject
7  the customer agreements, did Deltak engage in any contract by
8  contract analysis of the benefits or burdens of rejecting a
9  customer agreement?
10 A    I just don't have knowledge of that.
11 Q    Okay.   Are you generally familiar with the agreements with
12 Cormetech?
13 A    I am not.
14 Q    Would you have any personal knowledge with respect to any
15 of those agreements whether Deltak has approached its lenders
16 on a contract by contract basis for money?
17 A    No, I would not.
18          MR. SABIN:   I have no further questions, Your Honor.
19          THE COURT:   Okay.   Redirect.
20          MR. MASCITTI:   I have no further questions for this
21 witness, Your Honor.
22          THE COURT:   Very well.   You may step down.
23          MR. MASCITTI:   Your Honor, Cormetech calls Mr. Scott
24 Pritchard.
25          THE CLERK:   Please state your name and spell your

1  last name for the record.

2           THE WITNESS:  Scott Pritchard, P-r-i-t-c-h-a-r-d.

3               SCOT PRITCHARD, WITNESS, SWORN

4                    DIRECT EXAMINATION

5  BY MR. MASCITTI:

6  Q    Good afternoon, Mr. Pritchard.  Would you please describe

7  your education?

8  A    I have a Bachelor of Engineering degree from Stevens

9  Institute of Technology.

10  Q    What was your degree in?

11  A    Mechanical engineering.

12  Q    Would you please describe your employment history?

13  A    After graduating I went to work for Foster Wheeler as a

14  project engineer.  In which I was basically responsible for

15  designing both catalysts and systems design for the SCR

16  application.

17  Q    How long were you at Foster Wheeler for?

18  A    Four years.

19  Q    And what did you do after that?

20  A    1993, I went to Cormetech as a sales engineer where I was

21  responsible for designing and engineering custom catalysts for

22  any given applications.

23  Q    You are currently employed by Cormetech?

24  A    Yes, I am.

25  Q    And could you please describe Cormetech's business?

1  A     Cormetech is a --

2           THE COURT:  I don't mean to interrupt, but can he at

3  least tell me what his position at Cormetech is?

4           MR. MASCITTI:  Sure.  That was coming up.

5           THE COURT:  Okay.

6           MR. MASCITTI:  But I can do it now.

7  A     I'm vice president of sales and marketing at Cormetech.

8           THE COURT:  Very well.  Thank you.

9  Q     Going back to '93 when you started as a sales engineer,

10 how long were you a sales engineer for at Cormetech?

11 A     Approximately three years.

12 Q     And what did you do after that?

13 A     Then I moved into business development area as project

14 engineer, continuing the design and application of SCR

15 catalysts to a broader expanse of applications.

16 Q     How long were you in that position for?

17 A     Approximately two years.

18 Q     What position did you hold after that?

19 A     Project management position where I was responsible for

20 executing contracts from the design and engineering phase

21 through the manufacturing phase.

22 Q     And how long were you in that role?

23 A     Again, somewhere around two to three years.

24 Q     And what position did you hold after that?

25 A     Then I was the director of engineering.

1  Q    And what were your responsibilities as director of
2  engineering?
3  A    As that role, I was responsible for oversight of the
4  design and engineering of custom catalysts for various
5  applications.
6  Q    And what position did you hold after director of
7  engineering?
8  A    For a short time prior to vice president of sales and
9  marketing, I was general manager of sales and marketing which
10 incorporated the project management function as well as the
11 engineering design function of the catalyst.
12 Q    And when did you become vice president of sales and
13 marketing for Cormetech?
14 A    Approximately June of '05.
15 Q    As vice president of sales and marketing, what is your
16 responsibility?
17 A    Broad oversight of the design, engineering, manufacturing,
18 project management of the SCR catalysts for various
19 applications, as well as some marketing functions.
20 Q    Please describe the function of the sales engineering
21 group.
22 A    Sales engineering group is responsible for responding to
23 and generating requests for quotation for specific applications
24 that need SCR catalysts.  And they basically look at a
25 specification and design a custom catalyst for each

1 | application.

2 | Q    Describe the function of the project management group.

3 | A    Project management group -- once a contract is awarded to

4 | Cormetech for a given catalyst, the sales group turns it over

5 | to the project management group who is responsible for

6 | executing the deliverables of that contract through the

7 | manufacturing group, and primary interface back to the client.

8 | Q    And in your role as vice president, you oversee both of

9 | those groups?

10 | A    Yes.

11 | Q    Please describe your experience with designing,

12 | engineering, and manufacturing catalysts.

13 | A    Personally, I've been involved with it since I started at

14 | Foster Wheeler -- so approximately seven -- yeah, 17 years or

15 | so, but roughly 800 or so units.

16 | Q    Describe the design and engineering process for a

17 | catalyst.

18 | A    The process is -- again starts back at the customer

19 | specification which is driven by a particular requirements of

20 | the end user which are dictated by the particular permit

21 | requirements, or local, or federal requirements where the unit

22 | is located.  The specification will include the specifics of

23 | the unit, gas flow rate, flue gas constituents, NOx reduction

24 | efficiency or outlet NOx, pressure drop requirements, SO2

25 | conversion, and various and assorted other guarantees

1 associated with the spec.

2 Q    With respect to gas temperature, what is it?

3 A    The gas temperature is a key feature of how the catalyst

4 is designed depending on what range the temperature of

5 application is in, different catalysts will be applied to that

6 formulational change.

7 Q    How does gas temperature affect the design of a catalyst?

8 A    Again, basically the lower it is, the more catalyst you

9 require up to a certain point, roughly upper 700 degree range.

10 At which case, you have to switch products.  And then again,

11 that has its own design range.  And then again, roughly upper

12 800s we switch products again.

13 Q    Does the gas temperature have any effect on the module

14 used in a catalyst?

15 A    Yes, the module's steel will also be selected based on the

16 temperature.  It can vary between carbon steel, chromoly steel,

17 and stainless steel are the three most typical steels used.

18 Q    How does gas flow rate impact the design of the catalyst?

19 A    Gas flow rate is a critical component to the design.  It's

20 basically, the more gas you have to treat, the more catalyst

21 volume you need in order to do it.

22 Q    How does back pressure limitation affect the design of the

23 catalyst?

24 A    The back pressure limitation is -- basically a catalyst

25 provides a resistance in the gas stream.  And the catalyst has

1  to be designed in such a way that the cross section of the

2  catalyst is arranged specifically for each project to meet

3  those requirements in pressure drop.

4  Q    How does oxygen concentration affect the design of the

5  catalyst?

6  A    The lower the oxygen concentration, the larger the volume

7  of catalyst is required.

8  Q    And that's in the flue gas?

9  A    Yes, in the flue gas the production -- the products of

10  combustion.

11  Q    How does water concentration in the flue gas affect the

12  design of the catalyst?

13  A    The lower the water concentration, the less catalyst you

14  would need for an application.

15

16  Q    How does sulfur dioxide conversion affect the

17  construction, design, manufacture of a catalyst?

18  A    SO2 conversion is a feature of the catalyst, a side -- a

19  negative side reaction effectively.  So, in some cases it is

20  designed to minimize that in order to reduce the amount of

21  particulate emissions.

22  Q    What is ammonia slip?

23  A    Ammonia slip.  Again, the process of SCR catalyst is

24  -- the way it works is that your -- you have a combustion

25  products going out to a gas stream.  You need to inject ammonia

1  into the gas stream to combine with nitrogen oxides and
2  nitrogen dioxide through the catalyst in order to get it to
3  work.

4          And the -- not all of that nitrogen oxides and
5  ammonia get together as they go through the catalyst.  The
6  stuff that does not get together, goes through as unreacted
7  ammonia slip.

8  Q   How does ammonia slip affect the design of a catalyst?
9  A   The lower it is, the more volume you need to deal with.
10 And there's also some connection to the ammonia and the NOx
11 mixing.  But in general, the lower the ammonia slip, the more
12 volume you need.

13 Q   What is inlet NOx concentration?
14 A   Inlet NOx concentration, again, is a trace level component
15 within the flue gas, the products of combustion.  It's the
16 primary function of the SCR catalyst to reduce those nitrogen
17 oxides to elemental nitrogen and water vapor.  So, the inlet
18 NOx is basically the combination of NO and NO2 coming into the
19 catalyst that is to be reduced.

20 Q   How does reduction efficiency -- NOx reduction efficiency
21 affect the design of the catalyst?
22 A   The higher the efficiency requirements or the removal
23 rate, the more catalyst you need.

24 Q   Can you give us an example, please?
25 A   If for example, you had 100 parts per million

1  concentration of NOx coming into the catalyst and you wanted to
2  reduce it down to 20, that would reflect an 80 percent
3  reduction.  If you instead wanted to design that to get down to
4  10 ppm, that would imply a 90 percent reduction.  In that case,
5  you would require more catalyst than in the 80 percent
6  reduction case.
7  Q    What is catalyst life?
8  A    Catalyst life is another design feature that is a
9  combination either dictated by the spec or requested within the
10 spec and then we respond to it with a particular performance
11 warranty associated with it.  It can vary project to project
12 depending upon the request.
13 Q    And how does it impact the design of a catalyst?
14 A    Basically, the longer the life requirement, the more
15 catalyst you need.
16 Q    With respect to gas turbines, how does the fuel being
17 burned affect the design of the catalyst?
18 A    For gas turbines, the primary fuel is natural gas,
19 although in some cases there are refinery gases or other
20 processed gases, digestri gas, lane-fill gas, other types of
21 things.  Some have backup fuel, Number 2 oil, that can affect
22 the catalyst geometry and/or its formulation to minimize the
23 SO2 conversion, as I mentioned before.  It may also impact the
24 margin requirement in order to achieve a given life because the
25 poison concentrations are there.

Pritchard - Direct/Mascitti                                    78

1           THE COURT:   What is catalyst geometry?

2           THE WITNESS:   Catalyst geometry is a -- basically,
3  these blocks, I guess that were referred to or I guess you've
4  heard about in the prior discussions were -- are basically 150
5  millimeter square blocks -- extruded blocks.  And the geometry
6  of that is basically the cell density within that -- there's
7  basically square holes.  And the geometry just means you can
8  make those holes smaller and get higher geometric surface area
9  per volume.  Or you make them bigger and you get lower.  So,
10 the -- of the geometry basically is dictated by the
11 application.  And it will affect the volume.

12 Q    These are -- the factors that we just discussed, these are
13 the factors that you look at in connection with designing the
14 catalyst, correct?

15 A    Yeah.  All of them are intertwined, yeah.

16 Q    After you've collected these -- this information with
17 respect to a particular project, what's the next step?

18 A    The next step after you've designed the catalyst for a
19 given application?

20 Q    After you've collected the specs.

21 A    Okay.  After we collected the specs, the design process
22 basically utilizes all that information of catalyst life, flue
23 gas constituents, NOx reduction efficiency, essentially the
24 laundry list we just discussed on efficiency and slip, and the
25 catalyst is designed to meet the requirements of the spec.

D399

Pritchard - Direct/Mascitti                79

1  Sometimes it's an integrative process with the system supplier

2  in order to meet the requirements of the project.

3  Q   Afer you've developed the model for the catalyst, please

4  describe the manufacturing process for the catalyst.

5  A   Okay, so once you've -- once you've figured out what

6  catalyst volume and product that you need -- in the case of a

7  contract, for example, if that contract was successful, the

8  project would be then turned over to project management.

9  Project management would kick the project off to manufacturing.

10         And manufacturing basically has two process that it

11  completes.  One is the manufacturing of the catalyst blocks.

12  The other is the manufacturing of the steel frame.

13  Q   Describe the process -- the manufacturing process for the

14  catalyst, itself.

15  A   The catalyst goes through a number of steps.  First, raw

16  materials are mixed together in certain proportions based on

17  the catalyst formulation requirements.  Then it's put through

18  an extrusion process.  And then through a heat treat calcining

19  process.  Then to a cutting process, and then after that to

20  -- it awaits assembly into the steel frames.

21  Q   What are the components of the catalyst material?

22  A   The catalyst itself is a varied combination of vanadia,

23  titania, and tungsten.

24  Q   And how is -- are the -- is the formulation always the

25  same or is it sometimes different?

D400

Pritchard - Direct/Mascitti                    80

1 A    It can vary depending upon, in these particular, cases
2 temperatures.  Typically the biggest driver of formulation
3 variation are SO2 conversion.

4 Q    What is catalyst pitch?

5 A    I really need a picture.  A catalyst pitch is the center
6 line to center line distance between the square geometry of the
7 catalyst itself.  So, the pitch on the subject projects that
8 we're talking about is 2.1 millimeter.

9         THE COURT:  I didn't follow that.

10         THE WITNESS:  Yeah.  I need a drawing or something.
11 can I draw it for you?

12         THE COURT:  Sure.

13         THE WITNESS:  Basically, it's a square -- it's
14 basically defining the distance from this wall to this wall
15 -- the center line from this wall to the center line in that
16 wall.  That distance is the pitch.  And again, this is just a
17 sampling of how many -- these are contingent across --

18         THE COURT:  Okay.  Thank you.  I don't think there's
19 any need to introduce that as evidence.

20         THE WITNESS:  Yeah, please don't.  My drawing
21 capability is not very good.

22 Q    All right.  So, after the pitch and the geometry and the
23 formulation of the catalyst material itself is determined based
24 on the specs, what's the next step?

25 A    So, the manufacturing process is complete.  Then they are

Pritchard - Direct/Mascitti                    81

1  -- the catalyst blocks are together with the steel frame.

2  Q    Well, describe the extrusion process with respect to the
3  manufacturing of the catalyst.

4  A    Okay.  The extrusion process is again, basically taking a
5  clay type material after it's been mixed and extruded through a
6  specific die for -- that sets the geometry that we've been
7  talking about.  And that will vary depending upon the
8  application.

9  Q    Does Cormetech keep catalyst blocks in inventory?

10 A    No, we don't.

11 Q    Why not?

12 A    Basically because each project has a pretty unique and
13 custom arrangement to it.  And so, we've never been able to
14 really cut inventory stuff and then be able to apply it to a
15 project in any kind of efficient or economical fashion.

16 Q    Describe the manufacturing process with respect to the
17 frame or module for the catalyst.

18 A    So, after the catalyst is manufactured and you have these
19 catalyst blocks, roughly six inches square by varying lengths.
20 These blocks are assembled into the steel frame, somewhat akin
21 to laying bricks.  But instead of mortar, you have a ceramic
22 fiber material that you glue to and put between the catalyst
23 elements or blocks.

24       Once the blocks are in this part of this frame, we
25 then put on the other parts of the frame, the other side wall

D402

1  and the top.  And you bolt it all together to give compressive
2  -- you compress all the packing and the catalyst into the
3  frame.  And you -- that achieves the seal -- the gas seal that
4  you need for the project.
5  Q    Generally, how long does it take to design, engineer, and
6  manufacture a catalyst?
7  A    It varies -- as an example, on the subject projects, the
8  lead time varied from six months to 21 months.
9  Q    Once the catalyst is ready for shipment, what's the next
10  step?
11  A    Once the catalyst is ready for shipment, they're -- and
12  depending upon how close we are to the actual delivery time, we
13  will then request or provide a ship release form to the -- to
14  our client.  And the ship release form basically requests from
15  the client confirmation that the -- they are ready for the
16  product to be shipped to them.  Once we receive that back, then
17  we proceed with the specific shipping arrangements.
18  Q    What is a bill and hold letter?
19  A    A bill and hold letter is a letter that effectively does a
20  ship and place and allows us to invoice the delivery milestone,
21  effectively.
22  Q    How does a bill and hold letter affect title to the
23  catalyst?
24  A    The title to the catalyst upon receipt of the payment
25  would transfer to the buyer.  And in most cases, it will also

1  refer to some sort of storage fee that where we would maintain
2  the storage.

3  Q   What is Cormetech's role after delivery of the catalyst to
4  the site -- the project site?

5  A   It varies somewhat depending upon the project. But it can
6  range from nothing really to being an on-site service for
7  supervising the installation during operator training, those
8  types of things.

9  Q   Are you familiar with Cormetech's -- whether or not
10 Cormetech has any post-petition -- post-petition --
11 post-delivery obligations in connection with the contracts at
12 issue in this case?

13 A   I believe we have some -- some of them include multiple
14 mandate services for site supervision and that type of thing.

15         MR. MASCITI: Your Honor, may I approach the witness?
16         THE COURT:  Sure.

17 Q   Mr. Pritchard, I'd like to direct your attention to what's
18 been marked Joint Exhibit 1. Can you identify it?

19 A   It's the contract special and general conditions between
20 Cormetech and Deltak for the Port Westward project.

21         MR. MASCITTI: Your Honor, I move for the admission
22 of Joint Exhibit 1.

23         THE COURT: Any objections? It's admitted.

24 Q   Okay, let me, Mr. Pritchard, direct your attention to
25 Joint Exhibit 2. Can you identify it?

 1 | A    This is the purchase order document between Deltak and
 2 | Cormetech for the G.E. Riverside project.
 3 |         MR. MASCITTI:  Your Honor, I'd move for the admission
 4 | of Joint Exhibit 2.
 5 |         THE COURT:  Any objections?
 6 | Q    Mr. Pritchard, directing your attention to Joint Exhibit
 7 | 3, can you identify that?
 8 | A    Purchase order between Deltak and Cormetech for the
 9 | Hovensa project.
10 |         MR. MASCITTI:  Your Honor, I'd move for the admission
11 | of Joint Exhibit 3.
12 |         THE COURT:  Any objections.  Mr. Mascitti, one quick
13 | question.  You have ten exhibits, I see, in the joint
14 | submission.  Are there any objections or issues as to
15 | foundation or admissibility of these documents?  If not, I'm
16 | prepared to simply admit them all.
17 |         MR. MASCITTI:  Not up to five as far as I know.  But
18 | for six, seven, eight, nine, and ten, I'd like to hear what the
19 | witness has to say.
20 |         THE COURT:  Okay.
21 |         MR. MASCITTI:  Shall we just --
22 |         THE COURT:  Why don't you go through.
23 |         MR. MASCITTI:  Okay.
24 |         THE COURT:  That's fine.
25 |         MR. MASCITTI:  I forgot which one I was on.

1          THE COURT:  I think you're up to three.

2          THE WITNESS:  You're up to four.

3          THE COURT:  Oh, four.

4  Q    Mr. Pritchard, let me direct your attention to Joint

5  Exhibit 4, can you identify that?

6  A    Cormetech and Deltak for the Wharton project.

7          MR. MASCITTI:  Your Honor, I move for admission of

8  Joint Exhibit 4.

9          THE COURT:  Admitted.

10 Q    Mr. Pritchard, I'd direct your attention to Joint Exhibit

11 5, please identify it.

12 A    The purchase order between Deltak --

13 Q    Mr. Pritchard, what is the current state of the catalyst

14 under these contracts?

15 A    Each one of them has been manufactured and is in storage

16 in Cormetech facilities.

17 Q    So, Cormetech has already gone through the process of

18 designing, engineering, and manufacturing each of these

19 catalysts?

20 A    Yes.

21 Q    Mr. Pritchard, please describe the performance guarantees

22 that Cormetech has given under these contracts with Deltak.

23 A    Each one has a unique set of performance guarantee values.

24 The groupings of the performance guarantees are fairly similar.

25 In other words, we guaranteed NOx reduction efficiency or

Pritchard - Direct/Mascitti                86

1  outlet NOx, pressure drop, catalyst life -- and those are the
2  three primary things. And those will vary from each contract
3  depending upon the specifications in the contract, itself.
4  Q    Is ammonia slip also one of the --
5  A    Oh, I'm sorry. Thank you, yeah. I knew I forgot one,
6  ammonia slip.
7  Q    These performance guarantees are unique to the particular
8  catalyst and the particular project, correct?
9  A    Yeah, those performance warranties, for example, are
10 conditional upon the inlet conditions to the -- to the catalyst
11 itself. So, the specification basically has the -- defines the
12 inlet boundary conditions, so to speak -- the flue gas flow
13 rate is defined, the temperature is defined, the flue gas
14 constituents are defined, and the catalyst is guaranteed to
15 operate in a certain fashion against those inputs.
16 Q    Cormetech hasn't issued any performance guarantee with
17 respect to the use of a catalyst at any other project, correct?
18 A    The catalyst for any of these projects has not been
19 relooked at or rewarranted for anything else, no.
20 Q    Are you aware of any purchaser that has ever bought a
21 catalyst without a performance guarantee?
22 A    No, I'm not familiar with it.
23 Q    Why do you think that is?
24 A    Well, in most cases, these catalysts go into power
25 production facilities, refinery facilities, facilities that

1  heavily rely on the operation of the equipment to produce power
2  and generate income for the users. And so -- in addition to
3  that, they have to meet all the permit requirements that are
4  required in order to operate, otherwise they can be shut down.
5  So, it's paramount that those performance requirements are met
6  and they're backed up by their -- by the vendors that supply
7  it.

8  Q    In their current form, could these catalysts be used at
9  any other project?

10 A    No.

11 Q    What would have to be done to the catalysts in order to
12 use them at another project?

13 A    The first process would really be to kind of look -- go
14 back to whatever the new specification would be for an
15 alternate project, and redesign the -- or design the catalyst
16 for that particular project with the potential utilization of
17 the catalyst that's been produced in mind, and see if those two
18 things could be matched at all.

19 Q    And what would that require with -- physically with
20 respect to the catalyst?

21 A    In likelihood, if you have a project that was designed and
22 it required a length of 400 millimeters, and you only had 390
23 millimeters or 350 millimeters of catalyst, then you wouldn't
24 have a solution in that case.

25         Conversely, if the catalyst was -- their catalyst

1 requirement was shorter than one of the logs that you had for

2 the other applications, you would have to tear down the modules

3 that you have built already.  Get rid of that steel.

4 Remanufacture new steel on the new arrangement, and then cut,

5 and take whatever losses you may have with the rehandling of

6 the catalyst and reassemble the catalyst into the new

7 arrangement.

8 Q    Sir, are you aware of any secondary market for the sale of

9 catalysts?

10 A    No, not for this market.

11 Q    Have you ever sold a catalyst without a warranty?

12 A    No.

13 Q    Has Cormetech ever sold a catalyst without a performance

14 guarantee?

15 A    No.

16        MR. MASCITTI:  No, further questions, Your Honor.

17        THE COURT:  Cross examination?

18                    CROSS EXAMINATION

19 BY MR. CUNNINGHAM:

20 Q    Mr. Pritchard, you've been with Cormetech, I think you

21 testified, more than 15 years, is that correct?

22 A    '93 until present.  So, 13, 14 years.

23 Q    It's a little less than that.

24 A    Yeah, I don't think I said 15.  But total experience with

25 Foster Wheeler and Cormetech was over 15.

1  Q    Is Mitsubishi the ultimate parent of Cormetech?

2  A    They are Mitsubishi Heavy Industries is one of the

3  parents.

4  Q    And do you know if Mitsubishi Power Systems is a

5  subsidiary of Mitsubishi Heavy Industries?

6  A    I believe so, but I'm not sure.

7  Q    Let me ask you this, you just testified that you don't

8  believe these catalysts could work in any other project, is

9  that correct?

10  A    I believe I testified as they currently are, they would

11  not.

12  Q    Well, if I gave you a hypothetical and said that the Port

13  Westward facility got destroyed by a natural disaster.  And

14  therefore, these could not go into that facility.  What would

15  you do with the catalyst?

16  A    It's already the owner's catalyst?

17  Q    I'm saying --

18  A    Whose is it?

19  Q    -- if you have the catalyst as they exist right now.

20  A    Cormetech does?

21  Q    Right.  And the Port Westward facility could not move

22  forth, the catalyst could not be used there.  What would you do

23  with the catalyst?

24  A    It would be up to the owner to decide what they would want

25  to do with it.  They have an obligation to us to provide the

1  catalyst.  And we would go from there.

2  Q    What could be done -- could they be modified and used

3  elsewhere?

4  A    Potentially, as I just describe, yeah.  It could be,

5  depending upon what the application is and the significant

6  potential cost.

7  Q    So, it's not a foregone conclusion that they're going to

8  be thrown out.  You could -- you could go back and look at

9  other uses for these catalysts, is that correct?

10 A    Yeah, I think that's what I just describe, yeah.

11 Q    And there may -- that would require an evaluation process

12 of what other customers are out there who have a need for these

13 types of catalysts?

14 A    That's correct.

15 Q    Okay.  And you have not performed that type of analysis to

16 date, whether there are -- there exists such other customers?

17 A    No, because it's not ours to do that with, quite honestly.

18 Q    No, it's the debtors' to do that right now.

19 A    Yes.

20 Q    The debtors who have the contract with you have the

21 -- would have the ability to do that, right?

22 A    They haven't advised us to do anything to help them to do

23 that.

24 Q    Well, do you know the reason -- because they haven't done

25 that is because they've been having discussions with Mitsubishi

Pritchard - Cross/Cunningham                    91

1  about a completion agreement?

2  A    No, I'm not aware of that.

3  Q    Have you had any discussions with Mitsubishi, you,

4  yourself?

5  A    No.

6  Q    Since these case --

7               MR. MASCITTI: Objection, Your Honor, relevance?

8               MR. CUNNINGHAM:  I'm --

9               THE COURT:  It's overruled.

10  Q    Since the case was filed, have you had any discussion with

11  anyone in Mitsubishi Power Systems with respect to these

12  catalysts?

13  A    No.

14  Q    And if these catalysts could be transferred to or sold by

15  the debtors to another customer, that customer could take them

16  without a performance guarantee by Cormetech, is that correct

17  -- they could?

18  A    Could, sure.

19  Q    Or at the same time as part of assigning these catalysts

20  to somebody else, we could be negotiating with Cormetech about

21  a new performance guarantee in connection with that, is that

22  correct?

23  A    It's potentially, yeah.  Going back to the prior -- one of

24  our concerns effectively would be the -- with putting our

25  product out there, with having our name on it, we would be

D412

Pritchard - Cross/Sabin                92

1 || concerned about where it's used, how it's used, and what would
2 || be associated with that.
3 || Q    But that's just part of the negotiation process. We would
4 || have to --
5 || A    If we were involved with it.
6 || Q    Right, but as you said, it's the debtors' decision
7 || initially to identify those opportunities and come to you.
8 || A    It appears so.
9 || Q    Hang on one second. Mr. Pritchard, are you aware at all
10 || that Mitsubishi is proposing that your agreement with the
11 || debtors be rejected so that you can go ahead and directly sell
12 || these catalysts to Mitsubishi without the debtors?
13 || A    Yeah.  I heard about that earlier today.
14 || Q    Do you know if the -- Mitsubishi is proposing to pay the
15 || debtors anything for having you sell them directly to the -- to
16 || Mitsubishi?
17 || A    I'm not aware of anything.
18 ||            MR. CUNNINGHAM:  No further questions, Your Honor.
19 ||            THE COURT:  Mr. Sabin, anything?
20 ||            MR. SABIN:  Thank you, Your Honor.
21 || BY MR. SABIN:
22 || Q    Good afternoon, Mr. Pritchard.
23 || A    Good afternoon.
24 || Q    If I could call your attention to Joint Exhibit 1 for a
25 || moment?

1  A    Sure.

2  Q    And are you familiar with that document, sir?

3  A    Yes.

4  Q    Did you have any part in negotiating that document?

5  A    Not specifically.  As an oversight, I did.  But not

6  specifically.  So --

7  Q    Did you execute that document on behalf --

8  A    Yes, I did.

9  Q    You did?

10 A    Yes.

11 Q    And in connection with that execution, is it fair to say

12 that you reviewed this document?

13 A    Yes.

14 Q    Okay.  Perhaps we can review this document together in

15 relevant parts?

16 A    Okay.

17 Q    I call your attention first to Section 6, it's Arabic 6.

18 And that's in the far right, it says, CT0029 at the bottom.

19 A    Okay.

20 Q    If you take a moment to review 6A, and in particular my

21 question is as follows.  Is it fair to say that Deltak today,

22 tomorrow, the next day, could have a right to change the

23 delivery point of the catalyst that you have testified is all

24 but built and in your possession?

25 A    They would have the right to request the change.  And then

1  we would have to acknowledge that.

2  Q   Wait.  Where in this contract does it say you have to

3  acknowledge that or agree in writing to that?

4  A   The -- I think it was under B -- let me see.  "Any

5  differences in price or time performance resulting in such

6  damages will be equitably adjusted -- purchaser shall modify

7  the contract accordingly."  Doesn't -- B, I guess you could

8  imply that there are certain parts of that that would require

9  us to agree to any impact of the change.  That's in the second

10 sentence, "Seller shall notify purchaser of any conflicts,

11 discrepancies, errors, omissions, insufficient information, or

12 change in scope".

13 Q   But it no where -- no where in that language does it deal

14 with delivery point and change of delivery point, does it?

15 A   "Change in scope", I guess it would be -- could be

16 construed under that I think.

17 Q   How would you construe that, "change in scope"?  Your

18 catalyst is already built and they're just telling you where to

19 send it?

20 A   It depends on what the scope of the contract was.

21 Q   Well, isn't it fair to say that in connection with Mr.

22 Cunningham's hypothetical, that the Port Westward project was

23 in essence consumed by a fire.  I take it that this provision

24 could Deltak the absolute right without your consent, I would

25 submit, to change the destination point?

1  A    Well, fire would probably force -- I don't know, I'd have

2  to kind of go to that one a little bit.

3        MR. MASCITTI:  Objection, Your Honor.  I think the

4  question calls for a legal conclusion that would draw

5  implications from the -- clauses and the contract.  And I don't

6  think the witness is in a position to necessarily answer that

7  specific question with respect to contracts.

8        MR. SABIN:  I'll stick with his answer so far to his

9  understanding of Section 6.

10        THE COURT:  Overruled.

11  Q    So, other than the language you refer to, this -- is there

12  any other place in this agreement that you think would require

13  the written consent of Cormetech if Deltak exercised its right

14  under 6A to simply change the delivery point?

15  A    I don't know -- under 6A -- I guess we're back to the

16  -- how we construed 6A versus 6B, is that correct?

17  Q    That's fair enough.

18  A    I'm sorry.  I've lost you.

19  Q    Let me withdraw the question.  Assuming that the debtor

20  has the right to change the delivery point, are you still

21  obligated to warranty your product?

22  A    Assuming -- I'm sorry.  Repeat it one more time.

23  Q    Assume that Deltak has the right under 6A without your

24  consent to change the delivery point.  Okay?  And let's just

25  assume it says, you know, instead of sending it to Port

1 Westward, send it to, you know, a place that we control.

2 A     Okay.

3 Q     Or send it to another customer that we find.  Does your
4 warranty go with your product when you deliver it?

5 A     The -- I think it's two different things in there.  Okay.
6 The product deliver -- there's payment term issue in there.
7 And then there's also the issue of does the warranty go with
8 the product.

9         The warranty goes with the product based on the
10 -- as I mentioned before -- that the warranty conditions are
11 met, which means that the inlet boundary conditions are
12 identical to what's in the contract.

13 Q     Well, let's break that down in terms of your answer.  What
14 are the payment terms here now that the catalyst has been
15 complete?

16 A     The payment terms for Port Westward are -- there's a
17 payment term on delivery, and -- well, there was a payment term
18 on -- basically, an initial payment term, 15 percent, on the
19 submittal of certain documentation, and then a payment term of
20 85 percent against the delivery to site.

21 Q     And do you when that delivery was supposed to take place
22 to the site -- or I assume you mean the delivery point?

23 A     It's the fabrication site.  It's a little unusual
24 language.  But the original delivery date was November 1st
25 according to the front page.

1  Q   Do you know if the catalyst has been delivered?

2  A   It has not been delivered.  I don't believe the shipment

3  documentation has been returned.

4  Q   And so if I understand it right, the shipment

5  documentation is in your possession or is not in your

6  possession?

7  A   I don't believe Deltak has instructed us to ship.

8  Q   So, it's your understanding that Deltak would instruct you

9  to ship, and then the November 1st date would run -- would be

10  in essence delayed from that date?

11  A   We would be -- upon instruction to ship, we would await

12  payment and then ship.

13  Q   Where in the contract said, would you await payment and

14  then ship?

15  A   Well, it's the net 55 days.  Or excuse me.  In this case

16  net 30 days.  But I'm not -- if this was a normal circumstance,

17  we would ship and then get paid.

18  Q   Isn't that what the contract calls for right now?

19  A   You would ship and then get paid?

20       MR. MASCITTI:  Again, Your Honor, I'm going to object

21  to the extent that I think he's asking about Cormetech's legal

22  rights, not necessarily -- might not necessarily be limited by

23  what's in the contract -- I'm sorry.

24       THE COURT:  Well, I don't think he's -- I don't think

25  he's asking for a legal opinion.  I think you can ask that

Pritchard - Cross/Sabin                    98

1  question.

2         MR. MASCITTI:  To the extent the witness is answering

3  what the contract says, though, I would like the record to be

4  clear that there might be other remedies available to Cormetech

5  outside of the scope of the contract.

6         THE COURT:  Very well.  Proceed.  You may answer.

7  Q    I'm just asking your understanding of the contract.

8  A    Yeah, again, normally, what would occur is if ship release

9  documentation was returned and requested shipment, we would

10  ship the product.  And upon delivery invoice for the remaining

11  contract milestone.

12 Q    So, in essence, in plain parlance, you've given trade

13 credit under the -- as you understand this provision -- this

14 contract to Deltak?

15 A    Yeah, trade credit.  I'm not sure I understand that term.

16 Q    Well, let me put it this way.  You deliver your catalyst

17 and you wait to get paid, is that fair?

18 A    Yes.

19 Q    And in this case, you would wait 30 days after the last

20 invoice?

21 A    Yeah.  In this particular case, that's correct.

22 Q    And your understanding further is, is that you would have

23 a right to issue that last -- that last invoice only after you

24 received an instruction as to where to send your catalyst, is

25 that correct?

D419

1  A    Well, it kind of goes back to some of that documentation

2  -- the bill and hold, for example, our prior history, and our

3  existing history on some of the other projects are that we

4  would hold the product, we would send the invoice and then the

5  invoice would be paid.  And in our prior experience, all the

6  -- the invoice has been paid prior to any shipment when the

7  product has been on hold.

8  Q    For the Port Westward contract, you also have an

9  obligation to deliver a letter of credit in favor of Deltak?

10  A    Yeah, I believe there was one for acceptance.  I -- are

11  you looking at a particular page?

12  Q    CT0025.

13  A    Right, a letter of credit for ten percent, right, mm-hmm.

14  Q    Have you issued that letter of credit, yet?

15  A    I don't believe the final invoice has been issued, so, no.

16  It's been -- it's submitted with the final invoice.

17  Q    All right.  So, based on your understanding -- you know

18  I'm not asking for a conclusion of law in terms of the

19  contract, but based on our understanding, and assuming that

20  Deltak has the ability under 6A to simply change the

21  destination site, under your understanding of this contract, if

22  Deltak issued you a notice tomorrow to send the catalyst to one

23  of their warehouses, when would you be obligated to deliver,

24  and when would you invoice?

25  A    The delivery would be based on the particulars an agreed

Pritchard - Cross/Sabin                    100

1  upon delivery date based on the shipping documentation.  And
2  the second part was what -- when would we get paid?
3  Q    Mm-hmm.  When -- I think it was when would you invoice?
4  A    Yeah, those are two different things.  The invoices would
5  go with the -- with the -- once the delivery has been made, the
6  invoice would -- and I expect the invoice would be sent.
7  Q    Is it possible, sir, that Deltak could convince its
8  lenders to let them use cash collateral to be the buyer of your
9  catalyst?
10 A    Is it possible?  I suppose so.  I'm not familiar enough
11 with the collateral agreement or how all that works, to tell
12 you the truth.  So, if it's -- if it's possible, I'm not really
13 sure.
14 Q    In which case, I just want make sure, that your
15 understanding then is title would be in Deltak's hands, is that
16 correct?
17 A    Title transfer is typically done under --
18 Q    On delivery, if I understood your prior testimony, is that
19 correct?
20 A    Yes.
21        MR. MASCITTI:  Your Honor, I would appreciate it if
22 he wouldn't interrupt the witness while the witness is
23 answering the question.
24        THE COURT:  Please allow him to answer.
25        MR. SABIN:  I will.  Sorry, Your Honor.

1  A    Yeah, the -- when the catalyst is delivered to a site -- a
2  project site, the title is transferred at that point because
3  the catalyst begins to be handled by others.  And so the risk
4  of loss and title is transferred at that point.
5  Q    To your knowledge, has Cormetech demanded payment before
6  it ships?
7  A    Not to my knowledge.
8  Q    To your knowledge, has anyone else at Cormetech received
9  any communication, whether it's e-mail, letter or otherwise
10 from Mitsubishi in connection with any of these five contracts?
11 A    In connection with any of the five contracts?  I
12 understood that there were calls made, but I think we declined
13 to respond.
14 Q    Okay.  And other than calls, you have -- you have no
15 knowledge about e-mails, letters, or other communications from
16 Mitsubishi?
17 A    No.
18         MR. SABIN:  No further questions, Your Honor.
19         THE COURT:  Redirect?
20                    REDIRECT EXAMINATION
21 BY MR. MASCITTI:
22 Q    Mr. Pritchard, Deltak's counsel asked you about the
23 ability of Cormetech to use the catalyst that have been
24 manufactured at other projects or for other uses.  Please
25 describe exactly what parts of the catalyst could be used at

Pritchard - Redirect/Mascitti                102

1 other projects.

2 A    It really depends on what those other projects are.  It

3 could be -- it could be a decent portion, it could be a very

4 small portion depending upon what the specific project is.

5 Q    So, as a threshold matter, all of this, facts, and the

6 variables, and the factors that we discussed before would have

7 to line up with respect to this new project, correct?

8 A    If you were going to use it one for one or identically,

9 yeah.

10 Q    And the lengths would have to be the same?

11 A    Yeah, if you were going to try to use it exactly as it is,

12 yeah, mm-hmm.

13 Q    And with respect to the frame, would the frame -- would

14 you be able to use the frame at another project?

15 A    If we tore down the frame to use the catalyst elsewhere,

16 would we be able to reuse that frame?  No, again, highly

17 unlikely.  It would be scrapped.  We wouldn't -- we wouldn't

18 keep it in storage, waiting for a perfect project to use it on.

19 Q    And as you discussed the process earlier, these catalysts

20 are glued together.  Is there a loss of catalyst in taking them

21 apart?

22 A    Yeah, any of the rework, if you take a module apart,

23 you're going to have some product losses in addition to the

24 -- again any cutting that you would do to the lives in order to

25 get them to be applicable to another project.

Pritchard - Redirect/Mascitti                103

1  Q    With respect to modifying a catalyst that way, for using

2  some of the parts in another project, would you describe the

3  cost to modify as being minimal or substantial?

4  A    Substantial.

5  Q    Why is that?

6  A    Well, you go all the way back to the engineering and

7  design phase is part of it.  And then you get to the actual

8  reworking of the -- of the product.  And again, if you happen

9  to have a -- say, your new project requires a line length of

10 250 millimeters.  And what you have is something that's 450

11 long.  It means you've got to cut off more than half of it and

12 throw it away in order to -- so you get a big loss just by

13 doing that.  And then again, you have to throw out the steel,

14 and reprocure new steel for the new application.  So, a fair

15 amount of rework -- not to mention the labor that goes into it.

16 Q    To the best of your knowledge, could the Port Westward

17 catalyst be used at any other project that you are aware of

18 right now?

19 A    Not that Cormetech is aware of, no.

20 Q    In the event debtor rejects the Cormetech contract, what

21 happens to the catalyst?

22 A    It'll just sit there basically, awaiting something to

23 happen to it.

24 Q    Now, directing your attention to Joint Exhibit 1, let's

25 look at some of these contract terms.  Specifically, I'd like

Pritchard - Redirect/Mascitti                104

1  to direct your attention to 1B regarding the scope of the
2  contract.
3              THE COURT:   What page on the Bates number?
4              MR. MASCITTI:   CT0023, Your Honor.
5  Q    Please describe -- tell me what the scope of the project
6  of this contract is -- scope of the contract is based on 1B.
7  A    Yeah, specifically to fabricate and supply the materials
8  for the SCR catalyst for the Deltak Job Number G04006.
9  Q    This contract is for the manufacture of a catalyst for a
10 specific project, correct?
11 A    Yes.   In this particular case, Port Westward.
12 Q    Cormetech didn't agree to generally provide a catalyst to
13 Deltak, correct?
14 A    That's correct.   As I mentioned before, they're all custom
15 designed.
16 Q    And in 1C where the delivery point for the contract is
17 Oregon, why is it Oregon?
18 A    Well, that's the location of Deltak's Job Number G04006.
19 Q    This wasn't a contract for Deltak Job Number G04007,
20 correct?
21 A    Correct.
22 Q    And it wasn't a contract for Deltak Job undetermined or to
23 be announced, correct?
24 A    Correct.
25 Q    With respect to -- let's look at Section 6, CT0029.

1  Section 6 doesn't provide that the purchase can change the
2  project, does it?
3  A    No, it provides that it can make changes to this contract.
4  Q    Would Cormetech enter into a contract where the purchaser
5  could change projects midstream?
6  A    No, again, that would be subject to discussion and an
7  agreement between the two parties.
8  Q    With -- I'd like to direct your attention to CT0026,
9  Section 2, the definition of owner.  Who is the owner in
10 connection with this contract?
11 A    The owner -- I mean the entity with which the purchaser
12 has a contract.
13 Q    Do you know what entity that is with respect to the Port
14 Westward project?
15 A    Yeah.  Well -- I believe in this case, it's Mitsubishi
16 Power Systems.
17 Q    I'd like to direct your attention to Section 19, which is
18 CT0034 Section 19A.  What does the contract provide with
19 respect to the owner's interest in the contract under 19A
20 -- and specifically the second sentence in that paragraph?
21        MR. SABIN:  Your Honor, I rise only for the same
22 reasons that Mr. Pritchard was otherwise interrupted in
23 connection with my -- I assume this is his understanding of the
24 contract as opposed to what the contract itself is calling for.
25        MR. MASCITTI:  It is what it is.  It says what it

1 says, so --

2          THE COURT:  No, it's -- the question is this is his
3 understanding.  He's already testified he's not a lawyer.
4          MR. MASCITTI:  Yes.
5          THE COURT:  I'm satisfied to take him for his
6 representations.
7          MR. SABIN:  Thank you, Your Honor.
8 A    The second sentence, whenever purchaser is not the
9 ultimate consumer of the goods, all rights, benefits, and
10 remedies conferred upon purchaser by this contract shall accrue
11 and be available to and are for the express benefit of the
12 owner for which the goods are purchased.
13 Q    Was the purchaser the ultimate consumer of the goods in
14 this contract?
15 A    No.
16 Q    There are similar provisions with respect to each of these
17 contracts, correct in Exhibits 2, 3, 4, and 5?
18 A    Yes.  These are fairly standard, the general conditions --
19 or special conditions are fairly standard amongst them all.  We
20 don't have to go through each one, but generally it's similar
21 language used in each.
22 Q    Do you know how much is owed to Cormetech with respect to
23 the catalysts?
24 A    For -- the total, I think, is in the neighborhood of three
25 quarters of a million dollars.

1  Q    And that's an aggregate amount for all of the projects?

2  A    Yes.

3  Q    Mr. Pritchard, does Cormetech deliver catalysts to job

4  sites without instructions from the purchaser to deliver the

5  catalysts?

6  A    No.

7  Q    Why not?

8  A    Because they have the potential to be rejected, and just

9  incur unneeded costs, and potential risk of loss.

10 Q    Prior to the bankruptcy filing did Cormetech receive any

11 instructions from Deltak to deliver any of these catalysts to

12 any of the project sites?

13 A    No.  I believe a couple of them had changes in the dates

14 of delivery.

15 Q    With respect to the letter of credit that's mentioned in

16 the contract, what's the purpose of the letter of credit?

17 A    The letter of credit is just an effective way to -- it's

18 in place of retention payment, effectively.  We -- they pay us

19 on the invoice and we provide them a letter of credit, which

20 gives them access to the particular monies that are -- in this

21 case ten percent of the contract value in case there's a

22 warranty claim or that type of thing.

23 Q    So, rather than having a purchaser withhold five or ten

24 percent cash, they pay you the five or ten percent of cash, and

25 you issue a letter of credit back for retention issues --

Pritchard - Recross/Cunningham          108

1  A    That's correct. And -- yes, in this particular case they
2  asked for LC's, yes.

3          MR. MASCITTI:  No further questions, Your Honor.

4          THE COURT:  Mr. Mascitti, before you conclude, we
5  have, I don't think, touched upon the remaining exhibits in
6  your joint binder.  Is there a separate witness that you're
7  going to bring in?

8          MR. MASCITTI:  Not that I'm going to bring in, Your
9  Honor.  I believe those are debtor's exhibits, and that they
10 would bring them in on their direct.

11                    RECROSS EXAMINATION
12 BY MR. CUNNINGHAM:

13 Q    Mr. Pritchard, I'm a little confused as to your testimony
14 you just said.  Is it your general understanding that a
15 contract prevents Deltak from designating a new customer for
16 these catalysts to go to?

17 A    I think if you look at it, yeah, I think without our -- or
18 an agreement between the two parties about where they're going
19 and what it's to be used for, yes.

20 Q    Well, let me ask you, do you have a general understanding
21 of assumption and assignment of executory contracts in
22 bankruptcy?

23          MR. MASCITTI:  Objection.

24          THE COURT:  Sustained.

25 Q    Well, let me ask this.  Your counsel also tried to make

D429

Pritchard - Recross/Cunningham          109

1  the point that you could not use these catalysts in any other
2  facility without modification unless they fit these exact
3  specifications.  Is that correct?
4  A    That's correct.
5  Q    It's kind of a square peg in a round hole?
6  A    Yes.  I think it's that as well as, depending upon the
7  timing of it, that it would also bring other things into
8  account.
9  Q    But you did testify that they could -- there could be
10 modifications to the catalyst in which they could be used.  It
11 doesn't have to be identical.  You could make modifications.
12 It's just that you haven't considered and looked to see what
13 other customers are out there that may be able to use these
14 catalysts if modified?
15 A    We've had no real reason to go and try to find somebody
16 like that, nor in our experience have we been able to do so.
17 Q    And that's because, as you said, it would be the customer
18 who would be the one to go out and do that?  In this case it
19 would be Deltak?
20 A    Well, Deltak -- I mean, there's a particular project that
21 we had with Deltak, and we worked with them to try to do that
22 exact thing, and they could not find an economical solution to
23 it, and in fact, bought it from somebody else, so -- I don't --
24 I don't -- it's possible, yes, but it's not very economical.
25 That's part of the problem.

1  Q    Well, when your counsel asked you what were you going to

2  do with the catalysts if we reject it --

3  A    Um-hmm.

4  Q    -- he asked you what are you going to do with them?

5  A    Um-hmm.

6  Q    You said, we'll do something with it.

7  A    I said we'll sit around and figure out what the right

8  disposition is.  Yes.

9  Q    No.  What you're going to do is go to your affiliate,

10  Mitsubishi, and sell them to them, right?

11  A    I wouldn't presume anything, quite honestly.

12  Q    But you're aware that's what -- I think you testified when

13  I asked you, you were aware that is Mitsubishi's viewpoint,

14  that you would sell these catalysts directly to them?

15  A    I think that was the discussion from earlier today, that

16  that would be a potential.

17          MR. MASCITTI:  Your Honor, we would stipulate that if

18  this is rejected we would sell to Mitsubishi, as they are the

19  owner of the project for which it was designed.

20          MR. CUNNINGHAM:  No further questions, Your Honor.

21          THE COURT:  Mr. Sabin?

22          MS. SABIN:  Thank you, Your Honor.

23                    RECROSS EXAMINATION

24  BY MR. SABIN:

25  Q    Mr. Pritchard, I'm a little confused.  I'm going to ask

1  you to look again at Section 6 of Exhibit 1.

2  A    Um-hmm.

3  Q    And when you do so I'm going to ask you also to focus on

4  Section 2, which is the definition section?  And in particular,

5  on the defined terms work and equipment.

6  A    Okay.

7  Q    Sir, isn't it true that the purchaser, Deltak, has

8  reserved the right at any time to change any material or work

9  covered by this contract?

10 A    That's what it says in 6A.

11 Q    All right.  And if we look at the definition of work, does

12 the definition of work include equipment, sir?

13 A    Let's see here -- yes, it does.

14 Q    And is it your understanding that the catalyst that is

15 substantially built, in your possession, and in your title, is

16 part of equipment?

17 A    For Port Westward?  Yes.

18 Q    For Port Westward, yes.  And if I can call your attention

19 now to the special conditions at the front of this exhibit, in

20 fact, under Section 1 of special provisions, 1D, is it your

21 understanding that the pricing of this contract included

22 shipping costs to the initial delivery point?

23 A    Yes.  In this particular case shipping for Item C, the FOB

24 job site.

25 Q    So, do you know what piece of the purchase price is

1 allocated to shipping costs?

2 A   If you look at 1B, the third bullet down, there's an
3 allowance of $12,900.

4 Q   So, is it fair to say, if I bring your attention back to
5 Section 6, particularly 6B --

6 A   Um-hmm.

7 Q   -- assuming that Deltak has the right to change the
8 destination, and assuming Deltak tells you to ship it to point
9 X, and that the cost is less than $12,900, would you have
10 anything to gripe about?

11      MR. MASCITTI: Objection, Your Honor. Form of the
12 question and I'm not even sure what he's asking.

13 Q   Well, let me put it this way. If the cost of shipping
14 under my hypothetical question, was less than 12,900, do you
15 think that Cormetech would have any rights under Section 6B?

16 A   Shipments -- um -- well, no. 6B includes the scope
17 question, which I think kind of gets back into the -- in terms
18 of where you're asking --

19 Q   I'm just limiting my question to the shipping costs.

20 A   Um-hmm.

21 Q   And if it turns out that Deltak has the right, under
22 Section 6A, to change the delivery point --

23 A   Um-hmm.

24 Q   -- and if the place that Deltak were to choose to instruct
25 you to ship was such that the cost of that shipping was less

1 than 12,900, do you think you would have any rights under

2 Section 6B?

3                        (Pause)

4 A    Well, whenever the site is changed -- it would depend --

5 insufficient information, I guess, would be one of the

6 questions we would have.  We would be interested in where it's

7 going and why it's going there.

8              MR. SABIN:  I would move to strike the answer as non-

9 responsive to the question, Your Honor.

10             THE COURT:  I think you can rephrase, but I don't

11 think the question was completely non-responsive.

12             MR. SABIN:  Okay.  Then we'll let the answer stand as

13 it was.

14 Q    I also am a little confused, when I read Section 4B,

15 romanette 4, it says on page CT0027, as to your prior

16 understandings regarding whose obligation is it to give a

17 notice that starts the process of shipment.  Does this refresh

18 your recollection, sir?

19 A    Sellers will notify purchaser by fax or e-mail of each

20 shipment of equipment at least seven days prior to actual

21 shipment?  Yeah.  If that was mis-stated before, that was

22 exactly -- we send the ship release form to the client.

23 Q    All right.  That has refreshed your recollection.  I asked

24 you whether, indeed, Cormetech has issued, by fax or e-mail,

25 any notice of this intent to ship so as to meet the Section 1

D434

1  deadline of November 1?

2  A    I don't believe so.  I'm not sure if it's been sent or
3  not.

4  Q    And under Section 19, particularly A, is there any
5  identification in that section of Mitsubishi as the ultimate
6  consumer of goods that you are producing under this contract?
7  A    The ultimate consumer of goods?  No.  Again, I don't think
8  I -- I think that was a guess before about if they are the
9  ultimate user or not.  In fact, they might not be.

10  Q    So, in fact, a fair construction of this agreement in
11  connection with Section 6 is that the debtor can exercise its
12  rights to change who is the ultimate consumer and/or the
13  delivery point?

14  A    I don't know.  I think the second line, when it says
15  purchaser is not the ultimate consumer of goods conferred upon
16  purchaser by this contract shall accrue and be available to
17  and/or for the express benefit of the owner for which the goods
18  are purchased.  So, I mean, owner, I think there's an owner in
19  there besides the purchaser, so I -- I think the owner has --
20  what that's suggesting to me is that the owner has -- that's
21  who we're looking out for.

22  Q    Okay.  But it's fair to say is that if the parties had
23  intended Mitsubishi to be the only owner, it could have easily
24  said so in this contract?

25  A    I don't know if they are the only owner or not, but -- I'm

1  not familiar with the specifics of the -- if Mitsubishi is the

2  owner of this job or they're supplying it to someone in Oregon

3  that's operating it or owning it, I'm not sure.

4  Q    I have no further questions.  Thank you, Mr. Pritchard.

5  A    Um-hmm.

6          THE COURT:  Redirect?

7                FURTHER REDIRECT EXAMINATION

8  BY MR. MASCITTI:

9  Q    Mr. Pritchard, I'd like to direct your attention to Joint

10  Exhibit 2.  What project is this contract for?

11  A    This is for the GE Riverside project.

12  Q    I'd like to direct your attention to CT005.

13  A    Okay.  Um-hmm.

14  Q    What's the definition of owner in this contract?

15  A    Owner shall mean the entity with which purchaser has a

16  contract.

17  Q    Is that the same definition that was used in the other

18  contract?

19  A    I believe so.  Let me check.  Yes.

20  Q    And who is the owner under this particular contract,

21  referring to Joint Exhibit 2?

22  A    I'm not 100 percent sure.

23  Q    Is it Deltak?

24  A    The owner?  I -- I don't believe so, but I'm not 100

25  percent sure.  I presume they're supplying their equipment to

Pritchard - Redirect/Mascitti                116

1  someone else, but --

2  Q    Would it be GE?

3  A    It certainly could be.  I'm not sure if, again, GE is the

4  final one or not, but they certainly could be.

5          MR. MASCITTI:  No further questions, Your Honor.

6          THE COURT:  Okay.  Any recross?  Very well.  You may

7  step down.  Mr. Mascitti, any additional witnesses?

8          MR. MASCITTI:  No, Your Honor.  That's it.  Thank

9  you.

10         THE COURT:  Very well.  Mr. Cunningham?

11         MR. CUNNINGHAM:  Your Honor, we do have one witness.

12 It's Pat Albert, and my colleague, Mr. Swalina, will examine

13 him.

14         THE COURT:  Can we take just a five minute break?  Do

15 you have any idea how long the direct and cross --

16         MR. SWALINA:  Not very long, Your Honor.  It's not

17 going to be very long.  15, 20 minutes.

18         THE COURT:  Okay.  We'll take just a five minute

19 break.  Thank you.  Stand in recess.

20                        (Recess)

21         MR. SWALINA:  I believe so.  Call Mr. Albert.

22         THE COURT:  Very good.

23         THE CLERK:  Please state your name and spell your

24 last name.

25         MR. ALBERT:  Pat Albert, A-l-b-e-r-t.

117

1                    PAT ALBERT, DEBTOR'S WITNESS, SWORN

2               MR. ALBERT:  It's a little bit like a game of

3   Twister.

4               THE COURT:  We're trying to get that fixed.  It's

5   your tax dollar at work.

6                              (Laughter)

7               THE COURT:  That was off the record.

8                         DIRECT EXAMINATION

9   BY MR. SWALINA:

10  Q    Mr. Albert, could you please tell us where you reside

11  presently?

12  A    I reside in Minnetonka, Minnesota.

13  Q    And could you walk us through your educational experience,

14  starting after your graduation from high school, please?

15  A    Yes, sir.  My undergraduate work was at Carroll (sic)

16  State University, where I received a Bachelor of Science in

17  mechanical engineering, and I have received a Master's in

18  Business Administration from the University of St. Thomas.

19  Q    And when did you first graduate with your degree in

20  mechanical engineering?

21  A    1981.

22  Q    Do you hold any professional certifications, or licenses,

23  or do you belong to any professional associations relating to

24  engineering?

25  A    I am a registered professional engineer in the state of

Albert - Direct/Swalina                118

1  Minnesota.

2  Q    And where are you presently employed?

3  A    Deltak.

4  Q    And what is your current position there at Deltak?

5  A    My current position is senior vice president of

6  operations.

7  Q    And how long have you been in this position?

8  A    Come this December it will be 21 years.  Sorry -- in this

9  position?

10 Q    Yes.

11 A    In this position?  Sorry.  Since July of this year.

12 Q    And you say all tolled, 21 years at Deltak?

13 A    All tolled, 21 years.

14 Q    If you could just sort of explain for us, you know, from

15 the time you started at Deltak what positions you've held over

16 those 21 years, and briefly what your job responsibilities were

17 in each of those positions?

18 A    Well, when I first started Deltak I started as an

19 application engineer working on the proposals for heat recovery

20 equipment.  Then I worked -- I was there for about a year, and

21 then I went into the -- as a mechanical engineer working on the

22 project side of the equipment.  I was there for about two or

23 three years.  Then I went and became manager of the gas turbine

24 HRSG Engineering Group, which covered the different disciplines

25 of the engineering from the mechanical design, to structural

1 design, to layout. I was there for, oh, probably ten, 12

2 years. I was then manager of the Engineering Technology Group,

3 which is responsible for the standards Deltak follows, the

4 design standards, as well as product development, product

5 enhancements, and new product development. I was then promoted

6 to manager of engineering over all engineering. That included

7 both the production side and the engineering technology side.

8 And then vice president of engineering, and then finally vice

9 president of operations.

10 Q    Now, are you -- prior to the recent layoffs, how many

11 people reported to you in your current position?

12 A    Approximately 150.

13 Q    And presently who do you report to, yourself?

14 A    I report to the president of Deltak, Monte Ness.

15 Q    Okay. And generally, if you wouldn't mind just sort of

16 giving us a nutshell description of Deltak's business?

17 A    Deltak's business is, for the most part, in the area of

18 designing, manufacturing, and supplying waste heat recovery

19 equipment, both from a process -- recovery heat from a process

20 type application or from a gas turbine waste heat recovery,

21 which is what the HRSG side of the business did.

22 Q    Okay. And could you just sort of describe exactly, you

23 know, in more detail, what a HRSG does?

24 A    An H-R-S-G, or a HRSG, is recovering the energy or the

25 heat from the exhaust of the gas turbine, and generating steam

1 with that. And that's used either to generate additional
2 electricity through a steam generator or in a process
3 application.

4 Q    Now, are you aware of any business decisions that were
5 made by management at Deltak concerning the HRSG business as a
6 result of recent effects on the profitability of that business?
7 A    I am aware that there was a decision by Global Power that
8 for the benefit of the company to wind down the HRSG business.
9 Q    And are you aware that Deltak is presently seeking to
10 reject certain HRSG contracts for some of the projects it has?
11 A    Yes.

12 Q    Do any of the HRSG contracts that Deltak is seeking to
13 reject involve or utilize catalysts that are manufactured by a
14 company named Cormetech?

15 A    Yes.

16 Q    Okay. And what is your understanding of which projects
17 utilize Cormetech catalysts?

18 A    There are five on the list. There is the Port Westward
19 project M.P.S., Port Westward. There is the GE Riverside
20 project. There is the TIC Hovensa project. And then there is
21 the two -- two projects for Navasota, one for Wharton job site,
22 and the other is in Odessa, Texas.

23 Q    Now, of those five projects is Deltak planning to complete
24 the work on any of those projects notwithstanding the fact that
25 it is seeking to reject the contracts related to the projects?

Albert - Direct/Swalina                    121

1  A    In all of our contracts that we are rejecting we are in
2  discussions, negotiations with the customer, working toward a
3  completion agreement so that we would be able to complete those
4  projects.  Yes.

5  Q    Now, are you personally involved in the negotiations for
6  the completion agreements?

7  A    In many of them, yes.

8  Q    And what is the status of the negotiations with respect to
9  the five projects that you just discussed?

10 A    They're in different stages of negotiation.  There are
11 three that are very close to reaching agreement.  The TIC --
12 Hovensa project and then the project -- two Navasota projects
13 we are still turning the contract, but the number of changes
14 are very small, and I expect those -- that will reach agreement
15 very shortly.

16 Q    And by very shortly do you mean within a week, a month?  I
17 am hopeful this week.

18 A    Now, how familiar are you with the various projects -- the
19 underlying projects for the HRSG units that are involved in
20 these contracts Deltak seeks to reject?

21 A    Well, the projects -- the Project Management Group is one
22 of the groups that reports to me, and each of those projects
23 has a project manager assigned.  So, I am aware of those
24 projects.  We have often weekly or, right now almost a daily
25 meeting on those projects as far as where we are on the

1  completion agreements. Prior to the bankruptcy we would have
2  weekly or monthly updates, status reports.

3  Q   Now, you heard testimony earlier from Mr. Pritchard. He
4  referred to several exhibits which he indicated related to
5  various projects. Would you mind looking in the binder in
6  front of you as the exhibits Tab 1 through 5, and tell me if
7  those are the purchase orders and contracts related to the
8  projects that you've described?

9  A   One is the contract for the Port Westward project. Number
10 2 is for GE Riverside. Number 3 is Hovensa. Number 4 is the
11 Wharton -- Navasota Wharton. And Number 5 is Navasota Odessa.
12 Yes.

13 Q   Now, turning to the first one related to the first
14 project, the Port Westward project, re you generally familiar
15 with the terms of that agreement?

16 A   In general, yes.

17 Q   Now, on the first page, I believe there's a shipping
18 destination which is related to -- which is, you know,
19 designated as Oregon. Do you see that?

20 A   I do.

21 Q   Now, if Deltak were to assume this catalyst supply
22 contract with Cormetech, could it specify an alternate delivery
23 destination?

24 A   Yes.

25 Q   And on what basis could it do that?

Albert - Direct/Swalina                123

1  A     Well, if there was a reason for -- or this catalyst wasn't
2  needed at this job site, or something happened and we had a
3  different location for it, we would specify a different
4  destination for this project.  Sometimes customers will take
5  the catalyst and delivery and put it in storage themselves, and
6  that might result in a different job site or a different
7  destination for the catalyst.
8  Q     Now, did Deltak order catalysts from Cormetech for all
9  five of these projects, SCR catalysts, I believe they were
10 referred to?
11 A     SCR catalysts, yes.
12 Q     Now, you are familiar with those types of catalysts?
13 A     I am.
14 Q     And how are you familiar with SCR catalysts?
15 A     Both from a -- well, from a design -- from a process
16 specification and system integration, where we take the
17 catalyst itself and integrate it into our boilers.  My first
18 experience with SCR was in 1987, where we put in the first SCR
19 system and integrated the first SCR system into our HRSG.  And
20 that was actually a Mitsubishi catalyst at the time that we
21 did.  Since then, Deltak has installed -- probably about half
22 the jobs we've sold since then have had SCR catalysts in them.
23 Q     Can you put a number on the number of catalysts you may
24 have seen in your time at Deltak that are SCR catalysts?
25 A     SCR catalysts since that point in time, probably 100 or

Albert - Direct/Swalina                 124

1 more.

2 Q    Now, let's talk a little bit -- specifically about the SCR
3 catalysts, and try to get a better understanding of exactly
4 what this is.  Could you just sort of describe what the
5 function of this catalyst is?

6 A    The purpose of this catalyst is to -- to reduce the NOx in
7 the exhaust gas stream from the gas turbine from what is coming
8 out of the turbine.  Possibly if there's a duct burner, what
9 may be added by a duct burner, to reduce the emissions in the
10 stack, going out the stack.

11 Q    Now, if you look at Exhibit 6 in the binder that's in
12 front of you, could you look at that and identify what that is
13 for us, please?

14 A    Exhibit 6 is a -- just a diagram of what -- showing that
15 the -- what the reaction with the process is with the NOx
16 coming in from the -- really the exhaust flow starts from the
17 left side of the paper, goes to the right side.  It's showing
18 the inlet, the NOx coming in with the exhaust flow.  It shows
19 what's called the ammonia injection grid, which is the grid
20 upon which the ammonia is injected into the gas stream, then
21 the ammonia and the NOx then going into the catalyst, being
22 reacted, and showing the nitrogen and water leaving.  This is
23 an ideal -- showing kind of an ideal situation because there is
24 some -- a little bit of NOx and a little bit of ammonia on the
25 discharge side, but it's just representing what the process is.

Albert - Direct/Swalina                    125

1 Q    Okay.  And turning to tab seven, right behind that, it's a
2 cross sectional diagram of a HRSG.  Could you sort of explain,
3 you know, where in the unit the SCR catalyst is, and sort of
4 explain the function before and after catalyst?

5 A    Sure.  The SCR is located -- or is highlighted with the
6 yellow there.  It's a -- it's located in a temperature range
7 within the boiler, usually in the range of 600 degrees to 750
8 degrees.  What you see here in this particular picture is some
9 heat transfer surface upstreams, so that it's reducing the gas
10 temperature down to the appropriate temperature for this
11 catalyst.  In this particular drawing there's a sealed catalyst
12 and there's an AIG, and then the SCR itself.

13 Q    Now, we've seen pictures of how big these HRSG units are,
14 and based on this cross section, describe for me how big is
15 this catalyst standing by itself?

16 A    Well, to start with, if you look down toward where it says
17 Duct E, just above that you can see the representation of a man
18 that's probably about six foot.  That gives you a relative idea
19 of size.  These boilers will range anywhere from 30, 40 feet
20 tall up to almost 70, 80 feet tall to the top.

21 Q    Now, is the catalyst one big piece, or is it comprised of
22 components?

23 A    It's comprised of components.  As we've talked about, or
24 as has been discussed before, there are modules, catalyst
25 modules that are put into where this area where the SCR is.

Albert - Direct/Swalina                126

1  There are modules placed in there and stacked on top of one
2  another.

3  Q    Now, if you can utilize the tabs eight, nine, and ten in
4  the binder in front of you, would you mind sort of going
5  through those three and explaining for the Court what's
6  represented in those diagrams?

7  A    Sure.  Under tab eight is what's labeled as a ceramic
8  catalyst block, sometimes referred to as a log.  This is what's
9  extruded once the materials are combined and put into a -- like
10 a dome and the block is extruded, and this is what will come
11 out through the extrusion process.  Under number nine, those
12 particular logs or blocks are then put into what's called a
13 catalyst, or a module, or the frame.  And this is carbon,
14 steel, or chrome alloy, depending on temperature, or possibly
15 stainless, frame is what holds these blocks together.  Now, a
16 frame will vary in size a little bit, but, you know, you're
17 looking at something here that's eight to ten feet wide by, I
18 don't know, five or six feet tall, by a foot-and-a-half to
19 three feet deep.  Under number ten it shows how the catalyst
20 has three pictures.  Going from left to right the picture on
21 the left is the catalyst at the job site.  It's been delivered.
22 It's covered in plastic.  When it's ready to be installed into
23 the unit the plastic is removed.  It's then lifted by crane,
24 and usually -- I think all of our systems have been top loaded,
25 where the catalyst comes in and you drop it down through a

1  hatch in the roof of the HRSG.  And in the bottom picture you
2  can see the module now in position within the frame itself --
3  within a structural frame that holds all these module blocks
4  together.
5  Q    Okay.  Now, we've heard some testimony that there might be
6  variations in the materials that are used to make these
7  catalysts, and I wanted to talk about the manufacturing
8  process, because this extrusion process is a little foreign to
9  me.  I was wondering if you could sort of break that down for
10  me, in layman's terms, and explain to me how is each one of
11  these little bricks or blocks made?
12  A    Well, once the materials are put together into this dome,
13  and I kind of -- when I saw the process I kind of thought of it
14  as the old Play-Doh machine where you take the Play-Doh and you
15  extrude it and come out with stars, or whatever.  It's a
16  similar process where it comes through the -- you extrude it
17  through the dye, and then cut off.  It's then put into a -- and
18  it's very malleable, or very soft at that point in time.  It's
19  then put through a calciting process, or heating process, in an
20  oven, and that's where it takes its final shape and the block
21  is then used in the module itself.
22  Q    Now, the materials that make up the dough, is there sort
23  of a variation in the make up of that dough, or is it pretty
24  standard?  Or --
25  A    For the types of catalysts that we're talking about in the

Albert - Direct/Swalina                128

1  -- in a mid-range temperature application, typically they are
2  going to be vanadium titanum tungsten based. If it's a high
3  air temperature zone it may have a different material. One of
4  the components may be eliminated or reduced, but for the mid-
5  range temperature that we're talking about, which is the 600-
6  type temperature range plus or minus, it's going to be the
7  titanium vanadium tungsten catalyst.
8  Q    Now, how much of a temperature swing would there have to
9  be before we got into a different composition?
10  A    The temperature range we're talking about here is -- this
11  catalyst would go as high as 750, higher you would start to
12  change the composition. So, up to 750, down to as low as about
13  500.
14  Q    So, at temperatures -- for HRSG units that are going to
15  utilize gases at temperatures between 500 and 750, there would
16  be essentially the same composition as that?
17  A    There would be -- there might -- essentially the same
18  composition. There might be a slight change depending on some
19  of -- the SO2 to SO3 conversion, for example, but effectively
20  they would be titanium vanadium tungsten based.
21  Q    Now, are these -- these modules that we saw in tab nine,
22  and then stacked up again in tab ten, are those modules
23  specifically designed for each project? Is that the
24  customization component of these catalysts?
25  A    We provide to the catalyst manufacturer a cross sectional

1 area of the HRSG internal floor area that the blocks need to
2 fit in.  We then rely on -- or the catalyst manufacturer looks
3 at that and comes up with a catalyst module size that provides
4 the cross sectional area or the volume of catalyst that's
5 needed that fits within that cross sectional area in the
6 modules that will -- can be stacked up and put in -- and fill
7 that area, then.

8 Q    Are HRSG units ever designed to accommodate fluctuations
9 in catalyst size?  I mean, there's been testimony that they're
10 all six by six of varying lengths.  Are HRSG units ever
11 designed so that the length of the catalyst can change over
12 time?

13 A    As a matter of fact, in many applications we're asked to
14 provide -- you have to remember, this catalyst block that's in
15 tab number nine fits within a structural framework to hold it
16 in place.  And in that structural framework there are jacking
17 bolts -- what we call jacking bolts that basically take that
18 catalyst and push it up against the face of that frame to seal
19 it so gas doesn't bypass around it.  In many cases because
20 customers don't know if there might be a change in emissions
21 requirements, or as part of their catalyst management, they may
22 want to, in essence, add catalysts rather than replace the old
23 catalyst, maybe add catalysts either to extend the life of the
24 catalyst, or if there's a change in emissions requirements they
25 can be able to meet those particular changes.  And so the

Albert - Direct/Swalina                         130

1  frame, in many cases, is designed bigger than what's needed
2  here.
3  Q    So, in essence are you saying that a catalyst that, for
4  example, let's use a hypothetical, I order a 12-inch catalyst,
5  in the future I might be able to utilize a 14-inch catalyst in
6  my same HRSG unit if emissions requirements change and I need
7  better performance?
8  A    In many of our jobs that is a requirement to be able to
9  accept a bigger or a longer, deeper catalyst bed.
10 Q    Now, you've talked a little bit about the customization,
11 and we've heard a lot about how customized these modules are.
12 Sir, what's the significance of this customization of the
13 module frames with respect to Deltak's sort of continuing
14 operations today?
15 A    Well, the customization of the catalyst frames, if you
16 will, the -- for example, let's take the Port Westward job, if
17 you will.  The modules themselves are a certain size, certain
18 height, width, depth, and they are designed to fit in that
19 particular HRSG.  However, the blocks themselves, the -- what
20 I'll call the catalyst blocks, or the logs, are a fairly
21 standard size shape, and could be removed from this if there
22 was a different -- for example, if there was a different --
23 another job where the NOx reduction was similar to or less than
24 what was specified for Port Westward, or the gas side pressure
25 drop was equal to or higher than Port Westward, where the

Albert - Direct/Swalina                  131

1  exhaust flow was approximately the same and the temperature
2  window was the same, or similar. And other than maybe a change
3  in the size of a module itself we could re-fabricate the module
4  and re-stack those blocks in that and use that in another unit.
5  Q    Okay. Now, based on your years of experience with HRSG
6  projects and including your experience engineering catalysts,
7  are there alternate customers or alternate uses that Deltak
8  could pursue with respect to the SRG catalysts we're talking
9  about for Port Westward?
10 A    As an example -- there is no standing secondary market
11 right now for this type of -- for the catalysts for natural gas
12 applications. I believe there is somewhat of a secondary
13 market for coal-fired applications, but for the natural gas
14 fired combined cycle there's not really a set market or a
15 secondary market. But in preparation for this we did go back
16 and look at a couple of jobs, specific on the Mitsubishi 501G
17 gas turbine, where we have a job in Texas, we have a job in
18 Michigan. And looking at those jobs relative to this Port
19 Westward project, for example, those projects are all three --
20 all these projects are 501G gas turbine, which means they all
21 have about the same exhaust flow. The temperature windows, the
22 exhaust flow composition is very -- or, nominally the same.
23 The exhaust temperature window is in the same range. There are
24 some variations, but they are in the same range. The NOx
25 reduction requirement for Port Westward and for Culvert is

1  very, very close to each other.  The one in Texas, the Wolf

2  Hollow job site actually has a lower NOx reduction requirement.

3

4  Q    Now, let me see if I can understand that.  If the Wolf

5  Hollow project has a lower requirement, what would be the

6  effect if you put in the catalyst from the Port Westward

7  project?

8  A    It would result in a catalyst that would last longer than

9  what -- a catalyst designed for 85 percent would.

10  Q    And how is it that it would last longer?

11  A    Because there's more catalyst, there's more reactivity in

12  that catalyst bed than what's required, so they would inject --

13  and so that results in -- and that's how, when you -- if you

14  want a three-year life versus five-year life you end up adding

15  more catalyst to get a longer life in the catalyst.

16  Q    So, if someone were interested in extending the life of

17  replacement catalysts that they might purchase, they may decide

18  to get bigger catalysts, longer catalysts?

19  A    They might.  Yes.

20  Q    Okay.  Now, has anyone at Deltak, or you, yourself

21  included, undertaken the task of identifying all possible

22  alternatives for obtaining value for these Cormetech SCR

23  catalysts?

24  A    No.  We -- really for the past five weeks or so, our focus

25  has been, and all of our efforts have been in working through

1  the -- putting together the completion agreements for the
2  projects that we're rejecting.  So, we haven't spent very much
3  time at all working on -- if we -- on this catalyst, for
4  example, on Port Westward, could we use it someplace else?  We
5  really haven't had an opportunity to look at that in detail.
6  We have started, you know, in preparation for this, we've
7  looked at three projects, and from looking at it in, you know,
8  initially, there's really nothing that we see.  I mean, it
9  certainly has a potential to use this catalyst in another --
10 one of those other units.  Potentially.  There's more detail
11 work that would have to be looked at to make sure that it would
12 meet the requirements or to understand how the performance
13 would be, and then we'd have to go to the customer and see if
14 they could live with that change if it was.
15 Q    But based on your preliminary assessment of at least the
16 two projects that you've talked about in Michigan and Texas, do
17 you have an opinion as to whether there is a potential there?
18 A    It certainly is a potential and it would be something we
19 could look at in more -- it would be worth spending time
20 looking at and evaluating, yes.
21 Q    Now, when you say you haven't -- I'm sorry -- I didn't
22 mean to interrupt, but you said you haven't done the deep dive
23 yet, and gone through and done a detailed analysis.  When is it
24 that you would, you know, sort of decide that it would be
25 appropriate to do such a deep dive?

1  A    Well, like I said our focus has been in working toward
2  completion agreements with all of our customers.  And our hope
3  is that we reach a completion agreement with those customers.
4  Like I said, there are three that were -- three of the five
5  that we talked about here that were very close were actually
6  very -- were close on more than just those three, and in the
7  next week or two we'll know better where we stand on those.
8  Once we have an idea of where we are with those completion
9  agreements, then we need to work through and see what that
10 means for our vendors, for our suppliers.  If we could not use
11 this catalyst in Port Westward, for example, for some reason,
12 it would probably take us on the order of some time, two to
13 four months, to really evaluate and look for another
14 alternative use for this catalyst.
15 Q    Is it fair to say that your first step in determining what
16 to do with these catalysts is to go after your first best
17 customer, and that would be Mitsubishi?
18 A    Yes.
19 Q    And then your second step would be to identify other
20 potential facilities that could utilize these catalysts perhaps
21 as replacement parts?
22 A    They would be to expand on the list of potential projects
23 that could be used -- like I've said, I've started with two on
24 this particular one, but it would be then taking a look at our
25 whole user's list of SCR catalysts to see what other projects

Albert - Direct/Swalina                135

1  might have a benefit -- may have benefit from this catalyst.
2  Something we haven't -- we've talked a little bit about -- a
3  little bit foreign to it because we've never had to worry about
4  it in the past, but it would be to then maybe go to -- possibly
5  go to our competitors, who are in the process of designing new
6  units and see if there is a potential use for this catalyst in
7  those systems.
8  Q    So, you're suggesting a current or past competitor of
9  Deltak competing for the same HRSG business might be able to
10 utilize and already ordered and completed catalyst in coming up
11 with a design for a future project?
12 A    It is possible.  Yes.
13 Q    And that's something you haven't explored yet because that
14 would be a third step in sort of your evaluation?
15 A    It would be a third step, and in addition to looking at
16 our -- excuse me, at our own systems, you know, other
17 competitors, boilers in operation right now, might be possible
18 also.  The reason we would start with our own application is
19 because we know what the design requirements were.
20 Q    Okay.  Now, based on your experience and your
21 understanding of the HRSG business, and based on your
22 involvement in Deltak's efforts to enter into completion
23 agreements for the HRSG projects, what impact would requiring
24 Deltak to reject its catalyst supply contracts at the same time
25 it rejected the over arching contract have on Deltak's current

1  operations and its ability to complete the projects?

2  A    I have a favor.  If you could pour me a glass of water?

3  Q    Yes, sir.

4                          (Pause)

5  A    If we were forced to reject the catalyst purchase orders,

6  that would prevent us from completing the completion --

7  achieving what we're trying to do with the completion

8  agreements, and that is to complete the projects and get it to

9  where the customer is up and operating, and without this

10 catalyst it would cut us off at the knees.

11 Q    Now, for example, with respect to these three projects,

12 the latter three that you mentioned, I think that was Hovensa

13 (sic), Wharton, and Odessa?

14 A    Yes.

15 Q    For which you think you're very close to having completion

16 agreements, you nonetheless intend to reject those contracts,

17 or Deltak intends to reject those contracts, notwithstanding

18 the completion agreement.  Is that right?

19 A    That's correct.

20 Q    And if rejection of the supply contract for the catalyst

21 went hand in hand with rejection of the over arching contract

22 for the project, how would you be able to fulfill your

23 obligations under the completion agreement you negotiated?

24 A    We would not be able to.

25 Q    Now, if your supply contract, or if Deltak's supply

Albert - Direct/Swalina                137

1  contracts for catalysts are rejected involuntarily based on

2  your experience where do you think, for example, with respect

3  to the Port Westward project, where do you think that catalyst

4  is going to end up?

5  A   I would expect that catalyst would end up at the Port

6  Westward job site.

7          MR. SWALINA:  We have no further questions, Your

8  Honor.

9          THE COURT:  I have, actually, one question I think,

10 for counsel.  I just want to make sure exactly what we're

11 talking about.  Are we talking exclusively about the Cormetech

12 agreements that relate to Port Westward, or other Cormetech

13 agreements, as well?

14         MR. SWALINA:  We've been talking, and we've been

15 talking all day about all of the projects.  Each of the

16 witnesses identified each of the projects.  And generally with

17 respect to these catalysts I think Port Westward is the most

18 obvious example.  It's the best example.  But I think the

19 testimony relates to the SCR catalysts for all five projects

20 because they're essentially, you know, in the same types of

21 facilities.

22         THE COURT:  But is the debtor -- is the Cormetech

23 motion today seeking an order that directs the rejection or --

24 directs the debtor to assume or reject all of these different

25 agreements?

Albert - Direct/Swalina                    138

1    MR. CUNNINGHAM: I think, Your Honor, this goes to
2  the point that we left off at at the last hearing, knowing that
3  we were only going forward today with respect to the Mitsubishi
4  rejection, the Cormetech Port Westward supply agreement is the
5  only one related to that rejection. And since we were pushing
6  the remaining customer rejection and the remaining customer
7  projects to the 17th, we had the colloquy on the record with
8  counsel who said, okay, as to those I'm happy to have the Court
9  hear, you know, their evidence with respect to that at that
10  time. We've heard both -- you know, all the contracts, but I
11  think the only relief being asked of the Court today is to
12  direct us as to the Port Westward facility, the Mitsubishi
13  site.

14          THE COURT: Mr. Mascitti?

15          MR. MASCITTI: That's correct, Your Honor.

16          THE COURT: I just wanted to -- that was my
17  expectation when we started. I just wanted to make sure that I
18  had not missed something in the translation. But there was
19  dialogue back and forth that would seem to have --

20          MR. MASCITTI: As we had stated at the last hearing,
21  it is not Cormetech's intention to try to force the debtor to
22  assume or reject prior to a decision with respect to the prime
23  contractor position, as --

24          THE COURT: I understand.

25          MR. MASCITTI: -- to make the decision on the prime,

1  which would make a decision on the subcontractor.

2            THE COURT:  Thank you for clarifying.

3                        CROSS EXAMINATION

4  BY MR. MASCITTI:

5  Q    Mr. Albert, how many catalysts has Deltak manufactured?

6  A    Deltak does not manufacture catalysts.

7  Q    And -- so, what is your role specifically in connection

8  with the manufacturing of the catalysts?

9  A    Our role is to specify the process requirements that the

10 catalysts need to meet from the standpoint of NOx reduction,

11 ammonia slip.

12 Q    So, you don't actually do the designing and the

13 engineering with respect to the manufacture of the catalyst

14 itself?

15 A    With respect to the catalyst itself, no, we don't.  We do,

16 however, are responsible for integrating the catalyst into our

17 system, and as that we are responsible for maintaining or

18 achieving certain temperature, exhaust flow, NOx requirements,

19 distribution requirements going into the catalyst.

20 Q    Is it fair to describe the relationship between Cormetech

21 and Deltak in that manufacturing or engineering process to make

22 sure that you end up with a product that works with what you're

23 designing?  In other words, you take responsibility for making

24 sure that the various specifications for certain things are

25 where they are, and Cormetech's responsibility for designing

1  and manufacturing the catalyst to meet those specifications?

2  A    Yes.

3  Q    Now, with respect to -- I think you had mentioned a

4  Michigan project where there --

5  A    Yes, sir.

6  Q    -- it might be possible to use one of these catalysts?

7  Which catalyst were you referring to?

8  A    That would be the MGS Port Westward catalyst.

9  Q    And is the -- the Michigan project, is that an existing

10  project?

11  A    Yes.

12  Q    And what's the gas temperature at that project?

13  A    The temperature window for all three projects are 600

14  degrees plus or minus.  There's some variation between those --

15  between the three, but they're in the same -- approximately the

16  same temperature window.

17  Q    What's the inlet NOx concentration for that project?

18  A    I've got all three running through my head.  I don't

19  recall.

20  Q    What's the oxygen concentration and the flue gas?

21  A    About the same.  Nominally the same as the -- the oxygen

22  content, the nitrogen content, the water content for all three

23  are nominally the same.

24  Q    Nominally the same, but they are not specifically the

25  same, are they?

Albert - Cross/Mascitti                   141

1  A    They are not exactly the same necessarily, but --

2  Q    And that could impact the --

3  A    -- they -- go ahead.

4  Q    I'm sorry.  Go ahead and finish.

5  A    No, go ahead.

6  Q    That could impact the design of the catalyst, couldn't it?

7  A    It was something -- it would have to be -- the details of

8  which would have to be evaluated, yes.

9  Q    Okay.  With respect to the idea of selling the catalyst in

10 connection with some future project, wouldn't you have to

11 design the future project around the specifications of the

12 catalyst?

13 A    Sorry.  Say that one more time?

14 Q    In other words, typically you have a project in place and

15 you design the project around the specs that there's emissions

16 requirements for the particular project, there's inlet

17 conditions that are givens for the particular project, you

18 can't construct a project to meet those conditions, can you?

19 A    Yeah -- from the standpoint of -- some of those we can,

20 yes.

21 Q    And some you can't, correct?

22 A    Some of them are controlled -- are outside of our scope,

23 however the -- it would depend on what the requirements for

24 that -- for example, in Port Westward the reduction is, let's

25 say, 95 percent, 90, 95 percent.  If the application at hand

Albert - Cross/Mascitti                    142

1  was 80 or 85 percent, given the same temperature window we
2  could potentially use the -- evaluate the catalyst for that
3  application.
4  Q    How would that effect back pressure?
5  A    Well, depending on the catalyst's volume and how the
6  catalyst is sized, it could have a negative impact on back
7  pressure.  However, on looking at those three projects we
8  talked about, for example -- as an example, the catalyst
9  pressure drop, in looking at those three, is about the same.
10 Q    But the catalyst -- the pressure drop is specifically one
11 of the performance items that is guaranteed, at least, by
12 Cormetech under the contract, correct?
13 A    Yes.
14 Q    And simply throwing in a larger catalyst with more
15 catalyst area could negatively impact the pressure drop for a
16 particular system, correct?
17 A    Or positively impact it.  Depending on the cross sectional
18 area you could have lower pressure drop.
19 Q    With respect to the possible sale of these catalysts to
20 some other party, has Deltak ever sold a catalyst before?
21 A    Only in conjunction with a system, whether it be an HRSG
22 system or a simple cycle system.
23 Q    So, Deltak has never separately sold a catalyst?
24 A    No.
25 Q    I'm sorry?

Albert - Cross/Mascitti                    143

1  A     No.

2  Q     Has Deltak ever purchased a catalyst from a subcontractor

3  without a warranty or performance guarantee?

4  A     No.

5  Q     Under the scenario where Deltak is selling the catalyst to

6  some third party, would Deltak be issuing a performance

7  guarantee in connection with that sale?

8  A     Well, if we were to go out and market one of the

9  catalysts, or let's just take the Port Westward, we would first

10 start with Cormetech.  And if we found an application that

11 would be close to or a possibility, or our applications that

12 would be a possibility, we would approach Cormetech about

13 evaluating the catalyst so we could maintain the warranty for

14 that application in the new project.

15 Q     Sir, my question is, if Deltak sells this catalyst to a

16 third party, would Deltak issue a performance guarantee?

17 A     Deltak wouldn't be -- it would be something we would need

18 to evaluate.  If we could not get Cormetech's assistance with

19 that, there are other companies that we could go to that -- to

20 determine the reactivity, the performance of the catalyst in a

21 different application.

22 Q     Have you analyzed the cost of issuing a warranty or a

23 performance guarantee in connection with the catalyst?

24 A     As I said -- mentioned earlier, we -- for the past four or

25 five weeks have been focused on working to our completion

Albert - Cross/Sabin                    144

1  agreements, so really we've done some initial investigation,

2  but have not done a full detailed analysis, no.

3                    MR. MASCITTI:  No further questions, Your Honor.

4                              CROSS EXAMINATION

5  BY MR. SABIN:

6  Q    Good evening, Mr. Albert.

7  A    Good evening.

8  Q    Are you currently an officer of Deltak?

9  A    Yes.

10 Q    And what's that position that you hold?

11 A    Senior Vice President of Operations right now.

12 Q    And you've held that position for how long?

13 A    Since July of this year.

14 Q    And in that role did you participate in the wind down

15 decision?

16 A    I did not.

17 Q    To your knowledge who did participate who is management of

18 Deltak?

19 A    As I understand it was a decision at the global power

20 level.

21 Q    By that do you mean that no management of Deltak

22 participated in such a decision?

23 A    I did not participate.  I don't know if others did or not.

24 Q    Do you know whether Deltak has made any decision to assume

25 or reject any of the five Cormetech contracts?

1  A    We have not decided on that at this point in time.

2  Q    Okay.  Are you familiar with the five contracts that are

3  Exhibits 1 through 5?

4  A    I have reviewed them, yes.

5  Q    And are you familiar with the status of negotiation with

6  respect to the completion agreements with the customers

7  relating to each of those five agreements?

8  A    Yes, I am.

9  Q    Is it fair to say that with respect to customers other

10 than Mitsubishi, that those negotiations contemplate payment in

11 full to Cormetech upon delivery of the catalyst?

12 A    Yes.  Contemplated to be payment in full.  Yes.

13 Q    Is it your view that part of the structure of those

14 completion agreements would contemplate an assumption and

15 assignment of Deltak's rights under those related Cormetech

16 vendor arrangements?

17 A    With many of our -- in the discussions with most of our

18 customers, a discussion has been focused on an assumption and

19 assignment of the purchase order, especially for contracts or

20 purchase orders like Cormetech, where there is warranty or a

21 guarantee, a process guarantee associated with it.

22 Q    Based on your knowledge, and understanding you're not a

23 lawyer, if Deltak were to reject the Cormetech Exhibit 1

24 contract, that's for the Port Westward agreement, would Deltak

25 lose the warranties provided by Cormetech?

Albert - Cross/Sabin                146

1  A    If we were to reject the contract we would not have the

2  warranty, no.

3  Q    To your knowledge, what, if anything, is left for

4  Cormetech to do with respect to its obligations to Deltak under

5  the Port Westward agreement?

6  A    What's left for them to do is to deliver the catalyst.

7  Q    If I could direct your attention to Section 6A of Exhibit

8  1?  Is it your view that Deltak would have a right to change

9  the delivery point under this contract?

10 A    Yes.

11 Q    Is it -- would Deltak's right require the written consent

12 prior thereto Cormetech?

13 A    I don't -- I don't believe so.

14 Q    Now, sir, if I could direct your attention to Section 4B,

15 as in boy, romanette 4 of the same exhibit.  And that's at the

16 bottom right-hand, CT0027.

17 A    Yes, sir.

18 Q    Could you tell us your understanding of who is obligated

19 to give a notice with respect to shipment of the catalyst?

20 A    The seller is responsible for notification of shipment.

21 Q    And in connection with the Port Westward contract in

22 Exhibit 1, to your knowledge is the delivery date November 1?

23 A    With respect to --

24 Q    Exhibit 1.

25 A    Exhibit 1.

Albert - Cross/Sabin                    147

1  Q    Which is the Port Westward contract with Cormetech.

2  A    I believe so, but -- yes, it is.  November 1.

3  Q    And is that from your memory, or are you referring to

4  something in the contract to assist your answer?

5  A    I was assisted by number 1E, where it says delivery

6  November 1st.

7  Q    And to your knowledge has the catalyst been delivered?

8  A    It has not.

9  Q    Can I call your attention to Exhibits 4 and 5?  And

10 respectively, the first page of each of those exhibits, and ask

11 you to look at the first line item in each of those pages, to

12 confirm what the delivery dates are for the catalysts under

13 those two contracts?

14 A    Under Exhibit 4 -- excuse me, Exhibit 4, which is the

15 Wharton purchase order for the Wharton job, it's April 12th of

16 '07, and under Tab 5 is April 6th of '07.

17 Q    And now, if I can ask you to turn to Exhibit 2?  And in

18 particular, towards the back of Exhibit 2 I think it's the

19 penultimate page CT0021, and I would ask you what the delivery

20 dates are with respect to the two catalysts called for by that

21 contract?

22 A    For unit one, June 15th of 2007, and October -- and the

23 second one on October 2rd, 2007.

24 Q    And with respect to Exhibit 3?  I'd ask you to turn to

25 page -- we're on the far right at the bottom there are

Albert - Cross/Sabin                    148

1 signatures and to the left is the Bate stamp CT0058.

2 A    Okay.  Yes, sir.

3 Q    And give us your understanding of the arrangements that
4 are in place with respect to the catalyst called for under this
5 contract?

6 A    Under this contract delivery was originally August of '06,
7 and it's currently held in storage beginning August 4th, and
8 storage will be charged at $450 per month.

9 Q    Now, you indicated earlier that you expect completion
10 agreements very shortly with respect to some, but not
11 necessarily all, of Exhibits 1 through 5?  Is that correct?

12 A    Yes, sir.

13 Q    And I just want to make sure, which ones do you expect
14 within the next two weeks?

15 A    The Hovensa project, which is Item -- or, Tab 3, and the
16 two Navasota projects, which are Tab 4 and 5.

17 Q    And with respect to each of those, it is your testimony
18 that you would expect the completion agreement to contemplate
19 an assumption and assignment of the underlying Cormetech
20 agreements?

21 A    At this point in time that -- I believe that would be the
22 case, yes.  But until we have the -- with each of these
23 customers we're working on a completion plan, but for the most
24 part the discussions have focused on an assumption and
25 assignment of the purchase orders.

Albert - Recross/Mascitti / Decision          149

1       MR. SABIN:  I have on further questions, Your Honor.

2  Thank you.

3       THE COURT:  Any recross?

4       MR. SWALINA:  No redirect, Your Honor.

5       THE COURT:  Okay.

6       MR. MASCITTI:  I just had a --

7                    RECROSS EXAMINATION

8  BY MR. MASCITTI:

9  Q   Sir, is it your testimony that Deltak instructed Cormetech

10 to ship the Port Westward catalyst?

11 A   At this point I don't know if we have instructed Cormetech

12 to ship the catalyst.

13      MR. MASCITTI:  No further questions, Your Honor.

14      THE COURT:  Okay.  Are there any other witnesses?

15 All right.  I will not require closing argument.  I need just a

16 moment or two to collect my thoughts and review my notes.  We

17 will reconvene in less than five minutes.  Stand in recess.

18                       (Recess)

19      THE CLERK:  All rise.

20      THE COURT:  Please be seated.  Okay.  I am going to

21 grant Cormetech's motion and order that the debtor file a

22 motion to assume or reject its agreement with Cormetech on or

23 before noon on November 15, 2006.  I will conduct a hearing on

24 that motion on November 17th, 2006.  Any responses to that

25 motion must be filed at or before four p.m. on November 16,

Decision                              150

1 | 2006.

2 |      In making this ruling I note that I have weighed the
3 | competing harms to be suffered by the parties by setting a
4 | deadline for assumption or rejection, and I've considered the
5 | potential benefit to the estate, in particular associated with
6 | allowing this debtor more time to decide.  And additionally I
7 | note that Cormetech bears the burden of proof on its motion and
8 | I must also consider whether the debtor has had sufficient time
9 | in the case to consider its financial situation.  The fact is
10 | that the case law favors affording the debtor additional time.
11 | In this case, however, the record is abundantly clear that
12 | Deltak will be leaving this business line and the testimony
13 | does not indicate that there is or will be a meaningful
14 | opportunity to sell these catalysts on the secondary market,
15 | and that the catalysts are custom made items.  The testimony
16 | was that the catalyst would have to be practically scrapped in
17 | order to reuse it for another purpose if, indeed, that could
18 | occur.  Mr. Pritchard convincingly testified that the only
19 | realistic application for the catalysts in question is for the
20 | HRSG at Port Westward.  The debtor's witness did testify that
21 | conceivably there were alternative uses, but at present the
22 | debtor's witness could not identify any specific opportunities.

23 |      As a practical matter, if the catalysts are not
24 | timely sold or delivered to Mitsubishi for installation at Port
25 | Westward, Cormetech faces the risk that with the passage of

1  time the sole purchaser of the catalysts, which is Mitsubishi,
2  may likely disappear if it must contract with another supplier
3  to complete the HRSG at Port Westward.  On the other hand, the
4  debtor advances basically two separate grounds for denial of
5  the motion.  First, the debtor posits a speculative hope that
6  it might sell the catalysts to a third party.  As a general
7  rule, any line of reasoning that starts with isn't it possible
8  if there was a natural disaster is not likely to yield a
9  compelling point.  Second, and more to the point, denial of the
10  motion will maximize the debtor's leverage in its negotiations
11  with Mitsubishi, and I'm not insensitive to this consideration.
12  I commented at the outset of these cases that I thought that
13  the wind down program and the completion agreements that the
14  debtor was proposing to pursue were a good idea.  Nevertheless,
15  on balance I find that the evidence establishes that the
16  potential harm to Cormetech substantially outweighs the
17  imposition and inconvenience to the debtor of setting a
18  deadline for assumption or rejection of the contract.  I will
19  look to the parties to settle an order reflecting my ruling,
20  and I will look for it submitted under certification.  Are
21  there any questions?  Very well.  Mr. Cunningham, is there
22  anything further today?
23              MR. CUNNINGHAM:  That's it, Your Honor.
24              THE COURT:  Very well.  Stand in recess.
25              UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

                                Decision                      152

1          THE COURT:  Thank you counsel.

2                     *  *  *  *  *

                  C E R T I F I C A T I O N

         We, PATRICIA REPKO, VIDHYA VEERAPPAN, and TAMMY

DeRISI, court approved transcribers, certify that the foregoing

is a correct transcript from the official electronic sound

recording of the proceedings in the above-entitled matter.

**Patricia Repko**
Digitally signed by Patricia Repko
DN: CN = Patricia Repko, C = US
Date: 2006.11.09 17:45:52 -05'00'

                                      Date:  November 9, 2006

PATRICIA REPKO

**Vidhya Veerappan**
Digitally signed by Vidhya Veerappan
DN: CN = Vidhya Veerappan. C = US
Date: 2006.11.09 17:46:39 -05'00'

                                      Date:  November 9, 2006

VIDHYA VEERAPPAN

**Tammy DeRisi**
Digitally signed by Tammy DeRisi
DN: CN = Tammy DeRisi, C = US
Date: 2006.11.09 17:47:13 -05'00'

                                      Date:  November 9, 2006

TAMMY DeRISI

DIANA DOMAN TRANSCRIBING

# EXHIBIT M

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| Debtors. | Jointly Administered |
| | **Objection deadline: November 16, 2006 at 4:00 p.m.** |
| | **Hearing date: November 17, 2006 at 10:30 a.m.** |

## NOTICE OF MOTION

**TO:**   The Office of the United States Trustee, counsel to the Senior Lenders, proposed counsel to the Official Committee of Unsecured Creditors, proposed counsel to the Official Committee of Equity Security Holders, Cormetech, Inc., and all parties who filed a notice of appearance pursuant to Bankruptcy Rule 2002.

Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession have filed the attached **Debtors' Motion pursuant to 11 U.S.C. §§ 105 and 365 for Authority to Reject the Cormetech Port Westward Contract** (the "Motion").

Responses or objections to the Motion, if any, are to be filed on or before **November 16, 2006 at 4:00 p.m.**  At the same time, you must serve a copy of the objection or response on the undersigned attorneys.

If any responses are timely filed in accordance with this Notice, a hearing on the Motion will be held on **November 17, 2006 at 10:30 a.m.**

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: November 15, 2006

THE BAYARD FIRM

By: _____
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

-and-

643032v1

Thomas E Lauria, Esquire
Gerard Uzzi, Esquire
Matthew C. Brown, Esquire
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700

Attorneys to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| GLOBAL POWER EQUIPMENT GROUP | ) Case No. 06-11045 (BLS) |
| INC., et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Objection deadline: November 16, 2006 at 4:00 p.m.** |
| | ) **Hearing date: November 17, 2006 at 10:30 a.m.** |

## DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 365 FOR AUTHORITY TO REJECT THE CORMETECH PORT WESTWARD CONTRACT

Global Power Equipment Group Inc. ("Global Power") and its affiliated debtors

and debtors in possession (collectively, the "Debtors")[1] file this motion (the "Motion") pursuant

to sections 105 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the

"Bankruptcy Code") for an order authorizing the Debtors to reject the Port Westward Contract

(defined below) with Cormetech, Inc. ("Cormetech") nunc pro tunc to the date of filing of this

Motion, and respectfully represent as follows:

### Background

1.        On September 28, 2006 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors continue to

operate their respective businesses and manage their properties as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered.

---

[1]        In addition to Global Power, the Debtors include Global Power Professional Services, L.L.C., Braden
Manufacturing, L.L.C., Braden Construction Services, Inc., Deltak, L.L.C., Deltak Construction Services, Inc.,
Williams Industrial Services Group, L.L.C., Williams Industrial Services, LLC, Williams Specialty Services, LLC,
Williams Plant Services, LLC, and WSServices, LP.

2.    On October 10, 2006, the United States Trustee (the "Trustee") appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in these chapter 11 cases. On November 9, 2006, the Trustee appointed the Official Committee of Equity Security Holders (the "Equity Committee"). No trustee or examiner has been requested or appointed in any of the Debtors' chapter 11 cases.

3.    On September 29, 2006, the Debtors filed their Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (i) Wind Down Operations of the Heat Recovery Steam Generation Business (the "HRSG Business") Segment Operated by the Deltak Debtors, (ii) Reject Certain Executory Contracts in Connection Therewith, and (iii) Implement Procedures for the Orderly Completion of Work in Progress (the "HRSG Motion"). By the HRSG Motion, the Debtors sought authority, inter alia, to (a) reject nunc pro tunc to the date of the HRSG Motion all executory contracts for the delivery by the Deltak Debtors[2] of HRSG units to customers (the "Customer Contracts") and (b) to enter into agreements (the "Completion Agreements") with customers to complete HRSG projects in progress (the "HRSG Completion Program").

4.    By order dated October 10, 2006, the Court granted the HRSG Motion in part [Docket No. 85] (the "HRSG Order").

5.    On October 24, 2006, Mitsubishi Power Systems Americas, Inc. ("Mitsubishi") filed a corrected limited opposition to the HRSG Motion relating to its Customer Contract with the Deltak Debtors (the "Mitsubishi Customer Contract") and requested, among other things, that the Deltak Debtors be compelled to assign two subcontracts to Mitsubishi: (i)

---

[2]    The Deltak Debtors consist of Deltak, L.L.C. and Deltak Construction Services, Inc.

the Cormetech subcontract[3] and (ii) the BASF Catalyst, LLC ("BASF") subcontract [Docket No.

159] (the "Mitsubishi Objection"). Each subcontract relates to the delivery of catalysts in

connection with the Mitsubishi HRSG project.

      6.    Thereafter, on October 27, 2006, Cormetech filed a motion to compel the

Debtors to assume or reject certain executory contracts pursuant to 11 U.S.C. § 365(d)(2)

[Docket No. 204] (the "Cormetech Motion"), requesting the Court establish a date by which the

Debtors must assume or reject certain executory contracts with Cormetech for the assembly of

catalysts used in the "MPS/PGE/Port Westward" HRSG project (the "Port Westward Contract"),

the "7H Launch-Inland Empire" HRSG project (the "Riverside Contract"), the "Hovensa GT-13"

HRSG project (the "Hovensa Contract"), the "Wharton" HRSG project (the "Wharton

Contract"), the "Odessa" HRSG project (the "Odessa Contract," and collectively with the Port

Westward, Riverside, Hovensa and Wharton Contracts, the "Cormetech Contracts"), and that

such date coincide with the date of assumption or rejection of the Customer Contracts.

      7.    On October 31, 2006, the Debtors and the Creditors' Committee filed

objections to the Cormetech Motion [Docket Nos. 224 and 227, respectively].

      8.    The Court held a hearing on the Cormetech Motion on November 6, 2006

with respect to the Port Westward Contract; the hearing on the remaining Cormetech Contracts

was continued to November 17, 2006.

      9.    On November 9, 2006, the Court entered an order authorizing the Debtors

to reject their executory contract with Mitsubishi in connection with the Port Westward facility

(the "Mitsubishi Contract") [Docket No. 291]. On the same day, the Court entered an order

granting the Cormetech Motion with respect to the Port Westward Contract [Docket No. 289] (the

---

[3]    Cormetech and Mitsubishi are affiliates, and are both subsidiaries of Mitsubishi Heavy Industries, Ltd.

"Cormetech Order"), and directed the Debtors to file a motion to assume or reject the Port

Westward Contract by November 15, 2006.

### Jurisdiction

10.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

11.    By this Motion, pursuant to sections 105 and 365 of the Bankruptcy Code,

the Debtors respectfully request authority to reject the Port Westward Contract nunc pro tunc to

the date of filing of this Motion.

### Basis for Relief

12.    Pursuant to the Cormetech Order, the Debtors must make their decision

today whether to assume or reject the Port Westward Contract.  After evaluating the contract, the

Debtors have determined that the Debtors do not have the present ability to assume the Port

Westward Contract and cure the obligations thereunder, given that they cannot immediately

assign it to a third party.  In order to market the contract to a potential assignee, it would take

more (i) time and analysis, which the Debtors do not have, and (ii) cash collateral, which they are

not authorized to use without receiving additional consent from the Senior Lenders.

Accordingly, the Debtors have determined, in an exercise of sound business judgment, to reject

the Port Westward Contract immediately, effective nunc pro tunc to the date of filing of this

Motion.

13.    Section 365(a) of the Bankruptcy Code provides that a debtor in

possession, "subject to the court's approval, may assume or reject an executory contract or

unexpired lease of the debtor." 11 U.S.C. § 365(a). The rejection of an executory contract by a debtor is subject to review under the business judgment standard. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); In re Trans World Airlines, Inc., 261 B.R. 103, 120-21 (Bankr. D. Del. 2001); Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987); see also In re Nickels Midway Pier, LLC, 341 B.R. 486, 493 (D.N.J. 2006) ("Although the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject of [sic] a contract, the Third Circuit has adopted the business judgment standard."). This standard is satisfied when a debtor determines that rejection will benefit the estate. See Sharon Steel, 872 F.2d at 39-40; Wheeling-Pittsburgh, 72 B.R. at 846.

14.    If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See, e.g., In re III Enters., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa.) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet."), aff'd sub nom., Pueblo Chem., Inc. v. III Enters. Inc., V, 169 B.R. 551 (E.D.Pa. 1994); Wheeling-Pittsburgh, 72 B.R. at 849 ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter."); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) ("[C]ourt approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course."); cf. NLRB v.

Bildisco & Bildisco, 465 U.S. 513, 526 (1984) (noting that the business judgment rule is the standard even though higher scrutiny would be required in the case of collective bargaining agreements).

   15. Only where the debtor's actions are a product of bad faith, whim, caprice or a gross abuse of its managerial discretion should the business decision be disturbed. See Trans World Airlines, 261 B.R. at 121 ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" (citation omitted)); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1047 (4th Cir. 1985) ("Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion."); III Enters., 163 B.R. at 469 ("We will not substitute our own business judgment for that of the Debtor, nor will we disturb its decision to reject the [contract] unless 'the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim.'" (citation omitted)); Wheeling-Pittsburgh, 72 B.R. at 849 ("[T]he court should not interfere with or secondguess the debtor's sound business judgment unless and until evidence is presented that establishes that the debtor's decision was one taken in bad faith or in gross abuse of its retained business discretion.").

   16. The Port Westward Contract is "executory" pursuant to section 365 of the Bankruptcy Code because both the Debtors and Cormetech have continuing obligations to perform under it. Ample business justification exists to merit judicial approval of the proposed rejection. As of today, the Debtors have not yet been able to realize the value of the Port

Westward Contract, and given that the Debtors must decide today whether to assume or reject such contract, the Debtors have determined that rejection is preferable. As the Court itself acknowledged at the hearing on November 6, 2006, these catalysts are highly customized specialty equipment for which there is no ready and immediate market. While the Debtors believe they may be able to find a new buyer for the catalysts Cormetech assembles under the Port Westward Contract, the transportation and storage costs alone during the time it would take to find such a buyer are beyond the Debtors' means. Because of the drain on the Debtors' time and resources, the Debtors have determined in their exercise of sound business judgment that the Port Westward Contract must be rejected.

17.    Normally, the effective date of a rejection is the date that the order approving rejection is entered. See In re Chi Chi's Inc., 305 B.R. 396, 399 (Bankr. D. Del. 2004) (citing In re Thinking Machines Corp., 67 F.3d 1021, 1025 (1st Cir. 1995) (the date of court approval controls)). However, rejection has been allowed nunc pro tunc to the date the motion seeking rejection is filed under certain circumstances. See Chi Chi's, 305 B.R. at 399 (citing In re Thinking Machines Corp., 67 F.3d at 1025, which held the bankruptcy court has discretion to approve a rejection retroactively to the motion filing date, when principles of equity so dictate); In re CCI Wireless, LLC, 297 B.R. 133, 140 (D. Colo. 2003) (same). To grant nunc pro tunc rejection, the Debtors must have stated an unequivocal intent to reject the contract or leases. See, e.g., In re 1 Potato 2, Inc., 58 B.R. 752, 754-55 (Bankr. D. Minn. 1986) ("[T]he trustee or debtor in possession may assume or reject an executory contract or unexpired lease by clearly communicating in an unequivocal manner its intentions to either assume or reject to the lessor. The trustee or debtor-in-possession must manifest an unconditional and unambiguous decision.").

18.     Maximization of the value of the Deltak Debtors depends in large measure on their ability to relieve themselves from burdensome contracts and to keep their post-petition costs of administration to a minimum. For these reasons, the Debtors by this Motion provide notice of their intent to reject the Port Westward Contract. In accordance with applicable law, this provision of notice should be sufficient to enable such rejection to become effective as of the date of this Motion, notwithstanding the actual date of entry of any order approving rejection.

### Notice

19.     Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the Senior Lenders, counsel to the Creditors' Committee, counsel to the Equity Committee, Cornetech, and all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

20.     Pursuant to Rule 7.1.2(a) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, incorporated by reference into Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and because there are no novel issues of law presented in the Motion, the Debtors waive their right to file a brief in support of this Motion.

21.     No previous motion for the relief sought herein has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the

relief requested herein and (ii) granting the Debtors such other and further relief as the Court

deems just and proper.

Dated:   Wilmington, Delaware
         November 15, 2006

THE BAYARD FIRM

By: _____
    Jeffrey M. Schlerf (No. 3047)
    Eric M. Sutty (No. 4007)
    Mary E. Augustine (No. 4477)
    222 Delaware Avenue, Suite 900
    Wilmington, Delaware 19801
    (302) 655-5000

        -and-

    Thomas E Lauria
    Frank L. Eaton
    Matthew C. Brown
    WHITE & CASE LLP
    Wachovia Financial Center
    200 South Biscayne Boulevard, 49th Floor
    Miami, Florida 33131
    (305) 371-2700

    Attorneys to the Debtors and
    Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| Debtors. | Jointly Administered |
| | Re: Docket No. __ |

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 365 FOR AUTHORITY TO REJECT THE CORMETECH PORT WESTWARD CONTRACT

Upon the motion, dated November 15, 2006 (the "Motion"), of Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), for entry of an order pursuant to sections 105 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") authorizing the Debtors to reject the Port Westward Contract[1] with Cormetech, Inc. ("Cormetech") nunc pro tunc to the date of the Motion; and it appearing that the Court has jurisdiction over this matter; and it appearing that notice of the Motion as set forth therein is sufficient, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, the Port Westward Contract is rejected nunc pro tunc to November 15, 2006; and it is further

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or in relation to the implementation of this Order.

Dated:   Wilmington, Delaware
         November __, 2006

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT N

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
|  | Jointly Administered |
| Debtors. | Re: Docket No. 320 |

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 365 FOR AUTHORITY TO REJECT THE CORMETECH PORT WESTWARD CONTRACT

Upon the motion, dated November 15, 2006 (the "Motion"), of Global Power Equipment Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), for entry of an order pursuant to sections 105 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") authorizing the Debtors to reject the Port Westward Contract[1] with Cormetech, Inc. ("Cormetech") nunc pro tunc to the date of the Motion; and it appearing that the Court has jurisdiction over this matter; and it appearing that notice of the Motion as set forth therein is sufficient, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, the Port Westward Contract is rejected nunc pro tunc to November 15, 2006; and it is further

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect

to all matters arising from or in relation to the implementation of this Order.

Dated:    Wilmington, Delaware
          November 17, 2006

_____
UNITED STATES BANKRUPTCY JUDGE

2

D488

# EXHIBIT O

JS 44 (Rev. 12/96)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS - (PETITIONERS/APPELLANTS)<br>MITSUBISHI POWER SYSTEMS AMERICAS, INC. | DEFENDANTS (APPELLEES)<br>GLOBAL POWER EQUIPMENT GROUP, INC., ET AL. |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY) |
| (c) ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)<br><br>(SEE ATTACHED) | ATTORNEYS (IF KNOWN)<br><br>(SEE ATTACHED) |

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal<br>Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal<br>Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☒ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor Mgmt Relations<br>☐ 730 Labor Mgmt Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☒ 890 Other Statutory Actions |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
EMERGENCY REQUEST FOR EXPEDITED CONSIDERATION OF APPEAL OF BANKRUPTCY COURT ORDER OF THE HONORABLE BRENDAN L. SHANNON OF NOVEMBER 6, 2006.

| VII. REQUESTED IN<br>COMPLAINT: | CHECK IF THIS IS A CLASS ACTION<br>☐ UNDER F.R.C.P. 23 | DEMAND: | CHECK YES only if demanded in complaint:<br>JURY DEMAND: ☐ YES ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE BLS    DOCKET NUMBER 06-11045 UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| DATE<br>11/08/06 | SIGNATURE OF ATTORNEY OF RECORD | Marc J. Phillips (No. 4445) |
|---|---|---|

| FOR OFFICE USE ONLY<br>RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

D489

**ATTACHMENT TO CIVIL COVER SHEET**

Attorneys for Mitsubishi Power Systems Americas, Inc.
CONNOLLY BOVE LODGE & HUTZ LLP
Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141 (telephone)
(302) 658-0380 (facsimile)
mphillips@cblh.com

-and-

STEPTOE & JOHNSON LLP
Filiberto Agusti, Esq.
Joshua R. Taylor, Esq.
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)
fagusti@steptoe.com
jrtaylor@steptoe.com


Attorneys for Global Power Equipment Group, Inc., *et al.*
THE BAYARD FIRM
Jeffrey M. Schlerf (No.3047)
Eric M. Sutty (No. 4007)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 4477
Wilmington, Delaware 19801
(302) 655-5000

-and-

WHITE & CASE LLP
Thomas E. Lauria, Esq.
John K. Cunningham, Esq.
Gerard Uzzi, Esq.
Matthew C. Brown, Esq.
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

#498318v1

D490

JS 44 Reverse
(Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      (a) Plaintiffs – Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.      Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.      Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.      Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.      Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.      Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.      Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

D491

ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL POWER EQUIPMENT GROUP | ) | Case No. 06-11045 |
| INC., *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### NOTICE OF APPEAL

Mitsubishi Power Systems Americas, Inc. ("MPS"), a creditor of Debtor, Deltak, LLC

("Debtor" or "Deltak"), appeals under 28 U.S.C. § 158(a) from the ruling of the bankruptcy

judge with respect to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 For an

Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam

Generation Business Segment Operated By the Deltak Debtors, (II) Reject Certain Executory

Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion

of Work in Progress [Docket No. 12] and MPS' Corrected Limited Opposition By Mitsubishi

Power Systems Americas, Inc., To Debtors' Motion to Reject Certain Executory Contract

[Docket No. 159] rendered in open court on November 6, 2006.

The names of all parties to the judgment, order, or decree appealed from and the names,

address, and telephone numbers of their respective attorneys are as follows:

D492

**Debtor:**

Jeffrey M. Schlerf
Eric M. Sutty
Mary E. Augustine
The Bayard Firm
222 Delaware 19801

Thomas E. Lauria
Gerard Uzzi
Matthew C. Brown
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131

**Official Committee of Unsecured Creditors:**

Adam G. Landis
Kerri K. Mumford
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware 19899

Jeffrey S. Sabin
Adam C. Harris
David M. Hillman
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

**U.S. Trustee:**

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

**Cormetech, Inc.:**

Ian Connor Bifferato
Chad J. Toms
1308 Delaware Avenue
Wilmington, Delaware 19899

D493

Gregory J. Mascitti
Nixon Peabody LLP
1300 Clinton Square
Rochester, NY 14604

Dated: November 7, 2006
        Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

-and-

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 261-0658 (facsimile)
Counsel for Mitsubishi Power Systems
Americas, Inc.

#498426v1

D494

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 7th day of November, 2006, I caused a true and correct copy of the Notice of Appeal to be served in the manner as indicated upon the following counsel.

**BY HAND DELIVERY**

The Honorable Brendan L. Shannon
824 Market Street
6th Floor
Wilmington, DE 19801

Jeffrey M. Schlerf, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Stuart M. Brown, Esq.
William E. Chipman, Jr., Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

Joseph McMahon, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

**BY TELEFAX AND U.S. MAIL**

Matthew C. Brown, Esq.
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, FL 33131

Howard L. Siegel, Esq.
Brown Rudnick Berlack Israels LLP
City Place I
185 Asylum Street
Hartford, CT 06103

Steven D. Pohl, Esq.
John C. Elstad, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111

Thomas S. Kiriakos, Esq.
Matthew Wargin, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker
Chicago, IL 60606-4637

Edward S. Weisfelner, Esq.
Brown Rudnick Berlack Israels LLP
7 Times Square
New York, NY 10036

Jeffrey S. Sabin, Esq.
David M. Hillman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 1022

Marc J. Phillips

498384

## File an Appeal:

<u>06-11045-BLS Global Power Equipment Group Inc.</u>
Type: bk                                    Chapter: 11 v
Judge: BLS                                  Assets: y

Office: 1 (Delaware)
Case Flag: MEGA, PlnDue,
DsclsDue, LEAD, CLMSAGNT

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Phillips, Marc J. entered on 11/7/2006 at 3:16 PM EST and filed on 11/7/2006
**Case Name:**          Global Power Equipment Group Inc.
**Case Number:**        <u>06-11045-BLS</u>
**Document Number:** <u>270</u>

**Docket Text:**
Notice of Appeal *Related to Docket Nos. [12] and [159] Regarding Ruling Rendered in Open Court of November 6, 2006.* Fee Amount $255. (related document(s)[195] ) Filed by Mitsubishi Power Systems Americas, Inc.. Appellant Designation due by 11/17/2006. (Attachments: # (1) Certificate of Service) (Phillips, Marc)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Documents and Settings\mew\Desktop\1463301 Notice of Appeal.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=11/7/2006] [FileNumber=5291904-0]
[0cb65693f8c88f5d1a1c65e042a286cbe68f7c7605a0b02091bdaa98ec1a983cc616
ecf0d1ad92cdbda3ac508053a6d381930966c720ea07ec31866ea3ace5c6]]
**Document description:**Certificate of Service
**Original filename:**C:\Documents and Settings\mew\Desktop\1463301 Certificate of Service NOA.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=11/7/2006] [FileNumber=5291904-1]
[6981f9c1214a1935a88d4096617cd2712cd6da134a51712e41ec043f12a753ed899d
ac23c54ddbd9f7e48729620e294cff2aaaef59d64a8f19344275029d759d]]

**06-11045-BLS Notice will be electronically mailed to:**

Mary E. Augustine    bankserve@bayardfirm.com,
maugustine@bayardfirm.com;tmatthews@bayardfirm.com

Sarah Beckett Boehm    sboehm@mcguirewoods.com, dfoley@mcguirewoods.com

John Y. Bonds    jbonds@shannongracey.com

Charles J. Brown    cbrown@harvpenn.com

Matthew C. Brown    mbrown@whitecase.com

Catherine M. Campbell    ccampbell@fczlaw.com

William E. Chipman    wchipman@eapdlaw.com

Tobey M. Daluz    daluzt@ballardspahr.com

John D. Demmy    jdd@stevenslee.com

Mark E. Felger    mfelger@cozen.com, jschwartz@cozen.com

David B. Galle    dgalle@oppenheimer.com

Joseph H. Huston Jr.    jhh@stevenslee.com

James H. Joseph    jjoseph@mcguirewoods.com

Ivan Lerer Kallick    ikallick@manatt.com

Adam G. Landis    landis@lrclaw.com

Kathleen M. Miller    kmiller@skfdelaware.com, tlc@skfdelaware.com

Stephen M. Miller    smiller@morrisjames.com

Sheryl L. Moreau    deecf@dor.mo.gov

Kerri K Mumford    mumford@lrclaw.com, girello@lrclaw.com;adams@lrclaw.com

Marc J. Phillips    mphillips@cblh.com

Malka S. Resnicoff    mresnicoff@whitecase.com

Kathryn D. Sallie    bankserve@bayardfirm.com, ksallie@bayardfirm.com

Jeffrey M. Schlerf    bankserve@bayardfirm.com, jschlerf@bayardfirm.com

Jeffrey M. Schlerf    bankserve@bayardfirm.com, jschlerf@bayardfirm.com

William H. Schwarzschild, III    tschwarz@williamsmullen.com

William David Sullivan    ECF@williamdsullivanllc.com

Eric Michael Sutty    bankserve@bayardfirm.com, esutty@bayardfirm.com

Andrew Vance Tenzer    atenzer@shearman.com, jikja.chung@shearman.com;sspevak@shearman.com

Christina Maycen Thompson   cthompson@cblhlaw.com

Chad Joseph Toms   cjt@bgbblaw.com

United States Trustee   USTPREGION03.WL.ECF@USDOJ.GOV

**06-11045-BLS Notice will not be electronically mailed to:**

BNSF Railway Company
Attn: Angela Chilcutt
2400 Western Center Blvd.
Fort Worth, TX 76131

CWY Credit Bankruptcy Department
Con-Way Freight
5555 Rufe Snow Drive
Suite 5515
North Richland Hills, TX 76180

Certain Equity Security Holders
,

Conner & Winters
,

FPL Energy Seabrook LLC
,

HILCO Receivables LLC Assignee of Popular Club by eCAST Settlement Corporation as its agent
POB 35480
Newark, NJ 07193-5480

Philip J. Kochman
Kochman, Donati & Charbonnet, L.L.P.
12012 Wickchester
Suite 310
Houston, TX 77079

Lydall Filtration/Separation, Inc.
PO Box 1960
134 Chestnut Hill Rd
Rochester, NH 03867

Office of Unemployment Compensation Tax Services, Department of Labor and Industry,
Commonwealth of Pennsylvania
1171 S. Cameron St., Rm 312
Harrisburg, PA 17104-2513

Glenn M. Reisman
Two Corporate Drive
P.O. Box 861

Shelton, CT 06484-0861

Stolper W. Stolper
Stafford Rosenbaum LLP
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784

The Bayard Firm

,

The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19801

Unifrax Corporation
2351 Whirlpool Street
Niagara Falls, NY 14305-2413

D499

# EXHIBIT P

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., *et. al.*, | Case No. 06-11045 |
| Debtors. | Jointly Administered |
| MITSUBISHI POWER SYSTEMS AMERICAS, INC. | |
| Appellant, | Civil Action No. _____ |
| v. | |
| DELTAK, LLC | |
| Appellee. | |

**EMERGENCY MOTION FOR EXPEDITED ACTION ON THE APPEAL OF THE
BANKRUPTCY COURT'S NOVEMBER 6, 2006 ORDER**

Appellant Mitsubishi Power Systems Americas, Inc. ("MPS" or "Appellant") has

appealed under 28 U.S.C. § 158(a)(1) from a ruling rendered by the Honorable Brendan L.

Shannon, Bankruptcy Judge in open court, on November 6, 2006, granting the motion of one of

the Debtors, Deltak, LLC ("Deltak"), to reject executory contracts, while denying MPS' Limited

Opposition thereto wherein MPS requested that the Court order Deltak to assign Deltak's

catalyst subcontracts to MPS.

MPS has filed this appeal on an emergency basis and hereby requests expedited action

pursuant to Bankruptcy Rule 8011(d) on the ground that, to avoid irreparable harm, relief is

D500

needed in less time than would normally be taken by the District Court to consider a bankruptcy appeal, and in support thereof avers as follows:

### Procedural Background

1.  On or about September 29, 2006, Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress [Docket No. 12] (the "Rejection Motion") was filed.

2.  Pursuant to the Rejection Motion, Deltak, sought to reject, *inter alia*, a Purchase Agreement for Heat Recovery Steam Generator and Auxiliaries for the Port Westward Generating Facility by and between MPS and Deltak (the "Port Westward HRSG Contract").

3.  On or about October 24, 2006, the Corrected Limited Opposition of Mitsubishi Power Systems Americas, Inc. to Debtor's Motion to Reject Certain Executory Contracts (the "Limited Opposition").[1] MPS urged prompt rejection, but conditioned on the assignment of catalyst subcontracts it needs imminently for construction of a power plant in Oregon.

4.  On November 1, 2006, the Bankruptcy Court conducted a hearing on the Rejection Motion and Limited Opposition.

5.  At the hearing, MPS presented evidence that:

    a.  the Catalysts to be supplied under the Port Westward HRSG Contract were completed and ready to be shipped by Deltak's subcontractor

    b.  the Catalysts were custom-designed for the Port Westward Contract

---

[1] On October 23, 2006, MPS filed its Limited Opposition of Mitsubishi Power Systems Americas, Inc. to Debtor's Motion to Reject Certain Executory Contracts, however to correct some formatting errors which occurred during the filing process, on October 24, 2006 MPS filed the corrected Limited Opposition.

- 2 -

    c.  there was no other use for the Catalysts

    d.  massive damages would be incurred by MPS if the Catalysts were not delivered to MPS by December 15, 2006.

    e.  Packing and delivering the Catalysts would take up to three weeks.

6.    On November 6, 2006, Judge Shannon rendered an oral opinion in open court. Judge Shannon found:

    a.  The Catalysts were specialized.

    b.  There was no secondary market for the Catalysts

    c.  The Catalysts had value only to MPS

    d.  MPS would incur massive damages if the Catalysts were not delivered by December 15, 2006.

7.    Having made those findings, Judge Shannon ordered that the Port Westward HRSG Contract would be rejected *nunc pro tunc* to the petition date. Despite finding that MPS would face massive damages without relief, Judge Shannon denied MPS' request that Deltak be required to assign the subcontracts related to the Catalysts to MPS because he felt that, as a matter of law, such relief was unavailable under the Bankruptcy Code.

## Factual Background

8.    If relief is not granted to MPS such that the Catalysts are delivered by December 15, 2006, MPS will face massive damages or be compelled to pay Deltak an extortionate "ransom" for the custom-designed parts.

9.    MPS sells and services electrical power generating equipment and systems in the United States.[2] MPS purchases turbines from its Japanese affiliates, purchases related equipment

---

[2] Affidavit of Richard Boukal [Docket No. 156], ¶ 3.

D502

– including HRSGs – from other suppliers, and delivers integrated power generation systems to its customers for construction.[3]

10.     On September 3, 2004, MPS entered into a Power Island Equipment Purchase Agreement for Port Westward Generating Facility By and Between Portland General Electric Company ("PGE") and Mitsubishi Power Systems, Inc. (the "Port Westward Project Contract").[4]

11.     For the Port Westward power plant, still under construction, MPS agreed to supply a power generation system to PGE that includes a "G" Class combustion turbine generator, a steam turbine generator, and HRSGs, including all necessary auxiliary equipment and materials.[5]

12.     Pursuant to the Port Westward HRSG Contract, Deltak agreed to supply MPS with a HRSG, including catalysts and all necessary auxiliary equipment and materials.[6] The HRSG is an integral part of the power generation system that MPS agreed to supply at Port Westward.[7] The power generation system will not function without a functioning HRSG.[8]

---

[3] *Id.* ¶ 4.

[4] Port Westward Project Contract, at p. 5, attached as Exhibit 3 hereto (filed under seal pursuant to Order Authorizing the Filing of Certain Contracts and Schedules Under Seal [Docket No. 194] ("Seal Order")). The Port Westward Project Contract was then assigned by Portland General Electric to Black & Veatch Construction, Inc. Affidavit of Richard Boukal, ¶ 5.

[5] *Id.* at pp. 8, 17; Affidavit of Richard Boukal, ¶ 5.

[6] Port Westward HRSG Contract at pp. 8, 18, attached as Exhibit 4 hereto (filed under seal pursuant to Seal Order); Affidavit of Richard Boukal, ¶ 6.

[7] Affidavit of Richard Boukal, ¶ 7.

[8] *Id.*

D503

13.     Deltak entered into a subcontract with Cormetech to supply the NOx catalyst.[9] Deltak entered into a subcontract with BASF to supply the CO Catalyst.[10] Deltak also entered into other subcontracts related to the HRSG.[11]

14.     As of the petition date, Deltak had delivered virtually all of the HRSG equipment for the Port Westward Project except for the Catalysts. The HRSG is largely installed in the facility.[12]

15.     Cormetech and BASF have completed the manufacturing of the Catalysts and they are ready to ship to the installation site.[13] But neither Cormetech nor BASF are obligated to ship their respective Catalysts unless someone pays them in full.[14]

16.     The Catalysts are necessary for commissioning and testing of the Port Westward gas turbine.[15] Unless the Catalysts are paid for, delivered to Oregon and properly installed, commissioning and testing will be delayed.[16]

17.     Both Catalysts are custom-designed for the HRSG currently installed at the Port Westward facility.[17] Because of the time required to manufacture this custom designed product,

---

[9] *Id.* ¶ 10.

[10] *Id.* ¶ 11.

[11] *Id.* ¶ 12. A list of the relevant subcontractors is attached as Exhibit 1 hereto (filed under seal pursuant to Seal Order).

[12] *Id.,* ¶ 8.

[13] *Id.* ¶ 13.

[14] *Id.* ¶ 18.

[15] *Id.* ¶ 9.

[16] *Id.* ¶ 19.

[17] *Id.* ¶ 13.

D504

MPS cannot acquire replacement catalysts in time to perform its obligations under the Port Westward Project Contract.[18] This custom design also prevents Deltak from selling the Catalysts to another buyer without substantial modifications.[19]

18.    If MPS fails to deliver a major component of the system on or before December 15, 2006, MPS faces at least potential claims for equipment delay liquidated damages of $25,000 a day, escalating to $30,000 a day after 30 days, $50,000 a day after 60 days, and $75,000 a day after 120 days.[20] Along with the HRSG, the catalyst for the reduction of post-combustion nitric oxide ("NOx") and the catalyst for the reduction of carbon monoxide ("CO") and associated parts (collectively, the "Catalysts") are collectively considered a Major Component under the Port Westward Project Contract.[21]

19.    The Port Westward HRSG Contract specifies that if Deltak fails to deliver a Major Component of the HRSG by December 15, 2006, Deltak faces at least equipment delay liquidated damages of $25,000 a day, escalating to $30,000 a day after 30 days, escalating to $50,000 a day after 60 days, and $75,000 a day after 120 days.[22] The Catalysts are a Major Component under the Port Westward HRSG Contract.[23]

---

[18] *Id.* ¶ 14.

[19] *Id.* ¶ 16.

[20] Port Westward Project Contract, ¶ 20.2.5(b).  In noting the risk of such claims, MPS in no way concedes liability for any liquidated damages.

[21] *Id.*, Exhibit D-2 at p. 3.

[22] Port Westward HRSG Contract, ¶ 20.2.5(a).

[23] *Id.*, Exhibit D-2 at p. 2.

D505

20.    The project schedule anticipates 23 weeks for the ordering, manufacturing, and delivery of the NOx catalyst from Cormetech.[24]  The project schedule also shows 23 weeks for ordering, manufacturing, and delivery of the CO catalyst from BASF.[25]  Therefore, even if MPS re-ordered the NOx catalyst and the CO catalyst on the day after the November 1 hearing, it could not meet the December 15, 2006 scheduled delivery date.  MPS would face a minimum equipment delay liquidated damages of $5,175,000 under the Port Westward Project Contract for the Catalysts.[26]

### Relief Requested

21.    Since the necessary timeline for delivery of critical components already has been put in jeopardy, urgent action is required.

22.    The critical relief MPS requested from the Bankruptcy Court consisted of specific performance of provisions of the contract intended to govern in the circumstance of nonperformance of the contract's core substantive provisions.  These provisions would allow the assignment of subcontracts to MPS, which would enable MPS to ensure the delivery of critical

---

[24] Deltak Progress/Fabrication Schedule for Port Westward Project, dated January 4, 2006, at p. 19, attached as Exhibit 2 hereto (filed under seal pursuant to Seal Order).

[25] *Id.*

[26] Both Catalysts comprise a single Major Component as defined under the Port Westward Project Contract.  Delay in delivery of this Major Component is subject to equipment delay liquidated damages.  There are approximately 6 weeks between the November 1, 2006, hearing on the Rejection Motion and the December 15, 2006, scheduled delivery date.  Thus, there would be an additional 17 weeks of exposure for equipment delay liquidated damages beyond the scheduled delivery date.  For the first 30 days, equipment delay liquidated damages would total $750,000 ($25,000 x 30).  For the following 30 days, equipment delay liquidated damages would total $900,000 ($30,000 x 30). For the following 60 days, equipment delay liquidated damages would total $3,000,000 ($50,000 x 60).  For the following 7 days, equipment delay liquidated damages would total $525,000 ($75,000 x 7), giving a total of $5,175,000.

- 7 -

components for the projects. Such delivery would avoid massive damages (both to MPS and Deltak), at no harm to the Debtor or Estate.

23.    The Bankruptcy Court acknowledged that it was undisputed that the current situation would result in massive damages. Nonetheless, the Court entered an order denying the relief of specific performance, ruling that it had no authority to do so under the governing law. MPS respectfully disagrees with the Bankruptcy Court and appeals this ruling.

24.    MPS proposes the following expedited appeal schedule.

    a.  Appellant's brief shall be filed by 12:00 noon, Monday, November 13, 2006

    b.  Debtor's brief shall be filed by 5:00 pm, Friday November 17, 2006.

    c.  Appellant's reply, if any, shall be filed by 10:00 am , Monday, November 20, 2006.

    d.  Hearing scheduled for Tuesday, November 21, 2006.

25.    The briefing schedule is appropriate because the issues already have been briefed by the parties in the bankruptcy court and therefore should not require extensive additional time to brief them on appeal.

26.    The grounds for the relief requested in this appeal were presented to the bankruptcy court. No new grounds are presented on appeal.

27.    The names, addresses and phone numbers of the counsel for the interested parties is attached hereto as Exhibit A.

28.    Pursuant to D. Del. LR 7.1.1, prior to the filing of this motion, the undersigned counsel for MPS attempted to contact counsel for Deltak LLC regarding the substance of this motion.

- 8 -

WHEREFORE, MPS respectfully requests that this Court conduct an emergency review of the Bankruptcy Court's denial of MPS' motion.

Dated: November 8, 2006
      Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Marc J. Phillips (No. 4445)
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141 (telephone)
(302) 658-0380 (facsimile)
mphillips@cblh.com

-and-

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)
fagusti@steptoe.com
jrtaylor@steptoe.com
Counsel for Mitsubishi Power Systems Americas, Inc.

#498676v1

- 9 -

D508

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., *et. al.*, | Case No. 06-11045 |
| Debtors. | Jointly Administered |
| MITSUBISHI POWER SYSTEMS AMERICAS, INC. | |
| Appellant, | Civil Action No. _____ |
| v. | |
| DELTAK, LLC | |
| Appellee. | |

### ORDER

AND NOW, this ____ day of _____, 2006, upon consideration of Appellant's Emergency Motion for Expedited Action in the Appeal of the Bankruptcy Court's November 6, 2006 Order, and any responses thereto, it is hereby ORDERED that the motion is GRANTED.

A hearing on the underlying appeal is hereby scheduled for Tuesday, November 21, 2006.

Appellant's brief shall be filed by 12:00 noon, Monday, November 13, 2006.

Debtor's brief shall be filed by 5:00 pm, Friday November 17, 2006.

Appellant's reply, if any, shall be filed by 10:00 am , Monday, November 20, 2006.

BY THE COURT:

_____
                                                        J.

#498683v1

D509

## Exhibit A

Addresses and Phone Numbers for Counsel for Interested Parties.


**Debtor:**

Jeffrey M. Schlerf
Eric M. Sutty
Mary E. Augustine
The Bayard Firm
222 Delaware 19801
(302) 655-5000

Thomas E. Lauria
Gerard Uzzi
Matthew C. Brown
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

**Official Committee of Unsecured Creditors:**

Adam G. Landis
Kerri K. Mumford
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware 19899
(302) 467-4400

Jeffrey S. Sabin
Adam C. Harris
David M. Hillman
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

D510

**U.S. Trustee:**

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
302-573-6491

**Cormetech, Inc.:**

Ian Connor Bifferato
Chad J. toms
1308 Delaware Avenue
Wilmington, Delaware 19899
(302) 429-1900

Gregory J. Mascitti
Nixon Peabody LLP
1300 Clinton Square
Rochester, NY 14604
(585) 263-1123

**Mitsubishi Power Systems Americas, Inc.:**

Marc J. Phillips (No. 4445)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)

- 11 -

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
|  | ) | Bankruptcy Case No. 06-11045 |
| GLOBAL POWER EQUIPMENT | ) | Jointly Administered |
| GROUP INC., *et al.*, | ) |  |
| Debtors. | ) |  |
|  | ) |  |
| MITSUBISHI POWER SYSTEMS | ) |  |
| AMERICAS, INC., | ) | Civil Action No. 06-687 |
| Appellant, | ) |  |
|  | ) |  |
| v. | ) | Appeal from the United States Bankruptcy |
|  | ) | Court for the District of Delaware |
| DELTAK, LLC, | ) | (The Hon. Brendan L. Shannon) |
| Appellee. | ) |  |

**BRIEF OF APPELLANT
MITSUBISHI POWER SYSTEMS AMERICAS, INC.**

Marc J. Phillips (No. 4445)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141

Filiberto Agusti
Greg Yates
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)

*Counsel for Appellant
Mitsubishi Power Systems Americas, Inc.*

November 13, 2006

D512

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

JURISDICTION ............................................................................................................... 1

ISSUE PRESENTED AND STANDARD OF REVIEW ................................................... 1

STATEMENT OF THE CASE ......................................................................................... 1

SUMMARY OF ARGUMENT ......................................................................................... 5

STATEMENT OF FACTS ................................................................................................ 8

ARGUMENT .................................................................................................................. 16

I.   The Bankruptcy Court's Ruling That Specific Performance Is Not Permitted Under The
     Bankruptcy Code Was Incorrect As A Matter Of Law ......................................... 16

II.  MPS Is Entitled To Specific Performance Of The Assignment Covenant Under Oregon Law ..... 25

III. Section 365 Is Not Intended to Be a Leverage Tool For Debtors ........................... 29

IV.  Because Time Is Of The Essence, This Court Should Order The Requested Relief ........ 33

CONCLUSION ............................................................................................................... 33

D513

# TABLE OF AUTHORITIES

## CASES

*Airline Pilots v. Continental Airlines*, 125 F.3d 120 (3d Cir. 1997).................................................22, 23, 24

*In re Armstrong World Industrial*, 432 F.3d 507 (3d Cir. 2005) ..................................................................1

*Association of Public-Safety Communications Officials-International v. F.C.C.*,
    76 F.3d 395 (D.C. Cir. 1996)...................................................................................................................30

*Belleville v. Davis*, 498 P.2d 744 (Or. 1972).....................................................................................................26

*Chemical Ltd. v. Slim-Fast Nutritional Foods*, 350 F. Supp. 2d 582 (D. Del. 2004)......................................25

*In re Drexel Burnham Lambert Grp.*, 138 B.R. 687 (Bankr. S.D.N.Y. 1992) .................................................16

*In re Fleishman*, 138 B.R. 641, 648 (Bankr. D. Mass. 1992)............................................................................27

*In re General Datacomm Industrial*, 309 B.R. 848 (D. Del. 2004)....................................................................1

*Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889 (8th Cir. 1944)............................................................22, 28

*Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043 (4th Cir. 1985)..................................19, 22

*Ohio v. Kovaks*, 469 U.S. 274 (1989).......................................................................................................22, 23, 24

*Paullus v. Yarbrough*, 347 P.2d 620 (Or. 1959)...............................................................................................26

*Pittenger Equip. Co. v. Timber Structures, Inc.*, 217 P.2d 770 (Or. 1950) ....................................................26

*Sir Speedy, Inc. v. Morse*, 256 B.R. 657 (D. Mass. 2000)................................................................ 16-22, 24, 27

*In re Taylor*, 913 F.2d 102 (3d Cir. 1990).........................................................................................................1

*In re The Ground Round, Inc.*, 335 B.R. 253 (1st Cir. B.A.P. 2005) ........................... 16-19, 21, 22, 24, 25

*In re Torwico Electronics*, 8 F.3d 146 (3d Cir. 1993) ......................................................................................24

*In re Walnut Associates*, 145 B.R. 489 (Bankr. E.D. Pa. 1992) ................................................... 16-22, 24

*In re West Chestnut Realty*, 177 B.R. 501 (Bankr. E.D. Pa. 1995) ...........................................17, 21, 22, 25

D514

## STATUTES AND RULES

11 U.S.C. § 365 ............................................................................................................................*passim*

28 U.S.C. § 157(b)..........................................................................................................................1

28 U.S.C. § 158(a)(1) ......................................................................................................................1

28 U.S.C. § 1334 .............................................................................................................................1

Or. Rev. Stat. Ann. § 72.7160(1) & cmt. 2 (West 2006)......................................................25, 26

Fed. Bankr. R. 4001(b) .................................................................................................................13

Fed. Bankr. R. 8002(a) ...................................................................................................................1

## MISCELLANEOUS

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*,
    59 U. Colo. L. Rev. 845, 931 (1988).........................................................................................16

D515

## JURISDICTION

Appellee Deltak, LLC's motion to reject its contract with Appellant Mitsubishi Power

Systems Americas, Inc., was a core bankruptcy proceeding under 28 U.S.C. § 157(b). The Bank-

ruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334. The Bankruptcy Court's order

allowing rejection of the contract, and denying Mitsubishi's objection seeking assignment of Del-

tak's subcontracts, was a final order.[1] This Court has appellate jurisdiction under 28 U.S.C.

§ 158(a)(1). The final order (R.289) was docketed November 9, 2006. Mitsubishi's notice of

appeal (R.270), filed November 7, 2006, was timely under Fed. Bankr. R. 8002(a).

## ISSUE PRESENTED AND STANDARD OF REVIEW

This appeal presents a single issue of law under the Bankruptcy Code:

> Where a debtor's executory contract contains a remedial covenant spe-
> cifically intended to govern the relationship between the parties after the
> contract ends, may a Bankruptcy Court condition the debtor's rejection
> of the contract on specific performance of that covenant, where the cove-
> nant imposes no burden, cost, or substantive obligation to perform on the
> debtor, but failure to perform the covenant would severely harm both the
> counterparty to the contract and the bankruptcy estate?

The Bankruptcy Court denied relief because it believed the Code did not permit specific

performance of such a covenant.[2] Whether the Code allows such relief is a question of law, re-

viewed *de novo*.[3]

## STATEMENT OF THE CASE

Appellant Mitsubishi Power Systems America ("MPS" or "Mitsubishi") manufactures

and distributes power generation systems for electric utilities. MPS contracted with Debtor Del-

tak LLC ("Deltak"), for Deltak to manufacture and deliver a major component of a cogeneration

---

[1] *See In re Taylor*, 913 F.2d 102, 104 (3d Cir. 1990).

[2] R.293 (11/6/2006 Tr.) at 13-14.

[3] *See, e.g., In re Armstrong World Indus.*, 432 F.3d 507, 511 (3d Cir. 2005); *In re General Datacomm Indus.*, 309 B.R. 848, 851 (D. Del. 2004).

1

D516

power system called a Heat Recovery Steam Generator (or "HRSG"), for installation at a new power plant in Oregon.[4] Deltak, in turn, contracted with two subcontractors for the manufacture and delivery of two major components of the HRSG called "Catalysts," which remove pollutants from the HRSG's exhaust output.[5] The contract between MPS and Deltak provides that in the event of Deltak's default, Deltak will assign its subcontracts to MPS.[6]

HRSGs and Catalysts are massive pieces of custom-designed equipment, that are useful only for the specific applications for which they were designed—in this instance, installation at the new Oregon power plant. In this case, the HRSG has largely been completed and delivered. The only remaining major pieces to be delivered are the Catalysts, which have been completed by the subcontractors and are awaiting delivery.[7] The subcontractors have no obligation to release the Catalysts for delivery until they have been paid by Deltak.

On September 28, 2006, Deltak, along with its parent and affiliates, filed for Chapter 11 reorganization, with the stated intention of winding down and terminating Deltak's HRSG business.[8] On September 29, 2006, Deltak moved to reject its HRSG contract with MPS under Bankruptcy Code § 365.[9] MPS consented to immediate rejection, but asked the Bankruptcy Court to require, as a condition of rejection, that Deltak perform its covenant to assign the Catalyst sub-

---

[4] As its name suggests, a Heat Recovery Steam Generator recovers heat from the exhaust of the power plant's main turbines, and uses that heat to generate additional electricity. R.264 (11/1/2006 Tr.) at 84 (Thangiah).

[5] R.264 (11/1/2006 Tr.) at 85, 90 (Thangiah).

[6] R.159 Ex.4 ¶¶ 29.2.2, 29.2.3 (under seal) (Purchase Agreement For Heat Steam Generator And Auxiliaries For The Port Westward Generating Facility ("HRSG Purchase Agreement")).

[7] R.264 (11/1/2006 Tr.) at 32 (Ehm); *id.* at 91, 100-01 (Thangiah); *id.* at 117 (Boukal).

[8] R.1 (Petition).

[9] R.12 ¶ 26 (Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress ("Rejection Motion")).

2

D517

contracts to MPS.[10]

Because of their custom design, the Catalysts have no commercial value to anyone other than MPS.[11] None of Deltak, the bankruptcy estate, or the subcontractors has any other ready purchaser for the Catalysts. At the same time, if MPS does not take on-time delivery of the Catalysts, which are completed and awaiting shipment, then MPS' customer, Portland General Electric ("PGE"), will face needless delay in construction of its power plant, and MPS will face massive damages claims from PGE and its prime contractor, including but not limited to escalating liquidated damages of tens of thousands of dollars per day. The bankruptcy estate will also incur massive damages, not only to MPS for failure to deliver the Catalysts on time, but also to the subcontractors for failure to purchase them. All of these harms may be avoided, at no cost whatsoever to Deltak or the bankruptcy estate, by assignment of the subcontracts, which would allow MPS to purchase the Catalysts directly from the subcontractors.

Deltak nonetheless opposed assigning the Catalyst subcontracts to MPS, because of its stated desire to extract additional value from MPS in exchange for turnover of the Catalysts. Deltak proposed a "HRSG Completion Plan" under which MPS could complete its purchase of the Catalysts from Deltak, at a price far in excess of the contract price, conditioned on MPS' waiving all claims under the HRSG contract, including any indemnity or warranty claims against Deltak or the subcontractors.[12] The value of the demanded waivers, while incalculable due to the unknowable future warranty claims, was conceivably in the millions of dollars.[13] After MPS rejected that demand, Deltak instead demanded $1.85 million in cash—more than three times the

---

[10] R.212 at 9-10 (Corrected Limited Opposition by Mitsubishi Power Systems Americas, Inc., to Debtors' Motion to Reject Certain Executory Contracts ("Limited Opposition")).

[11] See R.293 (11/6/2006 Tr.) at 14-16 (Bankruptcy Court findings).

[12] R.264 (11/1/2006 Tr.) at 120 (Boukal); R.159 Ex. 5 (under seal).

[13] The prime contractor has already asserted millions of dollars of claims based on Deltak's allegedly inadequate performance.

D518

remaining contract price.[14] Deltak explained to the Bankruptcy Court that it desired to complete its sale and delivery to MPS, "but on terms favorable to the Debtors, their estates and creditors."[15] The Bankruptcy Court acknowledged that Deltak's goal was to "maximize [its] leverage in its negotiations with Mitsubishi."[16] In other words, Deltak, which has no commercial use or value for the Catalysts other than sale to MPS, refuses to assign the subcontracts solely so that it can try to extract additional value from MPS. To do this, Deltak is willing to hold up delivery of the completed Catalysts, delay the completion of PGE's power plant, and court massive liquidated damages claims against its estate, in the hope that MPS, facing similarly massive liquidated damages claims from PGE, will pony up additional cash.

The Bankruptcy Court found these facts were essentially undisputed.[17] It further recognized the dangerous game of "chicken" Deltak was engaged in.[18] The court declined to require assignment of the subcontracts, however, because it believed that such specific performance of the covenant to assign was not permitted under the Bankruptcy Code:

> [W]hile I understand the business and economic considerations that give rise to Mitsubishi's request, neither Bankruptcy Code Section 365 or applicable case law . . . mandates or even permits specific performance here.[19]

Because time was of the essence to the parties, the court read its ruling into the record at a November 6, 2006 hearing, without any written opinion.[20] The court followed with a short written order on November 9, 2006.[21]

---

[14] R.264 (11/1/2006 Tr.) at 122 (Boukal).

[15] R.212 at ¶ 12. (Debtor's Reply to the Corrected Limited Opposition by Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts.

[16] R.293 (11/6/2006 Tr.) at 151.

[17] R.293 (11/6/2006 Tr.) at 14-16.

[18] R.264 (11/1/2006 Tr.) at 145.

[19] R.293 (11/6/2006 Tr.) at 13 (bench ruling).

[20] R.293 (11/6/2006 Tr.) at 10-11.

[21] R.291 (Order Approving Rejection of Mitsubishi HRSG Purchase Agreement).

D519

## SUMMARY OF ARGUMENT

Rejection of a contract under Bankruptcy Code § 365 does not void or terminate the contract. Instead, rejection amounts to a breach of the contract pre-petition. § 365(g). Even after rejection, the parties' rights and obligations to one another remain, except that for any required payments, the non-breaching party is relegated to the remedies of a general unsecured creditor. For remedies that may not be reduced to payment, specific performance remains available if authorized by applicable state law.

Like all complex construction contracts, MPS's contract with Deltak contains continuity provisions intended to govern the relation of the parties in the event of the subcontractor's default. One such provision requires Deltak, upon demand, to assign its subcontracts to MPS. Such assignment, contemplated by the parties at the time of the agreement, provides for orderly transition and completion of the work, without delay, and allows the parties to minimize further damages flowing from the breach. Importantly, such assignment would *not* require Deltak to perform any of its substantive obligations under the contract—*i.e.*, Deltak would not be required to take any steps to deliver the already—completed Catalysts, or provide technical advice in connection with their attachment to the HRSGs. Nor would Deltak be required to pay any money. MPS asks for assignment so that MPS, with no further action or payment by Deltak, can take any steps and make any payments necessary to take delivery of the completed Catalysts from the subcontractors. In short, assignment of the subcontract would impose no burden whatsoever on the bankruptcy estate. On the contrary, assignment would benefit the estate and all of its creditors, by preventing the accrual of millions of dollars in liquidated damages claims against Deltak, both from MPS and from the Catalyst subcontractors.

Despite these clear facts, the Bankruptcy Court denied specific performance of the covenant to assign the subcontracts, because it believed such specific performance was not permitted

5

D520

under the Bankruptcy Code.[22] This ruling was legal error. Case law under § 365 distinguishes between specific performance of core substantive obligations under executory contracts, and performance of covenants intended to govern the subsequent relation of the parties after the end of the contractual relationship. The former would burden the estate, whereas performance of the remedial provisions here would impose no burden or cost. Where such a remedial provision does not call for payment by the debtor, bankruptcy law allows specific performance if specific performance would be permitted by applicable state law.

In this case, Oregon law governs the contract. Under Oregon law, MPS may obtain specific performance of the covenant to assign if it governs unique goods that cannot be obtained *at the time needed* on the open market. Here, the Bankruptcy Court found that the Catalysts are custom designed for the Oregon power plant for which they were ordered, and have no other commercial value or use. Because of their custom design and the long lead time required for their order and manufacture, they cannot be currently purchased anywhere else—they are not off-the-shelf items.[23] The Bankruptcy Court ruled that, despite their custom nature, the Catalysts are not "unique" items, because it was possible to re-manufacture them, though at extensive delay and massive cost (due to the millions in liquidated damages that would accrue in the interim). The Bankruptcy Court overlooked, however, that the subcontracts for which MPS seeks assignment are not for the mere *purchase* of the Catalysts. They also require the *timely delivery* of these custom-designed, custom-built pieces of equipment. Because the Catalysts cannot be readily purchased in the open market *in timely fashion*, they are sufficiently "unique" that the Bankruptcy Court may order specific performance of the covenant to assign the Catalyst subcontracts under Oregon law.

---

[22] R.293 (11/6/2006 Tr.) at 13.

[23] R.264 (11/1/2006 Tr.) at 99 (Thangiah).

6

Finally, the Bankruptcy Court ruled that "the availability of easily calculated money damages" was "fatal to Mitsubishi's request for specific performance."[24] But money damages are not a barrier to specific performance of delivery of unique goods under Oregon law. Nor can money damages fully compensate Mitsubishi (or its customer, Portland General Electric) for the *delay* caused by Deltak's refusal to assign the subcontracts. The Bankruptcy Court's analysis was based on the *liquidated* damages MPS stood to suffer if it had to delay completion of the Oregon power plant while it re-ordered new Catalysts. But Mitsubishi's harms are not so limited. Under the contract's default provisions, Mitsubishi may be responsible for currently incalculable *actual* damages caused by its delay in performance, over and above the liquidated damages considered by the lower court (to the extent that the actual damages exceed the liquidated sums).[25]

The Bankruptcy Court's syllogistic reasoning—that damages would be available, ergo specific performance is not—is inconsistent with Oregon law and has unfortunate consequences. In the circumstances presented, it will, in the Bankruptcy Court's words, induce a game of economic "chicken," which law otherwise prevents in international commerce. If the covenant to assign is enforced, it costs Deltak and the estate nothing. Deltak need only sign a piece of paper; Mitsubishi will take care of (and pay for) the rest. This *non-pecuniary* remedy allows Mitsubishi to do what is sensible and orderly: to pay for and take delivery of the completed Catalysts (which have no other use or value), and to complete the PGE job without loss to any party. By allowing Deltak to reject its contract with Mitsubishi while refusing to assign the Catalyst subcontracts, the court allows a situation where Deltak's refusal will require Mitsubishi either to commission new Catalysts, resulting in massive losses to itself and the estates, or to pay "ransom" for the ones that

---

[24] R.293 (11/6/2006 Tr.) at 14.

[25] R.159 Ex.3 (under seal) (Power Island Equipment Purchase Agreement For Port Westward Generating Facility by and between Portland General Electric Company and Mitsubishi Power Systems, Inc. ("PGE Contract")) ¶¶ 29.1.12, 29.3.

D522

are already made, and subject itself to further ransom demands on other contracts.

By refusing assignment, and threatening mutually destructive losses, Deltak openly seeks to extract extra value from Mitsubishi for an asset that has great value to Mitsubishi but no longer has any value at all to the estate or any other purchaser. Section 365, allowing rejection of executory contracts, was enacted to allow debtors to make economically rational decisions to terminate burdensome contracts. It was not enacted to be used as a leverage tool, so that debtors may shake down vulnerable creditors who have great need for unique assets in the hands of the debtor that are otherwise commercially worthless. This sort of behavior—exploiting a unique asset to extract unbargained-for value—is a precise instance for which the specific performance remedy exists. If Section 365 rejection means that customary assignment and takeover provisions in construction contracts are unenforceable, then any subcontractor in bankruptcy who possesses a critical project component will have the ability to hold up any construction project, no matter how complex, until its demands are met.

The contract date on which the Catalysts must be delivered to the Oregon job site is December 15, 2006. It will take 3 weeks to deliver them from their current locations (in Alabama and upstate New York)—meaning that Mitsubishi must know by November 22 (the day before Thanksgiving) whether it may take assignment of the completed Catalysts, or must choose between ransoming its parts or ordering new ones. In light of the urgent need for decision, this Court should reverse and remand with instructions to issue forthwith an order requiring specific performance forthwith of the covenant to assign.

## STATEMENT OF FACTS

1. Appellant Mitsubishi Power Systems, Inc. (MPS) is the Western Hemisphere power systems sales and service subsidiary of Mitsubishi Heavy Industries, Inc. (Japan). MPS builds power generation systems: gas, steam, hydroelectric, wind, and geothermal turbines, as well as

D523

auxiliary generation systems.[26] MPS purchases the generation turbines from its Japanese affiliates and purchases related major system components from other suppliers. It delivers these components to its customers for construction as integrated power generation systems.[27] MPS also offers project management services for the design and construction of power plants.[28]

2. This case concerns contracts for two major components for a power plant installation in Oregon: a Heat Recovery Steam Generator, or "HRSG," and two "Catalysts," which are components of the HRSG designed to reduce its pollution output.

3. On September 3, 2004, MPS entered into a Power Island Equipment Purchase Agreement for Port Westward Generating Facility with Portland General Electric Company ("PGE").[29]

4. In that contract, MPS agreed to supply a power generation system to PGE consisting of a "G" Class combustion turbine generator, a steam turbine generator, and a HRSG, along with all necessary auxiliary equipment and materials.[30] The Port Westward Generating Facility is currently under construction.[31]

5. On September 3, 2004, MPS also entered into a Purchase Agreement for Heat Recovery Steam Generator and Auxiliaries for the Port Westward Generating Facility with Deltak, LLC ("Deltak").[32]

6. Under that contract, Deltak agreed to supply MPS with a HRSG, including catalysts

---

[26] R.156 ¶ 3 (Boukal Aff.).

[27] R.156 ¶ 4 (Boukal Aff.).

[28] R.156 ¶ 3 (Boukal Aff.); *see also* R.264 (11/1/2006 Tr.) at 85-86 (Thangiah).

[29] R.159 Ex.3 (under seal) (PGE Contract). The PGE Contract was then assigned by Portland General Electric to Black & Veatch Construction, Inc. R.156 ¶ 5.

[30] R.159 Ex.3 at 8, 17 (under seal) (PGE Contract).

[31] R.156 ¶ 5 (Boukal Aff.).

[32] R.159 Ex.4 (under seal) (HRSG Purchase Agreement); R.156 ¶ 6 (Boukal Aff.).

D524

and all necessary auxiliary equipment and materials.[33] Because the power generation system will not function without an operational HRSG, the HRSG is an integral part of the system that MPS agreed to supply at Port Westward.[34]

    7. Deltak entered into various subcontracts related to the HRSG, including but not limited to a subcontract with Cormetech, Inc. ("Cormetech") to supply a catalyst for the reduction of post-combustion nitric oxide ("NOx"), and a subcontract with BASF Catalysts, LLP ("BASF") to supply a catalyst for the reduction of carbon monoxide ("CO").[35]

    8. The HRSG Purchase Agreement between MPS and Deltak contains remedy provisions specifying the parties' rights if a party defaults. One of those provisions requires Deltak, upon demand, to assign to MPS the outstanding subcontracts on the job:

> 29.2.2 If requested by Purchaser [MPS], Supplier [Deltak] shall withdraw from the Job Site, *assign to Purchaser such of Supplier's subcontracts and vendor contracts as Purchaser may request* . . . , and Purchaser may take possession of any and all designs, materials, Equipment, tools, purchase orders, correspondence, schedules, submittals, and facilities of Supplier which are on the Job Site or have been delivered to Purchaser or have been prepared by Supplier or any Subcontractor in connection with the Agreement; and
>
> 29.2.3 Purchaser, without incurring any liability to Supplier, shall have the right (either with or without the use of Supplier's materials, Equipment, tools and instruments) to have the obligations of this Agreement finished, whether by enforcing its rights pursuant to the Guaranty *or otherwise.*[36]

The Bankruptcy Court expressly found that MPS had a contractual right to assignment.[37]

    9. Along with the HRSG, the NOx and CO catalysts and their associated parts (the "Catalysts") are collectively considered a Major Component under the PGE Contract and the

---

[33] R.159 Ex.4 at 8, 18 (under seal) (HRSG Purchase Agreement); R.156 ¶ 6 (Boukal Aff.).

[34] R.156 ¶ 7 (Boukal Aff.).

[35] R.156 ¶¶ 10-12 (Boukal Aff.).

[36] R.159 Ex.4 ¶¶ 29.2.2, 29.2.3 (emphasis added) (under seal) (HRSG Purchase Agreement).

[37] R.293 (11/6/2006 Tr.) at 13.

D525

HRSG Purchase Agreement.[38]

10. The "Equipment Delay Liquidated Damages Clause" of the PGE Contract states that should MPS fail to deliver a Major Component of the system on or before December 15, 2006, it faces potential claims for liquidated damages at the rate of $25,000 per day of delay for the first 30 days, $30,000 per day after 30 days, $50,000 per day after 60 days, and $75,000 per day after 120 days.[39] If the delay is significant enough, MPS may be found in default under the PGE Contract and would be liable to PGE for costs in excess of the contract price that MPS incurred in having the equipment supplied, plus "all the additional reasonable internal expenses incurred" by PGE as a result of MPS' default.[40]

11. Similarly, the HRSG Purchase Agreement specifies that if Deltak fails to deliver a Major Component of the HRSG by December 15, 2006, Deltak faces potential equipment delay liquidated damages of $25,000 per day for the first 30 days, $30,000 per day after 30 days, $50,000 per day after 60 days, and $75,000 per day after 120 days.[41]

12. On September 28, 2006, Global Power Equipment Group, Inc., and its affiliated debtors and debtors in possession (collectively, the "Debtors"), including Deltak, filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

13. As of the filing of its bankruptcy petition, Deltak had delivered nearly all of the HRSG equipment for the Port Westward Project except for the Catalysts. Thus, the installation of the HRSG in the facility is almost completed.[42]

---

[38] R.159 Ex.4 at Exhibit D-2 p.3 (under seal); R.156 ¶ 9 (Boukal Aff.).
[39] R.159 Ex.3 ¶ 20.2.5(b) (under seal) (PGE Contract). In noting the risk of such claims, MPS in no way concedes liability for any liquidated damages.
[40] R.159 Ex.3 ¶ 29.1.12, 29.3 (under seal) (PGE Contract).
[41] R.159 Ex.4 ¶ 20.2.5(b) (under seal) (HRSG Purchase Agreement).
[42] R.156 ¶ 8 (Boukal Aff.).

D526

14. The Catalysts, however, are necessary for commissioning and testing the Port Westward gas turbine.[43] As such, unless the Catalysts are paid for, delivered to the site, and properly installed by December 15, 2006, commissioning and testing will be delayed.[44]

15. Cormetech and BASF have manufactured the Catalysts and are prepared to ship them to the installation site.[45] Neither Cormetech nor BASF, however, is obligated to ship its respective catalyst unless and until it is paid in full.[46]

16. The Catalysts are custom-designed for the HRSG currently installed at the Port Westward Facility.[47] The manufacture of custom catalysts is necessarily time intensive. As a result, it is not possible for MPS to acquire replacement catalysts in time to perform its obligations under the PGE Contract.[48] Moreover, the Catalysts' custom design proscribes Deltak's ability to sell them to another buyer.[49] The Bankruptcy Court found:

> I also note the largely unrebutted and convincing testimony of Mr. [Thangiah] establishes that there is no secondary market for these catalysts, and that it is highly unlikely that they could be sold for use in another plant. Again, the uncontradicted testimony is that these catalysts are custom designed, both for the power plant and to comply with local environmental regulations. Mr. [Thangiah] testified convincingly that installation of these catalysts in a HRSG at another plant was highly unlikely, both on account of different environmental standards, and because the HRSG is engineered to operate at precise pressures that would almost certainly be adversely affected by a non-customized catalyst array.
>
> . . . .
>
> Consequently, the record before the Court shows that the catalysts have value only to Mitsubishi, and that if the catalyst is not installed in the Port Westward facility, the catalysts will likely have only scrap value for the es-

---

[43] R.156 ¶ 9 (Boukal Aff.).

[44] R.156 ¶ 19 (Boukal Aff.).

[45] R.156 ¶ 14 (Boukal Aff.).

[46] R.156 ¶ 18 (Boukal Aff.).

[47] R.156 ¶ 13 (Boukal Aff.).

[48] R.156 ¶ 14 (Boukal Aff.).

[49] R.156 ¶ 16 (Boukal Aff.).

D527

tate. Correspondingly, Mitsubishi will have a massive damages claim against the debtor.[50]

17. According to the project schedule, 23 weeks are anticipated from the date of order to the date of delivery of either catalyst from either manufacturer.[51] As a result, it is now impossible for MPS to satisfy the December 15, 2006 delivery date if it must order replacements.[52] Accordingly, unless the completed Catalysts are delivered, MPS will face millions of dollars in equipment delay liquidated damages under the PGE Contract.[53]

18. On September 29, 2006, the Debtors, including Deltak, filed emergency motions in the Bankruptcy Court requesting authorization to use Cash Collateral[54] and authority to pay critical vendors and subcontractors of the Debtors.[55] The Debtors, however, did not seek authority to pay critical vendors with respect to its HRSG business. As a result, the Court entered an Interim Cash Collateral Order on October 2, 2006, stating that "no payments be made to critical vendors and/or subcontractors of . . . Deltak."[56]

---

[50] R.293 (11/6/2006 Tr.) at 14-15.

[51] R.159 Ex.2 at 19 (under seal) (Deltak Progress/Fabrication Schedule for Port Westward Project).

[52] Even if MPS had ordered the Catalysts immediately after its November 1, 2006 hearing before the Bankruptcy Court, it would not have been able to meet its scheduled deadline.

[53] R.159 Ex.3 at ¶ 20.2.5(b) (under seal) (PGE Contract).

[54] R.10 (Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 552 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure for (A) Emergency Relief (I) Authorizing the Use of Cash Collateral, (II) Finding that the Senior Lenders' Interests, or that of Any Other Party Which Is Purportedly Secured, Are Adequately Protected, and/or (III) Authorizing the Debtors to Surcharge Collateral, and (IV) Granting Related Relief; and (B) Scheduling Interim and Final Hearings Regarding the Same ("Cash Collateral Motion")).

[55] R.11 (Debtors' Motion for Authority to Pay Subcontractors and Vendors of the Williams Debtors in the Ordinary Course of Business); R.13 (Debtors' Motion for Authority to Pay Certain Critical Subcontractors and Vendors of the Specialty Boilers Business Segment Operated by the Deltak Debtors); R.14 (Debtors' Motion for Authority to Pay Certain Critical Subcontractors and Vendors of the Braden Debtors).

[56] R.40 (Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 552 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Use of Cash Collateral, and (II) Granting Related Relief ("Interim Cash Collateral Order")).

D528

19. To facilitate delivery of the completed Catalysts, MPS offered to assume all of Deltak's obligations to Cormetech, BASF, and any other Catalyst-related subcontractors, in return for an assignment of those subcontracts to MPS, per the specific remedy and warranty provisions contained in the HRSG Purchase Agreement.[57] In order to avoid imposing any burden on the estate, MPS assumed responsibility for attachment of the Catalysts to the HRSG and other steps for completion of the HRSG without any further technical assistance from Deltak.[58]

20. Deltak declined that offer, proposing instead a "HRSG Completion Program,"[59] under which MPS would have to agree:

    a.    to waive Deltak's indemnity obligations and liability for any damages under the Port Westward HRSG Contract.[60]

    b.    that warranty obligations, equipment performance guarantee obligations, and indemnity obligations are excluded from the definition of "unperformed obligations" under the Contract.[61]

    c.    to reimbursement Deltak's actual costs of personnel, materials, and facilities, as well as it out-of-pocket costs and expenses incurred in completing the HRSG project.[62]

    d.    to solicit Deltak's consent to the assignment of an existing purchase order with a subcontractor.[63]

    e.    to pay the cost and expense of the performance of Deltak's obligations under the Contract.[64]

    f.    to waive any rejection damages claims in connection with the Contract upon completion of the work.[65]

    g.    that equipment and services would be provided on an "as-is, where-is"

---

[57] R.156 ¶ 20 (Boukal Aff.).

[58] R.156 ¶ 17 (Boukal Aff.).

[59] R.159 Ex.5 at ¶ 1.1 (under seal) (HRSG Completion Program).

[60] R.159 Ex.5 at ¶ 1.2 (under seal) (HRSG Completion Program).

[61] R.159 Ex.5 at ¶ 1.2 (under seal) (HRSG Completion Program).

[62] R.159 Ex.5 at ¶ 1.5 (under seal) (HRSG Completion Program).

[63] R.159 Ex.5 at ¶ 1.5 (under seal) (HRSG Completion Program).

[64] R.159 Ex.5 at ¶ 2.1 (under seal) (HRSG Completion Program).

[65] R.159 Ex.5 at ¶ 2.1 (under seal) (HRSG Completion Program).

D529

basis.[66]

21. MPS refused to accept such terms and continued to seek from Deltak an assignment of the subcontracts for the Catalysts and parts held for shipment by various vendors.

22. After MPS' refusal of the "HRSG Completion Program," Deltak offered to release the Catalysts for a cash payment of $1.85 million. This sum is more than three times the remaining amount owed on the contract.[67]

23. On September 29, 2006, the Debtors filed a motion ("Rejection Motion") seeking authority, *inter alia*, to reject HRSG Purchase Agreement *nunc pro tunc* to the date of the motion.[68] The Debtors also requested that they be permitted to wind down the HRSG business.[69]

24. On October 3, 2006, the Bankruptcy Court issued an order granting the Debtor's Rejection Motion in part. Specifically, the Court "authorized and empowered [the Debtors] to wind down the HRSG Business operations and affairs."[70] The Court also set a hearing on the Debtor's proposed rejection of, *inter alia*, the HSRG Purchase Agreement for October 26, 2006.[71]

25. On October 24, 2006, MPS filed a Limited Opposition to the Debtors' Rejection Motion, asserting that (a) the HRSG Purchase Agreement should be rejected immediately or MPS would oppose rejection on *a nunc pro tunc basis* and (b) the rejection must be conditioned on the specific remedy and warranty provisions contained in the contract, including the assignment of Deltak's subcontracts with Cormetech, BASF, and any other Catalyst-related suppliers to MPS.[72]

---

[66] R.159 Ex.5 at ¶ 3.2 (under seal) (HRSG Completion Program).

[67] R.264 (11/1/2006 Tr.) at 122 (Boukal).

[68] R.12 ¶ 26 (Rejection Motion).

[69] *Id.*

[70] R.85 at 2. (Order Granting in Part Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order Authorizing Debtors to (I) Wind Down Operations of the Heat Recovery Steam Generation Business Segment Operated by the Deltak Debtors, (II) Reject Certain Executory Contracts in Connection Therewith, and (III) Implement Procedures for the Orderly Completion of Work in Progress ("Rejection Order")).

[71] *See id.*

[72] R.159 at 9-10 (Corrected Limited Opposition by Mitsubishi Power Systems Americas,
(Continued ...)

D530

26. The Court held an evidentiary hearing on November 1, 2006, at which additional evidence relating to the above facts was adduced.[73]

27. At a subsequent hearing on November 6, 2006, the Bankruptcy Court announced its ruling, approving rejection of the HRSG Purchase Agreement *nunc pro tunc*, and denying MPS's request for relief.[74] Because time was of the essence to the parties, rather than write a written opinion, the judge read his ruling into the record.[75]

28. The Bankruptcy Court subsequently issued a written order on November 9, 2006, confirming its ruling.[76] This appeal followed.

## ARGUMENT

The parties agreed that their contract was executory, and that it should be rejected immediately.[77] They differ, however, on MPS's demand that Deltak be required to specifically perform its covenant to assign the uncompleted Catalyst subcontracts to MPS.

## I.    The Bankruptcy Court's Ruling That Specific Performance Is Not Permitted Under The Bankruptcy Code Was Incorrect As A Matter Of Law

Deltak's rejection of its executory contract under Code § 365 does not void or terminate the contract.[78] Instead, under § 365(g), "the rejection of an executory contract ... constitutes a breach of such contract ...."[79] "Accordingly, the rights and obligations of the parties remain intact after a rejection because 'rejection does not change the substantive rights of the parties to the

---

Inc., to Debtors' Motion to Reject Certain Executory Contracts ("Limited Opposition")).

[73] R.264 (11/1/2006 Tr.).

[74] R.293 (11/6/2006 Tr.) at 9-16.

[75] R.293 (11/6/2006 Tr.) at 9-10.

[76] R.289 (Order on Motion as to the Port Westward Project).

[77] R.264 (11/1/2006 Tr.) at 14; R.293 (11/6/2006 Tr.) at 12.

[78] *In re The Ground Round, Inc.*, 335 B.R. 253, 261 (1st Cir. B.A.P. 2005) (citing cases); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. Colo. L. Rev. 845, 931 (1988) ("[R]ejection does not cancel, repudiate, or terminate contracts.").

[79] § 365(g); *accord Ground Round*, 335 B.R. at 261; *Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 659 (D. Mass. 2000); *In re Walnut Assocs.*, 145 B.R. 489, 494 (Bankr. E.D. Pa. 1992) (citing *In re Drexel Burnham Lambert Grp.*, 138 B.R. 687, 700-09 (Bankr. S.D.N.Y. 1992)).

D531

contract, but merely means the bankruptcy estate itself will not become a party to it.'"[80]  To the

extent the breach creates a claim for payment, that claim can be processed in the bankruptcy pro-

ceeding, on the same basis as the debtor's general unsecured creditors.[81]  The breach

> also means that, *unless specific performance is available to the non-debtor party under applicable state law*, the debtor cannot be compelled to render its performances under the contract. *However, if state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it.*[82]

Here, Deltak's rejection of the HRSG Purchase Agreement constitutes a pre-petition

breach  § 365(g)  The HRSG Purchase Agreement, like most complex construction contracts,

contains remedy provisions that specify what happens in event of breach, *i.e.*, default.  One of

those customary provisions requires a contractor like Deltak, upon request, to assign to the con-

tractor to whom it owes its obligations—here, MPS—all subcontracts and all purchase orders on

the job.[83]  MPS may also order Deltak to cease performance and vacate the Job Site, so that MPS

can take over the Job Site, including any designs, materials, equipment, tools, and purchase or-

ders, among other things, in order to complete the job.[84]  Such assignment and takeover provi-

sions are common in construction contracts in complex projects such as power plants.  They al-

low the non-breaching contractor to take over performance from the breaching subcontractor, in

order to mitigate damages and ensure completion of the job in an orderly and minimally damag-

ing fashion.  Without such transition provisions, the failure of any one of dozens of minor con-

tractors on a power project could throw a billion dollar power plant off schedule.

---

[80] *Ground Round*, 335 B.R. at 261 (quoting Andrew, *supra* note 78, at 848-49); *accord Sir Speedy*, 256 B.R. at 659; *Walnut Assocs.*, 145 B.R. at 494.

[81] *Ground Round*, 335 B.R. at 261; *Walnut Assocs.*, 145 B.R. at 494.

[82] *Walnut Assocs.*, 145 B.R. at 494; *accord Ground Round*, 335 B.R. at 261; *In re West Chestnut Realty*, 177 B.R. 501, 506 (Bankr. E.D. Pa. 1995).

[83] R.159 Ex.4 ¶ 29.2.2 (under seal) (HRSG Purchase Agreement).

[84] *Id*.

D532

In its limited opposition to Deltak's motion to reject, MPS invoked this remedial provision, and asked the Bankruptcy Court to condition Deltak's rejection of the HRSG contract on performance of the remedial covenant to assign the Catalyst subcontracts to MPS. Such assignment, which would require no substantive performance or payment by Deltak, would allow MPS to mitigate its damages from Deltak's breach of the HRSG Purchase Agreement, by proceeding to the orderly completion of the Port Westward Project. MPS offered to pay all sums outstanding to the Catalyst subcontractors (which is well above what MPS owed on the remaining contract price), and to pay all expenses and take all steps to ensure delivery, so that Deltak would not be burdened or have to undertake any substantive performance.[85] The Catalyst subcontractors, in turn, have completed manufacture of the Catalysts, and stand ready to deliver them.[86]

Deltak, however, refuses to assign the subcontracts, as required by the HRSG Purchase Agreement, unless MPS conveys additional unearned value, above and beyond either the contract price or the cost to complete. Deltak first demanded complete waivers of any future claims under the HRSG Purchase Agreement, including indemnification or warranty claims.[87] After MPS refused, Deltak demanded instead $1.85 million in cash—more than three times the amount owing on the contract.[88] Because the respective rights of the parties remain the same after rejection of the contract,[89] Deltak has no basis on which to demand such extra value or such waiver of MPS's claims. Deltak nonetheless seeks leverage for its demands by withholding the Catalysts—which, as custom-designed equipment, have only scrap value to anyone other than MPS.

---

[85] R.156 ¶ 20 (Boukal Aff.).

[86] R.293 (11/1/2006 Tr.) at 100-01 (Thangiah).

[87] Statement of Facts, *supra*, ¶ 20; R.159 Ex.5 (under seal) (HRSG Completion Program).

[88] Statement of Facts, *supra*, ¶ 22; R.264 (11/1/2006 Tr.) at 122 (Boukal).

[89] *Ground Round*, 335 B.R. at 261 (quoting Andrew, *supra* note 78, at 848-49); *accord Sir Speedy*, 256 B.R. at 659; *Walnut Assocs.*, 145 B.R. at 494.

D533

Objecting to such behavior by Deltak, MPS asked the Bankruptcy Court to order specific

performance of the covenant to assign the Catalyst subcontracts. The Bankruptcy Court rejected

MPS's request, out of the belief that such specific performance was not permitted under the

Bankruptcy Code:

> Mitsubishi has the contractual right to require assignment, but that's not the
> issue. The issue is whether to specifically enforce that contractual right or
> limit Mitsubishi to damages if the debtor[]s breach the contract by refusing
> assignment. And while I understand the business and economic considera-
> tions that give rise to Mitsubishi's request, neither Bankruptcy Code Section
> 365 or applicable case law, including that cited by Mitsubishi, mandates *or
> even permits* specific performance here.[90]

The Bankruptcy Court's belief that the Code does not permit specific performance of an assign-

ment provision such as that here was legal error.

Although a debtor in bankruptcy cannot be compelled to perform its core substantive ob-

ligations under an executory contract if such performance would impede reorganization or burden

the estate,[91] a number of bankruptcy courts, in this Circuit and elsewhere, have recognized that a

non-debtor can obtain specific performance of a covenant in a rejected contract, where the cove-

nant concerns not the contract's core obligations but rather the relation of the parties in the event

of breach.[92]

For instance, in *Sir Speedy, Inc. v. Morse,*[93] the rejected contract was a print shop fran-

chise agreement that contained a non-compete clause, under which the debtor agreed not to oper-

ate a competing business within five miles of his franchise location for a year after termination.

One week before filing for bankruptcy, the franchisee debtor "removed all the Sir Speedy signs

---

[90] R.293 (11/6/2006 Tr.) at 13.

[91] *See Lubrizol Enters. v. Richmond Metal Finishers,* 756 F.2d 1043, 1047 (4th Cir. 1985).

[92] Whether specific performance is available is a matter of the state law governing the contract. *See Ground Round,* 335 B.R. at 261; *Walnut Assocs.,* 145 B.R. at 494; Part II, *infra.*

[93] 256 B.R. 657 (D. Mass. 2000).

19

from his store ... and began operating under the name 'Morse Printing.'"[94]  On Sir Speedy's motion to enforce its non-compete clause, the bankruptcy court ruled that the § 365 rejection of the franchise agreement terminated Morse's obligations.[95]  The district court reversed.  Relying on a string of precedents enforcing non-compete clauses against bankruptcy debtors, the court held that Morse remained bound by the non-compete requirement, notwithstanding his rejection of the franchise agreement under § 365.  The court noted that

> [a]lthough Morse, in rejecting the Franchise Agreement, also rejected the covenant not to compete, *the very purpose of the covenant is to govern the relationship between the parties after the demise of the underlying contract.* The Trustee's rejection of the Franchise Agreement did not, therefore, constitute a 'termination' of that agreement.[96]

In *In re Walnut Associates*,[97] the disputed contract was a settlement agreement ending earlier litigation between the parties.[98]  The settlement agreement did not require payments from the bankruptcy debtor—rather, it required payments from the other party *to the debtor.*[99]  "The Debtor [was] required to do several things [under the settlement], the most important of which [was] to refrain from continuing to pursue the Saidels in further litigation ...."[100]  The debtor sought a declaration that its rejection of the settlement contract made its covenant not to sue unenforceable, but the bankruptcy court ruled the provision remained enforceable notwithstanding the bankruptcy.[101]  The court emphasized that in determining whether a covenant in a rejected con-

---

[94] *Id.* at 658.

[95] In an earlier round of litigation, the bankruptcy court first held that Sir Speedy's "right to enforce the non-compete agreement was a 'claim' like any other to be pursued under § 101(5)(B) of the Bankruptcy Code."  The district court reversed, "holding that the breach of a non-compete agreement does not give rise to a right of payment and thus is not a 'claim' under § 101(5)(B)." *Id.*

[96] *Id.* at 660 (emphasis added).

[97] 145 B.R. 489 (Bankr. E.D. Pa. 1992).

[98] *Id.* at 492.

[99] *Id.* at 495.

[100] *Id.*

[101] *Id.*

D535

tract could be subject to specific performance, the dispositive inquiry was not whether the contract was executory, but rather whether specific performance would be allowed under state law.[102]

In *In re West Chestnut Realty*,[103] the executory contract at issue was a stock option agreement which permitted the non-debtor party to purchase an interest in the debtor's landfill.[104] Noting that because the stock option agreement gave the non-debtor an interest in land, which is the quintessential legal right that is "unsusceptible to the calculation of monetary damages," the bankruptcy court ordered specific performance under Pennsylvania law.[105]

Most recently, in *In re Ground Round, Inc.*,[106] the Bankruptcy Appellate Panel for the First Circuit addressed a request for specific performance of a provision directing transfer of a liquor license. The debtor's unexpired lease for business premises was rejected under § 365, and the lease required, in the event of breach, that the lessee (debtor) reconvey the liquor license for the premises back to the lessor.[107] Following the holdings in *Walnut Associates* and *Sir Speedy* that rejection did not terminate the lease's remedial provision, and that specific performance was available if allowed under state law, the appellate panel ruled that "because the liquor license is an inherently 'unique' asset, specific performance [of the retransfer obligation] is a remedy available under Pennsylvania law."[108]

*Ground Round*, *Sir Speedy*, *Walnut Associates*, and *West Chestnut* establish that when a debtor rejects (*i.e.*, breaches) a contract, bankruptcy courts can and do exercise their equitable powers to order specific performance of post-termination remedial portions of rejected contracts,

---

[102] *Id.*

[103] 177 B.R. 501 (Bankr E.D. Pa. 1999).

[104] *Id.* at 503.

[105] *Id.* at 506. (citing and following *Walnut Assocs.*, 145 B.R. at 494).

[106] 335 B.R. 253 (B.A.P. 1st Cir. 2005).

[107] *Id.* at 257.

[108] *Id.* at 262.

D536

if specific performance is available under governing state law.

Other cases denying specific performance under rejected contracts address concerns over imposing undue burdens on the bankruptcy estate. The bulk of them involve refusals to order specific performance of the debtor's core substantive obligations under the rejected contract.[109] Courts refuse to enforce such core performance obligations because they would, as a practical matter, impose the same burdens on the debtor as the contract it has ostensibly rejected, defeating the purpose of § 365 rejection.[110] Such burdens have been deemed inappropriate as interfering with the debtor's reorganization.[111] And courts have particularly refused to impose burdens through specific performance where such performance would effectively impose an obligation to pay money, again circumventing the intent of rejection.[112]

These holdings are unremarkable under existing bankruptcy law. But they do not address enforcement of nonsubstantive, remedial covenants intended to adjust the parties' relations when the contract's substantive provisions have failed. The *Sir Speedy*, *Walnut Associates*, and *Ground*

---

[109] *See, e.g., Lubrizol*, 756 F.2d at 1047 (refusing specific performance where enforcement of exclusive licensing agreement precluding debtor from selling or licensing metal coating technology was of a "core obligation" involving debtor's "principal asset"); *Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889, 894 (8th Cir. 1944) (refusing specific performance where enforcement would violate § 365 by allowing plaintiff "to obtain a preference over . . . other creditors").

[110] *See Airline Pilots v. Continental Airlines*, 125 F.3d 120, 135-36 (3d Cir. 1997) (refusing specific performance where enforcement of seniority integration clause in labor agreement would burden debtor by causing "disruption to the work environment, irreparable damage to work relationships, and hostility and animosity").

[111] *See Airline Pilots*, 125 F.3d at 135-36; *Lubrizol*, 756 F.2d at 1047 (specific performance of exclusive licensing agreement would interfere with reorganization because selling and licensing the technology at issue was debtor's "primary potential source of funds by which [it] might emerge from bankruptcy").

[112] *See Ohio v. Kovaks*, 469 U.S. 274, 283 (1989) (refusing specific performance where obligation imposed by injunction had been converted to obligation for money damages, *i.e.*, reimbursement for environmental cleanup); *Airline Pilots*, 125 F.3d at 136 (refusing specific performance where union filed proof of claim requesting money damages, bargaining agreement was silent as to remedies upon breach, and claim was satisfiable by the payment of money damages); *Jamison Coal*, 143 F.2d at 894 (refusing specific performance where enforcement was payment for bonds).

D537

*Round,* decisions show that courts will enforce remedial covenants adjusting the relations of the parties after breach, where specific performance is allowed under applicable state law.

The covenant that MPS seeks to enforce is not a claim for money. MPS does not seek enforcement of any payment obligation, or even any payment incidental to execution of its equitable remedy. MPS does not seek to have Deltak discharge its technical advice or delivery obligations under the Contract. Deltak is not being asked to pay a dime. Deltak is being asked to lift a pen and sign a piece of paper allowing MPS to deal with the subcontractors directly, in order to complete the Port Westward job in orderly fashion, using equipment that Deltak cannot use, cannot pay for, and cannot sell.

Deltak's obligation to assign the Catalyst subcontracts does not amount to enforcement of a claim for money. It is not like the employees' right to future pay and benefits contained in the seniority integration clause at issue in *Airline Pilots*:[113] The *Airline Pilots* court noted that the seniority integration provision was specifically intended to protect the pilots' rights to future compensation and benefits.[114] Indeed, the union there had filed a claim in bankruptcy for the obligation,[115] and had specifically sought back pay and front pay, *from the debtor,* for the affected pilots.[116] Here, the MPS/Deltak covenant to assign protects not a right to payment, but rather prevention of future harms through disruption of the PGE Port Westward completion schedule. MPS seeks nothing from Deltak but a signature, to prevent such prospective harms.

Nor is the covenant to assign here similar to the environmental cleanup injunction at issue in *Ohio v Kovacs,*[117] discussed in *Airline Pilots.*[118] As the Third Circuit pointed out in *Airline*

---

[113] 125 F.3d at 134-36.
[114] *Id.* at 134.
[115] *Id.* at 126.
[116] *Id.* at 134.
[117] 469 U.S. 274 (1985).
[118] 125 F 3d at 132.

23

D538

*Pilots*, the critical fact in *Kovacs* was the state's appointment of a receiver to take over the cleanup, which dispossessed the debtor of the property and the ability to comply with the injunction. After the receiver's takeover, "'[w]hat the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs.'"[119]  Here, MPS seeks not money, nor core performance, but rather performance of a ministerial remedial act to prevent imminent prospective harm.

MPS' request for specific performance is more like the regulatory cleanup obligation in *In re Torwico Electronics*,[120] also discussed in *Airline Pilots*. In *Torwico*, "the State was not demanding that Torwico pay money to it, but rather was requesting it to take action to ameliorate an ongoing hazard."[121]  "Thus, the state [was] not asserting a 'repackaged claim for damages'; rather there [was] an ongoing and continuing threat and … an obligation on the part of the debtor to 'ameliorate ongoing pollution ….'"[122]  Likewise here, MPS is not asserting a "repackaged claim for damages"; instead, it is seeking enforcement of a covenant in order to prevent future harm, *i.e.*, future delay and disruption of the Port Westward project.

The fact that future harms could *eventually* be compensated by some amount of money does not mean, *ex ante*, that covenanted-for actions to prevent such harms are tantamount to claims for payment. If that were so, the cases allowing specific performance of remedial covenants would come out differently. In *Ground Round*, the liquor license at issue, though specifically tied to the subject property, was not the only liquor license available. The landlord could, with significant effort and expense, have obtained another one. Similarly, in *Walnut Associates*, the amount by which the non-debtor civil defendants would have been damaged by violation of the debtor's covenant not to sue would have become known at some point, and could have been

---

[119] *Kovacs*, 469 U.S. at 283 *quoted in Airline Pilots*, 125 F.3d at 132.

[120] 8 F.3d 146 (3d Cir. 1993).

[121] *Airline Pilots*, 125 F.3d at 133.

[122] *Id.* (quoting *Torwico*, 8 F.3d at 150).

24

paid back. In *Sir Speedy*, if the breaching franchisee were permitted to compete in violation of his contract, the franchisor at some point could have made an estimate of its harms from such competition, and sued for their recompense. All of the above facts, however, did not mean that the equitable covenants those non-debtors sought to enforce were "reducible to claims for payment," such that specific performance was barred. If that were true, every equitable claim could be reduced to money, and no court could ever award specific performance. What was true in the above cases, however, is true here: the covenant at issue does not impose the burdens of a core performance obligation, but is instead intended to govern the relation of the parties after breach. In these circumstances, specific performance of the remedial covenant is available if authorized by state law.[123]

## II. MPS Is Entitled To Specific Performance Of The Assignment Covenant Under Oregon Law

In this case, the HRSG Purchase Agreement is governed by Oregon law.[124] Under Oregon law, MPS may obtain specific performance of the covenant to assign if it governs unique goods that cannot be obtained on the open market. Oregon's U.C.C. statute provides that "[a] judgment requiring specific performance may be entered *if the goods are unique or in other proper circumstances*."[125] The commentary to that statutory provision indicates that the definition of the term "unique goods" and "other proper circumstances" has broadened over time to take into account the realities of the modern market:

> In view of this Article's emphasis on the commercial feasibility of replacement, a new concept of what are "unique" goods is introduced under this sec-

---

[123] *See Ground Round*, 335 B.R. at 261; *West Chestnut*, 177 B.R. at 506; *Walnut Assocs.*, 145 B.R. at 494.

[124] *See* R.159 Ex. 4 ¶ 36.15 (under seal) (HRSG Purchase Agreement). Delaware choice-of-law rules generally give effect to contractual choice-of-law provisions. *See, e.g., Chemical Ltd. v. Slim-Fast Nutritional Foods*, 350 F. Supp. 2d 582, 595 (D. Del. 2004). Because the Port Westward facility is located in Oregon, there is reason to disturb this choice-of-law provision.

[125] Or. Rev. Stat. Ann. § 72.7160(1) (West 2006) (emphasis added).

25

tion. Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of *the total situation which characterizes the contract*. Output and requirements contracts *involving a particular or peculiarly available source or market* present today the typical commercial specific performance situation, as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases. However, *uniqueness is not the sole basis of the remedy under this section* for the relief may also be granted "in other proper circumstances" *and inability to cover is strong evidence of "other proper circumstances"*.[126]

Oregon case law contains several examples of courts recognizing specific performance a contract remedy.[127]

Here, the Catalysts fall neatly within the category of goods for which Oregon law mandates specific performance. First, it is undisputed that the Catalysts are designed exclusively for the specific Oregon power plant for which they were ordered.[128] As the Bankruptcy Court found, because of their custom design, the Catalyst are of absolutely no commercial value to anyone other than MPS:

> [t]he record before the Court shows that *the catalysts have value only to Mitsubishi*, and that if the catalyst is not installed in the Port Westward facility, *the catalysts will likely have only scrap value for the estate*.[129]

Moreover, the custom-manufactured Catalysts are not off-the-shelf items that can be readily purchased elsewhere. Because of the long lead time and custom design involved in the Catalysts' manufacture, MPS's ability to cover is severely restricted, as it cannot simply purchase Catalysts

---

[126] *Id.* comment 2 (emphasis added).

[127] *See, e.g., Belleville v. Davis*, 498 P.2d 744, 751 (Or. 1972) (in a case involving contract for sale of one-half interest in taxicab, upholding lower court's determination that specific performance was an appropriate remedy and noting that trial court had considered the one-half ownership interest "unique"); *Paullus v. Yarbrough*, 347 P.2d 620, 641 (Or. 1959) (awarding specific performance, taking into account scarcity of chattel among other factors); *Pittenger Equip. Co. v. Timber Structures, Inc.*, 217 P.2d 770, 777-80 (Or. 1950) (stating that plaintiff is entitled to specific performance if a damages award at law "would not be as perfect and complete a remedy," and also stating that specific performance is an appropriate remedy involving agreements to purchase specific chattel for a specific purpose that can only be fulfilled by the delivery of the chattel itself).

[128] R.293 (11/6/2006 Tr.) at 14-15 (Bankruptcy Court findings).

[129] R.293 (11/6/2006 Tr.) at 15; *see also id.* at 14.

D541

"as-is" from any other supplier.[130]

Despite these factual findings, the Bankruptcy Court ruled that, notwithstanding their custom design, the Catalysts are not "unique" because it is *possible* to re-order and re-manufacture them.[131] The Court acknowledged, however, that such a process would be time- and cost-prohibitive, as millions of dollars in liquidated damages would accrue in the interim. Thus, the Bankruptcy Court failed to consider Oregon law's mandate that uniqueness involves a time dimension as well: the ability to cover. The Catalysts are unique not just because of design but because they are only ones available *now*. The agreements involved here—both MPS' HRSG Purchase Agreement with Deltak, and Deltak's subcontracts for the Catalysts—are not merely contracts to *purchase* those goods. Rather, the contracts all require *timely delivery* of custom equipment. Because they are custom built, the Catalysts simply cannot be purchased on the open market in a *timely fashion*. As such, they are sufficiently "unique" to warrant specific performance under Oregon law.

Second, the specific performance sought by MPS is modest, imposes no burden on the debtor, and thus "it does not, in effect do what [Section] 365 [of the Bankruptcy Code] meant to avoid, that is, impose burdensome contracts on the debtor."[132] MPS does not seek to enjoin Deltak to perform any of its core substantive contract obligations. Instead, it requests assignment of the Catalyst subcontracts (equipment MPS needs for which Deltak has no use) in the exercise of the specific remedy provisions in Section 29.2.2 of the HRSG Purchase Agreement.[133] That pro-

---

[130] R.293 (11/6/2006 Tr.) at 15 (Bankruptcy Court findings); *see* R. 264 (11/1/2006 Tr.) at 99 (Thangiah).

[131] R.293 (11/6/2006 Tr.) at 14.

[132] *Sir Speedy*, 256 B.R. at 262 n.3 (quoting *In re Fleishman*, 138 B.R. 641, 648 (Bankr. D. Mass. 1992)).

[133] *See Sir Speedy*, 256 B.R. at 660 (granting specific performance on a rejected contract provision where, as here, "the very purpose of the covenant is to govern the relationship between the parties after the demise of the underlying contract").

27

D542

vision expressly states that, in the event of default, "[i]f requested by the Purchaser, Supplier shall . . . assign to Purchaser such of Supplier's subcontracts and vendor contracts as Purchaser may request."[134]

Money damages are simply not viable here. "One of the cardinal rules for guidance of a court in equity in the exercise of its discretion in granting or denying an application for enforcement is that it must appear that specific performance will result in no injustice."[135] Here, it is insistence on an exclusive future damages remedy that would result in injustice: such a course would *increase* harm (by allowing *prospective* harms, subject to subsequent reimbursement). By contrast, specific performance would *prevent* those harms from happening in the first place, at no cost to any party. Specific performance is without question the most fair and equitable solution to all parties. As the Bankruptcy Court found, neither Deltak, the estate, nor the Catalyst subcontractors have any other ready purchasers for the Catalysts.[136] However, if MPS does not take timely delivery of the Catalysts, which are completed and ready to ship,[137] PGE will face needless delays in construction of its power plant and MPS will face, at a minimum, massive liquidated damages claims.[138] These harms are utterly avoidable, at zero cost to Deltak or the estate, by enforcement of the covenant to assign the subcontracts.

In ruling that "the availability of easily calculated money damages" was "fatal to MPS's request for specific performance,"[139] the Bankruptcy Court overlooked that the availability of money damages is not a barrier to specific performance under Oregon law, as discussed above. The Court also mistakenly focused only on MPS's showing of the *liquidated* damages it would

---

[134] R.159 Ex.4 ¶ 29.2.2 (under seal) (HRSG Purchase Agreement).

[135] *Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889 (8th Cir. 1944).

[136] *See* R.293 (11/6/2006 Tr.) at 14-15.

[137] R.156 Ex A ¶ 14 (Boukal Aff.).

[138] *See* R.159 Ex. B ¶ 20.2.5(b) (under seal) (PGE Contract).

[139] R.293 (11/6/2006 Tr.) at 14.

D543

face, *at a minimum*, in the event of non-delivery. Those liquidated damages are not, however, the limit of MPS's harms. If the delay is long enough, MPS would be liable for *all* damages resulting from a 23-week delay of the entire Port Westward project, including PGE's costs in excess of its contract price, plus "all the additional reasonable internal expenses incurred" by PGE as a result of MPS's default.[140] On a job this large and complex, those damages are unknowable. The Port Windward power plant project is a massive undertaking involving hundreds of pieces of critical equipment and dozens of subcontractors operating on a tightly interwoven schedule. The prospective harms that would result from a minimum 23-week delay in delivery of critical parts of the HRSG are not all knowable, and are by no means limited to a simple tally of 23 weeks' worth of liquidated damages. The liquidated damages represent the likely *minimum* harm to MPS, but MPS' total exposure is not so limited. Given the uncertainties of what would happen on a 23-week-delayed job site, that exposure is ultimately incalculable. Such prospective damages are easily preventable, however, by enforcement of the assignment covenant in the HRSG Purchase Agreement. Accordingly, MPS is entitled to specific performance of that covenant so that it may mitigate its damages and complete the Port Westward Project in orderly fashion.

III.    **Section 365 Is Not Intended to Be a Leverage Tool For Debtors**

As discussed above, performance of the covenant to assign will simply enact, at no burden to Deltak, the parties' contemplated remedial action in the event of breach. It will accomplish the remedial covenant's goal—allowing MPS to proceed with the orderly completion of the Port Windward project—at MPS's own expense and with no cost to Deltak.

Deltak nonetheless opposes specific performance, and refuses to turn over an asset for which it has no use or commercial value. The Bankruptcy Court expressly found, as a factual matter, that there is no secondary market for this custom equipment, that Deltak has no ready

---

[140] R.159 Ex.3 ¶¶ 29.1.12, 29.3 (under seal) (PGE Contract ).

D544

buyer, that there likely will never be any buyers, and that that the Catalysts thus have no value to the estate or to anyone but MPS.[141]  Moreover, Deltak is not even in a position to take delivery of the Catalysts—not only does it lack a buyer for them, it lacks cash to pay for them.[142]  The *only* thing Deltak is able to do with the Catalysts is withhold them from MPS.  It is doing so for one reason: to extract additional, non-bargained-for value from MPS.  Deltak tried to characterize this as "fair market value" in the Bankruptcy Court, but it is not fair market value, because, as the court found, there *is no market* for this custom equipment.[143]  The Catalysts have inherent value only to MPS.  Their only value to Deltak is as a leverage tool to extract concessions (*i.e.*, money) from MPS.  That is not fair market value, but instead ransom.[144]  The Bankruptcy Court and this Court, as courts of equity, should not condone it.

Deltak has been candid about its desire to extract additional value from MPS.  It explained to the district court that notwithstanding its rejection of the HRSG contract, it desired to complete its sale and delivery to MPS, "but on terms [more] favorable to the Debtors, their estates and creditors."[145]  Deltak first proposed a so-called "HRSG Completion Plan," under which it would withhold the Catalysts unless MPS agreed to concessions (waivers of future indemnifica-

---

[141] R.293 (11/6/2006 Tr.) at 14-15 (Bankruptcy Court findings); *see also* R.264 (11/1/2006 Tr.) at 49 (Ehm) (no secondary market for catalyst); *id* at 97 (Thangiah) (same); *id.* at 67 (Ehm) (unaware of any sale of a used catalyst); *id.* at 123 (Boukal) (same)..

[142] *Id.*; R.40 (Interim Cash Collateral Order).

[143] R.293 (11/6/2006 Tr.) at 14 (finding the testimony "*that there is no secondary market for these catalysts*, and that it is *highly unlikely that they could be sold for use in another plant*" was "unrebutted and convincing" (emphasis added)); *id.* at 150 ("[T]he testimony does not indicate that there is or will be a meaningful opportunity to sell these catalysts on the market, and that the catalysts are custom made items.").

[144] Or, in the language of law and economics scholars, "rent-seeking" behavior. *See e.g., Ass'n of Public-Safety Communications Officials-Int'l v. F.C.C.*, 76 F.3d 395, 399 n.5 (D.C. Cir. 1996).

[145] R.212 ¶ 8 (Debtors' Reply to the Corrected Limited Opposition by Mitsubishi Power Systems Americas, Inc. to Debtors' Motion to Reject Certain Executory Contracts).

D545

tion or warranty claims under the contract) potentially worth tens of millions of dollars.[146] When MPS refused, Deltak then proposed releasing the Catalysts, for a payment of $1.85 million—more than 3 times the amount still owing on the contract price. [147] The Bankruptcy Court acknowledged that Deltak's goal was to "maximize [its] leverage in its negotiations with Mitsubishi,"[148] and warned Deltak that it was playing a dangerous game of "chicken," in which it was potentially exposing the estate and its creditors to millions of dollars in liquidated damage claims from MPS and the Catalyst subcontractors.[149]

In other words, Deltak wants to withhold custom-made equipment in the midst of a billion-dollar construction project, thereby threatening to hold up completion of an entire power plant, in the process exposing MPS, itself, and its estate and creditors to massive damages (including *but not limited to* liquidated damages), in the hope that MPS, facing massive losses of its own, will cave in and pay more. Deltak thus seeks to use the Bankruptcy Code itself as a leverage tool, knowing that any future losses to it will be discharged, while MPS's threatened losses exist in real dollars. Section 365 was enacted to protect debtors from the burdens of unfavorable contracts, not to allow rejecting debtors to extort non-debtors by withholding custom assets that are worthless to the debtor.

Common sense and basic equity counsel against condoning this strategic gamesmanship. If debtors may hold construction projects hostage by withholding critically needed custom equipment, it will remove productive rationality from the business judgments that debtors and non-debtors must make in the real-world conduct of their businesses. If defaulting subcontractors

---

[146] Statement of Facts, *supra*, ¶ 20; R.159 Ex. 5 (under seal) (HRSG Completion Program).

[147] Statement of Facts, *supra*, ¶ 22; R.264 (11/1/2006 Tr.) at 121-22 (Boukal).

[148] R.293 (11/6/2006 Tr.) at 151.

[149] R.264 (11/1/2006 Tr.) at 145; R.293 (11/6/2006 Tr.) at 15-16.

31

D546

may hold up construction projects to enforce ransom demands, non-debtors faced with such demands will have to contrast their short-term interests (where reason dictates paying the ransom rather than incurring much greater losses) with their long-term interests (considering whether paying ransom will only encourage similar demands from the debtor on other projects). The process may induce rational actors to make otherwise irrational choices—letting perfectly good custom equipment go to waste, for example, rather than encouraging future demands by capitulating to present ones.

Complex construction projects like the Port Windward installation often involve hundreds of subcontracts, on interlocking schedules, to be performed by vendors or subcontractors who often operate on tight margins near the edge of solvency. It is for this reason that construction contracts routinely include assignment and takeover provisions among their remedies. If Deltak is right that Section 365 rejection prevents enforcement of assignment and takeover provisions, the industry will lose a critical contract tool that has long served to ensure the orderly continuation of projects. Instead, any complex construction project will be subject to holdup any time a subcontractor holding a critical custom asset seeks bankruptcy protection. Section 365 was not intended to hand debtors such a tool for gamesmanship.

Cases addressing this factual scenario are scarce, for the simple reason that, despite thousands of subcontractor bankruptcies in the construction industry, no businessmen in that industry have previously thought it legitimate to engage in this type of tactic. This Court should not allow reluctance or skepticism about the availability of specific performance lead it to be the first court to condone such behavior. Instead, it should apply common sense and basic equity to order performance of the contract's remedial continuity provision.

D547

IV.     **Because Time Is Of The Essence, This Court Should Order The Requested Relief**

The liquidated damages clause of the Port Westward Project Contract demands *delivery* of the Catalysts on or before December 15, 2006. It will take three weeks to ship the Catalysts from their present locations in New York and Alabama.[150] Thus, MPS needs to know by November 22 (the day before Thanksgiving) whether it may require assignment of the Catalyst subcontracts, or whether it must decide whether to order new Catalysts. Accordingly, this Court Because time is of the essence, MPS respectfully requests that this Court issue an order by November 22 directing the Bankruptcy Court to order forthwith that Deltak assign the Catalysts subcontracts immediately.

CONCLUSION

For the foregoing reasons, this Court should reverse the Bankruptcy Court's November 9, 2006 Order (R.291) to the extent that it denied MPS' request for specific performance of the covenant to assign the Catalyst subcontracts. Because of the urgent need for decision in light of the looming December 15 deadline for Mitsubishi to supply a HRSG on the Port Windward project, this Court should direct the Bankruptcy Court, on remand, to enter an order forthwith directing specific performance of the covenant to assign.

---

[150] *See* R.264 (11/1/2006 Tr.) at 125-27.

33

D548

Respectfully submitted,

Marc J. Phillips (No. 4445)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141
mphillips@cblh.com

Filiberto Agusti
Joshua R. Taylor
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, D.C. 20036
(202) 429-3000 (telephone)
(202) 429-3902 (facsimile)
fagusti@steptoe.com
jrtaylor@steptoe.com

*Counsel for Appellant*
*Mitsubishi Power Systems Americas, Inc.*

#499547v1

34

D549

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 13th day of November, 2006, I caused a true and correct copy of the **Brief of Appellant Mitsubishi Power Systems Americas, Inc.** to be served in the manner indicated upon the following counsel:

**BY HAND DELIVERY**

Jeffrey M. Schlerf, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Stuart M. Brown, Esq.
William E. Chipman, Jr., Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

Joseph McMahon, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

Christopher A. Ward, Esquire
Klehr, Harrison, Harvey, Branzburg
 & Ellers LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

**BY TELEFAX AND U.S. MAIL**

Matthew C. Brown, Esq.
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, FL 33131

Howard L. Siegel, Esq.
Brown Rudnick Berlack Israels LLP
City Place I
185 Asylum Street
Hartford, CT 06103

Steven D. Pohl, Esq.
John C. Elstad, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111

Thomas S. Kiriakos, Esq.
Matthew Wargin, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker
Chicago, IL 60606-4637

Edward S. Weisfelner, Esq.
Brown Rudnick Berlack Israels LLP
7 Times Square
New York, NY 10036

Jeffrey S. Sabin, Esq.
David M. Hillman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Marc J. Phillips (No. 4445)

#499551v1

# EXHIBIT R



Home              IR Information            Office             MHIA Affil

# Affiliate Organizations

| Name | Address | Phone | Description |
|------|---------|-------|-------------|
| MLP U.S.A. Inc. | 600 Barcley Blvd. Lincolnshire, IL 60069 | (847)634-9100 | Printing Machinery (Sheed-fed, web, newsp |
| Mitsubishi Injection Molding Machinery | 520 Thomas Drive Bensenville, Illinois 60106 | (630)350-0516 | Injection Molding Machin |
| Mitsubishi Engine North America | 1250 Greenbriar Drive Suite E Addison, IL 60101 | (630)268-0750 | Small Engines & Turboch |
| Mitsubishi Power Systems | 100 Colonial Center Parkway Lake Mary, FL 32746 | (407)688-6100 | Power Systems (Boiler, Turbine, Gas Tur |
|    Los Angeles | 100 Bayview Circle, Suite 4000 Newport Beach, CA 92660 | (949)856-8500 | Power Systems Turbine, De-Nox plant & Wind Tu |
|    Miami | 9100 S. Dadeland Blvd. Suite 1707 Miami, FL 33156 | (305)670-0028 | Developing new gas Tur |
|    Philadelphia | 259 East Lancaster Avenue Wynnewood, PA 19096 | (610)649-1412 | Power Plants |
| VienTek, L.L.C. | Postal Annex #212, Rudolph Plaza 3233, N. Mesa, Suite 205 #308 El Paso, TX 79902 | (915)225-1314 | Joint Venture between M |
| Advatech, L.L.C. | c/o URS Corporation 9400 Amberglen Boulevard Austin, TX 78729 | (512)419-6104 | Flue Gas Desulfurization |
| Diamond LNG, L.L.C. | One Houston Center, Suite 3330 1221 Mckinney Houston, TX 77010 | (713)652-9257 | Steel Structure (LNG Ta Stayed Bridges, etc) |
| Intercontinental Jet Service Corp. | 3332 M. 74th E. Ave Tulsa, OK 74115 | (618)834-8888 | Aircraft Product |
| Mitsubishi Caterpillar Forklift America | 2121 W. Sam Houston Parkway N. Houston, TX 77043 | (713)365-1000 | Forklift Trucks |
| Mitsubishi Climate Control | 1200 North Mitsubishi Parkway Franklin, IL 46131 | (317)346-5000 | Air Conditioning Systems |
|    Los Angeles | 3030 E. Victoria Street Rancho Dominquez, CA 90221 | (310)635-8111 | Air Conditioning Systems |
|    Detroit | 6555 18 Mile Road Sterling Heights, MI 48314-4213 | (586)685-1440 | Air Conditioning Systems |
| Cometech. Inc. | 5000 International Drive Durham, NC 27712 | (919)287-7254 | De-Nox Plant (Catalyst) |

## CERTIFICATE OF SERVICE

I, Kathryn D. Sallie, hereby certify that on the 8th day of December, 2006, I caused a copy of the **Appendix to the Brief of Appellee Deltak, L.L.C.** to be served upon the parties listed below in the manner indicated.

### *VIA* **ELECTRONIC MAIL & HAND DELIVERY**

Joseph McMahon, Esquire
Office of the United States Trustee
844 King North King Street, Suite 2207
Wilmington, DE 19801
joseph.mcmahon@usdoj.gov

Stuart M. Brown, Esquire
William E. Chipman, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801
sbrown@eapdlaw.com
wchipman@eapdlaw.com

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801
landis@lrclaw.com
mumford@lrclaw.com

David B. Stratton, Esquire
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19801
strattond@pepperlaw.com

Marc J. Phillips, Esquire
Jeffrey C. Wisler, Esquire
Connolly, Bove, Lodge & Hutz
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 888-6258
Fax: (302) 658-0380
mphillips@cblh.com
jwisler@cblh.com

Mark Minuti, Esquire
Saul Ewing LLP
222 Delaware Avenue
Suite 1200
Wilmington, DE 19808
mminuti@saul.com

### *VIA* **ELECTRONIC MAIL & FEDERAL EXPRESS**

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Curt Weidler, Esquire
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
jeffrey.sabin@srz.com
david.hillman@srz.com
curt.weidler@srz.com

Howard L. Siegel, Esquire
Brown Rudnick Berlack Israels LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402
hsiegel@brownrudnick.com

Steven D. Pohl, Esquire
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
spohl@brownrudnick.com


Erik D. Lindauer, Esquire
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
lindauere@sullcrom.com

Filiberto Agusti, Esquire
Joshua R. Taylor, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
fagusti@steptoe.com
jrtaylor@steptoe.com

Kathryn D. Sallie (No. 4600)